IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION

|  |  |  |
|---|---|---|
| IN RE: THE MARRIAGE OF | ) | |
| | ) | |
| **KERRY PARIS,** | ) | |
| | ) | |
| Petitioner, | ) | No. 2016 D 009650 |
| v. | ) | |
| | ) | Calendar #74 |
| **FRANK MARTIN PARIS, JR.** | ) | |
| | ) | |
| Respondent. | ) | |

Judge Timothy P. Murphy

DEC 02 2022

Circuit Court - 1892

### MEMORANDUM AND ORDER: JUDGMENT FOR DISSOLUTION OF MARRIAGE

**THIS CAUSE** came on to be heard on the Petition for Dissolution of Marriage filed by the Petitioner, **KERRY PARIS**, (hereafter referred to as KERRY) on May 17, 2016, the Petitioner and the Respondent, **FRANK MARTIN PARIS, JR.** (hereinafter referred to as MARTY) having appeared in their own stead and by various counsel in both the preliminary stage and at trial. That MARTY did cause to be filed his Counter-Petition for Dissolution of Marriage on June 2, 2016.

**DOES FIND:**

**I.  Preliminary proceedings:** That as Humphrey Bogart's fictional Rick Blaine stated in the classic American film, Casablanca, *"we will always have Paris"* ….. so it may have seemed to the litigants, their attorneys and to the Cook County, Illinois judiciary in this case as witnessed by a review of the case' progress and history.

### ASSIGNED JUDGES

That a review of the case history reflects that the following judges have heard substantive matters and/or entered Orders in this cause:

A.  **Judge Nancy Katz**; Calendar #21: That upon filing of the Petition for Dissolution of Marriage on May 17, 2016, the case was assigned to Individual Calendar # 21, Judge Nancy

Katz, for all pre-trial preliminary matters where the parties litigated such matters until Judge

Katz' retirement and Judge Karen Bowes was assigned to Calendar #21 on or about August,

2017.

B. **Judge Karen Bowes, Calendar #21**: Heard numerous matters in the preliminary stage

of the case, including motions for temporary support, sale of the marital residence, multiple

Petitions for Rule, emergency motions, temporary motions related to the parties' seven (7)

children and parenting issues, support, temporary attorneys' fees, discovery issues, and the like,

from August, 2017 until Judge Bowes' recusal on November 19, 2019;

C. **Judge Elizabeth Rivera, Calendar #41**: Heard MARTY's Motion for Substitution of

Judge for Cause which was denied in Judge Rivera's nine (9) page Order dated July 31, 2019;

D. **Judge Abby Romanek**, Calendar ##94: To whom the case was assigned after Judge

Bowes' recusal on November 19, 2019, who also heard multiple preliminary matters related to

discovery, compliance and contempt, etc. until the matter was finally sent out to trial before this

court on February 14, 2022.

E. **Judge Timothy P. Murphy**, Expedited Trial Judge Calendar #74 (this court) to whom

the case was assigned for original trial dates on November 4, 5, 6, 7, 8, 12, 13, 15, 18, 19, 20,

21, and 22, 2019 along with December 2, 3, 4, 5, and 6, 2019 by Judge Bowes' Expedited Trial

Order dated May 28, 2019.

That on July 31, 2019 the parties appeared before this court for a Case Management

Conference on which date this court entered an Order modifying some of the discovery cut-off

dates set in the Expedited Trial Order. Then on September 24, 2019, upon KERRY's *Motion to*

*Continue Trial Date and Allow Discovery to Remain Open for 180 Days* and over MARTY's

objection, Judge Bowes struck all of the aforesaid trial dates.

That this court did enter a series of Orders related to discovery and other case management

issues on October 7, 2019, November 19, 2019, December 11, 2019, January 24, 2020, and on

February 4, 2020. Then on February 21, 2020 this court entered an Order that returned the case

to Judge Romanek, Calendar #94, for all further preliminary and pre-trial proceedings.

That after numerous proceedings before Calendar #94, Judge Romanek entered an Order on

February 1, 2021 setting new trial dates before this court to commence October 4, 2021 through

November 12, 2021. That said trial dates were subsequently stricken by Judge Romanek's

November 19, 2021 Order that set new trial dates before this court, Calendar #74, of February

14, 2022 through March 31, 2022.

That the trial commenced on February 14, 2022 before this court and did proceed as further

described herein.

F.   That during the nearly six (6) years of preliminary proceedings numerous other judges

entered Orders in this matter which were almost uniformally managerial in nature.

Additionally, there was an interlocutory appeal filed by MARTY after his incarceration for

indirect civil contempt which resulted in the written decision in **IN RE MARRIAGE OF**

**PARIS, 2020 IL. App (1st) 181116; 164 N.E.3D 41; 2020 Ill.App. LEXIS 45; 444 Ill.Dec.**

**416 (1st Dist., 2020).**

### THE PARTIES' REPRESENTATION

That both of the parties have had various attorneys representing them in the cause:

That **KERRY**, the Petitioner has been represented by the following attorneys of record:

A.   STEIN & STEIN, Ltd. from the filing of the Petition for Dissolution of Marriage on May

17, 2016 until late 2018;

B.   RHONDA E. de FRIETAS of the Chicago-Kent College of Law, from December 17,

2018 until March 20, 2019;

C.   ANGELINI ORI & ABATE LAW from March 12, 2019 through trial.

That **MARTY**, the Respondent has been represented by the following attorneys of record:

**EXHIBIT A, Page 3 of 101**

A. ROSENFELD HAFRON SHAPIRO FARMER from May 25, 2016 through June 13, 2018;

B. LAKE, TOBACK, DiDOMENICO on their Limited Appearance related to the appeal in this cause arising from MARTY's contempt and incarceration, until their withdrawal on May 28, 2019 (see IN RE MARRIAGE OF PARIS, 2020 IL. App (1st) 181116; 164 N.E.3D 41; 2020 Ill.App. LEXIS 45; 444 Ill.Dec. 416);

C. That on September 20, 2018 MARTY did cause to be filed his PRO SE Appearance;

D. Brian J. Hurst of HURST, ROBIN & KAY, LLC, represented MARTY from February 13, 2020 through January 3, 2022 at which time their Motion to Withdraw was granted by Judge Romanek.

E. That Attorney Lawrence W. Byrne of PEDERSEN & HOUPT did appear via Zoom before this court on February 14, 2022 related to his possible representation of MARTY in the cause but filed no Appearance. That February 14, 2022 was the scheduled first day of trial on which date MARTY presented his *Motion for Extension of Time to Identify Witnesses Pursuant to Illinois Supreme Court Rules 213 and 183*, and his *Motion of Frank Martin Paris, Jr., for a Short Continuance of the Trial Date*. That said Motions were continued to the next day by agreement.

That Mr. Byrne did appear via Zoom on February 15, 2022 along with Attorney Michael F. Bonaguro of LEINENWEBER BARONI & DAFFADA, LLC. and did advise this court that they had discussed financial arrangements with MARTY related to possible representation. That a discussion was held by the court with all counsel related to hearing various Motions filed by both KERRY and MARTY, and the court did set hearing on same for February 17, 2022.

That on February 17, 2022, neither Mr. Byrne nor Mr. Bonaguro appeared on behalf of MARTY, nor did either file an Appearance on his behalf, and the hearing on MARTY's Motions proceeded. That after said hearing this court did issue its written Order of February 18,

4

2022 denying both the request for a continuance of the trial and the request to identify Rule 213

witnesses late (i.e. to extend the disclosure deadline related to witnesses under Rule 213).

That on March 1, 2022, Steven Wittenberg of DUSSIAS, WITTENBERG,

KOENIGSBERGER, LLP, on their Limited Scope Appearance, did appear and present their

*Emergency Motion to Continue* filed on February 25, 2022, seeking "a very brief continuance

for his attorney to adequately prepare the case for trial…"   That the court did deny same, and

DWK did subsequently appear and represented MARTY on their Limited Scope Appearances

on various issues throughout the trial of the cause before this court.

F.   That Louis D. Bernstein of BERNSTEIN LAW FIRM, LLC, did file their Appearance

on behalf of STEIN & STEIN, LTD. on October 16, 2020 along with their *Motion to Enforce*

*Interim Fee Judgment Order Affirmed on Appeal.*

G.   That THOMAS C. CRONIN did file his Appearance on behalf of Sean B. Crotty, "Non-

Party Respondent," on May 25, 2021 along with Crotty's *Objections and Responses to the*

*Subpoena for Deposition* issued by MARTY. That Cronin did also appear with Mr. Crotty at

trial pursuant to a trial subpoena.

H.   That as mentioned above, MARTY represented himself at trial on a variety of issues

before the court, and Steven Wittenberg of DUSSIAS, WITTENBERG,

KOENIGSBERGERER, LLP, represented MARTY on other issues under Limited Scope

Appearances.

**II. Hearing dates:**   That as previously noted the cause was originally set for trial before this

court to commence on November 4, 2019. This court conducted a Case Management Conference on

July 31, 2019 at which time it determined that the matter was not ready for trial. On September 24,

2019, Judge Bowes struck the trial dates. That this court then heard discovery statuses on October 7,

2019, November 19, 2019, December 11, 2019, February 4, 2020 in an effort to monitor its trial

readiness, then returned the matter to Calendar #94 for all preliminary matters. That final trial dates

were set by Judge Romanek's November 19, 2021 Order that set the trial dates of February 14 through March 31, 2022 before this court and additional trial dates were subsequently added by this court.

That the trial was not complete on March 31, 2022 and this court did set additional trial dates. That a review of the case record reflects that the parties appeared before this court in excess of seventy (70) separate dates between February 1, 2022, and November 28, 2022 either for testimony, motions, argument, emergency motions and/or the Court's rulings on said matters.

**III. Date of Marriage:** The parties were married on August 10, 2002, in Cook County, Illinois.

**IV. Children:** That the parties have seven (7) children, namely **FRANK MARTIN PARIS, III,** and **CONNOR PARIS (D.O.B. 2/17/04), MAEVE PARIS (D.O.B. 4/13/05), JOHN PATRICK PARIS (D.O.B. 10/4/06), QUINN PARIS (D.O.B. 11/14/09), GRACE PARIS (D.O.B. 4/24/12)** and **HUGH PARIS (8/28/13)** (hereinafter collectively referred to as "the children"). That no other children were born to the parties, and that the Petitioner is not now pregnant by the Respondent.

That the Children's Representative, HOWARD P. ROSENBERG, was appointed by Order of court on January 27, 2017 by Judge Nancy Katz, and despite the efforts of Mr. Rosenberg, the parties remained at issue regarding an Allocation Judgment addressing decision-making and parenting time at the time of trial.

**V. Grounds:** That the evidence established at trial that there has been an irretrievable breakdown of the marriage, and the Court does find that the grounds of irreconcilable differences is established.

**VI. Witnesses at Trial**

The following individuals testified at said trial:

  i. The Petitioner, **KERRY PARIS;**

  ii. The Respondent, **FRANK MARTIN PARIS, Jr.;**

  iii. **BRIAN POTTER, CFA, CFE, Managing Director of Valuation Advisory Group, Head of Chicago Office of STOUT SERVICES RISIUS ROSS, LLC ("STOUT**

**SERVICES")** which was *"engaged to determine the Fair Market Value of certain equity interests held by Frank M. Paris, Jr. either directly or indirectly through the Frank M. Paris, Jr. Revocable Trust, in various privately held entities, as of December 31, 2020."* That Mr. Potter testified that he was the "lead director" of the team which performed the various functions and findings that resulted in the report entitled, *"Marriage of Paris Valuation of Equity Interests Held by Frank Martin Paris, Jr. or the Frank Martin Paris, Jr. Revocable Trust as of December 31, 2020 Issued: December 31, 2021" (Petitioner's Exhibit #102 admitted into evidence.)*

Potter appeared and testified on February 22, 23, 24 and 25, 2022, and then on April 18 and 20, 2022, and May 10, 2022

iv. **ARTHUR J. MURPHY III, J.D., Certified General Real Estate Appraiser – Illinois,** Executive Vice-President of Urban Real Estate Research, Inc. testified on February 28, March 1, March 3 and March 4, 2022 related to the appraisals performed by Urban as set forth in Paragraph *VII. Reports* below.

v. **JOHN W. VANSANTEN, CRE, MAI, AI-GRS, MBA Real Estate Finance,** Managing Director Real Estate Valuation Practice at STOUT SERVICES's Services, testified on March 8 and March 9, 2022 regarding the appraisals performed by STOUT SERVICES and itemized in Paragraph *VII. Reports* below.

vi.     The video evidence deposition of **FRANK MARTIN PARIS, SR.**, taken on December 11, 2019 in this cause was viewed in open court on March 30 and March 31, 2022, and admitted into evidence. That present during said deposition were Mr. Frank Martin Paris, Sr. and George Stathis, his counsel; Donald Angelini, counsel for the Petitioner; and the Respondent, MARTY, Pro Se. That the particular focus of Mr. Paris' deposition was on loans made by his business, Keystone Stuart, to MARTY personally or to entities in which MARTY has/had an interest.

vii. **DR. PHYLLIS E. AMABILE, M.D., J.D.,** appointed by Judge Nancy Katz on March 1, 2017 as a 750 ILCS 5/604.10 (b) evaluator "related to the issues of a) the parties' capacity to co-parent for purposes of decision-making; b.) a parenting schedule that is in the best interests of the children, and c.) whether any party suffers from any mental health issues that impact his or her ability to parent."

That Dr. Amabile appeared and testified on May 4 and May 5, 2022 regarding her testing, evaluation and written reports entitled "604.10(b) REPORT REGARDING MR. FRANK MARTIN PARIS, JR., MS. KERRY PARIS AND SEVEN MINOR PARIS CHILDREN CASE N0. 16 D 4685" dated June 26, 2017, and the report entitled "604.10(b) UPDATE REPORT REGARDING MR. FRANK MARTIN PARIS, JR., MS. KERRY PARIS AND SEVEN MINOR PARIS CHILDREN CASE N0. 16 D 4685" completed July 7, 2021 and issued September 8, 2021. That both of Dr. Amabile's Reports were entered into evidence as Exhibits #87 and Exhibit #97 and she testified under both cross and direct questioning by Howard Rosenberg, Children's Representative, Donald Angelini for the Petitioner, and by the Respondent, MARTY, Pro Se.

viii. **JAMES WAGNER, Sr. Vice President** of Old Second Bank was called in both KERRY's and MARTY's cases-in-chief, and did testify first on March 30, 2022 and then on June 29, 2022 regarding commercial loans made by Old Second Bank to MARTY or entities in which he may have an interest.

ix. **TERRY ROSENBERGER** of Beverly Bank & Trust appeared and testified on April 11, 2022 per KERRY's Subpoena (*Petitioner's Exhibit #754)* regarding a loan made by MARTY or an entity I which he may have an interest.

x. **ARTHUR PARIS,** brother of the Respondent, MARTY, testified on May 24, 2022 in MARTY'S case-in-chief relative to issues related to the Paris children.

**EXHIBIT A, Page 8 of 101**

xi. **SEAN CROTTY, J.D.** testified as an adverse witness pursuant to a subpoena issued by

MARTY on June 28, 2022 related to his relationship with the Petitioner, KERRY.

xii. **GEORGE L. SPENCER, Certified Public Accountant,** of George L. Spencer &

Associates, Ltd. appeared and testified on June 30, 2022, and again on August 5, 2022,

regarding various federal and state tax returns prepared by his firm for various entities in which

MARTY has an interest.

**VII. Reports:** That there were numerous reports offered and/or entered into evidence at trial

from the various witnesses and parties:

A. Stout, Risius, Ross, LLC, (hereafter referred to as "STOUT SERVICES") report entitled

"Marriage of Paris Valuation of Equity Interests Held by Frank Martin Paris, Jr. or the Frank

Martin Paris, Jr. Revocable Trust as of December 31, 2020 Issued: December 31, 2021"

*(Petitioner's Exhibit #102 admitted into evidence.)*

B. Written real estate appraisals and underlying documents in support of the STOUT

SERVICES business valuation report performed under the supervision and/or signatory of John

W. Vansanten, Lauren M. Trilling, and Adam D. Cline of STOUT SERVICES:

i. **1325 North Wells Street, Chicago**, Illinois, a sixty (60)-unit mid-rise apartment

building, appraised value (i.e. the valuation date) as of December 31, 2020 *(Petitioner's

Exhibit # 303)*;

ii. **1552 North Park Avenue, Chicago,** Illinois, a (sixty-nine) 69)-unit mid-rise

apartment building, appraised value (i.e. the valuation date) as of December 31, 2020

(Petitioner's Exhibit # 304);

iii. **Nine (9) Parking Spaces at 828 West Grace Street,** Chicago, Illinois, in the

parking garage at the condominium complex at 828 West Grace Street, appraised value

(i.e. the valuation date) as of December 31, 2020 *(Petitioner's Exhibit # 305)*;

C.  URBAN REAL ESTATE RESEARCH, INC. written real estate appraisals with underlying documents prepared by Arthur J. Murphy, III, and certified by Hugh T. Edfors MAI, J.D. for the following properties:

    i.    **1464 South Michigan Avenue, #1605**, Chicago, Illinois, a condominium unit and Parking Space P48, appraised value as of August 25, 2021 *(Petitioner's Exhibit #306)*;

    ii.    **1857 West Dickens Avenue**, Chicago, Illinois, a six-unit building appraised value as of September 2, 2021 *(Petitioner's Exhibit #307)*;

    iii.    **1927 North Sedgwick Avenue**, Chicago, Illinois, a six-unit residential apartment building appraised value as of September 2, 2021 *(Petitioner's Exhibit #308)*;

    iv.    **1933 North Sedgwick Avenue**, Chicago, Illinois, a three-unit residential apartment building appraised value as of September 2, 2021 *(Petitioner's Exhibit #309)*;

    v.    **2049 North Sheffield Avenue,** Chicago, Illinois, a four-unit residential apartment building appraised value as of September 2, 2021 *(Petitioner's Exhibit #310)*;

    vi.    **3114 North Southport Avenue**, Chicago, Illinois, a four-unit residential apartment building appraised value as of September 2, 2021 *(Petitioner's Exhibit #311)*;

    vii.    **3216 North Racine Avenue**, Chicago, Illinois, a four-unit residential apartment building appraised value as of September 2, 2021 *(Petitioner's Exhibit #312)*;

    viii.    **703 Park Street, River Forest,** Illinois, a vacant lot adjacent to the Paris' family home, appraised value as of November 2, 2021 *(Petitioner's Exhibit #313)*;

    ix.    **711 Park Street, River Forest,** Illinois, the Paris' single family home appraised value as of November 2, 2021 *(Petitioner's Exhibit #314)*: and

    x.    **828 West Grace Street, Unit #402,** a Chicago, Illinois condominium and parking space P53, appraised value as of August 25, 2021 *(Petitioner's Exhibit #315)*.

D.  Dr. Amabile's two (2) reports entitled ***"604.10(b) Report Regarding Mr. Frank Martin Paris, Jr., Ms. Kerry Paris and Seven Minor Children Case No. 16 D 4685,"*** *(Petitioner's*

*Exhibit #87) issued* on June 26, 2017, and the *"604.10(b) Update Report Regarding Mr. Frank*

*Martin Paris, Jr., Ms. Kerry Paris, and Seven Minor Paris Children Case No. 16 D 4685"*

*(Petitioner's Exhibit #97) issued* on September 8, 2021.

E.   That the court received numerous 1040 Individual or Joint U.S. Federal Tax Returns for

KERRY and MARTY, as well as returns for the business entities in which MARTY has an

interest (more below).

**VII. Exhibits at Trial.** That the court did receive and admit nearly One Thousand (1,000)

exhibits. KERRY's business valuation expert, BRIAN POTTER of STOUT SERVICES, testified that

he reviewed over 40,000 pages, all of which had been produced in discovery.


## SEDGWICK PROPERTIES DEVELOPMENT'S BUSINESS MODEL:

That in order to understand and analyze the marital and non-marital estates, it is necessary to

review and understand the history and development of MARTY's business under the "Sedgwick

Property Development Company" umbrella.

That MARTY did testify both on adverse and on direct testimony regarding the structure and

process by which the businesses in which he has an interest operate. That the court does find that his

Respondent's "SEDGWICK PROPERTIES DEVELOPMENT'S BUSINESS MODEL," at pages 9, 10

and 11 is an accurate and well-articulated demonstrative exhibit which is useful to the court, and that it

is supported by the evidence adduced at trial. At the risk of being somewhat redundant, the court does

summarize that business structure.

A.   **Identify and Evaluate Project**. At this early stage SEDGWICK seeks to identify and

evaluate real estate that offers potential development and investment opportunity.

B.   **Pre-Development**. This stage of development would likely include doing due diligence

related to zoning, permits, environmental work, liens or other claims against the property, estimated

costs, preliminary drawings and the like, and model analysis to determine if the project is deemed

11

viable. MARTY testified that a partial capital investment from MAEVE LLC is frequently necessary at this point and that there may be an executed contract to purchase the property at this point signed by SEDGWICK INVESTMENTS LLC.

C. **Create new LLC for Project**. This stage generally occurs somewhat contemporaneously with efforts to secure the financing for the new development, and the new LLC is created to "hold" the new investment entity.

D. **Finance and Funding**. If the project is deemed viable, SEDGWICK seeks funding from "an appropriate combination of an (sic) Institutional Capital investment and debt financing arrangement to fund the new project." An institutional lender may require that a certain number of units be "pre-sale," i.e. under contract before final closing if the project is a condominium development, along with detailed final plans, and an executed Guaranteed Maximum Price contract executed with the general contractor.

Additional conditions on the financing often include certain covenants and/or guarantees which are distinct from any collateral that may be pledged to secure the loan(s). Some examples of these include:

i. MARTY's personal guarantee of the loan on 2049 North Sheffield (See *Respondent's Ex. #271.f.i.*);

ii. MARTY's "Commercial Guaranty" related to 3114 North Southport in the amount of $855,317.00 dated May 10, 2018, which is effectively a personal guarantee;

iii. Liquidity covenants and personal guarantees related to loans with Old Second Bank on the 1454 South Michigan property which require $1,000,000.00 in liquidity and $15,000,000.00 of net worth, and

iv. The new Reserve Accounts of $2 Million and $3 Million respectively for the refinanced Mortgage and Note on the ERIE LASALLE VENTURES, LLC, project now secured by 1454 South Michigan.

12

E. **Development and Construction**. That as shown on page 9 of the Business Model Exhibit, various Sedgwick entities are involved in not only the predevelopment stage in assessing the potential project, but highly involved in the construction and development stage. SEDGWICK DEVELOPMENT LLC acts as the Contract Representative on the purchase and closing; ALPHA CONSTRUCTION typically acts as the General Contractor in the construction of the building(s); SEDGWICK PROPERTY DEVELOPMENT COMPANY (SPDC) acts as the development manager or owner's representative; ALPHA CARPENTRY and ALPHA DRYWALL are construction sub-contractors that perform work and are paid during the project workflow; SEDGWICK DESIGN may act as the architect on the project; SEDGWICK PAYROLL handles payment for all of the relevant entities on the project; and ALPHA PROPERTIES SERVICES provides property management. Each of these entities have operating expenses, are paid separately and have their own payroll. MARTY's salary is paid from ALPHA CONSTRUCTION.

F. **Leasing/Tenant or Disposition/Sale**. If the development is for rental apartments, the process of leasing begins and management of the building is secured.

If the development is a condominium project the completion of construction begins the turnover phase including the creation of the condominium association which may be under the purview of ALPHA PROPERTIES SERVICES until the requisite number of units are sold when it is turned over to the unit owners. Any retail units sold in the development are carved out from the Homeowners' Association and are encumbered by a reciprocal agreement with the Association.

G. **Payoff.** Once funds begin to be derived from sales of units in the building, any proceeds or percentage thereof goes first to pay the construction loan until that loan is paid in full. Ergo, from each condominium sold the construction lender receives funds based on that unit's percentage of ownership until the construction loan is paid in full. Neither the institutional lenders nor MAEVE LLC receive any proceeds until the construction loan is paid in full.

After the construction loan is paid in full, the "waterfall provision" of the investor agreement dictates the percentage paid to the institutional investor(s) and to MAEVE LLC. The waterfall provision is typically top loaded in favor of the investors until they are paid in full, i.e. the investor receives a greater percentage pro rata from each sale than does MAEVE LLC. If the agreement with an institutional investor or lender is also a "preferred equity" loan, the investor/lender receives 100% of the unit sales' proceeds until their investment/loan is paid in full.

MARTY testified that funds received by MAEVE LLC, are put into the cash account, are then utilized to fund the next project, and that most projects take three to five years to complete from inception to final payout.

## MARITAL OR NON-MARITAL INTERESTS IN BUSINESSES

That before a trial court may dispose of property upon dissolution of marriage, the property must be identified as either marital or nonmarital. **IN RE SCHMITT, 909 N.E.2d 221, 228; 391 Ill.App.3d 1010, 2009 Ill.App. LEXIS 237 (2nd Dist., 2009)**. The trial court's classification will not be disturbed on appeal unless it is against the manifest weight of the evidence. **IN RE HEROY, 385 Ill.App.3d 640, 663; 895 N.E.2d 1025;2008 Ill.App. LEXIS (1st Dist., 2008)**. There is a rebuttable presumption that all property acquired by either spouse after the date of the marriage but before the entry of judgment of dissolution is marital property, regardless of how title is held. 750 ILCS 5.503(b) (WEST 2006). A party can overcome this presumption only by a showing of clear and convincing evidence that the property falls within one of the exceptions listed in section 503(a) of the Illinois Marriage and Dissolution of Marriage Act. **IN RE DIDIER, 318 Ill.App.3d 253, 258; 742 N.E.2d 808 (2000)**. The party claiming that the property is nonmarital has the burden of proof, and any doubts as to the nature of the property are resolved in favor of finding that the property is marital. 750 ILCS 5./503(a). **DIDIER at 258.**

That **750 ILCS 5/503** does provide in relevant part:

14

(a) For purposes of this Act, "marital property" means all property, including debts and other obligations, acquired by either spouse subsequent to the marriage, except the following, which is known as "non-marital property":

(1) property acquired by gift, legacy or descent or property acquired in exchange for such property;

(2) property acquired in exchange for property acquired before the marriage;

(3) property acquired by a spouse after a judgment of legal separation;

(4) property excluded by valid agreement of the parties, including a premarital agreement or a postnuptial agreement;

(5) any judgment or property obtained by judgment awarded to a spouse from the other spouse except, however, when a spouse is required to sue the other spouse in order to obtain insurance coverage or otherwise recover from a third party and the recovery is directly related to amounts advanced by the marital estate, the judgment shall be considered marital property;

(6) property acquired before the marriage, except as it relates to retirement plans that may have both marital and non-marital characteristics;

(6.5) all property acquired by a spouse by the sole use of non-marital property as collateral for a loan that then is used to acquire property during the marriage; to the extent that the marital estate repays any portion of the loan, it shall be considered a contribution from the marital estate to the non-marital estate subject to reimbursement;

(7) the increase in value of non-marital property, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section; and

(8) income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse.

15

@PJBATTR="Render Name=HP Univers  Page 16 of 470  6"
@PJL SET JOBATTR="Render Versi

*Property acquired prior to a marriage that would otherwise be non-marital property shall*

*not be deemed to be marital property solely because the property was acquired in*

*contemplation of marriage.*

*The court shall make specific factual findings as to its classification of assets as marital or*

*non-marital property, values, and other factual findings supporting its property award.*

*(b) (1) For purposes of distribution of property, all property acquired by either spouse after the*

*marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage is*

*presumed marital property. This presumption includes non-marital property transferred into some form*

*of co-ownership between the spouses, regardless of whether title is held individually or by the spouses*

*in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, or*

*community property. The presumption of marital property is overcome by showing through clear and*

*convincing evidence that the property was acquired by a method listed in subsection (a) of this Section*

*or was done for estate or tax planning purposes or for other reasons that establish that a transfer*

*between spouses was not intended to be a gift.*

That of particular consequence in the instant matter are the provisions of Sections (a)(6),

(a)(6.5) and Section (a)(7) of the IMDMA related to the acquisition of property and assets by MARTY

in conjunction with his business(es) herein. That as discussed above under "SEDGWICK

PROPERTIES DEVELOPMENT'S BUSINESS MODEL," MARTY essentially argues that each of his

interests in the various projects after the date of marriage, and the entities held in MAEVE LLC, were a

result of the initial funding of the project from nonmarital funds and that the use of nonmarital property

as collateral for the construction and development loan(s) associated therewith, and payment of the

loan(s) and costs related to the new entity from nonmarital funds render the resulting interests

nonmarital.

That MARTY does bear the burden to show by clear and convincing evidence that the newly

acquired property has been acquired in exchange for nonmarital property in order to classify it as

16

**EXHIBIT A, Page 16 of 101**

nonmarital property. **IN RE EDDY, 210 Ill.App.3d 450, 456; 1991 Ill.App. LEXIS 337 (1st Dist., 1991), citing IN RE ROGERS, 85 Ill.2d 217.** Any doubts must be resolved in favor of finding that the property is marital. Once marital and nonmarital property are commingled and lose their identity through the acquisition of a newly created asset during the marriage, the asset is marital. EDDY at 457.

That the court has reviewed Illinois caselaw related to the issue of whether a pre-marital business has retained its non-marital characteristics and classification, whether it has been transmuted into marital property, whether there is a right of contribution to the marital estate, and other related issues, said cases including but not limited to:

- **IN RE MARRIAGE OF DANN,** 973 N.E. 2d 498; 2012 IL App (2d) 100343; 2012 Ill.App. LEXIS 608 (2nd Dist., 2012);

- **IN RE MARRIAGE OF HEROY,** 895 N.E.2d 1025; 385 Ill.App.3d 640; 2008 Ill.App. LEXIS 913 (1ST Dist., 2008);

- **IN RE MARRIAGE OF SCHMITT,** 909 N.E.2d 221; 391 Ill.App.3d 1010; 2009 Il.App. LEXIS 237 (2nd Dist., 2009):

- **IN RE MARRIAGE OF EDDY,** 210 Ill.App.3d 450, 456; 1991 Ill.App. LEXIS 337 (1ST Dist., 1991);

- **IN RE MARRIAGE OF PERLMUTTER,** 587 N.E.2d 609; 225 Ill.App.3d 362; 1992 Ill.App. LEXIS 189 (2nd Dist., 1992);

- **IN RE WERRIES**; 616 N.E.2d 1379; 247 Ill.App.3d 639; 1992 Ill.App. LEXIS (4th Dist., 1993):

\* **IN RE MARRIAGE OF JELINEK,** 613 N.E.2d 1284; 244 Ill.App.3d 496; 1993 Ill.App. LEXIS 510 (1st Dist., 1993): and

\* **IN RE SCHNEIDER,** 214 Ill.2d 152; 824 N.E.2d 177; 2005 Ill. LEXIS 7 (Ill.S.Ct., 2005).

17

That after a review and analysis of the facts and evidence in the instant matter, the court does conclude that the relevant facts in EDDY are most similar to those present here:

    a.  The Husband and his brother formed Eddy Foods prior to Husband's marriage and at that time owned three (3) McDonald's restaurants together. The purchase money for those pre-marital McDonald's restaurants came from mortgages and loans to the brothers secured by the property.

    b.  That Mr. and Ms. Eddy married on June 28, 1958.

    c.  That the marriage was dissolved on October 5, 1988; that Wife was 52 years old and Husband was 53.

    d.  That Husband had been employed by Eddy Foods from 1972 throughout the marriage and received an annual salary of $250,000.

    e.  That at the time of dissolution, Husband and his brother owned twenty-five (25) McDonald's restaurants, equally.

    f.  The trial court found that although Husband had business interests that were acquired after the marriage, no family income or marital money was used to acquire those interests or used for business loans, and no marital property was pledged as security for any of the loans related to the business(es). The court found that since the McDonald's business itself repaid the loans, the presumption of marital property was rebutted by clear and convincing evidence, that the assets were acquired by exchanging non-marital property for them, and that no reimbursement to the marital estate was required. **EDDY, at 454, citing IN RE ROGERS 85 Ill.2d 217, and IN RE BROOKS, 138 Ill.App.3d 252.**

## TIMELINE OF MARTY'S BUSINESSES AND BUSINESS INTERESTS

That at the time of trial MARTY was age fifty-three (53), and had graduated from Drake University in 1991 with a degree in economics. MARTY commenced employment with Amalgamated Bank in Chicago, Illinois from late 1991 until sometime in 1997 or 1998, as a credit analyst and lastly in risk management. That during his period of employment at Amalgamated, MARTY first began his

career in real estate development unrelated to his employment until he left Amalgamated to pursue the

real estate development career full-time.

2.    That on **July 15, 1994**, MARTY and his partner, Craig M. Chesney, purchased their first

real estate parcel for development at **1933 NORTH SEDWICK, CHICAGO, ILLINOIS**, taking an

Executor's Deed (*Petitioner's Exhibit #338 and Respondent's Ex. #1F1*) upon purchase. That 1933 N.

SEDGWICK LLC, was then incorporated on June 14, 2001, (*Petitioner's Exhibit #336*) with its

Operating Agreement being executed and effective the same date. The Operating Agreement reflects

that MARTY and CHESNEY each own fifty percent (50%) interest in same (*Petitioner's Exhibit #337*).

Ultimately, MARTY's interest in 1933 SEDGWICK LLC was assigned to MAEVE LLC, Series M (see

*Petitioner's Exhibit #335*) on December 29, 2009 (more later on the MAEVE LLC interests).

That MARTY testified that the acquisition and development of 1933 NORTH SEDGWICK was

funded by his and Chesney's equity investment and a construction loan. MARTY testified that he

moved into the property himself, and that he continued working at Amalgamated Bank during the 1933

NORTH SEDGWICK development and rehabilitation.

That the court does find that MARTY's fifty percent (50%) interest in 1933 NORTH

SEDWICK, LLC, is his non-marital property which he acquired prior to the marriage and has been

maintained separately without any transmutation from its non-marital form. That the court does further

find that there has been no action related to the non-marital interest during the marriage that would give

rise to a claim of reimbursement or transmutation by the marital estate. This is MARTY's non-marital

property.

3.    That on **November 23, 1996**, MARTY and partner, GINO FIORAVANTI, acquired the real

estate located at **3216 NORTH RACINE, CHICAGO, ILLINOIS** by a Trustee's Deed (*see

Petitioner's Exhibit #343* and *Respondent's Ex. #2F1*). That 3216 NORTH RACINE, LLC, was then

incorporated on April 16, 2001, (*Petitioner's Exhibit #341*) with its Operating Agreement being

executed and effective the same date. The Operating Agreement reflects that MARTY and CHESNEY

19

each own fifty percent (50%) interest in same as Members (*Petitioner's Exhibit #342*) and that both are

co-Managers of same. Ultimately, MARTY's fifty percent (50%) interest in 3216 NORTH RACINE

LLC was assigned to MAEVE LLC, - Series J (see *Petitioner's Exhibit #340*) on December 29, 2009.

That the court does find that MARTY's fifty percent (50%) interest in 3216 NORTH RACINE,

CHICAGO, ILLINOIS, and all of his interest in 3216 NORTH RACINE, LLC, is his non-marital

property which he acquired prior to the marriage and has been maintained separately without any

transmutation from its non-marital form. That the court does further find that there has been no action

related to the interest during the marriage that would give rise to a claim of reimbursement by the

marital estate. This is MARTY's non-marital asset.

4.    That upon adverse examination MARTY testified that there were other projects developed

and incorporated while he was still employed at Amalgamated Bank, including 1933 NORTH

SEDWICK, 1927 NORTH SEDWICK, and 3216 NORTH RACINE in all of which he still has an

interest. That MARTY stated that he didn't recall each additional project(s) purchased during this time

period without records but that there were other parcels of real estate that were purchased before the

parties' marriage including real estate parcels located at 1925 North Sedgwick, Chicago, Illinois, 1929

North Sedgwick, Chicago, 2517 North Ashland, Chicago, 1636 West Melrose, Chicago (an old hotel),

and 1100 West Lill Street, Chicago, Illinois. MARTY stated that these projects were completed and all

sold between 2004 and 2007 in "the wrap up phase" which grossed Five million dollars ($5,000,000.00)

and netted Three Million dollars ($3,000,000.00). (See *Petitioner's Exhibit #372, page 4.*)

That MARTY testified that SEDGWICK PROPERTIES DEVELOPMENT CORPORATION

did not do any new construction (i.e. "ground up") projects prior to January, 1999, and that he believed

that the "Colorado project" and the development at 437 West North Avenue, Chicago, Illinois were the

first ground up projects that began in 1999 and wrapped up during the 2004-2007 period.

MARTY further testified that of the $3,000.000.00 net realized from the "wrap-up" of these

claimed pre-marital properties he gave KERRY One Million dollar ($1,000.000.00) to use for the rehab

**EXHIBIT A, Page 20 of 101**

and improvement to the family home located at 703 Park Avenue, River Forest, Illinois, which had been purchased in 2003. MARTY testified that the remaining Two Million dollars ($2,000,000.00) was used to fund MAEVE LLC, which was incorporated in 2009 (See more on MAEVE LLC, below). MARTY argues that these funds (i.e. the remaining $2 Million) were non-marital having derived from the aforesaid pre-marital projects, and that MAEVE, LLC, was not transmuted by the non-marital deposits despite having occurred after the date of the marriage.

FINDING: The court concurs with this analysis and does find that the $2 Million contribution of non-marital funds to MAEVE LLC resulted in a new non-marital entity. There was no transmutation of those funds or the entity.

5.   That on **February 1, 1999**, Articles of Incorporation for the entity entitled **SEDGWICK PROPERTIES DEVELOPMENT CORPORATION** were filed the Illinois Secretary of State on the said date as reflected in *Petitioner's Exhibit #356*. That the document reflects that MARTY signed the Articles as the incorporator on January 21, 1999, and that it was proposed that 1,000 shares of the 10,000 authorized shares be issued.

That the document dated January 1, 2010 entitled, "Assignment Separate From Certificate" (*Petitioner's Exhibit # 367*) states that MARTY does assign and transfer One Thousand (1,000) shares of Common Stock of SEDGWICK PROPERTIES DEVELOPMENT CORPORATION in his name to SEDGWICK PROPERTIES HOLDING CORP. a Nevada corporation, from which this court does conclude his interest in SPDC (more later regarding the merger of SEDGWICK PROPERTIES HOLDING CORP.) Additionally, *Petitioner's Exhibit #366* is a Stock Certificate issued by SPDC for 1000 shares to SEDGWICK PROPERTIES HOLDING CORP. a Nevada corporation, signed by MARTY as Secretary and President of SPDC.

FINDING: That the court does find that SEDGWICK PROPERTIES DEVELOPMENT CORPORATION (SPDC) was a holding entity which was created prior to the parties' marriage, has maintained its non-marital characterization throughout the marriage even with its transfer to

21

SEDGWICK PROPERTIES HOLDING CORPORATION of Nevada. That the interest is MARTY's

non-marital property along with the associated Private Bank (now CIBC) account #7572.

6. That on **May 13, 1999**, the entity entitled **PC PROPERTY HOLDINGS, L.L.C**. was

created by the execution of its Operating Agreement (See *Petitioner's Exhibit #352*) and incorporation

by the Illinois Secretary of State on the same date as reflected in *Petitioner's Exhibit #351*.

That as provided in Article 2.3 of the Operating Agreement, its purpose is stated as:

"**2.3 Purpose.** *The Company has been organized (i) to acquire, own and improve real*

*property located within the State of Illinois, and to use, develop, operate, manage, lease, sell,*

*exchange, convey and otherwise dispose of said real property and improvements or any interest*

*therein; and (ii) transact any and all lawful business for which limited liability companies are*

*organized under the Illinois Limited Liability Company Act, as amended from time to time.*"

That as reflected in said Agreement dated May 13, 1999, the Members of PC PROPERTY

HOLDINGS, L.L.C. are MARTY and Craig M. Chesney in equal percentage ownership (i.e. Fifty

percent (50%)) and that MARTY is the sole Manager. That on August 17, 2001, the FIRST

AMENDED AND RESTATED OPERATING AGREEMENT OF PC PROPERTY HOLDINGS, LLC

was executed by its Members, MARTY and CHESNEY naming both MARTY and CHESNEY as

Managers thereof (see *Petitioner's Exhibit #353*).

That on December 29, 2009, MARTY's fifty percent (50%) interest in PC PROPERTY

HOLDINGS, LLC was transferred into MAEVE LLC – Series L (see *Petitioner's Exhibit #350* and

more on MAEVE LLC L.L.C. below).

FINDING: That the court does find that PC PROPERTY HOLDINGS, L.L.C. was a holding

entity which was created prior to the parties' marriage and has maintained its non-marital

characterization throughout the marriage. That the interest is MARTY's non-marital property along

with any associated bank account, The Private Bank (now CIBC) account #8641 and The Private Bank

(now CIBC) money market account #4880.

7.   That on **July 26, 1999**, MARTY and his partner, Craig M. Chesney, purchased the real

estate parcel at **1927 NORTH SEDGWICK, CHICAGO, ILLINOIS,** by a Trustee's Deed (See

*Petitioner's Exhibit #354 and Respondent's Ex. #4F1*) conveyed to PC PROPERTY HOLDINGS,

L.L.C.   That as noted above in Paragraph 3. on December 29, 2009, MARTY's fifty percent (50%)

interest in PC PROPERTY HOLDINGS, LLC was transferred into MAEVE LLC – Series L (see

*Petitioner's Exhibit #350*) and that Chesney is a fifty percent (50%) owner of PC PROPERTY

HOLDINGS, LLC.

FINDING: That the court does find that MARTY's fifty percent (50%) interest 1927 North

Sedgwick, CHICAGO, ILLINOIS, all of his interest in PC PROPERTY HOLDINGS, LLC, and all of

the interest in MAEVE LLC – Series L is his non-marital property which he acquired prior to the

marriage and has been maintained separately without any transmutation from its non-marital form. That

the court does further find that there has been no action related to the interest during the marriage that

would give rise to a claim of reimbursement by the marital estate. Additionally, the court does find that

any interest in the related "PC HOLDINGS LLC" bank accounts #8641, #4880, and #7529 at The

Private bank (now CIBC) are MARTY'S non-marital property not subject to any claim of transmutation

or of reimbursement to the marriage.

8.   That on **September 09, 2000**, MARTY alone acquired real estate located at **2049 NORTH

SHEFFIELD, CHICAGO, ILLINOIS,** by way of a Warranty Deed of that date (*Petitioner's Exhibit

#348 and Respondent's Ex. #3F1*). That 2049 NORTH SHEFFIELD, LLC, was then incorporated on

April 6, 2001, (*Petitioner's Exhibit #346*) with its Operating Agreement being executed and effective

the same date. The Operating Agreement reflects that MARTY is the sole Member owning One

Hundred percent (100%) interest in same (*Petitioner's Exhibit #347 and Respondent's Ex. #3F3),* and

that MARTY is the sole Manager. Ultimately, Ninety-nine percent (99%) of MARTY's interest in 2049

NORTH SHEFFIELD LLC was assigned to MAEVE LLC-Series K (see *Petitioner's Exhibit #345*) on

December 29, 2009, and One percent (1%) was assigned to the Frank Martin Paris, Jr. Revocable Trust.

**EXHIBIT A, Page 23 of 101**

That account #0360 at First Midwest Bank is the associated bank account in the name of 2049 N SHEFFIELD LLC, (See Respondent's Ex. #3F6) along with account #7095 entitled 2049 N SHEFFIELD LLC SECURITY DEPOSIT ACCOUNT (See *Respondent's Ex. #3F8)*.

FINDING: That the court does find that MARTY's interest 2049 NORTH SHEFFIELD, CHICAGO, ILLINOIS, all of his interest in 2049 NORTH SHEFFIELD, LLC, and all of the interest in MAEVE LLC – Series K is his non-marital property which he acquired prior to the marriage and has been maintained separately without any transmutation from its non-marital form. That the court does further find that there has been no action related to the interest during the marriage that would give rise to a claim of reimbursement by the marital estate. Additionally, the court does find that any interest in the related bank accounts #0630 and #7095 at First Midwest Bank are MARTY'S non-marital property not subject to any claim of transmutation or of reimbursement to the marriage.

**DATE OF MARRIAGE, AUGUST 10, 2002:** That KERRY and MARTY were married on August 10, 2002. MARTY's business interests continue as described hereafter.

9.   That MARTY was a Member of **3737 NORTH BROADWAY L.L.C.** (see *Respondent's Exhibit #9.F.9.* and *Respondent's Exhibit #9.f.xii. Illinois Secretary of State Filing Report dated 8/23/04)* said L.LC having been established in March, 2004. That the Manager of 3737 NORTH BROADWAY LLC, was MK MANAGER CORP. and the sole Class A Member was MARTY, who executed the Limited Liability Company Agreement.

That on **August 31, 2004**, 3737 NORTH BROADWAY LLC. purchased the real estate located at from Chicago Title Land Trust #62735. Said real estate had been a parking lot.

That on the same day, the 3737 NORTH BROADWAY LLC, sold the property to a third party, Bernard Zell Anshe Emet Day School, Inc., for a considerable gain (See *Respondent's Exhibit #9.F3,*

24

*Closing Statement dated August 31, 2004 for the sale*) of which proceeds MARTY testified he received

the sum of $145,913.00.

That MARTY testified that he used his portion of the gain on the sale of 3731-39 and 3741-47

NORTH BROADWAY AVENUE, CHICAGO, ILLINOIS as part of his investment in 828 West Grace

Street (See below, and *Respondent's Answer to Interrogatory No. 22. #9.c.*)

That both the 3737 North Broadway LLC, and 828 W. Grace LLC, had the same investors;

MARTY was a Class A Member in both.

FINDING: That the court does find that 3737 NORTH BROADWAY LLC, and the purchase of

the real estate at 3731-39 and 3741-47 NORTH BROADWAY AVENUE, CHICAGO, ILLINOIS was

funded from non-marital funds, and that MARTY's interest(s) in same is his non-marital property.

10. That the real estate located at **828 WEST GRACE STREET, CHICAGO, ILLINOIS** was

purchased and closed on **August 31, 2004** (See *Respondent's Exhibit # 9.F6 and 9F7, Closing

Statement*). That the 828 W. GRACE LLC was established on 3/31/04 as was the Operating Agreement

(*Petitioner's Group Exhibit #155* and *Respondent's Exhibit #9.F8.*). That the Operating Agreement

reflects that MARTY is a Class A member, and the MAEVE LLC –Series C & D documents reflect that

MARTY's interest in **828 W. GRACE LLC,** is held within. That the Seller of 828 West Grace Street,

Chicago, Illinois was the same Land Trust as that involved in the sale of the 3731-39 and 3741-47

North Broadway Avenue, Chicago, Illinois properties. The purchase price was $5.25 million.

That MARTY testified that his funds for his share of the investment in 828 W. GRACE L.L.C.

came from the following alleged non-marital sources:

a. The $145,913.00 proceeds MARTY received from the sale of the 3731-39 and 3741-47

NORTH BROADWAY AVENUE, CHICAGO, ILLINOIS properties (see above);

b. A cashier's check drawn on the Private Bank on February 26, 2004, check no. 83339 in

the amount of $50,000.00 (See *Respondent's Exhibit #9F1*); and

c. "$225,000.00 in deferred architectural fees which were intended to be paid to Sedgwick

Development Corporation by the 828 W Grace Project but were used for a portion of Marty's

investment." (See *Respondent's Answer to Interrogatory No. 22. #9.c.*)

d. That the Closing Statement *(Respondent's Ex. #9F6)* and the Escrow Trust

Disbursement Statement *(Respondent's Ex. #9F7)* reflect:

    i.   "1/2 of Earnest Money from Escrow #xxxx" $250,000.00; and

    ii.   "Receipts: 08/31/04 828 W. GRACE LLC    $240,619.00
         .. PURCHASE DEPOSIT

        08/31/04 828 W. GRACE LLC    $250,000.00
         ..AS DIRECTED –EARNEST MONEY

FINDINGS: That while not exactly the same amount, the sums to which MARTY testified and

the figures reflected on the Exhibits 9F6 and 9F7 are approximately the same, and the court does find

MARTY's testimony related to the Earnest Money to be credible.

That the court does find that MARTY's interest in 828 West Grace, CHICAGO, ILLINOIS, all

of his interest in 828W GRACE, LLC,, and all of the interest in MAEVE LLC – Series C and D are his

non-marital property which he acquired from funds acquired prior to the marriage and has been

maintained separately without any transmutation from its non-marital form. That the court does further

find that there has been no action related to the interest during the marriage that would give rise to a

claim of reimbursement by the marital estate. Additionally, the court does find that any interest in the

related bank accounts are MARTY'S non-marital property not subject to any claim of transmutation or

of reimbursement to the marriage.

11. **UNITS 402 AND P37, 828 WEST GRACE STREET, CHICAGO:** That on January 28,

2007, 828 W. GRACE, LLC, issued its Special Warranty Deed for Unit 402 (the condominium unit),

for garage space P37, and for storage space #53 to Frank Martin Paris, Jr., Kerry Paris and Bridget K.

Reidy (KERRY's sister hereafter referred to as "Bridget") as Grantees as joint tenants. (See *Petitioner's*

*Ex. # 696 and 612,* and *Petitioner's Ex. #153).* That a Mortgage in the amount of $158,150.00 was executed on that same date by Bridget, MARTY and KERRY (signed for by MARTY under her Power of Attorney dated the same date (see *Petitioner's Ex. #607 and #611).*

That on December 28, 2009, (See *Petitioner's Ex. #698)* a Trust Agreement was signed by MARTY as President of MAEVE LLC –Series Q, and Frank Martin Paris, Sr. as Trustee of the 828 W. Grace Garage Unit P-37 Land Trust, related to Units P-37 and storage space 53. The named beneficiary of the Trust is MAEVE, LLC –Series Q.

That the appraisal of the property done by Arthur Murphy of Urban Real Estate Research, Inc. set the value at $370,000.00 (see *Petitioner's Exhibit #315).*

That the court does find that the PARIS' interest in said real estate is a marital asset.

12. **1454 SOUTH MICHIGAN AVENUE, 1458-64 SOUTH MICHIGAN AVENUE, and 1466-68 SOUTH MICHIGAN AVENUE, CHICAGO, ILLINOIS** collectively the real estate owned by **1454 S. MICHIGAN, LLC:**

That the Sedgwick development at 1454 South Michigan Avenue, Chicago, Illinois is a thirty-two (32) unit building with seventy (70) parking spots and two (2) retail spaces.

That 1454 S. MICHIGAN LLC, was created on March 1, 2005 by the execution of the Limited Liability Company Agreement of 1454 S. Michigan LLC, (See *Respondent's Ex. #8F4)* and later transferred into MAEVE LLC –Series G. That MARTY is the only Class A Member and there were originally twelve (12) Class B members (See *Exhibit A to LLC Agreement),* all of whom were paid off with the refinance of the Keystone & Stuart loan (See *Petitioner's Exhibit #174),* Amended Promissory Note for $3,775,430.66) by Old Second Bank.

That an "Earnest Money Escrow Agreement" executed on October 25, 2004 reflecting Sedgwick Properties Development Corporation as the Purchaser; 1460 South Michigan Associates,, L.P. as Seller; and Greater Illinois Title, Inc. as the Escrow Holder. That Paragraph 2.B. of the agreement reflects total Earnest Money of $150,000.00 due in two instalments. (See *Respondent's*

*Exhibit #8F2.*) That the purchase and closing for same occurred on **June 21, 2005** as evidenced by the

Closing Statement executed on that date by and between MARTY as Manager for MK MANAGER

CORP. and by the third party Sellers (See *Respondent's Exhibit #8F3*). That the Closing Statement

reflects Earnest Money of $150,000.00. That *Respondent's Exhibit #8F1* (Sedgwick Properties

Development Corporation register from 10/25/2004 thru 1/24/2005) reflects payments to Greater

Illinois Title of $50,000.00 and $100,000.00 on October 25, 2004 and January 24, 2005.

That on July 26, 2012, a Mortgage and Security Agreement was executed on behalf of 1454 S.

MICHIGAN, LLC, by MARTY as President of MK Manager Corp., its Manager, in the amount of Six

Million dollars ($6,000,000.00) (See *Petitioner's Ex.# 684*) with KEYSTONE & STUART, LLC.. That

the real estate itself was pledged as security for the Mortgage.

That on July 26, 2017, the following documents related to 1454 S. MICHIGAN, LLC, and the

real estate of the same address were executed:

a.   Mortgage and Security Agreement in the amount of Three Million, Seven Hundred,

seventy-five Thousand, Four Hundred thirty dollars and 68/100's ($3,775,430.68) from Keystone-

Stuart, LLC, to 1454 S. MICHIGAN, LLC, and whereby MAEVE, LLC, - Series A and MAEVE,

LLC, - Series DD interests were pledged as security for the Amended and Restated Promissory

Note, along with the real estate itself (See *Petitioner's Ex. #685*);

b.   Amended and Restated Promissory Note in the amount of Three Million, Seven Hundred,

seventy-five Thousand, Four Hundred thirty dollars and 68/100's ($3,775,430.68) (See

*Petitioner's Ex. #686*);

c.   Subordinate Membership Interest Pledge Agreement made by MAEVE, LLC, - Series DD

in favor of Keystone & Stuart, LLC, having previously pledged "its membership to Jeffries" and

providing a subordinate pledge of One hundred percent (100%) of its interest in MAEVE, LLC, -

Series DD (See *Petitioner's Ex. #687*); and

**EXHIBIT A, Page 28 of 101**

d.  Subordinate Membership Interest Pledge Agreement made by MAEVE, LLC, - Series A in

favor of Keystone & Stuart, LLC, and providing a subordinate pledge of One hundred percent

(100%) of its interest in MAEVE, LLC, - Series A (See *Petitioner's Ex. #688*).

That V.P. James Wagner of Old Second testified on June 29, 2022 before this court that of the

original $7,000,000.00 Old Second Loan, approximately $6.8 million was outstanding, and that the loan

contained a $1,000,000.00 liquidity requirement on MARTY personally. That on November 16, 2022,

this court did grant MARTY's Emergency Motion which allowed the refinance of the Republic Bank

loan on the ERIE LAKE property/project with funds in part secured by a new loan by Republic Bank

and secured by the property at 1454 South Michigan and 1454 S. MICHIGAN LLC. (*See Emergency*

*Motion of that date and this court's Order*). That the new Republic Bank loan paid off the Old Second

Bank loan that was secured by 1454 S. Michigan and increased the outstanding indebtedness on 1454 S.

Michigan to $11.8 million.

That Private Bank accounts numbers 9507, 9046 and 3124 are the operating accounts for 1454

S. MICHIGAN LLC and the evidence reflects that they have retained their non-marital characteristics.

(See *Respondent Exhibits #8F7, 8F8 and 8F9.*)

FINDINGS : That the real property at 1454 South Michigan was purchased with non-marital

earnest money and secured by a mortgage in the name of the non-marital LLC; that all payments on the

mortgage came from the non-marital LLC; and that the recent refinance by Republic Bank is secured by

non-marital interests. That MARTY's interest in 1454 South Michigan Avenue, 1454 S MICHIGAN

LLC, and the related business bank accounts are his non-marital interests with the exception of the

following interest in Unit 1605 and Garage Unit P-48 as described below.

13. That **Condominium Unit 1605** and Garage Unit **P-48** at **1464 South Michigan Avenue,**

**Chicago, Illinois** were transferred from 1454 S. MICHIGAN, LLC, to MARTY individually by way of

a Special Warranty Deed on March 20, 2008 (see *Petitioner's Ex. #613*) and a Mortgage was taken

from United Home Loans, Inc. by SHANNON K. REIDY and F. MARTIN PARIS and KERRY D.

PARIS in the amount of $180,000.00, secured by Unit 1605 on the same date (*Petitioner's Ex. #609*). That although KERRY's name appears on the first page of the Mortgage, it is signed only by Shannon and MARTY.

That on June 14, 2010, MARTY executed two (2) Quit Claim Deeds in Trust from himself to "1464 S. Michigan Unit 1605 Land Trust," conveying an undivided 50% interest in Unit 1605 and an undivided 50% interest in P-48, and the other Deed conveying an undivided 50% interest in both Unit 1605 and Garage Unit P-48 to SHANNON REIDY (see *Petitioner's Exhibits # 608 and 610*).

That this property was appraised by Arthur Murphy of Urban Real Estate Research, Inc. on August 25, 2021 and valued at $360,000.00 (See *Petitioner's Exhibit #306*). That the court finds said appraisal to be a fair and accurate assessment of the current market value of said condominium, parking spot and storage unit.

FINDING: That the court does find that the Paris marriage has an undivided Fifty percent (50%) interest in Unit 1605 and in Garage Unit P-48 at 1454 South Michigan Avenue, Chicago, Illinois, and that the remaining Fifty percent (50%) interest belongs to Shannon Reidy, a third party.

14. **MK MANAGER CORPORATION** was formed and incorporated with the Secretary of State of Illinois on March 4, 2004, with Two Hundred (200) shares of an authorized One Thousand (1,000) shares being issued for a capital contribution of $1,000.00 (See *Petitioner's Exhibit #138*). That on March 7, 2006, the Bylaws of MK MANAGER CORP. were adopted and signed by MARTY as the sole director, and by MARTY and by KERRY as "all of the shareholders of the corporation" (see *Petitioner's Exhibit #137, "Unanimous Written Consent of All of the Shareholders of MK MANAGER CORP."*)

That as evidenced by the many references in the documents received by the court, MK MANAGER CORPORATION performs management functions for various Sedgwick entities. Stout Services placed a value of Twenty-eight Thousand dollars ($28,000.00) on said entity (see *Petitioner's Exhibit #102, Marriage of Paris, p.14*).

FINDING: That the court does find that both MARTY and KERRY are shown as shareholders of MK MANAGER CORP., and the court does conclude that this is a marital asset. Further the Stout valuation is the only evidence presented as to the value of the corporation and the court does accept same.

15. That the real property located at **3114 NORTH SOUTHPORT, CHICAGO, ILLINOIS** was purchased on **August 3, 2011** for a purchase price of $365,000.00 (see *Respondent's Exhibit #5F2*). The property was titled in 3114 N SOUTHPORT L.L.C. of which MAEVE LLC-Series T is a fifty percent (50%) owner (see *Petitioner's Exhibit #642*). That the Amended Operating Agreement of 3114 N SOUTHPORT, LLC, was entered into on March 1, 2012 and reflects two Members, Fifty percent (50%) to Gino Fioravanti, and Fifty percent (50%) to MAEVE LLC –Series T. (See Respondent's Exhibit #5F9).

That MARTY testified that of the purchase price of $365,000.00, he and Gino Fioravanti each took $50,000.00 from the 3216 North Racine L.L.C. bank account for the initial earnest money and down payment (see *Respondent's Exhibit #5.F4. entries in 3216 N. Racine Transaction Journal dated 8/03/11*). A purchase money mortgage in the amount of $279,092.44 was taken on August 3, 2011 in the name of 3114 N SOUTHPORT LLC and is reflected in the 3114 Southport General Journal Transaction admitted at trial (See *Respondent's Exhibit #5F5*).

That a construction loan was acquired on May 24, 2012 from Pan American Bank in the form of a Mortgage for $1.485 million (See *Respondent Exhibit #5F3)* taken by 3114 N SOUTHPORT LLC of which the sum of $742,520 was disbursed at the closing of the May 24, 2012 loan and/from which the purchase mortgage taken on August 3, 2011 was paid in full.

That Private Bank account number 4897 is the operating "business checking" account for 3114 N SOUTHPORT LLC, and the Pan American Bank & Trust accounts #1601 and 4001 are the "business money market" account and business checking account for 3115 N SOUTHPORT, LLC. That the

31

**EXHIBIT A, Page 31 of 101**

evidence reflects that they have retained their non-marital characteristics. (See *Respondent Exhibits #5F12 and 5F13.*)

FINDINGS: That the court does find that the funds for the earnest money advanced for the purchase of 3114 North Southport, Chicago, Illinois were from non-marital sources; that the purchase mortgage was taken in the name of the non-marital entity, 3114 N SOUTHPORT, LLC,; that the purchase mortgage was paid for by non-marital funds; and that the existing mortgage with Pan American Bank & Trust is paid by the non-marital LLC. That the business and operating expenses of 3114 N SOUTHPORT LLC, are paid from the non-marital Pan American Bank & Trust accounts #1601 and 4001.

That the court does find that MARTY'S interests in the real estate located at 3114 North Southport Avenue, Chicago, Illinois; the entity known as 3114 N SOUTHPORT, LLC, and MAEVE LLC, - Series T's interest therein along with the Pan American Bank & Trust accounts #1601 and 4001 are MARTY's non-marital property, and has been maintained separately without any transmutation from its non-marital form. That the court does further find that there has been no action related to the interest during the marriage that would give rise to a claim of reimbursement by the marital estate. nor to any claim of transmutation or of reimbursement to the marriage.

16. That on **June 22, 2012** the Operating Agreement of **645 CUSTER LLC**, was entered into by the manager, MK MANAGER, and the Members, MAEVE LLC –Series U, and the Children's Trust, with capital contributions of $772,896.43 and $100,000.00 respectively, and giving MAEVE – Series U an Eighty-seven (87%) interest, and the Children's Trust a Thirteen (13%) interest. (See *Respondent's Exhibit #24F17.*)

On **June 29, 2012**, 645 CUSTER LLC of Evanston received a Special Warranty Deed for eight (8) condominium units, eleven (11) parking spaces and three (3) row houses from Synergy Property Holdings, LLC. located at 643, 645, 647 and 649 Custer, Evanston, Illinois. (See *Respondent's Exhibit #24F9.*) That the Escrow Trust Disbursement Statement from the closing of the transaction was

admitted into evidence as *Respondent's Exhibit #24F10* and reflects Earnest Money of $100,000.00 which MARTY testified was paid from Sedgwick Investments, LLC, and reflected in *Respondent's Exhibit #24F12*, the Sedgwick Investments, LLC, Register.

That MARTY testified that the Custer properties were sold and that the proceeds to 645 CUSTER LLC were $690,100.00, which were then transferred to 1611 N HERMITAGE, LLC, on May 30, 2013. That *Respondent's Exhibit #24F4*, the Register for 645 CUSTER LLC of Evanston reflects a "Decrease" of $690,100.00 on May 30, 2013, and that *Respondent's Exhibit #24F5*, the General Ledger for 1611 N HERMITAGE LLC, reflects an "Increase" of $400,000.00 and $340,100.00 on May 30, 2013. (See more on 1611 N. HERMITAGE below.)

FINDINGS: That the evidence supports a finding that the purchase of the interests at 643, 645, 647 and 649 Custer, Evanston, Illinois were funded by non-marital money; that the interest of 645 CUSTER LLC of Evanston in said real estate was sold; and that the non-marital proceeds of the sale were transferred to the non-marital entity known as 1611 N HERMITAGE LLC. The court does conclude that there is no marital interest in either 645 CUSTER LLC. of Evanston, or in the sales proceeds from the sale of 643, 645, 647 and 649 Custer, Evanston, Illinois.

17. That on **March 28, 2013**, the Manager and Members entered into the Limited Liability Company Agreement for **55th & KEDZIE INVESTORS, LLC,** for the purchase of non-contiguous parcels of real estate on Kedzie Avenue at 55th and 56th Streets (see *Respondent's Exhibit 40F2*). That the Members were MAEVE LLC – Series V, Five Hundred and Two (502) Class A Interests; Frank Martin Paris, Jr. Revocable Trust, Five (5) Class A Interests; Stuart & Keystone, LLC, Six Hundred (6000 Class B Interests; Jeanine Schutz One Hundred (100) Class B Interests; and The Paris Children Trust, Forty-three (43) Class B Interests. (See *Exhibit A to Respondent's Exhibit #40F2*).

On **February 25, 2013**, Articles of Incorporation were filed with the Illinois Secretary of State's Office and 5501 S. KEDZIE, LLC, was registered with the State of Illinois (see *Respondent's Exhibit #40F8*).

Then on **April 8, 2013,** 5501 S. KEDZIE, LLC, was created by the execution of the Limited

Liability Agreement of **5501 S. KEDZIE, LLC** (see *Respondent's Exhibit 40F1*), with the express

purpose to "purchase non-contiguous parcels of real estate on Kedzie Avenue at 55th and 56th streets."

That the Members of 5501 S. KEDZIE, LLC, were Bixby Bridge Fund II, LLC, with a Capital

Contribution of $2.6 Million and a Sixty-Seven and 50/100's (67.5%) interest; and 55th & KEDZIE

INVESTMENTS LLC with a Capital Contribution of $1.25 Million and a Thirty-two and 50/100's

(32.5%) interest (see *Schedule 1 to Respondent's Exhibit 40F1*).

Also on **April 8, 2013,** MK MANAGER executed a Loan Agreement (see *Petitioner's Exhibit

#220*) on behalf of 5501 S. KEDZIE, LLC, with Republic Bank for $11.6 Million to demolish existing

structures and to build a C.V.S. drugstore and L.A. Fitness facility on the acquired real estate. The same

parties executed a "Modification and Extension Agreement" of the loan on **May 10, 2016,** refinancing

the outstanding loan balance of $10,769,705.47 until the due date of October 1, 2017 (see *Petitioner's

exhibit #221*).

That The Private Bank business checking account #7942 was the operating account for 55th &

KEDZIE INVESTORS, LLC, (see R*espondent's Exhibit #40F9*), and The Private Bank account number

6865 was the operating account for 55th & KEDZIE, LLC, (see *Respondent's Exhibit #40F10*).

On **June 13, 2016,** a Purchase and Sale Agreement for the sale of a 52,923 square foot parcel of

real estate located at 5501 South Kedzie, Chicago, Illinois, was executed by MK MANAGER in its

capacity as manager of 5501 S KEDZIE, LLC, to the Buyer, Chody Real Estate Corporation in the

amount of $2,000,000.00 (see *Petitioner's Exhibit #222*). Then on **June 23, 2017,** a signed "Letter of

Intent" was executed by MARTY for Seller, and Holsum, Inc. as Purchaser for the real estate at 5559 -

5600 South Kedzie, Chicago, Illinois for the purchase amount of $16,000,000.00 (see *Petitioner's

Exhibit #223*).

That the Federal Tax returns for 5501 S. KEDZIE INVESTORS (see *Petitioner's Group Exhibit #213*) reflect that while there were no (-0-) distributions made in 2016 (*see K-1's in said return*). That there were distributions made in the **2017 tax year** as follows:

| | |
|---|---|
| MAEVE LLC – Series V: | $690,744.00 |
| Frank Martin Paris Jr. Rev.Trust | $ 6,951.00 |
| Children's Trust: | $ 59,065.00 |
| Keystone & Stuart, LLC: | $825,556.00 |
| Jean Schutz: | $137,593.00 |

That the **2018 tax return** for 55th & KEDZIE INVESTORS, LLC. reflects distributions to MAEVE LLC –Series V in the amount of $5,609.00 and to Keystone & Stuart, LLC. in the amount of $6,704. No other distributions were made to Members in 2018, nor were any distributions made in 2019. That a review of all of the above indicates that the sale of the properties owned by 5501 S. KEDZIE, LLC, were sold and closed pursuant to the above Purchase and Sale Agreement for 5501 South Kedzie, and the executed Letter of Intent for the sale of 5559-5600 South Kedzie, Chicago, and the Member's interests distributed.

FINDINGS: That the evidence shows that the real estate at 55th and 56th and Kedzie Avenue, Chicago was purchased by 5501 S. KEDZIE, LLC, whose Members were Bixby Bridge Fund II, and 55th & KEDZIE INVESTORS, LLC. That MARTY's interest in 55th & KEDZIE INVESTORS, LLC. was held in MAEVE LLC, Series - V. Ergo, the contribution towards the purchase price came from the non-marital MAEVE LLC, Series – V which also received the distribution(s) upon sale. The court finds MARTY'S interest in 5501 S. KEDZIE INVESTORS, LLC, to be non-marital and that said interest has been maintained separately without any transmutation from its non-marital form. That the court does further find that there has been no action related to the interest during the marriage that would give rise to a claim of reimbursement by the marital estate, nor to any claim of transmutation or of reimbursement to the marriage.

35

18. That on **May 15, 2013,** the entity known as **1611 N HERMITAGE, LLC.** was created and the "Limited Liability Company Agreement of 1611 N. HERMITAGE, LLC," was entered into by its Manager and its Members. (See *Respondent's Exhibit #24F---* and *Petitioner's Ex. #224*). That on August 20, 2013, the "First Amended and Restated Limited Liability Company Agreement of 1611 N. HERMITAGE, LLC," was entered into by its Manager and Members (see *Respondent's Exhibit #24F2* and *Petitioner's Ex. #225*). That the Class A Member, MAEVE LLC – Series Y, held 340 Interests, and the Class B Members, the Paris children's Trust, Stuart & Keystone, LLC, and MAEVE LLC – Series Y held 110, 400 and 400 Interests respectively.

That 1611 N HERMITAGE LLC, purchased the **real estate commonly known as 1714-1720 West North Avenue, Chicago, Illinois** on May 30, 2013 (See *Respondent's Exhibit #24F3* and *Petitioner's Exhibit #228*) for the amount of $2,400,000.00, with a mortgage taken in the amount of $1,555,000.00 with Pan American Bank. The stated Earnest Money was $50,000.00 which MARTY stated was from the 645 CUSTER LLC of Evanston ledger (See *Respondent's Exhibit #24F4*).

That on **October 16, 2018**, the real estate owned by 1611 N HERMITAGE LLC, was sold to Rondo Investment, LLC, for a sales price of $1,573,103.00 as reflected in the Final Combined Statement from Stewart Title Guaranty Company of that date (See *Respondent's Exhibit #230*), and pursuant to the "Agreement of Sale and Purchase" between 1611 N. HERMITAGE LLC, and REMHY LLC, (see *Petitioner's Exhibit #230*).

That the Federal Income Tax Returns for 1611 N. HERMITAGE LLC (See *Petitioner's Group Exhibit #226*) reflect:

| 2017 K-1's | MAEVE LLC –Series Y Net Rental Income : $21,506.00 | Paris Children's Trust Net Rental Income: $6,481.00 | |
|---|---|---|---|
| 2018 K-1's | MAEVE LLC –Series Y Net Rental Income: $58,822.00 | Paris Children's Trust Net Rental Income: -0- | |

| | MAEVE LLC –Series Y Distribution: $983,396.00 | Paris Children's Trust Distribution: $64,000.00 | |
|---|---|---|---|
| **2019 K-1's** | MAEVE LLC – Series Y Income: $635.00 | Paris Children's Trust Income: $40.00 | |
| | MAEVE LLC –Series Y Distribution: $13,780.00 | Paris Children's Trust Distribution: -0- | |
| **2020 K-1's** | MAEVE LLC –Series Y Income: ($613.00) Distributions: -0- | Paris Children's Trust: Income: ($39.00) Distributions: -0- | |
| **Note:** | **The Class B Members also received proportionate distributions in 2018** | | |
| | | | |

That MARTY did testify at trial on June 27, 2022 that 1611 N HERITAGE "was fully sold out; no fees are owed to affiliated properties." That the 1611 N HERMITAGE LLC General Ledger (see Petitioner's Exhibit #227) reflects that there was a zero (-0-) balance as of September 14, 2020.

FINDINGS: That the court does find that the source of purchase funds was from the non-marital 645 CUSTER, LLC, of Evanston, and that the purchase money mortgage was taken and paid in the non-marital entity's name (1611 N HERMITAGE LLC). That the subject real estate was sold to third party and the net proceeds were distributed. MARTY's interest in proceeds to MAEVE LLC –Series Y are non-marital and that said interest has been maintained separately without any transmutation from its non-marital form. That the court does further find that there has been no action related to the interest during the marriage that would give rise to a claim of reimbursement by the marital estate. nor to any claim of transmutation or of reimbursement to the marriage.

19. That on **December 30, 2013**, the entity known as **1545 W NORTH AVE., LLC.** purchased the real estate commonly known as 1550 North Bosworth, Chicago, Illinois for the purchase price of

**EXHIBIT A, Page 37 of 101**

$1.9 Million, with Earnest Money paid of $50,000.00, and a new loan taken in the amount of

$1,765,500.00 from Pan American Bank (See *Respondent's Exhibit #26F3*).

That the Limited Liability Agreement of **1545 W NORTH, LLC,** was entered into on

**December 15, 2013,** by its Manager, MK MANAGER CORPORATION and its Member, MAEVE

LLC –Series BB. That MAEVE LLC – Series BB held 100 Class A Interests with a capital contribution

of $100,000.00, and 285 Class B interests with a capital contribution of $285,000.00 (See Exhibit A of

*Respondent's Ex. #26F1*). That *Respondent's Exhibit #26F4* reflects a decrease of $335,000.00 on

December 30, 2013 (the day of the closing of the purchase) from the 645 CUSTER LLC of Evanston

register, and an earlier "increase" of $40,000.00 in the MAEVE LLC register notes as "Investments in

1550 Bosworth," (see *Respondent's Ex. #26F5*) which MARTY testified constituted the non-marital

contribution to the purchase of 1550 North Bosworth real estate.

That the project acquired an institutional partner with the creation of the "Limited Partnership

Agreement of 1545 W NORTH AVENUE, L.P" on **December 18, 2013** by and between 1545 W

NORTH LLC, and RECAP OPPORTUNITY FUND, L.P. (see *Respondent's Exhibit #26F2*). That

amongst the more salient terms of the Agreement was the Project Budget of $10,228,000.00 as set forth

in Exhibit A therein, and the Guaranty Agreement (Exhibit D therein) given by MARTY personally,

and by 1545 W NORTH LLC, in favor of Recap Opportunity Fund, L.P. and 1545 W NORTH AVE.,

L.P.

On **December 17, 2014,** a "Guaranty of Payment" agreement was executed by MARTY

personally, MAEVE LLC –Series DD, and MARTIN NEVADA II, INC. in favor of Associated Bank

in conjunction with a Construction Loan Agreement and Promissory Note of $8,000,000.00 for the

development at 1550 North Bosworth. MARTY signed said Guaranty personally, in his capacity as

President of MAEVE LLC –Series DD, and in his capacity as President of MNV II, INC. That

*Respondent's Exhibit #28F3* is a Jeffries statement MAEVE LLC –Series DD, for the period of

November 17, 2014, to November 30, 2014, reflecting a balance of $1,058,339.02. That *Respondent's*

*Exhibit #28F2* is a Jeffries statement MAEVE LLC –Series DD, for the period of April 1, 2017 to April 30, 2017 reflecting a balance of $1,347,133.98. Said Exhibits reflect some of the security for the Guaranty pledge in conjunction with development.

That in his testimony on July 18, 2022, MARTY testified that this project was "completed and Closed; sold to a local investor."

FINDINGS: That the court does find that the funds for the downpayment on the purchase of 1550 North Bosworth, Chicago, Illinois, were from a non-marital source; that the purchase mortgage was taken in the name of the non-marital LLC, and payments thereunder were made by the non-marital LLC; that there has been no contribution to the asset from the marital estate that would give rise to a claim of reimbursement; and that MARTY's interest in 1545 W NORTH AVE., LLC, 1545 W NORTH, LLC, and in the real estate  commonly known as 1550 North Bosworth, Chicago, Illinois were/are MARTY's non-marital property.

19. That the real estate commonly known as **1853-57 WEST DICKENS, CHICAGO, ILLINOIS** was purchased on **June 5, 2014** by 1857 W DICKENS, LLC, which received title by way of a Trustee's Deed recorded on August 12, 2014 by the Cook County recorder of Deeds Office (See *Respondent's Exhibit #6F1*). That the Operating Agreement of **1857 W. DICKENS, LLC**, effective March 1, 2014 (See *Respondent's Exhibit #6F8*) reflects the Members as Craig Chesney with a Fifty percent (50%) interest, and MAEVE LLC – Series E at Fifty percent (50%) (See *Respondent's Exhibit 6F8, Exhibit A*).

That the HUD-1 Settlement Statement dated June 5, 2014, reflects, INTER ALIA, a new loan from Talmer Bank and Trust in the amount of $1.125 Million, Earnest Money of $50,000.00, and an interest reserve of $50,000.00 in addition to various closing costs and credits. (See Respondent's Exhibit #6F2.) That Respondent's Exhibit ##6F4 reflects withdrawals of $100,000.00 each by MARTY and Chesney for the 1857 W. Dickens closing from PC HOLDINGS, LLC. as reflected in the "Transaction Journal" on June 5, 2014, the date of the closing. Additionally, Respondent's Exhibit

#6F5, the 1933 North Sedgwick "General Journal Transaction" of the same date reflects $30,000.00 distributions to MARTY and to Chesney related to the 1857 W. Dickens transaction.

FINDINGS: That MARTY has a fifty percent (50%) interest in this entity; that MARTY's portion of the earnest money came from a non-marital source; that the underlying mortgage is being paid by the non-marital LLC, and that there has been no marital contribution to the acquisition or maintenance of this entity. This interest is the non-marital property of MARTY.

**20. 1325 NORTH WELLS, LLC, and SP/SRA 1325 HOLDINGS, LLC.:** That a most succinct summary of the interests related to the real estate located at **1325 North Wells Street, Chicago, Illinois** is contained in the STOUT SERVICES Report at MAEVE, LLC, page 5 (See *Petitioner's Exhibit #102*):

a. *Series CC and Series EE:* 1325 N WELLS, LLC ("1325 Wells") Formed on September 17, 2014, 1325 Wells is an investment holding company managed by MK Manager. The company's primary asset is an equity interest in SP/RPA 1325 Holdings, LLC. As of the valuation date, Maeve Series CC holds a 100% Class A interest and Maeve Series EE holds a 100% Class B interest in 1325 Wells.

b. *SP/RPA 1325 Holdings, LLC, ("1325 Holdings"):* Formed on November 9, 2015, 1325 Holdings is an investment holding company managed by RPA 1325 Investor, LLC. The company's primary asset is an equity interest in SP/RPA Apartments, LLC. As of the Valuation Date, 1325 Wells holds a "Developer" interest in 1325 Holdings. See Exhibit C.12 for further details.

c. *SP/RPA 1325 Apartments, LLC ("1325 Apartments"):* Formed on April 20, 2015, 1325 Apartments is a real estate holding company managed by 1325 Holdings. The company's primary asset is real property located at 1325 North Wells Street in Chicago. 1325 Holdings holds a 100% equity interest in 1325 Apartments as of the Valuation Date. See Exhibit C.12 for further detail.

That a review of the Exhibits admitted at trial reflects that on **October 20, 2014** the Limited

Liability Company Agreement of **1325 N WELLS, LLC**, was entered into by its Manager, MK

MANAGER, CORP. and its Member, MAEVE LLC – Series DD. That MAEVE Series DD held Fifty

(50) Class A interest units and contributed capital in the amount of $50,000.00; and that MAEVE Series

BB held four Hundred (400) Class B interest units and contributed capital of $400,000.00 (See

*Respondent's Exhibit #27F1*).

That **SP/RPA 1325 HOLDINGS, LLC.** was created on **November 9, 2015** with the execution

of the Limited Liability Company Agreement of SP/RPA 1325 HOLDINGS, LLC, by and between

RPA 1325 INVESTOR, LLC, (the "Investor" entity of the project) and by 1325 N WELLS, LLC, the

"Developer" entity of the project. In simple terms the Investor is essentially Prudential Insurance

Company and the Developer is the Sedgwick Development entity, 1325 N WELLS, LLC. That this

Agreement defines the " Purposes" (*see Section 2.6 of the Agreement*) to owning and operating "the

Subsidiary," and indirectly acquiring, owning, developing, improving, maintaining, repairing,

managing, operating, leasing and selling the Property, to construct the improvements, etc. with

"Distributions and Allocations" set forth at Section 9 of the Agreement.

That on **November 15, 2014**, the Limited Liability Company Agreement of **1325 N. WELLS**

**PARTNERS, LLC**, was executed by its Manager, MK MANAGER CORP. and by 1325 N WELLS,

LLC., with the sole Member being 1325 N WELLS, LLC. That 50 Class A interest units were issued

for a capital contribution of $50,000.00. That Exhibit C, *"BORROWER SINGLE PURPOSE ENTITY*

*COVENANTS"* were incorporated into the terms of the Limited Liability Company Agreement of 1325

N Wells Partners, LLC. (See *Respondent's Exhibit #27F2.*)

That the Chicago Title &Trust Company (C.T.&T.) *"Escrow Trust and Disbursement*

*Statement"* dated 11/7/14 (see *Respondent's Group Exhibit #27F3)* reflects, INTER ALIA, a Purchase

Price of $4.5 Million, earnest money credit to Buyer of $250,000.00, and loans of $3,206,483.0 from

Pan American Bank, and $1,085,000.00 from Bixby Bridge Fund II, LLC. That the entries from 5/14/14

**EXHIBIT A, Page 41 of 101**

and 6/26/16 in the Sedgwick Properties Holding, Corp. register for $50,000.00 and $200,000.00

respectively (see *Respondent's Group Exhibit #27F3*).

That *Petitioner's Group Exhibit #238* are Federal, Illinois and New Jersey tax returns for the

years of 2017 to 2020 for **SP/RPA 1325 HOLDINGS, LLC,** and reflect the K-1 distribution of income

or losses to the Developer (Prudential) and to 1325 N WELLS, LLC, (Sedgwick) in the respective

years. That the most tendered recent returns reflect:

|  | 2019 | PRUDENTIAL | 1325 N. WELLS | 2020 | PRUDENTIAL | 1325 N. WELLS |
|---|---|---|---|---|---|---|
| Gross Rents |  | $592,790.00 | $592,790.00 |  | $1,341,272.00 | $1,341,272.00 |
| Net Rental Income on K-1 |  | ($430,841) | ($430,841.00) |  | ($525,024.00) | ($525,024.00) |
| Income/Loss on K-1 |  | ($322,413.00) | ($108,428.00) |  | ($434,333.00) | ($90,691.00) |

That the court did not receive returns for the year of 2021.

That MARTY stated that the Limited Liability Company Agreement of SP/RPA 1325

HOLDINGS, LLC, is "quite restrictive," and that he believes that "we have no ownership percentage,

just a percentage of the distributions." That after a review of all of the records related to SP/RPA 1325

HOLDINGS, LLC, MARTY's statement is an assessment with which the court concurs.

FINDINGS: That the SEDGWICK/MAEVE interest in 1325 NORTH WELLS, LLC, and

SP/SRA 1325 HOLDINGS, LLC, was acquired from non-marital funds; that the earnest money deposit

related to the real estate was from non-marital funds; that the purchase money mortgage and the bridge

loan were paid for and contracted for by the non-marital entities; that there was no evidence of a marital

contribution to the interests which would give rise to a claim of reimbursement or transmutation; and

that the interests therein are MARTY's non-marital property as are the bank/checking accounts titled in

the LLCs.

**21.** That the Limited Liability Company Agreement of **301 W NORTH, LLC,** was entered into

on **November 24, 2014,** by its Manager, MK MANAGER CORPORATION, and by its Member,

MAEVE LLC, - Series FF and MAEVE LLC – Series GG. (See *Respondent's Exhibit #30F2.*) That

MAEVE LLC – Series FF was issued One Hundred (100) Class A units of interest for a capital

contribution of $100,000.00, and MAEVE LLC –Series GG was issued Five Hundred, twenty-six (526)

Class B units of interests for a capital contribution of $526,000.00 (*see Exhibit A to Respondent's

Exhibit #30F2.*)

That on **December 4, 2014** the real estate located at 301-319 West North Avenue, Chicago,

Illinois was purchased by **301 W NORTH AVENUE, LP.,** for the purchase price of $8.75 Million with

an earnest money payment of $250,000.00 (See *Respondent's Exhibit #30F1*). That MARTY testified

that *Respondent's Exhibit #30F8* reflects an entry for the payment of $250,000.00 on June 13, 2014

from Sedgwick Properties Holding, Corp. which was the earnest money deposit for the purchase of the

301 W North Avenue real estate.

That on the same date, **December 4, 2014**, the Limited Partnership Agreement of 301 W

NORTH AVENUE, L.P. (See *Respondent's Exhibit #30F3*) was signed and executed by 301 W

NORTH LLC, (the "General Partner") and by RECAP OPPORTUNITY FUND, L.P. (the "Investor

Partner"). That the "Project" was defined as "the acquisition of the Land and the development and

construction of the Project improvements, as contemplated in the Business Plan." That the "Project

Improvements" was defined as "69-unit multifamily apartment project to be developed, constructed and

known as "301 W North Avenue Apartments" and related improvements…" Included in the Agreement

is the GUARANTY AGREEMENT made by 301 W NORTH, LLC, and by F. MARTIN PARIS, JR.

individually, and in favor of RECAP OPPORTUNIT FUND, L.P. and in favor of 301 W NORTH

AVENUE, L.P. (see *Exhibit D of Respondent's Exhibit #30F3*).

That the MAEVE LLC – Series FF and GG hold an investment interest in the 69-unit building,

and its parking units, at the real estate commonly known as 301-313 West North Avenue, Chicago,

**EXHIBIT A, Page 43 of 101**

Illinois and 1552 North Park Avenue, Chicago, Illinois. That the Limited Partnership Agreement of 301

W NORTH AVENUE, L.P. defines the parties' pecuniary interests including the development fee,

compensation of the manager, etc.

That the 301 W NORTH AVENUE, LP, commercial checking account is held at First Midwest

Bank in account #3744 and the business account is held at Republic Bank, account # 5383 (see

*Respondent's Exhibits #30F5 and 30F6.*)

**FINDINGS:** That the SEDGWICK/MAEVE interests in 301 W NORTH AVENUE, LP., and

301 W NORTH, LLC, were acquired from non-marital funds; that the earnest money deposit related to

the real estate was from non-marital funds; that the purchase money mortgage payments were paid for

and contracted for by the non-marital entities; that there was no evidence of a marital contribution to the

interests which would give rise to a claim of reimbursement or transmutation; and that the interests

therein are MARTY's non-marital property as are the bank/checking accounts titled in the Limited

Partnership and in the LLC.

*22.* That **ERIE & LASALLE, LLC.** was incorporated in the State of Delaware on September

12, 2016, and ERIE & LASALLE VENTURES, LC, was incorporated on October 4, 2016, also in the

State of Delaware (see *Respondent's Group Exhibits #32F 1*). That the entity known as **ERIE AND**

**LASALLE VENTURES, LLC,** was created, and the Limited Liability Agreement for ERIE AND

LASALLE VENTURES, LLC, was entered into by M17 Land Investments, LLC. (referred to as the

"Preferred Member") and by ERIE & LASALLE LLC, (the Sponsor Member") on October 7, 2016.

The Agreement was signed by MARTY as the President of MK MANAGER, LLC, the manager of

ERIE & LASALLE, LLC., and by the C.E.O. and Manager of BELVEDERE FINANCAIL, LLC, as

Manager of M17 LAND INVESTMENTS, LLS. That the stated purpose of the LLC was *"to own,*

*acquire, manage, encumber, sell or otherwise dispose of that certain real property and all buildings*

*and other improvements thereon commonly known as 146 West Erie Street, Chicago, Illinois..."* (See

*Respondent's Exhibit #32F5, Article 1.3(a).*)

The Members of ERIE AND LASALLE VENTURES, LLC, are set forth in Exhibit A as M17 Land Investments, LLC, with a "PE Contribution of $3,000,000.00/100%" and ERIE &LASALLE, LLC, with "Common Capital Contribution of $325,000.00/100%."

That the Agreement also provided for the procurement of a $6.4 Million loan from Republic Bank for the stated purposes and to develop a residential condominium containing thirty (30) units. (see *Article 1.3.(b)of Respondent's Exhibit #32F5 and #32F7, Stewart Title "Final Combined Statement" dated October 7, 2016)*. The Manager of the Company was designated as ERIE & LASALLE, LLC.

That MARTY testified to, and produced *Respondent's Exhibit #32F11*, a General Journal Transaction of 2049 North Sheffield, LLC, dated October 7, 2016, reflecting an entry of $400,00.00 "due from Erie &LaSalle" which MARTY stated was part of the earnest money for this purchase.

That *Respondent's Exhibit #32F14* is the "Stewart Title Guaranty Company Final Buyer's Closing Statement" dated June 28, 2019, which reflects, inter alia, new loans in the amount of $28.5 Million and $7.5 Million (See *Petitioner's Exhibit # 262*), a mortgage payoff of $6,805,702.26 to Republic Bank, funds held for future construction of $27,027,384.59 and an escrow account of $4,48,899.93 with Stewart Title "to fund Construction." That *Respondent's Exhibit #32F10* is a copy of a statement from Old Second National Bank, account #2087, a business account for ERIE & LASALLE VENTURES, LLC.

That on August 4, 2022, at trial, MARTY testified to the current state of the business as follows:

i.   That the sales prices for units in this project range from $1 Million to $2.4 Million. That on the date of the closing of the construction loan, i.e. June 28, 2019, there were fourteen (14) units under contract for sale (See *Petitioner's Exhibit Group #260*);

ii.   That as of August 4, 2022, they had lost all but one of the fourteen under contract and had one (1) new purchase contract;

iii.   That this is probably the most problematic Sedgwick project, citing a cost overrun of $10.5 Million in construction costs, escalation of material costs, labor shortages, concerns of potential

45

buyers related to safety, rising Cook County tax bills, and buyers now seeking larger personal

space and less common areas;

iv. Problems paying back the loan, citing the graduated interest rate of the loan, lack of cash

flow due to lack of sales. MARTY stated that they were facing a $2.5 Million interest shortfall

with the full loan due on October 22, 2022.

That on November 15, 2022 this court received and granted MARTY's Emergency Motion

related to his request that the court modify its earlier Injunctive Order to allow him to execute and

complete a refinance of the ERIE LASALLE loan with Republic Bank from new funds secured by hi

interest in the 1454 South Michigan property as described further herein. This refinance has stabilized

the loan on ERIE & LASALLE at least temporarily.

FINDINGS: That the SEDGWICK/MAEVE interest in ERIE & LASALLE, LLC, and in ERIE

AND LASALLE VENTURES, LLC,, were acquired from non-marital funds; that the earnest money

deposit related to the real estate was from non-marital funds; that the purchase money mortgage and the

bridge loan were paid for and contracted for by the non-marital entities; that there was no evidence of a

marital contribution to the interests which would give rise to a claim of reimbursement or

transmutation; and that the interests therein are MARTY's non-marital property as are the

bank/checking accounts titled in the LLCs.

**23.** That on or about **December 13, 2010, LAKE & LATHROP PARTNERS, LLC,**

contracted with the Village of River Forest to develop three existing parcels of real estate in a T.I.F.

district in the Village. That certain T.I.F. funds would be made available to the Developer, i.e. LAKE &

LATHROP PARTNERS, LLC, to procure, remediate and develop a 210 ft. by 150 ft. parcel, and to

build a five story, twenty-two (22) residential units and 65 parking spaces in the finished building. (See

*Petitioner's Exhibit #265 "Amended and Restated Development Agreement for Lake Street and Lathrop*

*Avenue in the Village of River Forest, Cook County, Illinois"* Pages 1 through 8 for a recitation of the

history of the project through September 18, 2017.)

That Articles of Organization for LAKE LATHROP PARTNERS, LLC, were filed with the

Illinois Secretary of State on March 9, 2016, and the Operating Agreement of LAKE LATHROP

PARTNERS, LLC, was entered into and created on January 6, 2017 (See *Petitioner's Exhibit #264*).

That the Managers of the LLC are Timothy B. Hague and MK MANAGER CORP., and the Members

are Timothy B. Hague with an initial capital investment of $1,000.00 for a Twenty-Five percent (25%)

interest and SEDGWICK INVESTMENTS LLC, with an initial capital investment of $1,000.00 and a

Seventy-Five percent (75%) interest therein. The SEDGWICK INVESTMENTS LLC interest is now

held in MAEVE LLC, Series – JJ.

That the *"Amended and Restated Development Agreement for Lake Street and Lathrop Avenue

in the Village of River Forest, Cook County, Illinois"* extended various completion dates for the

procurement of the third parcel of real estate, remediation of the land, etc. and was signed by Hague as

Manager of Keystone Ventures, LLC, and by MARTY as Manager of LAKE LATHROP PARTNERS,

LLC. (See *Petitioners' Exhibit #265.)*

That in February, 2022, a construction loan in the amount of $20,000,000.00 was taken from

Beverly Bank/Wintrust and that MARTY executed both a "Guaranty" (see Petitioner's Exhibit #259)

and a "Guaranty of Completion" (see Petitioner's Exhibit #760) as an individual, for MARTIN NV II,

LLC, and for MAEVE LLC – Series A, Series DD, and Series JJ. That the original purchase money

loan from KEYSTONE VENTURES was paid off from the construction loan proceeds at this closing.

That as to the current status of the development, MARTY testified:

a.  That the construction loan closed in February, 2022;

b.  That fourteen (14) of the twenty-two (22) units are under contract;

c.  That various delays in construction occurred due to the Local 150-Operating Engineers,
    strike, issues with the TIF funding from the Village;

d.  Increases in costs of material and labor;

e.  That the necessary permits have been issued; and

f.  That LAKE LATHROP PARTNERS, LLC, is relying on the TIF money to realize any

gain and profit.

FINDINGS: That MARTY's interests in the LAKE LATHROP PARTNERS, LLC, and the

SEDGWICK INVESTMENTS LLC, were funded from non-marital assets; that the loan obligations are

being paid by the non-marital LLC; that there is no evidence of any marital contribution to the

entity(ies) that would give rise to a claim of reimbursement or transmutation; and that the interests are

non-marital assets.

## OPERATING COMPANIES

That all of the following operating companies service the general operations of Sedgwick

Development, have no assets or equipment to speak of, and have little or no value to anyone outside of

the Sedgwick Development family of companies. That the court received no evidence of any of these

entities being employed by any builder or entity other than those in the Sedgwick Properties

Development family of businesses.

24.  **ALPHA CARPENTRY, LLC**: Founded on March 7, 2014, ALPHA CARPENTRY

functions as a contractor in building construction and is managed by MK MANAGER. Stout Service's

valuation Report placed the value at "de minimis;" (See *Petitioner's Exhibit #102* and *Respondent's 13*

*F1, 13F2, and 13F3.*)

25.  **ALPHA PROPERTY SERVICES, LLC**: Formed on June 10, 2011, ALPHA

PROPERTY SERVICES provides property management services to certain of the Sedgwick interests,

and is also managed by MK MANAGER.  Stout Services values this entity at Four Thousand, Two

Hundred dollars ($4,200.00.) (See *Respondent's Exhibit #21F1 through #21F5.*)

26.  **ALPHA CONSTRUCTION SERVICES, LLC**: Formed on October 3, 2013, ALPHA

CONSTRUCTION SERVICES is a contractor in the building construction business also managed by

MK MANAGER. Stout Services values this entity at One Thousand, One Hundred dollars ($1,100.00).

(See *Respondent's Exhibits 22F1 through 21F6.*)

27.  **ALPHA DRYWALL SERVICES, LLC:** Formed on June 9, 2020, ALPHA DRYWALL SERVICES, LLC, also provides construction services in the building construction trade in Chicago. It is also managed by MK MANAGER, LLC, and Stout Services values it at Nine Thousand dollars ($9,000.00).

28.  **SEDGWICK DESIGN CORPORATION, LLC:** That this entity provides in-house design services to the various Sedgwick construction projects.

29.  **SEDGWICK PAYROLL:** That as the name suggests, SEDWICK PAYROLL provides payroll services for all of the Alpha and Sedgwick entities.

30.  **MK MANAGER CORPORATION:** That as discussed at Paragraph 14 above, this is a management entity for various Sedgwick Development entities, and is a marital asset.

FINDING: That the court does find that these entities have minimal value except as noted, are part of the overreaching Sedgwick Properties that are almost exclusively non-marital property. Their value was included in the STOUT SERVICES Evaluation Report.

## HOLDING COMPANIES

31. **SEDGWICK INVESTMENT LLC,** is a holding company created on April 28, 2005, which has no present assets. Stout Services values SEDGWICK INVESTMENT LLC, at Sixty-five dollars ($65.00). (See *Petitioner's Exhibit #102 at p.14-15*, and *Respondent's Exhibits 15F1 – 15F6*.)

32. **55TH & KEDZIE INVESTMENT LLC** is discussed at length in Paragraph 17 above. The assets were developed and sold. Stout Services values the entity at Six Hundred, seventy-five dollars ($675.00) as of December 31, 2020.

33. **SEDGWICK HOLDING** was created on December 9, 2009 and is/was an investment holding company and has no present assets. Stout Services values this entity as "de minimis."

34. **1611 N HERMITAGE LLC** is discussed at length at Paragraph 18 above. Its assets have been sold and has no real present value.

## INVESTMENT ENTITIES

**35. EVENTRIC** (A/K/A Production Consultants Guild, Inc.) was incorporated May 9, 2009 (See *Respondent's Exhibit #16F1*), and a Subscription Agreement was signed by MARTY for 100,000 shares for the amount of $50,000.00 (See *Respondent's Ex.16F3, Stock Certificate for 100,000 shares of Production Consultant's Guild issued to "Marty Paris" and dated October 14, 2008.*)

That while MARTY argues in his Closing Argument that *"No marital funds were used to acquire Eventric LLC. In addition to being representing the natural growth of Marty's pre-marital business (see WERRIES), the acquisition of Eventric, LLC, is directly traceable to MARTY'S non-marital assets,"* the record indicates otherwise. That *Petitioner's Exhibit #201* is a copy of a check written on MARTY's personal account for $50,000.00 to Production Consultants Guild, Inc. That Petitioner's Exhibit #202 is a copy of an "Assignment of Member's Common B Units" form MARTY to MAEVE LLC – Series N.

That the court does conclude that as a result of the failure to show a non-marital source of the acquisition of said funds, and said asset being acquired during the marriage, the interest in EVENTRIC LLC, (a/k/a Production Consultants Guild, Inc.) is determined to be a marital asset. Lacking any other source of value, the court determines the marital value of such interest to be the purchase price of Fifty Thousand dollars ($50,000.00). (See **IN RE HLUSKA, 961 N.E.2d 1247; 356 Ill.Dec. 612; 2011 Ill.App. LEXIS 1245 (1st Dist., 2011)** regarding the parties' duty to present evidence of value to the court.)

**36. PET HEALTH PEOPLE, LLC,** is an entity formed and managed by MARTY's sister, Amy R. Paris. MARTY's interest of 14,286 units in Pet Health People was acquired in March, 2012 for an investment of $50,001.00 which are held in MAEVE LLC, - Series U. That MARTY does not address this asset in his Closing Argument and the court did not receive any documents in evidence related to the acquisition of same.

Clearly the PARIS' interest in PET HEALTH PEOPLE, LLC, was acquired during the marriage
and is then presumed to be marital. The burden of proof to show that the asset is non-marital is on
MARTY and he has failed to do so. The court does find this to be a marital asset.

**37. RETIREMENT ASSETS:**  That the evidence and pleadings reveal that there are two (2)
retirement assets accumulated during the marriage in MARTY's name: 1) **Charles Schwab &
Company IRA Contributory account #xxx3167**, and 2) **Charles Schwab & Company Sedgwick
Properties 401(k) Plan account #xxx5514.** That in his most recent "Emergency Motion to Access
Retirement Accounts to PY Family Expenses" MARTY admits that these accounts are marital accounts
at Paragraph 11 and in his prayer for relief at Paragraph a. These accounts have been frozen by this
court's injunctive Orders of June 22, 2022 and prior Orders.

That the most recent figures provided to the court indicate the balance of the 401(k) account
xxx-5514 to be $643,061.00 as of September 1, 2021. That IRA account #xxx-3167 had a balance of
$107,502.00 on the same date, MARTY testified at trial that the balance was now at zero (-0-) as a
result of his accessing same to pay attorneys' fees, and does admit same in his Closing Argument at
Page 31.

That the court does find that both of these accounts are marital property, and that MARTY
unilaterally diminished the IRA account #xxx-3167 to KERRY's detriment.

**38. MAEVE LLC - SERIES A and SERIES DD (Jeffries Accounts):**  That MAEVE LLC
was created on December 29, 2009, as previously described herein. That MAEVE LLC, - Series A and
MAEVE LLC, - Series DD were also created at that time as what would be characterized as
"investment pledge accounts" comprised of cash, bonds, mutual funds/investments which are used as
collateral for various loans, and to satisfy liquidity covenants in various loans of the Sedgwick
Properties family. That the accounts are titled in MAEVE Series A and/or Series DD.

That *Petitioner's Exhibit #748*, dated February 14, 2022, entitled "Jeffries Portfolio Review"
reflects the following:

51

| ACCOUNTS | FEB 14, 2022 |
|---|---|
| Maeve LLC – Series A | $5,059,814 |
| JWxxxx6356 | $2,734,806 |
| JWxxxx7190 | $1,075,402 |
| JWxxxx9932 | $432,155 |
| JWxxxx9973 | $817,451 |
| Maeve LLC – Series DD | $1,174,122 |
| JWxxx8022 | $1,174,122 |
| Martin Paris NPL* | ($4,160,269) |
| JWxxx1351 | ($4,160,269) |
| Total | $2,073,667 |

*Non Purpose Loan Account (see below)

That *Petitioner's Exhibits #749, 750 and 751* are all statements received into evidence for the period of February 1 – February 28, 2022 for the respective accounts stated above.

That the court received into evidence *Petitioner's Group Exhibit #377* dated April 29, 2015, entitled "New Account Agreement" by Jeffries and signed by MARTY, which created a "LoanAdvance account in the amount of $2.9 Million (see P.4). That on March 14, 2022, MARTY testified that the line of credit was "now over $4 Million" which would reflect the figures stated in *Petitioner's Exhibit #748* above. That this is the "Non Purpose Loan Account" referenced above.

That MARTY testified that the accounts were funded with pre-existing assets (as well as accumulated gains) that he received prior to the marriage from distributions to him from a Children's Trust created by his parents. That in support of said claim MARTY tendered Respondent's Group Exhibit #12F1 through 12F30, including statements from The Private Bank dated July 31, 2002, which pre-date the marriage. That no evidence was tendered to the court that reflect a marital contribution to the account; that prior testimony and evidence reflects that MAEVE LLC – Series A was the recipient of various distributions form the Sedgwick entities as further described herein (i.e. from the business) and that there are regular increases in the value of the account form returns on the various investments

held. That MARTY has met the burden of proof to establish that these accounts are his non-marital property.

## THE 2009 RESTRUCTURING PLAN

**CREATION OF MAEVE LLC:** That at trial, MARTY testified that in late 2009 he implemented a series of plans and transfers of his various interests for the stated purpose of:

i.   "Business and personal liability protection by (the) separation of business and personal activities;

ii.   Limit liability among business entities;

iii.   Meet requirements of project lenders;

iv.   Meet necessary structural requirements of institutional capital partners;

v.   Consolidate business interests in on holding company;

vi.   Tax planning purposes;

vii.   Cost efficiency;

viii.   Provided for ownership succession planning;

ix.   Bankruptcy remote."

(See MARTY's eleven (11) page Exhibit entitled *"Sedgwick Explanation of Business Structure and Process."*)

That the investment holding entity named "MAEVE, LLC," and many of its Series, were created on December 29, 2009. That various Series of the LLC were populated by the transfer of multiple interests therein. As described by MARTY in his Closing Statement (at p. 20), *"The Maeve investment series are a sophisticated series of various Companies (alphabetically lettered from A to LL) that own: 1) cash and marketable securities; 2) real property; 3) operating companies; 4) undivided interests in real property; and 5) other companies that no longer hold real estate or assets."* That MARTY's Exhibit, "Sedgwick Explanation of Business Structure and Process" at Page 6 is a summary

exhibit which this court does find to be an accurate depiction of the "family assets and business

interests" flow chart which reflects how the various ownership interests are held. Of particular note to

this discussion is the ownership related to MAEVE LLC.

That examples of the population of MAEVE, LLC, by Series and as stated above, are:

i.    That MARTY's interest in 1933 SEDGWICK LLC was assigned to MAEVE LLC, Series

M (see *Petitioner's Exhibit #335*) on December 29, 2009;

ii.    That MARTY's fifty percent (50%) interest in 3216 NORTH RACINE LLC was assigned

to MAEVE LLC LLC-Series J (see *Petitioner's Exhibit #340*) on December 29, 2009;

iii.    That on December 29, 2009, MARTY's fifty percent (50%) interest in PC PROPERTY

HOLDINGS, LLC and its interest in 1927 NORTH SEDGWICK, CHICAGO, ILLINOIS was

transferred into MAEVE LLC, Series L; etc.

That the STOUT SERVICES Report (*Petitioner's Exhibit #102*) at Appendix I, Maeve, LLC,

Report, pages 3 thru 8, contain an accurate detailing of each of the MAEVE LLC Series as of the date

of December 31, 2020 and this court does incorporate said listing herein for purposes of describing each

Series.

**OWNERSHIP OF MAEVE LLC**: That the members of MAEVE LLC are Jack Enterprises,

LP with a Ninety-Nine percent (99%) ownership interest and The Frank Martin Paris, Jr. Revocable

Trust with a One Percent (1%) ownership interest. That as stated at Page 21 of MARTY's Closing

Statement, there is agreement that "*each series in MAEVE LLC has identical ownership and*

*management – MAEVE MANAGER, Inc. as manager and Jack Enterprises at 99% and FMPRT* (i.e.

Frank Martin Paris Revocable Trust) *at 1% ownership respectively.*"

**JACK ENTERPRISES LIMITED PARTNERSHIP** was incorporated on October 22, 2009

(See *Petitioner's Ex. #118*) and is owned Ninety-nine percent (99%) by Conor Management, LLC. (See

*Petitioner's Ex. #119*) and One percent (1%) by Conor DE, I. That JACK ENTERPRISES has a

Ninety-nine percent (99%) ownership interest in MAEVE, LLC. as stated above.

**CONOR DE, I** was incorporated on 10/22/09 in the State of Delaware; MARTY signed as Incorporator and Director (*Petitioner's Ex. #108*) That One Thousand (1000) shares of the 3000 authorized shares of common stock of CONOR DE, I were issued to Martin Nevada, I, Inc. (MARTIN NV I, Inc.) on October 22, 2009 (See *Petitioner's Ex. #109*). That CONOR DE, I, Inc. has a One percent (1%) interest in JACK ENTERPRISES as stated above.

**CONOR DE II, Inc.** was incorporated on October 20, 2009 (See *Petitioner's Ex. #104*) and One Thousand (1,000) Class A Common Stock voting shares are held by the Frank Martin Paris, Jr. Revocable Trust, and Six Hundred (600) shares of Class B Common Stock non-voting shares owned by Frank Martin Paris, Sr. (See *Petitioner's Ex. #105*). CONOR DE II, Inc. owns One Hundred percent (100%) of MARTIN NV A., LLC.

**MARTIN NV A, LLC.** was incorporated in the State of Nevada on October 20, 2009 (See Petitioner's Group Ex. #131, Bates Page 1547), with MARTY as the sole manager thereof (See Petitioner's Group Ex. 131, Bates Page 1542). That Martin NV A, LLC. is wholly owned by Conor DE II, Inc. as reflected by the Certificate of Membership dated October 20, 2009 which issued One Hundred (100) units of membership to Conor DE II, Inc. (See Petitioner's Group Ex. 131, bates Page 1549) and as evidenced by "Exhibit A Membership Information" to the Operating Agreement (See *Petitioner's Group Ex. 131 at Bates page 1599*). That MARTIN NV A, LLC, owns ten (10) shares of MARTIN NV 1, Inc.

**CONOR MANAGEMENT, LLC.** was incorporated on October 21, 2009 in the State of Delaware (see *Petitioner's Ex. #114, Bates p.1840*), is owned One percent (1%) by the FMP, Jr. Trust and Ninety-nine percent (99%) by MARTIN NV II, Inc. (See *Petitioner's Group Ex. #113, 2017 Tax Return, K-1*).

That Conor Management, LLC. has a Ninety-nine percent (99%) ownership interest in JACK ENTERPRISES as stated above.

**MARTIN NV I, Inc**. was incorporated in the State of Nevada on October 21, 2009 (See Petitioner's Group Ex. #133, Bates Page 1612) and MARTY was named as the sole director of the corporation on the same date (See Petitioner's Group Ex. #133, Bates Page #1610). That on October 21, 2009, MARTIN NV I, Inc. issued 990 shares of stock to CONOR DE II, Inc. and Ten (10) shares to MARTIN NV A, LLC.

That MARTIN NV I, Inc. owns One Hundred Percent (100%) of CONOR DE I as stated above.

**MARTIN NV II, Inc**. was incorporated in the State of Nevada on October 20, 2009 (See *Petitioner's Ex. #122*) and issued all of its authorized Common Shares to the Frank Martin Paris, Jr. Revocable Trust on the same date (See *Petitioner's Group Ex. # 125*). That on January 1, 2011, the Trust transferred 682 shares of common stock to the children's Trust (See Petitioner's Ex. #_____), the first of a number of such transactions. At the time of trial, the MARTIN NV II, Inc. stock was owned Eighty-eight and 09/100's percent (88.009%) by the Frank Martin Paris, Jr. Revocable Trust and Nine and 91/100's percent (9.991%) by the Children's Trust.

That Martin NV, II, Inc. has a Ninety-nine percent (99%) interest in Conor Management, LLC. as stated above.

The **FRANK MARTIN PARIS JR. REVOCABLE TRUST:**

That the Frank Martin Paris, Jr. Revocable Trust has the following ownership interests:

1) One Hundred percent (100%) interest in CONOR DE II, Inc.;

2) One percent (1%) interest in MAEVE, LLC.;

3) One percent (1%) interest in CONOR MANAGEMENT, LLC.

4) An eighty-nine percent (89%) interest in MARTIN NV II, Inc.

FINDINGS: That the court does find that MARTY's interests in MAEVE LLC and all of the Series therein are all his non-marital assets except as otherwise noted herein. That the court does find that MARTY's interest in JACK ENTERPRISES LIMITED PARTNERSHIP is his non-marital property. That the court does find that MARTY's interest in CONOR DE, I and in CONOR DE II, Inc.

are his non-marital property. That the court does find that MARTY's interest in MARTIN NV A, LLC.,

MARTIN NV I, Inc., and MARTIN NV II, Inc. are his non-marital property. That the court does find

that MARTY's interest in CONOR MANAGEMENT, LLC. is his non-marital property. That the court

does find that MARTY's interest in the FRANK MARTIN PARIS JR. REVOCABLE TRUST is his

non-marital property.

## VALUATION OF MARTY'S NON-MARTIAL BUSINESS INTEREST

That the STOUT SERVICES Report and evaluation of MARTY's interests related to his

business interests "determined the Fair Market Value of a 99% equity interest in Maeve, on a

marketable, controlling-interest basis, as o December 31, 2020 to be: SEVENTEEN MILLION THREE

HUNDREDTWENTY THOUSAND DOLLARS (**$17,320,000**)" (See *Petitioner's Exhibit #102,*

*Maeve, LLC, p.15.*) That as Mr. Potter notes in the Report, and as this court learned thru the course of

the trial, STOUT was not provided with all of the documents requested through the discovery process in

the case to enable it to do a complete analysis of all of MARTY's possible interests. The record is

replete with the amount of time and motions related to discovery in the preliminary proceedings of the

cause.

That the court heard at testimony from Brian Potter of STOUT over parts of seven (7) days

related to the evaluation, the testimony John Vansanten over two (2) days related to the appraisal of the

Sedgwick real estate, and the testimony of Arthur Murphy over four (4) days related to the properties he

appraised, as well as to the valuation methods utilized by each witness and the Reports generated in

their process. The court found their process(es) and their resulting valuation results to be credible. The

court would note that the cross-examination of these witnesses was conducted, in large part, by

MARTY himself in a very capable manner. Although he was not disclosed as a Rule 213 expert

witness, MARTY certainly possess the knowledge, experience and expertise to qualify as an expert as it

**EXHIBIT A, Page 57 of 101**

relates to the value of real estate of the type that was the subject of the Stout Report. This line of questioning was right in the proverbial "wheelhouse" of MARTY.

That MARTY himself provided his own valuation of his interests in the real estate related to his "partnerships/LLC Interests" in conjunction with his loan application to Beverly Bank/Wintrust in January of 2022 (See *Petitioner's Exhibit #755 et al*) wherein MARTY placed the value of those interests at Twenty-Three Million, Four Hundred, Twenty-eight Thousand dollars (**$23,428,000.00.)** Additional support for MARTY's valuation can be found in the Personal Financial Statements he prepared in conjunction with the Old Second Bank mortgages and others tendered to institutional lenders.

That while there is some variance in the values arrived at by STOUT and MARTY, it is clear to the court that the non-marital estate is substantial, with a mean value of Twenty Million, Three Hundred, Seventy-four Thousand dollars (**$20,374,000.00**).

### 711 PARK AVENUE, RIVER FOREST, ILINOIS (The House)

That upon the purchase of 711 Park Avenue (parcels #030 and 031) on November 21, 2003, a Warranty Deed was executed transferring title to MARTY and KERRY as Tenants by the Entirety (See *Petitioner's Exhibit #616*). That on April 28, 2006, MARTY and KERRY executed a Warranty Deed in Trust to KERRY as Trustee of the KERRY REIDY PARIS REVOCABLE TRUST (See *Petitioner's Exhibit #615*). Next, on February 3, 2011, Kerry AS Trustee of the KRPRT conveyed both parcels (030) and (031) to MARTY and KERRY as Husband and Wife (See *Petitioner's Exhibit #617*).

That on February 22, 2013, the property at 711 Park Avenue (lots 030 and 031) along with the real estate at 703 Park Avenue (the Lot, parcel #029) were pledged as security for a Mortgage in the amount of $1.3 Million, along with the two lots (030 and 031) that comprise 711 Park Avenue, taken by MARTY and KERRY from J.P. Morgan Chase Bank (See *Petitioner's Exhibit #619*).

That the court doe find that the real estate located at 711 Park Avenue, River Forest, Illinois (parcels 030 and 031) are marital property. The court does also note that the title is liened with a

58

Memorandum of Judgment in favor of Howard Rosenberg, the Children's Representative, in the

amount of $87,629.53 (See *Petitioner's Exhibit #620*) and by a Federal Tax lien in the approximate

amount of $250,00.00 as testified to by the parties.

### 703 PARK AVENUE, RIVER FOREST, ILLINOIS (The Lot)

That on **September 7, 2012**, the real estate located at 703 Park Avenue, River Forest, Illinois

was acquired by MAEVE LLC – Series U, for a purchase price of $432,825.00 (See *Respondent's*

*Exhibit #45F1. Stewart Title Co. Settlement Statement*). That MARTY testified that the funds for the

purchase of 703 Park Avenue came from the MAEVE LLC J.P. Morgan account xxx-4992 and is

reflected in *Respondent's Exhibit #45F2, Loan Summary for Loan #xxx-5032*, dated "the period of

6/30/12 to 7/31/12" in the amount of $431,890.21. The Statement is signed by MARTY as president of

MAEVE MANAGER, INC. That a Special Warranty Deed was executed by the Sellers on August 31,

2012 to MAEVE LLC – Series U (See *Petitioner's Exhibit #618*).

That on February 22, 2013, the Lot (parcel #029) was pledged as security for a Mortgage in the

amount of $1.3 Million, along with the two lots (030 and 031) that comprise 711 Park Avenue, taken by

MARTY and KERRY from J.P. Morgan Chase Bank (See *Petitioner's Exhibit #619*).

That the court received no other documentation related to the Lot.

That the court does find that although title to 703 Park Avenue, River Forest, Illinois is held in

Maeve LLC - Series U, the act of pledging the non-marital lot for a marital obligation (i.e. the $1.3

Million mortgage) transmuted the interest in the Lot into a marital asset.

### STOCK PLEDGE AGREEMENTS AND SECURED NOTES
### BETWEEN FRANK MARTIN PARIS, JR. AND KEYSTONE & STUART, LLC.
### AND RELATED DOCUMENTS AND EXHIBITS

That on August 8, 2017, Judge Bowes held a non-evidentiary hearing and entered an award of

interim fees and costs totaling Seven Hundred Fifty Thousand dollars ($750,000.00) to be funded by an

equity line of Two Hundred Thousand dollars ($200,000.00) to be secured by the Paris family home

and the balance of Five Hundred-Fifty Thousand ($550,000.00) dollars to be funded by MARTY. That

in September of 2017, KERRY filed her petition for indirect civil contempt alleging MARTY's failure

to comply with said Order. That a hearing on the petition for rule was held on February 28, 2018 and

Judge Bowes' Order of Adjudication of Indirect Civil Contempt and/or Order of Commitment was

entered on March 1, 2018 against MARTY. The order of commitment was stayed until subsequent

proceedings.

Ultimately the Order of Commitment against MARTY was executed on May 21, 2018, and he

was taken into custody by the Sheriff of Cook County, Illinois with the purge being set for the

$550,000.00 as previously ordered. That on May 25, 2018, MARTY did appear before this court

(sitting in Judge Bowes' stead), tendered the purge amount plus an additional One Hundred Thousand

dollars ($100,000.00) and was released from custody (See Order dated May 25, 2018). An appeal

resulted which was affirmed and reported at **IN RE PARIS, 2019 IL App (1st) 18116-U; 2019 Ill.App.

Unpub. LEXIS 2326 (1st Dist., 2019).**

That the funds of Six Hundred-Fifty Thousand dollars ($650,000.00) were secured and procured

by MARTY from Keystone & Stuart, LLC, a private lender wholly owned by MARTY's father, Frank

Martin Paris, Sr. whose evidence deposition was taken in this cause on December 4 and December 11,

2019. That the transcript thereof was entered into evidence and provided to the court by counsel. That

the executed Stock Pledge Agreement, Secured Note/Fixed Rate, Option Contract and various attached

exhibits were entered into evidence at trial.

    i.   STOCK PLEDGE AGREEMENT: (See *Petitioner's Ex. #647*) The Stock Pledge

Agreement was entered into on May 25, 2018 and signed by MARTY both individually and as

Trustee of the Frank Martin Paris, Jr. Revocable Trust (See p.9 thereof).

    ii.  That Exhibit "A" to the Agreement, "Pledged Shares" identifies Forty-nine percent

(49%) shares of the voting common stock and Forty-nine percent (49%) of the shares of the

non-voting common stock of MARTIN NV II, Inc. as the pledged shares. This Exhibit is also

signed by MARTY individually and as Trustee of the FMP., Jr. REV.TRUST.

**EXHIBIT A, Page 60 of 101**

iii. That Paragraph (F) contains three (3) restrictive covenants that MARTY shall not cause

the Company i) to incur debt outside of the company's ordinary course of business in excess of

$7,500.00; ii) pay compensation to Pledgor/MARTY in excess of $20,000.00 per month; and iii)

make any loan to Pledgor/MARTY.

iv. That Paragraph G of the Agreement requires MARTY to maintain full-time employment

and control over the Company.

v. That Paragraph 5 of the Agreement sets forth default provisions.

vi. That Paragraph 8 of the Agreement sets out remedies upon default including the right to

sell the Collateral upon ten (10) days advance notice (more later).

vii. Paragraph 12 of the Agreement sets forth the Addresses for Notices related to the

Agreement, for MARTY, Keystone & Stuart, LLC, and a copy to George Spathis, Esq. Frank

Martin Paris, Sr.'s attorney.

viii. STOCK POWER: signed by MARTY individually granting the Secured Party

(Keystone & Stuart, LLC) certain powers over the Pledged Shares as set out in the Agreement.

ix. SECURED NOTE/FIXED RATE: (See *Petitioner's Ex. #649*) The Secured Note dated

May 25, 2018 set the terms of the loan; i.e. loan amount of $650,000.00 (Par. 1 therein);

Nineteen percent (19%) annual interest rate in the absence of a default (Par.3); monthly

payments of the interest in the amount of Twelve Thousand, Seven Hundred, fifty-six dollars

($12,756.00) for eleven months from July 1, 2018 through June, 2019; and payment of the

principal amount of $650,000.00 on June 1, 2019 (Par. 1.(a) and (b).).

That a default on the terms of the loan would result in an annual interest rate of Twenty-five

percent (25%) being impose, and the balance and all other amounts due under the Agreement

would be immediately due. (Par. 6).

x. OPTION CONTRACT: (See *Petitioner's Ex. # 650*) That also executed on May 25,

2018, was the Option Contract which granted Keystone & Stuart an option to purchase Two

percent (2%) of Martin NV II, Inc.'s voting common stock and non-voting common stock in the

event of a default by MARTY under the terms of the Stock Pledge Agreement and/or the Note.

The Option Contract was signed by MARTY as Trustee of the FMP, Jr. Revocable Trust and

Frank Martin Paris on behalf of Keystone & Stuart, LLC. and would have expired on July 31,

2019 had MARTY not been in default.

That Mr. Paris, Sr. testified in his deposition that the loan was made related to MARTY's

incarceration, that it was not the type of loan he would normally make but that he wanted to see

MARTY out of jail. (*FMP, Sr. Deposition transcript, pp 15-16*). He testified that the interest rate of

Nineteen percent (19%) was due to the lack of collateral pledged, that other similar personal loans made

to his other children were lower "because they were based on collateral" (*FMP, Sr. Dep.Tr. p. 30.*).

However, Mr. Paris later stated that he did not recall whether MARTIN NV II's assets were collateral

for the loan in May, 2018 (*FMP, Sr. Tr. p 46 and 48*). He did state that he was told that MARTY was in

default on the loan (*FMP Sr. Dep.Tr. p.25 and 26.*) but had not made a decision how to react to it.

(*FMP Sr. Dep.Tr. p.26*). Lastly, Mr. Paris, Sr. testified that he had engaged counsel to take the lead in

negotiating the loan with MARTY on behalf of Keystone & Stuart (*FMP Sr. Dep.Tr. p 103 and 105*).

That the evidence at trial reflected that MARTY was indeed in default on the Keystone &

Stuart, LLC loan both in July, 2018 and at the time of trial. That a "Notice of Disposition of Collateral

at Public Sale was issued by Keystone & Stuart, LLC, to MARTY of a sale of the pledged shares on

MARTIN NV II, Inc. to take place on June 24, 2021 at the offices of Fox Rothschild, LLP. (See

*Petitioner's Exhibit #600*). That said notice reflected an outstanding balance of $1,068,035.29 as of

April 29, 2021 under the loan documents. That in June of 2021, after service of the Notice of

Disposition of Collateral at Public Sale related to the Keystone & Stuart loan, counsel for KERRY had

prepared and sent a Notice of Motion and "Motion to Add Keystone & Stuart, LLC and Frank Martin

Paris, Sr. as Third Party Defendants" to counsel for K & S, that Notice was withdrawn and the

MARTIN NV II, Inc. stock that was pledged as collateral for the loan was not sold.

**EXHIBIT A, Page 62 of 101**

That as memorialized in a letter from Keystone & Stuart's counsel dated July 23, 2018 (*Petitioner's Exhibit #695*), K & S did consent to MARTY's request for consent to the issuance of dividends by MARTIN NV II, Inc. "for purposes of paying interest due on the Note." That there was no evidence at trial related to whether such dividends were issued, and the testimony reflected that only one payment was made on the Keystone loan. That the evidence at trial reflects that said loan is still in default and accumulating penalties and additional interest.

There was no evidence that Keystone & Stuart ever exercised their right to purchase the additional MARTIN NV II, Inc. stock as provided for in the Stock Option that would give Keystone & Stuart, LLC, a Fifty-one percent (51%) interest in MARTIN NV II, Inc. had they perfected their rights under the Note and the Stock Pledge Agreement.

FINDING: That the court does find that the Keystone & Stuart indebtedness is a personal obligation of MARTY and should be allocated accordingly.

## DID MARTY'S PERSONAL EFFORTS CAUSE EITHER TRANSMUTATION OR TRIGGER A RIGHT OF REIMBURSEMENT TO THE MARITAL ESTATE, OR WAS MARTY (AND THE MARRIAGE) REASONABLY COMPENSATED FOR HIS PERSONAL EFFORTS?

That **750 ILCS 5/503 (c)(2)(B)** states:

*"(B) When a spouse contributes personal effort to non-marital property, it shall be deemed a contribution from the marital estate, which shall receive reimbursement for the efforts if the efforts are significant and result in substantial appreciation to the non-marital property except that if the marital estate reasonably has been compensated for his or her efforts, it shall not be deemed a contribution to the marital estate and there shall be no reimbursement to the marital estate. The court may provide for reimbursement out of the marital property to be divided or by imposing a lien against the non-marital property which received the contribution.*

In determining whether the marital estate is entitled to reimbursement from a nonmarital business for the contribution of personal efforts of a spouse, the court may inquire as to whether the

63

spouse was reasonably compensated by the business for those efforts. If the spouse has already been

reasonably compensated for the personal effort, no reimbursement is necessary. **IN RE WERRIES,**

**247 Ill.App.3d 639,648; 616 N.E.2d 1379; 1993 Ill.App. LEXIS 1078 (4th Dist., 1993)** citing **IN RE**

**PERLMUTTER, 225 Ill.App.3d at 372; 587 N.E.2d at 615; 1992 Ill.App. LEXIS 189; (2nd Dist.,**

**1992)**

     That MARTY's monthly salary of Twenty Thousand dollars ($20,000.00) was the subject of the

STOUT SERVICES "Compensation Analysis" in Petitioner's Exhibit #102, and the subject of Brian

Potter's testimony in the cause. (See p.17-18 and pp.36-38, *"Marriage of Paris" of the STOUT*

*SERVICES Report, Petitioner's Ex. #102.*) In doing their analysis, STOUT SERVICES looked at *"the*

*level of compensation that could be earned by Marty for his efforts in overseeing the Entities....the*

*market level of compensation that would be paid to an executive to manage the operations of certain of*

*the Entities (and their combined holdings), including Sedgwick Holding, Alpha carpentry, Alpha*

*Property, Alpha Construction, Alpha Drywall, and Maeve (the "Observed Companies")."*

     That STOUT SERVICES considered that the operating companies of Sedgwick Holding, Alpha

Carpentry, Alpha Property, Alpha Construction, and Alpha Drywall generated revenue of $16.5 million

in the year of 2020 in doing this analysis, a figure that was disputed by the tax returns for each entity by

MARTY. STOUT SERVICES also considered the value of the "Assets Under Management" (AUM) of

Maeve to be approximately $31.9 million as of December 31, 2022, also disputed by MARTY based

upon his disagreements with the appraisals and values reached by STOUT SERVICES personnel and

Arthur Murphy related to the various Maeve assets. That STOUT SERVICES puts "a market level of

compensation to be approximately $650,000.00 (per year)."

     That this court has heard detailed and cumulative testimony and evidence related to the

Sedgwick Properties Development projects, the terms and details of the loans and collateralization of

same, the restrictive covenants related to the loans, the terms of default of the various loans, etc. and the

court cannot help but recognize that the STOUT SERVICES analysis of compensation omits a glaring

factor that the hypothetical *" executive manag(ing) the Entities"* does not have; i.e. the personal financial risk that MARTY bears in managing the Sedgwick business(es). It is true that MARTY has the authority that set his compensation, and that he has the authority to change it, (see below for historical income) but he is essentially self-employed and like many such individuals is limited by the cash flow and profits of the business after considering its other obligations. So, to a certain extent the STOUT compensation analysis of MARTY's income compares apples to oranges; i.e. how much a salaried manager performing the stated duties may expect as compensation versus that of an essentially self-employed individual. (See more below re. MARTY'S INCOME.) Like many small, self-managed entities, the Sedgwick business experienced some very good years, some lean years and some very difficult years particularly from 2020 until the present as a result of external factors.

FINDING: That after consideration of all of the evidence, analysis of the records and the nature and extent of MARTY's duties and role(s) in the Sedgwick Properties Development Companies, including the nature of its highly leveraged finances, the court cannot find that MARTY's compensation is unreasonable given same. The court does find that no compensation to the marriage for MARTY's compensation is warranted under the facts of the case.

## MARTY'S INCOME

That throughout the trial and the pre-trial phases of this cause, MARTY has maintained that his income is the monthly salary of Twenty-Thousand dollars ($20,000.00) although the evidence and records belie that statement. That the evidence and testimony (including MARTY's admission to same) shows that MARTY controls and dictates both his salary and whether any annual distributions are made for dividends, bonuses and the like.

That a review of ***Petitioner's Group Exhibit #558***, the parties' joint tax returns, reflects the following:

**EXHIBIT A, Page 65 of 101**

## MARTY'S REPORTED INCOME ON TAX RETURNS

| YEAR | REPORTED INCOME | SOURCE AND COMMENTS |
|------|-----------------|---------------------|
| 2011 | Wages of $82,500<br>Tax-exempt interest of $73,070<br>Dividends of $66,736<br>Reports an AGI of (-$2,821,686) Loss | 1040 Line 7<br>1040 Line 8a<br>1040 Line 9a<br>In "Preparer Notes" explains the taxpayer's election to defer recognition of gain |
| 2012 | Wages of $83,542<br>Interest of $7,135<br>Dividends of $88,041<br>Schedule E income of $1,652,256<br><br>Line 21 shows (-$2,865,464) as "Other Income" | Line 7<br>Line 8a<br>Line 9a<br>Line 18 and Schedule E<br><br>Much of this tax return produced by MARTY is either obscured or blank and no evidence was presented as to the details of this claimed loss at trial |
| 2013 | W-2 for MARTY from "Goodwill Industries of Eastern (illegible)" of $60,000<br><br>W-2 wages of $49,000 for KERRY from "North Carolina Baptist Hospital" | Much of this "Return" is blank and there is no indication who prepared same<br><br>Neither MARTY nor KERRY worked for these entities |
| 2014 | W-2 wages for MARTY of $78,650<br>W-2 wages for KERRY of $ 40,000<br>Dividends of $153,602<br>Schedule E income for real estate of $566,643<br>Capital gain of $3,190,818 | Attached W-2's<br><br>Line 9a<br>Line 17<br>Line 13 |
| 2015 | W-2 Wages of $83,650<br>Taxable interest of $5,685<br>Dividends of $109,868<br>Capital gain of $49,409<br>Schedule $ income of $918,910 | Line 7<br>Line 8a<br>Line 9a<br>Line 13<br>Line 17 — Court's comment: We would expect to see some degree of consistency from year to year in Schedule E rental income |
| 2016 | W-2 wages for MARTY of $174,005<br>W-2 wages for KERRY of $63,050<br>Taxable Interest of $5,532<br>Dividends of $124,120<br>Capital gain of $901,082 and a Schedule E<br>Schedule E loss of ($825,860) | Line 7<br><br>Line 8a<br>Line 9a<br>Line 13, Schedule D<br>Line 17, Schedule E |
| 2017 | W-2 wages of $148,517<br>Taxable Interest of $2,760<br>Dividends of $145,151<br>Capital gain of $972,507<br>Schedule E loss of (-$764,391) | Line 7<br>Line 8a<br>Line pa<br>Line 13, Schedule D<br>Schedule E |

| | | |
|------|--------------------------------------------------------------------------------------------------------------------------------------------------------|-----------------------------------------------|
| 2018 | Zero (0) wages<br>Dividends of $165,200<br>Other income of $186,000 derived from a<br>Capital Gain of $1,404,914 (Schedule D)<br>Less Schedule E claimed loss of ($1,225,581) | Line 1<br>Line 3b<br>Line 6 and Schedule 1 |
| 2019 | Zero (0) wages reported<br>Interest of $3,524<br>Dividends of $159,325<br>Capital Gain of $184,424<br>Less: Claimed Schedule E loss of<br>($2,374,986) | Line 1<br>Line 2b<br>Line 3b<br>Line 6<br>Line 7a |
| 2020 | W-2 wages of $180,000<br>Taxable interest of $6357<br>Dividends of $93,538<br>Capital gain of $950,644<br>Less: Claimed loss of $4,514,938 | Line 1<br>Line 2b<br>Line 3b<br>Line 7<br>Line 8 and Schedule 1 |

That the use of the data in in the above Table, this court is simply stating the figures that are reflected in the documents produced by MARTY in production or at trial. This is not a finding by the court as to the reliability of the tax returns themselves. The 2013 wage reporting, for example, is simply incredible as there is no evidence that MARTY worked for Goodwill Industries or that KERRY worked for North Carolina Baptist Hospital. Additionally, testimony at trial stated that the parties have back taxes due to the IRS in the amount of $204,793 for the year of 2015 and for $44,655 for the year of 2017 which raises doubt about the accuracy of those returns and/or the deductions utilized by the tax advisor/preparer.

What is most reliable and of weight to the court are the amounts and categories of income that are controlled by MARTY such as wages, dividends, interest income, Schedule E real estate income, etc. that are easily verified and require supporting documents or Schedules to be attached to the taxpayer's tax return(s).

**EXHIBIT A, Page 67 of 101**

That the court does contrast the Income Tax Returns and Table above to the Personal Financial

Statements prepared and signed by MARTY himself in conjunction with the Sedgwick loans (See

*Petitioner's Group Exhibit #557, 559 and 560*).

## INCOME AND ASSETS AS SELF-REPORTED ON
## MARTY'S PERSONAL FINANCIAL STATEMENTS FOR LENDERS

| | REPORTED SALARY | REPORTED DIVIDENDS/ADDITIONAL INCOME | REPORTED NET INCOME | REPORTED ASSETS | REPORTED NET WORTH |
|---|---|---|---|---|---|
| **2012** | $225,000.00 | $753,000.00 | $510,600.00 | $17,258,945.00 | $15,288,945.00 |
| **2013** | $225,000.00 | $1,210,000 | $990,200.00 | $19,538,702.00 | $16,168,702.00 |
| **2014** | $225,000.00 | $1,152,000.00 | $861,200.00 | $24,395,762.00 | $20,115,752.00 |
| **2015** | $225,000.00 | $1,960,000.00 | $1,395,200.00 | $26,848,514.00 | $22,063,514.00 |
| **2016** | | | This PFS was for Pan American Bank | Is blank and unsigned | |
| **2017** | $120,000.00 | $1,454,500.00 | $964,500.00 | $25,094,780.00 | $19,926,780.00 |
| **2018** | $240,000.00 | $1,099,500.00 | $1,294,350.00 | $25,414,617.00 | $18,746,617.00 |
| **2019** | No stated income figures | This is for MARTIN NV, II, INC | | $25,414,617 | $18,746,617 |

That a comparison of the stated income in MARTY's tax returns in any given year reflects that

they do not match with the income reported in his Personal Financial Statements. That a more recent

Financial Statement was produced at trial upon production of same pursuant to KERRY's Subpoena to

Wintrust Bank. That *Petitioner's Exhibit #755*, **"Credit Approval Presentation"** is dated January 19,

2022 and contains relevant financial information tendered by MARTY to Wintrust/Beverly Bank &

Trust Company, N.A. in conjunction with the LAKE LATHROP PARTNERS, LLC., project being

done by Sedgwick Properties Development Corporation. That amongst the terms of the Approval are:

i.   The Guarantor is listed as Frank Martin Paris, Jr. with:

**EXHIBIT A, Page 68 of 101**

a.  Liquid Assets of $9,525,000.00;

b.  Total Assets of $34,940,000.00;

c.  Total Debt of $6,668,000.00; and

d.  Net Worth of $28,272,000.00; (see P.1 of Ex.#755.)

ii. That the "subject facility" will also have a corporate guaranty from Martin NV II, Inc; (see P.1.)

iii. That *"Mr. Paris' low credit score is primarily due to a $3 M collection account that will be settled with the resolution of Mr. Paris' divorce proceedings:"* (see P.1.)

iv. That *"Martin NV II, Inc. and Marty Paris will maintain a 100% completion guaranty as well as a limited guaranty on the facility. Mr. Paris reports liquidity of $9.5 MM, assets of $34.9 MM and a net worth of $28.3 MM."* (P.5.)

That on April 11, 2022, TERRY ROSENBERGER from Beverly Bank & Trust appeared and did testify pursuant to subpoena before this court. Mr. Rosenberger stated, INTER ALIA, that the loan for the LAKE LATHROP project closed around February 8 or 10th, 2022; that the lender accepted MARTY's 2019 Personal Financial Statement rather than an updated statement because *"it was my understanding that the property was underwritten; i.e we evaluate the project and rely on the project;"* that Rosenberger had approved two (2) construction draws to date on the project, and has not denied any construction draw on the project to date.

## THE COURT'S FINDINGS REGARDING MARTY's INCOME:

That after reviewing and considering the evidence presented, the court does make the following findings related to MARTY's personal income for purposes of the calculation of support and maintenance, allocation of assets and liabilities, and as otherwise utilized herein:

i. That MARTY controls his own salary;

ii. That MARTY controls issuance of dividends and interest in the various entities in which he holds financial interests vis-à-vis Sedgwick, Maeve, Martin NV II, Inc.., etc.;

iv. That MARTY has reported differing historical income to the I.R.S. (his tax returns) than to potential lenders (his Personal Financial Statements), albeit that "income" is not necessarily similarly defined for these entities;

v. That MARTY's testimony regarding his precise personal income was not credible, was evasive, and unreliable;

vi. That George Spencer's testimony regarding MARTY's income was not credible; and

vii. That the STOUT SERVICES Compensation Analysis was thorough, appears to meet community standards in terms of the analysis utilized (see Case), and is credible to the extent that it is an apt comparison of MARTY's duties compared to the hypothetical manager of Stout's analysis, i.e. (See *Petitioner's Exhibit #102, Marriage of Paris, p.17 and 18.*) *"the market level of compensation that could be earned by Marty for his efforts in overseeing the Entities... including Sedgwick Holding, Alpha Carpentry, Alpha Property, Alpha Construction, Alpha Drywall and Maeve (the "Observed Companies."* (P.17.) Potter stated that they considered the Executive Compensation Assessor survey prepared by the Economic Research Institute, comparing MARTY's compensation to that of CEO's of companies with assets under management (AUM) consistent with Maeve, LLC., and assets of Sedgwick Holding, Alpha Carpentry, Alpha Property, Alpha Construction, and Alpha Drywall, finding that the market level of compensation of MARTY's management of the entities to be Six Hundred, Fifty Thousand dollars ($650,000.00) per year.

That this court does find said assessment of assistance in that it leads to the conclusion that MARTY's current salary of Twenty thousand dollars ($20,000.00) per month to be understated compensation for the work performed by MARTY. That nevertheless, after considering all of the above data and information, the court cannot make an accurate determination of MARTY's actual income other than it is minimally his stated salary of $240,000.00 and somewhere above that when distributions occur. That the court does find that MARTY does have sufficient income and/or resources to make provision for the financial support and maintenance of KERRY and the Paris children.

## THE MARITAL ESTATE

That after a review of the evidence and the case law as set forth herein, the court does determine

the marital estate to be as follows:

A.) The two retirement accounts at **Charles Schwab & Co.**:

 i. 401(k) Account #5514 with a balance of $643,061.00 as of 9/1/21; and

 ii. IRA Account #3167 with a balance of $107,502.00 as of 9/1/21.

 iii. <u>Court ordered return of funds to account of $87,500.00.</u>
   Subtotal:          **$838,063.00**

That the evidence showed that MARTY accessed the funds in IRA Account #3167 sometime

between September 1, 2021 and this court's Injunctive Orders, and that at the time of the conclusion

of this trial the balance of said account was zero (-0-), ergo, the marital estate was depleted by at

least the sum of $107,502.00 by MARTY's unilateral use of those funds.

Similarly, this court directed MARTY to replenish the retirement account(s) in the amount of

$87,500.00 as set forth in this court's Order. As of this writing, MARTY has failed to do so.

The court does find that the value of the Schwab 401(k) account is $643,061.00 plus any

accumulation since September 1, 2021, but would be $838,063.00 plus any accumulation since

September 1, 2021 but for MARTY's unilateral withdrawal of the sums stated.

B.) The Paris' interest in **828 W. Grace Street, Unit 402 and P-37**:

That the appraised market value of the condominium and parking space was $360,000.00 as of

August 25, 2021 (see *Petitioner's Exhibit #315*). That title to the property was taken in joint tenancy

between MARTY and KERRY PARIS, and Bridget K. Reidy, and that a mortgage in the initial

amount of $158,150.00 was taken in <u>all three names.</u> Ergo, a precise valuation of the MARTY and

KERRY marital interest is somewhat difficult to ascertain. Nevertheless, the marital interest is

easily addressed in an equitable manner.

71

That for valuation purposes in this proceeding, the court does attribute One-third (1/3) of the value to each of the titled individuals; i.e. MARTY, KERRY and Bridget.

C.) The Paris' interest in **1454 S. Michigan Unit 1605 and P-48:**

That the appraised market value of the condominium and parking space at 1454 South Michigan Avenue was $370,000.00 as of August 25, 2021 (see *Petitioner's Exhibit #306*). That title to the property was taken between MARTY and KERRY PARIS with a Fifty percent (50%) interest and Bridget K. Reidy with a Fifty percent (50%) interest. That a mortgage in the initial amount of $158,150.00 was taken in all three names. Ergo, a precise valuation of the MARTY and KERRY marital interest is somewhat difficult to ascertain. Nevertheless, the marital interest is easily addressed in an equitable manner.

For valuation purposes in this proceeding, the court does find that the Paris' interest in 1454 S. Michigan Unit 1605 and P-48 to be $90,000.00.

D.) **MK MANAGER CORPORATION:** That the evidence at trial shows that MK MANAGER CORPORATION is a marital asset that has been valued at Twenty-eight Thousand dollars ($28,000.00).

E.) **EVENTRIC LLC:** That the evidence shows that EVENTRIC LLC is a marital asset valued at $50,000.00.

F.) **PET HEALTH PEOPLE:** That the evidence shows that PET HEALTH PEOPLE is a marital asset valued at $50,000.00.

G.) **REAL ESTATE LOCATED AT 703 PARK AVENUE and at 711 PARK AVENUE, RIVER FOREST, ILLINOIS:** That as stated above, the court finds the real estate both 703 Park Avenue (parcel 029) and 711 Park Avenue, River Forest, Illinois (parcels 030 and 031) to be marital property. That the properties were appraised at $550,000.00 and $1,060,000.00 respectively by Arthur Murphy of Urban Real Estate Research on November 2, 2021 (See *Petitioner's Exhibits # 313 and #314 respectively*). Unfortunately, the properties are encumbered by the $1.3 Million

**EXHIBIT A, Page 72 of 101**

mortgage, the Memorandum of Judgment for $87,629.53 and the Federal tax lien of approximately $250,000.00.

## ALLOCATION OF THE MARITAL ESTATE

**750 ILCS 5/503 FACTORS:**

*(d) In a proceeding for dissolution of marriage or declaration of invalidity of marriage, or in a proceeding for disposition of property following dissolution of marriage by a court that lacked personal jurisdiction over the absent spouse or lacked jurisdiction to dispose of the property, the court shall assign each spouse's non-marital property to that spouse. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:*

*(1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including (i) any decrease attributable to an advance from the parties' marital estate under subsection (c-1)(2) of Section 501; (ii) the contribution of a spouse as a homemaker or to the family unit; and (iii) whether the contribution is after the commencement of a proceeding for dissolution of marriage or declaration of invalidity of marriage;*

That the court does find that both parties made equal and substantial contributions to the acquisition of the marital estate from the date of the marriage through the date of this Judgment. The simple fact is that without KERRY's daily care of the household and of the children, MARTY could not run his business, and the parties' joint duty to support and nurture the children could not be met.

*(2) the dissipation by each party of the marital property, provided that a party's claim of dissipation is subject to the following conditions:*

See above for the discussion related to the parties' Retirement assets and the advances against same taken by MARTY.

**EXHIBIT A, Page 73 of 101**

*(i) a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later;*

*(ii) the notice of intent to claim dissipation shall contain, at a minimum, a date or period of time during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred;*

*(iii) a certificate or service of the notice of intent to claim dissipation shall be filed with the clerk of the court and be served pursuant to applicable rules;*

*(iv) no dissipation shall be deemed to have occurred prior to 3 years after the party claiming dissipation knew or should have known of the dissipation, but in no event prior to 5 years before the filing of the petition for dissolution of marriage;*

*(3) the value of the property assigned to each spouse;*

The values of the various assets are set forth above. The value of MARTY's non-marital interests far exceed the marital estate.

*(4) the duration of the marriage;*

The parties have been married since 2002, the Petition for Dissolution of Marriage was filed in 2016, and the dissolution is now being entered.

*(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having the primary residence of the children;*

See the discussion of the maintenance factors herein as it relates to the parties' relevant economic circumstances, along with the court's discussion of MARTY's income and non-marital estate.

As to *"the desirability of awarding the family home…,"* the court does find the following:

74

(i) That the parties purchased the residence at 711 Park Avenue, and then later the Lot next door at 703 Park Avenue, for the express purpose of providing their growing family with a stable, long-term home in a town which MARTY expressly desired and himself was raised;

(ii) That the parties expended in excess of $1.7 Million in the acquisition and improvement of the property towards the above ends;

(iii) That 711 Park Avenue has been the home of all of the children for virtually all of their lives;

(iv) That the children's lives are engrained in the River Forest community, going to schools there and very actively participating in numerous activities therein;

(v) That the home has been a source of comfort and stability to the children at all times and particularly during the acrimonious period of divorce between their parents;

(vi) That all of the children have clearly expressed their desire to remain in the home through both the Children's Representative and the court's 604 expert, Dr. Amabile.

(vii) That the court does find that it is in the best interests of all, and each, of the Paris children that they remain in the marital home for such time as reasonable and necessary for their emotional and developmental well-being.

*(6) any obligations and rights arising from a prior marriage of either party;*

That neither party was previously married, nor do they have other obligations related to maintenance or support.

*(7) any prenuptial or postnuptial agreement of the parties;*

That there was no evidence of any prenuptial or postnuptial agreement entered into by the parties.

*(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;*

75

See the discussions herein related to these factors as discussed in the sections related to maintenance, the marital and non-marital estates, incomes and the like.

*(9) the custodial provisions for any children;*

See the Allocation Judgment entered herewith for a discussion of the specifics related to this factor. Of particular note is the court's findings relative to KERRY being the residential parent who has the vast majority of parenting time of the children, as well as responsibility for decision-making.

*(10) whether the apportionment is in lieu of or in addition to maintenance;*

The property allocation is not in lieu of maintenance.

*(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and*

See the discussion herein related to maintenance and this factor.

*(12) the tax consequences of the property division upon the respective economic circumstances of the parties.*

The court does consider same.

*(e) Each spouse has a species of common ownership in the marital property which vests at the time dissolution proceedings are commenced and continues only during the pendency of the action. Any such interest in marital property shall not encumber that property so as to restrict its transfer, assignment or conveyance by the title holder unless such title holder is specifically enjoined from making such transfer, assignment or conveyance.*

**THEREFORE,** the court does allocate the marital estate as follows:

A.) The **two retirement accounts at Charles Schwab & Co.:**

    i.   The totality of the 401(k) Account #5514 to KERRY, free and clear from any claim of interest by MARTY; and

**EXHIBIT A, Page 76 of 101**

      ii.  Any remaining balance in the IRA Account #3167 to MARTY, free and clear of any claim of interest from KERRY.

B.) The Paris' interest in **828 W. Grace Street, Unit 402 and P-37** to KERRY, free and clear of any further claim of interest by MARTY;

C.) The Paris' interest in **1454 S. Michigan Unit 1605 and P-48** to KERRY free and clear of any further claim of interest by MARTY;

D.) **MK MANAGER CORPORATION** to MARTY free and clear of any further claim of interest by KERRY;

E.) **EVENTRIC LLC,** to MARTY free and clear of any further claim of interest by KERRY;

F.) **PET HEALTH PEOPLE**, to MARTY free and clear of any further claim of interest by KERRY;

G.) **REAL ESTATE LOCATED AT 703 PARK AVENUE and at 711 PARK AVENUE, RIVER FOREST, ILLINOIS:** That the court has considered these parcels of real estate under both Sections 503 and 504 of the IMDMA and does consider it in the best interests of the Paris children that temporary exclusive possession of the home and the lot be awarded to KERRY under the terms described hereafter in the Maintenance award herein.

That upon HUGH's completion of eight (8th) grade, all parcels of the real estate shall be listed for sale with a licensed broker agreed to by the parties. That if the parties cannot agree to the broker, each shall submit names to the court and a name will be drawn randomly out of a hat. That if the parties cannot agree to a listing price, the broker shall set same. The parties are to cooperate with the listing broker in showing, scheduling and otherwise presenting the house for sale and are to do so in a prompt manner, and are to cooperate to clear title and take necessary steps for a successful closing to the Buyer(s).

That MARTY is solely responsible for any Federal and/or State of Illinois taxes that encumber the properties, and for any amounts due for same (including any interest, penalties or fines related

thereto), and that said sums shall be satisfied by MARTY's share of the proceeds therefrom. That MARTY shall also be responsible for the amounts due to Howard Rosenberg, the Children's Representative, under any Memorandum of Judgment that is recorded/encumbered against the property(ies). That if there is insufficient equity/ net proceeds to Seller or a deficiency ("Due from Sellers") on the Paris' side, MARTY shall be solely responsible for satisfying such obligation(s) such that the closing may be successfully completed in a timely manner.

That in the event of the failure of either MARTY or KERRY to comply with these provisions, the court, upon notice and motion, may appoint a Power of Attorney as necessary, granting the authority to undertake all necessary actions to effectuate the terms of this provision.

That any net proceeds, after the payment of such necessary and ordinary closing costs are paid, shall be divided equally (50/50) between MARTY and KERRY. That all personal property including furniture and the like in the residence and other buildings is awarded to KERRY as her sole and exclusive property, free and clear of any further claim of interest from MARTY. That MARTY is solely responsible and liable for any back real estate taxes that may be due on said property.

That during KERRY's period of exclusive possession of said property, MARTY is ordered and directed to timely make payment(s) of the monthly mortgage obligation related thereto, pay the real estate taxes on each parcel in a timely fashion, and pay and maintain the homeowners' insurance related to the property(ies). That KERRY shall be responsible for payment of the utilities and other household expenses related to the property during her period of exclusive possession.

H. **VEHICLES:** That the court is cognizant that the vehicles presently used by, and in possession of KERRY and the children, are titled in MAEVE LLC, and are not marital property. That the court does expressly find that KERRY is in need of a reliable vehicle over which she has exclusive possession and control, and the court has considered this, and the cost thereof, in the overall award and allocation of the marital estate. Said consideration inures to awarding a greater percentage of the estate to KERRY so that she may secure such a vehicle.

**EXHIBIT A, Page 78 of 101**

I. **FEELEY ADVANCE:** That KERRY argues that MARTY made a loan to an employee, JAY

FEELEY, of $90,000.00 which remains unpaid, and that said amount should be a charge/dissipation

against MARTY's share of the marital estate.

That at trial, MARTY testified that the $90,000.00 was an "Advance against future earnings"

and that the advance was made by the Sedgwick companies and not MARTY personally. That a review

of *Petitioner's Exhibit #39*, a check drawn on SEDGWICK PAYROLL CORP., dated 12/1/17 is

evidence that any obligation owed by FEELEY is owed to the non-marital Sedgwick entity(ies) and not

to MARTY personally. The court does conclude that this is not a marital asset/receivable, and that it

should not be counted in valuing the marital estate.

## MAINTENANCE:

## IS THE PETITIONER IN A DE FACTO MARRIAGE SUCH AS TO PRECLUDE AN AWARD OF MAINTENANCE?

That precedent to the court's analysis of the factors related to an award of maintenance,

MARTY does argue that KERRY's relationship with Sean Crotty precludes a claim of maintenance by

KERRY. That Section 510(c) of the Act provides that "the obligation to pay future maintenance is

terminated if the party receiving maintenance cohabits with another person on a resident, continuing

conjugal basis." **750 ILCS 5/510(c)** "The rationale behind termination of maintenance when resident,

continuing, conjugal cohabitation exists is the inequity created when the ex-spouse receiving

maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it,

with the result that he or she can continue to receive maintenance." In re Marriage of Herrin, 262 Ill.

App. 3d 573, 577, 634 N.E.2d 1168, 199 Ill. Dec. 814 (1994). The burden is on the party seeking the

termination of maintenance to prove that the ex-spouse receiving maintenance is involved in a de facto

marriage. In re Marriage of Susan, 367 Ill. App. 3d 926, 929, 856 N.E.2d 1167, 306 Ill. Dec. 72 (2006).

In determining whether petitioners have has met their burden, courts look at the totality of the

circumstances, and "just as no two relationships are alike, no two cases are alike." IN RE ANDRES,

2021 IL App (2d) 191146; 2021 Ill.App. LEXIS 442 (2ND Dist., 2021) citing In re Miller, 2015 IL App

(2d) 140530, ¶ 40, 396 Ill. Dec. 553, 40 N.E.3d 206. (2nd Dist., 2015).

That a non-exhaustive list of factors courts consider includes: (1) the length of the relationship,

(2) the amount of time spent together, (3) the nature of activities engaged in, (4) the interrelation of

personal affairs (including finances), (5) whether they vacation together, and (6) whether they spend

holidays together. Id. We will not disturb the trial court's finding of a de facto marriage unless that

finding is contrary to the manifest weight of the evidence. In re Marriage of Walther, 2018 IL App (3d)

170289, ¶ 26, 424 Ill. Dec. 871, 110 N.E.3d 221. A finding is against the manifest weight of the

evidence when "'the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary,

or not based on the evidence.'" Id. (quoting In re Marriage of Miller, 2015 IL App (2d) 140530, ¶ 40,

396 Ill. Dec. 553, 40 N.E.3d 206). As opposed to an intimate dating relationship, a de facto marriage

involves a deeper commitment, permanence and partnership. Id.

That at trial Sean Crotty appeared and testified pursuant to two (2) separate Subpoenas issued by

MARTY and/or counsel on June 28, 2022 and then on August 2, 2022. That on direct testimony by Mr.

Wittenberg, Crotty testified, INTER ALIA, to the following:

   a.   That he was married to Sandra Crotty on August 23, 1997 and divorced in May, 2021;

   b.   That after his divorce he has had only one romantic relationship, that that is with KERRY

and that they are still involved;

   c.   That they met when their respective children were in organized baseball and were

members of the "board;" became romantic in July of 2015;

   d.   That in January or February of 2016, Crotty did put an extra line on his phone for KERRY

's use;

   e.   Did stay at various Chicago hotels together probably until January, 2016; that KERRY did

stay some overnights at his one-bedroom Oak Park apartment when each of them had begun

**EXHIBIT A, Page 80 of 101**

"nesting" arrangements in their divorces; that prior to that KERRY had stayed at The Union League Club;

    f.   That KERRY also stayed overnights "at Danielle's and Megan O'Malley's";

    g.   That he and KERRY did stay together during certain trips to Miami, Florida, Los Angeles Las Vegas, Hawaii, and Long Beach, Indiana over the course of 5-6 years;

    h.   That he did take KERRY to Oak Park Country Club when she was no longer a member for golf, lunch/dinner and so that the kids could swim;

    i.   That he did give KERRY the use of his credit card on two occasions; 1) on a trip to Miami when she travelled alone; and 2) when she flew to Hawaii alone;

    j.   That he has purchased some gifts for KERRY on her birthday, usually flowers, and Christmas, all of modest sums;

    k.   That he and KERRY have attended various concerts together and one or two Chicago Cubs games;

    l.   That he has purchased groceries or meals for KERRY and her children about ten (10) times;

    m.  That he did loan KERRY Five Thousand dollars ($5,000.00) to retain Stein & Stein as her counsel; did loan her $250 or $500.00 for the boys' registration at Fenwick; but did not give her cash except to buy something for him when they were out and about;

    n.   That he did perform legal services for KERRY in a case related to the plumbing at the River Forest house, charging her only for the costs; did not participate in her divorce;

    o.   Admits that he gave KERRY certain passcodes for certain accounts in his name at various times; and

    p.   Admits that he and KERRY have discussed a more long-term relationship from time to time, but have no plans to get married.

81

q.  That Crotty testified that he never had any conversations with Mr. Angelini related to either his testimony in this case or related to other matters.

That on cross-examination on August 2, 2022 by Mr. Angelini, Crotty testified INTER ALIA, as follows:

a.  That he presently lives in a townhouse in River Forest, Illinois;

b.  That he had lived in Elmhurst, Illinois for the prior two years in a residence owned by his sister;

c.  That prior to Elmhurst he lived in a townhouse in Oak Park, Illinois;

d.  That he does not possess keys to KERRY's home, nor does she possess keys to his townhouse;

e.  That he slept at the Paris' home 2 or 3 times when he lost electricity;

f.  That during the Paris' nesting arrangement in 2017, KERRY was originally staying at the Union League Club on nights when MARTY was in the River Forest home until "she called me to pick her up because she could not stay at Union League because the account was closed;"

g.  That KERRY would then sleep at his Oak Park townhouse about half of the time when MARTY was nesting in the River Forest house; that KERRY would also stay at friends' or family's home during this period;

h.  That neither he nor KERRY keep any clothes at each other's residence;

i.  That he does not pay KERRY's mortgage or other bills;

j.  That he has not paid any repair bills for KERRY;

k.  That neither he nor KERRY pick out furniture for each other; do not clean each other's house; do not do each other's laundry; do not do each other's yardwork, nor maintain each other's automobiles.

l.  "We date, go out to eat, go to concerts and movies together."

m.   That he never planned a budget with KERRY; that they do not have any joint accounts together nor are they signatory on each other's accounts; that neither is on the other's credit card accounts; that she does not have any of his credit cards; and that he gave her the use of his credit card on two occasions;

n.   That KERRY is not on his Oak Park Country Club account;

o.   That he added KERRY to his phone line "because MARTY cut her off and she had no phone;" this stopped in February 2022;

p.   That regarding purchasing groceries for KERRY, "she'd be crying because she could not feed the kids, and over her objection I'd show up with food."

q.   That he paid the registration fees for Martin and Conor at Fenwick High School in "because they were going to lose their spots and she came to me to see if I could help;"

r.   That he and KERRY have no plans to marry or to move in together; that "in 2017 we talked about getting to a place where we could stabilize, get the divorces over;"

s.   "That it is unlikely that we would be in a position to marry, we are in different stages of life – I'm an empty nester and she has young children; she almost never sees my kids; I try to say hello to her kids when I pick her up; the Paris and Crotty kids might be together once a year."

t.   That over the past six years he and KERRY have celebrated one Christmas Eve or Day together, and one Thanksgiving Day; that he has never attended a Paris child's birthday celebration;

u.   That he and KERRY did take vacations alone in 2021; and

v.   That if they were to break up it would be an easy disentanglement; the only financial tie is that Martin has access to his Netflix account.

That KERRY testified on adverse by Mr. Wittenberg (on his Limited Appearance for this subject) on August 22, 2022, INTER ALIA, as follows:

**EXHIBIT A, Page 83 of 101**

a.  That nobody spends overnights at the Paris family home except the children and occasionally their friends, and that no one else since August 10, 2020 (KERRY was deposed on August 10, 2020);

b.  That Sean Crotty has spent two or three nights over, "maximum;"

c.  That she does not recall any conversations (s) with Sean regarding them getting married;

d.  That Sean lent her $5,000.00 to retain Stein & Stein, that she has not repaid him and that there is no Note re. same;

e.  That when asked "How many hotels did you and Sean stay at between July, 2015 and January, 2016? KERRY responded about ten or less, that they never stayed overnight at a hotel;

f.  That from January, 2016 until today, she and Sean took "five or less that were just me and Sean; some were with other people; a few where children were present; and two trips with children and other families;"

g.  That in 2018 at Long Beach, Indiana, "Sean rented a house, then another for me and other friends; we did not stay in the same house;" that in 2019 "he paid for the rental of a home with other families there" (and named 5-6 families)

h.  That Sean and she played tennis at Oak Park Country Club once or twice; golfed around four times, and the kids went to the pool 2 to 5 times;

i.  That she did meet Sean at the Union League Club a couple of times after he had met with clients;

j.  Travelled to California in 2017 to visit Sean's brother;

k.  Travelled to Florida three times with or to meet Sean, including 2020 or 2021;

l.  That Sean did pay the boys' Fenwick registration fee, and that he has purchased groceries for which she repaid him;

m.  That Sean has made Christmas gifts to her children in the $15 to $30 range;

n.  That they do not exchange Christmas gifts with Sean's family;

**EXHIBIT A, Page 84 of 101**

o.  That she never received cash from Sean; That he did not buy her a gift on her birthday; and that they did not celebrate their "anniversary" this year.

That this court does review and consider MARTY's claim that KERRY and Sean Crotty are engaged in a de facto marriage such that it precludes a maintenance claim by KERRY in the instant cause, and does find the following:

1.  The court does first note that the relationship between KERRY and Sean Crotty began in July, 2015, and continued at some level through the date of trial, a period of seven (7) years.

2.  That there was no evidence of a "resident" relationship between KERRY and Sean, i.e. besides the "initial bloom of the relationship," (See IN RE CHURCHILL, 2019 IL App (3d) 180208; 2019 Ill.App. LEXIS 290; (3rd Dist., 2019) there is little evidence of frequent overnights and/or even the amount of time spent between KERRY and Sean since the year 2020.

3.  That there is no evidence of the comingling of assets between KERRY and Sean, or that "Sean and KERRY's personal affairs are virtually inseparable" (see MARTY's Closing, p.79). There is no evidence that Sean and KERRY have any joint accounts; that there is no evidence that they have joint property of any kind; nor is there evidence that KERRY has access to Sean's credit cards or that she has unrestricted access to his bank accounts. The court is cognizant of the limited occasions during which KERRY did have such access as established by the testimony.

4.  That there is no evidence of regular financial support being supplied by one to the other, and that the court does find that those rare occasions during which Sean provided funds to KERRY were occasioned by the persistent and unconscionable conduct of MARTY as it relates to providing funds for the Paris children, i.e. regular support so that KERRY can purchase groceries, and his refusal to provide funds for the registration of MARTIN and CONOR at Fenwick H.S.

5.  That KERRY and Sean do not regularly spend holidays with each other.

6.  That KERRY did not spend "every night outside the marital home with Sean" during the nesting period. (Closing, p.78).

85

7. That KERRY and Sean did go to various concerts together, some Chicago Cubs games and other normal dating activities including occasionally attending a child's event.

8. That there was no evidence presented to this court that KERRY and Sean attended events at Oak Park Country Club with Sean's clients despite MARTY's claim in his Closing Argument (See p.78.). (This court does note that Mr. Wittenberg did represent Sean's ex-wife in their divorce proceedings and did depose him in same.)

9. That neither party has a key to the other's residence.

10. That KERRY and Sean each does have a separate residence.

11. That neither has moved furniture, belongings or clothing into the other's residence.

12. That Sean has provided some legal representation to KERRY at minimum cost.

13. That KERRY and Sean did travel and/or meet each other for vacations during the first several years of their relationship with some regularity, frequently staying with members of Sean's large family. That that frequency has greatly diminished since the year 2020.

14. That there is no evidence that either KERRY or Sean has provided for the other in his/her Will or other INTER VIVOS transaction.

15. That there is no evidence that Sean and KERRY have exchanged either engagement rings or a promise to marry. To the contrary, both have testified as to the uncertainty of the permanence of the relationship.

That this court does find that KERRY and Sean Crotty each testified credibly and that they are not engaging in a de facto marriage nor are they cohabitating as contemplated by the Illinois Marriage and Dissolution of Marriage Act. That MARTY's claim that they are either cohabitating or engaged in a de facto marriage is rejected by this court, and the court does consider the issue of whether maintenance is appropriate in this cause.

## CONSIDERATION OF THE MAINTENANCE FACTORS
## 750 ILCS, SECTION 504(a)

That **750 ILCS 5/504(a)** does provide:

*(a)   Entitlement to maintenance. In a proceeding for dissolution of marriage, legal separation, declaration of invalidity of marriage, or dissolution of a civil union, a proceeding for maintenance following a legal separation or dissolution of the marriage or civil union by a court which lacked personal jurisdiction over the absent spouse, a proceeding for modification of a previous order for maintenance under Section 510 of this Act, or any proceeding authorized under Section 501 of this Act, the court may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just, without regard to marital misconduct, and the maintenance may be paid from the income or property of the other spouse. The court shall first make a finding as to whether a maintenance award is appropriate, after consideration of all relevant factors, including:*

Ergo, this court does first consider the above factors in determining KERRY's claim for maintenance from MARTY.

**(1) The income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage.**

That the court does consider the allocation of the marital estate as set forth herein, the allocation of liabilities and support obligations herein, and MARTY's sizeable non-marital estate and does find that this factor heavily weighs in favor of an award of maintenance to KERRY.

(2) **The needs of each party**. That as a result of being the primary caretaker and caregiver to the seven (7) Paris children, five of whom reside with her in the family home, it is clear that KERRY is presently unable to provide for her separate maintenance needs. That the evidence shows that the Paris children's needs should be the foremost consideration of this court in allocating maintenance and

87

support herein, and that this case does not lend itself to simply following some formula. The court shall

consider the total financial circumstances and needs of the family during any period of maintenance and

exclusive occupancy of the home in determining how to allocate support for the children and

maintenance to KERRY.

That as reflected in the above analysis of MARTY's income, the court does find that MARTY

possesses the income and means to provide for the maintenance and support of KERRY.

**(3) The realistic present and future earning capacity of each party.**

That as previously discussed herein, MARTY receives a monthly salary of Twenty-Thousand

dollars ($20,000.00) limited by his covenants in the Keystone & Stuart LLC (See *Petitioner's Ex. #*

_____, *Stock Pledge Agreement, Paragraph 2.F.*) That of particular note is that his salary was set by him

in his capacity as Manager of Alpha Construction and as he testified in direct response to this court's

question and by Mr. Angelini. That while the Sedgwick businesses have undoubtedly experienced

unprecedented variables including the economic downturn occasioned by COVID, civil unrest and the

increase in crime in the City of Chicago, MARTY has historically exhibited great resiliency as a

business man who can deliver a project. Evidence of that was the unequivocal statement of James

Wagner, the Vice-President of Old Second Bank, who stated that they would not have approved recent

loans in the amount of Eleven million dollars ($11,000,000.00) on 1857 West Dickens, 1454 South

Michigan, and Lake & Lathrop if the project manager <u>was not</u> MARTY PARIS. (Testimony of June 29,

2022.)

Mr. Wagner also testified to the One million dollar ($1,000,000.00) "liquidity" requirement of

the Guarantor (MARTY) on the 1454 S. Michigan loan, and admitted that the bank had not received a

timely personal financial statement from MARTY at the most recent due date. He agreed that this was a

technical default under the terms of the loan, and also testified that a transfer of the Guarantor's assets

(such as in a divorce) would trigger a default of the loan. That from the foregoing and other testimony

and evidence in the cause, this court does conclude that while there are any number of contingencies in

**EXHIBIT A, Page 88 of 101**

the current Sedgwick Development projects that could cause a default or potential failure of the project, MARTY's reputation and experience give the corporate lenders confidence in his ability to deliver the project to its conclusion, and ergo, the repayment of their loan(s).

That the evidence clearly shows that KERRY put her career on hold in 2003 when the twins were born, and that she has been the children's primary caretaker, caregiver, and mentor. The Paris marriage was for a time, the once-traditional model of man at work, woman at home raising the children. Even though that marriage is now being dissolved, the Paris family still follows that model; i.e seven children, five of whom are still minors living at home, highly engaged in multiple activities, sports and the like, the house a beehive of activity from daylight to nighttime, and the need for an organized, motivating, hard-working yet loving parent to help these children navigate their formative years. KERRY is that person.

Given the ages of the youngest Paris children at the time of trial, QUINN (age 13), GRACE (age10), and HUGH (age 9) it is clear that it is in the best interests of the children that KERRY remain at home, and in the home until an appropriate time when the children can function as young adults well on their way to adulthood.

That it is difficult to project KERRY's potential earning capacity sometime in the year of 2027-28 given that she will have been out of her field of employment for a period of 24-25 years. This factor strongly weighs for an award of reviewable maintenance to KERRY. It is important to note that KERRY will also be approximately fifty-eight (58) years old when HUGH begins his junior year of high school, no longer the young woman she was when she left The Illinois Housing Development Authority in 2003.

**(4) Any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage.**

89

That the evidence shows that at the time the parties met and began dating, KERRY was employed at the Illinois Housing Development Authority having graduated from St. Norbert's University with a degree in Business Administration in 1995. Her initial annual salary was $28,000.00 and duties were Assistant to the Executive Manager, then as an Executive Program Analyst and Legislative Liason related to bond financing, and lastly as a Loan Officer related to the recommendation of, and underwriting of multi-family unit loans related to affordable housing. At the time KERRY left with the twins' impending birth in 2003, she was earning an annual salary of $75,000.00 along with a 401(k) plan.

That with the time, needs and duties of being the primary homemaker, stay-at-home mother, and caretaker of the seven Paris children beginning in 2003 and continuing through this date, KERRY certainly did forego career opportunities that would have presented themselves had she remained in the work force. This is a factor that weighs in favor of an award of maintenance to KERRY.

**(5) Any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought.** That there was no evidence presented at trial of any type of physical or mental impairment related to MARTY and his ability to earn future income. This court has discussed some of the market variables but again reiterates the confidence shown by institutional lenders such as Old Second Bank, and more recently Republic Bank, in granting credit to MARTY's business and reflecting their confidence in his ability to deliver the real estate development project(s) that he has undertaken.

**(6) The time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment.**

This factor is a difficult factor to assess given various factors present in this case: i) the length of time that KERRY will have been out of the employment field; ii) the changes that may have occurred in the housing and financial market(s), the field in which KERRY was most knowledgeable; iii) whether

**EXHIBIT A, Page 90 of 101**

KERRY's background will lend itself to reentry into similar employment or whether some type of

updated education/training will be necessary; iv) whether opportunity is available to one of her age; and

v) whether an alternative field of employment is available.

This factor weighs heavily towards an award of reviewable maintenance.

**(6.1) The effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment.**

That this factor weighs heavily in favor of an award of maintenance to KERRY. As the evidence

at trial established, it is her responsibility to manage the household and the children's busy lives; to

make sure each is up and getting ready for school; to prepare lunches, meals and snacks; to see that

homework is timely done; to see that each child is prepared, dressed and attending his/her activities; to

see that there is clean laundry, that the dishes are done, house is clean, etc. As a child of ten (10) this

court can attest to the volume of work necessary in a large family's home.

That as the primary caretaker and decision-maker it is incumbent on KERRY to be attuned to

each child's emotional, physical and developmental needs and progress. It is unfortunate that MARTY

has displayed such deficiency in this regard and it magnifies the need for KERRY to spend the time and

effort to help each Paris child develop in a healthy, happy and well-adjusted manner. Coupled with the

more mundane household tasks described above, the children's needs are and will continue to be a full-

time effort. KERRY is needed at home and this factor greatly affects her ability to seek or secure

employment at this time.

This factor weighs heavily in favor of an award of reviewable maintenance.

**(7) The standard of living established during the marriage:** That analysis of this factor

necessitates that the court bifurcate the time period of the parties' marriage from before the KERRY-

CROTTY affair and the period thereafter. That the standard of living during the period before the affair

from the date of marriage in August, 10, 2002 is clearly delineated from the standard of living post-

affair.

**EXHIBIT A, Page 91 of 101**

That the evidence related to the early years of the Paris marriage reflects a hardworking, loving team working for common goals to establish a good life for themselves and their children. They went from living in one of the apartments in one of MARTY's projects to purchasing and rehabbing a beautiful, spacious late 19th century home in the prestigious Village of River Forest. They and their children enjoyed the activities and benefits of membership at Oak Park Country Club as well as The Union League Club in downtown Chicago. The children went to private schools and participated in a bevy of activities, including sports travel teams, lessons, and recreational teams.

The Paris home was the hub of the family's activities and their place of respite. MARTY worked frequently twelve hours per day from Monday thru Friday in Chicago, but was home on the weekends. KERRY made the children's home welcoming and their birthdays special. The time period from 2004 to 2007 was highly financially rewarding and successful for Sedgwick Properties and the Paris family enjoyed the fruits of MARTY's and KERRY's labors.

That although the breakdown of the marriage had begun some years earlier centering around financial issues (see Dr. Amabile's Report dated June 26, 2017), the discovery of the KERRY-CROTTY affair by MARTY in early 2016 marked a major shift in the parties' relationship and the family's standard of living. That after the filing of the Petition for Dissolution of Marriage in May, 2016, the parties have engaged in highly contentious litigation on almost all issues related to the most minute financial obligations to major issues of parenting time, etc. The court has detailed some of that history herein as has Dr. Amabile in her Reports.

That the marital discord has coincided with COVID-era economic changes that have affected MARTY's business, and his failure to comply with various support and maintenance Orders has created chaos on a day-to-day basis for the family to the point of the children lacking running water at times, lack of food, non-payment of medical and health-care bills, etc. The payment of the mortgage on the family home has been at risk. The evidence overwhelmingly shows that the Paris family's standard of living has declined considerably.

It is difficult to quantify the effect of the COVID era market changes on MARTY's business, and any corresponding effect on his income due to a) the STOUT SERVICES Report having utilized date only up to December 31, 2020, and b) MARTY's Personal Financial Statements only being current through 2019-2020. Certainly MARTY's income had a direct correlation to the family's standard of living prior to the KERRY-CROTTY affair.

**(8) The duration of the marriage:** That the parties were married on August 10, 2002, and remain so twenty (20) years later despite having physically separated on March, 2017 when the "nesting" Order was entered by Judge Bowes. That the filing date of the Petition for Dissolution of Marriage by KERRY on May 17, 2016 post-dates the breakdown of the marriage and the commencement of the affair in July, 2015.

This court is mindful of the provisions of **750 ILCS 5/504(b-1)(1)(B)** of the IMDMA that provide, INTER ALIA, that for "a marriage of 20 years or more years, the court in its discretion, shall order maintenance for a period equal to the length of the marriage or for an indefinite term." That this court is also mindful of findings that "indefinite or permanent maintenance is appropriate in cases where the recipient spouse 'devoted significant time to raising a family in lieu of pursuing a career,'" **IN RE HAMILTON, 2019 IL App (5th) 170295** citing **IN RE HEROY, 385 Ill.App.3d 640, 652; 2008 Ill.App. LEXUS 913; 324 Ill.Dec. 310 (1st Dist., 2008)** and "where the recipient spouse is not employable at an income level sufficient to enable her to live at the standard of living that was established during the marriage." **HAMILTON** citing **IN RE HARMS, 2018 IL App (5th) 160472, Par.45; 422 Ill.Dec. 615.**

This factor strongly favors an award of maintenance to KERRY.

**(9) The age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties.** See the discussion herein related to these factors.

**(10) All sources of public and private income including, without limitation, disability and retirement income.**

The court does consider factors (9) and (10) together:

That as discussed herein, at all relevant times, MARTY was the sole source of income to the family through his interests and position at Sedgwick Development, and remains so at the time of trial. That at age 53, MARTY appears to be of good health and did not report nor produce evidence to the contrary, and his future capacity to work and enjoy a substantial income appears to be somewhat secure. The evidence presented to the court strongly supports the conclusion that MARTY is a well-established, highly regarded real estate developer with a reputation of being able to bring his projects to completion.

That the evidence shows that KERRY left her employment when pregnant with the Paris twins, MARTIN and CONOR, and has not returned to the workforce since, being the primary caretaker and caregiver of the seven (7) Paris children. That although KERRY did testify that she is not adverse to going back to work, it is clear that the obligations related to being the primary caretaker of the children necessitate KERRY remain a stay-at-home mother for the forseeable future in that the youngest children, QUINN (age 13), GRACE (age10), and HUGH (age 9) are not sufficiently capable of a "turnkey" type home life at present should the court direct KERRY to seek employment at this time.

**(11) The tax consequences to each party.** That the court has considered this factor and does find that it has minimal relevance on the issue of whether maintenance is appropriate in this cause.

**(12) The contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse.** That the evidence is clear that KERRY's devotion to full-time efforts to the family and home, enabled MARTY to devote full-time work effort to the business, and did contribute to the success of the business. This factor favors an award of maintenance to KERRY.

**(13) Any valid agreement of the parties.** That the court was not presented with any agreement between the parties that resolves either the division of assets not the support issues in the cause. Notably, the parties have litigated for a period in excess of six (6) years, spent hundreds of thousands of dollars on attorneys' fees and costs, taken hundreds of hours of the courts' time, been referred to or otherwise have had the benefit of family-related experts and personnel, and have been unable to resolve parenting and financial issues that almost all other divorcing couples are able to resolve.

**(14) Any other factor that the court expressly finds to be just and equitable.**

That related to the property division, support and maintenance, and to the parenting obligations in this cause, the most significant factor in this court's consideration is the seven (7) Paris children and how all decisions herein may affect their well-being and respective futures.

MARTY and KERRY created a nuclear family much like that in which they grew up in, whether intentionally or organically, with fairly distinct roles and a division of duties. MARTY worked and developed his business to support the family, spending many hours from Monday through Friday doing so; and KERRY had and raised the seven (7) children at home, providing their primary care, nurture, and overseeing their development, activities, education, and the like. The family enjoyed a very nice standard of living for much of the first dozen years of the marriage in their beautiful River Forest home with their social clubs and the children's activities, and with the children's attendance at private schools. The Paris children are clearly entrenched in their community and activities, and their identities are tied to same.

That their parents' divorce is not the choice of the children, but the brunt of the day-to-day changes to the family's lives is borne by them. It is this court's belief and desire that to minimize the daily effects of the divorce is to help give the children some of the "normalcy" and stability needed so that they may develop into happy and well-adjusted adults. That this court does consider same in all of the issues before it.

## MAINTENANCE AND SUPPORT

That as stated heretofore, it is uncertain as to what MARTY's exact income is, and the facts of the case suggest that the best approach to determining the questions of child support and maintenance is to take a needs based approach based upon the reliable family expenses. To determine the current reasonable needs, the court considered all of the testimony and evidence adduced at trial and did a line-by-line review and analysis of the historical and reasonable family expenses with particular consideration of MARTY and KERRY'S Financial Affidavits tendered and exchanged previously (See *Petitioner's Exhibit # 15*, "MARTY'S Spreadsheet;" *Petitioner's Exhibit #555*, MARTY's 4/1/19 Financial Affidavit; *Petitioner's Exhibit #556*, MARTY's 9/1/21 Financial Affidavit; and *Petitioner's Exhibit #557*, KERRY's 10/6/21 Financial Affidavit).

That the following table breaks down these expenses based upon the court's determination of the expense related to the nature of the support (all figures are in monthly amounts):

| EXPENSE | CHILD RELATED | MAINTENANCE RELATED |
|---|---|---|
| *Mortgage* | (MARTY to pay directly) | |
| *Real Estate Taxes* | (MARTY to pay directly) | |
| *Homeowners' Insurance* | (MARTY to pay directly) | |
| *Gas/Heat* | $642.00 | |
| *Telephone(s)* | | $150.00 |
| *Electric* | $450.00 | |
| *Internet* | $508.00 | |
| *Water/Sewer* | $459.00 | |
| *Groceries and H.H. Supplies* | $3,000.00 | |
| *Medical Insurance (for KERRY)* | | $1,000.00 |

| | | |
|---|---|---|
| *Automobile gas* | $250.00 (kids) | $250.00 |
| *Automobile payment* | | $750.00 |
| *Clothing* | $1,000.00 (kids) | *$1,150.00 |
| *Grooming* | $190.00 (kids) | **$390.00 |
| *Lunch/Allowances* | $1,100.00 (kids) | |
| *Health Club* | | $150.00 |
| *Entertainment* | | $500.00 |
| *Dental* | | $350.00 |
| *Optical* | | $50.00 |
| *Medicine* | | $50.00 |
| *Life Insurance* | | $150.00 |
| *Gifts/Donations (Including for children and their gifts* | | $200.00 |
| **SUB-TOTALS:** | **$7,207.00** | **$5,265.00** |

\*Clothing, shoes, handbags, etc.
\*\* Grooming, hair, nails, facials, etc.

**MAINTENANCE:** That after consideration of the facts and each of maintenance factors set forth above, the court does set current maintenance at the sum of Five Thousand, Five Hundred dollars ($5,500.00) per month, and MARTY is directed to pay such sum to KERRY on a monthly basis, due on the First day of each month commencing on January 1, 2023. That said maintenance is due for a continuous period until the child, HUGH, graduates from eighth grade at which time said maintenance may be reviewed by the court upon notice and petition by either party. That maintenance shall continue at the same amount for such time as a motion to modify or to extend shall remain pending until resolved by the court or by written agreement of the parties.

**EXHIBIT A, Page 97 of 101**

That a future change in the figures utilized by this court in the table above are not intended to be absolute; they are reasonable approximations of said expenses based upon the information and evidence at trial. The court has added some amounts to both the child support amount and the maintenance amount due to the unexpected exigencies that occur in life, and due to inflationary trends in the cost of living that the U.S. economy experiences.

That KERRY shall have a duty to seek employment commencing with the month of January in the year of HUGH is attending his last semester of eight grade, that is she should begin to seek employment in January of that year. This does not mean that she should be employed by January of that year, unless she chooses to be. That KERRY's efforts to secure employment shall be a factor considered by the court in any motion to modify or motion to extend maintenance, along with all of the factors under sections 504 and 510 of the IMDMA.

**CHILD SUPPORT**: That upon review of the reasonable needs of the children given the family history, and the evidence herein the court does find that child support should be set at the sum of Seven Thousand, Five Hundred dollars ($7,500.00) per month. That MARTY is further ordered and directed to timely pay the mortgage on the family home and on the adjoining lot each month, as well as the real estate taxes and homeowners' insurance related thereto each month when due, until further order of court.

**Section 503(g) trust:**

That the court in **IN RE PICKHOLTZ, 178 Ill.App.3d 512; 533 N.E.2d 529; 1988 Ill.App. LEXIS 1837 (1st Dist., 1988)** stated:

*"Section 503(g) permits a court, if necessary, to set aside a portion of the jointly or separately held estates of the parties in a separate fund or trust for the support, maintenance, education and general welfare of any minor. In deciding whether to create a section 503(g) trust or fund, the circuit court must initially determine whether the fund is necessary to promote and protect the best interests of the children. (Citation) Application of section 503(g) also demands evidence of a*

98

*demonstrated unwillingness or inability by a parent to make direct payments of child support.*

*(Citation)*

That the later case of **VUCIC, 216 Ill.App.3d 692; 576 N.E.2d 406; 1991 Ill.App. LEXIS 1212 (2nd Dist., 1991)** noted that the supreme court examined this portion of the Act finding that the imposition of such a trust is "inappropriate in the absence of evidence showing some need to protect the interests of the children". **(ATKINSON, 87 Ill.2d 174, 179 (1981).** Courts thereafter established section 503(g) trusts only when "there is evidence showing a need to protect the interests of the children (Citation). One court found that the establishment of an educational trust fund was warranted based on evidence in the record as to the father's inability to make timely child support payments and the father's disdain for education. **(HARSY, 193 Ill.App.3d 415, 419-422.)**

That as evidenced by the extraordinary number of Petitions for Rule and findings of non-compliance and/or contempt against MARTY for his failures to pay timely child support, the costs of the children's activities, tuition, utilities and other expenses related to the family home and the children's well-being, the court does find that it is necessary to protect the interests of the Paris children by imposing a Section 503(g) trust to be funded by MARTY to secure such payments. That MARTY is hereby ordered and directed to fund said 503(g) Trust with the amount of One Hundred-Fifty Thousand dollars ($150,000.00) within sixty (60) days from the date of the entry of this Judgment, and to tender said funds to the Trustee of the 503(g) Trust for the Benefit of the Paris Children. That the Children's Representative, Howard Rosenberg, or such successor Children's Representative that might be named by the court, is hereby designated as the Trustee of said 503(g) Trust.

**ORDERS TO EFFECTUATE SUPPORT PAYMENTS**: That counsel for KERRY is directed to prepare appropriate Orders to effectuate the terms of the Child Support and Maintenance provisions of this Judgment, and to tender same to the court with due haste.

**CHILD REPRESENTATIVES FEES AND COSTS**: That pursuant to 750 ILCS 5/506(b), the Children's Representative has tendered timely records and billing related to his representation of the

**EXHIBIT A, Page 99 of 101**

children in this cause, has tendered his final itemized billing, and the court has reviewed same. That throughout the trial the court has heard the relevant financial circumstances of the parties and has considered same related to the allocation of the Child Representative's fees and costs. The court does find Mr. Rosenberg's fees and costs related to the cause to be reasonable and necessary to protect the children's interests herein, and does note that a majority of the time incurred in such capacity was occasioned by MARTY's actions, recalcitrance, and the like.

The court does find that KERRY has no financial ability to contribute to said fees, and that it is appropriate that MARTY be ordered to pay the full remaining balance due to the Children's Representative Howard Rosenberg, within sixty (60) days hereof. That Mr. Rosenberg is directed to prepare an Order consistent with this ruling and to present same to Judge Romanek on or before December 21, 2022 for entry.

**LIFE INSURANCE ON THE PARENTS' LIVES:** That given the number of dependent children, including the two collegiate, MARTIN and CONOR, it is abundantly clear that this court must mandate both MARTY and KERRY secure life insurance on their respective life to provide for the children in the event of either of the parent's demise. That after consideration of the children's reasonable needs as set forth herein, the court does order and direct MARTY to secure and maintain life insurance on his life in the amount of Two Million, Five Hundred dollars ($2.5 Million), and to provide a copy of same to the Children's Representative and to KERRY's counsel within Thirty (30) days hereof.

**FEDERAL AND STATE INCOME TAXES, ANY ARREARS, PENALTIES AND INTERST:** That MARTY shall be solely liable and responsible for any and all Federal and State income taxes incurred in conjunction with any and all joint returns filed on behalf of MARTY and KERRY to date, including any late fees, interest and penalties that may have accrued in conjunction therewith, and MARTY shall indemnify and hold KERRY harmless therefrom.

**THIS COURT THEREFORE FINDS AND IT IS ORDERED:**

1. DISSOLUTION OF MARRIAGE: That the Petition for Dissolution of Marriage is granted

and the bonds of matrimony between the parties are hereby dissolved.

2. That all of the terms and conditions of this Judgment and Memorandum are made orders of

the court and are incorporated herein.

ENTERED:

Judge Timothy P. Murphy

Date: _12/2/22_

**ORDER PREPARED BY THE COURT**

101

**EXHIBIT A, Page 101 of 101**

EXHIBIT B

STOUT

# Marriage of Paris

Valuation of Equity Interests Held by Frank Martin Paris, Jr. or the Frank Martin
Paris, Jr. Revocable Trust as of December 31, 2020

Issued: December 13, 2021

CONFIDENTIAL

# Contact Information

For more information, please contact one of the following members of the engagement team:

**Brian R. Potter, CFA, CFE**
Managing Director
+1.312.752.3352
bpotter@stout.com

**Thomas J. Czupta, ASA, ABV**
Director
+1.312.763.6629
tczupta@stout.com

**Adam B. Moeller**
Associate
+1.312.237.4850
amoeller@stout.com

## STOUT'S SERVICES

**Investment Banking**
Advising buyers and sellers on mergers and acquisitions, private capital raising, and other corporate financial transactions.

**Valuation Advisory**
Providing valuations of business enterprises, complex securities, intellectual property, real estate, and personal property.

**Transaction Advisory**
Helping clients navigate the transaction process and provide transaction opinions and due diligence services.

**Disputes, Compliance, & Investigations**
Providing expert testimony and consulting, as well as investigative and compliance services for financial-related matters.

**EXHIBIT B, Page 2 of 237**

**STOUT**

# Table of Contents

## Sections

I.   Summary ...................................................................................... 5

II.  Valuation Analysis ...................................................................... 14

III. Conclusion of Value ................................................................... 16

IV. Compensation Analysis ............................................................. 17

## Exhibits

Exhibit A ............................................................................ Ownership Chart

Exhibit B ......................................................................... Conclusion of Value

Exhibit C ................................................. Adjusted Book Value Method

Exhibit D .................................................... Compensation Analysis

Exhibit E .................................................... Valuation Discount Studies

Exhibit F ................................... Assumptions and Limiting Conditions

Exhibit G ............................................................................ Certification

Exhibit H ..................................................... Statement of Qualifications

**EXHIBIT B, Page 3 of 237**

◢STOUT

# Table of Contents

## Appendices

Appendix I ................................................................ Maeve, LLC Report

Appendix II .......................................................... Alpha Carpentry, LLC Report

Appendix III ................................................. Alpha Construction Services, LLC Report

Appendix IV .......................................... Alpha Drywall Services, LLC Report

Appendix V ............................................ Alpha Property Services, LLC Report

Appendix VI ........................................ Sedgwick Properties Holding Corp. Report

**EXHIBIT B, Page 4 of 237**

# I.  Summary

December 13, 2021

Donald J. Angelini, Esq.
Carly E. Kenny, Esq.
Angelini Ori + Abate Law
155 North Michigan Avenue
Suite 400
Chicago, Illinois 60601

Dear Mr. Angelini and Ms. Kenny:

Stout Risius Ross, LLC ("Stout") has been engaged to determine the Fair Market Value of certain equity interests (individually, the "Subject Interest" and collectively, the "Subject Interests") held by Frank Martin Paris, Jr. ("Marty"), either directly or indirectly through the Frank M. Paris, Jr. Revocable Trust (the "FMP Trust"), in various privately held entities (described below in greater detail), as of December 31, 2020 (the "Valuation Date").[1] We understand the results of our analysis will be used for marital-dissolution purposes.

## Interests Held by Marty

As of the Valuation Date, Marty held interests in 18 privately held entities (which held, among other things, interests in several other privately held entities), including:

- Conor DE II, Inc. ("Conor II");

- Conor Management, LLC ("Conor Management");

- Martin NV II, Inc. ("Martin II");

- Maeve, LLC ("Maeve");

- Maeve Manager, Inc. ("Maeve Manager");

- MK Manager Corp. ("MK Manager");

- 828 W Grace, LLC ("828 Grace");

- 1454 Michigan, LLC ("1454 Michigan");

- Sedgwick Investments, LLC ("Sedgwick Investments");

- 2049 N Sheffield, LLC ("2049 Sheffield");

- 55th and Kedzie Investments, LLC ("55th Investments");

- Erie LaSalle Venture, LLC ("EL Venture");

- Alpha Carpentry, LLC ("Alpha Carpentry");

- Alpha Construction Services, LLC ("Alpha Construction");

- Alpha Drywall Services, LLC ("Alpha Drywall");

- Alpha Property Services, LLC ("Alpha Property");

- Sedgwick Properties Holding Corp. ("Sedgwick Holding");

- Sedgwick Realty Corp. ("Sedgwick Realty").

The foregoing 18 companies are hereinafter referred to as the "Entities." See *Exhibit A* for further detail.

## Overview of the Entities

The Entities are comprised of investment holding companies, real estate holding companies, operating companies, and management companies.

---

[1] References to Marty in this report may also include references to the FMP Trust.

**EXHIBIT B, Page 5 of 237**

**STOUT**

# I.   Summary

## Investment Holding Companies

- *Conor II*: Conor II was formed on October 20, 2009 and functions as an investment holding company. The company's primary assets are ownership interests in privately held companies, including a 1.0% general partner interest in Jack Enterprises, LP, a 100% equity interest in Martin NV A, LLC, and a 99.0% equity interest in Martin NV I, Inc. The company is organized in Delaware and Marty is the sole director. As of the Valuation Date, Marty held 300 Common A (voting) shares out of Conor II's 300 Common A shares outstanding. See **Exhibit A** and **Exhibit C.1** for additional detail.

- *Conor Management*: Conor Management was formed on October 21, 2009 and functions as an investment holding company. The company's primary asset is a 99% limited partner interest in Jack Enterprises, LP ("Jack Enterprises"). The company is organized in Delaware and the manager of Conor Management is Frank M. Paris, Sr. As of the Valuation Date, Marty held a 1.0% member interest and Martin II held a 99.0% member interest in Conor Management. See **Exhibit A** and **Exhibit C.2** for additional detail.

- *Jack Enterprises*: Jack Enterprises was formed on October 22, 2009 and functions as an investment holding company. The company's primary asset is a 99.0% member interest in Maeve. The company is organized in Delaware and the sole general partner of Jack Enterprises is Conor DE I, Inc.[2] As of the Valuation Date, Conor II held a 1.0% general partner interest and Conor Management held a 99.0% limited partner interest in Jack Enterprises. See **Exhibit A** and **Exhibit C.2** for additional detail.

- *Martin NV I, Inc. ("Martin I")*: Martin I was formed on October 20, 2009 and is an investment holding company.

Marty is the sole director of the company. Martin I holds a 100% equity interest in Conor DE I, Inc.[3] As of the Valuation Date, Conor II held a 99.0% equity interest and Martin NV A, LLC held a 1.0% equity interest in Martin I.[4]

- *Conor DE I, Inc. ("Conor I")*: Conor I was formed on October 22, 2009, was organized in Delaware, and functions as an investment holding company. Marty is the sole director of the company. As of the Valuation Date, Martin I held a 100.0% of the outstanding shares of Conor I.[4]

- *Martin NV A, LLC ("Martin A")*: Martin A was formed on October 20, 2009 and functions as an investment holding company. Frank Martin Paris, Sr. is the manager of the company.[5] As of the Valuation Date, Conor II held a 100.0% equity interest in Martin A.

- *Martin II*: Martin II was formed on October 20, 2009 and functions as an investment holding company. The company's primary asset is a 99.0% member interest in Conor Management. The company is organized in Nevada and the manager of Martin II is the FMP Trust. As of the Valuation Date, Marty held 92,958 non-voting shares and 1,000 voting shares of Martin II. See **Exhibit A** and **Exhibit C.3** for additional detail.

- *Maeve*: Maeve was formed on December 29, 2009 and functions as an investment holding company. Marty holds a 1.0% member interest in Maeve. Refer to **Appendix I** for additional information.

- *Sedgwick Holding*: Sedgwick Holding was formed on December 9, 2009 and functions as an investment holding company. Marty holds

---

[2] It should be noted that Jack Enterprises' tax returns for 2010 through 2020 list Conor DE II, Inc. as the company's General Partner. Conversely, Conor DE I, Inc. is identified as the General Partner in the Limited Partnership Agreement dated 10/22/2009 and various written actions of the company. Marty is the sole director of both Conor DE I, Inc. and Conor DE II, Inc and owns (directly or indirectly) a majority of the voting stock of both companies.
[3] Based on information received to date and representations in Marty's affidavit attached as Exhibit L to the Response to Motion to Continue Trial Date Due to Commence on October 4,

2021 (the "Affidavit"), the company's sole function is to hold another business entity (Conor DE I, Inc.), and it does not conduct any other business.
[4] According to the Affidavit, "Conor DE I, Inc.'s sole function is to hold another business entity and does not hold property or conduct any other business outside of holding that entity."
[5] According to the Affidavit, Martin A "exists only to hold another business entity."

# I.   Summary

a 100.0% equity interest in Sedgwick Holding. Refer to **Appendix VI** for additional information.

- *Sedgwick Investments*: Sedgwick Investments was formed on April 28, 2005 and functions as an investment holding company. Marty holds a 1.0% equity interest in Sedgwick Investments. Refer to **Appendix I** for additional information.

- *55th Investments*: 55th Investments was formed on March 28, 2013 and functions as an investment holding company. Marty holds 5 Class A Interests in 55th Investments. Refer to **Appendix I** for additional information.

## Real Estate Holding Companies

- *828 Grace*: 828 Grace was formed on March 31, 2004 and functions as a real estate holding company that owns real property located at 828 West Grace Street in Chicago. Marty holds a 1.0% Class A interest in 828 Grace. Refer to **Appendix I** for additional information.

- *1454 Michigan*: 1454 Michigan was formed on March 1, 2005 and functions as a real estate holding company that owns real property located at 1454-64 South Michigan Avenue in Chicago. Marty holds a 1.0% Class A interest in 1454 Michigan. Refer to **Appendix I** for additional information.

- *2049 Sheffield*: 2049 Sheffield was formed on April 6, 2001 and functions as a real estate holding company that owns real property located at 2049 North Sheffield Avenue in Chicago. Marty holds a 1.0% equity interest in 2049 Sheffield. Refer to **Appendix I** for additional information.

- *EL Venture*: EL Venture was formed on October 4, 2016 and functions as a real estate holding company that owns real property located at 146 West Erie Street in Chicago.[6] Marty holds a 0.01% equity interest in EL Venture. Refer to **Appendix I** for additional information.

## Operating Companies

- *Sedgwick Realty*: Sedgwick Realty was formed on January 25, 2006 and operates in the real estate brokers industry. The company's directors are Marty and Elizabeth C. Cohen (née Paris). As of the Valuation Date, Marty held a 50.0% equity interest in Sedgwick Realty. See **Exhibit C.5** for additional detail.

- *Alpha Carpentry*: Alpha Carpentry was formed on March 7, 2014 and operates in the construction industry. Marty holds a 1.0% equity interest in Alpha Carpentry. See **Appendix II** for further detail.

- *Alpha Construction*: Alpha Construction was formed on October 3, 2013 and operates in the construction industry. Marty holds a 1.0% equity interest in Alpha Construction. See **Appendix III** for further detail.

- *Alpha Drywall*: Alpha Drywall was formed on June 9, 2020 and operates in the construction industry. Marty holds a 1.0% equity interest in Alpha Drywall. See **Appendix IV** for further detail.

- *Alpha Property*: Alpha Property was formed on June 10, 2011 and operates in the property management industry. Marty holds a 1.0% equity interest in Alpha Property. See **Appendix V** for further detail.

## Management Companies

- *Maeve Manager*: Maeve Manager was formed on December 28, 2009 and functions as a management company. Refer to **Appendix I** for information on the series of investments managed by Maeve Manager. The sole director of the company is Marty. As of the Valuation Date, Marty held 300 Common A (voting) shares out of

---

[6] See **Exhibit A** to **Appendix I** for additional information related to EL Venture and the real property located at 146 West Erie Street.

**EXHIBIT B, Page 7 of 237**

# I. Summary

- Maeve Manager's 300 Common A shares outstanding. See **Exhibit A** and **Exhibit B.1** for further detail.

- *MK Manager:* MK Manager was formed on March 4, 2004 and functions as a management company. Refer to **Appendix I** for additional information on the companies managed by MK Manager. The sole director of this company is Marty. As of the Valuation Date, Marty held a 100% equity interest in MK Manager. See **Exhibit A** and **Exhibit C.4** for further detail.

## Retained Earnings

We were asked to analyze the aggregate retained earnings of the Entities over the several years leading up to the Valuation Date. Given that a meaningful portion of Marty's investments are held through Martin II, we reviewed the balance sheets as presented in the historical tax returns for Martin II for this purpose. As shown in the following table, Martin II's retained earnings increased from approximately $106,000 in 2009 to approximately $6.4 million in 2019.[7]

### Retained Earnings – Martin II

| | As of: | Retained Earnings |
|---|---|---|
| 1 | 12/31/2009 | $ 105,864 |
| 2 | 12/31/2010 | 195,678 |
| 3 | 12/31/2011 | (2,790,096) |
| 4 | 12/31/2012 | (990,473) |
| 5 | 12/31/2013 | (424,931) |
| 6 | 12/31/2014 | 2,659,098 |
| 7 | 12/31/2015 | 3,489,092 |
| 8 | 12/31/2016 | 4,610,425 |
| 9 | 12/31/2017 | 5,718,199 |
| 10 | 12/31/2018 | 7,065,838 |
| 11 | 12/31/2019 | 6,398,217 |
| 12 | 12/31/2020 | [a] NOT PROVIDED |

Source: Federal tax returns.

[a] Based on a review of the 2020 tax return produced for Martin II, the balance sheet figures reported for 2020 were identical to those reported for 2019. As such, we did not include the retained earnings balance from the 2020 tax returns above.

## Definition of Value

For purposes of our valuation, the term "Fair Market Value" is defined as the price at which property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.[8]

The term "property" reflects the combined tangible and intangible assets of a company, as components of a going concern, and gives consideration to

[7] A 2020 tax return for Martin II was produced on or around September 15, 2021. However, the balance sheet figures for 2020 were identical to those reported for 2019 (e.g., reported other current assets was $7,082,118 in 2019 **and** 2020). Investigation continues.

[8] Treasury Regs. §20.2031-1(b) and §25.2512-1.



# I.    Summary

all known liabilities. The terms "willing buyer" and "willing seller" refer to hypothetical parties rather than any particular buyer or seller. It is important to note that the specific incentives or attributes of particular buyers and sellers may not be the same as the hypothetical buyer and seller from which Fair Market Value is determined. For purposes of this engagement, we defined the term "nonmarketable" to mean privately held and not actively traded in established public markets.

## Premise of Value

We conducted our analysis of the Entities under a going-concern premise, meaning that the underlying assets of the Entities are presumed, in the absence of a qualified appraisal of such assets, to attain their highest values as integral components of business entities in continued operation and that liquidation of said assets would likely diminish the value of the whole to the members, shareholders and creditors of the Entities.

## Factors Considered

Our analysis considered the valuation guidelines referenced in Revenue Ruling 59-60, 1959-1 C.B. 237, which include consideration of the following factors:

- the nature of the business and the history of the Entities from their inception;
- the economic outlook in general and the condition and outlook of the industries in which the Entities operate;
- the book value of the stock and the financial condition of the Entities;

- the earnings capacity of the Entities;
- the dividend-paying capacity of the Entities;
- whether goodwill or other intangible value exists within the Entities;
- previous sales of the Entities' stock and the size of the block of stock to be valued; and
- the market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Information Reviewed and Procedures Performed

We reviewed several sources of information during the course of the valuation analysis including, but not limited to, the following:[9]

- Conor II's federal income tax returns for the years ended December 31, 2010 through 2020;
- Conor II's certificate of incorporation dated October 20, 2009;
- Conor II's stock certificates dated October 20, 2009;
- Conor II's by-laws;
- Conor II's written actions dated October 20, 2009, January 25, 2010 and January 31, 2011;
- Conor I's certificate of incorporation dated October 21, 2009;
- Conor I's stock certificate dated October 22, 2009;
- Conor I's by-laws;

---

[9] This is not intended to be an exhaustive list of the documents reviewed in this matter.

**STOUT**

**MARRIAGE OF PARIS | 10**

# I. Summary

- Conor I's written actions dated October 22, 2009 and January 31, 2011;

- Conor I's subscription agreement dated October 22, 2009;

- Conor Management's federal income tax returns for the years ended December 31, 2010 through 2020;

- Conor Management's written actions dated October 21, 2009 and May 1, 2010;

- Conor Management's certificate of formation executed October 19, 2009;

- Conor Management's certificates of membership dated October 21, 2009 with Martin NV II, Inc. and the Frank Martin Paris, Jr. Revocable Trust;

- Conor Management's operating agreement dated October 21, 2009;

- Jack Enterprises' federal income tax returns for the years ended December 31, 2010 through 2020;

- Jack Enterprises' written actions dated October 22, 2009 and May 3, 2010;

- Jack Enterprises' limited partnership agreement dated October 22, 2009;

- Jack Enterprises' certificate of formation dated October 22, 2009;

- Jack Enterprises' certificates of partnership interest dated October 22, 2009 with Conor DE I, Inc. and Frank M. Paris, Jr. and dated October 23, 2009 with Conor Management, LLC;

- an assignment agreement of a limited partnership interest in Jack Enterprises between Marty and Conor Management, LLC dated October 23, 2009;

- Martin II's federal income tax returns for the years ended December 31, 2010 through 2020;

- Martin II's articles of incorporation dated October 20, 2009;

- Martin II's subscription agreement dated October 20, 2009;

- Martin II's by-laws;

- Martin II's stock certificates dated October 20, 2009, December 10, 2009, December 31, 2009, January 1, 2010, and January 1, 2011;

- assignment agreements of Martin II's Common Non-Voting stock between Marty and the Declaration of Trust for Frank Martin Paris, III, Conor Reidy Paris and Any Future Born Children of Frank Martin Paris, Jr. and Kerry Reidy Paris dated December 31, 2009, January 1, 2010, and January 1, 2011;

- Martin II's written actions dated October 20, 2009;

- Martin II's Section 1244 Stock Plan dated October 20, 2009;

- Martin II's undated plan of recapitalization;

- a stock pledge agreement dated May 25, 2018 between Marty and Keystone & Stuart, LLC hypothecating an ownership interest in Martin II;

- Martin A's operating agreement dated October 20, 2009;

- Martin A's articles of organization dated October 20, 2009;

- Martin A's certificate of membership interest dated October 20, 2009;

- Martin A's written actions dated October 20, 2009 and October 3, 2011;

- Martin I's by-laws;

**EXHIBIT B, Page 10 of 237**

# I. Summary

- Martin I's articles of organization dated October 21, 2009;

- Martin I's written actions dated October 21, 2009 and October 3, 2011;

- Martin I's subscription agreement dated October 21, 2009;

- Maeve Manager's federal income tax returns for the years ended December 31, 2013 through 2020;

- Maeve Manager's certificate of incorporation dated December 28, 2009;

- Maeve Manager's stock certificates dated December 28, 2009;

- Maeve Manager's subscription agreement dated December 28, 2009;

- Maeve Manager's stock certificates dated December 28, 2009;

- Maeve Manager's Section 1244 Stock Plan dated December 28, 2009;

- Maeve Manager's written actions dated December 28, 2009 and January 25, 2010;

- MK Manager's federal income tax returns for the years ended December 31, 2012, 2013, and 2015 through 2020;

- MK Manager's by-laws dated March 7, 2006;

- MK Manager's articles of incorporation dated March 4, 2004;

- MK Manager's written actions dated March 7, 2006;

- MK Manager's general ledger as of December 31, 2020;

- Sedgwick Realty's federal income tax returns for the years ended December 31, 2011 through 2020;

- Sedgwick Realty's articles of incorporation dated January 25, 2006;

- a valuation report entitled: *Maeve, LLC: Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020* prepared by Stout and dated December 13, 2021;

- a valuation report entitled: *Alpha Carpentry, LLC: Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020* prepared by Stout and dated December 13, 2021;

- a valuation report entitled: *Alpha Construction Services, LLC: Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020* prepared by Stout and dated December 13, 2021;

- a valuation report entitled: *Alpha Drywall Services, LLC: Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020* prepared by Stout and dated December 13, 2021;

- a valuation report entitled: *Alpha Property Services, LLC: Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020* prepared by Stout and dated December 13, 2021; and

- a valuation report entitled: *Sedgwick Properties Holding Corp.: Valuation of a 100.0% Equity Interest as of December 31, 2020* prepared by Stout and dated December 13, 2021.

In addition to the information reviewed above, we also performed the following procedures:



# I.   Summary

- conducted an analysis of other facts and data resulting in our calculation of value.[10]

## Valuation Methodology

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our determination of value. A description of each approach is discussed below.

The *Income Approach* is a technique that estimates the value of a company based on the cash flows the company is expected to generate in the future. The Income Approach is generally performed in two steps: 1) estimate the expected annual future cash flows of the company; and 2) discount or capitalize these cash flows to present value at a rate of return that considers the relative risk of realizing the cash flows.

Under the *Market Approach*, which consists of the Guideline Public Company Method and the Merger and Acquisition Method, the value of a company is estimated by employing statistics derived from observed transactions of similar companies or prior transactions involving interests in the subject company. Ideally, these companies will operate in comparable markets and will have similar growth prospects and risks.

The *Asset Approach* estimates the equity of a business based on the market value of a company's assets minus the value of its liabilities.

The above valuation methods have long been recognized as acceptable in the appropriate circumstances. Accordingly, we applied the methods that,

in our experience and judgment, provide the most supportable valuation based on the information available. Based thereon, we have relied on the Adjusted Book Value Method, a form of the Asset Approach, in our determination of the value of the Subject Interests that relate to investment holding, real estate holding, and management companies. For a discussion of the valuation approaches relied on in our determination of the value of the Subject Interests that relate to operating companies, refer to **Appendices II through VI.**

A more detailed description of our procedures, methodologies, assumptions, and conclusions is contained in our internal work papers.

[10] We conducted an interview with Marty on January 24, 2018. However, while we requested a more recent interview with management of the Entities, we were not afforded with the opportunity to conduct such an interview prior to the issuance of this report. As such, we reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

**EXHIBIT B, Page 12 of 237**



# I.   Summary

## Conclusion of Value

As further described in this report and illustrated in **Exhibit B.1**, we determined the Fair Market Value of the Subject Interests, as of the Valuation Date, to be:

*FOURTEEN MILLION EIGHT-HUNDRED THOUSAND DOLLARS*

*$14,800,000*

This valuation is subject to the assumptions and limiting conditions outlined in the exhibits of this report.

Regards,

Stout Risius Ross, LLC

**STOUT RISIUS ROSS, LLC**

MARRIAGE OF PARIS | 13

# II. Valuation Analysis

## Valuation Analysis

Our application of the Adjusted Book Value Method is presented below and in **Exhibit C** and the attached **Appendices**.

### Conor II

As presented in **Exhibit C.1.a**, the pro rata value of 300 Common A shares of Conor II is determined to be $56,667, as of the Valuation Date.

### Conor Management

As shown in **Exhibit C.2.a**, the pro rata value of a 1.0% equity interest in Conor Management is determined to be $171,420, as of December 31, 2020.

### Martin II

As presented in **Exhibit C.3.a**, the pro rata value of 92,958 Non-Voting Shares of Martin II is determined to be approximately $15,728,494, as of December 31, 2020. Further, the pro rata value of 1,000 Voting Shares of Martin II is determined to be $169,200, as of December 31, 2020.

### Maeve

As presented in **Appendix I**, the pro rata value of a 1.0% member interest in Maeve is determined to be $175,000, as of the Valuation Date.

### Maeve Manager

As shown in **Exhibit B.1**, the Fair Market Value of 300 Common A Shares of Maeve Manager is determined to be *de minimis*, as of the Valuation Date.

### MK Manager

As presented in **Exhibit C.4.a**, the pro rata value of a 100.0% equity interest in MK Manager is determined to be $28,000, as of December 31, 2020.

### Sedgwick Holding

As presented in **Appendix VI**, the Fair Market Value of a 100.0% equity interest in Sedgwick Holding is determined to be *de minimis*, as of the Valuation Date.

### Sedgwick Realty

As shown in **Exhibit C.5.a**, the pro rata value of a 50.0% equity interest in Sedgwick Realty is determined to be $1,500, as of December 31, 2020.

### 828 Grace

As presented in **Appendix I (Exhibit C.1.a)**, the pro rata value of a 1.0% Class A interest in 828 Grace is determined to be $723, as of the Valuation Date.

### Alpha Carpentry

As presented in **Appendix II**, the pro rata value of a 1.0% equity interest in Alpha Carpentry is determined to be *de minimis*, as of December 31, 2020.

### 1454 Michigan

As presented in **Appendix I (Exhibit C.3.a)**, the pro rata value of a 1.0% Class A interest in 1454 Michigan is determined to be $67,260, as of the Valuation Date.

# II.  Valuation Analysis

### Sedgwick Investments

As shown in **Appendix I (Exhibit C.4.a)**, the pro rata value of a 1.0% equity interest in Sedgwick Investments is determined to be $65, as of December 31, 2020.

### 2049 Sheffield

As presented in **Appendix I (Exhibit C.6.a)**, the pro rata value of a 1.0% equity interest in 2049 Sheffield is determined to be $16,350, as of the Valuation Date.

### 55th Investments

As presented in **Appendix I (Exhibit C.10.a)**, the pro rata value of 5 Class A Interests in 55th Investments is determined to be $673, as of December 31, 2020.

### EL Venture

As presented in **Appendix I (Exhibit C.14.b)**, the pro rata value of a 0.01% equity interest in EL Venture is determined to be $648, as of the Valuation Date.

### Alpha Construction

As presented in **Appendix III**, the pro rata value of a 1.0% equity interest in Alpha Construction is determined to be $1,100, as of the Valuation Date.

### Alpha Property

As shown in **Appendix V**, the pro rata value of a 1.0% equity interest in Alpha Property is determined to be $4,200, as of December 31, 2020.

### Alpha Drywall

As shown in **Appendix IV**, the pro rata value of a 1.0% equity interest in Alpha Drywall is determined to be $900, as of December 31, 2020.

**STOUT**

# III.  Conclusion of Value

## Conclusion of Value

As shown in **Exhibit B.1**, the total pro rata value of the Subject Interests as of the Valuation Date is determined to be $16.4 million. As the Subject Interests represent nonmarketable, controlling interests in the Entities, we applied a valuation discount of 10.0% to arrive at the Fair Market Value of the Subject Interests. (Refer to **Exhibit E** for further detail.)

As detailed herein and presented in **Exhibit B.1**, we determine the Fair Market Value of the Subject Interests, as of the Valuation Date, to be:[11]

### *FOURTEEN MILLION EIGHT-HUNDRED THOUSAND DOLLARS*

### *$14,800,000*

\* \* \* \* \* \* \*

Our calculation of value is applicable only for the stated date and purpose and may not be appropriate for any other date or purpose. Reference should be made to the exhibits for assumptions and limiting conditions that apply to this valuation and report.

---

[11] Given the valuation methodologies employed in valuing the Entities (and other related entities owned by Marty), as well as the fact that we adjusted Marty's compensation to a level that reflects both the services performed as an employee and his personal contributions to the businesses, our conclusion of value does not include any elements of personal goodwill.

CONFIDENTIAL

◢STOUT

# IV. Compensation Analysis

## Compensation Analysis

Historically, Marty's compensation was paid in the form of wages by Sedgwick Payroll Corporation and Alpha Carpentry. Marty received annual pre-tax wages of $95,000 in 2017, $0 in 2018 and 2019, and $180,000 in 2020.[12]

We were asked to analyze the market level of compensation that could be earned by Marty for his efforts in overseeing the Entities. In doing such, we considered the market level of compensation that would be paid to an executive to manage the operations of certain of the Entities (and their combined holdings), including Sedgwick Holding, Alpha Carpentry, Alpha Property, Alpha Construction, Alpha Drywall, and Maeve (the "Observed Companies"). These companies operate in various industries, including the real estate services, construction, and financial investment activities industries.

As shown in **Exhibit D.1**, Sedgwick Holding, Alpha Carpentry, Alpha Property, Alpha Construction, and Alpha Drywall, generated combined revenue of approximately $16.5 million in 2020. Further, based on our determination of the Fair Market Value of the equity of Maeve and as shown in **Exhibit D.2**, Maeve had assets under management ("AUM") of approximately $31.9 million as of the Valuation Date.

To estimate the appropriate level of market compensation, we considered the *Executive Compensation Assessor* survey prepared by the Economic Research Institute ("ERI") for NAICS Codes 523900 (Other Financial

Investment Activities), 523920 (Portfolio Management), 236110 (Residential Building Construction), 236200 (Nonresidential Building Construction), and 531300 (Activities Related to Real Estate). The following points summarize the market data.

- *NAICS 523900 and 523920:* As shown in **Exhibit D.2**, median market total compensation for the CEO of a company located in Chicago with AUM ranging from $5.0 million to $45.0 million, ranged from $289,000 to $581,000, while 90th percentile compensation ranged from $477,000 to $964,000. For companies with AUM at a level consistent with Maeve (approximately $31.9 million), indicated market compensation ranged from $499,000 to $857,000.

- *NAICS 236110, 236200, and 531300:* As shown in **Exhibit D.2**, median market total compensation for the CEO of a company located in Chicago with revenue ranging from $10.0 million to $20.0 million, ranged from $362,000 to $509,000, while 90th percentile compensation ranged from $600,000 to $844,000. For companies with revenue consistent with the combined revenue of Sedgwick Holding, Alpha Carpentry, Alpha Property, Alpha Construction, and Alpha Drywall (approximately $16.5 million), indicated market compensation ranged from $415,000 to $797,000.

Based on the above information and given the recent financial results of the Observed Companies and the personal contributions made by Marty to the Entities, we estimate a market level of compensation to be approximately $650,000. This level of market compensation is consistent with the 75th percentile of the market data, which considers both Marty's services performed as an employee of certain of the Entities as well as his personal contributions (i.e., the skill, reputation, experience and relationships held by Marty) to the businesses.

---

[12] In deposition testimony given on May 18, 2021, Marty testified, "Right now I'm earning $20,000 a month gross." Further, when asked whether his compensation had changed from $20,000 a month gross since August 2019, Marty testified, "I don't believe so." Finally, Marty testified that he is paid out of Sedgwick Payroll.

MARRIAGE OF PARIS | 17

**EXHIBIT B, Page 17 of 237**



# IV. Compensation Analysis

It is important to note that this level of market compensation does not include any one-time development fees, asset management fees, property management fees, commission income, etc. paid to Marty (directly or through one of the Entities) as a result of his efforts, any sublease income, any personal expenses paid by one of the Entities (or any other related entity) on behalf of Marty, or any distributions paid to Marty by one of the Entities (or any other related entity).

CONFIDENTIAL

# A. Ownership Chart



Exhibit A.1 - Marty Ownership Chart [a]

▲STOUT

# A. Ownership Chart

## Footnotes to Exhibit A.1 - Marty Ownership Chart

[a] In addition to the entities on this exhibit, Marty holds equity interests in entities held in common with a series of Maeve LLC. Refer to Exhibit A.2.

[b] Frank M. Paris, Sr. (Marty's father) also owns 600 shares of Common B stock (non-voting) of this entity.

[c] Based on our review of the federal tax returns, stock certificates, assignment agreements between Marty and the Declaration of Trust for Frank Martin Paris, III, Conor Reidy Paris and Any Future Born Children of Frank Martin Paris, Jr. and Kerry Reidy Paris (the "Children's Trust"), and various other documents produced in this matter, it appears that Martin NV II, Inc. was recapitalized in 2009 such that Marty then held all of the 1,000 voting shares outstanding and all of the 99,000 non-voting shares outstanding. In a series of subsequent assignment agreements dated 12/31/2009, 1/1/2010 and 1/1/2011, 4,680 common non-voting shares were transferred from Marty to the Children's Trust. The net effect of these transfers is consistent with the percentage of stock ownership allocated to each shareholder on the 2011 Schedules K-1 (95.32% to Marty and 4.68% to the Children's Trust). While no additional assignment agreements were produced, it appears that additional shares were transferred from Marty to the Children's Trust in subsequent years based on the percentage of stock ownership reported on the 2012 and 2013 Schedules K-1. *For purposes of our analysis, we have assumed that Marty transferred non-voting shares of Martin NV II, Inc. in 2012 and 2013 such that his current percentage of stock ownership is consistent with the figure reported on his schedules K-1 from 2013 through 2019.* As a result, based on information provided to date, it appears that Marty currently holds 92,958 non-voting shares and 1,000 voting shares of Martin NV II, Inc. and that the Children's Trust holds the remaining 6,042 non-voting shares outstanding.

[d] Marty issued an option contract to Keystone & Stuart, LLC on May 25, 2018 giving Keystone & Stuart, LLC the right to purchase 2% of both the voting and non-voting stock of Martin NV II, Inc. for $11,500. The contract, which was set to expire July 31, 2019, and which was made in conjunction with a promissory note agreement between Marty and Keystone & Stuart, LLC that was secured by a collateral interest in Martin NV II, Inc., does not appear to have been exercised based on the Schedules K-1 issued to Marty for the 2017 through 2019 tax years. Based thereon, for purposes of our analysis we have assumed that Marty continues to own 1,000 voting shares and 92,958 non-voting shares of Martin NV II, INc. as of the Valuation Date.

[e] Jack Enterprises, LLC's tax returns for 2010 through 2019 list Conor DE II, Inc. as the company's General Partner. Conversely, Conor DE I, Inc. is identified as the General Partner in the Limited Partnership Agreement dated 10/22/2009 and various written actions of the company. Marty is the sole director of both Conor DE I, Inc. and Conor DE II, Inc and owns (directly or indirectly) a majority of the voting stock of both companies.

[f] The name "Sedgwick Holding Corp." appears on the tax returns filed annually by Loberg Miki & O'Brien LLP and Spencer & Associates, Ltd. No additional filings or documents were identified that make reference to this entity. For purposes of our analysis we have assumed that this entity is the d/b/a for tax filing purposes for Sedgwick Properties Holding Corp. given that tax documents for the latter have not been produced and we have been provided with any organizational documents for "Sedgwick Holding Corp."

[g] Based on the 2011 tax return of Sedgwick Properties Holding Corp., which shows this entity reported as a "Q-Sub" effective January 1, 2011 and therefore consolidated on the tax return, we have assumed that Sedgwick Properties Holding Corp. holds 100.0% of the equity of this entity.



# A. Ownership Chart



Exhibit A.2 - Ownership Chart - Maeve LLC



# A. Ownership Chart



MARRIAGE OF PARIS | 22

CONFIDENTIAL



# A.  Ownership Chart

STOUT

MARRIAGE OF PARIS | 23





# A. Ownership Chart

## Footnotes to Exhibit A.2 - Maeve Ownership Chart

[a] Note that Exhibit A of the Alpha Carpentry LLC operating agreement dated March 7, 2014 identifies Series E as the owner of the 99.0% membership interest rather than Series F. It appears, however, based on the Maeve, LLC Amended Certificate of Formation filed November 26, 2014 and our review of other documents produced in this matter that Maeve LLC - Series F holds this interest.

[b] Series H formerly held an equity interest in 1935 S Wabash, LLC. We have not been provided with any documentation detailing the current holdings of Series H, if any.

[c] Series O formerly held an equity interest in True Believers II, LLC. This entity dissolved in 2017 per a filing with the Illinois Secretary of State. We have not been provided with any documentation detailing the current holdings of Series O, if any.

[d] Quit claim deeds dated July 1, 2010 show Maeve LLC - Series P holding a 100% interest in 828 W. Grace Unit 402 Land Trust, which holds a 50% undivided interest in a condominium unit located at 828 W Grace Street in Chicago, and Maeve LLC - Series Q holding a 100% interest in 828 W. Grace Garage Unit P37 Land Trust, which holds a 50% undivided interest in a parking stall located at 828 W Grace Street in Chicago. The remaining 50% undivided interest of each property is held by Bridget Reidy Lacey. Both the condominium unit and the garage unit were under contract to sell on June 8, 2019 for $385,000, but our understanding is that this sale did not close. The settlement statement for this transaction indicated that the sellers were Bridget Reidy Lacey and Kerry and Marty Paris.

[e] According to the Amended Certificate of Formation of Maeve, LLC dated November 26, 2014 and other related documentation, Series U was formerly the owner of 100% of the Class B membership interests in 1545 W North LLC. See footnote [i] for further detail related to 1545 W North, LLC.

[f] Per a Subscription Agreement for The Per Hydration People, LLC, Maeve LLC - Series U subscribed for 14,286 units of membership interests in exchange for $50,001.

[g] According to a closing statement for 703 Park Avenue dated August 31, 2012 and a settlement statement dated September 7, 2012, Maeve LLC - Series U was the purchaser of this property. Further, the Special Warranty Deed recorded with the Cook County Clerk's office lists Maeve, LLC - Series U as the owner of the property. As such, we have assumed that Series U is the owner of this property for purposes of our analysis.

It should be noted that the Amended Certificate of Formation of Maeve LLC dated November 26, 2014 lists Series X as the owner of 703 Park Avenue. Other than the Amended Certificate of Formation of Maeve, LLC dated November 26, 2014, we have been provided with no other documentation detailing the current holdings of Series X, if any.

[h] The Amended Certificate of Formation of Maeve, LLC dated November 26, 2014 lists Series AA as the owner of a 20% Class B Membership Interest in 1611 N Hermitage, LLC. However, the Schedules K-1 and First Amended Operating Agreement of 1611 Hermitage, LLC list Maeve, LLC - Series Y as the owner of this interest.

[i] According to the Amended Certificate of Formation of Maeve, LLC dated November 26, 2014 and other related documentation, Series BB was formerly the owner of 100% of the Class A membership interests in 1545 W North LLC. 1545 W North LLC was the general partner in 1545 W North, LP. 1545 W North, LP filed a final tax return in 2018 after liquidating its real property holdings and distributing its remaining assets to the company's partners.

A filing with the Illinois Secretary of State indicates that the status of 1545 W North, LLC was revoked on September 29, 2020. It appears based on documents produced that 1545 W North, LLC was not operating as of the Valuation Date. We have not been provided with any documentation detailing the current holdings of Series BB, if any.

**STOUT**

# A. Ownership Chart

## Footnotes to Exhibit A.2 - Maeve Ownership Chart

[1] Paragraph 42 of Marty's affidavit attached as Exhibit L to the Response to Motion to Continue Trial Date Due to Commence on October 4, 2021 states:

"As to the entity 301 W. North LP, the business organization documents have been previously produced along with loan documents associated with the project....This entity is inactive, and it has not been operating since at least October 2020; accordingly, I am not aware of any documents in my possession and control which have been requested but not previously produced."

However, according to a search of the Cook County Clerk's Office, a Trustee's Deed was recorded on December 6, 2014 conveying and quitclaiming property located at 301-313 West North Avenue, Chicago, IL 60610 (PINs: 17-04-201-002-0000; 17-04-201-008-0000; 17-04-201-009-0000; 17-04-201-010-0000; 17-04-201-011-0000; 17-04-201-012-0000) to 301 W North Avenue, L.P. There does not appear to have been a more recent deed recorded for this property as of the Valuation Date. Further, Marty produced a copy of the 2020 federal tax return for 301 W North Avenue, LP on September 15, 2021. The 2020 tax return was **_NOT_** marked as a "final return."

Per the Response to Sixth Supplemental Request for the Production of Documents for Inspection and Copying Pursuant to Supreme Court Rule 214, Marty produced 1) a Promissory Note dated September 23, 2020 for a principal amount of $26 million with 301 W North Avenue, LLC as the borrower and BDS III Mortgage Capital J LLC as the lender and 2) an Estimated Buyer's Closing Statement for this loan dated September 23, 2020 (the "Closing Statement"). The Closing Statement listed 301 W North **_Avenue, LLC_** (a Delaware LLC) as the "Buyer" of the Property located at 1552 North Park Avenue Chicago Illinois 60610 and 301 West North Avenue Chicago, Illinois 60610. The principal amount of the new loan made by BDS III Mortgage Capital J LLC (the "Lender") was $26 million. Further, the loan proceeds went to, among other things, a mortgage payoff to First Midwest Bank (the prior lender to 301 W North Avenue, LP) in the amount of $18.9 million and a "Redemption payment to RECAP" in the amount of $4,227,449. RECAP Opportunity Fund, L.P. was the Investor Partner in 301 W North Avenue, L.P. One week later, on September 30, 2020, counsel for RECAP Opportunity Fund, L.P. entered into a Stipulation of Discontinuance in a lawsuit where RECAP Opportunity Fund, L.P. was Plaintiff and 301 W. North, LLC and Marty were Defendants, which discontinued the action.

While the LLC Agreement for 301 W North, LLC, the Limited Partnership Agreement of 301 W North Avenue, L.P. and various other documents for these two entities have been produced, we have not been provided with any organizational documents, agreements, tax returns, financial statements, or other documents for 301 W North **_Avenue, LLC_** to date. (A filing with the Illinois Secretary of State indicates that a Delaware limited liability company by the name of 301 W North Avenue, LLC was admitted to operate in the State of Illinois approximately one week after the date of the Closing Statement.)

Based on the above, for purposes of our analysis, we have assumed that Maeve Series FF and Series GG hold 100% of the equity of the entity or entities that own the real property located at 301 W North Avenue and 1552 North Park Avenue in Chicago (PINs: 17-04-201-002-0000; 17-04-201-008-0000; 17-04-201-009-0000; 17-04-201-010-0000; 17-04-201-011-0000; 17-04-201-012-0000). **_We reserve the right to amend our report and this analysis if additional documents or information related to 301 W North Avenue, LP, 301 W North, LLC, 301 W North Avenue Lots, LLC, the real property located at 301-313 West North Avenue._**

**MARRIAGE OF PARIS | 25**

CONFIDENTIAL

# A. Ownership Chart

**STOUT**

## Footnotes to Exhibit A.2 - Maeve Ownership Chart

[k] Based on a review of documents produced to date, it appears that Erie & LaSalle, LLC ("Erie & LaSalle") currently holds a 99.99% equity interest in this entity, while Marty owns a 0.01% interest. The Operating Agreement of Erie LaSalle Venture, LLC ("Venture") effective October 7, 2016 (the "Agreement"), as subsequently amended, indicates that Erie & LaSalle held a "Sponsor Member" interest in Venture and M17 Land Investments, LLC ("M17") held a "Preferred Member" interest in Venture. However, per a Notice of Change in Control Event from M17 and Belvedere Financial, LLC to Erie & LaSalle dated January 23, 2018, the Preferred Member provided notice to the Sponsor Member "THAT IT SHALL BE DEEMED TO HAVE RESIGNED FROM THE COMPANY AND HAVE ITS CAPITAL ACCOUNT AND INTEREST IN THE COMPANY TRANSFERRED TO PREFERRED MEMBER IF COMPANY FAILS TO REDEEM, IN FULL, PREFERRED MEMBER'S INTEREST…" Notably, the 2019 federal income tax return and related Schedules K-1 for Venture indicate that M17 transferred its capital of $3,000,000 to Erie & LaSalle in 2019. The $3,000,000 capital figure is consistent with the original capital contribution made by M17 per the Agreement and the 2016 Schedule K-1 for Venture issued to M17. Further, the 2019 Schedule K-1 for Venture issued to M17 is marked final and shows that M17 has an ending share of profits, losses and capital of 0.0%. Moreover, the 2019 Schedule K-1 for Venture issued to Erie & LaSalle shows a capital contribution of $5.5 million in 2019 (consisting of $3.0 million of "transferred capital" and $2.5 million of "contributions to capital"), is not marked final, and shows an ending share of profits, losses and capital of 100.0%. Finally, the 2020 Schedules K-1 for Venture indicate that Marty owns 0.01% of Venture as of December 31, 2020. Thus, for purposes of our analysis, we have assumed that Erie & LaSalle owns 99.99%, and Marty owns 0.01%, of the equity of Venture (or any related entity or entities that own the real property located at 146 W. Erie, Chicago, IL).

It should be noted that the 2020 Schedule K-1 for Venture issued to Erie & LaSalle shows Erie & LaSalle's percentage ownership interest as 0.9999999999%, rather than 99.99%. However, given that: 1) the 2019 Schedule K-1 for Venture issued to Erie & LaSalle indicates that Erie & LaSalle owns 100.0% of Venture; 2) there are only two members of Venture listed in the 2020 federal tax return for Venture (i.e., Erie & LaSalle and Marty); 3) Marty ostensibly owns 0.01% of Venture as of December 31, 2020 per the 2020 Schedules K-1 for Venture); and 4) we were not provided with any documents evidencing the transfer of any part of Erie & LaSalle's ownership interest in Venture in 2020, the ownership percentage listed on the 2020 Schedule K-1 for Erie & LaSalle appears to be a typographical error.

Further, a promissory note dated July 2, 2019 was recently produced that contains the following representation: "This Note has been issued pursuant to that certain Purchase Agreement, dated as of July 2, 2019 (the "Purchase Agreement"), by and between [LaSalle & Erie, LLC] and [M17], pursuant to which [LaSalle & Erie, LLC] has purchased [M17]'s entire equity interest in Erie LaSalle Venture LLC." According to public filings made with the State of Delaware, a limited liability company named LaSalle & Erie, LLC was formed on June 25, 2019, seven days prior to the date of this note agreement. To date, we have not been provided with the purchase agreement referenced in the note agreement dated July 2, 2019, nor various other documents for LaSalle & Erie, LLC, including any organizational documents, agreements, tax returns, financial statements, or other documents. As such, the ownership structure and holdings of LaSalle & Erie, LLC are not known at this time.

[l] Based on the above, for purposes of our analysis, we have assumed that Marty, Maeve Series HH and Series II hold 100% of the equity of the entity or entities that own the real property located at 146 West Erie Street in Chicago. *We reserve the right to amend our report and this analysis if additional documents or information related to LaSalle & Erie, LLC, the real property located at 146 West Erie, Chicago, Illinois, or any other related entity or real property are subsequently produced.*

[l] For purposes of our analysis, we have assumed that Erie LaSalle Venture, LLC owned the real property located at 146 W Erie Street in Chicago as of the Valuation Date based on Venture's 2020 federal income tax return, recordings with the Cook County Clerk's Office, and other documents produced in this matter to date.

[m] The Amended and Restated Operating Agreement of Maeve, LLC dated November 7, 2014 does not provide member information for Series JJ through Series LL. For purposes of this analysis we have assumed that ownership of these series is consistent with Series A through Series II (i.e. 99% held by Jack Enterprises, LP and 1% held by the FMP Jr. Revocable Trust).

**MARRIAGE OF PARIS** | 26

**EXHIBIT B, Page 26 of 237**

# B.   Conclusion of Value

**◆STOUT**

**Investments Held by Marty**
**December 31, 2020**
**Conclusion of Value**                                                                                                Exhibit B.1
*In U.S. Dollars*

| | Entity | Marty's Ownership Interest [a] | Notes | Pro Rata Value | Refer to |
|---|---|---|---|---|---|
| 1 | Conor DE II, Inc. | 300 Common A Shares | | $ 56,667 | Exhibit C.1.a |
| 2 | Conor Management, LLC | 1.0% equity interest | | 171,420 | Exhibit C.2.a |
| 3 | Martin NV II, Inc. | 92,958 Non-Voting Shares | | 15,728,494 | Exhibit C.3.a |
| 4 | Martin NV II, Inc. | 1,000 Voting Shares | | 169,200 | Exhibit C.3.a |
| 5 | Maeve, LLC | 1.0% equity interest | | 175,000 | Appendix I |
| 6 | Maeve Manager, Inc. | 300 Common A Shares | [b] | *de minimis* | |
| 7 | MK Manager Corp. | 100.0% equity interest | | 28,000 | Exhibit C.4.a |
| 8 | Sedgwick Properties Holding Corp. | 100.0% equity interest | | *de minimis* | Appendix VI |
| 9 | Sedgwick Realty Corp. | 50.0% equity interest | | 1,500 | Exhibit C.5.a |
| 10 | 828 W Grace, LLC | 1.0% Class A interest | | 723 | Appendix I |
| 11 | Alpha Carpentry, LLC | 1.0% equity interest | | *de minimis* | Appendix II |
| 12 | 1454 S Michigan, LLC | 1.0% Class A interest | | 67,260 | Appendix I |
| 13 | Sedgwick Investments, LLC | 1.0% equity interest | | 65 | Appendix I |
| 14 | 2049 N Sheffield, LLC | 1.0% equity interest | | 16,350 | Appendix I |
| 15 | 55th and Kedzie Investments, LLC | 5 Class A Interests | | 673 | Appendix I |
| 16 | Erie LaSalle Venture, LLC | 0.01% equity interest | | 648 | Appendix I |
| 17 | Alpha Construction Services, LLC | 1.0% equity interest | | 1,100 | Appendix III |
| 18 | Alpha Property Services, LLC | 1.0% equity interest | | 4,200 | Appendix V |
| 19 | Alpha Drywall Services, LLC | 1.0% equity interest | | 900 | Appendix IV |
| 20 | **Total Pro Rata Value of the Subject Interests** | | | 16,422,199 | |
| 21 | Less: Valuation Discount [c] | | 10.0% | $ (1,642,220) | |
| 22 | **Fair Market Value of Subject Interests (Rounded)** | | | **$ 14,800,000** | |

[a] References to Marty herein may also include references to the FMP Trust.
[b] Maeve Manager, Inc. holds no tangible assets or liabilities per its 2020 tax return.
[c] Refer to Exhibit E for further detail.

**EXHIBIT B, Page 27 of 237**



# C.    Adjusted Book Value Method

**Conor DE II, Inc.**
**December 31, 2020**
**Adjusted Book Value Method**                                                            Exhibit C.1.a

*In U.S. Dollars*

|  |  | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Investment in Jack Enterprises | $ 72,126 | $ 173,180 | [a] |
| 2 | Stock Subscription Receivable | 900 | 900 | [b] |
| 3 | **Total Current Assets** | **73,026** | **174,080** | |
| 4 | **Total Assets** | **$ 73,026** | **$ 174,080** | |
| 5 | Due to Maeve LLC | $ 3,550 | $ 3,550 | [b] |
| 6 | Loans from Shareholders | 1,000 | 1,000 | [b] |
| 7 | **Total Liabilities** | **4,550** | **4,550** | |
| 8 | **Total Stockholders' Equity** | **$ 68,476** | **$ 169,530** | [c] |
| 9 | **Total Value of Equity (Rounded)** | | **$ 170,000** | |
| 10 | **Pro Rata Value of 300 Common A Shares** | 33.3% | **$ 56,667** | [d] |

Refer to the last page of this exhibit for a description of the footnotes.



**STOUT**

# C.   Adjusted Book Value Method

**Conor DE II, Inc.**
**December 31, 2020**
**Explanation of Fair Market Value**                                    **Exhibit C.1.a**

[a] The value of this investment was adjusted to its Fair Market Value as indicated in Exhibit C.2.b.

[b] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[c] The resulting value of stockholders' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[d] While the company's Common A Shares have voting privileges and the Common B Shares do not, proceeds generated by the company are equitably distributable to both classes of shares. The value attributable to the voting privileges of the Common A Shares has been contemplated in our application of a valuation discount. See Exhibit B.1.

**EXHIBIT B, Page 29 of 237**



# C. Adjusted Book Value Method

**Conor Management, LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.2.a

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 1 Investment in Jack Enterprises | $ 7,140,074 | $ 17,144,820 | [a] |
| 2 **Total Current Assets** | 7,140,074 | 17,144,820 | |
| 3 **Total Assets** | $ 7,140,074 | $ 17,144,820 | |
| 4 Due to Maeve | $ 2,602 | $ 2,602 | [b] |
| 5 Due to Partner | 250 | 250 | [b] |
| 6 **Total Liabilities** | 2,852 | 2,852 | |
| 7 **Total Members' Equity** | $ 7,137,222 | $ 17,141,968 | [c] |
| 8 **Total Value of Equity (Rounded)** | | $ 17,142,000 | |
| 9 **Pro Rata Value of Martin NV II Inc.'s Interest** | 99.0% | $ 16,970,580 | |
| 10 **Pro Rata Value of Marty's Interest** | 1.0% | $ 171,420 | |

[a] The value of this investment was adjusted to its Fair Market Value as indicated in Exhibit C.2.b.

[b] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[c] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

MARRIAGE OF PARIS | 30

# C.   Adjusted Book Value Method

STOUT

**Jack Enterprises, LP**
**December 31, 2020**
**Adjusted Book Value Method**                                                    Exhibit C.2.b

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Due from Affiliates | $            13 | $            13 | [a] |
| 2 | Investment in Maeve LLC | 7,214,687 | 17,320,000 | [b] |
| 3 | **Total Current Assets** | 7,214,700 | 17,320,013 | |
| | | | | |
| 4 | **Total Assets** | **$ 7,214,700** | **$ 17,320,013** | |
| | | | | |
| 5 | Due to Partner | 2,500 | 2,500 | [a] |
| 6 | **Total Liabilities** | **2,500** | **2,500** | |
| | | | | |
| 7 | **Total Partners' Equity** | **$ 7,212,200** | **$ 17,317,513** | [c] |
| | | | | |
| 8 | **Total Value of Equity (Rounded)** | | **$ 17,318,000** | |
| | | | | |
| 9 | **Pro Rata Value of Limited Partner Interest** | 99.0% | **$ 17,144,820** | [d] |
| | | | | |
| 10 | **Pro Rata Value of General Partner Interest** | 1.0% | **$    173,180** | [d] |

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The value of this investment was adjusted to its Fair Market Value as indicated in the Maeve Report. See **Appendix I**.

[c] The resulting value of stockholders' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[d] Proceeds generated by the company are equitably distributable to both partnership classes. The value attributable to the voting privileges of the General Partner Interest has been contemplated in our application of a valuation discount. See Exhibit B.1.

CONFIDENTIAL

# C.  Adjusted Book Value Method

**STOUT**

MARRIAGE OF PARIS | 32

**Martin NV II, Inc.**
**December 31, 2020**
**Adjusted Book Value Method**

**Exhibit C.3.a**

*In U.S. Dollars*

|  |  | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Investment in Partnership | $ 7,081,118 | $ 16,970,580 | [a] |
| 2 | Stock Subscription Receivable | 1,000 | 1,000 | [b] |
| 3 | **Total Current Assets** | 7,082,118 | 16,971,580 | |
| 4 | **Total Assets** | $ 7,082,118 | $ 16,971,580 | |
| 5 | Loans from Shareholders | $ 250 | $ 250 | [b] |
| 6 | Due to Maeve LLC | 51,767 | 51,767 | [b] |
| 7 | **Total Liabilities** | 52,017 | 52,017 | |
| 8 | **Total Stockholders' Equity** | $ 7,030,101 | $ 16,919,563 | [c] |
| 9 | **Total Value of Equity (Rounded)** | | $ 16,920,000 | |
| 10 | **Pro Rata Value of Marty's 92,958 Non-Voting Shares** | 93.0% | $ 15,728,494 | [d] |
| 11 | **Pro Rata Value of Marty's 1,000 Voting Shares** | 1.0% | $ 169,200 | [d] |
| 12 | **Pro Rata Value of the Children's Trust's 6,042 Non-Voting Shares** | 6.0% | $ 1,022,306 | [d] |

Refer to the last page of this exhibit for a description of the footnotes.



# C.  Adjusted Book Value Method

**Exhibit C.3.a**

**Martin NV II, Inc.**
**December 31, 2020**
**Explanation of Fair Market Value**

[a] The value of this investment was adjusted to its Fair Market Value as indicated in Exhibit C.2.a.

[b] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[c] The resulting value of stockholders' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[d] Proceeds generated by the company are equitably distributable to both shareholder classes. The value attributable to the voting privileges of the Voting Shares has been contemplated in our application of a discount on Exhibit B.1. See Exhibit A.1 for our understanding of the ownership of this entity as of the Valuation Date.

# C.   Adjusted Book Value Method

**STOUT**

**MK Manager Corp.**
**December 31, 2020**
**Adjusted Book Value Method**                                                    **Exhibit C.4.a**

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ | 217 | $ 217 | [a] |
| 2 | Due from Affiliates | | 49,716 | 27,678 | [b] |
| 3 | Other Receivable | | 220 | 220 | [a] |
| 4 | **Total Current Assets** | | **50,153** | **28,115** | |
| 5 | **Total Assets** | $ | **50,153** | $ **28,115** | |
| 6 | Due to Affiliates | | 200 | 200 | [a] |
| 7 | **Total Liabilities** | | **200** | **200** | |
| 8 | **Total Stockholders' Equity** | $ | **49,953** | $ **27,915** | [c] |
| 9 | **Total Value of Equity (Rounded)** | | | $ **28,000** | |

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The Company's note receivable from Sedgwick Properties Holding Corp. has been reduced by $22,038 since the full amount of the note is not considered collectible. A corresponding adjustment has been made to the note payable to MK Manager Corp. as of the Valuation Date on the balance sheet of Sedgwick Properties Holding Corp.

[c] The resulting value of stockholders' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.



# C.  Adjusted Book Value Method

**Sedgwick Realty Corp.**
**December 31, 2020**
**Adjusted Book Value Method**                                                     **Exhibit C.5.a**

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 1 Cash and Cash Equivalents | $ 16,591 | $ 16,591 | [a] |
| 2 Tax Refund Receivable | 237 | 237 | [a] |
| 3 **Total Current Assets** | **16,828** | **16,828** | |
| | | | |
| 4 **Total Assets** | **$ 16,828** | **$ 16,828** | |
| | | | |
| 5 Loans from Shareholders | 14,245 | 14,245 | [a] |
| 6 **Total Liabilities** | **14,245** | **14,245** | |
| | | | |
| 7 **Total Stockholders' Equity** | **$ 2,583** | **$ 2,583** | [b] |
| | | | |
| 8 **Total Value of Equity (Rounded)** | | **$ 3,000** | |
| | | | |
| 9 **Pro Rata Value of Marty's Interest** | 50.0% | **$ 1,500** | |

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The resulting value of stockholders' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

CONFIDENTIAL

**STOUT**

# D. Compensation Analysis

## Allocation of Compensation

*In U.S. Dollars*

**Exhibit D.1**

| | Entity | 2020 Revenue | Notes | Market Compensation |
|---|---|---|---|---|
| 1 | Sedgwick Properties Holding Corp. | $ 1,424,291 | | $ 90,000 |
| 2 | Alpha Carpentry, LLC | 173,184 | | 0 |
| 3 | Alpha Property Services, LLC | 52,733 | | 55,000 |
| 4 | Alpha Construction Services, LLC | 14,330,689 | | 125,000 |
| 5 | Alpha Drywall Services, LLC | 532,080 | | 45,000 |
| 6 | Maeve, LLC | n/a | | 335,000 |
| 7 | **Total** | **$ 16,512,977** | [a] | **$ 650,000** |

[a] See Exhibit D.2.

**STOUT**

# D. Compensation Analysis

Exhibit D.2

**Market Compensation**
*In U.S. Dollars*

| | Role | Industry | Assets Under Management | Total Compensation | | | % of AUM | | |
| | | | | Median | 75th Percent. | 90th Percent. | Median | 75th Percent. | 90th Percent. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Chief Executive Officer | 523900 - Other Financial Investment Activities | $ 45,000,000 | $ 567,219 | $ 766,112 | $ 940,802 | 1.3% | 1.7% | 2.1% |
| 2 | Chief Executive Officer | 523900 - Other Financial Investment Activities | 40,000,000 | 545,557 | 736,806 | 904,918 | 1.4% | 1.8% | 2.3% |
| 3 | Chief Executive Officer | 523900 - Other Financial Investment Activities | 35,000,000 | 522,210 | 705,159 | 866,179 | 1.5% | 2.0% | 2.5% |
| 4 | Chief Executive Officer | 523900 - Other Financial Investment Activities | 30,000,000 | 496,790 | 670,640 | 823,931 | 1.7% | 2.2% | 2.7% |
| 5 | Chief Executive Officer | 523900 - Other Financial Investment Activities | 25,000,000 | 468,710 | 632,472 | 777,191 | 1.9% | 2.5% | 3.1% |
| 6 | Chief Executive Officer | 523900 - Other Financial Investment Activities | 20,000,000 | 437,028 | 589,440 | 724,367 | 2.2% | 2.9% | 3.6% |
| 7 | Chief Executive Officer | 523900 - Other Financial Investment Activities | 15,000,000 | 400,050 | 539,329 | 662,600 | 2.7% | 3.6% | 4.4% |
| 8 | Chief Executive Officer | 523900 - Other Financial Investment Activities | 10,000,000 | 354,173 | 477,288 | 585,975 | 3.5% | 4.8% | 5.9% |
| 9 | Chief Executive Officer | 523900 - Other Financial Investment Activities | 5,000,000 | 288,801 | 388,976 | 477,249 | 5.8% | 7.8% | 9.5% |
| 10 | Chief Executive Officer | 523920 - Portfolio Management | 45,000,000 | 581,378 | 785,236 | 964,224 | 1.3% | 1.7% | 2.1% |
| 11 | Chief Executive Officer | 523920 - Portfolio Management | 40,000,000 | 561,546 | 758,443 | 931,411 | 1.4% | 1.9% | 2.3% |
| 12 | Chief Executive Officer | 523920 - Portfolio Management | 35,000,000 | 539,959 | 729,223 | 895,635 | 1.5% | 2.1% | 2.6% |
| 13 | Chief Executive Officer | 523920 - Portfolio Management | 30,000,000 | 516,152 | 696,937 | 856,116 | 1.7% | 2.3% | 2.9% |
| 14 | Chief Executive Officer | 523920 - Portfolio Management | 25,000,000 | 489,421 | 660,625 | 811,672 | 2.0% | 2.6% | 3.2% |
| 15 | Chief Executive Officer | 523920 - Portfolio Management | 20,000,000 | 458,619 | 618,759 | 760,377 | 2.3% | 3.1% | 3.8% |
| 16 | Chief Executive Officer | 523920 - Portfolio Management | 15,000,000 | 421,673 | 568,616 | 698,731 | 2.8% | 3.8% | 4.7% |
| 17 | Chief Executive Officer | 523920 - Portfolio Management | 10,000,000 | 374,122 | 504,254 | 619,269 | 3.7% | 5.0% | 6.2% |
| 18 | Chief Executive Officer | 523920 - Portfolio Management | 5,000,000 | 303,017 | 408,177 | 500,860 | 6.1% | 8.2% | 10.0% |
| 19 | Chief Executive Officer | 523900 - Other Financial Investment Activities | 31,868,799 | 499,000 | 673,621 | 827,431 | 1.6% | 2.1% | 2.6% |
| 20 | Chief Executive Officer | 523920 - Portfolio Management | 31,868,799 | 516,866 | 697,833 | 857,119 | 1.6% | 2.2% | 2.7% |

Economic Research Institute Executive Compensation Assessor Tool.

**EXHIBIT B, Page 37 of 237**

# D.  Compensation Analysis

**STOUT**

**Exhibit D.2**

## Market Compensation

| | Role | Industry | Revenue | Total Compensation Median | 75th Percent. | 90th Percent. | % of Revenue Median | 75th Percent. | 90th Percent. |
|---|---|---|---|---|---|---|---|---|---|
| 21 | Chief Executive Officer | 236110 - Residential Building Construction | $ 20,000,000 | $ 507,721 | $ 685,490 | $ 842,106 | 2.5% | 3.4% | 4.2% |
| 22 | Chief Executive Officer | 236110 - Residential Building Construction | 19,000,000 | 500,427 | 675,582 | 829,981 | 2.6% | 3.6% | 4.4% |
| 23 | Chief Executive Officer | 236110 - Residential Building Construction | 18,000,000 | 492,848 | 665,283 | 817,374 | 2.7% | 3.7% | 4.5% |
| 24 | Chief Executive Officer | 236110 - Residential Building Construction | 17,000,000 | 484,951 | 654,550 | 804,234 | 2.9% | 3.9% | 4.7% |
| 25 | Chief Executive Officer | 236110 - Residential Building Construction | 16,000,000 | 476,701 | 643,335 | 790,500 | 3.0% | 4.0% | 4.9% |
| 26 | Chief Executive Officer | 236110 - Residential Building Construction | 15,000,000 | 468,054 | 631,581 | 776,099 | 3.1% | 4.2% | 5.2% |
| 27 | Chief Executive Officer | 236110 - Residential Building Construction | 14,000,000 | 458,960 | 619,223 | 760,946 | 3.3% | 4.4% | 5.4% |
| 28 | Chief Executive Officer | 236110 - Residential Building Construction | 13,000,000 | 449,356 | 606,176 | 744,933 | 3.5% | 4.7% | 5.7% |
| 29 | Chief Executive Officer | 236110 - Residential Building Construction | 12,000,000 | 439,165 | 592,341 | 727,933 | 3.7% | 4.9% | 6.1% |
| 30 | Chief Executive Officer | 236110 - Residential Building Construction | 11,000,000 | 428,292 | 577,590 | 709,784 | 3.9% | 5.3% | 6.5% |
| 31 | Chief Executive Officer | 236110 - Residential Building Construction | 10,000,000 | 416,614 | 561,761 | 690,280 | 4.2% | 5.6% | 6.9% |
| 32 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 20,000,000 | 508,991 | 687,215 | 844,217 | 2.5% | 3.4% | 4.2% |
| 33 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 19,000,000 | 501,681 | 677,286 | 832,065 | 2.6% | 3.6% | 4.4% |
| 34 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 18,000,000 | 494,084 | 666,962 | 819,430 | 2.7% | 3.7% | 4.6% |
| 35 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 17,000,000 | 486,167 | 656,203 | 806,258 | 2.9% | 3.9% | 4.7% |
| 36 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 16,000,000 | 477,896 | 644,959 | 792,490 | 3.0% | 4.0% | 5.0% |
| 37 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 15,000,000 | 469,226 | 633,174 | 778,051 | 3.1% | 4.2% | 5.2% |
| 38 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 14,000,000 | 460,107 | 620,780 | 762,856 | 3.3% | 4.4% | 5.4% |
| 39 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 13,000,000 | 450,474 | 607,695 | 746,798 | 3.5% | 4.7% | 5.7% |
| 40 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 12,000,000 | 440,253 | 593,817 | 729,748 | 3.7% | 4.9% | 6.1% |
| 41 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 11,000,000 | 429,345 | 579,019 | 711,543 | 3.9% | 5.3% | 6.5% |
| 42 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 10,000,000 | 417,630 | 563,138 | 691,978 | 4.2% | 5.6% | 6.9% |
| 43 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 20,000,000 | 438,898 | 591,979 | 727,488 | 2.2% | 3.0% | 3.6% |
| 44 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 19,000,000 | 432,745 | 583,629 | 717,218 | 2.3% | 3.1% | 3.8% |
| 45 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 18,000,000 | 426,359 | 574,969 | 706,556 | 2.4% | 3.2% | 3.9% |
| 46 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 17,000,000 | 419,715 | 565,962 | 695,460 | 2.5% | 3.3% | 4.1% |
| 47 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 16,000,000 | 412,783 | 556,570 | 683,879 | 2.6% | 3.5% | 4.3% |
| 48 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 15,000,000 | 405,527 | 546,744 | 671,754 | 2.7% | 3.6% | 4.5% |
| 49 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 14,000,000 | 397,905 | 536,425 | 659,013 | 2.8% | 3.8% | 4.7% |
| 50 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 13,000,000 | 389,863 | 525,543 | 645,571 | 3.0% | 4.0% | 5.0% |
| 51 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 12,000,000 | 381,337 | 514,011 | 631,323 | 3.2% | 4.3% | 5.3% |
| 52 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 11,000,000 | 372,246 | 501,677 | 616,105 | 3.4% | 4.5% | 5.6% |
| 53 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 10,000,000 | 362,485 | 488,522 | 599,840 | 3.6% | 4.9% | 6.0% |
| 54 | Chief Executive Officer | 236110 - Residential Building Construction | 16,512,977 | 479,421 | 647,037 | 794,980 | 2.9% | 3.9% | 4.8% |
| 55 | Chief Executive Officer | 236200 - Nonresidential Building Construction | 16,512,977 | 480,620 | 648,665 | 796,975 | 2.9% | 3.9% | 4.8% |
| 56 | Chief Executive Officer | 531300 - Activities Related to Real Estate | 16,512,977 | 415,102 | 559,729 | 687,726 | 2.5% | 3.4% | 4.2% |
| 57 | Average (All Industries) | | | 478,202 | 645,377 | 792,846 | | | |
| 58 | Median (All Industries) | | | 480,620 | 648,665 | 796,975 | | | |
| 59 | **Selected Compensation** | | | | **$ 650,000** | | | | |
| | % of Assets Under Management | | | | 2.0% | | | | |
| | % of Combined Revenue | | | | 3.9% | | | | |

Economic Research Institute Executive Compensation Assessor Tool.

**MARRIAGE OF PARIS | 38**

# E.  Valuation Discount Studies

## Discount for Lack of Marketability

### Restricted Stock Studies

Restricted stock studies compare the quoted price of freely traded public stock to the price at which restricted stock of the same company was purchased in a private placement. Restricted stock is identical to freely traded stock except for temporary restrictions that preclude it from trading on the open market for a certain period of time. Such restrictions are contained in SEC Rule 144 ("Rule 144"), which governs the purchase and resale of restricted securities.

Since restricted stock studies compare the prices that investors are willing to pay, at the exact same point in time, for two otherwise identical securities, with one being fully liquid and the other having liquidity-related restrictions, the results of these studies serve as a useful starting point in assessing an appropriate DLOM applicable to the Subject Interests. However, unlike the marketability constraints associated with the Subject Interests, restrictions on the transfer of letter stock eventually lapse, at which point the shares become freely tradable in the public market. Therefore, all else being equal, privately held units of the Subject Interests – which may never have the benefit of a public market – may require a higher DLOM than the discount applicable to restricted stock that will eventually trade on an organized exchange, but is temporarily restricted from being traded. In analyzing restricted stock discounts, our approach is to: (a) identify relevant restricted stock studies and observe trends in the level of discounts; (b) analyze the factors that influence the magnitude of restricted stock discounts; and (c) apply these factors to the specific characteristics of the Subject Interests.

The first known analysis of restricted stock discounts is contained within a comprehensive 1971 SEC study of institutional investor actions, in which one topic addressed was the amount of discount at which transactions in restricted stock took place compared to the prices of identical but unrestricted stock on the open market. The study included companies listed on the New York Stock Exchange ("NYSE") and the American Stock Exchange ("AMEX"), over-the-counter ("OTC") reporting companies, and certain other publicly traded companies. The restrictions typically prevented the holder of the letter stock from selling the stock for a period of two years. The overall mean discount from the freely traded stock price observed in the study was approximately 26.0%.

Over the years, numerous other studies have quantified discounts associated with the sale of restricted stock. The table *Summary of Restricted Stock Studies* (on the following page) summarizes the results of these restricted stock studies.

- As presented in the *Summary of Restricted Stock Studies* table, average discounts attributable to restricted stock ranged from 10.9% to 45.0%. Most of the studies involve small samples of restricted stock transactions and provide little detail about how the discount varies around the average. A few studies, however, provide sufficient detail to facilitate further analysis of the factors that influence the magnitude of discounts associated with the sale of restricted stock. In particular, we analyzed the following studies in greater detail:



**STOUT**

# E.  Valuation Discount Studies

## Summary of Restricted Stock Studies

| Study | Notes | Years Covered in Study | Number of Transactions | Average Discount [a] |
|---|---|---|---|---|
| SEC Institutional Investor | [b] | 1966 – 1969 | 398 | 25.8% |
| Milton Gelman | [c] | 1968 – 1970 | 89 | 33.0% |
| Robert R. Trout | [d] | 1968 – 1972 | 60 | 33.5% |
| Robert E. Moroney | [e] | 1969 – 1972 | 146 | 35.6% |
| J. Michael Maher | [f] | 1969 – 1973 | 33 | 35.4% |
| Standard Research Consultants | [g] | 1978 – 1982 | 28 | 45.0% |
| Willamette Management Associates | [h] | 1981 – 1984 | 33 | 31.2% |
| William L. Silber | [i] | 1981 – 1988 | 69 | 33.8% |
| FMV Opinions, Inc. | [j] | 1980 – 1995 | 49 | 27.7% |
| Management Planning, Inc. | [j] | 1980 – 1997 | 243 | 22.1% |
| Bruce A. Johnson | [l] | 1991 – 1995 | 72 | 20.2% |
| Columbia Financial Advisors | [m] | 1996 – 1997 | 23 | 21.0% |
| Columbia Financial Advisors | [m] | 1997 – 1998 | 15 | 13.0% |
| Stout Risius Ross, LLC | [n] | 2005 – 2010 | 98 | 10.9% |

[a] Reflects means except for Standard Research and Willamette Management, which reflects medians.

[b] "Discounts Involved in Purchases of Common Stock (1966-1969)," *Institutional Investor Study Report of the Securities and Exchange Commission*, H.R. Doc. No. 64, Part 5, 92nd Congress, 1st Session, 1971, pp. 2444-56.

[c] Gelman, Milton, "An Economist-Financial Analyst's Approach to Valuing Stock in a Closely Held Company," *Journal of Taxation*, June 1972, p. 353.

[d] Trout, Robert R. "Estimation of the Discount Associated with the Transfer of Restricted Securities," *Taxes*, June 1977, pp. 381-85.

[e] Moroney, Robert E., "Most Courts Overvalue Closely Held Stocks," *Taxes*, March 1973, pp. 144-55.

[f] Maher, J. Michael, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes*, September 1976, pp. 562-71.

[g] Pittock, William F. and Charles H. Stryker, "Revenue Ruling 77-276 Revisited," *SRC Quarterly Reports*, Spring 1983, pp. 1-3.

[h] Shannon P. Pratt, Robert F. Reilly, Robert P. Schweihs, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 4th Ed. (New York: McGraw-Hill, Silber, William L., "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, pp. 60-64.

[j] Management Planning, Inc. Study, "Analysis of Restricted Stocks of Public Companies: 1980-1995," (Chapter 12) in Z. Christopher Mercer, *Quantifying Marketability Discounts* (Peabody Publishing, 1997).

[k] FMV Opinions, Inc., *Determining Lack of Marketability Discounts: A Companion Guide to The FMV Restricted Stock Study*, (Irvine, California: FMV Opinions, Inc., 2001).

[l] Johnson, Bruce A., "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, December 1999, (American Society of Appraisers.)

[m] Aschwald, Kathryn F., "Restricted Stock Discounts Decline as a Result of 1-Year Holding Period," *Business Valuation Update*, May 2000 (Business Valuation Resources), p. 1.

[n] Stumpf, Aaron M., Robert L. Martinez, and Christopher T. Salman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions from September 2005 through May 2010," *Business Valuation Review*, Spring 2011, (American Society of Appraisers), p. 7.

---

- The FMV Opinions, Inc. study (the "FMV Study"), primarily used to compare the restricted stock discount to the holding period;

- The Management Planning, Inc. study (the "MPI Study"), primarily used to compare the restricted stock discount to the holding period;

- The study performed by Dr. William Silber (the "Silber Study"), primarily used to compare the restricted stock discount to certain company-specific risk factors;

- The Standard Research Consultants study (the "SRC Study"), primarily used to compare the restricted stock discount to certain company-specific risk factors, including profitability;

- The Stout Risius Ross, LLC study (the "Stout Study"), primarily used to measure restricted stock discounts over short holding periods and to compare the relationship between dividends, volatility, and restricted stock discounts; and

- The SEC Institutional Investor study (the "SEC Study"), primarily used to compare restricted stock discounts by market exchange.

Based on our review of these studies, we identify several factors that demonstrate a strong relationship to the size of restricted stock discounts, including expected holding period, level of risk, existence of dividends, level of volatility, and the trading market for the security. An analysis of each of these factors is discussed below.

### Expected Holding Period

There is abundant empirical evidence that an investor's expected holding period is the primary determinant of the magnitude of the marketability discount in restricted stock transactions. The impact of expected holding period on restricted stock discounts can be measured in two ways: (a) by analyzing trends in restricted stock discounts over time and (b) by analyzing



# E.   Valuation Discount Studies

the expected holding periods of individual securities included in the restricted stock studies.

**Trends in Restricted Stock Discounts**

The decline in average discounts reflected in more recent restricted stock studies may be largely attributable to changes in securities laws that had the effect of enhancing the liquidity of restricted stock. Prior to 1990, institutional investors that purchased restricted stock and did not register the stock had a minimum holding period of two years before the stock could be sold in the public market. Average restricted stock discounts reflected in pre-1990 studies generally ranged from 30% to 35%.

In 1990, the SEC adopted Rule 144A, which introduced the concept of "tacking" of the holding period between investors. Prior to the amendment, if a purchaser of restricted stock sold his holdings in a privately negotiated transaction, the required holding period of the buyer would restart at the time of purchase. Thus, any buyer of the restricted stock would have to wait at least two years before selling shares in the public market. The amendment allowed the purchaser of restricted stock to aggregate and tack, or include as part of its own holding period, the holding periods of the previous owners, so long as the previous owner was not an affiliate of the issuer. This change permitted the holding period to be measured from the time the securities were initially acquired by prior owners, rather than restarting the entire holding period for each successive holder. This tacking provision (which resulted in potentially shorter holding periods by advancing the date when the shares of restricted stocks could be sold in the open market) increased

the liquidity of the subject units and resulted in lower negotiated restricted stock discounts. Average restricted stock discounts reflected in studies prepared subsequent to Rule 144A, but prior to the 1997 amendment, generally ranged from 20% to 27%.

In 1997, the SEC reduced the required holding period imposed by Rule 144 from two years to one year. Although there are few post-1997 empirical studies of restricted stock, the limited data available indicates that average restricted stock discounts were lower still relative to previous studies. In particular, the Columbia Financial Advisors studies referenced in the *Summary of Restricted Stock Studies* table determined average restricted stock discounts of 13.0% and 21.0%. In addition, Business Valuation Resources analyzed 187 post-1997 transactions included in the FMV Opinions Restricted Stock Database and found average and median discounts of 23.8% and 21.0%, respectively.[13]

In 2007, the SEC further reduced the required holding period for the resale of restricted securities for both affiliates and non-affiliates of a reporting issuer from one year to six months, effective February 15, 2008. This amendment to Rule 144 was enacted with the stated objectives of increasing the liquidity of privately sold securities of public issuers and decreasing the cost of capital for all issuers without compromising investor protection.

The Stout Study contains transactions that occurred after the SEC's 2008 reduction in required holding period. In particular, the Stout Study analyzed the time period that incorporates transactions in the few years both before

[13] Shannon P. Pratt, Business Valuation Update: Empirical Evidence Shows Holding Period the Major Determinant of Marketability Discount, April 2003 (Business Valuation Resources), p. 1.

◤ **STOUT**

# E.  Valuation Discount Studies

and after the most recent changes to Rule 144. In this manner, the Stout Study provides updated data and analysis to measure the impact of a shorter holding period on restricted stock discounts. The Stout Study found transactions with average and median discounts of 10.9% and 9.3%, respectively.[14] The overall indicated discounts reported in the Stout Study are lower relative to the previous market studies due to the presence of registration rights in a majority of the restricted stock transactions, which effectively reduced the holding period to even less than that mandated by the Rule 144 minimum holding period.[15]

stock. Thus, as restricted stock has become more marketable, the marketability of privately held company stock has remained largely unchanged. As such, the more recent restricted stock studies may be rendered less applicable to a privately held interest due to an increasing lack of comparability with respect to liquidity considerations. Rather, the less liquid securities included in pre-1990 restricted stock studies may more closely resemble an investment in a privately held company, such as the Subject Interests.

**Expected Holding Period of Individual Securities**

Larger blocks of restricted stock tend to require a longer holding period (and are therefore less liquid) due to the resale provisions of Rule 144. According to Rule 144, following the expiration of the initial required holding period (currently six months following the 1997 and 2007 amendments to Rule 144), restricted stock may be "dribbled out" into public markets, subject to certain trading volume limits. These volume provisions limit the number of shares sold in any three-month period to the greater of 1.0% of the total shares outstanding or the average weekly trading volume for the four weeks prior to the transaction. As such, larger blocks of stock will, all else held constant, take longer to dribble out into the public market, and will therefore have a longer expected holding period.

The FMV Study, which includes only transactions completed prior to the 1997 amendment that reduced the required holding period from two years to one year, observes discounts sorted by the size of the block of restricted stock sold in each private placement. This analysis, which is summarized in

**Average Discounts by Study**

Less Liquidity

| Study | Discount |
|---|---|
| SEC (66-69) | 25.8% |
| Gelman (68-70) | 33.0% |
| Trout (68-72) | 33.5% |
| Moroney (69-72) | 35.6% |
| Maher (69-73) | 35.4% |
| *SRC (78-82) | 45.0% |
| *Willamette (81-88) | 31.2% |
| Silber (81-88) | 33.8% |
| MPI (80-96) | 27.1% |
| FMV (80-97) | 22.1% |
| Johnson (91-95) | 20.2% |
| CFAI (96-497) | 21.0% |
| CFAI (597-98) | 13.0% |
| Stout (05-10) | 10.9% |

More Liquidity

● Denotes a change to Rule 144A/Rule 144 holding period

Studies denoted with (*) reflect medians.

1990 ● 1997 ● 2008 ●

While these changes in securities laws (along with the continued development and efficiency of the secondary market for restricted securities and the proliferation of derivative securities that allow an investor to hedge a position in restricted stock) have enhanced the liquidity of restricted stock, there has not been a similar change in the liquidity of privately held company

[14] Aaron M. Stumpf, Robert L. Martinez, and Christopher T. Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions from September 2005 through May 2010," *Business Valuation Review*, Spring 2011, pp. 7-19.

[15] The Stout Study considered the amount of time elapsed since the completion of the transaction and the date the shares were ultimately registered, noting the average amount of time elapsed was approximately four months.

**MARRIAGE OF PARIS | 42**

CONFIDENTIAL

◢STOUT

# E.   Valuation Discount Studies

the following table, suggests that restricted stock discounts tend to increase as an investor's expected holding period (measured as the percentage of shares placed relative to total shares outstanding) increases.

### FMV Study:  Analysis of Discounts by Block Size

| | Percentage Shares Placed | | Discount | |
| | Range | Median | Median | Mean |
| --- | --- | --- | --- | --- |
| Top Decile | > 25.0% | 32.1% | 35.3% | 33.7% |
| Top Quintile | > 18.4% | 26.7% | 25.6% | 28.8% |
| Bottom Quintile | < 5.0% | 2.9% | 17.8% | 19.5% |

Source: FMV Opinions, Inc.

The top quintile and decile of restricted stock transactions in the FMV Study, ranked by size of the block of stock, have median discounts of 25.6% and 35.3%, respectively, or significantly above the overall sample average of 22.1%.

The MPI Study (which also includes pre-1997 transactions) confirms the correlation between expected holding period (as measured by the estimated number of quarters required to dribble out the block of restricted stock) and the magnitude of average restricted stock discounts.

### MPI Study:  Analysis of Discounts by Holding Period

| | | Estimated "Dribble-Out" Period | | | |
| | < 1 Year | 1 - 5 Years | > 5 Years | Overall | |
| --- | --- | --- | --- | --- | --- |
| Number of Transactions | 12 | 29 | 8 | 49 | |
| Median Qtrs. to Dribble Ou | 2 | 10 | 40 | 9 | |
| Median Discount | 17.5% | 26.0% | 33.5% | 28.8% | |
| Average Discount | 23.2% | 26.8% | 37.6% | 27.7% | |

Source: Management Planning, Inc.

The transactions in the MPI Study reflect blocks of stock with median and average estimated dribble-out periods (after the mandatory two-year holding period is satisfied) of nine quarters and 14 quarters, respectively. However, interests in privately held companies are typically not able to be liquidated gradually (i.e., dribbled out) over time, as demand for such noncontrolling interests is limited. As such, an owner of a privately held interest such as the Subject Interests generally faces a longer and more uncertain expected holding period than investors in restricted stock. Therefore, the higher discounts associated with transactions involving longer estimated dribble-out periods (i.e., larger blocks) may be more applicable to interests in privately held companies than overall sample averages or transactions involving smaller blocks.

### Risk

The Silber Study presents the analysis of 69 private placements of restricted shares between 1981 and 1988. This study concluded on an average discount of 33.75%. The Silber Study divided the companies into two groups. The first group consisted of private placements with a restricted stock discount below 35%, and the second group consisted of private placements with a restricted stock discount above 35%. The study found that firms with higher revenues, earnings, and market capitalization, deemed to represent characteristics of less risky companies, were associated with lower discounts. Conversely, private placements of firms with lower revenues, earnings, and market capitalizations tended to have higher discounts. The Silber Study also found that the greater the size of the block of restricted shares as a percentage of total shares outstanding, the higher the restricted stock discount.

◆STOUT

# E.  Valuation Discount Studies

| Silber Study | | |
|---|---|---|

*In Millions of U.S. Dollars*

| | Group I | Group II |
|---|---|---|
| Number of Companies | 34 | 35 |
| Discount | > 35% | < 35% |
| **Sample Characteristics - Mean Values** | | |
| Percentage Discount | 53.9% | 14.1% |
| Dollar Size of Issue | 2.7 | 5.8 |
| Restricted Shares / Total Shares | 16.3% | 10.9% |
| Net Income | -1.44 | 3.198 |
| Revenue | 13.9 | 65.4 |
| Market Capitalization | 33.8 | 74.6 |

Source: William L. Silber.

The SRC Study compiled and analyzed information on 28 private placement transactions between October 1978 and June 1982. The SRC Study found that the earnings pattern of the companies appeared to affect the size of the restricted stock discount. On average, companies that were profitable in each of the five years prior to the date of placement sold restricted stock at substantially smaller discounts from market value than did those with two, three, or four unprofitable years during the preceding five-year period.

| SRC Study | | |
|---|---|---|

| Profitable Years of Last 5 | Number of Placements | Discount |
|---|---|---|
| 5 | 2 | 34.0% |
| 2 to 4 | 12 | 39.0% |
| 0 to 1 | 14 | 46.0% |
| Entire Sample | 28 | 45.0% |

Source: William F. Pittock and Charles H. Stryker.

## Dividends

Consistent, meaningful dividends provide a current return to investors and reduce the importance of an uncertain future liquidity event (e.g., sale, recapitalization, liquidation, etc.) to an investor's overall return. In effect, dividends shorten the duration of a security, as current income "front-loads" some of the economic benefits a security holder can expect to receive. Due to this enhanced liquidity, the firms in the FMV Study and the Stout Study that paid dividends demonstrated lower discounts associated with their restricted stock transactions. Specifically, the FMV Study indicates the observed discount in non-dividend-paying stocks was nearly double that of its dividend-paying counterparts.

Furthermore, in addition to analyzing the effect of changes to Rule 144 on restricted stock discounts, an additional objective of the Stout Study was to provide a more robust and comprehensive study of certain company-specific and market variables in order to determine those attributes that are most highly correlated with the magnitude of restricted stock discounts. In particular, the existence of dividends was determined to exhibit a "very

# E.    Valuation Discount Studies

"strong" relationship to the level of indicated restricted stock discounts.[16] As shown in the following table, the Stout Study indicates restricted stock transactions for companies that paid a dividend traded at average and median discounts of 7.4% and 7.7%, respectively, while discounts for non-dividend-paying companies were higher at 11.9% and 10.1%, respectively.

### Stout Study:  Analysis of Discounts and Dividends

|  | Dividends | No Dividends |
|---|---|---|
| Transactions | 23 | 75 |
| Average Dividend Yield | 5.2% | 0.0% |
| Average Discount | 7.4% | 11.9% |
| Median Discount | 7.7% | 10.1% |

Source: Stout Risius Ross, LLC

### Volatility

The Stout Study concluded that an additional variable exhibiting a "very strong" relationship to the magnitude of restricted stock discounts was the annualized volatility for a company, as derived from weekly stock price observations for the year preceding the announcement of the transaction. As shown in the following table, the median discounts exhibited a consistently increasing trend from the first quartile to the fourth quartile, increasing from 7.0% to 16.1%. These results indicate that investors tend to demand larger discounts for companies exhibiting greater volatility, since volatility is often synonymous with risk.

### Stout Study:  Analysis of Discounts and Volatility

|  | Quartile | | | |
|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 |
| Quartile Range | <36.7% | 36.7% to 47.9% | 47.9% to 68.9% | >68.9% |
| Average Discount | 6.3% | 8.7% | 13.4% | 16.6% |
| Median Discount | 7.0% | 8.5% | 14.4% | 16.1% |

Source: Stout Risius Ross, LLC
Based on historical one-year annualized volatility (weekly basis).

### Market for Securities

The SEC Study noted a correlation between the trading market for a company's securities and the size of the discount associated with the company's sale of restricted stock. Companies whose securities were traded on major exchanges such as the NYSE and the AMEX (which are subject to strict disclosure requirements, are generally covered more closely by securities analysts, and have substantial trading volume) incurred a lower discount on the sale of temporarily restricted stock than their counterparts on less regulated (i.e., OTC) exchanges. An analysis of discounts by trading market observed in the SEC Study is presented in the *SEC Institutional Investor Survey* table.

Interests in privately held companies are not subject to SEC regulation, generally have no disclosure requirements, and do not have outside analyst

---

[16] The Stout Study performed a linear regression with the independent variable being each distinct factor and the dependent variable being the restricted stock discount. The factors that resulted in linear regressions that were statistically significant at the 5% level were deemed to exhibit a "very strong" relationship.

CONFIDENTIAL

# E. Valuation Discount Studies

coverage. Thus, there is considerably less information available regarding interests in privately held companies than that available for the publicly traded securities in the SEC Study. As such, privately held company interests most closely resemble those of restricted securities traded over-the-counter with nonreporting issuers. More than one-half of the observed discounts of securities traded OTC with nonreporting issuers exceeded 30%, and over one-third exceeded 40%. Conversely, over 80% of all restricted securities traded on the NYSE exhibited discounts of less than 30%, with 50% of NYSE-traded securities demonstrating discounts between 0% and 20%.

stock transactions may serve as a useful starting point for estimating the discount for lack of marketability applicable to the Subject Interests. In so doing, it is appropriate to consider the specific characteristics of the Subject Interests in the context of the restricted stock studies. Refer to the discussion below.

- **Pre-1990 Studies**: Historical changes in securities laws have continued to enhance the liquidity of restricted stock. Conversely, there has not been a similar change in the liquidity of privately held stock over this same time period. Based thereon, the less liquid securities included in pre-1990 restricted stock studies may more closely resemble an investment in the Subject Interests. The average discounts indicated by restricted stock studies conducted prior to 1990 generally ranged from 25% to 35%.

- **FMV Study**: Sales of large blocks of stock generally indicated higher restricted stock discounts relative to smaller blocks of stock, due to the extended holding periods anticipated for these issues. In the instant case, the Subject Interests maintain an expected holding period most similar to those reflected by the large blocks of restricted stocks. The top quintile and decile of restricted stock transactions in the FMV Study, ranked by size of the block of stock, have median discounts of 25.6% and 35.3%, respectively.

- **SEC Study**: The SEC Study noted that companies whose securities were traded on major exchanges incurred a lower discount on the sale of temporarily restricted stock than their counterparts on less regulated exchanges. Since the Entities are not subject to SEC regulation or disclosure requirements, the Subject Interests are most similar to the restricted stocks of companies traded on less regulated exchanges. More than one-half of the observed discounts of securities traded OTC with nonreporting issuers exceeded 30.0%, and over one-third exceeded 40.0%.

- **Stout Study**: The Stout Study identified the existence of dividends as a significant determining factor in the level of discounts indicated by restricted stock transactions. Specifically, restricted stock transactions for companies that paid a dividend traded at average

## SEC Institutional Investor Survey

| Size of Discount | NYSE # | % | AMEX # | % | OTC (Reporting) # | % | OTC (Nonreporting) # | % | Unknown # | % | Total # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| -15.0% to 0.0% | 7 | 14% | 2 | 4% | 11 | 6% | 5 | 4% | 1 | 14% | 26 | 7% |
| 0.1% to 10.0% | 13 | 25% | 4 | 8% | 39 | 22% | 9 | 8% | 2 | 29% | 67 | 17% |
| 10.1% to 20.0% | 13 | 25% | 11 | 22% | 35 | 20% | 18 | 16% | 1 | 14% | 78 | 20% |
| 20.1% to 30.0% | 10 | 20% | 20 | 41% | 30 | 17% | 17 | 15% | 0 | 0% | 77 | 19% |
| 30.1% to 40.0% | 3 | 6% | 7 | 14% | 30 | 17% | 25 | 22% | 2 | 29% | 67 | 17% |
| 40.1% to 50.0% | 1 | 2% | 1 | 2% | 13 | 7% | 20 | 18% | 0 | 0% | 35 | 9% |
| 50.1% to 60.0% | 4 | 8% | 4 | 8% | 21 | 12% | 18 | 16% | 1 | 14% | 48 | 12% |
| **Total** | **51** | **100%** | **49** | **100%** | **179** | **100%** | **112** | **100%** | **7** | **100%** | **398** | **100%** |

Source: Securities and Exchange Commission.

### Comparison to the Subject Interests

Restricted stock studies compare the quoted price of freely traded public stock to the price at which restricted stock of the same company was purchased in a private placement. Since restricted stock studies compare the prices that investors are willing to pay, at the exact same point in time, for two otherwise identical securities, with one being fully liquid and the other having liquidity-related restrictions, the discounts associated with restricted



# E. Valuation Discount Studies

and median discounts below those for non-dividend paying companies. The Entities have not made distributions to their members or shareholders in the recent past.

## Entity-Specific Factors

The factors typically considered when estimating a DLOM include: dividend policy; the nature of the subject company; management; the amount of control being transferred; restrictions on the transferability of the stock; expected holding period for the stock; redemption policy; and costs associated with making a public offering. Following is a summary of these factors as they relate to the Subject Interests:

- The Entities' equity is not traded in the public markets.

- A member of the Entities would incur time and expense related to a private sale of the interests.

- The Entities have not paid dividends in the recent past.

- The Subject Interests represent a controlling interest in the Entities. Accordingly, a holder of the Subject Interests has the ability to set dividend and redemption policies, restrict the transferability of equity interests, consider changes to the tax status (e.g.; C corporation, S corporation, proprietorship, etc.), and otherwise alter business practices and strategies within the Entities. The ability to make these decisions considerably increases the marketability of the Subject Interests.

- Perhaps most important, however, is a controlling shareholder's (i.e., a holder of the Subject Interests) ability to attempt to liquidate or sell the Entities at his or her discretion. However, as the Entities are private companies, a controlling shareholder or member would still incur some time and expense in his or her decision to sell or liquidate. Unlike trading securities on a public stock exchange (where a ready market exists, willing buyers and sellers are generally abundant, and transactions typically close within a few days), the owner of the Subject Interests would likely face a scenario where

immediate transfer is not probable. As such, an owner of the Subject Interests would incur holding period risk for an uncertain period of time until a buyer is found, due diligence is completed, negotiations are finalized, and the sale of the Entities is consummated. Therefore, although the ability to sell the Entities significantly increases the marketability of the Subject Interests, a small discount for lack of marketability remains applicable.

## Discount for Lack of Control

In determining the applicable valuation discount, we considered the results of control premium studies published by *Mergerstat*. In addition, we considered the differences in the trading prices of certain publicly traded closed-end investment funds compared to their net asset value ("NAV").

## Control Premium Analysis

A DLOC can be inferred by observing control premiums paid in acquisitions of publicly traded companies. *Mergerstat Review 2020*, published by FactSet Mergerstat LLC, tracks publicly announced formal transfers of ownership of at least 10.0% of a company's equity. According to these annual studies, the premium paid for controlling interests relative to noncontrolling interests in publicly traded companies ranged from 24.3% to 47.7% over the past 20 years, with a median premium of 32.8%. The results of these studies are summarized in the following table.

 **STOUT**

# E. Valuation Discount Studies

| | Percent Premium Paid Over Market Price | | | | |
|---|---|---|---|---|---|
| Year | Number of Transactions | Median Premium Paid | Year | Number of Transactions | Median Premium Paid |
| 2000 | 675 | 40.4% | 2010 | 322 | 37.6% |
| 2001 | 504 | 40.4% | 2011 | 287 | 38.6% |
| 2002 | 385 | 33.0% | 2012 | 302 | 39.3% |
| 2003 | 450 | 32.5% | 2013 | 246 | 33.3% |
| 2004 | 374 | 24.3% | 2014 | 302 | 30.8% |
| 2005 | 478 | 24.5% | 2015 | 322 | 30.2% |
| 2006 | 564 | 24.3% | 2016 | 326 | 37.0% |
| 2007 | 563 | 24.6% | 2017 | 307 | 26.8% |
| 2008 | 250 | 34.4% | 2018 | 294 | 26.8% |
| 2009 | 218 | 47.7% | 2019 | 249 | 30.1% |
| | | | **20-Year Median Control Premium** | | **32.8%** |

Source: Factset Mergerstat LLC, Mergerstat Review 2020.

The relationship between an acquisition premium and a discount for lack of control is expressed in the following formula:

$$DLOC = CP / (1 + CP)$$

where "DLOC" is the discount for lack of control and "CP" is the control premium. Accordingly, the lack of control discount implied by the 20-year median control premium is 24.7%.

We considered that the transactions included in the *Mergerstat* studies represent both financial and strategic acquisitions. Strategic acquisitions may include a premium for such items as economies of scale, the reduction in competition, increased purchasing power, etc. Moreover, these studies only include premiums associated with successful transactions whereby

such strategic benefits might have been present. Fair Market Value, however, represents a hypothetical buyer, not a specific strategic buyer.

Partially mitigating this factor is the fact that the target companies that are the subject of the *Mergerstat* studies were publicly traded prior to the acquisition. Because the companies included in the study were publicly traded, each of them were subject to certain SEC regulations meant to ensure that the noncontrolling-interest shareholders in these entities were treated fairly with respect to such items as transactions between related parties, officers' compensation, access to information, etc. Accordingly, the disadvantages associated with a noncontrolling interest in these target companies (prior to being acquired) are comparatively less than the disadvantages associated with a noncontrolling interest in a non-regulated company, which has no such SEC protections. This factor partially mitigates the downward adjustment to the DLOC (due to a lack of synergies) discussed above.

## Closed-End Investment Funds Analysis

Closed-end investment funds are publicly traded holding companies that typically own portfolios of publicly traded securities. For valuation purposes, the trading prices of closed-end funds can be compared to their respective NAVs. Closed-end funds have historically sold at a discount to their underlying NAVs due to the noncontrolling nature of an investment in a closed-end fund.

Closed-end funds and privately held entities share certain common lack of control attributes. Although investors in closed-end funds can buy and sell shares of the fund on the open market, investors cannot access the assets or control the management of the securities owned by the closed-end funds.

**STOUT**

# E.  Valuation Discount Studies

The lack of control over day-to-day operations and investment decisions, and the inability to liquidate the assets of the entity, are investment characteristics shared by investors in publicly traded closed-end investment funds and noncontrolling shareholders in closely-held companies.

### Closed-End Domestic Equity Funds

Our selection of closed-end funds is based on information published by Morningstar. Morningstar is a global investment research firm founded in 1984. Morningstar is widely recognized in the financial community as one of the primary sources of investment information, data, and analysis of stocks, mutual funds, exchange-traded funds, closed-end funds, separate accounts, and variable annuity/life subaccounts. Morningstar has an extensive research database that covers, among other investments, closed-end funds. This database allows us to screen by various criteria to achieve a universe of closed-end funds for purposes of comparison to the Subject Interest.

Morningstar publishes information on closed-end funds on a quarterly basis. We used the information available as of December 31, 2020. We also updated the market price and NAV as of the Valuation Date using information provided by TagniFi, LLC. To select the closed-end domestic equity funds that were most similar to the Company, we employed the following criteria:

- We selected funds classified by Morningstar as domestic equity funds, as the underlying assets held by these funds are most comparable to an equity interest in the Entities.

- We excluded a majority of funds that are classified as "specialty funds," defined as those funds that invest primarily in the common stock of companies belonging to a certain sector, such as real estate, utilities, or financials.

- We excluded any fund with a portfolio that had, according to Morningstar, less than 75% of its assets invested in domestic common stocks. Additionally, we did not consider funds for which portfolio information was unavailable, as these closed-end funds may invest a significant percentage of total assets in cash or convertible or preferred securities.

- There is extensive market evidence that the discounts on closed-end investment funds contract (that is, approach zero) when a closed-end investment fund announces that it will either dissolve and distribute its net assets to shareholders or convert into an open-end fund. The contraction in discounts relates to a reduction in the detriment that results from the noncontrolling-interest nature of the shares, as both a liquidation and an open-end conversion will enable a noncontrolling-interest investor to receive an amount equal to the fund's NAV on the sale of shares in the formerly closed-end investment fund. For this reason, we excluded all funds with a stated termination date or plans to convert into an open-end fund.

- We excluded funds with shares traded infrequently (fewer than fifty days during the three months prior to the Valuation Date), as the discount to NAV exhibited by thinly traded funds may already incorporate a certain level of consideration for illiquidity.

- We excluded the Cornerstone Strategic Value Fund and the Cornerstone Total Return Fund because these funds return an abnormally large portion of the funds' capital as distributions to investors relative to the remaining closed-end funds.

From the universe of equity closed-end funds listed in Morningstar, we identified 13 funds that met these criteria. The table on the following page contains an analysis of the selected closed-end domestic equity funds. For each closed-end fund, the table indicates the ticker symbol, NAV per share, market price per share, size in terms of total net assets, distributions per



# E.  Valuation Discount Studies

share, distributions as a percentage of NAV, distribution yield, and the discount or premium at which each fund was selling relative to its NAV.

The shares of the 13 closed-end funds sold at price-to-NAV ratios ranging from a discount of 18.0% to a premium of 7.0%, with median and average discounts of 13.8% and 10.7%, respectively. All of the funds made distributions. Including all funds, distributions as a percentage of NAV ranged from 3.0% to 10.2%, with a median and average of 5.7% and 6.1%, respectively.

# E.  Valuation Discount Studies

**STOUT**

## Closed-End Funds - Domestic Equities

| Company | Ticker Symbol | 12/31/2020 NAV per Share | 12/31/2020 Market Price per Share | Total Net Assets (Millions) | Distribution Rate per Share | Distribution Rate to NAV | Distribution Yield | Percentage Premium (Discount) |
|---|---|---|---|---|---|---|---|---|
| Boulder Growth & Income | BIF | $  13.59 | $  11.14 | $  1,349 | $  0.41 | 3.0% | 3.7% | -18.0% |
| Central Securities Corporation | CET | 39.49 | 32.64 | 1,018 | 1.70 | 4.3% | 5.2% | -17.3% |
| Eagle Capital Growth | GRF | 9.44 | 7.98 | 38 | 0.55 | 5.8% | 6.9% | -15.5% |
| General American Investors | GAM | 43.96 | 37.19 | 1,072 | 2.50 | 5.7% | 6.7% | -15.4% |
| Gabelli Dividend & Income | GDV | 25.02 | 21.46 | 2,237 | 1.32 | 5.3% | 6.2% | -14.2% |
| Royce Micro Cap Trust | RMT | 11.79 | 10.12 | 502 | 0.61 | 5.2% | 6.0% | -14.2% |
| Adams Diversified Equity Fund | ADX | 20.06 | 17.29 | 2,148 | 0.90 | 4.5% | 5.2% | -13.8% |
| LMP Capital & Income | SCD | 13.44 | 11.65 | 236 | 1.04 | 7.7% | 8.9% | -13.3% |
| Royce Value Trust | RVT | 18.52 | 16.14 | 1,850 | 1.00 | 5.4% | 6.2% | -12.9% |
| Nuveen Core Equity Alpha | JCE | 15.21 | 14.07 | 241 | 0.90 | 5.9% | 6.4% | -7.5% |
| Liberty All-Star Equity | USA | 7.37 | 6.90 | 1,545 | 0.64 | 8.7% | 9.3% | -6.4% |
| Liberty All-Star Growth | ASG | 7.98 | 8.20 | 327 | 0.56 | 7.0% | 6.8% | 2.8% |
| Gabelli Equity Trust | GAB | 5.86 | 6.27 | 1,501 | 0.60 | 10.2% | 9.6% | 7.0% |
| | | | | | | | | |
| Maximum | | | | $  2,237 | | 10.2% | 9.6% | -18.0% |
| Upper Quartile | | | | 1,545 | | 7.0% | 6.9% | -15.4% |
| Median | | | | 1,072 | | 5.7% | 6.4% | -13.8% |
| Mean | | | | 1,082 | | 6.1% | 6.7% | -10.7% |
| Lower Quartile | | | | 327 | | 5.2% | 6.0% | -7.5% |
| Minimum | | | | 38 | | 3.0% | 3.7% | 7.0% |

Sources: Morningstar Advisor Workstation: Closed-End Funds - December 31, 2020; TagniFi, LLC.

**MARRIAGE OF PARIS | 51**

# E.  Valuation Discount Studies

## Conclusion

Based on our analysis, we apply a valuation discount of 10.0% in order to determine the value of the Subject Interests in the Entities on a nonmarketable, controlling-interest basis.



# F.  Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or its representatives, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon.

- We conducted an interview with Marty on January 24, 2018. We also requested a more recent interview with management of the Entities. However, as of the date of this report, we had not been afforded the opportunity to conduct such an interview. We reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

- We have requested numerous documents related to the Entities and their assets, liabilities, investments and other holdings, including but not limited to: prior real property appraisals and business valuations; current capitalization tables and other details related to the capitalization of the Entities; budgets/forecasts/projections for the Entities; construction budgets and construction costs completed as of the Valuation Date for certain real estate projects owned or being developed by the Entities; correspondence/letters to investors, limited partners, or members of the Entities; confidential offering memoranda, prospectuses, private placement memoranda, subscription agreements; operating, redemption, purchase, loan and other major agreements; income tax returns; financial statements; etc. While many documents responsive to these requests have been produced, a meaningful amount of this information had not been provided to us as of the date of this report. To the extent that any salient information related to the Entities or their assets, liabilities, investments and other holdings is subsequently produced, we reserve the right to amend or supplement our analysis and this report accordingly.

- Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such

information and have performed no procedures to corroborate the information.

- For the purpose of this engagement and report, we make no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our conclusion of value assumes the assets and liabilities presented in the Entities' December 31, 2020 balance sheets were accurate and complete as of that date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- We do not provide assurance on the achievability of the results forecasted in this report. Differences between actual and expected results may be material and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- Our conclusion of value is applicable to the Subject Interests for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report (which reflects a Summary Report as defined by the American Institute of Certified Public Accountants Statement on Standards for Valuation Services), and the opinions expressed herein are provided exclusively for the use of the addressee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent. Further, the rationale for how we arrived at the opinions and conclusions expressed herein may not be understood properly without additional information contained in our internal work papers.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" or a "solvency opinion" regarding any contemplated present or future transaction.

STOUT

# F.  Assumptions and Limiting Conditions

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Entities or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- We are not required to give testimony in court, or be in attendance during any hearings or depositions, unless previous arrangements have been made. We are committed to supporting the valuation report provided compensation arrangements for such additional services have been made.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and we have no obligation to update our report for such events and conditions.

- We have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The value that results from a valuation engagement is expressed as a conclusion of value.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

**▲STOUT**

**MARRIAGE OF PARIS | 55**

# G.  Certification

We certify that, to the best of our knowledge and belief:

■ The statements of fact contained in this report, on which the analysis, opinions, and calculations expressed herein are based, are true and correct.

■ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

■ The data used in this report was obtained from sources believed to be reliable. All facts known to us that have bearing on the values presented in this report have been considered, and no facts of importance have been intentionally omitted.

■ We have no present or prospective interest in the business that is the subject of this report, and we have no personal interest with respect to the parties involved.

■ We have no bias with respect to the business that is the subject of this report or the parties involved with this assignment.

■ Our engagement in this assignment was not contingent on developing or reporting predetermined results.

■ Our compensation for completing this assignment is fee-based and is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

■ Our analyses, opinions, and conclusions are developed, and this report is prepared, with the intent of being in conformity with the American Institute of Certified Public Accountants Statement on Standards for Valuation Services.

■ Stout Risius Ross, LLC has performed no services, as an appraiser or in any other capacity, regarding the business that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

■ In addition to the undersigned, Adam B. Moeller assisted in the research, analysis development, and report preparation for this engagement.

Brian R. Potter, CFA, CFE
Managing Director

Thomas J. Czupta, ASA, ABV
Director

**EXHIBIT B, Page 55 of 237**

# H.  Statement of Qualifications





Chicago, IL USA
**Office:** +1.312.752.3352
bpotter@stout.com

**Education**

B.S., Finance
Miami University

**Designations**

Chartered Financial Analyst (CFA)
Certified Fraud Examiner (CFE)

**Practice Areas**

Valuation Disputes
Complex Business Litigation
High-Stakes Marital Dissolution
Shareholder Disputes
Transaction Disputes

Brian Potter is a Managing Director in the Valuation Advisory group and head of the firm's Chicago office. Mr. Potter has provided valuation, litigation advisory, and forensic accounting services for numerous purposes, including marital dissolutions, shareholder disputes, estate and gift taxation, purchase price allocation, Employee Stock Ownership Plans, brokerage fraud, bankruptcy, potential transactions and intellectual property valuations. Mr. Potter has extensive experience with intellectual property and brokerage fraud litigation, having provided advisory services in several patent infringement, misappropriation of trade secret and securities fraud matters. Additionally, Mr. Potter has been involved in the appraisal of real estate for various property types, including office, industrial and retail buildings, and vacant land. Mr. Potter has provided services within the context of litigation and has been trained to offer services within various alternative dispute resolution models.

Mr. Potter has presented continuing education seminars on business valuation, understanding tax returns, occupational fraud, and computer forensics and e-discovery. He has also published several articles on valuation and other related topics. Mr. Potter was a contributing author to the chapter entitled "Valuation in Shareholder and Partner Disputes" in Business Valuation, published by the Law Journal Press.

Prior to joining Stout, Mr. Potter was a Consulting Associate with CRA International in its Intellectual Property and Finance practices in Chicago. While at Miami, Mr. Potter earned CoSIDA First Team Academic All-America honors for his academic and athletic achievements while a member of the university's varsity football team.

**Professional Memberships**

- The CFA Institute
- The CFA Society of Chicago
- Association of Certified Fraud Examiners (ACFE)
- AAML Foundation Forensic and Business Valuation Division

**STOUT**

**EXHIBIT B, Page 56 of 237**



**STOUT**

# H.  Statement of Qualifications



Chicago, IL USA
**Office:** +1.312.763.6629
**Mobile:** +1.312.833.2509
tczupta@stout.com

**Education**

B.S., Finance & Economics
DePaul University

**Designations**

Accredited Senior Appraiser (ASA)
Accredited in Business Valuation (ABV)

**Practice Areas**

High-Stakes Marital Dissolution
Valuation Disputes
Transaction Disputes
Trust & Estate

Thomas J. Czupta is a Director in the Valuation Advisory group. Mr. Czupta has extensive experience providing professional valuation advisory services in the fields of taxation, litigation, and corporate transactions.

Mr. Czupta has provided business valuation and financial advisory services for numerous purposes including estate and gift taxation, marital dissolutions, business transitions, shareholder disputes, and other tax, corporate, and litigation related matters. His experience spans a diverse client base, from regional middle-market businesses to billion dollar multinational companies, as well as private equity firms, law firms, and financial institutions.

Prior to joining Stout, Mr. Czupta was a Manager with Business Valuation Group, Inc. where his valuations were used in connection with ESOP reporting compliance, litigation support, and federal gift and estate taxation.

**Professional Memberships**

- American Institute of Certified Public Accountants
- Business Valuation Association of Chicago
- Chicago Estate Planning Council
- American Society of Appraisers

STOUT

MARRIAGE OF PARIS

# Appendix I
## Maeve, LLC Report

CONFIDENTIAL



# Maeve, LLC

Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020

Issued: December 13, 2021

CONFIDENTIAL

# Contact Information

For more information, please contact one of the following members of the engagement team:

**Brian R. Potter, CFA, CFE**
Managing Director
+1.312.752.3352
bpotter@stout.com

**Thomas J. Czupta, ASA, ABV**
Director
+1.312.763.6629
tczupta@stout.com

**Adam B. Moeller**
Associate
+1.312.237.4850
amoeller@stout.com

## STOUT'S SERVICES

**Investment Banking**
Advising buyers and sellers on mergers and acquisitions, private capital raising, and other corporate financial transactions.

**Valuation Advisory**
Providing valuations of business enterprises, complex securities, intellectual property, real estate, and personal property.

**Transaction Advisory**
Helping clients navigate the transaction process and provide transaction opinions and due diligence services.

**Disputes, Compliance, & Investigations**
Providing expert testimony and consulting, as well as investigative and compliance services for financial-related matters.

MAEVE, LLC | 2

CONFIDENTIAL

**EXHIBIT B, Page 60 of 237**

STOUT

# Executive Summary

December 13, 2021

Donald J. Angelini, Esq.
Carly E. Kenny, Esq.
Angelini, Ori + Abate Law
155 North Michigan Avenue
Suite 400
Chicago, Illinois 60601

Dear Mr. Angelini and Ms. Kenny:

Stout Risius Ross, LLC ("Stout") has been engaged to determine the Fair Market Value of a 99.0% equity interest and a 1.0% equity interest in Maeve, LLC ("Maeve" or the "Company"), on a marketable, controlling-interest basis (the "Subject Interest"), as of December 31, 2020 (the "Valuation Date"). We understand the results of our analysis will be used for marital-dissolution purposes.

## Company Synopsis

Maeve is an investment holding company that was founded in 2009. Incorporated as a limited liability company ("LLC") in Delaware, Maeve is segmented into a series of separate investment interests pursuant to its Certificate of Formation filed December 29, 2009 (as amended June 27, 2012, November 6, 2013 and November 26, 2014) and §18-215 of the Delaware Limited Liability Company Act (the "Act"). Per the terms of the Act:

[T]he debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular series shall be enforceable against the assets of such series only, and not against the assets of the limited liability company generally or any other series thereof, and, unless otherwise provided in the limited liability company agreement, none of the debts, liabilities,

obligations and expenses incurred, contracted for or otherwise existing with respect to the limited liability company generally or any other series thereof shall be enforceable against the assets of such series.[1]

Based on information provided to date, it appears that as of the Valuation Date, Maeve is segmented into 38 separate series lettered alphabetically from Series A through Series LL.

Maeve is managed by Maeve Manager, Inc. and has two members: Jack Enterprises, LP ("Jack Enterprises"), which holds a 99.0% member interest and the Frank Martin Paris, Jr. Revocable Trust (the "FMP Trust," and collectively with Frank Martin Paris, Jr., "Marty"), which holds a 1.0% member interest. Based on the Amended Certificate of Formation dated November 26, 2014 (the "ACF"), each individual series of Maeve has identical management and ownership as Maeve generally (i.e., each Maeve series is managed by Maeve Manager, Inc., and owned 99.0% by Jack Enterprises and 1.0% by Marty).

The following is a description of Maeve's investment holdings as segmented by series ("Maeve Series Investments"). *Note that the most recent amended certificate of formation reflecting the current assets of each Maeve LLC series that was provided to us was filed November 26, 2014.* Where warranted by our review of subsequent federal tax returns, organizational documents, assignment agreements and other documents produced in this matter, we have updated this information as depicted in **Exhibit A** and as described below.

---

[1] §18-215(b) of the Act.

**▲STOUT**

# Executive Summary

## Overview of Maeve Series Investments

As of the Valuation Date, the Maeve Series Investments are comprised of investments in checking and brokerage accounts holding cash and marketable securities, investments in companies that hold real property, direct investments in real property, investments in operating companies, investments in companies without substantial assets or operations, and unknown holdings. The following is a description of the Maeve Series Investments grouped by their primary purpose or function.

## Investments in Cash and Marketable Securities

- *Series A: Various Cash and Investment Accounts:* Per Maeve's ACF, Maeve Series A holds "cash and various investment accounts."[2] Account statements as of December 31, 2020 (and other dates) were provided for various bank and investment accounts titled in the name of Maeve Series A, including Jefferies #6356, Jefferies #9932, Jefferies #9973, Jefferies #7190, and The PrivateBank #6361 (the "Series A Investment Accounts").

- *Series DD: Jefferies Brokerage Account #8022 (the "Series DD Investment Account"):* Per Maeve's ACF, Maeve Series DD holds "cash and various funds held in an investment pledge account."[3] An account statement as of the Valuation Date was provided for an account titled in the name of Maeve Series DD.

- *Series U: Pan American Checking Account #2201 (the "Series U Account"):* We received various monthly account statements for the Series U Account. Maeve Series U also holds an equity interest in The Pet Health People, LLC f/k/a Pet Hydration People, LLC and a parcel of undeveloped land. Please see the sections below on investments in operating companies and direct investments in real property for additional information on these assets.

## Investments in Companies Holding Real Property

- *Series C and Series D: 828 W Grace, LLC ("828 Grace"):* Formed on March 31, 2004, 828 Grace is a real estate holding company managed by MK Manager Corp. ("MK Manager"). The sole owner and director of MK Manager is Marty. The company's primary asset is real property located at 828 West Grace Street in Chicago. As of the Valuation Date, 828 Grace is owned in part by Maeve Series C, which holds a 99.0% Class A interest, Maeve Series D, which holds a 20.1% Class C interest, and Marty, who holds a 1.0% Class A interest. See **Exhibit C.1** for further detail.

- *Series E: 1857 W Dickens, LLC ("1857 Dickens"):* Formed on March 1, 2014, 1857 Dickens is a real estate holding company managed by MK Manager and Craig M. Chesney. The company's primary asset is real property located at 1857 West Dickens Avenue in Chicago. Maeve Series E holds a 50.0% equity interest in 1857 Dickens as of the Valuation Date. See **Exhibit C.2** for further detail.

- *Series G: 1454 S Michigan, LLC ("1454 Michigan"):* Formed on March 1, 2005, 1454 Michigan is a real estate holding company managed by MK Manager Corp. The company's primary asset is real property located at 1454-64 South Michigan Avenue in Chicago. Maeve Series G holds a 99.0% Class A interest in 1454 Michigan as of the Valuation Date. See **Exhibit C.3** for further detail.

- *Series J: 3216 N Racine, LLC ("3216 Racine"):* Formed on April 16, 2001, 3216 Racine is a real estate holding company managed by Marty and Gino Fioravanti. The company's primary asset is real property located at 3216 North Racine Avenue in Chicago. Maeve Series J holds a 50.0% equity interest in 3216 Racine as of the Valuation Date. See **Exhibit C.5** for further detail.

- *Series K: 2049 N Sheffield, LLC ("2049 Sheffield"):* Formed on April 6, 2001, 2049 Sheffield is a real estate holding company managed by Marty. The company's primary asset is real property located at 2049 North Sheffield Avenue in Chicago. Maeve Series K holds a

---

[2] See §2.1.a.i of Maeve's ACF.

[3] See §2.1.dd.i of Maeve's ACF.

◆ STOUT

# Executive Summary

99.0% equity interest in 2049 Sheffield as of the Valuation Date. See **Exhibit C.6** for further detail.

■ *Series L: PC Property Holdings, LLC ("PC")*: Formed on May 13, 1999, PC is a real estate holding company managed by Marty and Craig M. Chesney. The company's primary asset is real property located at 1927 North Sedgwick Street in Chicago. Maeve Series L holds a 50.0% equity interest in PC as of the Valuation Date. See **Exhibit C.7** for further detail.

■ *Series M: 1933 Sedgwick, LLC ("1933 Sedgwick")*: Formed on June 14, 2001, 1933 Sedgwick is a real estate holding company managed by Marty and Craig M. Chesney. The company's primary asset is real property located at 1933 North Sedgwick Street in Chicago. Maeve Series M holds a 50.0% equity interest in 1933 Sedgwick as of the Valuation Date. See **Exhibit C.8** for further detail.

■ *Series T: 3114 N Southport, LLC ("3114 Southport")*: Formed on August 3, 2011, 3114 Southport is a real estate holding company managed by MK Manager. The company's primary asset is real property located at 3114 North Southport Avenue in Chicago. Maeve Series T holds a 50.0% equity interest in 3114 Southport as of the Valuation Date. See **Exhibit C.9** for further detail.

■ *Series CC and Series EE: 1325 N Wells, LLC ("1325 Wells")*: Formed on September 17, 2014, 1325 Wells is an investment holding company managed by MK Manager. The company's primary asset is an equity interest in SP/RPA 1325 Holdings, LLC. As of the Valuation Date, Maeve Series CC holds a 100% Class A interest and Maeve Series EE holds a 100% Class B interest in 1325 Wells.

■ *SP/RPA 1325 Holdings, LLC ("1325 Holdings")*: Formed on November 9, 2015, 1325 Holdings is an investment holding company managed by RPA 1325 Investor, LLC.

The company's primary asset is an equity interest in SP/RPA Apartments, LLC. As of the Valuation Date, 1325 Wells holds a "Developer" interest in 1325 Holdings. See **Exhibit C.12** for further detail.

■ *SP/RPA 1325 Apartments, LLC ("1325 Apartments")*: Formed on April 20, 2015, 1325 Apartments is a real estate holding company managed by 1325 Holdings. The company's primary asset is real property located at 1325 North Wells Street in Chicago. 1325 Holdings holds a 100.0% equity interest in 1325 Apartments as of the Valuation Date. See **Exhibit C.12** for further detail.

■ *Series FF and Series GG: 301 W North, LLC ("301 LLC")*: Formed on November 24, 2014, 301 LLC is an investment holding company managed by MK Manager. As of the Valuation Date, Maeve Series FF holds 100 Class A Interests in 301 LLC. See **Exhibit A.1** and **Exhibit B.1** for further detail.[4]

■ *301 W North Avenue, LP / 301 W North Avenue, LLC / 301 W North Avenue Lots, LLC (collectively "301 North")*: 301 North's primary asset is real property located at 301-313 W North Avenue and 1552 North Park Avenue in Chicago. See **Exhibit A.1** and **Exhibit C.13** for further detail.

■ *Series HH and Series II: Erie & LaSalle, LLC ("E&L")*: Formed on September 30, 2016, E&L is an investment holding company managed by MK Manager. As of the Valuation Date, Maeve Series HH holds a 100% Class A interest and Maeve Series II holds a 100%

report and this analysis if additional documents or information related to 301 W North Avenue, LP, 301 W North, LLC, 301 W North Avenue, LLC, 301 W North Avenue Lots, LLC, the real property located at 301-313 West North Avenue, Chicago, Illinois, the real property located at 1552 North Park Avenue, Chicago, Illinois, or any other related entity or real property are subsequently produced.

[4] As detailed in Exhibit A.1, for purposes of our analysis we have assumed that Maeve Series FF and Series GG hold 100% of the equity of the entity or entities (i.e., 301 W North, LLC, 301 W North Avenue, LP, 301 W North Avenue, LLC, 301 W North Avenue Lots, LLC, etc.) that own the real property located at 301 W North Avenue and 1552 North Park Avenue in Chicago (PINs: 17-04-201-002-0000; 17-04-201-008-0000; 17-04-201-009-0000; 17-04-201-010-0000; 17-04-201-011-0000; 17-04-201-012-0000). We reserve the right to amend our

**EXHIBIT B, Page 63 of 237**

# Executive Summary

▲STOUT

Class B interest in E&L. See **Exhibit A.1** and **Exhibit C.14** for further detail.[5]

- *Erie LaSalle Venture, LP / LaSalle & Erie, LLC ("EL Venture")*: EL Venture's primary asset is real property located at 146 W Erie Street in Chicago. E&L holds a 99.99% partnership interest and Marty holds a 0.01% partnership interest in EL Venture as of the Valuation Date. See **Exhibit A.1** and **Exhibit C.14** for further detail.

- *JJ: Lake Lathrop Partners, LLC ("LL Partners")*: Formed on March 9, 2016, LL Partners is a real estate holding company managed by MK Manager. The company's primary asset is real property located at 7601-7621 Lake Street in River Forest, Illinois. Maeve Series JJ holds a 100.0% equity interest in LL Partners as of the Valuation Date. See **Exhibit C.15** for further detail.

## Direct Investments in Real Property

- *Series P: 828 W Grace Unit 402 Land Trust (the "Grace Condo Trust")*: The Grace Condo Trust holds a 50.0% undivided interest in a condominium unit developed by an affiliate of Marty. As of the Valuation Date, Maeve Series P is the beneficial owner of the Grace Condo Trust. See **Exhibit B.1** for further detail.

- *Series Q: 828 W Grace Unit P-37 Land Trust (the "Grace Parking Trust")*: The Grace Parking Trust holds a 50.0% undivided interest in a parking stall developed by an affiliate of Marty. As of the Valuation Date, Maeve Series Q is the beneficial owner of the Grace Parking Trust. See **Exhibit B.1** for further detail.

- *Series R: 1464 S Michigan Unit 1605 Land Trust (the "Michigan Condo Trust")*: The Michigan Condo Trust holds a 50.0% undivided interest in a condominium unit that was developed by an affiliate of Marty. As of the Valuation Date, Maeve Series R is the beneficial

owner of the Michigan Condo Trust. See **Exhibit B.1** for further detail.

- *Series S: the 1464 S Michigan Garage Unit P48 Land Trust (the "Michigan Garage Trust")*: The Michigan Garage Trust holds a 50.0% undivided interest in real property that was developed by an affiliate of Marty. As of the Valuation Date, Maeve Series S is the beneficial owner of the Michigan Garage Trust. See **Exhibit B.1** for further detail.

- *Series U: 703 Park Avenue, River Forest, Illinois ("703 Park")*: 703 Park is undeveloped land located in River Forest. As of the Valuation Date, 703 Park is owned by Maeve Series U. See **Exhibit B.1** for further detail.

## Investments in Operating Companies

- *Series F: Alpha Carpentry, LLC ("Alpha Carpentry")*: Alpha Carpentry was formed on March 7, 2014 and is managed by MK Manager. The company operates as a contractor in the building construction industry and is headquartered in Chicago. Maeve Series F holds a 99.0% equity interest in Alpha Carpentry. We determined the Fair Market Value of a 99.0% equity interest in Alpha Carpentry in a separate report entitled *Alpha Carpentry, LLC: Valuation of a 99.0% Equity Interest and a 1.0% Equity Interest as of December 31, 2020* (the "**AC Report**") and incorporated this figure into our valuation of Maeve.

- *Series N: Eventric LLC f/k/a Production Consultants Guild, Inc. ("Eventric")*: Eventric was formed on November 1, 1999 and is managed by Paul Bradley. The company provides software and online services for the professional live entertainment industry and is headquartered in Chicago. Maeve Series N holds 100,000 Common B Units of Eventric that were acquired for $50,000 in October 2008. We were not provided with sufficient information to value this investment as of the Valuation Date. As such, we have

[5] As detailed in Exhibit A.1, for purposes of our analysis we have assumed that Marty, Maeve Series HH and Series II hold 100% of the equity of the entity or entities that own the real property located at 146 West Erie Street in Chicago. We reserve the right to amend our report and this analysis if additional documents or information related to LaSalle & Erie, LLC, the real property located at 146 West Erie, Chicago, Illinois, or any other related entity or real property are subsequently produced.

CONFIDENTIAL

MAEVE, LLC | 6

# Executive Summary

relied on the original investment amount as an indication of value and have incorporated this figure into our valuation of Maeve.

■ *Series U: The Pet Health People, LLC f/k/a Pet Hydration People, LLC ("PHP")*: PHP was formed on September 24, 2010 and is managed by Amy R. Paris. The company manufactures and distributes consumable pet products through its brand LICKS® Pill Free Solutions and is headquartered in Chicago. Maeve Series U holds 14,286 Units of PHP that were acquired for $50,001 in March 2012. We were not provided with sufficient information to value this investment as of the Valuation Date. As such, we have relied on the original investment amount as an indication of value and have incorporated this figure into our valuation of Maeve.

■ *Series W: Alpha Property Services, LLC ("APS")*: APS was formed on June 10, 2011 and is managed by MK Manager. The company provides property management services and is headquartered in Chicago. Maeve Series W holds a 99.0% equity interest in APS. We determined the Fair Market Value of a 99.0% equity interest in APS in a separate report entitled *Alpha Property Services, LLC: Valuation of a 99.0% Equity Interest and a 1.0% Equity Interest as of December 31, 2020* (the "**APS Report**") and incorporated this figure into our valuation of Maeve.

■ *Series Z: Alpha Construction Services, LLC ("ACS")*: ACS was formed on October 3, 2013 and is managed by MK Manager. The company operates as a contractor in the building construction industry and is headquartered in Chicago. Maeve Series Z holds a 99.0% equity interest in ACS. We determined the Fair Market Value of a 99.0% equity interest in ACS in a separate report entitled *Alpha Construction Services, LLC: Valuation of a 99.0% Equity Interest and a 1.0% Equity Interest as of December 31, 2020* (the "**ACS Report**") and incorporated this figure into our valuation of Maeve.

■ *Series LL: Alpha Drywall Services, LLC ("ADS")*: ADS was formed on June 9, 2020 and is managed by MK Manager. The company operates as a contractor in the building construction industry and is headquartered in Chicago. Maeve Series LL holds a 99.0% equity interest in ADS. We determined the Fair Market value of a 99.0% equity interest in ADS in a separate report entitled *Alpha Drywall*

*Services, LLC: Valuation of a 99.0% Equity Interest and a 1.0% Equity Interest as of December 31, 2020* (the "**ADS Report**") and incorporated this figure into our valuation of Maeve.

## Investments in Companies Without Substantial Assets or Operations

■ *Series I: Sedgwick Investments, LLC ("Sedgwick Investments")*: Formed on April 28, 2005, Sedgwick Investments is an investment holding company managed by MK Manager. The company's primary asset was a 75% equity interest in LL Partners. Maeve Series I holds a 99.0% equity interest in Sedgwick Investments as of the Valuation Date. See **Exhibit C.4** for further detail.

■ *Series V: 55th and Kedzie Investments, LLC ("55th Investments")*: Formed on March 28, 2013, 55th Investments is an investment holding company managed by MK Manager. The company's primary asset is an equity interest in 5501 S Kedzie, LLC. Maeve Series V holds 502 Class A Interests in 55th Investments as of the Valuation Date. See **Exhibit C.10** for further detail.

■ *5501 S Kedzie, LLC ("5501 Kedzie")*: Formed on April 8, 2013, 5501 Kedzie is a real estate holding company managed by MK Manager. The company's primary asset was real property located at 5501 S Kedzie Avenue in Chicago, that was sold in 2017. 55th Investments holds a "Kedzie Investments Member" equity interest in 5501 Kedzie as of the Valuation Date. See **Exhibit C.10** for further detail.

■ *Series Y: 1611 N Hermitage, LLC ("1611 Hermitage")*: Formed on May 15, 2013, 1611 Hermitage is an investment holding company managed by MK Manager. The company's primary asset was real property located at 1714-20 West North Avenue in Chicago, that was sold in 2018. Maeve Series Y holds 340 Class A Interests and 400 Class B Interests in 1611 Hermitage as of the Valuation Date. See **Exhibit C.11** for further detail.



# Executive Summary

**Unknown Holdings**

- *Series B: Personal Property:* Per the ACF, Maeve Series B holds "personal property."[6] Paragraph 16 of Marty's affidavit attached as Exhibit L to the Response to Motion to Continue Trial Date Due to Commence on October 4, 2021 states, "As to the entity Maeve LLC - Series B, the entity currently holds $100,000 of non-marital personal property." As we have not been provided with documentation surrounding the assets and liabilities held by Maeve LLC - Series B as of the Valuation Date, we have relied on this representation as an indication of the value of Maeve LLC - Series B's holdings.

- *Series H:* Maeve Series H formerly held an equity interest in 1935 S Wabash, LLC. We have not been provided with documentation surrounding the assets, liabilities, or investments of Series H as of the Valuation Date.

- *Series O:* Maeve Series O formerly held an equity interest in True Believers II, LLC. We have not been provided with documentation related to the assets, liabilities or investments of Series O as of the Valuation Date.

- *Series X:* We have not been provided with any documentation related to the assets, liabilities or investments of Series X as of the Valuation Date.

- *Series AA:* We have not been provided with any documentation related to the assets, liabilities or investments of Series AA as of the Valuation Date.

- *Series BB:* Maeve Series BB formerly held an equity interest in 1545 W North, LLC. We have not been provided with documentation surrounding the assets, liabilities or investments of Series BB as of the Valuation Date.

- *Series KK:* We have not been provided with any documentation related to the assets, liabilities or investments of Series AA as of the Valuation Date.

## Definition of Value

For purposes of our valuation, the term "Fair Market Value" is defined as the price at which property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.[7]

The term "property" reflects the combined tangible and intangible assets of a company, as components of a going concern, and gives consideration to all known liabilities. The terms "willing buyer" and "willing seller" refer to hypothetical parties rather than any particular buyer or seller. It is important to note that the specific incentives or attributes of particular buyers and sellers may not be the same as the hypothetical buyer and seller from which Fair Market Value is determined.

## Premise of Value

We conducted our analysis of the Company under a going-concern premise, meaning that the underlying assets of the Company are presumed, in the absence of a qualified appraisal of such assets, to attain their highest values as integral components of a business entity in continued operation and that liquidation of said assets would likely diminish the value of the whole to the members and creditors of the Company.

---

[6] See §2.1.b.i of Maeve's ACF.

[7] Treasury Regs. §20.2031-1(b) and §25.2512-1.

# Executive Summary

## Factors Considered

Our analysis considered the valuation guidelines referenced in Revenue Ruling 59-60, 1959-1 C.B. 237, which include consideration of the following factors:

- the nature of the business and the history of the Company from its inception;

- the economic outlook in general and the condition and outlook of the industry in which the Company operates;

- the book value of the stock and the financial condition of the Company;

- the earnings capacity of the Company;

- the dividend-paying capacity of the Company;

- whether goodwill or other intangible value exists within the Company;

- previous sales of the Company's stock and the size of the block of stock to be valued; and

- the market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Maeve Investment Account Tracing Analysis

We were also asked to analyze certain transactions contained in the account statements produced for the Series A Investment Accounts and the Series DD Investment Account for the three-year period preceding the

Valuation Date (i.e., 2018 through 2020). We identified numerous transactions in the Series A Investment Accounts and Series D Investment Account during the observed period. See **Exhibit D** for further detail.

## Information Reviewed and Procedures Performed

We reviewed sources of information during the course of the valuation analysis including, but not limited to, the following:[8]

- Maeve's federal income tax returns for the years ended December 31, 2009 through 2014 and 2016 through 2020;

- Maeve's written actions dated December 29, 2009, May 1, 2010, and May 1, 2011;

- Maeve's operating agreement dated December 29, 2009;

- Maeve's amended and restated operating agreement dated November 7, 2014;

- Maeve's certificate of formation dated December 29, 2009;

- the ACF;

- membership certificates dated December 29, 2009 for interests in various series of Maeve;

- Maeve's general ledger as of December 31, 2020;

- various account statements for Jefferies brokerage accounts #6356, #7190, #8022, #9932 and #9973;

- various account statements for Jefferies loan account #1351;

[8] This is not intended to be an exhaustive list of the documents reviewed in this matter.

**STOUT**

# Executive Summary

- various account statements for PrivateBank brokerage account #6361;

- trust agreements dated December 28, 2009, unrecorded land trust quit claims dated July 1, 2010, and a sales contract dated June 8, 2019 related to a condominium unit and parking stall at 828 W Grace Street in Chicago;

- trust agreements dated December 28, 2009 and quit claim deeds dated June 14, 2010 related to a condominium unit and parking stall at 1464 S Michigan Avenue in Chicago;

- a Subordinate Membership Interest Pledge Agreement dated July 26, 2017 between Maeve Series A and Keystone & Stuart, LLC;

- 828 Grace's operating agreement dated March 31, 2004;

- William Filan's subscription agreement dated June 14, 2004 for Class C Interests in 828 Grace;

- 828 Grace's federal income tax returns for the years ended December 31, 2011 through 2020;

- 828 Grace's general ledger as of December 31, 2020;

- a closing statement dated August 31, 2004 for 828 Grace's acquisition of real property;

- various lease agreements for parking stalls at 828 W Grace Street in Chicago;

- 1857 Dickens' operating agreement dated March 1, 2014;

- 1857 Dickens' federal income tax returns for the years ended December 31, 2014 through 2020;

- 1857 Dickens' general ledger as of December 31, 2020;

- a settlement statement dated June 5, 2014 for 1857 Dickens' acquisition of real property;

- 1454 Michigan's operating agreement dated March 1, 2005;

- William Filan's subscription agreement dated April 18, 2005 for Class B Interests in 1454 Michigan;

- investor letters from Marty to William Filan dated March 19, 2018, April 3, 2018, March 26, 2019, April 3, 2019 and September 13, 2019 regarding investments in 1454 Michigan and 828 Grace;

- 1454 Michigan's federal income tax returns for the years ended December 31, 2012 through 2020;

- 1454 Michigan's internally prepared income statement for the twelve months ended December 31, 2019;

- 1454 Michigan's general ledger as of December 31, 2020;

- a closing statement dated June 21, 2005 for 1454 Michigan's acquisition of real property;

- various lease agreements related to 1454 Michigan's real property;

- an appraisal report of 32 residential units, 70 parking spaces and 2 commercial spaces located at 1454-64 South Michigan Avenue in Chicago as of December 31, 2020 prepared by Integra Realty Resources – Chicago and dated January 8, 2021;

- 1454 Michigan's amended and restated promissory note agreement dated July 26, 2017 and mortgage and security agreement dated July 28, 2017 with Keystone & Stuart LLC;

- a change in terms agreement dated July 8, 2020 between 1454 Michigan and Old Second National Bank;

- assignment agreements dated December 29, 2009 between Marty, Maeve Series G and the FMP Trust related to ownership interests in 1454 Michigan;

- Sedgwick Investments' articles of organization dated April 28, 2005;

MAEVE, LLC | 10

**≜ STOUT**

# Executive Summary

MAEVE, LLC │11

- Sedgwick Investments' operating agreement dated April 29, 2005;

- Sedgwick Investments' federal income tax returns for the years ended December 31, 2012 and 2014 through 2020;

- Sedgwick Investments' general ledger as of December 31, 2020;

- assignment agreements dated December 29, 2009 between Marty, Maeve Series I and the FMP Trust related to ownership interests in Sedgwick Investments;

- 3216 Racine's articles of organization dated April 16, 2001;

- 3216 Racine's operating agreement dated April 16, 2001;

- 3216 Racine's federal income tax returns for the years ended December 31, 2012 through 2020;

- 3216 Racine's general ledger as of December 31, 2020;

- assignment agreements dated December 29, 2009 between Marty, Maeve Series J and the FMP Trust related to ownership interests in 3216 Racine;

- 2049 Sheffield's articles of organization dated April 6, 2001;

- 2049 Sheffield's operating agreement dated April 6, 2001;

- 2049 Sheffield's federal income tax returns for the years ended December 31, 2012 through 2020;

- 2049 Sheffield's general ledger as of December 31, 2020;

- the Amended and Restated Promissory Note Agreement dated December 14, 2018 between 2049 Sheffield and Keystone & Stuart LLC;

- assignment agreements dated December 29, 2009 between Marty, Maeve Series K and the FMP Trust related to ownership interests in 2049 Sheffield;

- PC's First Amended and Restated Operating Agreement dated August 17, 2001;

- PC's federal income tax returns for the years ended December 31, 2012 through 2020;

- PC's general ledger as of December 31, 2020;

- an assignment agreement dated December 29, 2009 between Marty and Maeve Series L related to an ownership interest in PC;

- 1933 Sedgwick's operating agreement dated June 14, 2001;

- 1933 Sedgwick's federal income tax returns for the years ended December 31, 2012 through 2020;

- 1933 Sedgwick's general ledger as of December 31, 2020;

- an assignment agreement dated December 29, 2009 between Marty and Maeve Series M related to an ownership interest in 1933 Sedgwick;

- a copy of a check from Marty dated October 14, 2008 in the amount of $50,000 payable to Eventric;

- an assignment agreement dated December 29, 2009 between Marty and Maeve Series N related to an ownership interest in Eventric;

- 3114 Southport's amended operating agreement dated March 1, 2012;

- 3114 Southport's articles of organization dated August 3, 2011;

- 3114 Southport's federal income tax returns for the years ended December 31, 2012 through 2016;

- 3114 Southport's Schedule K-1 issued to Maeve Series T for the year ended December 31, 2020;

CONFIDENTIAL

**EXHIBIT B, Page 69 of 237**

# Executive Summary

- a settlement statement dated August 3, 2011 for 3114 Southport's acquisition of real property;

- a mortgage agreement dated May 24, 2012 between 3114 Southport and Pan American Bank;

- PHP's articles of organization dated September 24, 2010;

- PHP's articles of amendment filed January 16, 2014;

- a subscription agreement dated March 1, 2012 between Maeve Series U and PHP;

- 55th Investments' operating agreement dated March 28, 2013;

- 55th Investments' federal income tax returns for the years ended December 31, 2013 through 2020;

- 5501 Kedzie's operating agreement dated April 8, 2013;

- 5501 Kedzie's amendment to the operating agreement dated October 2, 2014;

- 5501 Kedzie's federal income tax returns for the years ended December 31, 2013 through 2020;

- 5501 Kedzie's general ledger as of December 31, 2020;

- 5501 Kedzie's project budget and schedule of disbursements dated April 5, 2013;

- a settlement statement dated April 8, 2013 for 5501 Kedzie's acquisition of real property;

- 5501 Kedzie's loan agreement with Republic Bank of Chicago dated April 8, 2013;

- 5501 Kedzie's loan modification and extension agreement with Republic Bank of Chicago dated May 10, 2016;

- a purchase agreement dated June 13, 2016 between 5501 Kedzie and Chody Real Estate Corp. related to the sale of 5501 Kedzie's real property;

- a purchase agreement dated June 23, 2017 between 5501 Kedzie and Holsum, Inc. related to the sale of 5501 Kedzie's real property;

- 1611 Hermitage's operating agreement dated May 15, 2013;

- 1611 Hermitage's amended and restated operating agreement dated August 20, 2013;

- 1611 Hermitage's federal income tax returns for the years ended December 31, 2013 through 2020;

- 1611 Hermitage's general ledger as of September 14, 2019;

- a purchase agreement dated May 30, 2013 between 1611 Hermitage and Fire King Service Station, Inc. related to the acquisition of 1611 Hermitage's real property;

- a purchase agreement dated January 2018 between 1611 Hermitage and REMHY LLC related to the sale of 1611 Hermitage's real property;

- a closing statement dated October 16, 2018 between 1611 Hermitage and Rondo Investment, LLC related to the sale of 1611 Hermitage's real property;

- 1325 Wells' Delaware certificate of formation dated September 17, 2014;

- 1325 Wells' Illinois certificate of formation dated October 20, 2014;

- 1325 Wells' operating agreement dated October 20, 2014;

- a project budget related to 1325 Apartments;

- a rent roll of 1325 Apartments as of January 14, 2021;

◆STOUT

# Executive Summary

- 1325 Holdings' operating agreement dated November 9, 2015;

- 1325 Holdings' federal income tax returns for the years ended December 31, 2016, 2017, 2019, and 2020;

- 1325 Apartments' development services agreement with Sedgwick Properties Development Corporation dated November 9, 2015;

- 1325 Apartments' general contractor agreement with ACS dated November 9, 2015;

- 1325 Apartments' general ledger as of December 31, 2020;

- 1325 Apartments' construction loan and security agreement with JP Morgan Chase Bank and JP Morgan Securities dated November 9, 2015;

- 301 LLC's operating agreement dated November 24, 2014;

- 301 North's partnership agreement dated December 4, 2014;

- 301 North's amendment to partnership agreement dated June 8, 2015;

- 301 North's federal income tax returns for the years ended December 31, 2014 through 2020;

- a promissory note agreement dated December 31, 2015 between 301 North and First Midwest Bank;

- a summary promissory note agreement dated September 23, 2020 between BDS III Mortgage Capital J LLC and 301 W North Avenue, LLC;

- a settlement statement dated September 23, 2020 for a loan between BDS III Mortgage Capital J LLC and 301 W North Avenue, LLC;

- E&L's operating agreement dated September 30, 2016;

- E&L's certificate of formation dated September 12, 2016;

- E&L's federal income tax returns for the years ended December 31, 2016 through 2018 and 2020;

- a promissory note agreement dated July 2, 2019 between LaSalle & Erie, LLC and M17 Land Investments LLC;

- EL Venture's operating agreement dated October 7, 2016;

- EL Venture's amendment to the operating agreement dated November 1, 2016;

- EL Venture's amendment to the operating agreement dated April 1, 2017;

- EL Venture's federal income tax returns for the years ended December 31, 2016 through 2020;

- EL Venture's general ledger as of December 31, 2020;

- correspondence dated January 23, 2018 from Belvedere Financial, LLC on behalf of M17 Land Investments, LLC to E&L entitled "Notice of Change in Control Event;"

- a settlement statement dated October 7, 2016 for EL Venture's acquisition of real property;

- various purchase agreements dated March 7, 2017 through June 23, 2021 pertaining to the sale of EL Venture's real property;

- a loan agreement dated October 7, 2016 between EL Venture and Republic Bank of Chicago;

- two promissory note agreements dated June 28, 2019 between EL Venture and Republic Bank of Chicago;

- LL Partners' operating agreement dated January 6, 2017;

# Executive Summary

- the Amended and Restated Redevelopment Agreement dated September 18, 2017 between LL Partners, the Village of River Forest and Keystone Ventures, LLC;

- a certificate dated July 6, 2020 from LL Partners;

- LL Partners' articles of organization filed March 9, 2016;

- LL Partners' amended and restated operating agreement dated 2020;

- LL Partners' consolidated resolutions dated July 6, 2020;

- LL Partners' federal income tax returns for the years ended December 31, 2017 through 2020;

- LL Partners' general ledger as of December 31, 2020;

- LL Partners' sworn owner's statement as of December 31, 2020;

- a loan agreement dated June 2020 between LL Partners and Old Second National Bank;

- an appraisal report of real property located at 1857 West Dickens Avenue in Chicago as of September 2, 2021 prepared by Arthur J. Murphy III and Hugh T. Edfors and dated November 16, 2021;

- an appraisal report of real property located at 1464 S Michigan Avenue Unit 1605 and P48 in Chicago as of August 25, 2021 prepared by Arthur J. Murphy III and Hugh T. Edfors and dated November 10, 2021;

- an appraisal report of real property located at 828 West Grace Street Unit 402 and P53 in Chicago as of August 25, 2021 prepared by Arthur J. Murphy III and Hugh T. Edfors and dated November 10, 2021;

- an appraisal report of real property located at 711 Park Street in River Forest, Illinois as of November 2, 2021 prepared by Arthur J. Murphy III and Hugh T. Edfors and dated November 10, 2021;

- an appraisal report of real property located at 1927 North Sedgwick Street in Chicago as of September 2, 2021 prepared by Arthur J. Murphy III and Hugh T. Edfors and dated November 16, 2021;

- an appraisal report of real property located at 1933 North Sedgwick Street in Chicago as of September 2, 2021 prepared by Arthur J. Murphy III and Hugh T. Edfors and dated November 16, 2021;

- an appraisal report of real property located at 2049 North Sheffield Avenue in Chicago as of September 2, 2021 prepared by Arthur J. Murphy III and Hugh T. Edfors and dated November 16, 2021;

- an appraisal report of real property located at 3114 North Southport Avenue in Chicago as of September 2, 2021 prepared by Arthur J. Murphy III and Hugh T. Edfors and dated November 10, 2021;

- an appraisal report of real property located at 3216 North Racine Avenue in Chicago as of September 2, 2021 prepared by Arthur J. Murphy III and Hugh T. Edfors and dated November 10, 2021;

- an appraisal report of real property located at 828 West Grace Street in Chicago as of December 31, 2020 prepared by Stout and dated December 13, 2021;

- an appraisal report of real property located at 1325 North Wells Street in Chicago as of December 31, 2020 prepared by Stout and dated December 13, 2021;

- an appraisal report of real property located at 1552 North North Park Avenue in Chicago as of December 31, 2020 prepared by Stout and dated December 13, 2021;

- a valuation report entitled: Alpha Carpentry, LLC: Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020 prepared by Stout and dated December 13, 2021;

- a valuation report entitled: Alpha Construction Services, LLC: Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020 prepared by Stout and dated December 13, 2021;

STOUT

# Executive Summary

- a valuation report entitled: *Alpha Drywall Services, LLC: Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020* prepared by Stout and dated December 13, 2021; and

- a valuation report entitled: *Alpha Property Services, LLC: Valuation of 99.0% and 1.0% Membership Interests as of December 31, 2020* prepared by Stout and dated December 13, 2021.

In addition to the information reviewed above, we also performed the following procedures:

- conducted an analysis of other facts and data resulting in our calculation of value.[9]

## Valuation Methodology

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our determination of value. A description of each approach is discussed below.

The *Income Approach* is a technique that estimates the value of a company based on the cash flows the company is expected to generate in the future. The Income Approach is generally performed in two steps: 1) estimate the expected annual future cash flows of the company; and 2) discount or capitalize these cash flows to present value at a rate of return that considers the relative risk of realizing the cash flows.

Under the *Market Approach*, which consists of the Guideline Public Company Method and the Merger and Acquisition ("M&A") Method, the value of a company is estimated by employing statistics derived from observed transactions of similar companies or prior transactions involving interests in the subject company. Ideally, these companies will operate in comparable markets and will have similar growth prospects and risks.

The *Asset Approach* estimates the equity of a business based on the market value of a company's assets minus the value of its liabilities.

The above valuation methods have long been recognized as acceptable in the appropriate circumstances. Accordingly, we applied the methods that, in our experience and judgment, provide the most supportable valuation based on the information available. Based thereon, we have chosen to rely on the Asset Approach, in our determination of the value of the equity of Maeve.

## Conclusion of Value

In accordance with the foregoing, and as presented in **Exhibit B**, we determined the Fair Market Value of a 99.0% equity interest in Maeve, on a marketable, controlling-interest basis, as of December 31, 2020, to be:[10]

*SEVENTEEN MILLION THREE HUNDRED TWENTY THOUSAND DOLLARS*

*$17,320,000*

---

[9] We conducted an interview with Marty on January 24, 2018. However, while we requested a more recent interview with management of Maeve and the Maeve Series Investments, we were not afforded with the opportunity to conduct such an interview prior to the issuance of this report. As such, we reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

[10] Given the valuation methodologies employed in valuing Maeve and the Maeve Series Investments (and other related entities owned by Marty), as well as the fact that we adjusted Marty's compensation to a level that reflects both the services performed as an employee and his personal contributions to the businesses, our conclusion of value does not include any elements of personal goodwill.

STOUT



# Executive Summary

Additionally, and as presented in **Exhibit B**, we determined the Fair Market Value of a 1.0% equity interest in Maeve, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

**_ONE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS_**

**_$175,000_**

\*   \*   \*   \*   \*   \*   \*   \*

Our calculation of value is applicable only for the stated date and purpose and may not be appropriate for any other date or purpose. Reference should be made to the exhibits for assumptions and limiting conditions that apply to this valuation and report.

Regards,

*Stout Risius Ross, LLC*

**STOUT RISIUS ROSS, LLC**

STOUT

# Exhibits

**Exhibit A** ........................................................................................ Ownership Chart

**Exhibit B** ........................................................... Adjusted Book Value Method - Maeve

**Exhibit C** ............................... Adjusted Book Value Method – Maeve Series Investments

**Exhibit D** .................................................................................... Tracing Analysis

**Exhibit E** ......................................................... Assumptions and Limiting Conditions

**Exhibit F** .......................................................................................... Certification

**Exhibit G** ................................................................... Statement of Qualifications

**EXHIBIT B, Page 75 of 237**

# A. Ownership Chart



Exhibit A.1 - Ownership Chart - Maeve LLC

STOUT

MAEVE, LLC | 18

CONFIDENTIAL

# A. Ownership Chart



STOUT

MAEVE, LLC | 19

Exhibit A.1 - Ownership Chart - Maeve LLC

CONFIDENTIAL



# A. Ownership Chart



**Exhibit A-1 - Ownership Chart - Maeve LLC**

STOUT

MAEVE, LLC | 20

CONFIDENTIAL



# A. Ownership Chart

**STOUT**

## Footnotes to Exhibit A.1 - Maeve Ownership Chart

[a] Note that Exhibit A of the Alpha Carpentry LLC operating agreement dated March 7, 2014 identifies Series E as the owner of the 99.0% membership interest rather than Series F. It appears, however, based on the Maeve, LLC Amended Certificate of Formation filed November 26, 2014 and our review of other documents produced in this matter that Maeve LLC - Series F holds this interest.

[b] Series H formerly held an equity interest in 1935 S Wabash, LLC. We have not been provided with any documentation detailing the current holdings of Series H, if any.

[c] Series O formerly held an equity interest in True Believers II, LLC. This entity dissolved in 2017 per a filing with the Illinois Secretary of State. We have not been provided with any documentation detailing the current holdings of Series O, if any.

[d] Quit claim deeds dated July 1, 2010 show Maeve LLC - Series P holding a 100% interest in 828 W. Grace Unit 402 Land Trust, which holds a 50% undivided interest in a condominium unit located at 828 W Grace Street in Chicago, and Maeve LLC - Series Q holding a 100% interest in 828 W. Grace Garage Unit P37 Land Trust, which holds a 50% undivided interest in a parking stall located at 828 W Grace Street in Chicago. The remaining 50% undivided interest of each property is held by Bridget Reidy Lacey. Both the condominium unit and the garage unit were under contract to sell on June 8, 2019 for $385,000, but our understanding is that this sale did not close. The settlement statement for this transaction indicated that the sellers were Bridget Reidy Lacey and Kerry and Marty Paris.

[e] According to the Amended Certificate of Formation of Maeve, LLC dated November 26, 2014 and other related documentation, Series U was formerly the owner of 100% of the Class B membership interests in 1545 W North LLC. See footnote [i] for further detail related to 1545 W North, LLC.

[f] Per a Subscription Agreement for The Per Hydration People, LLC, Maeve LLC - Series U subscribed for 14,286 units of membership interests in exchange for $50,001.

[g] According to a closing statement for 703 Park Avenue dated August 31, 2012 and a settlement statement dated September 7, 2012, Maeve LLC - Series U was the purchaser of this property. Further, the Special Warranty Deed recorded with the Cook County Clerk's office lists Maeve, LLC - Series U as the owner of the property. As such, we have assumed that Series U is the owner of this property for purposes of our analysis.

It should be noted that the Amended Certificate of Formation of Maeve LLC dated November 26, 2014 lists Series X as the owner of 703 Park Avenue. Other than the Amended Certificate of Formation of Maeve, LLC dated November 26, 2014, we have been provided with no other documentation detailing the current holdings of Series X, if any.

[h] The Amended Certificate of Formation of Maeve, LLC dated November 26, 2014 lists Series AA as the owner of a 20% Class B Membership Interest in 1611 N Hermitage, LLC. However, the Schedules K-1 and First Amended Operating Agreement of 1611 Hermitage, LLC list Maeve, LLC - Series Y as the owner of this interest.

[i] According to the Amended Certificate of Formation of Maeve, LLC dated November 26, 2014 and other related documentation, Series BB was formerly the owner of 100% of the Class A membership interests in 1545 W North LLC. 1545 W North, LLC was the general partner in 1545 W North, LP. 1545 W North, LP filed a final tax return in 2018 after liquidating its real property holdings and distributing its remaining assets to the company's partners.

A filing with the Illinois Secretary of State indicates that the status of 1545 W North, LLC was revoked on September 29, 2020. It appears based on documents produced that 1545 W North, LLC was not operating as of the Valuation Date. We have not been provided with any documentation detailing the current holdings of Series BB, if any.

# A. Ownership Chart

## Footnotes to Exhibit A.1 - Maeve Ownership Chart

[i]  Paragraph 42 of Marty's affidavit attached as Exhibit L to the Response to Motion to Continue Trial Date Due to Commence on October 4, 2021 states:

"As to the entity 301 W. North LP, the business organization documents have been previously produced along with loan documents associated with the project....This entity is inactive, and it has not been operating since at least October 2020; accordingly, I am not aware of any documents in my possession and control which have been requested but not previously produced."

However, according to a search of the Cook County Clerk's Office, a Trustee's Deed was recorded on December 6, 2014 conveying and quitclaiming property located at 301-313 West North Avenue, Chicago, IL 60610 (PINs: 17-04-201-002-0000; 17-04-201-008-0000; 17-04-201-009-0000; 17-04-201-010-0000; 17-04-201-011-0000; 17-04-201-012-0000) to 301 W North Avenue, L.P. There does not appear to have been a more recent deed recorded for this property as of the Valuation Date. Further, Marty produced a copy of the 2020 federal tax return for 301 W North Avenue, LP on September 15, 2021. The 2020 tax return was **_NOT_** marked as a "final return."

Per the Response to Sixth Supplemental Request for the Production of Documents for Inspection and Copying Pursuant to Supreme Court Rule 214, Marty produced 1) a Promissory Note dated September 23, 2020 for a principal amount of $26 million with 301 W North Avenue, LLC as the borrower and BDS III Mortgage Capital J LLC as the lender and 2) an Estimated Buyer's Closing Statement for this loan dated September 23, 2020 (the "Closing Statement"). The Closing Statement listed 301 W North **_Avenue, LLC_** (a Delaware LLC) as the "Buyer" of the Property located at 1552 North Park Avenue Chicago Illinois 60610 and 301 West North Avenue Chicago, Illinois 60610. The principal amount of the new loan made by BDS III Mortgage Capital J LLC (the "Lender") was $26 million. Further, the loan proceeds went to, among other things, a mortgage payoff to First Midwest Bank (the prior lender to 301 W North Avenue, LP) in the amount of $18.9 million and a "Redemption payment to RECAP" in the amount of $4,227,449. RECAP Opportunity Fund, L.P. was the Investor Partner in 301 W North Avenue, L.P. One week later, on September 30, 2020, counsel for RECAP Opportunity Fund, L.P. entered into a Stipulation of Discontinuance in a lawsuit where RECAP Opportunity Fund, L.P. was Plaintiff and 301 W. North, LLC and Marty were Defendants, which discontinued the action.

While the LLC Agreement for 301 W North, LLC, the Limited Partnership Agreement of 301 W North Avenue, L.P. and various other documents for these two entities have been produced, we have not been provided with any organizational documents, agreements, tax returns, financial statements, or other documents for 301 W North **_Avenue, LLC_** to date. (A filing with the Illinois Secretary of State indicates that a Delaware limited liability company by the name of 301 W North Avenue, LLC was admitted to operate in the State of Illinois approximately one week after the date of the Closing Statement.)

Based on the above, for purposes of our analysis, we have assumed that Maeve Series FF and Series GG hold 100% of the equity of the entity or entities that own the real property located at 301 W North Avenue and 1552 North Park Avenue in Chicago (PINs: 17-04-201-002-0000; 17-04-201-008-0000; 17-04-201-009-0000; 17-04-201-010-0000; 17-04-201-011-0000; 17-04-201-012-0000). **_We reserve the right to amend our report and this analysis if additional documents or information related to 301 W North Avenue, LP, 301 W North, LLC, 301 W North Avenue, LLC, 301 W North Avenue Lots, LLC, the real property located at 301-313 West North Avenue,_**

# A. Ownership Chart

STOUT

## Footnotes to Exhibit A.1 - Maeve Ownership Chart

[k]    Based on a review of documents produced to date, it appears that Erie & LaSalle, LLC ("Erie & LaSalle") currently holds a 99.99% equity interest in this entity, while Marty owns a 0.01% interest. The Operating Agreement of Erie LaSalle Venture, LLC ("Venture") effective October 7, 2016 (the "Agreement"), as subsequently amended, indicates that Erie & LaSalle held a "Sponsor Member" interest in Venture and M17 Land Investments, LLC ("M17") held a "Preferred Member" interest in Venture. However, per a Notice of Change in Control Event from M17 and Belvedere Financial, LLC to Erie & LaSalle dated January 23, 2018, the Preferred Member provided notice to the Sponsor Member "THAT IT SHALL BE DEEMED TO HAVE RESIGNED FROM THE COMPANY AND HAVE ITS CAPITAL ACCOUNT AND INTEREST IN THE COMPANY TRANSFERRED TO PREFERRED MEMBER IF COMPANY FAILS TO REDEEM, IN FULL, PREFERRED MEMBER'S INTEREST…." Notably, the 2019 federal income tax return and related Schedules K-1 for Venture indicate that M17 transferred its capital of $3,000,000 to Erie & LaSalle in 2019. The $3,000,000 capital figure is consistent with the original capital contribution made by M17 per the Agreement and the 2016 Schedule K-1 for Venture issued to M17. Further, the 2019 Schedule K-1 for Venture issued to M17 is marked final and shows that M17 has an ending share of profits, losses and capital of 0.0%. Moreover, the 2019 Schedule K-1 for Venture issued to Erie & LaSalle shows a capital contribution of $5.5 million in 2019 (consisting of $3.0 million of "transferred capital" and $2.5 million of "contributions to capital"), is not marked final, and shows an ending share of profits, losses and capital of 100.0%. Finally, the 2020 Schedules K-1 for Venture indicate that Marty owns 0.01% of Venture as of December 31, 2020. Thus, for purposes of our analysis, we have assumed that Erie & LaSalle owns 99.99%, and Marty owns 0.01%, of the equity of Venture (or any related entity or entities that own the real property located at 146 W. Erie, Chicago, IL).

It should be noted that the 2020 Schedule K-1 for Venture issued to Erie & LaSalle shows Erie & LaSalle's percentage ownership interest as 0.9999999999%, rather than 99.99%. However, given that: 1) the 2019 Schedule K-1 for Venture issued to Erie & LaSalle indicates that Erie & LaSalle owns 100.0% of Venture; 2) there are only two members of Venture listed in the 2020 federal tax return for Venture (i.e., Erie & LaSalle and Marty); 3) Marty ostensibly owns 0.01% of Venture as of December 31, 2020 per the 2020 Schedules K-1 for Venture); and 4) we were not provided with any documents evidencing the transfer of any part of Erie & LaSalle's ownership interest in Venture in 2020, the ownership percentage listed on the 2020 Schedule K-1 for Erie & LaSalle appears to be a typographical error.

Further, a promissory note dated July 2, 2019 was recently produced that contains the following representation: "This Note has been issued pursuant to that certain Purchase Agreement, dated as of July 2, 2019 (the "Purchase Agreement"), by and between [LaSalle & Erie, LLC] and [M17], pursuant to which [LaSalle & Erie, LLC] has purchased [M17]'s entire equity interest in Erie LaSalle Venture LLC." According to public filings made with the State of Delaware, a limited liability company named LaSalle & Erie, LLC was formed on June 25, 2019, seven days prior to the date of this note agreement. To date, we have not been provided with the purchase agreement referenced in the note agreement dated July 2, 2019, nor various other documents for LaSalle & Erie, LLC, including any organizational documents, agreements, tax returns, financial statements, or other documents. As such, the ownership structure and holdings of LaSalle & Erie, LLC are not known at this time.

[l]    Based on the above, for purposes of our analysis, we have assumed that Marty, Maeve Series HH and Series II hold 100% of the equity of the entity or entities that own the real property located at 146 West Erie Street in Chicago. We reserve the right to amend our report and this analysis if additional documents or information related to LaSalle & Erie, LLC, the real property located at 146 West Erie, Chicago, Illinois, or any other related entity or real property are subsequently produced.

[l]    For purposes of our analysis, we have assumed that Erie LaSalle Venture, LLC owned the real property located at 146 W Erie Street in Chicago as of the Valuation Date based on Venture's 2020 federal income tax return, recordings with the Cook County Clerk's Office, and other documents produced in this matter to date.

[m]    The Amended and Restated Operating Agreement of Maeve, LLC dated November 7, 2014 does not provide member information for Series JJ through Series LL. For purposes of this analysis we have assumed that ownership of these series is consistent with Series A through Series II (i.e. 99% held by Jack Enterprises, LP and 1% held by the FMP Jr. Revocable Trust).

MAEVE, LLC | 23

EXHIBIT B, Page 81 of 237

# B.  Adjusted Book Value Method - Maeve

**STOUT**

**Exhibit B.1**

**Maeve LLC**
**December 31, 2020**
**Adjusted Book Value Method**
*In U.S. Dollars*

| | Maeve Series | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value | Refer to |
|---|---|---|---|---|---|
| 1 Cash and Cash Equivalents | Series A and U | $ 87,245 | $ 10,012 | [a] | |
| 2 Contributions Receivable | none | 1,000 | 1,000 | [b] | |
| 3 Due from Affiliates | various | 7,014,987 | 4,217,418 | [c] | |
| 4 Marketable Securities | Series A and DD | 4,038,183 | n/a | [d] | |
| 5   Jeffries Account #6356 | Series A | n/a | 2,508,802 | [d] | |
| 6   Jeffries Account #7190 | Series A | n/a | 825,737 | [d] | |
| 7   Jeffries Account #9932 | Series A | n/a | 354,750 | [d] | |
| 8   Jeffries Account #9973 | Series A | n/a | 752,336 | [d] | |
| 9   The PrivateBank Account #6361 | Series A | n/a | 0 | [e] | |
| 10  Jeffries Account #8022 | Series DD | n/a | 1,458,331 | [d] | |
| 11 Personal Property | Series B | n/a | 100,000 | [f] | |
| 12 Real Estate Deposits and Inventory | unknown | 941,476 | 941,476 | [b] | |
| 13 **Total Current Assets** | | **12,082,891** | **11,169,862** | | |

Refer to the last pages of this exhibit for a description of the footnotes.

**MAEVE, LLC** | 24

CONFIDENTIAL

**EXHIBIT B, Page 82 of 237**

◆STOUT

# B. Adjusted Book Value Method - Maeve

**Exhibit B.1**

**Maeve LLC**
**December 31, 2020**
**Adjusted Book Value Method**
*In U.S. Dollars*

| | Maeve Series | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value | Refer to |
|---|---|---|---|---|---|
| 14 Investment in Partnerships and Real Estate | | 3,980,090 | n/a | [g] | |
| 15  828 W Grace, LLC - Class A and C Interests | Series C and D | n/a | 71,586 | [g] [h] | Exhibit C.1.a |
| 16  1857 W Dickens, LLC | Series E | n/a | 221,000 | [g] | Exhibit C.2.a |
| 17  Alpha Carpentry, LLC | Series F | n/a | de minimis | [g] | Appendix II |
| 18  1454 S Michigan, LLC | Series G | n/a | 6,658,736 | [g] | Exhibit C.3.a |
| 19  Sedgwick Investments, LLC | Series I | n/a | 6,435 | [g] | Exhibit C.4.a |
| 20  3216 N Racine, LLC | Series J | n/a | 787,500 | [g] | Exhibit C.5.a |
| 21  2049 N Sheffield, LLC | Series K | n/a | 1,618,650 | [g] | Exhibit C.6.a |
| 22  PC Property Holdings, LLC | Series L | n/a | 888,500 | [g] | Exhibit C.7.a |
| 23  1933 Sedgwick, LLC | Series M | n/a | 616,000 | [g] | Exhibit C.8.a |
| 24  Eventric, LLC | Series N | n/a | 50,000 | [i] | |
| 25  50% Undivided Interest - 828 W Grace Unit 402 and P53 | Series P and Q | n/a | 185,000 | [i] | |
| 26  50% Undivided Interest - 1464 S Michigan Unit 1605 and P48 | Series R and S | n/a | 180,000 | [i] | |
| 27  3114 N Southport, LLC | Series T | n/a | 469,500 | [g] | Exhibit C.9.a |
| 28  The Pet Health People, LLC | Series U | n/a | 50,001 | [i] | |
| 29  703 Park St., River Forest, IL | Series U | n/a | 550,000 | [k] | |
| 30  55th and Kedzie Investments, LLC | Series V | n/a | 66,669 | [g] | Exhibit C.10.a |
| 31  Alpha Property Services, LLC | Series W | n/a | 414,000 | [g] | Appendix V |
| 32  1611 N Hermitage, LLC | Series Y | n/a | 37,930 | [g] | Exhibit C.11.a |
| 33  Alpha Construction Services, LLC | Series Z | n/a | 111,000 | [g] | Appendix III |
| 34  1325 N Wells, LLC - Class A and B Interests | Series CC and EE | n/a | 466,019 | [g] [l] | Exhibit C.12.a |
| 35  301 W North, LLC - Class A and B Interests | Series FF and GG | n/a | (1,332,000) | [g] [m] | Exhibit C.13.a |
| 36  Erie & LaSalle, LLC - Class A and B Interests | Series HH and II | n/a | 604,000 | [g] [n] | Exhibit C.14.a |
| 37  Lake Lathrop Partners, LLC | Series JJ | n/a | 2,355,000 | [g] | Exhibit C.15.a |
| 38  Alpha Drywall Services, LLC | Series LL | n/a | 86,000 | [g] | Appendix IV |
| 39 **Total Other Assets** | | 3,980,090 | 15,161,526 | | |
| | | | | | |
| 40 **Total Assets** | | $ 16,062,981 | $ 26,331,388 | | |

Refer to the last pages of this exhibit for a description of the footnotes.

MAEVE, LLC | 25

# B.  Adjusted Book Value Method - Maeve

**Maeve LLC**
**December 31, 2020**
**Adjusted Book Value Method**
*In U.S. Dollars*

| | Maeve Series | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value | Refer to |
|---|---|---|---|---|---|
| 41 Due to Affiliates | various | $ 4,727,848 | $ 4,727,848 | [b] | |
| 42 Unearned Interest | unknown | 389 | 389 | [b] | |
| 43 Short-Term Debt (Jefferies #1351) | Series A | 4,047,286 | 4,107,999 | [d] | |
| 44 **Total Liabilities** | | 8,775,523 | 8,836,236 | | |
| 45 **Total Members' Equity** | | $ 7,287,458 | $ 17,495,152 | [o] | |
| 46 **Total Value of Equity** | | | $ 17,495,152 | | |
| 47 Pro Rata Value of Jack Enterprises, LP's Interest (Rounded) | | 99.0% | $ 17,320,000 | | |
| 48 Pro Rata Value of Marty's Interest (Rounded) | | 1.0% | $ 175,000 | | |

Refer to the last pages of this exhibit for a description of the footnotes.

 **STOUT**

# B.  Adjusted Book Value Method - Maeve

Exhibit B.1

**Maeve LLC**
**December 31, 2020**
**Explanation of Fair Market Value**

[a] The value of this asset is determined based on the account balance of CIBC checking account #7622 as of December 31, 2020 and Pan American checking account #2201 as of August 31, 2020.

[b] The value of this asset or liability is determined to be equal to book value as represented in Maeve's 2020 federal tax return.

[c] Due from affiliates was adjusted for purposes of our analysis as the Company holds notes receivable from affiliates that are not fully collectible. Specifically, the note receivable from Sedgwick Properties Holding Corporation has been reduced by $2,524,820 and the note receivable from Alpha Carpentry, LLC has been reduced by $123,776. Corresponding adjustments have been made to the notes payable to Maeve, LLC as of the Valuation Date on the balance sheets of Sedgwick Properties Holding Corp. and Alpha Carpentry, LLC.

[d] The value of the portfolio of marketable securities (or loan) was determined to be equal to the balance reported on the account statement as of December 31, 2020.

[e] The value of the portfolio of marketable securities was determined to be equal to the balance reported on the account statement as of May 31, 2020.

[f] Paragraph 16 of Marty's affidavit attached as Exhibit L to the Response to Motion to Continue Trial Date Due to Commence on October 4, 2021 states: "As to the entity Maeve LLC - Series B, the entity currently holds $100,000 of non-marital personal property." As we have not been provided with additional documentation of the assets and liabilities of Maeve LLC - Series B - Series B as of the Valuation Date, we have relied on this representation as an indication of the value of Maeve LLC - Series B holdings.

[g] The value of this investment was adjusted to the Fair Market Value as indicated in the corresponding exhibit or report.

[h] Insufficient information was provided to allocate the value of 828 W Grace, LLC between Maeve LLC - Series C and Series D. As such, we have presented the combined Fair Market Value of both Maeve Series investments on line 15.



**STOUT**

**Exhibit B.1**

# B.  Adjusted Book Value Method - Maeve

## Explanation of Fair Market Value

[i] The Fair Market Value of this investment was based on the original investment amount.

[j] The Fair Market Value of the asset was determined based on a property appraisal prepared by Arthur J. Murphy III, JD and Hugh T. Edfors MAI, JD as of August 25, 2021. We have allocated half of the value of both the condominium unit and the parking unit to Maeve on this line.

[k] The Fair Market Value of the asset was determined based on a property appraisal prepared by Arthur J. Murphy III, JD and Hugh T. Edfors MAI, JD as of November 2, 2021.

[l] Financial statements for 1325 N Wells, LLC were not provided. However, based on information provided with respect to SP/RPA 1325 Holdings, LLC, it appears that 1325 N Wells, LLC continues to hold the "Developer" interest in SP/RPA 1325 Holdings, LLC. As a result, *for purposes of our analysis we have assumed that 1325 N Wells, LLC holds no assets or liabilities other than the Developer interest in SP/RPA 1325 Holdings, LLC*. Further, based on the operating agreement of 1325 N Wells, LLC dated October 20, 2014, 100% of the company's equity is held by Maeve LLC Series CC and Series EE. Since insufficient information was provided to allocate the value of 1325 N Wells, LLC between Maeve LLC - Series CC and Series EE, we have presented the combined Fair Market Value of both Maeve Series investments on line 34.

[m] As detailed in Exhibit A.1, for purposes of our analysis we have assumed that Maeve Series FF and Series GG hold 100% of the equity of the entity or entities that own the real property located at 301 W North Avenue and 1552 North Park Avenue in Chicago (PINs: 17-04-201-002-0000; 17-04-201-008-0000; 17-04-201-009-0000; 17-04-201-010-0000; 17-04-201-011-0000; 17-04-201-012-0000). Based thereon, we have presented the combined Fair Market Value of both Maeve Series investments on line 35.

[n] As detailed in Exhibit A.1, for purposes of our analysis, we have assumed that Marty, Maeve Series HH and Series II hold 100% of the equity of the entity or entities that own the real property located at 146 West Erie Street in Chicago. Based on the operating agreement of Erie & LaSalle, LLC dated September 30, 2016, 100% of the company's equity is held by Maeve LLC distributed between Series HH and Series II. Since insufficient information was provided to allocate the value of Erie & LaSalle, LLC between Maeve LLC - Series HH and Series II, we have presented the combined Fair Market Value of both Maeve Series investments on line 36.

[o] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

**EXHIBIT B, Page 86 of 237**

# C. Adjusted Book Value Method – Maeve Series Investments  ◆STOUT

MAEVE, LLC | 29

**828 W Grace LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.1.a

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 1 Cash and Cash Equivalents | $ 4,132 | $ 4,132 | [a] |
| 2 Accounts Receivable | 163,229 | 163,229 | [a] |
| 3 Inventories | 36,000 | 36,000 | [a] |
| 4 Due from Affiliate | 0 | 0 | [a] |
| 5 Due from Members | 307,878 | 307,878 | [a] |
| 6 **Total Current Assets** | **511,239** | **511,239** | |
| | | | |
| 7 Buildings and Other Depreciable Assets | 150,386 | 180,000 | [b] |
| 8 Land | 38,280 | n/a | [b] |
| 9 Less: Accumulated Depreciation | (35,293) | n/a | n/a |
| 10 **Net Property and Equipment** | **153,373** | **180,000** | |
| | | | |
| 11 **Total Assets** | **$ 664,612** | **$ 691,239** | |

Refer to the last page of this exhibit for a description of the footnotes.

CONFIDENTIAL

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**828 W Grace LLC**
**December 31, 2020**
**Adjusted Book Value Method**                                                              **Exhibit C.1.a**

*In U.S. Dollars*

|  | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 12 Accrued Expenses | $ 257,064 | $ 257,064 | [a] |
| 13 Accrued Real Estate Taxes | 13,941 | 13,941 | [a] |
| 14 Developer Fee Payable | 150,000 | 150,000 | [a] |
| 15 Due to Affiliates | 7,820 | 7,820 | [a] |
| 16 Due to Title Co. | 2,473 | 2,473 | [a] |
| 17 Security Deposits | 11,939 | 11,939 | [a] |
| 18 **Total Current Liabilities** | 443,237 | 443,237 | |
| | | | |
| 19 Deferred Installment Gain | 137,747 | 137,747 | [a] |
| 20 **Total Long-Term Liabilities** | 137,747 | 137,747 | |
| | | | |
| 21 **Total Liabilities** | 580,984 | 580,984 | |
| | | | |
| 22 **Total Stockholders' Equity** | $ 83,628 | $ 110,255 | [c] |
| | | | |
| 23 Total Value of Equity (Rounded) | | $ 110,000 | |
| | | | |
| 24 Pro Rata Value of Maeve's Interest | | $ 71,586 | [d] |
| | | | |
| 25 Pro Rata Value of Marty's Interest | | $ 723 | [d] |

Refer to the last page of this exhibit for a description of the footnotes.

MAEVE, LLC | 30

CONFIDENTIAL

# C.   Adjusted Book Value Method – Maeve Series Investments   ◆STOUT

**828 W Grace LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                              **Exhibit C.1.a**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The Fair Market Value of the asset was determined based on a property appraisal prepared by Stout as of December 31, 2020.

[c] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[d] We determined Maeve's interest based on a review of section 8.4 of the operating agreement, a letter to investors dated March 26, 2019 and Schedules K-1 issued to the company's members.

CONFIDENTIAL

MAEVE, LLC | 31

**EXHIBIT B, Page 89 of 237**

# C.  Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**1857 W Dickens, LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.2.a

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ 20,919 | $ 20,919 | [a] |
| 2 | Trade Notes and Accounts Receivable | 900 | 900 | [a] |
| 3 | **Total Current Assets** | **21,819** | **21,819** | |
| 4 | Buildings and Other Depreciable Assets | 1,602,966 | 2,080,000 | [b] |
| 5 | Land | 245,947 | n/a | [b] |
| 6 | Less: Accumulated Depreciation | (200,156) | n/a | n/a |
| 7 | **Net Property and Equipment** | **1,648,757** | **2,080,000** | |
| 8 | Intangible Assets, Net | 10,044 | 0 | [c] |
| 9 | **Total Other Assets** | **10,044** | **0** | |
| 10 | **Total Assets** | **$ 1,680,620** | **$ 2,101,819** | |
| 11 | Due to Affiliates | $ 237,630 | $ 237,630 | [a] |
| 12 | **Total Current Liabilities** | **237,630** | **237,630** | |
| 13 | Mortgages, Notes, Bonds Payable | 1,421,807 | 1,421,807 | [a] |
| 14 | **Total Long-Term Liabilities** | **1,421,807** | **1,421,807** | |
| 15 | **Total Liabilities** | **1,659,437** | **1,659,437** | |
| 16 | **Total Members' Equity** | **$ 21,183** | **$ 442,382** | [d] |
| 17 | **Total Value of Equity (Rounded)** | | **$ 442,000** | |
| 18 | **Pro Rata Value of Maeve's Interest** | 50.0% | **$ 221,000** | |

Refer to the last page of this exhibit for a description of the footnotes.

CONFIDENTIAL

MAEVE, LLC | 32

# C.   Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**1857 W Dickens, LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                    **Exhibit C.2.a**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The Fair Market Value of the asset was determined based on a property appraisal prepared by Arthur J. Murphy III, JD and Hugh T. Edfors MAI, JD as of September 2, 2021.

[c] The Fair Market Value of this asset is determined to be zero in the context of a hypothetical sale of the company to an unrelated third party.

[d] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

CONFIDENTIAL

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**MAEVE, LLC | 34**

**1454 S Michigan LLC**
**December 31, 2020**
**Adjusted Book Value Method**                                   **Exhibit C.3.a**

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 1  Cash and Cash Equivalents | $ 29,318 | $ 29,318 | [a] |
| 2  Due from Affiliate | 3,084,994 | 3,084,994 | [a] |
| 3  Escrow Holdback | 10,406 | 10,406 | [a] |
| 4  Old Second Holdback | 400,222 | 400,222 | [a] |
| 5  Real Estate Tax Escrow | 142,491 | 142,491 | [a] |
| 6  **Total Current Assets** | **3,667,431** | **3,667,431** | |
| | | | |
| 7  Land | 481,139 | n/a | [b] |
| 8  Buildings and Other Depreciable Assets | 6,411,761 | 10,400,000 | [b] |
| 9  Less: Accumulated Depreciation | (2,860,893) | n/a | n/a |
| 10  **Net Property and Equipment** | **4,032,007** | **10,400,000** | |
| | | | |
| 11  Intangible Assets | 219,321 | 0 | [c] |
| 12  Less: Accumulated Amortization | (170,058) | 0 | [c] |
| 13  **Total Other Assets** | **49,263** | **0** | |
| | | | |
| 14  **Total Assets** | **$ 7,748,701** | **$ 14,067,431** | |

Refer to the last page of this exhibit for a description of the footnotes.

**EXHIBIT B, Page 92 of 237**

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**1454 S Michigan LLC**
**December 31, 2020**
**Adjusted Book Value Method**                                                          **Exhibit C.3.a**

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 15 Accounts Payable | $ 74,762 | $ 74,762 | [a] |
| 16 Accrued Real Estate Taxes | 201,500 | 201,500 | [a] |
| 17 Security Deposits | 7,848 | 7,848 | [a] |
| 18 **Total Current Liabilities** | **284,110** | **284,110** | |
| | | | |
| 19 Long-Term Debt | 7,015,511 | 7,015,511 | [a] |
| 20 **Total Long-Term Liabilities** | **7,015,511** | **7,015,511** | |
| | | | |
| 21 **Total Liabilities** | **7,299,621** | **7,299,621** | |
| | | | |
| 22 **Total Members' Equity** | **$ 449,080** | **$ 6,767,810** | [d] |
| | | | |
| | | | |
| 23 **Total Value of Equity (Rounded)** | | **$ 6,768,000** | |
| 24 Less: Return of Capital Accounts | | 42,004 | [e] |
| 25 **Distributable Proceeds** | | **6,725,996** | |
| | | | |
| 26 Pro Rata Value of Maeve's 99.0% Class A Interest | 99.0% | $ 6,658,736 | [e] |
| | | | |
| 27 Pro Rata Value of Marty's 1.0% Class A Interest | 1.0% | $ 67,260 | [e] |

Refer to the last page of this exhibit for a description of the footnotes.

# C.   Adjusted Book Value Method – Maeve Series Investments    ◆STOUT

MAEVE, LLC | 36

**1454 S Michigan LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                      **Exhibit C.3.a**

[a]  The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b]  Based on an appraisal report of 1454-64 S. Michigan Avenue, Chicago, Illinois, as prepared by Integra Realty Resources, as of December 31, 2020, dated January 8, 2021.

[c]  The Fair Market Value of this asset is determined to be zero in the context of a hypothetical sale of the company to an unrelated third party.

[d]  The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[e]  Based on our review of the provided tax returns, the Operating Agreement dated March 1, 2005, and an investor letter dated September 13, 2019, it appears that future proceeds will be distributable 1) first to two outside investors to redeem their remaining capital account balances; and 2) second, 100% to the Class A members in accordance with section 8.4 of the Operating Agreement.

CONFIDENTIAL

**EXHIBIT B, Page 94 of 237**

# C. Adjusted Book Value Method – Maeve Series Investments ◀ STOUT

MAEVE, LLC | 37

**Sedgwick Investments LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.4.a

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | The Private Bank | $ (3,078) | $ (3,078) | [a] |
| 2 | Due from 301 North | 5,000 | 5,000 | [a] |
| 3 | Due from River Forest Deal | 12,181 | 12,181 | [a] |
| 4 | Due from SPDC | 54,509 | 54,509 | [a] |
| 5 | **Total Current Assets** | **68,612** | **68,612** | |
| 6 | Property Earnest Money - 1550 Bosworth | 10,000 | 10,000 | [a] |
| 7 | Property Earnest Money - 1720 W North Avenue | 10,000 | 10,000 | [a] |
| 8 | **Total Other Assets** | **20,000** | **20,000** | |
| 9 | **Total Assets** | **$ 88,612** | **$ 88,612** | |
| 10 | Due to Maeve, LLC | $ 13,181 | $ 13,181 | [a] |
| 11 | Due to Shareholder | 68,882 | 68,882 | [a] |
| 12 | **Total Liabilities** | **82,063** | **82,063** | |
| 13 | **Total Members' Equity** | **$ 6,549** | **$ 6,549** | [b] |
| 14 | **Total Value of Equity (Rounded)** | | **$ 6,500** | |
| 15 | **Pro Rata Value of Maeve's Interest** | 99.0% | **$ 6,435** | |
| 16 | **Pro Rata Value of Marty's Interest** | 1.0% | **$ 65** | |

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**3216 N Racine, LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.5.a

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ 91,237 | $ 91,237 | [a] |
| 2 | Due from Affiliate | 146,825 | 146,825 | [a] |
| 3 | Tax Escrow | 9,916 | 9,916 | [a] |
| 4 | **Total Current Assets** | **247,978** | **247,978** | |
| 5 | Land | 97,567 | n/a | [b] |
| 6 | Buildings and Other Depreciable Assets | 379,050 | 1,420,000 | [b] |
| 7 | Less: Accumulated Depreciation | (353,289) | n/a | n/a |
| 8 | **Net Property and Equipment** | **123,328** | **1,420,000** | |
| 9 | Intangible Assets | 2,578 | 0 | [c] |
| 10 | Less: Accumulated Amortization | (2,578) | 0 | [c] |
| 11 | **Total Other Assets** | **0** | **0** | |
| 12 | **Total Assets** | **$ 371,306** | **$ 1,667,978** | |
| 13 | Long-Term Debt | $ 93,187 | $ 93,187 | [a] |
| 14 | **Total Liabilities** | **93,187** | **93,187** | |
| 15 | **Total Members' Equity** | **$ 278,119** | **$ 1,574,791** | [d] |
| 16 | **Total Value of Equity (Rounded)** | | **$ 1,575,000** | |
| 17 | **Pro Rata Value of Maeve's Interest** | 50.0% | **$ 787,500** | |

Refer to the last page of this exhibit for a description of the footnotes.

CONFIDENTIAL

MAEVE, LLC | 38

# C. Adjusted Book Value Method – Maeve Series Investments ◀STOUT

**3216 N Racine, LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                    **Exhibit C.5.a**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The Fair Market Value of the asset was determined based on a property appraisal prepared by Arthur J. Murphy III, JD and Hugh T. Edfors MAI, JD as of September 2, 2021.

[c] The Fair Market Value of this asset is determined to be zero in the context of a hypothetical sale of the company to an unrelated third party.

[d] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**2049 N Sheffield LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.6.a

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ 33,327 | $ 33,327 | [a] |
| 2 | Due from Affiliate | 1,219,599 | 1,219,599 | [a] |
| 3 | Escrow Account | 16,373 | 16,373 | [a] |
| 4 | **Total Current Assets** | **1,269,299** | **1,269,299** | |
| 5 | Land | 250,000 | n/a | [b] |
| 6 | Property | 786,868 | 2,050,000 | [b] |
| 7 | Less: Accumulated Depreciation | (786,159) | n/a | n/a |
| 8 | **Net Property and Equipment** | **250,709** | **2,050,000** | |
| 9 | Capitalized Loan Fees | 3,862 | 0 | [c] |
| 10 | Less: Accumulated Amortization of Loan Fee | (2,313) | 0 | [c] |
| 11 | **Total Other Assets** | **1,549** | **0** | |
| 12 | **Total Assets** | **$ 1,521,557** | **$ 3,319,299** | |
| 13 | Long Term Debt | 1,684,089 | 1,684,089 | [a] |
| 14 | **Total Liabilities** | **1,684,089** | **1,684,089** | |
| 15 | **Total Members' Equity** | **$ (162,532)** | **$ 1,635,210** | [d] |
| 16 | **Total Value of Equity (Rounded)** | | **$ 1,635,000** | |
| 17 | **Pro Rata Value of Maeve's Interest** | 99.0% | **$ 1,618,650** | |
| 18 | **Pro Rata Value of Marty's Interest** | 1.0% | **$ 16,350** | |

Refer to the last page of this exhibit for a description of the footnotes.

# C.    Adjusted Book Value Method – Maeve Series Investments    STOUT

**2049 N Sheffield LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                    **Exhibit C.6.a**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The Fair Market Value of the asset was determined based on a property appraisal prepared by Arthur J. Murphy III, JD and Hugh T. Edfors MAI, JD as of September 2, 2021.

[c] The Fair Market Value of this asset is determined to be zero in the context of a hypothetical sale of the company to an unrelated third party.

[d] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

MAEVE, LLC | 41

CONFIDENTIAL

# C.  Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**MAEVE, LLC | 42**

**PC Property Holdings, LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.7.a

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ 450,679 | $ 450,679 | [a] |
| 2 | Due from Affiliate | 28,854 | 28,854 | [a] |
| 3 | Insurance Escrow | 408 | 408 | [a] |
| 4 | **Total Current Assets** | **479,941** | **479,941** | |
| 5 | Buildings and Other Depreciable Assets | 1,387,276 | 2,610,000 | [b] |
| 6 | Land | 303,308 | n/a | [b] |
| 7 | Less:  Accumulated Depreciation | (1,229,046) | n/a | n/a |
| 8 | **Net Property and Equipment** | **461,538** | **2,610,000** | |
| 9 | Intangible Assets, Net | 3,831 | 0 | [c] |
| 10 | **Total Other Assets** | **3,831** | **0** | |
| 11 | **Total Assets** | **$ 945,310** | **$ 3,089,941** | |
| 12 | Related Party Loans | $ 60 | $ 60 | [a] |
| 13 | **Total Current Liabilities** | **60** | **60** | |
| 14 | Loans from Partners | 83,800 | 83,800 | [a] |
| 15 | Long-Term Debt | 1,229,216 | 1,229,216 | [a] |
| 16 | **Total Liabilities** | **1,313,076** | **1,313,076** | |
| 17 | **Total Stockholders' Equity** | **$ (367,766)** | **$ 1,776,865** | [d] |
| 18 | **Total Value of Equity (Rounded)** | | **$ 1,777,000** | |
| 19 | **Pro Rata Value of Maeve's Interest** | 50.0% | **$ 888,500** | |

Refer to the last page of this exhibit for a description of the footnotes.

CONFIDENTIAL

# C.  Adjusted Book Value Method – Maeve Series Investments

**◢ STOUT**

**PC Property Holdings, LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                                    **Exhibit C.7.a**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The Fair Market Value of the asset was determined based on a property appraisal prepared by Arthur J. Murphy III, JD and Hugh T. Edfors MAI, JD as of September 2, 2021.

[c] The Fair Market Value of this asset is determined to be zero in the context of a hypothetical sale of the company to an unrelated third party.

[d] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

CONFIDENTIAL

**EXHIBIT B, Page 101 of 237**

# C.    Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**1933 N Sedgwick, LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.8.a

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ 42,570 | $ 42,570 | [a] |
| 2 | Due from Affiliate | 206,467 | 206,467 | [a] |
| 3 | Real Estate Tax Escrow | 11,610 | 11,610 | [a] |
| 4 | **Total Current Assets** | **260,647** | **260,647** | |
| 5 | Land | 172,523 | n/a | [b] |
| 6 | Buildings and Other Depreciable Assets | 229,607 | 1,090,000 | [b] |
| 7 | Less: Accumulated Depreciation | (219,081) | n/a | n/a |
| 8 | **Net Property and Equipment** | **183,049** | **1,090,000** | |
| 9 | Intangible Assets, Net | 2 | 0 | [c] |
| 10 | **Total Other Assets** | **2** | **0** | |
| 11 | **Total Assets** | **$ 443,698** | **$ 1,350,647** | |
| 12 | Long-Term Debt | 118,715 | 118,715 | [a] |
| 13 | **Total Liabilities** | **118,715** | **118,715** | |
| 14 | **Total Members' Equity** | **$ 324,983** | **$ 1,231,932** | [d] |
| 15 | **Total Value of Equity (Rounded)** | | **$ 1,232,000** | |
| 16 | **Pro Rata Value of Maeve's Interest** | 50.0% | **$ 616,000** | |

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The Fair Market Value of the asset was determined based on a property appraisal prepared by Arthur J. Murphy III, JD and Hugh T. Edfors MAI, JD as of September 2, 2021.

[c] The Fair Market Value of this asset is determined to be zero in the context of a hypothetical sale of the company to an unrelated third party.

[d] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

# C.  Adjusted Book Value Method – Maeve Series Investments ◆ STOUT

MAEVE, LLC | 45

**3114 N Southport, LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.9.a

*In U.S. Dollars*

| | | Book Value as of 12/31/2016 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $    3,644 | $    1,703 | [a] |
| 2 | Due from Title Company | 91,672 | 91,672 | [b] |
| 3 | **Total Current Assets** | 95,316 | 93,375 | |
| 4 | Buildings and Other Depreciable Assets | 852,353 | 2,010,000 | [c] |
| 5 | Land | 286,472 | n/a | [c] |
| 6 | Less: Accumulated Depreciation | (10,332) | n/a | n/a |
| 7 | **Net Property and Equipment** | 1,128,493 | 2,010,000 | |
| 8 | Tax Escrow | 3,506 | 3,506 | [b] |
| 9 | **Total Other Assets** | 3,506 | 3,506 | |
| 10 | **Total Assets** | $ 1,227,315 | $ 2,106,881 | |
| 11 | Due to Affiliate | $  282,537 | $  282,537 | [b] |
| 12 | **Total Current Liabilities** | 282,537 | 282,537 | |
| 13 | Long-Term Debt | 889,252 | 884,858 | [d] |
| 14 | **Total Long-Term Liabilities** | 889,252 | 884,858 | |
| 15 | **Total Liabilities** | 1,171,789 | 1,167,395 | |
| 16 | **Total Stockholders' Equity** | $    55,526 | $  939,486 | [e] |
| 17 | **Total Value of Equity (Rounded)** | | $  939,000 | |
| 18 | **Pro Rata Value of Maeve's Interest** | 50.0% | $  469,500 | |

Refer to the last page of this exhibit for a description of the footnotes.

CONFIDENTIAL

**EXHIBIT B, Page 103 of 237**

**C.   Adjusted Book Value Method – Maeve Series Investments** ◀STOUT

MAEVE, LLC | 46

**3114 N Southport, LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                    **Exhibit C.9.a**

[a] The value of this asset is determined based on an account statement for CIBC checking account #4897 as of August 31, 2020.

[b] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2016 federal tax return.

[c] The Fair Market Value of the asset was determined based on a property appraisal prepared by Arthur J. Murphy III, JD and Hugh T. Edfors MAI, JD as of September 2, 2021.

[d] The Fair Market Value of this liability was calculated by grossing up the pro rata recourse debt allocated to Maeve, LLC - Series T on its 2020 Schedule K-1.

[e] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

CONFIDENTIAL

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

## 55th and Kedzie Investments, LLC
## December 31, 2020
## Adjusted Book Value Method

Exhibit C.10.a

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ 89,681 | $ 89,681 | [a] |
| 2 | **Total Current Assets** | **89,681** | **89,681** | |
| 3 | Investment in 5501 S Kedzie | 82,171 | 78,000 | [b] |
| 4 | **Total Other Assets** | **82,171** | **78,000** | |
| 5 | **Total Assets** | **$ 171,852** | **$ 167,681** | |
| 6 | Due to SPDC | $ 2,000 | $ 2,000 | [a] |
| 7 | **Total Liabilities** | **2,000** | **2,000** | |
| 8 | **Total Members' Equity** | **$ 169,852** | **$ 165,681** | [c] |
| 9 | **Total Value of Equity (Rounded)** | | **$ 166,000** | |
| 10 | **Pro Rata Value of Maeve's 502 Class A Interests** | 40.2% | **66,669** | [d] |
| 11 | **Pro Rata Value of Marty's 5 Class A Interests** | 0.4% | **673** | [d] |

Refer to the last page of this exhibit for a description of the footnotes.

**EXHIBIT B, Page 105 of 237**

# C.   Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**55th and Kedzie Investments, LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                    **Exhibit C.10.a**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The value of this investment was adjusted to the Fair Market Value as indicated in Exhibit C.10.b.

[c] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[d] Insufficient information was provided in order to calculate the distribution of the company's proceeds in accordance with section 8.4 of the Operating Agreement dated March 28, 2013. Based on our review of the federal tax returns and various other documents produced in this matter, it appears that historical distributions were insufficient to trigger the Promote Distributions. As such, for purposes of our analysis, we have assumed that all future proceeds will be distributed in accordance with the percentage of each member's capital contributions.

CONFIDENTIAL

**EXHIBIT B, Page 106 of 237**

# C. Adjusted Book Value Method – Maeve Series Investments ◤STOUT

**MAEVE, LLC | 49**

**5501 S Kedzie LLC**
**December 31, 2020**
**Adjusted Book Value Method**                                      **Exhibit C.10.b**

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 1  Cash and Cash Equivalents | $ 51,899 | $ 51,899 | [a] |
| 2  **Total Current Assets** | **51,899** | **51,899** | |
| 3  City Deposit | 5,000 | 5,000 | [a] |
| 4  Escrow | 185,000 | 185,000 | [a] |
| 5  Intangible Assets | 21,683 | 0 | [b] |
| 6  Less: Amortization | (11,206) | n/a | n/a |
| 7  **Total Other Assets** | **200,477** | **190,000** | |
| 8  **Total Assets** | **$ 252,376** | **$ 241,899** | |
| 9  Accounts Payable | $ 1,600 | $ 1,600 | [a] |
| 10 **Total Liabilities** | **1,600** | **1,600** | |
| 11 **Total Members' Equity** | **$ 250,776** | **$ 240,299** | [c] |
| 12 **Total Value of Equity (Rounded)** | | **$ 240,000** | |
| 13 **Pro Rata Value of Kedzie Investments Member** | 32.5% | **$ 78,000** | [d] |

Refer to the last page of this exhibit for a description of the footnotes.

**EXHIBIT B, Page 107 of 237**

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**5501 S Kedzie LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                                    **Exhibit C.10.b**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The Fair Market Value of this asset is determined to be zero in the context of a hypothetical sale of the company to an unrelated third party.

[c] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[d] Based on our review of the tax returns provided and Operating Agreement dated April 8, 2013 as amended October 2, 2014, it appears that the remaining distributable cash is 100% allocated in accordance with the members' percentage interests as historical distributions were insufficient to trigger the Promote Distributions.

CONFIDENTIAL

MAEVE, LLC | 50

**EXHIBIT B, Page 108 of 237**

# C.   Adjusted Book Value Method – Maeve Series Investments ◆ STOUT

MAEVE, LLC | 51

**1611 N Hermitage LLC**
**December 31, 2020**
**Adjusted Book Value Method**                                        **Exhibit C.11.a**

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 1  Cash and Cash Equivalents | $  49,456 | $  49,456 | [a] |
| 2  Total Current Assets | 49,456 | 49,456 | |
| 3  Total Assets | $  49,456 | $  49,456 | |
| 4  Total Liabilities | 0 | 0 | |
| 5  Total Members' Equity | $  49,456 | $  49,456 | [b] |
| 6  Total Value of Equity (Rounded) | | $  49,000 | |
| 7  Pro Rata Value of Maeve's 340 Class A Interests and 400 Class B Interests | 77.4% | $  37,930 | [c] |

Refer to the last page of this exhibit for a description of the footnotes.

CONFIDENTIAL

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**1611 N Hermitage LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                              **Exhibit C.11.a**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[c] Insufficient information was provided in order to calculate the distribution of proceeds in accordance with section 8.4 of the First Amended and Restated Limited Liability Company Agreement dated August 20, 2013. However, based on our review of the federal tax returns, general ledger and various other documents produced in this matter, it appears that historical distributions were sufficient to trigger the Promote Distributions. As such we have assumed that all future proceeds will be distributed in accordance with section 8.4(e) of the Operating Agreement (i.e. 50% to the Class A Member and 50% to Class A and Class B Members in accordance with Equity Percentages). This is consistent with member distributions made in 2018 as represented in the Company's general ledger dated September 14, 2020.

CONFIDENTIAL

# C. Adjusted Book Value Method – Maeve Series Investments ◆ STOUT

**SP/RPA 1325 Holdings, LLC**
**December 31, 2020**
**Adjusted Book Value Method**

**Exhibit C.12.a**

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 1 Cash and Cash Equivalents | $ 2,278,168 | $ 2,278,168 | [a] |
| 2 Accounts Receivable, Net | 17,653 | 17,653 | [a] |
| 3 Prepaid Insurance | 18,319 | 18,319 | [a] |
| 4 Prepaid Other | 153 | 153 | [a] |
| 5 **Total Current Assets** | 2,314,293 | 2,314,293 | |
| | | | |
| 6 Buildings and Other Depreciable Assets | 19,012,450 | 21,100,000 | [b] |
| 7 Land | 4,905,280 | n/a | [b] |
| 8 Less: Accumulated Depreciation | 0 | n/a | n/a |
| 9 **Net Property and Equipment** | 23,917,730 | 21,100,000 | |
| | | | |
| 10 Unrealized Appreciation | 3,620,377 | n/a | [b] |
| 11 **Total Other Assets** | 3,620,377 | 0 | |
| | | | |
| 12 **Total Assets** | $ 29,852,400 | $ 23,414,293 | |

Refer to the last page of this exhibit for a description of the footnotes.

**EXHIBIT B, Page 111 of 237**

# C.   Adjusted Book Value Method – Maeve Series Investments    ◆STOUT

**SP/RPA 1325 Holdings, LLC**
**December 31, 2020**
**Adjusted Book Value Method**                                                                 **Exhibit C.12.a**

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 13  Accrued Expenses | $  2,246,729 | $  2,246,729 | [a] |
| 14  Prepaid Rent | 27,904 | 27,904 | [a] |
| 15  Other Deposits | 450 | 450 | [a] |
| 16  **Total Current Liabilities** | 2,275,083 | 2,275,083 | |
| | | | |
| 17  Long-Term Debt | 7,664,042 | 7,664,042 | [a] |
| 18  Other Liabilities | 136,491 | 136,491 | [a] |
| 19  **Total Long-Term Liabilities** | 7,800,533 | 7,800,533 | |
| | | | |
| 20  **Total Liabilities** | 10,075,616 | 10,075,616 | |
| | | | |
| 21  **Total Members' Equity** | $ 19,776,784 | $ 13,338,677 | [c] |
| | | | |
| 22  **Total Value of Equity (Rounded)** | | $ 13,339,000 | |
| | | | |
| 23  Less: Operating Return Payable to RPA 1325 Investor, LLC | | 6,477,406 | [d] |
| 24  Less: Cash-Based Operating Return Payable to 1325 N Wells, LLC | | 274,944 | [d] |
| 25  **Remaining Distributable Proceeds** | | 6,586,650 | |
| | | | |
| 26  Return of Capital Allocated to RPA 1325 Investor, LLC | 97.1% | 6,395,575 | [d] |
| 27  Return of Capital Allocated to 1325 N Wells, LLC | 2.9% | 191,075 | [d] |
| | | | |
| 28  **Pro Rata Value of 1325 N Wells, LLC's Interest** | | $  466,019 | [e] |

Refer to the last page of this exhibit for a description of the footnotes.

MAEVE, LLC | 54

**EXHIBIT B, Page 112 of 237**

# C.  Adjusted Book Value Method – Maeve Series Investments STOUT

**SP/RPA 1325 Holdings, LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                                      **Exhibit C.12.a**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return. Note that the assets of the company's wholly owned subsidiary, SP/RPA 1325 Apartments, LLC, appear to have been consolidated on the company's tax returns.

[b] The Fair Market Value of the asset was determined based on a separate appraisal prepared by Stout as of December 31, 2020.

[c] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[d] Insufficient information was provided in order to calculate the distribution of proceeds in accordance with section 9.2 of the Limited Liability Company Agreement dated November 9, 2015. However, based on our review of the federal tax returns, general ledger and various other documents produced in this matter, it appears that no distributions have been made as of the Valuation Date. Given the limited information made available to us to determine the timing and type of contributions historically made to the company by its members, we have made the following assumptions for purposes of our analysis to determine the current capitalization of the company: (1) in years where tax returns were provided, contributions were assumed to be equal to the figure reported on each member's Schedule K-1; in 2015 and 2018, we relied on the figures reported in the company's general ledger; (2) no contributions from the company's members were considered a "Priority Contribution" pursuant to the definition in the company's operating agreement; (3) all contributions in a given year were assumed to have occurred on June 30th of that year with the exception of 2015, in which case we assumed contributions were made on the date of the company's original operating agreement (November 9, 2015); (4) per the terms of the Development Services Agreement dated November 9, 2015, the project was considered "Substantially Complete" on March 29, 2019, which corresponds with the onset of "Fair Rental Days" reported on the company's 2019 tax return.

[e] Equal to the sum of Lines 24 and 27.

**EXHIBIT B, Page 113 of 237**

# C.  Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**301 W North Avenue, LP / 301 W North Avenue, LLC /**
**301 W North Avenue Lots, LLC**
**December 31, 2020**                                                    **Exhibit C.13.a**
**Adjusted Book Value Method**

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 [a] | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---:|---:|:---:|
| 1 | Cash and Cash Equivalents | $  97,682 | $   465,014 | [b] |
| 2 | Due from Title Company | 27,182 | 40,250 | [b] |
| 3 | Due from Management Company | 913 | 209,083 | [b] |
| 4 | Escrows | 271,155 | 732,734 | [b] [c] |
| 5 | Due from Alpha Construction | 16,013 | 16,013 | [b] |
| 6 | **Total Current Assets** | **412,945** | **1,463,094** | |
| 7 | Land | 9,643,615 | 24,700,000 | [d] |
| 8 | Buildings and Other Depreciable Assets | 10,429,766 | n/a | [d] |
| 9 | Less:  Accumulated Depreciation | (55,441) | n/a | n/a |
| 10 | **Net Property and Equipment** | **20,017,940** | **24,700,000** | |
| 11 | Net Intangible Assets | 18,402 | 0 | [e] |
| 12 | Construction in Progress | 9,542,912 | n/a | [d] |
| 13 | **Total Other Assets** | **9,561,314** | **0** | |
| 14 | **Total Assets** | **$ 29,992,199** | **$ 26,163,094** | |

Refer to the last page of this exhibit for a description of the footnotes.

MAEVE, LLC | 56

**EXHIBIT B, Page 114 of 237**

# C.  Adjusted Book Value Method – Maeve Series Investments ◆STOUT

## 301 W North Avenue, LP / 301 W North Avenue, LLC / 301 W North Avenue Lots, LLC
### December 31, 2020
### Adjusted Book Value Method

Exhibit C.13.a

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 [a] | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 15 | Real Estate Taxes Payable | 75,000 | 75,000 | [b] |
| 16 | Impress Liability | 10,000 | 10,000 | [b] |
| 17 | 13100 - Loan Deposit | 0 | 50,000 | [b] |
| 18 | **Total Current Liabilities** | **85,000** | **135,000** | |
| | | | | |
| 19 | Long-Term Debt | 19,971,074 | 27,360,000 | [b] [f] |
| 20 | **Total Long-Term Liabilities** | **19,971,074** | **27,360,000** | |
| | | | | |
| 21 | **Total Liabilities** | **20,056,074** | **27,495,000** | |
| | | | | |
| 22 | **Total Members' Equity** | **$  9,936,125** | **$  (1,331,906)** | [g] |
| | | | | |
| 23 | **Total Value of Equity (Rounded)** | | **$  (1,332,000)** | |
| | | | | |
| 24 | **Pro Rata Value of 301 W North, LLC's Interest** | 100.0% | **$  (1,332,000)** | [h] |

Refer to the last page of this exhibit for a description of the footnotes.

**EXHIBIT B, Page 115 of 237**

# C.   Adjusted Book Value Method – Maeve Series Investments   ◆STOUT

**301 W North Avenue, LP / 301 W North Avenue, LLC /**
**301 W North Avenue Lots, LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                    **Exhibit C.13.a**

[a] The figures in the column represent the book value of this asset (or liability) as reported in 301 W North Avenue, LP's 2020 federal tax return.

[b] The value of this asset (or liability) is determined to be equal to book value as represented in 301 W North Avenue, LP's general ledger as of the Valuation Date.

[c] The company's closing statement dated September 23, 2020 for a loan from BDS III Mortgage Capital J LLC indicate that $816,983.40 of liens and other costs were to be paid outside of closing to Stewart Title Commercial Services. Accordingly, we have reduced the Fair Market Value of the company's escrow funds by this amount.

[d] The Fair Market Value of the asset was determined based on a separate appraisal prepared by Stout as of December 31, 2020.

[e] The Fair Market Value of this asset is determined to be zero in the context of a hypothetical sale of the company to an unrelated third party.

[f] Based on the company's general ledgers as of the Valuation Date and various other documents produced in this matter, the company's long-term debt as of the Valuation Date consists of a $26.0 million promissory note payable to BDS III Mortgage Capital J LLC and a $1.36 million loan payable to Pan American Bank.

[g] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[h] We have assumed that Maeve Series FF and Series GG hold 100% of the equity of the entity. Refer to Exhibit A.1.

CONFIDENTIAL

**EXHIBIT B, Page 116 of 237**

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

MAEVE, LLC | 59

## Erie and LaSalle, LLC / LaSalle & Erie, LLC
### December 31, 2020
### Adjusted Book Value Method

Exhibit C.14.a

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| **1 Total Current Assets** | $ 0 | $ 0 | |
| 2 Investment in Erie & LaSalle Ventures | 6,476,050 | 6,475,352 | [a] |
| **3 Total Other Assets** | **6,476,050** | **6,475,352** | |
| **4 Total Assets** | **$ 6,476,050** | **$ 6,475,352** | |
| 5 Due to Affiliate | $ 2,982,633 | $ 2,982,633 | [b] |
| **6 Total Current Liabilities** | **2,982,633** | **2,982,633** | |
| 7 Long-Term Debt | 2,500,000 | 2,500,000 | [b] |
| 8 Accrued PIK Interest | 0 | 388,500 | [c] |
| **9 Total Long-Term Liabilities** | **2,500,000** | **2,888,500** | |
| **10 Total Liabilities** | **5,482,633** | **5,871,133** | |
| **11 Total Members' Equity** | **$ 993,417** | **$ 604,219** | [d] |
| **12 Total Value of Equity (Rounded)** | | **$ 604,000** | |

[a] The value of this investment was adjusted to the Fair Market Value indicated in Exhibit C.14.b.

[b] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[c] We calculated the accrued PIK interest expense payable as of the Valuation Date pursuant to the terms of the promissory note agreement dated July 2, 2019.

[d] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

CONFIDENTIAL

**EXHIBIT B, Page 117 of 237**

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

MAEVE, LLC | 60

## Erie LaSalle Venture, LLC
### December 31, 2020
### Adjusted Book Value Method

Exhibit C.14.b

*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $  542,066 | $  542,066 | [a] |
| 2 | Due from Affiliate | 51,945 | 51,945 | [a] |
| 3 | Due from Title Co. | 140,103 | 140,103 | [a] |
| 4 | Payment Reserve | 90,000 | 90,000 | [a] |
| 5 | **Total Current Assets** | **824,114** | **824,114** | |
| | | | | |
| 6 | Real Estate | 19,029,604 | 19,029,604 | [a],[b] |
| 7 | Real Estate Basis Adjustment | 2,500,000 | 2,500,000 | [a],[b] |
| 8 | Real Estate Taxes | 6,820 | 6,820 | [a],[b] |
| 9 | Land | 9,602,791 | 9,602,791 | [a],[b] |
| 10 | **Net Property and Equipment** | **31,139,215** | **31,139,215** | |
| | | | | |
| 11 | Security Deposits | 6,500 | 6,500 | [a] |
| 12 | **Total Other Assets** | **6,500** | **6,500** | |
| | | | | |
| 13 | **Total Assets** | **$ 31,969,829** | **$ 31,969,829** | |

Refer to the last page of this exhibit for a description of the footnotes.

CONFIDENTIAL

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

MAEVE, LLC | 61

**Erie LaSalle Venture, LLC**
**December 31, 2020**
**Adjusted Book Value Method**

Exhibit C.14.b

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 14 Buyer Deposits & Earnest Money | $ 525,588 | $ 525,588 | [a] |
| 15 Due to Affiliate | 70,000 | 70,000 | [a] |
| 16 **Total Current Liabilities** | **595,588** | **595,588** | |
| 17 Long-Term Debt | 24,898,191 | 24,898,191 | [a] |
| 18 **Total Long-Term Liabilities** | **24,898,191** | **24,898,191** | |
| 19 **Total Liabilities** | **25,493,779** | **25,493,779** | |
| 20 **Total Members' Equity** | **$ 6,476,050** | **$ 6,476,050** | [c] |
| 21 **Total Value of Equity (Rounded)** | | **$ 6,476,000** | |
| 22 Erie and LaSalle, LLC's Interest | 99.99% | **$ 6,475,352** | [d] |
| 23 Pro Rata Value of Marty's Interest | 0.01% | **$ 648** | [d] |

Refer to the last page of this exhibit for a description of the footnotes.

# C.   Adjusted Book Value Method – Maeve Series Investments ◆STOUT

MAEVE, LLC | 62

**Erie LaSalle Venture, LLC**
**December 31, 2020**
**Explanation of Fair Market Value**                                    **Exhibit C.14.b**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] Insufficient information was provided in order for Stout to appraise the company's real property holdings as of the Valuation Date.

[c] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

[d] Refer to Exhibit A.1 for additional information related to the ownership of this company.

CONFIDENTIAL

**EXHIBIT B, Page 120 of 237**

# C. Adjusted Book Value Method – Maeve Series Investments ◆STOUT

**Lake Lathrop Partners LLC**
**December 31, 2020**
**Adjusted Book Value Method**                                               **Exhibit C.15.a**

*In U.S. Dollars*

|   |                                   | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|-----------------------------------|----------:|----------:|:----:|
| 1 | Cash and Cash Equivalents         | $ 257,842 | $ 257,842 | [a]  |
| 2 | Due from Title Co                 |       142 |       142 | [a]  |
| 3 | Security Deposits                 |     2,625 |     2,625 | [a]  |
| 4 | Village of River Forest           |     7,500 |     7,500 | [a]  |
| 5 | **Total Current Assets**          | **268,109** | **268,109** |   |
|   |                                   |           |           |      |
| 6 | Work in Progress                  | 1,202,461 |       n/a | [b]  |
| 7 | Land                              |         0 | 3,508,668 | [b]  |
| 8 | Showroom                          |    18,095 |       n/a | [b]  |
| 9 | Less: Accumulated Depreciation    |   (6,205) |       n/a | n/a  |
| 10 | **Net Property and Equipment**   | **1,214,351** | **3,508,668** |  |
|   |                                   |           |           |      |
| 11 | **Total Assets**                 | **$ 1,482,460** | **$ 3,776,777** |   |

Refer to the last page of this exhibit for a description of the footnotes.

MAEVE, LLC | 63

CONFIDENTIAL

**EXHIBIT B, Page 121 of 237**

# C.  Adjusted Book Value Method – Maeve Series Investments ◆STOUT

MAEVE, LLC | 64

**Lake Lathrop Partners LLC**
**December 31, 2020**
**Adjusted Book Value Method**                                    **Exhibit C.15.a**

*In U.S. Dollars*

| | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|
| 12 Buyer Earnest Money | $  248,970 | $  248,970 | [a] |
| 13 Due to Maeve | 24,750 | 24,750 | [a] |
| 14 Due to River Forest | 1,600 | 1,600 | [a] |
| 15 Due to Sedgwick Investments | 12,181 | 12,181 | [a] |
| 16 Payroll Liabilities | 0 | 0 | [a] |
| 17 Tenant Deposits | 8,100 | 8,100 | [a] |
| 18 **Total Current Liabilities** | 295,601 | 295,601 | |
| | | | |
| 19 Long-Term Debt | 1,126,087 | 1,126,087 | [a] |
| 20 **Total Long-Term Liabilities** | 1,126,087 | 1,126,087 | |
| | | | |
| 21 **Total Liabilities** | 1,421,688 | 1,421,688 | |
| | | | |
| 22 **Total Members' Equity** | $  60,772 | $  2,355,089 | [c] |
| | | | |
| 23 **Total Value of Equity (Rounded)** | | $  2,355,000 | |
| | | | |
| 24 **Fair Market Value of Maeve's Interest** | 100.0% | $  2,355,000 | |

Refer to the last page of this exhibit for a description of the footnotes.

CONFIDENTIAL

**EXHIBIT B, Page 122 of 237**

# C. Adjusted Book Value Method – Maeve Series Investments **◆STOUT**

**Lake Lathrop Partners LLC**
**December 31, 2020**
**Explanation of Fair Market Value**      **Exhibit C.15.a**

[a] The value of this asset (or liability) is determined to be equal to book value as represented in the company's 2020 federal tax return.

[b] Based on an appraisal report of 7601-7621 Lake Street, River Forest, Illinois, as prepared by JLL Valuation & Advisory Services, LLC, as of April 20, 2020, dated May 1, 2020. We have updated the analysis to reflect additional environmental remediation work done as of the Valuation Date as represented in a sworn owner's statement dated December 31, 2020.

[c] The resulting value of members' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

CONFIDENTIAL

**EXHIBIT B, Page 123 of 237**



# D. Tracing Analysis

Exhibit D.1

## Outflows from The PrivateBank #6361
## Maeve Series A

| | Transfer to: | Account Holder | Notes | Date | Amount | | Type |
|---|---|---|---|---|---|---|---|
| 1 | CIBC #7622 | Maeve | | 2/13/2019 | $ | 10,000 | Wire |
| 2 | CIBC #7622 | Maeve | | 3/16/2020 | | 90,000 | Wire |
| 3 | Jefferies #7190 | Maeve Series A | | 5/7/2020 | | 665,364 | Securities |
| 4 | Jefferies #7190 | Maeve Series A | | 5/7/2020 | | 10,467 | Cash |
| 5 | Jefferies #7190 | Maeve Series A | | 5/13/2020 | | 36 | Cash |
| 6 | **Total** | | | | **$** | **775,867** | |

Source: account statements for The PrivateBank #6361 from January 2018 through May 2020 and Jefferies #7190 for September 2020. Note that we were unable to identify whether transfers from this account occurred in December 2018 as a statement for that month was not provided.

MAEVE, LLC | 66

CONFIDENTIAL

# D. Tracing Analysis

## Outflows from (Inflows to) Jefferies #6356
## Maeve Series A

**Exhibit D.2**

| # | Transfer to: | Account Holder | Notes | Date | Amount | Type |
|---|---|---|---|---|---|---|
| 1 | Unknown | Unknown | [a] | Jan 2018 | $ 6,814 | Unknown |
| 2 | Kavar | Third Party | | 4/16/2018 | 4,788 | Check |
| 3 | Kavar | Third Party | | 7/6/2018 | 6,618 | Check |
| 4 | Kavar | Third Party | | 10/11/2018 | 6,976 | Check |
| 5 | Kavar | Third Party | | 1/8/2019 | 6,177 | Check |
| 6 | Old Second National #0454 | 1611 N Hermitage | | 1/31/2019 | (726,125) | Wire |
| 7 | CIBC #6340 | Sedgwick Payroll | | 2/15/2019 | 110,000 | Wire |
| 8 | CIBC #7622 | Maeve | | 3/5/2019 | 85,000 | Wire |
| 9 | Pan American | Unknown | [b] | 3/11/2019 | 15,000 | Wire |
| 10 | CIBC #6340 | Sedgwick Payroll | | 3/15/2019 | 155,000 | Wire |
| 11 | First Midwest #3744 | 301 W North Avenue LP, Kass Management | | 3/15/2019 | 8,125 | Wire |
| 12 | Old Second National #2087 | Erie LaSalle Venture | | 3/20/2019 | 42,000 | Wire |
| 13 | CIBC #7622 | Maeve | | 3/28/2019 | 200,000 | Wire |
| 14 | CIBC #7622 | Maeve | | 4/12/2019 | 6,465 | Wire |
| 15 | Kavar | Third Party | | 4/17/2019 | 6,980 | Check |
| 16 | CIBC #7622 | Maeve | | 4/17/2019 | 50,000 | Wire |
| 17 | Jefferies #9973 | Maeve | | 5/23/2019 | (7,436) | Wire |
| 18 | Bank United | Unknown | [c] | 5/23/2019 | 26,126 | Wire |
| 19 | First Midwest #3744 | 301 W North Avenue LP, Kass Management | | 6/20/2019 | 9,362 | Wire |
| 20 | Kavar | Third Party | | 7/5/2019 | 6,925 | Check |
| 21 | CIBC #6340 | Sedgwick Payroll | | 9/3/2019 | 125,000 | Wire |
| 22 | First Midwest #3744 | 301 W North Avenue LP, Kass Management | | 9/24/2019 | 8,686 | Wire |
| 23 | CIBC #6340 | Sedgwick Payroll | | 9/30/2019 | 26,000 | Wire |
| 24 | CIBC #6340 | Sedgwick Payroll | | 10/2/2019 | 60,000 | Wire |

Refer to the last page of this exhibit for a description of the footnotes.

MAEVE, LLC | 67

STOUT

# D. Tracing Analysis

◤ STOUT

## Outflows from (Inflows to) Jefferies #6356
## Maeve Series A

Exhibit D.2

| | Transfer to: | Account Holder | Notes | Date | | Amount | Type |
|---|---|---|---|---|---|---|---|
| 25 | Kavar | Third Party | | 10/4/2019 | $ | 6,748 | Check |
| 26 | CIBC #6340 | Sedgwick Payroll | | 10/15/2019 | | 78,000 | Wire |
| 27 | CIBC #6340 | Sedgwick Payroll | | 10/17/2019 | | 82,000 | Wire |
| 28 | CIBC #6340 | Sedgwick Payroll | | 11/8/2019 | | 30,000 | Wire |
| 29 | CIBC #6340 | Sedgwick Payroll | | 12/2/2019 | | 170,000 | Wire |
| 30 | CIBC #6340 | Sedgwick Payroll | | 12/26/2019 | | 38,000 | Wire |
| 31 | CIBC #6340 | Sedgwick Payroll | | 12/27/2019 | | 1,000 | Wire |
| 32 | Kavar | Third Party | | 1/7/2020 | | 6,437 | Check |
| 33 | CIBC #6340 | Sedgwick Payroll | | 1/15/2020 | | 50,000 | Wire |
| 34 | CIBC #6340 | Sedgwick Payroll | | 3/5/2020 | | 70,000 | Wire |
| 35 | CIBC #6340 | Sedgwick Payroll | | 4/6/2020 | | 100,000 | Wire |
| 36 | Kavar | Third Party | | 4/7/2020 | | 5,431 | Check |
| 37 | Unknown | Unknown | [d] | 4/21/2020 | | 247,055 | Wire |
| 38 | CIBC #6340 | Sedgwick Payroll | | 6/12/2020 | | 125,000 | Wire |
| 39 | Unknown | Unknown | [e] | 6/16/2020 | | 500,000 | Wire |
| 40 | Kavar | Third Party | | 7/31/2020 | | 4,627 | Check |
| 41 | Kavar | Third Party | | 10/15/2020 | | 4,844 | Check |
| 42 | CIBC #6340 | Sedgwick Payroll | | 12/30/2020 | | 195,000 | Wire |
| 43 | **Total** | | | | | **$ 1,952,622** | |

Source: monthly account statements for Jefferies #6356 and various account statements for CIBC #6340
and #7622, First Midwest #3744, and Old Second National #2087 and #0454.

[a] We were not provided with an account statement for this period and therefore could not determine the
recipient of this withdrawal. However, the year-to-date figures reported in the February account statement
indicate that an outflow in this amount occurred in January 2018 and the timing and amount of the outflow is
consistent with it being a quarterly check paid to Kavar Capital Partners.

[b] The description of this wire transfer in the account statement is "Pan American."

[c] The description of this wire transfer in the account statement is "Bank United, NA."

[d] The description of this wire transfer in the account statement is "CIBC Bank USA."

[e] The description of this wire transfer in the account statement is "JP Morgan Chase Bank."

**EXHIBIT B, Page 126 of 237**

**STOUT**

# D.   Tracing Analysis

## Outflows from Jefferies #9973
### Maeve Series A

Exhibit D.3

| | Transfer to: | Account Holder | Notes | Date | Amount | Type |
|---|---|---|---|---|---|---|
| 1 | Jeffries #6356 | Maeve Series A | | 5/23/2019 | 7,436 | Wire |
| 2 | Total | | | | $ 7,436 | |

Source: account statements for Jefferies #9973 and #6356.

MAEVE, LLC | 69

CONFIDENTIAL

**EXHIBIT B, Page 127 of 237**

# D. Tracing Analysis

**≜STOUT**

**Inflows to Jefferies #7190**
**Maeve Series A**

Exhibit D.4

| | Transfer from: | Account Holder | Notes | Date | Amount | Type |
|---|---|---|---|---|---|---|
| 1 | The PrivateBank #6361 | Maeve Series A | | 5/7/2020 | (665,364) | Securities |
| 2 | The PrivateBank #6361 | Maeve Series A | | 5/7/2020 | (10,467) | Cash |
| 3 | The PrivateBank #6361 | Maeve Series A | | 5/13/2020 | (36) | Cash |
| 4 | **Total** | | | | **$ (675,867)** | |

Source: account statements for Jefferies #9973 and #6356.

MAEVE, LLC | 70

# D. Tracing Analysis

**STOUT**

**Exhibit D.5**

## Outflows from (Inflows to) Jefferies #8022
## Maeve Series DD

| | Transfer to: | Account Holder | Notes | Date | Amount | Type |
|---|---|---|---|---|---|---|
| 1 | CIBC #7622 | Maeve LLC | | 4/12/2019 | $ 117,625 | Wire |
| 2 | CIBC #6340 | Sedgwick Payroll | | 9/30/2019 | 53,000 | Wire |
| 3 | CIBC #6340 | Sedgwick Payroll | | 12/26/2019 | 2,000 | Wire |
| 4 | CIBC #6340 | Sedgwick Payroll | | 12/27/2019 | 109,000 | Wire |
| 5 | CIBC #6340 | Sedgwick Payroll | [a] | 1/15/2020 | 50,000 | Wire |
| 6 | CIBC #6340 | Sedgwick Payroll | [a] | 2/14/2020 | 65,000 | Wire |
| 7 | Unknown | Unknown | [b] | 3/16/2020 | (300,000) | Wire |
| 8 | **Total** | | | | **$  96,625** | |

Source: account statements for Jefferies #8022 and CIBC #6340.
[a] The description of this wire transfer in the account statement is "CIBC Bank USA."
[b] The description of this deposit in the account statement is "Old Second National 27244."

**MAEVE, LLC | 71**

**CONFIDENTIAL**

**EXHIBIT B, Page 129 of 237**



**◆STOUT**

# E.   Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or its representatives, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon.

- We conducted an interview with Marty on January 24, 2018. We also requested a more recent interview with management of Maeve and the Maeve Series Investments. However, as of the date of this report, we had not been afforded the opportunity to conduct such an interview. We reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

- We have requested numerous documents related to Maeve and the Maeve Series Investments and their assets, liabilities, investments and other holdings, including but not limited to: prior real property appraisals and business valuations; current capitalization tables and other details related to the capitalization of the Maeve Series Investments; budgets/forecasts/projections for the Maeve Series Investments; construction budgets and construction costs completed as of the Valuation Date for certain real estate projects owned or being developed by the Maeve Series Investments; correspondence/letters to investors, limited partners, or members of the Maeve Series Investments; confidential offering memoranda, prospectuses, private placement memoranda, subscription agreements; operating, redemption, purchase, loan and other major agreements; income tax returns; financial statements; etc. While many documents responsive to these requests have been produced, a meaningful amount of this information had not been provided to us as of the date of this report. To the extent that any salient information related to Maeve or the Maeve Series Investments or their assets, liabilities, investments and other holdings is subsequently produced, we reserve the right to amend or supplement our analysis and this report accordingly.

- Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

- For the purpose of this engagement and report, we make no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our calculation of value assumes the assets and liabilities presented in the Maeve and Maeve Series Investments' December 31, 2020 balance sheets were accurate and complete as of that date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- We do not provide assurance on the achievability of the results forecasted in this report. Differences between actual and expected results may be material and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- Our calculation of value is applicable to the Subject Interest for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report (which reflects a Summary Report as defined by the American Institute of Certified Public Accountants Statement on Standards for Valuation Services), and the opinions expressed herein are provided exclusively for the use of the addressee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent. Further, the rationale for how we arrived at the opinions and conclusions expressed herein may not be understood properly without additional information contained in our internal work papers.

**EXHIBIT B, Page 130 of 237**



STOUT

MAEVE, LLC | 73

# E.  Assumptions and Limiting Conditions

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" or a "solvency opinion" regarding any contemplated present or future transaction.

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of Maeve or the Maeve Series Investments or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- We are not required to give testimony in court, or be in attendance during any hearings or depositions, unless previous arrangements have been made. We are committed to supporting the valuation report provided compensation arrangements for such additional services have been made.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and we have no obligation to update our report for such events and conditions.

- We have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The value that results from a valuation engagement is expressed as a conclusion of value.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

CONFIDENTIAL

▲STOUT

# F.   Certification

We certify that, to the best of our knowledge and belief:

■ The statements of fact contained in this report, on which the analysis, opinions, and calculations expressed herein are based, are true and correct.

■ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

■ The data used in this report was obtained from sources believed to be reliable. All facts known to us that have bearing on the values presented in this report have been considered, and no facts of importance have been intentionally omitted.

■ We have no present or prospective interest in the business that is the subject of this report, and we have no personal interest with respect to the parties involved.

■ We have no bias with respect to the business that is the subject of this report or the parties involved with this assignment.

■ Our engagement in this assignment was not contingent on developing or reporting predetermined results.

■ Our compensation for completing this assignment is fee-based and is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

■ Our analyses, opinions, and conclusions are developed, and this report is prepared, with the intent of being in conformity with the American Society of Appraisers, and the American Institute of Certified Public Accountants Statement on Standards for Valuation Services.

■ Stout Risius Ross, LLC has performed no services, as an appraiser or in any other capacity, regarding the business that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

■ In addition to the undersigned, Adam B. Moeller assisted in the research, analysis development, and report preparation for this engagement.

Brian R. Potter, CFA, CFE
Managing Director

Thomas J. Czupta, ASA, ABV
Director

**EXHIBIT B, Page 132 of 237**

# G.   Statement of Qualifications



Chicago, IL USA
**Office:** +1.312.752.3352
bpotter@stout.com

**Education**

B.S., Finance
Miami University

**Designations**

Chartered Financial Analyst (CFA)
Certified Fraud Examiner (CFE)

**Practice Areas**

Valuation Disputes
Complex Business Litigation
High-Stakes Marital Dissolution
Shareholder Disputes
Transaction Disputes

Brian Potter is a Managing Director in the Valuation Advisory group and head of the firm's Chicago office. Mr. Potter has provided valuation, litigation advisory, and forensic accounting services for numerous purposes, including marital dissolutions, shareholder disputes, estate and gift taxation, purchase price allocation, Employee Stock Ownership Plans, brokerage fraud, bankruptcy, potential transactions and intellectual property valuations. Mr. Potter has extensive experience with intellectual property and brokerage fraud litigation, having provided advisory services in several patent infringement, misappropriation of trade secret and securities fraud matters. Additionally, Mr. Potter has been involved in the appraisal of real estate for various property types, including office, industrial and retail buildings, and vacant land. Mr. Potter has provided services within the context of litigation and has been trained to offer services within various alternative dispute resolution models.

Mr. Potter has presented continuing education seminars on business valuation, understanding tax returns, occupational fraud, and computer forensics and e-discovery. He has also published several articles on valuation and other related topics. Mr. Potter was a contributing author to the chapter entitled "Valuation in Shareholder and Partner Disputes" in Business Valuation, published by the Law Journal Press.

Prior to joining Stout, Mr. Potter was a Consulting Associate with CRA International in its Intellectual Property and Finance practices in Chicago. While at Miami, Mr. Potter earned CoSIDA First Team Academic All-America honors for his academic and athletic achievements while a member of the university's varsity football team.

**Professional Memberships**

- The CFA Institute

- The CFA Society of Chicago

- Association of Certified Fraud Examiners (ACFE)

- AAML Foundation Forensic and Business Valuation Division

◆ STOUT

MAEVE, LLC | 75

CONFIDENTIAL

**STOUT**

# G.  Statement of Qualifications



Thomas J. Czupta is a Director in the Valuation Advisory group. Mr. Czupta has extensive experience providing professional valuation advisory services in the fields of taxation, litigation, and corporate transactions.

Mr. Czupta has provided business valuation and financial advisory services for numerous purposes including estate and gift taxation, marital dissolutions, business transitions, shareholder disputes, and other tax, corporate, and litigation related matters. His experience spans a diverse client base, from regional middle-market businesses to billion dollar multinational companies, as well as private equity firms, law firms, and financial institutions.

Prior to joining Stout, Mr. Czupta was a Manager with Business Valuation Group, Inc. where his valuations were used in connection with ESOP reporting compliance, litigation support, and federal gift and estate taxation.

**Professional Memberships**

- American Institute of Certified Public Accountants
- Business Valuation Association of Chicago
- Chicago Estate Planning Council
- American Society of Appraisers

Chicago, IL USA
**Office:** +1.312.763.6629
**Mobile:** +1.312.833.2509
tczupta@stout.com

**Education**

B.S., Finance & Economics
DePaul University

**Designations**

Accredited Senior Appraiser (ASA)
Accredited in Business Valuation (ABV)

**Practice Areas**

High-Stakes Marital Dissolution
Valuation Disputes
Transaction Disputes
Trust & Estate

**CONFIDENTIAL**

STOUT

MARRIAGE OF PARIS

# Appendix II
## Alpha Carpentry, LLC Report

CONFIDENTIAL

**EXHIBIT B, Page 135 of 237**



# Alpha Carpentry, LLC

Valuation of 99.0% and 1.0% Membership Interests
as of December 31, 2020

Issued: December 13, 2021

CONFIDENTIAL



**STOUT**

# Contact Information

For more information, please contact one of the following members of the engagement team:

**Brian R. Potter, CFA, CFE**
Managing Director
+1.312.752.3352
bpotter@stout.com

**Christopher J. Carlton**
Associate
+1.312.752.3324
ccarlton@stout.com

**Thomas J. Czupta, ASA, ABV**
Director
+1.312.763.6629
tczupta@stout.com

**Adam B. Moeller**
Associate
+1.312.237.4850
amoeller@stout.com

## STOUT'S SERVICES

**Investment Banking**
Advising buyers and sellers on mergers and acquisitions, private capital raising, and other corporate financial transactions.

**Valuation Advisory**
Providing valuations of business enterprises, complex securities, intellectual property, real estate, and personal property.

**Transaction Advisory**
Helping clients navigate the transaction process and provide transaction opinions and due diligence services.

**Disputes, Compliance, & Investigations**
Providing expert testimony and consulting, as well as investigative and compliance services for financial-related matters.

ALPHA CARPENTRY, LLC | 2

CONFIDENTIAL

**EXHIBIT B, Page 137 of 237**

# Executive Summary

December 13, 2021

Donald J. Angelini, Esq.
Carly E. Kenny, Esq.
Angelini Ori + Abate Law
155 North Michigan Avenue
Suite 400
Chicago, Illinois 60601

Dear Mr. Angelini and Ms. Kenny:

Stout Risius Ross, LLC ("Stout") has been engaged to determine the Fair Market Values of a 99.0% membership interest and a 1.0% membership interest in Alpha Carpentry, LLC ("Alpha Carpentry" or the "Company"), on a marketable, controlling-interest basis (the "Subject Interests"), as of December 31, 2020 (the "Valuation Date"). We understand the results of our analysis will be used for marital-dissolution purposes.

## Company Synopsis

Founded in 2014, Alpha Carpentry is a privately held company that operates in the construction industry. The Company is managed by MK Manager Corp. Maeve, LLC – Series F holds a 99.0% membership interest in Alpha Carpentry and Frank Martin Paris, Jr. ("Marty") holds the remaining 1.0% membership interest. Alpha Carpentry is organized as a limited liability company incorporated in Delaware.

## Definition of Value

For purposes of our valuation, the term "Fair Market Value" is defined as the price at which property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.[1]

The term "property" reflects the combined tangible and intangible assets of a company, as components of a going concern, and gives consideration to all known liabilities. The terms "willing buyer" and "willing seller" refer to hypothetical parties rather than any particular buyer or seller. It is important to note that the specific incentives or attributes of particular buyers and sellers may not be the same as the hypothetical buyer and seller from which Fair Market Value is determined.

## Premise of Value

When estimating the Fair Market Value of a controlling interest, we typically consider whether to analyze the subject business enterprise on a going-concern or liquidation basis. As economic theory holds that a controlling interest holder will seek to maximize the value of his or her interest, the determination of whether to use a going-concern or liquidation premise of value may depend on which basis provides a higher indication of value.

We conducted our analysis of the Company under a going-concern premise, meaning that the underlying assets of the Company are presumed, in the absence of a qualified appraisal of such assets, to attain their highest values as integral components of a business entity in continued operation and that liquidation of said assets would likely diminish the value of the whole to the members and creditors of the Company.

---

[1] Treasury Regs. §20.2031-1(b) and §25.2512-1.

**EXHIBIT B, Page 138 of 237**

STOUT

# Executive Summary

## Factors Considered

Our analysis considered the valuation guidelines referenced in Revenue Ruling 59-60, 1959-1 C.B. 237, which include consideration of the following factors:

- the nature of the business and the history of the Company from its inception;

- the economic outlook in general and the condition and outlook of the industry in which the Company operates;

- the book value of the stock and the financial condition of the Company;

- the earnings capacity of the Company;

- the dividend-paying capacity of the Company;

- whether goodwill or other intangible value exists within the Company;

- previous sales of the Company's stock and the size of the block of stock to be valued; and

- the market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Information Reviewed and Procedures Performed

We reviewed several sources of information during the course of the valuation analysis including, but not limited to, the following:[2]

- Alpha Carpentry's federal income tax returns for the years ended December 31, 2014 through 2020;

- Alpha Carpentry's general ledger as of December 31, 2020;

- Alpha Carpentry's certificate of good standing;

- Alpha Carpentry's operating agreement dated March 7, 2014; and

- promissory note terms dated April 29, 2020 between Alpha Carpentry and the U.S. Small Business Administration.

In addition to the information reviewed above, we also performed the following procedures:

- conducted an analysis of other facts and data resulting in our calculation of value.[3]

## Valuation Methodology

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our determination of value. A description of each approach is discussed below.

The *Income Approach* is a technique that estimates the value of a company based on the cash flows the company is expected to generate in the future. The Income Approach is generally performed in two steps: 1) estimate the expected annual future cash flows of the company; and 2) discount or capitalize these cash flows to present value at a rate of return that considers the relative risk of realizing the cash flows.

[2] This is not intended to be an exhaustive list of the documents reviewed in this matter.
[3] We conducted an interview with Marty on January 24, 2018. However, while we requested a more recent interview with management of the Company, we were not afforded with the opportunity to conduct such an interview prior to the issuance of this report. As such, we reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

CONFIDENTIAL

ALPHA CARPENTRY, LLC | 4

**EXHIBIT B, Page 139 of 237**



STOUT

# Executive Summary

Under the **Market Approach**, which consists of the Guideline Public Company Method and the Merger and Acquisition ("M&A") Method, the value of a company is estimated by employing statistics derived from observed transactions of similar companies or prior transactions involving interests in the subject company. Ideally, these companies will operate in comparable markets and will have similar growth prospects and risks.

The **Asset Approach** estimates the equity of a business based on the market value of a company's assets minus the value of its liabilities.

The above valuation methods have long been recognized as acceptable in the appropriate circumstances. Accordingly, we applied the methods that, in our experience and judgment, provide the most supportable valuation based on the information available. For Alpha Carpentry, we were unable to derive indications of value from the application of either the Income Approach or the Market Approach as the expected operating cash flows of the business do not support the economic value of the underlying operating assets of the Company. As such, we ultimately relied on the Adjusted Book Value ("ABV") Method, a form of the Asset Approach, in our determination of the value of the equity of Alpha Carpentry.

## Calculation of Value

In accordance with the foregoing, and as presented in Exhibit A, we determined the Fair Market Value of a 99.0% membership interest of Alpha Carpentry, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

### *DE MINIMIS*

Additionally, as presented in Exhibit A, we determined the Fair Market Value of a 1.0% membership interest of Alpha Carpentry, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

### *DE MINIMIS*

\*     \*     \*     \*     \*     \*     \*     \*

Our calculation of value is applicable only for the stated date and purpose and may not be appropriate for any other date or purpose. Reference should be made to the exhibits for assumptions and limiting conditions that apply to this valuation and report.

Regards,

*Stout Risius Ross, LLC*

**STOUT RISIUS ROSS, LLC**

**EXHIBIT B, Page 140 of 237**

**STOUT**

# Exhibits

Exhibit A ................................................................... Conclusion of Value

Exhibit B ................................................................... Financial Statements

Exhibit C ................................................................... Adjusted Book Value Method

Exhibit D ................................................................... Assumptions and Limiting Conditions

Exhibit E ................................................................... Certification

Exhibit F ................................................................... Statement of Qualifications

ALPHA CARPENTRY, LLC | 6

CONFIDENTIAL

**STOUT**

# A.  Conclusion of Value

## Calculation of Value

*In U.S. Dollars*

Exhibit A.1

| | Notes | |
|---|---|---|
| **1  Total Value of Equity** | [a] | *de minimis* |
| **2  Pro rata value of Maeve's 99.0% Interest** | | *de minimis* |
| **3  Pro rata value of Marty's 1.0% Interest** | | *de minimis* |

[a] See Exhibit C.1.

ALPHA CARPENTRY, LLC | 7

# B. Financial Statements

**◢◣STOUT**

**Exhibit B.1**

## Reported Balance Sheets
*In U.S. Dollars*

| | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|
| 1 Cash and Cash Equivalents | $ 183,542 | $ 74,906 | $ 6,794 | $ 55,997 | $ 56,072 | $ 69,691 |
| 2 Due from Affiliate | 0 | 0 | 0 | 0 | 19,733 | 30,788 |
| 3 Due from Title | 40,492 | 226,691 | 244,857 | 250,870 | 251,761 | 250,071 |
| 4 Other Assets | 0 | 0 | 17,674 | 0 | 0 | 0 |
| 5 **Total Current Assets** | 224,034 | 301,597 | 269,325 | 306,867 | 327,566 | 350,550 |
| 6 **Total Assets** | $ 224,034 | $ 301,597 | $ 269,325 | $ 306,867 | $ 327,566 | $ 350,550 |
| 7 Accounts Payable | $ 0 | $ 284,127 | $ 177,570 | $ 96,008 | $ 76,140 | $ 76,140 |
| 8 Due to Affiliates | 171,831 | 132,820 | 430,090 | 824,547 | 1,047,908 | 1,293,995 |
| 9 **Total Current Liabilities** | 171,831 | 416,947 | 607,660 | 920,555 | 1,124,048 | 1,370,135 |
| 10 Long-term Debt | 0 | 0 | 17,674 | 0 | 0 | 0 |
| 11 **Total Long-Term Liabilities** | 0 | 0 | 17,674 | 0 | 0 | 0 |
| 12 **Total Liabilities** | 171,831 | 416,947 | 625,334 | 920,555 | 1,124,048 | 1,370,135 |
| 13 Partners' Capital Accounts | 52,203 | (115,350) | (356,009) | (613,688) | (796,482) | (1,019,585) |
| 14 **Total Members' Equity** | 52,203 | (115,350) | (356,009) | (613,688) | (796,482) | (1,019,585) |
| 15 **Total Liabilities & Members' Equity** | $ 224,034 | $ 301,597 | $ 269,325 | $ 306,867 | $ 327,566 | $ 350,550 |

Source: Federal tax returns.

ALPHA CARPENTRY, LLC | 8

CONFIDENTIAL

**STOUT**

ALPHA CARPENTRY, LLC | 9

# B. Financial Statements

Exhibit B.2

## Reported Income Statements
*In U.S. Dollars*

| | | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|
| 1 | **Total Net Sales** | **$ 1,272,196** | **$ 3,371,095** | **$ 977,429** | **$ 585,713** | **$ 173,184** |
| 2 | *Growth Rate* | *24.4%* | *165.0%* | *-71.0%* | *-40.1%* | *-70.4%* |
| 3 | Cost of Labor | 568,211 | 1,439,858 | 531,496 | 644,216 | 363,577 |
| 4 | Other Cost of Sales | 832,962 | 2,156,524 | 691,182 | 255,892 | 125,263 |
| 5 | **Total Cost of Sales** | **1,401,173** | **3,596,382** | **1,222,678** | **900,108** | **488,840** |
| 6 | **Gross Profit** | **(128,977)** | **(225,287)** | **(245,249)** | **(314,395)** | **(315,656)** |
| 7 | *Gross Profit Margin* | *-10.1%* | *-6.7%* | *-25.1%* | *-53.7%* | *-182.3%* |
| 8 | Officer's Compensation | 0 | 0 | 0 | 0 | 0 |
| 9 | Other Operating Expenses | 6,148 | 15,372 | 11,822 | 9,013 | 8,163 |
| 10 | Depreciation | 0 | 0 | 0 | 0 | 0 |
| 11 | **Total Operating Expenses** | **6,148** | **15,372** | **11,822** | **9,013** | **8,163** |
| 12 | **Operating Income** | **(135,125)** | **(240,659)** | **(257,071)** | **(323,408)** | **(323,819)** |
| 13 | Other Income | 0 | 0 | 0 | 140,864 | 100,716 |
| 14 | **EBIT** | **(135,125)** | **(240,659)** | **(257,071)** | **(182,544)** | **(223,103)** |
| 15 | Interest Income (Expense) | 0 | 0 | (20) | (250) | 0 |
| 16 | **Earnings Before Taxes** | **(135,125)** | **(240,659)** | **(257,091)** | **(182,794)** | **(223,103)** |
| 17 | Income Tax Benefit (Expense) | 0 | 0 | 0 | 0 | 0 |
| 18 | **Net Income (Loss)** | **$ (135,125)** | **$ (240,659)** | **$ (257,091)** | **$ (182,794)** | **$ (223,103)** |
| 19 | **EBIT** | **$ (135,125)** | **$ (240,659)** | **$ (257,071)** | **$ (182,544)** | **$ (223,103)** |
| 20 | EBIT Margin | -10.6% | -7.1% | -26.3% | -31.2% | -128.8% |
| 21 | **EBITDA** | **$ (135,125)** | **$ (240,659)** | **$ (257,071)** | **$ (182,544)** | **$ (223,103)** |
| 22 | EBITDA Margin | -10.6% | -7.1% | -26.3% | -31.2% | -128.8% |

Source: Federal income tax returns.

CONFIDENTIAL

# C. Adjusted Book Value Method

**STOUT**

**Adjusted Book Value Method**

*In U.S. Dollars*

Exhibit C.1

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ 69,691 | $ 69,691 | [a] |
| 2 | Due from Affiliate | 30,788 | 30,788 | [a] |
| 3 | Due from Title | 250,071 | 250,071 | [a] |
| 4 | **Total Current Assets** | **350,550** | **350,550** | |
| 5 | **Total Assets** | **$ 350,550** | **$ 350,550** | |
| 6 | Due to Alpha Construction | $ 616,653 | $ 0 | [b] [c] |
| 7 | Due to Maeve | 102,200 | 0 | [b] [c] |
| 8 | Due to Sedgwick Holding | 123,005 | 0 | [b] [c] |
| 9 | Accounts Payable | 76,140 | 76,140 | [a] |
| 10 | Due to Affiliates | 452,138 | 274,410 | [c] [d] |
| 11 | **Total Current Liabilities** | **1,370,135** | **350,550** | |
| 12 | **Total Liabilities** | **1,370,135** | **350,550** | |
| 13 | Partners' Capital Accounts | (1,019,585) | n/a | n/a |
| 14 | **Total Members' Equity** | **$ (1,019,585)** | **$ 0** | [e] |
| 15 | **Fair Market Value of Equity** | | *de minimis* | |

Refer to the last page of this exhibit for a description of the footnotes.

ALPHA CARPENTRY, LLC | 10

CONFIDENTIAL

**EXHIBIT B, Page 145 of 237**



**STOUT**

ALPHA CARPENTRY, LLC | 11

# C.  Adjusted Book Value Method

**Explanation of Fair Market Value**                                                   **Exhibit C.1**

[a]  The value of this asset (or liability) is estimated to be equal to book value as represented in the company's 2020 federal tax return.

[b]  Since the Company's assets are insufficient to cover the Company's liabilities as of the Valuation Date, this note payable to an entity held by Marty has been adjusted to the collectible amount. A corresponding adjustment has been made to the note receivable from Alpha Carpentry, LLC as of the Valuation Date on the balance sheets of Alpha Construction Services, LLC, Maeve, LLC and Sedgwick Properties Holding Corp.

[c]  Detail of the company's "Due to Affiliates" has been separately itemized based on a review of the company's general ledger as of December 31, 2020.

[d]  This line item represents the remaining balance of "Due to Affiliates" on the Company's 2020 federal income tax return that was not separately itemized on rows 6, 7 and 8. Since the Company's assets are insufficient to cover the Company's liabilities as of the Valuation Date, this note payable has been adjusted to the collectible amount. Since insufficient information was provided to determine which affiliates this liability is payable to, and therefore which corresponding receivables from affiliates would need to be written down, we have assumed that the affiliates in this case are consistent with the companies owed money on the Company's general ledger as of the Valuation Date. In other words, we have assumed that in addition to the uncollectible amount of notes receivable on lines 6, 7 and 8, that Alpha Construction, LLC will not collect on $130,184 of receivables from Alpha Carpentry, LLC, Maeve, LLC will not collect on $21,576 of receivables from Alpha Carpentry, LLC, and Sedgwick Properties Holding Corp. will not collect on $25,968 of receivables from Alpha Carpentry, LLC.

[e]  The resulting value of stockholders' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

**EXHIBIT B, Page 146 of 237**

STOUT

# D. Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or its representatives, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon.

- We conducted an interview with Marty on January 24, 2018. We also requested a more recent interview with management of Alpha Carpentry. However, as of the date of this report, we had not been afforded the opportunity to conduct such an interview. We reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

- Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

- For the purpose of this engagement and report, we make no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our conclusion of value assumes the assets and liabilities presented in the Company's December 31, 2020 balance sheet were accurate and complete as of that date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- We do not provide assurance on the achievability of the results forecasted in this report. Differences between actual and expected results may be material and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- Our calculation of value is applicable to the Subject Interests for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report (which reflects a Summary Report as defined by the American Institute of Certified Public Accountants Statement on Standards for Valuation Services), and the opinions expressed herein are provided exclusively for the use of the addressee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent. Further, the rationale for how we arrived at the opinions and conclusions expressed herein may not be understood properly without additional information contained in our internal work papers.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" or a "solvency opinion" regarding any contemplated present or future transaction.

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and we have no obligation to update our report for such events and conditions.

- We have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The value that results from a valuation engagement is expressed as a conclusion of value.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

ALPHA CARPENTRY, LLC | 12

STOUT

# E. Certification

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report, on which the analysis, opinions, and calculations expressed herein are based, are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- The data used in this report was obtained from sources believed to be reliable. All facts known to us that have bearing on the values presented in this report have been considered, and no facts of importance have been intentionally omitted.

- We have no present or prospective interest in the business that is the subject of this report, and we have no personal interest with respect to the parties involved.

- We have no bias with respect to the business that is the subject of this report or the parties involved with this assignment.

- Our engagement in this assignment was not contingent on developing or reporting predetermined results.

- Our compensation for completing this assignment is fee-based and is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- Our analyses, opinions, and conclusions are developed, and this report is prepared, with the intent of being in conformity with the American Institute of Certified Public Accountants Statement on Standards for Valuation Services.

- Stout Risius Ross, LLC has performed no services, as an appraiser or in any other capacity, regarding the business that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

- In addition to the undersigned, Adam B. Moeller and Christopher J. Carlton assisted in the research, analysis development, and report preparation for this engagement.

_____
Brian R. Potter, CFA, CFE
Managing Director

_____
Thomas J. Czupta, ASA, ABV
Director

ALPHA CARPENTRY, LLC | 13

**EXHIBIT B, Page 148 of 237**

**STOUT**

# F.  Statement of Qualifications



Chicago, IL USA
**Office:** +1.312.752.3352
bpotter@stout.com

**Education**

B.S., Finance
Miami University

**Designations**

Chartered Financial Analyst (CFA)
Certified Fraud Examiner (CFE)

**Practice Areas**

Valuation Disputes
Complex Business Litigation
High-Stakes Marital Dissolution
Shareholder Disputes
Transaction Disputes

Brian Potter is a Managing Director in the Valuation Advisory group and head of the firm's Chicago office. Mr. Potter has provided valuation, litigation advisory, and forensic accounting services for numerous purposes, including marital dissolutions, shareholder disputes, estate and gift taxation, purchase price allocation, Employee Stock Ownership Plans, brokerage fraud, bankruptcy, potential transactions and intellectual property valuations. Mr. Potter has extensive experience with intellectual property and brokerage fraud litigation, having provided advisory services in several patent infringement, misappropriation of trade secret and securities fraud matters. Additionally, Mr. Potter has been involved in the appraisal of real estate for various property types, including office, industrial and retail buildings, and vacant land. Mr. Potter has provided services within the context of litigation and has been trained to offer services within various alternative dispute resolution models.

Mr. Potter has presented continuing education seminars on business valuation, understanding tax returns, occupational fraud, and computer forensics and e-discovery. He has also published several articles on valuation and other related topics. Mr. Potter was a contributing author to the chapter entitled "Valuation in Shareholder and Partner Disputes" in Business Valuation, published by the Law Journal Press.

Prior to joining Stout, Mr. Potter was a Consulting Associate with CRA International in its Intellectual Property and Finance practices in Chicago. While at Miami, Mr. Potter earned CoSIDA First Team Academic All-America honors for his academic and athletic achievements while a member of the university's varsity football team.

**Professional Memberships**

- The CFA Institute
- The CFA Society of Chicago
- Association of Certified Fraud Examiners (ACFE)
- AAML Foundation Forensic and Business Valuation Division

ALPHA CARPENTRY, LLC | 14

CONFIDENTIAL

# F.   Statement of Qualifications



**ALPHA CARPENTRY, LLC | 15**

Thomas J. Czupta is a Director in the Valuation Advisory group. Mr. Czupta has extensive experience providing professional valuation advisory services in the fields of taxation, litigation, and corporate transactions.

Mr. Czupta has provided business valuation and financial advisory services for numerous purposes including estate and gift taxation, marital dissolutions, business transitions, shareholder disputes, and other tax, corporate, and litigation related matters. His experience spans a diverse client base, from regional middle-market businesses to billion dollar multinational companies, as well as private equity firms, law firms, and financial institutions.

Prior to joining Stout, Mr. Czupta was a Manager with Business Valuation Group, Inc. where his valuations were used in connection with ESOP reporting compliance, litigation support, and federal gift and estate taxation.

**Professional Memberships**

- American Institute of Certified Public Accountants
- Business Valuation Association of Chicago
- Chicago Estate Planning Council
- American Society of Appraisers



Chicago, IL USA
**Office:** +1.312.763.6629
**Mobile:** +1.312.833.2509
tczupta@stout.com

**Education**

B.S., Finance & Economics
DePaul University

**Designations**

Accredited Senior Appraiser (ASA)
Accredited in Business Valuation (ABV)

**Practice Areas**

High-Stakes Marital Dissolution
Valuation Disputes
Transaction Disputes
Trust & Estate

**CONFIDENTIAL**

**STOUT**

# Appendix III
## Alpha Construction, LLC Report

CONFIDENTIAL



# Alpha Construction Services, LLC

Valuation of 99.0% and 1.0% Membership Interests
as of December 31, 2020

Issued: December 13, 2021

CONFIDENTIAL



# Contact Information

For more information, please contact one of the following members of the engagement team:

**Brian R. Potter, CFA, CFE**
Managing Director
+1.312.752.3352
bpotter@stout.com

**Karla N. Gross**
Associate
+1.248.432.1265
kgross@stout.com

**Thomas J. Czupta, ASA, ABV**
Director
+1.312.763.6629
tczupta@stout.com

**Adam B. Moeller**
Associate
+1.312.237.4850
amoeller@stout.com



## STOUT'S SERVICES

**Investment Banking**
Advising buyers and sellers on mergers and acquisitions, private capital raising, and other corporate financial transactions.

**Valuation Advisory**
Providing valuations of business enterprises, complex securities, intellectual property, real estate, and personal property.

**Transaction Advisory**
Helping clients navigate the transaction process and provide transaction opinions and due diligence services.

**Disputes, Compliance, & Investigations**
Providing expert testimony and consulting, as well as investigative and compliance services for financial-related matters.

ALPHA CONSTRUCTION SERVICES, LLC | 2

CONFIDENTIAL

**EXHIBIT B, Page 153 of 237**

**STOUT**

# Executive Summary

December 13, 2021

Donald J. Angelini, Esq.
Carly E. Kenny, Esq.
Angelini Ori + Abate Law
155 North Michigan Avenue
Suite 400
Chicago, Illinois 60601

Dear Mr. Angelini and Ms. Kenny:

Stout Risius Ross, LLC ("Stout") has been engaged to determine the Fair Market Values of a 99.0% membership interest and a 1.0% membership interest in Alpha Construction Services, LLC ("Alpha Construction" or the "Company"), on a marketable, controlling-interest basis (the "Subject Interests"), as of December 31, 2020 (the "Valuation Date"). We understand the results of our analysis will be used for marital-dissolution purposes.

## Company Synopsis

Founded in 2013, Alpha Construction is a privately held company that operates as a construction management company. The Company is managed by MK Manager Corp. Maeve, LLC – Series Z holds a 99.0% membership interest in Alpha Construction and Frank Martin Paris, Jr. ("Marty") holds the remaining 1.0% membership interest in the Company. Alpha Construction is organized as a limited liability company in Illinois.

## Definition of Value

For purposes of our valuation, the term "Fair Market Value" is defined as the price at which property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.[1]

The term "property" reflects the combined tangible and intangible assets of a company, as components of a going concern, and gives consideration to all known liabilities. The terms "willing buyer" and "willing seller" refer to hypothetical parties rather than any particular buyer or seller. It is important to note that the specific incentives or attributes of particular buyers and sellers may not be the same as the hypothetical buyer and seller from which Fair Market Value is determined.

## Premise of Value

When estimating the Fair Market Value of a controlling interest, we typically consider whether to analyze the subject business enterprise on a going-concern or liquidation basis. As economic theory holds that a controlling interest holder will seek to maximize the value of his or her interest, the determination of whether to use a going-concern or liquidation premise of value may depend on which basis provides a higher indication of value.

We conducted our analysis of the Company under a going-concern premise, meaning that the underlying assets of the Company are presumed, in the absence of a qualified appraisal of such assets, to attain their highest values as integral components of a business entity in continued operation and that liquidation of said assets would likely diminish the value of the whole to the members and creditors of the Company.

[1] Treasury Regs. §20.2031-1(b) and §25.2512-1.

ALPHA CONSTRUCTION SERVICES, LLC | 3

CONFIDENTIAL

**EXHIBIT B, Page 154 of 237**


**STOUT**

# Executive Summary

## Factors Considered

Our analysis considered the valuation guidelines referenced in Revenue Ruling 59-60, 1959-1 C.B. 237, which include consideration of the following factors:

- the nature of the business and the history of the Company from its inception;

- the economic outlook in general and the condition and outlook of the industry in which the Company operates;

- the book value of the stock and the financial condition of the Company;

- the earnings capacity of the Company;

- the dividend-paying capacity of the Company;

- whether goodwill or other intangible value exists within the Company;

- previous sales of the Company's stock and the size of the block of stock to be valued; and

- the market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Information Reviewed and Procedures Performed

We reviewed several sources of information during the course of the valuation analysis including, but not limited to, the following:[2]

- Alpha Construction's federal income tax returns for the years ended December 31, 2014 through 2020;

- Alpha Construction's general ledger as of December 31, 2020

- Alpha Construction's certificate of formation dated October 3, 2013; and

- Alpha Construction's operating agreement dated October 10, 2013.

In addition to the information reviewed above, we also performed the following procedures:

- conducted an analysis of other facts and data resulting in our calculation of value.[3]

## Valuation Methodology

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our determination of value. A description of each approach is discussed below.

The **Income Approach** is a technique that estimates the value of a company based on the cash flows the company is expected to generate in the future. The Income Approach is generally performed in two steps: 1) estimate the expected annual future cash flows of the company; and 2) discount or capitalize these cash flows to present value at a rate of return that considers the relative risk of realizing the cash flows.

[2] This is not intended to be an exhaustive list of the documents reviewed in this matter.
[3] We conducted an interview with Marty on January 24, 2018. However, while we requested a more recent interview with management of the Company, we were not afforded with the opportunity to conduct such an interview prior to the issuance of this report. As such, we reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

ALPHA CONSTRUCTION SERVICES, LLC | 4

**CONFIDENTIAL**



# Executive Summary

Under the *Market Approach*, which consists of the Guideline Public Company Method and the Merger and Acquisition ("M&A") Method, the value of a company is estimated by employing statistics derived from observed transactions of similar companies or prior transactions involving interests in the subject company. Ideally, these companies will operate in comparable markets and will have similar growth prospects and risks.

The *Asset Approach* estimates the equity of a business based on the market value of a company's assets minus the value of its liabilities.

The above valuation methods have long been recognized as acceptable in the appropriate circumstances. Accordingly, we applied the methods that, in our experience and judgment, provide the most supportable valuation based on the information available. Based thereon, we have chosen to rely on the Capitalized Cash Flow ("CCF") Method, a form of the Income Approach, in our determination of the value of the equity of Alpha Construction. Additionally, we used the M&A Method as a reasonableness test to corroborate the results of our application of the CCF Method.

## Analysis of Goodwill

### Total Goodwill

The EV of an entity incorporates the value of its total invested capital, including both debt and equity capital. Alternatively, the EV of an entity may also be expressed as the collective value of its individual assets, including net working capital, tangible assets, and intangible assets. For example, the EV of Alpha Construction was determined to be approximately $502,000. Allocating this amount to each of the separate tangible asset categories of Alpha Construction yields the value attributable to the Company's intangible

assets, which is determined on a residual basis. In other words, to the extent that the EV exceeds the market value of net working capital and tangible assets, it is indicated that an element of intangible asset value exist.



To the extent that the total intangible asset value exceeds the value of identifiable intangible assets (e.g., workforce, customer list, tradename, etc.), unidentifiable intangible assets (i.e., goodwill (personal and/or enterprise)) exist.



ALPHA CONSTRUCTION SERVICES, LLC | 5

**≜STOUT**

# Executive Summary

As it relates specifically to the Company, it is possible that unidentifiable intangible assets (i.e., goodwill) exist. However, the relevant question is what portion of this unidentifiable asset value, if any, should be allocated to personal goodwill.

## Personal Goodwill

In the case of the Company, it is appropriate to examine the possibility that personal goodwill may exist based on the skill, knowledge, reputation, experience, and relationships held by Marty. In considering these personal contributions made by Marty to the business, it is important to ascertain whether the current compensation amounts paid to him are at a level that would be required to fairly compensate him for his services performed as an employee as well as these efforts. To the extent that a market level of compensation for Marty is incorporated within the cash flows of the Company as an operating expense, the resulting value of the Company indicated by any remaining profits would be attributable solely to intangible value other than personal goodwill (i.e., enterprise goodwill and other identifiable intangible assets).

As discussed above, we adjusted the annual compensation for the CEO of the Company to be consistent with the 75th percentile of the market compensation data contained in the ERI study. Accordingly, as we adjusted Marty's compensation to a market level required to fairly compensate him for both his services performed as an employee of the company, **as well as his personal contributions to the business**, our calculation of the Fair Market Value of the Subject Interests, as of December 31, 2020, **does not include any elements of personal goodwill.**

## Calculation of Value

In accordance with the foregoing, and as presented in Exhibit A, we determined the Fair Market Value of a 99.0% membership interest of Alpha Construction, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

*ONE HUNDRED ELEVEN THOUSAND DOLLARS*

*$111,000*

Additionally, as presented in Exhibit A, we determined the Fair Market Value of a 1.0% membership interest of Alpha Construction, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

*ONE THOUSAND ONE HUNDRED DOLLARS*

*$1,100*

\*      \*      \*      \*      \*      \*      \*      \*

Our calculation of value is applicable only for the stated date and purpose and may not be appropriate for any other date or purpose. Reference should be made to the exhibits for assumptions and limiting conditions that apply to this valuation and report.

Regards,

*Stout Risius Ross, LLC*

**STOUT RISIUS ROSS, LLC**

ALPHA CONSTRUCTION SERVICES, LLC | 6

**STOUT**

# Exhibits

**Exhibit A** ................................................................ Conclusion of Value

**Exhibit B** ................................................................ Financial Statements

**Exhibit C** ................................................ Capitalized Cash Flow Method

**Exhibit D** .............................................. Merger and Acquisition Method

**Exhibit E** ........................................ Assumptions and Limiting Conditions

**Exhibit F** ................................................................ Certification

**Exhibit G** ........................................ Statement of Qualifications

**EXHIBIT B, Page 158 of 237**

# A.  Conclusion of Value

STOUT

ALPHA CONSTRUCTION SERVICES, LLC | 8

## Conclusion of Value
*In U.S. Dollars*

Exhibit A.1

| | | Notes | | |
|---|---|---|---|---|
| 1 | **Concluded Enterprise Value** | | **$** | **502,000** |
| | | | | |
| 2 | Less: Interest-Bearing Debt | [a] | | 0 |
| 3 | Add: Cash and Cash Equivalents | | | 123,953 |
| 4 | Add: Nonoperating Assets (Liabilities) | [b] | | (373,615) |
| 5 | Less: Working Capital Deficit | | | (140,457) |
| | | | | |
| 6 | **Total Value of Equity** | | **$** | **111,881** |
| | | | | |
| 7 | **Pro Rata Value of Maeve's 99.0% Interest (Rounded)** | | **$** | **111,000** |
| | | | | |
| 8 | **Pro Rata Value of Marty's 1.0% Interest (Rounded)** | | **$** | **1,100** |
| | | | | |
| | **Implied Multiples** | | | |
| 9 | EV / Proj. EBITDA | | | 5.1x |
| 10 | EV / Proj. Revenue | | | 0.05x |

[a]  See Exhibit C.1.
[b]  Due from affiliates was adjusted as the Company has two notes receivable that are not considered fully collectible. Specifically, the note receivable from Alpha Carpentry, LLC has been reduced by $746,836 and the note receivable from Sedgwick Properties Holding Corp. has been reduced by $583,356. Corresponding adjustments have been made to notes payable to Alpha Construction Services, LLC as of the Valuation Date on the balance sheets of Alpha Carpentry, LLC and Sedgwick Properties Holding Corp.

**EXHIBIT B, Page 159 of 237**



# B. Financial Statements

Exhibit B.1

## Reported Balance Sheets
*In U.S. Dollars*

| | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|
| 1 Cash and Cash Equivalents | $ 456,400 | $ (20,019) | $ 54,404 | $ (6,259) | $ 35,848 | $ 123,953 |
| 2 Due from Affiliates | 269,665 | 785,627 | 1,144,446 | 1,316,459 | 1,132,619 | 1,397,150 |
| 3 Due from Title Company | 0 | 71,565 | 35,794 | 94,980 | 56,182 | 39,332 |
| 4 Work in Progress | 518,968 | 407,440 | 363,675 | 287,336 | 287,336 | 287,336 |
| 5 Total Current Assets | 1,245,033 | 1,244,613 | 1,598,319 | 1,692,516 | 1,511,985 | 1,847,771 |
| 6 Total Assets | $ 1,245,033 | $ 1,244,613 | $ 1,598,319 | $ 1,692,516 | $ 1,511,985 | $ 1,847,771 |
| 7 Accounts Payable | $ 0 | $ 16,007 | $ 12,178 | $ 9,172 | $ 9,172 | $ 9,172 |
| 8 Due to Affiliate | 756,733 | 688,618 | 880,874 | 934,720 | 761,690 | 479,905 |
| 9 Due to Electrical Contractor | 0 | 0 | 0 | 0 | 0 | 109,423 |
| 10 Due to Title Company | 88,714 | 0 | 0 | 0 | 0 | 0 |
| 11 Total Current Liabilities | 845,447 | 704,625 | 893,052 | 943,892 | 770,862 | 598,500 |
| 12 Total Liabilities | 845,447 | 704,625 | 893,052 | 943,892 | 770,862 | 598,500 |
| 13 Partners' Capital Accounts | 399,586 | 539,988 | 705,267 | 748,624 | 741,123 | 1,249,271 |
| 14 Total Members' Equity | 399,586 | 539,988 | 705,267 | 748,624 | 741,123 | 1,249,271 |
| 15 Total Liabilities & Members' Equity | $ 1,245,033 | $ 1,244,613 | $ 1,598,319 | $ 1,692,516 | $ 1,511,985 | $ 1,847,771 |

Source: Federal income tax returns.

ALPHA CONSTRUCTION SERVICES, LLC | 9

CONFIDENTIAL

# B. Financial Statements

**STOUT**

**Exhibit B.2**

## Reported Income Statements
*In U.S. Dollars*

| | | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|---|
| 1 | **Total Net Sales** | $ 8,577,391 | $ 9,381,471 | $ 11,606,806 | $ 10,086,232 | $ 7,677,746 | $ 14,330,689 |
| 2 | *Growth Rate* | *n/a* | 9.4% | 23.7% | -13.1% | -23.9% | 86.7% |
| 3 | **Total Cost of Sales** | 8,326,275 | 9,054,793 | 11,431,707 | 10,032,402 | 7,679,272 | 13,793,445 |
| 4 | **Gross Profit** | 251,116 | 326,678 | 175,099 | 53,830 | (1,526) | 537,244 |
| 5 | Gross Profit Margin | 2.9% | 3.5% | 1.5% | 0.5% | 0.0% | 3.7% |
| 6 | Officer's Compensation | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | Other Operating Expenses | 27,701 | 175,653 | 9,531 | 9,713 | 9,034 | 29,746 |
| 8 | Depreciation | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | **Total Operating Expenses** | 27,701 | 175,653 | 9,531 | 9,713 | 9,034 | 29,746 |
| 10 | **Operating Income** | 223,415 | 151,025 | 165,568 | 44,117 | (10,560) | 507,498 |
| 11 | Other Income (Expense) | 0 | 0 | 0 | 0 | 3,059 | 650 |
| 12 | **EBIT** | 223,415 | 151,025 | 165,568 | 44,117 | (7,501) | 508,148 |
| 13 | Interest Income (Expense) | (71) | (623) | (289) | (760) | 0 | 0 |
| 14 | **Earnings Before Taxes** | 223,344 | 150,402 | 165,279 | 43,357 | (7,501) | 508,148 |
| 15 | Income Tax Expense | 0 | 0 | 0 | 0 | 0 | 0 |
| 16 | **Net Income (Loss)** | $ 223,344 | $ 150,402 | $ 165,279 | $ 43,357 | $ (7,501) | $ 508,148 |
| 17 | **EBIT** | $ 223,415 | $ 151,025 | $ 165,568 | $ 44,117 | $ (7,501) | $ 508,148 |
| 18 | EBIT Margin | 2.6% | 1.6% | 1.4% | 0.4% | -0.1% | 3.5% |
| 19 | **EBITDA** | $ 223,415 | $ 151,025 | $ 165,568 | $ 44,117 | $ (7,501) | $ 508,148 |
| 20 | EBITDA Margin | 2.6% | 1.6% | 1.4% | 0.4% | -0.1% | 3.5% |

Source: federal tax returns.

**ALPHA CONSTRUCTION SERVICES, LLC | 10**

CONFIDENTIAL

**◢STOUT**

**Exhibit B.3**

# B. Financial Statements

## Adjustments to Reported Income Statements
*In U.S. Dollars*

| | Notes | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|---|
| 1 Reported EBIT | | $ 223,415 | $ 151,025 | $ 165,568 | $ 44,117 | $ (7,501) | $ 508,148 |
| 2 Officer's Comp. - Market Level Adj. | [a] | (74,817) | (81,830) | (101,241) | (87,978) | (66,969) | (125,000) |
| 3 Insurance Reimbursement | [b] | 0 | 0 | 0 | 0 | (3,059) | (650) |
| 4 Adjusted EBIT | | 148,598 | 69,195 | 64,327 | (43,861) | (77,529) | 382,498 |
| 5 Adjusted EBIT Margin | | 1.7% | 0.7% | 0.6% | -0.4% | -1.0% | 2.7% |
| | | | | | | | |
| 6 Reported Net Income (Loss) | | 223,344 | 150,402 | 165,279 | 43,357 | (7,501) | 508,148 |
| 7 Total Adjustments to EBIT | | (74,817) | (81,830) | (101,241) | (87,978) | (70,028) | (125,650) |
| 8 Interest Expense Adjustment | [c] | 71 | 623 | 289 | 760 | 0 | 0 |
| 9 Income Taxes Adjustment | [d] | (42,358) | (19,724) | (18,336) | 0 | 0 | (109,031) |
| 10 Adjusted Net Income | | 106,240 | 49,471 | 45,991 | (43,861) | (77,529) | 273,467 |
| 11 Adjusted Net Income Margin | | 1.2% | 0.5% | 0.4% | -0.4% | -1.0% | 1.9% |
| | | | | | | | |
| 12 Adjusted EBIT | | $ 148,598 | $ 69,195 | $ 64,327 | $ (43,861) | $ (77,529) | $ 382,498 |
| 13 Adjusted EBIT Margin | | 1.7% | 0.7% | 0.6% | -0.4% | -1.0% | 2.7% |
| 14 Adjusted EBITDA | | $ 148,598 | $ 69,195 | $ 64,327 | $ (43,861) | $ (77,529) | $ 382,498 |
| 15 Adjusted EBITDA Margin | | 1.7% | 0.7% | 0.6% | -0.4% | -1.0% | 2.7% |

[a] Officers' compensation was adjusted to a market level that would be paid by a third party for a management team to oversee the day-to-day operations of the Company, as well as to compensate Marty for his personal contributions to the business.

[b] Adjusted to present results on a normalized basis.

[c] Interest expense was removed to reflect the Company's earnings on a debt-free basis.

[d] Income taxes were adjusted to reflect the prevailing federal and state income tax rates in effect as of the Valuation Date. Although the Company has elected to be taxed as a limited liability company ("LLC"), resulting in no taxes being paid at the corporate level, our approach is to tax-affect LLC income, thus incorporating distributions at a rate similar to a normalized corporate tax liability.

**ALPHA CONSTRUCTION SERVICES, LLC | 11**

CONFIDENTIAL

# B. Financial Statements

**◆ STOUT**

**Exhibit B.4**

## Adjusted Historical and Projected Income Statements
*In U.S. Dollars*

| | | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | Projection Period |
|---|---|---|---|---|---|---|---|---|
| 1 | **Total Net Sales** | $ 8,577,391 | $ 9,381,471 | $ 11,606,806 | $ 10,086,232 | $ 7,677,746 | $ 14,330,689 | $ 10,616,600 |
| 2 | *Growth Rate* | *n/a* | 9.4% | 23.7% | -13.1% | -23.9% | 86.7% | -25.9% |
| 3 | Total Cost of Sales | 8,326,275 | 9,054,793 | 11,431,707 | 10,032,402 | 7,679,272 | 13,793,445 | 10,404,300 |
| 4 | **Gross Profit** | **251,116** | **326,678** | **175,099** | **53,830** | **(1,526)** | **537,244** | **212,300** |
| 5 | *Gross Profit Margin* | 2.9% | 3.5% | 1.5% | 0.5% | 0.0% | 3.7% | 2.0% |
| 6 | Officer's Compensation | 74,817 | 81,830 | 101,241 | 87,978 | 66,969 | 125,000 | 92,600 |
| 7 | Other Operating Expenses | 27,701 | 175,653 | 9,531 | 9,713 | 9,034 | 29,746 | 22,000 |
| 8 | **Total Operating Expenses** | **102,518** | **257,483** | **110,772** | **97,691** | **76,003** | **154,746** | **114,600** |
| 9 | **Operating Income** | **148,598** | **69,195** | **64,327** | **(43,861)** | **(77,529)** | **382,498** | **97,700** |
| 10 | Other Income (Expense) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | **EBIT** | **148,598** | **69,195** | **64,327** | **(43,861)** | **(77,529)** | **382,498** | **97,700** |
| 12 | Interest Income (Expense) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 | **Earnings Before Taxes** | **148,598** | **69,195** | **64,327** | **(43,861)** | **(77,529)** | **382,498** | **97,700** |
| 14 | Income Tax Expense | (42,358) | (19,724) | (18,336) | 0 | 0 | (109,031) | (27,800) |
| 15 | **Net Income (Loss)** | **$ 106,240** | **$ 49,471** | **$ 45,991** | **$ (43,861)** | **$ (77,529)** | **$ 273,467** | **$ 69,900** |
| 16 | **EBIT** | **$ 148,598** | **$ 69,195** | **$ 64,327** | **$ (43,861)** | **$ (77,529)** | **$ 382,498** | **$ 97,700** |
| 17 | *EBIT Margin* | 1.7% | 0.7% | 0.6% | -0.4% | -1.0% | 2.7% | 0.9% |
| 18 | **EBITDA** | **$ 148,598** | **$ 69,195** | **$ 64,327** | **$ (43,861)** | **$ (77,529)** | **$ 382,498** | **$ 97,700** |
| 19 | *EBITDA Margin* | 1.7% | 0.7% | 0.6% | -0.4% | -1.0% | 2.7% | 0.9% |

Source: projection period prepared by Stout based on a review of the Company's historical adjusted results and an analysis of the overall economy and the Company's industry.

**ALPHA CONSTRUCTION SERVICES, LLC | 12**


**STOUT**

**ALPHA CONSTRUCTION SERVICES, LLC** | 13

# C.  Capitalized Cash Flow Method

## Capitalized Cash Flow Method

**Exhibit C.1**

*In U.S. Dollars*

|  |  | Notes |  |  |
|---|---|---|---|---|
| | **Sustainable Free Cash Flows** | | | |
| 1 | EBITDA | [a] | $ | 97,700 |
| 2 | Depreciation | | | 0 |
| 3 | Income Taxes | | | (27,800) |
| 4 | **Projected Sustainable Debt-Free Net Income** | | | **69,900** |
| | | | | |
| 5 | Depreciation | | | 0 |
| 6 | Capital Expenditures | | | 0 |
| 7 | Additional Working Capital | | | (9,300) |
| 8 | **Projected Sustainable Free Cash Flows** | | | **60,600** |
| | | | | |
| | **Capitalization Factor** | | | |
| 9 | Weighted Average Cost of Capital | | | 16.0% |
| 10 | Less: Long-Term Growth Rate | | | -3.0% |
| 11 | **Capitalization Rate** | | | **13.0%** |
| | | | | |
| 12 | **Capitalization Factor** | [b] | | **8.2849** |
| | | | | |
| | **Enterprise Value** | | | |
| 13 | Projected Sustainable Free Cash Flows | | | 60,600 |
| 14 | Capitalization Factor | | | 8.2849 |
| 15 | **Enterprise Value** | | | **502,063** |
| | | | | |
| 16 | **Rounded** | | $ | **502,000** |

[a]  See Exhibit B.4.
[b]  The capitalization factor is calculated utilizing the "mid-year convention," which assumes that the capitalized cash flows will be received throughout each year into perpetuity, instead of at the end of the year.

The capitalization factor is derived utilizing the following formula:

Capitalization Factor = [(1 + WACC)^0.5] / (CR)

where:

WACC = Weighted Average Cost of Capital (i.e., line 9)
CR = Capitalization Rate (i.e., line 11)

CONFIDENTIAL

**EXHIBIT B, Page 164 of 237**

# C.  Capitalized Cash Flow Method

**STOUT**

ALPHA CONSTRUCTION SERVICES, LLC │14

## Weighted Average Cost of Capital

**Exhibit C.2**

### Required Return on Equity

Modified Capital Asset Pricing Model

| | | Notes | | |
|---|---|---|---|---|
| 1 | Risk-Free Rate of Return | [a] | | 1.5% |
| 2 | Long-Term Market Equity Risk Premium | [b] | 6.2% | |
| 3 | Selected Equity Beta | [c] | 1.10 | 6.8% |
| 4 | Small Stock Risk Premium | [b] | | 7.9% |
| 5 | Company-Specific Risk Premium | | | 3.0% |
| 6 | **Concluded Required Return on Equity** | | | **19.1%** |

### Cost of Debt

Long-Term Cost of Debt

| | | | | |
|---|---|---|---|---|
| 7 | Risk-Free Rate of Return | [a] | | 1.5% |
| 8 | Add:  Credit Spread | [d] | | 3.0% |
| 9 | Long-Term Cost of Debt | | | 4.5% |
| 10 | Less:  Income Tax Factor | | 28.5% | -1.3% |
| 11 | **Concluded Cost of Debt** | | | **3.2%** |

### Weighted Average Cost of Capital

| | | | | |
|---|---|---|---|---|
| 12 | Equity Allocation of Capital Structure | [c] | 80.0% | 15.3% |
| 13 | Debt Allocation of Capital Structure | [c] | 20.0% | 0.6% |
| 14 | **Weighted Average Cost of Capital (Rounded)** | | | **16.0%** |

[a] 20-year U.S. Treasury bond yield as of the Valuation Date.
[b] Based on: *Valuation Handbook: U.S. Guide to Cost of Capital*, Duff & Phelps, LLC.
[c] Based on the results of the Company's applicable GICS code. Refer to Exhibit C.3.
[d] Based on the historical spread between the prime rate and the 90-day Treasury Bill
(approximately 300 basis points).

CONFIDENTIAL

**EXHIBIT B, Page 165 of 237**



**STOUT**

# C. Capitalized Cash Flow Method

## Capital Structure and Beta Analysis

**Exhibit C.3**

| GICS Code [a] | 5-year Debt & Pfd. to EV | Current Debt & Pfd. to EV | Beta |
|---|---|---|---|
| 1  GICS Code 201030 - Median | 18.2% | 19.3% | 1.12 |
| 2  GICS Code 201030 - Composite | 24.6% | 19.1% | 1.11 |
| **3  Selected** | | **20.0%** | **1.10** |

[a] Source: *Valuation Handbook: U.S. Industry Cost of Capital,* Duff & Phelps, LLC

**STOUT**

**Exhibit D.1**

# D. Merger and Acquisition Method

**Statistical Analysis of Company Fundamentals and Multiples**

*In U.S. Dollars*

| | Adjusted Enterprise Value ("EV") | | Analysis of Targets | | | Analysis of Multiples | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | LTM Net Revenue | LTM EBITDA | LTM EBITDA Margin | EV / Revenue | EV / EBITDA |
| 1 High | $ 2,225,000 | $ 12,152,112 | $ 903,005 | 70.2% | 0.84x | 6.5x |
| 2 Upper Quartile | 855,108 | 2,500,349 | 383,104 | 20.9% | 0.39x | 4.3x |
| 3 Median | 362,000 | 1,150,551 | 264,488 | 11.5% | 0.29x | 2.2x |
| 4 Lower Quartile | 168,750 | 785,385 | 76,187 | 6.3% | 0.22x | 1.8x |
| 5 Low | 45,000 | 205,264 | (27,160) | -4.3% | 0.05x | 1.2x |
| | | | | | | |
| 6 Mean [a] | 628,689 | 2,248,500 | 303,179 | 15.6% | 0.21x | 2.3x |
| 7 Count | 34 | 34 | 15 | 15 | 34 | 14 |

| | Implied Enterprise Value | Subject Company Fundamentals | | |
| --- | --- | --- | --- | --- |
| | | Projected Revenue | Projected EBITDA | Projected EBITDA Margin |
| 8 **Alpha Construction Services, LLC** | **$ 502,000** | **$ 10,616,600** | **$ 97,700** | **0.9%** |

Source: DealStats™ Transaction Database
n/a = Not Available
[a] Mean represents arithmetic mean for analysis of targets and harmonic mean for analysis of multiples.

ALPHA CONSTRUCTION SERVICES, LLC | 16

**EXHIBIT B, Page 167 of 237**

**STOUT**

**Exhibit D.2**

# D. Merger and Acquisition Method

## Comparable Transactions

| # | Sale Date | Target Business Description | Adjusted Enterprise Value ("EV") [a] | LTM Net Revenue | LTM EBITDA | LTM EBITDA Margin | EV / Revenue | EV / EBITDA |
|---|---|---|---|---|---|---|---|---|
| | | | | | Target Fundamentals | | Indicated Multiples | |
| 1 | 11/16/2020 | Residential Remodeling and Renovation Company | $ 690,433 | $ 2,405,787 | n/a | n/a | 0.29x | n/a |
| 2 | 7/31/2020 | Kitchen and Bathroom Remodeling | 2,225,000 | 6,397,616 | n/a | n/a | 0.35x | n/a |
| 3 | 10/4/2019 | Residential Reconstruction and Remodeling Services | 535,000 | 1,023,199 | n/a | n/a | 0.52x | n/a |
| 4 | 9/13/2019 | Provider of General Contractor Services for Kitchen and Bath | 349,000 | 965,909 | n/a | n/a | 0.36x | n/a |
| 5 | 8/24/2019 | Home Improvement Contractor | 300,000 | 1,000,000 | n/a | n/a | 0.30x | n/a |
| 6 | 7/29/2019 | Residential Remodeling Services | 391,000 | 993,701 | $ 230,002 | 23.1% | 0.39x | 1.70x |
| 7 | 6/28/2019 | Home Remodeling and Renovation Company | 104,000 | 871,068 | 51,414 | 5.9% | 0.12x | 2.02x |
| 8 | 6/15/2019 | New Single Family and Duplex Construction | 650,000 | 12,152,112 | n/a | n/a | 0.05x | n/a |
| 9 | 6/6/2019 | Provider of Kitchen and Bath Remodeling Services focusing on Cabinetry and Countertops | 85,000 | 224,827 | n/a | n/a | 0.38x | n/a |
| 10 | 5/6/2019 | Residential Remodeler and Custom Home Builder | 1,645,000 | 7,380,671 | 848,316 | 11.5% | 0.22x | 1.94x |
| 11 | 5/2/2019 | General Contractor Focused on new Construction, Commercial and Residential Remodeling | 300,000 | 756,824 | n/a | n/a | 0.40x | n/a |
| 12 | 4/30/2019 | Kitchen and Bath Remodeling Company | 910,000 | 1,136,446 | n/a | n/a | 0.80x | n/a |
| 13 | 4/22/2019 | Provider of Construction Services to Modify Homes for the Handicap, Special Needs and Aging Populations | 500,000 | 1,783,855 | n/a | n/a | 0.28x | n/a |
| 14 | 4/1/2019 | Kitchen and Bathroom Remodeling Showroom and Installation | 150,000 | 1,351,066 | n/a | n/a | 0.11x | n/a |
| 15 | 3/27/2019 | Provider of Remodeling and Renovation Services | 140,000 | 567,790 | n/a | n/a | 0.25x | n/a |
| 16 | 3/18/2019 | Kitchen and Bathroom Remodeling Showroom and Installation | 120,000 | 1,593,081 | n/a | n/a | 0.08x | n/a |
| 17 | 1/25/2019 | Residential and Commercial Restoration Company | 550,000 | 654,683 | 459,631 | 70.2% | 0.84x | 1.20x |
| 18 | 1/1/2019 | Residential Remodeler | 1,390,000 | 3,477,000 | 651,000 | 18.7% | 0.40x | 2.14x |
| 19 | 12/7/2018 | General Construction Contractor | 1,400,000 | 5,049,954 | 278,790 | 5.5% | 0.28x | 5.02x |
| 20 | 11/19/2018 | Construction Contractor | 1,400,000 | 6,071,502 | n/a | n/a | 0.23x | n/a |
| 21 | 10/26/2018 | Provider of Remodeling Services for Kitchen and Bath | 165,000 | 2,378,000 | 27,028 | 1.1% | 0.07x | 6.10x |
| 22 | 10/1/2018 | Residential Remodeling Company | 2,025,000 | 3,693,760 | 903,005 | 24.4% | 0.55x | 2.24x |
| 23 | 8/31/2018 | Provider of Remodeling Services for Bathroom, Kitchen and Room Additions | 45,000 | 205,264 | n/a | n/a | 0.22x | n/a |
| 24 | 8/31/2018 | Residential Remodeling Contractor | 180,000 | 948,000 | 107,000 | 11.3% | 0.19x | 1.68x |

Source: DealStats™ Transaction Database
Enterprise Value is presented on a "net of cash" basis.
**Terms Defined:**
n/a = Not Available
nmf = Not Meaningful
EBITDA = Earnings Before Interest, Taxes, Depreciation and Amortization

[a] For stock-based transactions, the target's cash balance is removed.

**ALPHA CONSTRUCTION SERVICES, LLC | 17**

CONFIDENTIAL

# D. Merger and Acquisition Method

**STOUT**

**Exhibit D.2**

## Comparable Transactions

| | Sale Date | Target Business Description | Adjusted Enterprise Value ("EV") [a] | Target Fundamentals | | | Indicated Multiples | |
|---|---|---|---|---|---|---|---|---|
| | | | | LTM Net Revenue | LTM EBITDA | LTM EBITDA Margin | EV / Revenue | EV / EBITDA |
| 25 | 8/14/2018 | Home Improvement Contractor | $ 120,000 | $ 486,939 | n/a | n/a | 0.25x | n/a |
| 26 | 5/25/2018 | General Contractor, Residential and Commercial Construction, and Renovation | 550,000 | 1,702,946 | n/a | n/a | 0.32x | n/a |
| 27 | 5/22/2018 | Home Based Full-Service Construction and Remodeling Company | 240,000 | 638,598 | $ (27,160) | -4.3% | 0.38x | nmf |
| 28 | 3/23/2018 | General Construction Company | 249,000 | 627,297 | 91,406 | 14.6% | 0.40x | 2.72x |
| 29 | 8/28/2017 | Home Improvement Contractor | 2,000,000 | 2,531,869 | 306,577 | 12.1% | 0.79x | 6.52x |
| 30 | 6/29/2017 | Home Improvement Contractor | 375,000 | 1,330,759 | n/a | n/a | 0.28x | n/a |
| 31 | 5/9/2017 | Restoration and Renovation Services | 925,000 | 3,355,090 | 264,488 | 7.9% | 0.28x | 3.50x |
| 32 | 1/3/2017 | Residential General Contractor | 50,000 | 611,225 | n/a | n/a | 0.08x | n/a |
| 33 | 6/21/2016 | Residential Kitchen and Bath Remodeling | 277,000 | 917,523 | 60,967 | 6.6% | 0.30x | 4.54x |
| 34 | 5/2/2016 | Residential Remodeling Business | 340,000 | 1,164,655 | 295,228 | 25.3% | 0.29x | 1.15x |

Source: DealStats™ Transaction Database
Enterprise Value is presented on a "net of cash" basis.
**Terms Defined:**
n/a = Not Available
nmf = Not Meaningful
EBITDA = Earnings Before Interest, Taxes, Depreciation and Amortization

[a] For stock-based transactions, the target's cash balance is removed.

ALPHA CONSTRUCTION SERVICES, LLC | 18

CONFIDENTIAL

# E.  Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or its representatives, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon.

- We conducted an interview with Marty on January 24, 2018. We also requested a more recent interview with management of Alpha Construction. However, as of the date of this report, we had not been afforded the opportunity to conduct such an interview. We reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

- Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

- For the purpose of this engagement and report, we make no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our conclusion of value assumes the assets and liabilities presented in the Company's December 31, 2020 balance sheet were accurate and complete as of that date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- We do not provide assurance on the achievability of the results forecasted in this report. Differences between actual and expected results may be material and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- Our calculation of value is applicable to the Subject Interests for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report (which reflects a Summary Report as defined by the American Institute of Certified Public Accountants Statement on Standards for Valuation Services), and the opinions expressed herein are provided exclusively for the use of the addressee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent. Further, the rationale for how we arrived at the opinions and conclusions expressed herein may not be understood properly without additional information contained in our internal work papers.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" or a "solvency opinion" regarding any contemplated present or future transaction.

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and we have no obligation to update our report for such events and conditions.

- We have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The value that results from a valuation engagement is expressed as a conclusion of value.

By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

ALPHA CONSTRUCTION SERVICES, LLC | 19

STOUT

STOUT

# F. Certification

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report, on which the analysis, opinions, and calculations expressed herein are based, are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- The data used in this report was obtained from sources believed to be reliable. All facts known to us that have bearing on the values presented in this report have been considered, and no facts of importance have been intentionally omitted.

- We have no present or prospective interest in the business that is the subject of this report, and we have no personal interest with respect to the parties involved.

- We have no bias with respect to the business that is the subject of this report or the parties involved with this assignment.

- Our engagement in this assignment was not contingent on developing or reporting predetermined results.

- Our compensation for completing this assignment is fee-based and is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- Our analyses, opinions, and conclusions are developed, and this report is prepared, with the intent of being in conformity with the American Institute of Certified Public Accountants Statement on Standards for Valuation Services.

- Stout Risius Ross, LLC has performed no services, as an appraiser or in any other capacity, regarding the business that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

- In addition to the undersigned, Adam B. Moeller and Karla N. Gross assisted in the research, analysis development, and report preparation for this engagement.

Brian R. Potter, CFA, CFE
Managing Director

Thomas J. Czupta, ASA, ABV
Director

ALPHA CONSTRUCTION SERVICES, LLC | 20

**EXHIBIT B, Page 171 of 237**



**STOUT**

# G.  Statement of Qualifications



Chicago, IL USA
**Office:** +1.312.752.3352
bpotter@stout.com

**Education**

B.S., Finance
Miami University

**Designations**

Chartered Financial Analyst (CFA)
Certified Fraud Examiner (CFE)

**Practice Areas**

Valuation Disputes
Complex Business Litigation
High-Stakes Marital Dissolution
Shareholder Disputes
Transaction Disputes

Brian Potter is a Managing Director in the Valuation Advisory group and head of the firm's Chicago office. Mr. Potter has provided valuation, litigation advisory, and forensic accounting services for numerous purposes, including marital dissolutions, shareholder disputes, estate and gift taxation, purchase price allocation, Employee Stock Ownership Plans, brokerage fraud, bankruptcy, potential transactions and intellectual property valuations. Mr. Potter has extensive experience with intellectual property and brokerage fraud litigation, having provided advisory services in several patent infringement, misappropriation of trade secret and securities fraud matters. Additionally, Mr. Potter has been involved in the appraisal of real estate for various property types, including office, industrial and retail buildings, and vacant land. Mr. Potter has provided services within the context of litigation and has been trained to offer services within various alternative dispute resolution models.

Mr. Potter has presented continuing education seminars on business valuation, understanding tax returns, occupational fraud, and computer forensics and e-discovery. He has also published several articles on valuation and other related topics. Mr. Potter was a contributing author to the chapter entitled "Valuation in Shareholder and Partner Disputes" in Business Valuation, published by the Law Journal Press.

Prior to joining Stout, Mr. Potter was a Consulting Associate with CRA International in its Intellectual Property and Finance practices in Chicago. While at Miami, Mr. Potter earned CoSIDA First Team Academic All-America honors for his academic and athletic achievements while a member of the university's varsity football team.

**Professional Memberships**

- The CFA Institute
- The CFA Society of Chicago
- Association of Certified Fraud Examiners (ACFE)
- AAML Foundation Forensic and Business Valuation Division

**ALPHA CONSTRUCTION SERVICES, LLC | 21**

**CONFIDENTIAL**

# G.  Statement of Qualifications

◢ STOUT



Chicago, IL USA
**Office:** +1.312.763.6629
**Mobile:** +1.312.833.2509
tczupta@stout.com

**Education**

B.S., Finance & Economics
DePaul University

**Designations**

Accredited Senior Appraiser (ASA)
Accredited in Business Valuation
(ABV)

**Practice Areas**

High-Stakes Marital Dissolution
Valuation Disputes
Transaction Disputes
Trust & Estate

Thomas J. Czupta is a Director in the Valuation Advisory group. Mr. Czupta has extensive experience providing professional valuation advisory services in the fields of taxation, litigation, and corporate transactions.

Mr. Czupta has provided business valuation and financial advisory services for numerous purposes including estate and gift taxation, marital dissolutions, business transitions, shareholder disputes, and other tax, corporate, and litigation related matters. His experience spans a diverse client base, from regional middle-market businesses to billion dollar multinational companies, as well as private equity firms, law firms, and financial institutions.

Prior to joining Stout, Mr. Czupta was a Manager with Business Valuation Group, Inc. where his valuations were used in connection with ESOP reporting compliance, litigation support, and federal gift and estate taxation.

**Professional Memberships**

- American Institute of Certified Public Accountants
- Business Valuation Association of Chicago
- Chicago Estate Planning Council
- American Society of Appraisers

**ALPHA CONSTRUCTION SERVICES, LLC** | 22

**CONFIDENTIAL**

**EXHIBIT B, Page 173 of 237**

STOUT

MARRIAGE OF PARIS

# Appendix IV
## Alpha Drywall Services, LLC Report

CONFIDENTIAL

# Alpha Drywall Services, LLC

Valuation of 99.0% and 1.0% Membership Interests
as of December 31, 2020

Issued: December 13, 2021

CONFIDENTIAL

STOUT



**STOUT**

# Contact Information

For more information, please contact one of the following members of the engagement team:

**Brian R. Potter, CFA, CFE**
Managing Director
+1.312.752.3352
bpotter@stout.com

**Thomas J. Czupta, ASA, ABV**
Director
+1.312.763.6629
tczupta@stout.com

**Adam B. Moeller**
Associate
+1.312.237.4850
amoeller@stout.com

## STOUT'S SERVICES

**Investment Banking**
Advising buyers and sellers on mergers and acquisitions, private capital raising, and other corporate financial transactions.

**Valuation Advisory**
Providing valuations of business enterprises, complex securities, intellectual property, real estate, and personal property.

**Transaction Advisory**
Helping clients navigate the transaction process and provide transaction opinions and due diligence services.

**Disputes, Compliance, & Investigations**
Providing expert testimony and consulting, as well as investigative and compliance services for financial-related matters.

ALPHA DRYWALL SERVICES, LLC | 2

CONFIDENTIAL



**STOUT**

# Executive Summary

December 13, 2021

Donald J. Angelini, Esq.
Carly E. Kenny, Esq.
Angelini Ori + Abate Law
155 North Michigan Avenue
Suite 400
Chicago, Illinois 60601

Dear Mr. Angelini and Ms. Kenny:

Stout Risius Ross, LLC ("Stout") has been engaged to determine the Fair Market Values of a 99.0% membership interest and a 1.0% membership interest in Alpha Drywall Services, LLC ("ADS" or the "Company"), on a marketable, controlling-interest basis (the "Subject Interests"), as of December 31, 2020 (the "Valuation Date"). We understand the results of our analysis will be used for marital-dissolution purposes.

## Company Synopsis

Founded in 2020, ADS is a privately held company that operates in the multi-family residential construction industry. The Company is managed by MK Manager Corp. Maeve, LLC – Series LL holds a 99.0% membership interest in ADS and Frank Martin Paris, Jr. ("Marty") holds the remaining 1.0% membership interest. ADS is organized as a limited liability company in Illinois.

## Definition of Value

For purposes of our valuation, the term "Fair Market Value" is defined as the price at which property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.[1]

The term "property" reflects the combined tangible and intangible assets of a company, as components of a going concern, and gives consideration to all known liabilities. The terms "willing buyer" and "willing seller" refer to hypothetical parties rather than any particular buyer or seller. It is important to note that the specific incentives or attributes of particular buyers and sellers may not be the same as the hypothetical buyer and seller from which Fair Market Value is determined.

## Premise of Value

When estimating the Fair Market Value of a controlling interest, we typically consider whether to analyze the subject business enterprise on a going-concern or liquidation basis. As economic theory holds that a controlling interest holder will seek to maximize the value of his or her interest, the determination of whether to use a going-concern or liquidation premise of value may depend on which basis provides a higher indication of value.

We conducted our analysis of the Company under a going-concern premise, meaning that the underlying assets of the Company are presumed, in the absence of a qualified appraisal of such assets, to attain their highest values as integral components of a business entity in continued operation and that liquidation of said assets would likely diminish the value of the whole to the members and creditors of the Company.

---

[1] Treasury Regs. §20.2031-1(b) and §25.2512-1.

CONFIDENTIAL

ALPHA DRYWALL SERVICES, LLC | 3

**◢STOUT**

# Executive Summary

## Factors Considered

Our analysis considered the valuation guidelines referenced in Revenue Ruling 59-60, 1959-1 C.B. 237, which include consideration of the following factors:

- the nature of the business and the history of the Company from its inception;

- the economic outlook in general and the condition and outlook of the industry in which the Company operates;

- the book value of the stock and the financial condition of the Company;

- the earnings capacity of the Company;

- the dividend-paying capacity of the Company;

- whether goodwill or other intangible value exists within the Company;

- previous sales of the Company's stock and the size of the block of stock to be valued; and

- the market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Information Reviewed and Procedures Performed

We reviewed several sources of information during the course of the valuation analysis including, but not limited to, the following:[2]

- ADS' federal income tax returns (form US 1065) for the partial year ended December 31, 2020;

- ADS' general ledger as of December 31, 2020;

- ADS' certificate of formation dated June 9, 2020; and

- a promissory note agreement dated July 21, 2020 with Old Second National Bank and various related documents.

In addition to the information reviewed above, we also performed the following procedures:

- conducted an analysis of other facts and data resulting in our calculation of value.[3]

## Valuation Methodology

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our determination of value. A description of each approach is discussed below.

The *Income Approach* is a technique that estimates the value of a company based on the cash flows the company is expected to generate in the future. The Income Approach is generally performed in two steps: 1) estimate the expected annual future cash flows of the company; and 2) discount or capitalize these cash flows to present value at a rate of return that considers the relative risk of realizing the cash flows.

---

[2] This is not intended to be an exhaustive list of the documents reviewed in this matter.
[3] We conducted an interview with Marty on January 24, 2018. However, while we requested a more recent interview with management of the Company, we were not afforded with the opportunity to conduct such an interview prior to the issuance of this report. As such, we reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

ALPHA DRYWALL SERVICES, LLC | 4

**EXHIBIT B, Page 178 of 237**

# Executive Summary

Under the **Market Approach**, which consists of the Guideline Public Company Method and the Merger and Acquisition ("M&A") Method, the value of a company is estimated by employing statistics derived from observed transactions of similar companies or prior transactions involving interests in the subject company. Ideally, these companies will operate in comparable markets and will have similar growth prospects and risks.

The **Asset Approach** estimates the equity of a business based on the market value of a company's assets minus the value of its liabilities.

The above valuation methods have long been recognized as acceptable in the appropriate circumstances. Accordingly, we applied the methods that, in our experience and judgment, provide the most supportable valuation based on the information available. Based thereon, we have chosen to rely on the Capitalized Cash Flow ("CCF") Method, a form of the Income Approach, in our determination of the value of the equity of ADS. Additionally, we used the M&A Method as a reasonableness test to corroborate the results of our application of the CCF Method.

## Analysis of Goodwill

### Total Goodwill

The EV of an entity incorporates the value of its total invested capital, including both debt and equity capital. Alternatively, the EV of an entity may also be expressed as the collective value of its individual assets, including net working capital, tangible assets, and intangible assets. For example, the EV of ADS was determined to be approximately $56,000. Allocating this amount to each of the separate tangible asset categories of ADS yields the value attributable to the Company's intangible assets, which is determined

on a residual basis. In other words, to the extent that the EV exceeds the market value of net working capital and tangible assets, it is indicated that an element of intangible asset value exist.



To the extent that the total intangible asset value exceeds the value of identifiable intangible assets (e.g., workforce, customer list, tradename, etc.), unidentifiable intangible assets (i.e., goodwill (personal and/or enterprise)) exist.



CONFIDENTIAL

ALPHA DRYWALL SERVICES, LLC | 5

**EXHIBIT B, Page 179 of 237**


**STOUT**

# Executive Summary

As it relates specifically to the Company, it is possible that unidentifiable intangible assets (i.e., goodwill) exist. However, the relevant question is what portion of this unidentifiable asset value, if any, should be allocated to personal goodwill.

## Personal Goodwill

In the case of the Company, it is appropriate to examine the possibility that personal goodwill may exist based on the skill, knowledge, reputation, experience, and relationships held by Marty. In considering these personal contributions made by Marty to the business, it is important to ascertain whether the current compensation amounts paid to him are at a level that would be required to fairly compensate him for his services performed as an employee as well as these efforts. To the extent that a market level of compensation for Marty is incorporated within the cash flows of the Company as an operating expense, the resulting value of the Company indicated by any remaining profits would be attributable solely to intangible value other than personal goodwill (i.e., enterprise goodwill and other identifiable intangible assets).

As discussed above, we adjusted the annual compensation for the CEO of the Company to be consistent with the 75th percentile of the market compensation data contained in the ERI study. Accordingly, as we adjusted Marty's compensation to a market level required to fairly compensate him for both his services performed as an employee of the company, **as well as his personal contributions to the business**, our calculation of the Fair Market Value of the Subject Interests, as of December 31, 2020, **does not include any elements of personal goodwill.**

## Calculation of Value

In accordance with the foregoing, and as presented in Exhibit A, we determined the Fair Market Value of a 99.0% membership interest of ADS, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

### *EIGHTY-SIX THOUSAND DOLLARS*

### *$86,000*

Additionally, as presented in Exhibit A, we determined the Fair Market Value of a 1.0% membership interest of ADS, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

### *NINE HUNDRED DOLLARS*

### *$900*

\*     \*     \*     \*     \*     \*     \*     \*

Our calculation of value is applicable only for the stated date and purpose and may not be appropriate for any other date or purpose. Reference should be made to the exhibits for assumptions and limiting conditions that apply to this valuation and report.

Regards,

*Stout Risius Ross, LLC*

**STOUT RISIUS ROSS, LLC**

**STOUT**

# Exhibits

**Exhibit A** ............................................................................................................ Conclusion of Value

**Exhibit B** ................................................................................................................ Financial Statements

**Exhibit C** ......................................................................................................... Capitalized Cash Flow Method

**Exhibit D** ...................................................................................................... Merger and Acquisition Method

**Exhibit E** .................................................................................................. Assumptions and Limiting Conditions

**Exhibit F** .................................................................................................................................. Certification

**Exhibit G** ........................................................................................................... Statement of Qualifications

ALPHA DRYWALL SERVICES, LLC | 7

CONFIDENTIAL

**◆STOUT**

# A. Conclusion of Value

## Calculation of Value
*In U.S. Dollars*

Exhibit A.1

|  | | Notes | | |
|---|---|---|---|---|
| 1 | **Concluded Enterprise Value** | [a] | $ | **56,000** |
| | | | | |
| 2 | Add: Cash and Cash Equivalents | | | 96,116 |
| 3 | Add: Nonoperating Assets (Liabilities) | | | (65,000) |
| | | | | |
| 4 | **Total Value of Equity** | | $ | **87,116** |
| | | | | |
| 5 | **Pro Rata Value of Maeve's 99.0% Interest** | | $ | **86,000** |
| | | | | |
| 6 | **Pro Rata Value of Marty's 1.0% Interest** | | $ | **900** |
| | | | | |
| | **Implied Multiples** | | | |
| 7 | EV / Proj. EBITDA | | | 5.4x |
| 8 | EV / Proj. Revenue | | | 0.06x |

[a] See Exhibit C.1.

ALPHA DRYWALL SERVICES, LLC | 8

CONFIDENTIAL

**EXHIBIT B, Page 182 of 237**

**STOUT**

# B. Financial Statements

ALPHA DRYWALL SERVICES, LLC | 9

## Reported Balance Sheets

**Exhibit B.1**

*In U.S. Dollars*

|  |  | 12/31/2020 |
|---|---|---|
| 1 | Cash and Cash Equivalents | $ 96,116 |
| 2 | **Total Current Assets** | **96,116** |
| 3 | **Total Assets** | **$ 96,116** |
| 4 | Due to Affiliates | 65,000 |
| 5 | **Total Liabilities** | **65,000** |
| 6 | **Total Members' Equity** | **31,116** |
| 7 | **Total Liabilities & Members' Equity** | **$ 96,116** |

Source: Federal income tax return.

CONFIDENTIAL

**EXHIBIT B, Page 183 of 237**



# B. Financial Statements

**STOUT**

**ALPHA DRYWALL SERVICES, LLC | 10**

## Reported Income Statements

*In U.S. Dollars*

**Exhibit B.2**

| | | 7-Mo. Ended 12/31/2020 |
|---|---|---|
| 1 | **Total Net Sales** | **$ 532,080** |
| 2 | *Growth Rate* | *n/a* |
| 3 | Cost of Labor | 327,525 |
| 4 | Other Cost of Sales | 168,363 |
| 5 | Depreciation | 0 |
| 6 | **Total Cost of Sales** | **495,888** |
| 7 | **Gross Profit** | **36,192** |
| 8 | Gross Profit Margin | 6.8% |
| 9 | Officer's Compensation | 0 |
| 10 | Other Operating Expenses | 5,076 |
| 11 | **Total Operating Expenses** | **5,076** |
| 12 | **Operating Income** | **31,116** |
| 13 | Other Income | 0 |
| 14 | **EBIT** | **31,116** |
| 15 | Interest Income (Expense) | 0 |
| 16 | **Earnings Before Taxes** | **31,116** |
| 17 | Income Tax Benefit (Expense) | 0 |
| 18 | **Net Income (Loss)** | **$ 31,116** |
| 19 | **EBIT** | **$ 31,116** |
| 20 | EBIT Margin | 5.8% |
| 21 | **EBITDA** | **$ 31,116** |
| 22 | EBITDA Margin | 5.8% |

Source: Federal income tax return.

CONFIDENTIAL



**STOUT**

# B.  Financial Statements

## Adjustments to Reported Income Statements

**Exhibit B.3**

*In U.S. Dollars*

| | Notes | 7-Mo. Ended 12/31/2020 |
|---|---|---|
| **1 Reported EBIT** | | $ 31,116 |
| 2 Officer's Compensation - Market Level Adj. | [a] | (25,250) |
| **3 Adjusted EBIT** | | **5,866** |
| 4 Adjusted EBIT Margin | | 1.1% |
| | | |
| **5 Reported Net Income (Loss)** | | 31,116 |
| 6 Total Adjustments to EBIT | | (25,250) |
| 7 Income Taxes Adjustment | [b] | (1,672) |
| **8 Adjusted Net Income** | | **4,194** |
| 9 Adjusted Net Income Margin | | 0.8% |
| | | |
| **10 Adjusted EBIT** | | $ 5,866 |
| 11 Adjusted EBIT Margin | | 1.1% |
| **12 Adjusted EBITDA** | | $ 5,866 |
| 13 Adjusted EBITDA Margin | | 1.1% |

[a] Officers' compensation was adjusted to a market level that would be paid by a third party for a management team to oversee the day-to-day operations of the Company, as well as to compensate Marty for his personal contributions to the business.

[b] Income taxes were adjusted to reflect the prevailing federal and state income tax rates in effect as of the Valuation Date. Although the Company has elected to be taxed as a limited liability company ("LLC"), resulting in no taxes being paid at the corporate level, our approach is to tax-affect LLC income, thus incorporating distributions at a rate similar to a normalized corporate tax liability.

ALPHA DRYWALL SERVICES, LLC | 11

CONFIDENTIAL

# B. Financial Statements



**STOUT**

**Adjusted Historical and Projected Income Statements**

**Exhibit B.4**

*In U.S. Dollars*

| | | 7-Mo. Ended 12/31/2020 | Projection Period |
|---|---|---|---|
| 1 | **Total Net Sales** | $ 532,080 | $ 948,261 |
| 2 | *Growth Rate* | *n/a* | *n/a* |
| 3 | Cost of Labor | 327,525 | 583,708 |
| 4 | Other Cost of Sales | 168,363 | 300,053 |
| 5 | **Total Cost of Sales** | 495,888 | 883,761 |
| 6 | **Gross Profit** | 36,192 | 64,501 |
| 7 | Gross Profit Margin | 6.8% | 6.8% |
| 8 | Officer's Compensation | 25,250 | 45,000 |
| 9 | Other Operating Expenses | 5,076 | 9,046 |
| 10 | Depreciation | 0 | 0 |
| 11 | **Total Operating Expenses** | 30,326 | 54,046 |
| 12 | **Operating Income** | 5,866 | 10,454 |
| 13 | Other Income | 0 | 0 |
| 14 | **EBIT** | 5,866 | 10,454 |
| 15 | Interest Income (Expense) | 0 | 0 |
| 16 | **Earnings Before Taxes** | 5,866 | 10,454 |
| 17 | Income Tax Benefit (Expense) | (1,672) | (2,980) |
| 18 | **Net Income (Loss)** | $ 4,194 | $ 7,474 |
| 19 | EBIT | $ 5,866 | $ 10,454 |
| 20 | EBIT Margin | 1.1% | 1.1% |
| 21 | **EBITDA** | $ 5,866 | $ 10,454 |
| 22 | EBITDA Margin | 1.1% | 1.1% |

Source: projection period prepared by Stout based on a review of the Company's historical adjusted results and an analysis of the overall economy and the Company's industry.

**ALPHA DRYWALL SERVICES, LLC | 12**

CONFIDENTIAL



**◢◣ STOUT**

ALPHA DRYWALL SERVICES, LLC | 13

# C. Capitalized Cash Flow Method

## Capitalized Cash Flow Method                                      Exhibit C.1
*In U.S. Dollars*

| | | Notes | | |
|---|---|---|---|---|
| | **Sustainable Free Cash Flows** | | | |
| 1 | EBITDA | [a] | $ | 10,454 |
| 2 | Depreciation | | | 0 |
| 3 | Income Taxes | | | (2,980) |
| 4 | **Projected Sustainable Debt-Free Net Income** | | | **7,474** |
| | | | | |
| 5 | Depreciation | | | 0 |
| 6 | Capital Expenditures | | | 0 |
| 7 | Additional Working Capital | | | 0 |
| 8 | **Projected Sustainable Free Cash Flows** | | | **7,474** |
| | | | | |
| | **Capitalization Factor** | | | |
| 9 | Weighted Average Cost of Capital | | | 17.5% |
| 10 | Less: Long-Term Growth Rate | | | -3.0% |
| 11 | **Capitalization Rate** | | | **14.5%** |
| | | | | |
| 12 | **Capitalization Factor** | [b] | | **7.4757** |
| | | | | |
| | **Enterprise Value** | | | |
| 13 | Projected Sustainable Free Cash Flows | | | 7,474 |
| 14 | Capitalization Factor | | | 7.4757 |
| 15 | **Enterprise Value** | | | **55,875** |
| | | | | |
| 16 | **Rounded** | | $ | **56,000** |

[a] See Exhibit B.4.
[b] The capitalization factor is calculated utilizing the "mid-year convention," which assumes that the capitalized cash flows will be received throughout each year into perpetuity, instead of at the end of the year.

The capitalization factor is derived utilizing the following formula:

Capitalization Factor = [(1 + WACC)^0.5] / (CR)
where:
    WACC = Weighted Average Cost of Capital (i.e., line 9)
    CR = Capitalization Rate (i.e., line 11)

**EXHIBIT B, Page 187 of 237**



# C.  Capitalized Cash Flow Method

**STOUT**

ALPHA DRYWALL SERVICES, LLC | 14

## Weighted Average Cost of Capital                                             Exhibit C.2

### Required Return on Equity

| | | Notes | | |
|---|---|---|---|---|
| **1** | Risk-Free Rate of Return | [a] | | 1.5% |
| **2** | Long-Term Market Equity Risk Premium | [b] | 6.2% | |
| **3** | Selected Equity Beta | [c] | 1.10 | 6.8% |
| **4** | Small Stock Risk Premium | [b] | | 9.7% |
| **5** | Company-Specific Risk Premium | | | 3.0% |
| **6** | **Concluded Required Return on Equity** | | | **21.0%** |

### Cost of Debt

| | | | | |
|---|---|---|---|---|
| **7** | Risk-Free Rate of Return | [a] | | 1.5% |
| **8** | Add:  Credit Spread | [d] | | 3.0% |
| **9** | Long-Term Cost of Debt | | | 4.5% |
| **10** | Less:  Income Tax Factor | | 28.5% | -1.3% |
| **11** | **Concluded Cost of Debt** | | | **3.2%** |

### Weighted Average Cost of Capital

| | | | |
|---|---|---|---|
| **12** | Equity Allocation of Capital Structure | [c] | 80.0% | 16.8% |
| **13** | Debt Allocation of Capital Structure | [c] | 20.0% | 0.6% |
| **14** | **Weighted Average Cost of Capital (Rounded)** | | | **17.5%** |

[a] 20-year U.S. Treasury bond yield as of the Valuation Date.
[b] Based on: *Valuation Handbook: U.S. Guide to Cost of Capital*, Duff & Phelps, LLC.
[c] Based on the relevant data for the Company's applicable GICS code.  Refer to Exhibit C.3.
[d] Based on the historical spread between the prime rate and the 90-day Treasury Bill
    (approximately 300 basis points).

CONFIDENTIAL


**STOUT**

**ALPHA DRYWALL SERVICES, LLC | 15**

# C.  Capitalized Cash Flow Method

## Capital Structure and Beta Analysis

**Exhibit C.3**

| | GICS Code [a] | 5-year Debt & Pfd. to EV | Current Debt & Pfd. to EV | Beta |
|---|---|---|---|---|
| 1 | GICS Code 201030 - Median | 18.2% | 19.3% | 1.12 |
| 2 | GICS Code 201030 - Composite | 24.6% | 19.1% | 1.11 |
| 3 | **Selected** | | **20.0%** | **1.10** |

[a] Source: *Valuation Handbook: U.S. Industry Cost of Capital,* Duff & Phelps, LLC

**EXHIBIT B, Page 189 of 237**

**STOUT**

**Exhibit D.1**

# D. Merger and Acquisition Method

## Statistical Analysis of Company Fundamentals and Multiples

*In U.S. Dollars*

| | Adjusted Enterprise Value ("EV") | Analysis of Targets | | | Analysis of Multiples | |
|---|---|---|---|---|---|---|
| | | LTM Net Revenue | LTM EBITDA | LTM EBITDA Margin | EV / Revenue | EV / EBITDA |
| 1 High | $ 2,225,000 | $ 12,152,112 | $ 903,005 | 70.2% | 0.84x | 6.5x |
| 2 Upper Quartile | 855,108 | 2,500,349 | 383,104 | 20.9% | 0.39x | 4.3x |
| 3 Median | 362,000 | 1,150,551 | 264,488 | 11.5% | 0.29x | 2.2x |
| 4 Lower Quartile | 168,750 | 785,385 | 76,187 | 6.3% | 0.22x | 1.8x |
| 5 Low | 45,000 | 205,264 | (27,160) | -4.3% | 0.05x | 1.2x |
| | | | | | | |
| 6 Mean [a] | 628,689 | 2,248,500 | 303,179 | 15.6% | 0.21x | 2.3x |
| 7 Count | 34 | 34 | 15 | 15 | 34 | 14 |

| | Implied Enterprise Value | Subject Company Fundamentals | | | | |
|---|---|---|---|---|---|---|
| | | Projected Net Revenue | Projected EBITDA | Projected EBITDA Margin | | |
| 8 **Alpha Drywall Services, LLC** | $ 56,000 | $ 948,261 | $ 10,454 | 1.1% | | |

Source: DealStats™ Transaction Database
n/a = Not Available
[a] Mean represents arithmetic mean for analysis of targets and harmonic mean for analysis of multiples.

# D. Merger and Acquisition Method

**STOUT**

**Exhibit D.2**

## Comparable Transactions

| # | Sale Date | Target Business Description | Adjusted Enterprise Value ("EV") [a] | Target Fundamentals | | | Indicated Multiples | |
|---|-----------|----------------------------|--------------------------------------|---------------------|---|---|---------------------|---|
| | | | | LTM Net Revenue | LTM EBITDA | LTM EBITDA Margin | EV / Revenue | EV / EBITDA |
| 1 | 11/16/2020 | Residential Remodeling and Renovation Company | $ 690,433 | $ 2,405,787 | n/a | n/a | 0.29x | n/a |
| 2 | 7/31/2020 | Kitchen and Bathroom Remodeling | 2,225,000 | 6,397,616 | n/a | n/a | 0.35x | n/a |
| 3 | 10/4/2019 | Residential Reconstruction and Remodeling Services | 535,000 | 1,023,199 | n/a | n/a | 0.52x | n/a |
| 4 | 9/13/2019 | Provider of General Contractor Services for Kitchen and Bath | 349,000 | 965,909 | n/a | n/a | 0.36x | n/a |
| 5 | 8/24/2019 | Home Improvement Contractor | 300,000 | 1,000,000 | n/a | n/a | 0.30x | n/a |
| 6 | 7/29/2019 | Residential Remodeling Services | 391,000 | 993,701 | $ 230,002 | 23.1% | 0.39x | 1.70x |
| 7 | 6/28/2019 | Home Remodeling and Renovation Company | 104,000 | 871,068 | 51,414 | 5.9% | 0.12x | 2.02x |
| 8 | 6/15/2019 | New Single Family and Duplex Construction | 650,000 | 12,152,112 | n/a | n/a | 0.05x | n/a |
| 9 | 6/6/2019 | Provider of Kitchen and Bath Remodeling Services focusing on Cabinetry and Countertops | 85,000 | 224,827 | n/a | n/a | 0.38x | n/a |
| 10 | 5/6/2019 | Residential Remodeler and Custom Home Builder | 1,645,000 | 7,380,671 | 848,316 | 11.5% | 0.22x | 1.94x |
| 11 | 5/2/2019 | General Contractor Focused on new Construction, Commercial and Residential Remodeling | 300,000 | 756,824 | n/a | n/a | 0.40x | n/a |
| 12 | 4/30/2019 | Kitchen and Bath Remodeling Company | 910,000 | 1,136,446 | n/a | n/a | 0.80x | n/a |
| 13 | 4/22/2019 | Provider of Construction Services to Modify Homes for the Handicap, Special Needs and Aging Populations | 500,000 | 1,783,855 | n/a | n/a | 0.28x | n/a |
| 14 | 4/1/2019 | Kitchen and Bathroom Remodeling Showroom and Installation | 150,000 | 1,351,066 | n/a | n/a | 0.11x | n/a |
| 15 | 3/27/2019 | Provider of Remodeling and Renovation Services | 140,000 | 567,790 | n/a | n/a | 0.25x | n/a |
| 16 | 3/18/2019 | Kitchen and Bathroom Remodeling Showroom and Installation | 120,000 | 1,593,081 | n/a | n/a | 0.08x | n/a |
| 17 | 1/25/2019 | Residential and Commercial Restoration Company | 550,000 | 654,683 | 459,631 | 70.2% | 0.84x | 1.20x |
| 18 | 1/1/2019 | Residential Remodeler | 1,390,000 | 3,477,000 | 651,000 | 18.7% | 0.40x | 2.14x |
| 19 | 12/7/2018 | General Construction Contractor | 1,400,000 | 5,049,954 | 278,790 | 5.5% | 0.28x | 5.02x |
| 20 | 11/19/2018 | Construction Contractor | 1,400,000 | 6,071,502 | n/a | n/a | 0.23x | n/a |
| 21 | 10/26/2018 | Provider of Remodeling Services for Kitchen and Bath | 165,000 | 2,378,000 | 27,028 | 1.1% | 0.07x | 6.10x |
| 22 | 10/1/2018 | Residential Remodeling Company | 2,025,000 | 3,693,760 | 903,005 | 24.4% | 0.55x | 2.24x |
| 23 | 8/31/2018 | Provider of Remodeling Services for Bathroom, Kitchen and Room Additions | 45,000 | 205,264 | n/a | n/a | 0.22x | n/a |
| 24 | 8/31/2018 | Residential Remodeling Contractor | 180,000 | 948,000 | 107,000 | 11.3% | 0.19x | 1.68x |

Source: DealStats™ Transaction Database
Enterprise Value is presented on a "net of cash" basis.
**Terms Defined:**
n/a = Not Available
nmf = Not Meaningful
EBITDA = Earnings Before Interest, Taxes, Depreciation and Amortization

[a]  For stock-based transactions, the target's cash balance is removed.

ALPHA DRYWALL SERVICES, LLC | 17

CONFIDENTIAL

# D. Merger and Acquisition Method

**STOUT**

**Exhibit D.2**

## Comparable Transactions

| | Sale Date | Target Business Description | Adjusted Enterprise Value ("EV") [a] | Target Fundamentals | | | Indicated Multiples | |
|---|---|---|---|---|---|---|---|---|
| | | | | LTM Net Revenue | LTM EBITDA | LTM EBITDA Margin | EV / Revenue | EV / EBITDA |
| 25 | 8/14/2018 | Home Improvement Contractor | $ 120,000 | $ 486,939 | n/a | n/a | 0.25x | n/a |
| 26 | 5/25/2018 | General Contractor, Residential and Commercial Construction, and Renovation | 550,000 | 1,702,946 | n/a | n/a | 0.32x | n/a |
| 27 | 5/22/2018 | Home Based Full-Service Construction and Remodeling Company | 240,000 | 638,598 | $ (27,160) | -4.3% | 0.38x | nmf |
| 28 | 3/23/2018 | General Construction Company | 249,000 | 627,297 | 91,406 | 14.6% | 0.40x | 2.72x |
| 29 | 8/28/2017 | Home Improvement Contractor | 2,000,000 | 2,531,869 | 306,577 | 12.1% | 0.79x | 6.52x |
| 30 | 6/29/2017 | Home Improvement Contractor | 375,000 | 1,330,759 | n/a | n/a | 0.28x | n/a |
| 31 | 5/9/2017 | Restoration and Renovation Services | 925,000 | 3,355,090 | 264,488 | 7.9% | 0.28x | 3.50x |
| 32 | 1/3/2017 | Residential General Contractor | 50,000 | 611,225 | n/a | n/a | 0.08x | n/a |
| 33 | 6/21/2016 | Residential Kitchen and Bath Remodeling | 277,000 | 917,523 | 60,967 | 6.6% | 0.30x | 4.54x |
| 34 | 5/2/2016 | Residential Remodeling Business | 340,000 | 1,164,655 | 295,228 | 25.3% | 0.29x | 1.15x |

Source: DealStats™ Transaction Database
Enterprise Value is presented on a "net of cash" basis.
**Terms Defined:**
   n/a = Not Available
   nmf = Not Meaningful
   EBITDA = Earnings Before Interest, Taxes, Depreciation and Amortization

[a]  For stock-based transactions, the target's cash balance is removed.

ALPHA DRYWALL SERVICES, LLC | 18

◆STOUT

# E.    Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or its representatives, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon.

- We conducted an interview with Marty on January 24, 2018. We also requested a more recent interview with management of ADS. However, as of the date of this report, we had not been afforded the opportunity to conduct such an interview. We reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

- Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

- For the purpose of this engagement and report, we make no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our conclusion of value assumes the assets and liabilities presented in the Company's December 31, 2020 balance sheet were accurate and complete as of that date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- We do not provide assurance on the achievability of the results forecasted in this report. Differences between actual and expected results may be material and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- Our calculation of value is applicable to the Subject Interests for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report (which reflects a Summary Report as defined by the American Institute of Certified Public Accountants Statement on Standards for Valuation Services), and the opinions expressed herein are provided exclusively for the use of the addressee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent. Further, the rationale for how we arrived at the opinions and conclusions expressed herein may not be understood properly without additional information contained in our internal work papers.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" or a "solvency opinion" regarding any contemplated present or future transaction.

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and we have no obligation to update our report for such events and conditions.

- We have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The value that results from a valuation engagement is expressed as a conclusion of value.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

**EXHIBIT B, Page 193 of 237**

# F.  Certification

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report, on which the analysis, opinions, and calculations expressed herein are based, are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- The data used in this report was obtained from sources believed to be reliable. All facts known to us that have bearing on the values presented in this report have been considered, and no facts of importance have been intentionally omitted.

- We have no present or prospective interest in the business that is the subject of this report, and we have no personal interest with respect to the parties involved.

- We have no bias with respect to the business that is the subject of this report or the parties involved with this assignment.

- Our engagement in this assignment was not contingent on developing or reporting predetermined results.

- Our compensation for completing this assignment is fee-based and is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- Our analyses, opinions, and conclusions are developed, and this report is prepared, with the intent of being in conformity with the American Institute of Certified Public Accountants Statement on Standards for Valuation Services.

- Stout Risius Ross, LLC has performed no services, as an appraiser or in any other capacity, regarding the business that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

- In addition to the undersigned, Adam B. Moeller and Karla N. Gross assisted in the research, analysis development, and report preparation for this engagement.

Brian R. Potter, CFA, CFE
Managing Director

Thomas J. Czupta, ASA, ABV
Director

ALPHA DRYWALL SERVICES, LLC | 20



# G.  Statement of Qualifications



Chicago, IL USA
**Office:** +1.312.752.3352
bpotter@stout.com

**Education**

B.S., Finance
Miami University

**Designations**

Chartered Financial Analyst (CFA)
Certified Fraud Examiner (CFE)

**Practice Areas**

Valuation Disputes
Complex Business Litigation
High-Stakes Marital Dissolution
Shareholder Disputes
Transaction Disputes

Brian Potter is a Managing Director in the Valuation Advisory group and head of the firm's Chicago office. Mr. Potter has provided valuation, litigation advisory, and forensic accounting services for numerous purposes, including marital dissolutions, shareholder disputes, estate and gift taxation, purchase price allocation, Employee Stock Ownership Plans, brokerage fraud, bankruptcy, potential transactions and intellectual property valuations. Mr. Potter has extensive experience with intellectual property and brokerage fraud litigation, having provided advisory services in several patent infringement, misappropriation of trade secret and securities fraud matters. Additionally, Mr. Potter has been involved in the appraisal of real estate for various property types, including office, industrial and retail buildings, and vacant land. Mr. Potter has provided services within the context of litigation and has been trained to offer services within various alternative dispute resolution models.

Mr. Potter has presented continuing education seminars on business valuation, understanding tax returns, occupational fraud, and computer forensics and e-discovery. He has also published several articles on valuation and other related topics. Mr. Potter was a contributing author to the chapter entitled "Valuation in Shareholder and Partner Disputes" in Business Valuation, published by the Law Journal Press.

Prior to joining Stout, Mr. Potter was a Consulting Associate with CRA International in its Intellectual Property and Finance practices in Chicago. While at Miami, Mr. Potter earned CoSIDA First Team Academic All-America honors for his academic and athletic achievements while a member of the university's varsity football team.

**Professional Memberships**

- The CFA Institute
- The CFA Society of Chicago
- Association of Certified Fraud Examiners (ACFE)
- AAML Foundation Forensic and Business Valuation Division

**STOUT**

ALPHA DRYWALL SERVICES, LLC | 21



**▲STOUT**

# G.  Statement of Qualifications



Chicago, IL USA
**Office:** +1.312.763.6629
**Mobile:** +1.312.833.2509
tczupta@stout.com

**Education**

B.S., Finance & Economics
DePaul University

**Designations**

Accredited Senior Appraiser (ASA)
Accredited in Business Valuation
(ABV)

**Practice Areas**

High-Stakes Marital Dissolution
Valuation Disputes
Transaction Disputes
Trust & Estate

Thomas J. Czupta is a Director in the Valuation Advisory group. Mr. Czupta has extensive experience providing professional valuation advisory services in the fields of taxation, litigation, and corporate transactions.

Mr. Czupta has provided business valuation and financial advisory services for numerous purposes including estate and gift taxation, marital dissolutions, business transitions, shareholder disputes, and other tax, corporate, and litigation related matters. His experience spans a diverse client base, from regional middle-market businesses to billion dollar multinational companies, as well as private equity firms, law firms, and financial institutions.

Prior to joining Stout, Mr. Czupta was a Manager with Business Valuation Group, Inc. where his valuations were used in connection with ESOP reporting compliance, litigation support, and federal gift and estate taxation.

**Professional Memberships**

- American Institute of Certified Public Accountants
- Business Valuation Association of Chicago
- Chicago Estate Planning Council
- American Society of Appraisers

**EXHIBIT B, Page 196 of 237**

STOUT

# Appendix V
## Alpha Property Services, LLC Report



# Alpha Property Services, LLC

Valuation of 99.0% and 1.0% Membership Interests
as of December 31, 2020

Issued: December 13, 2021

CONFIDENTIAL



**STOUT**

# Contact Information

For more information, please contact one of the following members of the engagement team:

**Brian R. Potter, CFA, CFE**
Managing Director
+1.312.752.3352
bpotter@stout.com

**Karla N. Gross**
Associate
+1.248.432.1265
kgross@stout.com

**Thomas J. Czupta, ASA, ABV**
Director
+1.312.763.6629
tczupta@stout.com

**Adam Moeller**
Associate
+1.312.237.4850
amoeller@stout.com



STOUT'S
SERVICES

**Investment Banking**
Advising buyers and sellers on mergers and acquisitions, private capital raising, and other corporate financial transactions.

**Valuation Advisory**
Providing valuations of business enterprises, complex securities, intellectual property, real estate, and personal property.

**Transaction Advisory**
Helping clients navigate the transaction process and provide transaction opinions and due diligence services.

**Disputes, Compliance, & Investigations**
Providing expert testimony and consulting, as well as investigative and compliance services for financial-related matters.

ALPHA PROPERTY SERVICES, LLC | 2

CONFIDENTIAL

**EXHIBIT B, Page 199 of 237**

# Executive Summary

December 13, 2021

Donald J. Angelini, Esq.
Carly E. Kenny, Esq.
Angelini Ori + Abate Law
155 North Michigan Avenue
Suite 400
Chicago, Illinois 60601

Dear Mr. Angelini and Ms. Kenny:

Stout Risius Ross, LLC ("Stout") has been engaged to determine the Fair Market Values of a 99.0% membership interest and a 1.0% membership interest in Alpha Property Services, LLC ("APS" or the "Company"), on a marketable, controlling-interest basis (the "Subject Interests"), as of December 31, 2020 (the "Valuation Date"). We understand the results of our analysis will be used for marital-dissolution purposes.

## Company Synopsis

Founded in 2011, APS is a privately held company that operates as a property management company in the real estate industry. The Company is managed by MK Manager Corp. Maeve, LLC – Series W holds a 99.0% membership interest in APS and Frank Martin Paris, Jr. ("Marty") holds the remaining 1.0% membership interest. APS is organized as a limited liability company in Illinois.

## Definition of Value

For purposes of our valuation, the term "Fair Market Value" is defined as the price at which property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.[1]

The term "property" reflects the combined tangible and intangible assets of a company, as components of a going concern, and gives consideration to all known liabilities. The terms "willing buyer" and "willing seller" refer to hypothetical parties rather than any particular buyer or seller. It is important to note that the specific incentives or attributes of particular buyers and sellers may not be the same as the hypothetical buyer and seller from which Fair Market Value is determined.

## Premise of Value

When estimating the Fair Market Value of a controlling interest, we typically consider whether to analyze the subject business enterprise on a going-concern or liquidation basis. As economic theory holds that a controlling interest holder will seek to maximize the value of his or her interest, the determination of whether to use a going-concern or liquidation premise of value may depend on which basis provides a higher indication of value.

We conducted our analysis of the Company under a going-concern premise, meaning that the underlying assets of the Company are presumed, in the absence of a qualified appraisal of such assets, to attain their highest values as integral components of a business entity in continued operation and that liquidation of said assets would likely diminish the value of the whole to the members and creditors of the Company.

---

[1] Treasury Regs. §20.2031-1(b) and §25.2512-1.

**STOUT**

**ALPHA PROPERTY SERVICES, LLC | 3**

CONFIDENTIAL

**EXHIBIT B, Page 200 of 237**

**STOUT**

# Executive Summary

## Factors Considered

Our analysis considered the valuation guidelines referenced in Revenue Ruling 59-60, 1959-1 C.B. 237, which include consideration of the following factors:

- the nature of the business and the history of the Company from its inception;

- the economic outlook in general and the condition and outlook of the industry in which the Company operates;

- the book value of the stock and the financial condition of the Company;

- the earnings capacity of the Company;

- the dividend-paying capacity of the Company;

- whether goodwill or other intangible value exists within the Company;

- previous sales of the Company's stock and the size of the block of stock to be valued; and

- the market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Information Reviewed and Procedures Performed

We reviewed several sources of information during the course of the valuation analysis including, but not limited to, the following:[2]

- APS's federal income tax returns (form US 1065) for the years ended December 31, 2015 through 2020;

- APS's general ledger as of December 31, 2020;

- APS's operating agreement dated July 1, 2011; and

- APS's articles of amendment dated November 15, 2012.

In addition to the information reviewed above, we also performed the following procedures:

- conducted an analysis of other facts and data resulting in our calculation of value.[3]

## Valuation Methodology

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our determination of value. A description of each approach is discussed below.

The *Income Approach* is a technique that estimates the value of a company based on the cash flows the company is expected to generate in the future. The Income Approach is generally performed in two steps: 1) estimate the expected annual future cash flows of the company; and 2) discount or capitalize these cash flows to present value at a rate of return that considers the relative risk of realizing the cash flows.

Under the *Market Approach*, which consists of the Guideline Public Company Method and the Merger and Acquisition ("M&A") Method, the

---

[2] This is not intended to be an exhaustive list of the documents reviewed in this matter.
[3] We conducted an interview with Marty on January 24, 2018. However, while we requested a more recent interview with management of the Company, we were not afforded with the opportunity to conduct such an interview prior to the issuance of this report. As such, we reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

CONFIDENTIAL

ALPHA PROPERTY SERVICES, LLC | 4

**EXHIBIT B, Page 201 of 237**

# Executive Summary

value of a company is estimated by employing statistics derived from observed transactions of similar companies or prior transactions involving interests in the subject company. Ideally, these companies will operate in comparable markets and will have similar growth prospects and risks.

The *Asset Approach* estimates the equity of a business based on the market value of a company's assets minus the value of its liabilities.

The above valuation methods have long been recognized as acceptable in the appropriate circumstances. Accordingly, we applied the methods that, in our experience and judgment, provide the most supportable valuation based on the information available. Based thereon, we have chosen to rely on the Capitalized Cash Flow ("CCF") Method, a form of the Income Approach, in our determination of the value of the equity of APS. Additionally, we used the M&A Method as a reasonableness test to corroborate the results of our application of the CCF Method.

## Analysis of Goodwill

### Total Goodwill

The EV of an entity incorporates the value of its total invested capital, including both debt and equity capital. Alternatively, the EV of an entity may also be expressed as the collective value of its individual assets, including net working capital, tangible assets, and intangible assets. For example, the EV of APS was determined to be approximately $68,000. Allocating this amount to each of the separate tangible asset categories of APS yields the value attributable to the Company's intangible assets, which is determined on a residual basis. In other words, to the extent that the EV exceeds the

market value of net working capital and tangible assets, it is indicated that an element of intangible asset value exist.



To the extent that the total intangible asset value exceeds the value of identifiable intangible assets (e.g., workforce, customer list, tradename, etc.), unidentifiable intangible assets (i.e., goodwill (personal and/or enterprise)) exist.



**▲STOUT**

# Executive Summary

As it relates specifically to the Company, it is possible that unidentifiable intangible assets (i.e., goodwill) exist. However, the relevant question is what portion of this unidentifiable asset value, if any, should be allocated to personal goodwill.

## Personal Goodwill

In the case of the Company, it is appropriate to examine the possibility that personal goodwill may exist based on the skill, knowledge, reputation, experience, and relationships held by Marty. In considering these personal contributions made by Marty to the business, it is important to ascertain whether the current compensation amounts paid to him are at a level that would be required to fairly compensate him for his services performed as an employee as well as these efforts. To the extent that a market level of compensation for Marty is incorporated within the cash flows of the Company as an operating expense, the resulting value of the Company indicated by any remaining profits would be attributable solely to intangible value other than personal goodwill (i.e., enterprise goodwill and other identifiable intangible assets).

As discussed above, we adjusted the annual compensation for the CEO of the Company to be consistent with the 75th percentile of the market compensation data contained in the ERI study. Accordingly, as we adjusted Marty's compensation to a market level required to fairly compensate him for both his services performed as an employee of the company, **as well as his personal contributions to the business**, our calculation of the Fair Market Value of the Subject Interests, as of December 31, 2020, **does not include any elements of personal goodwill.**

## Calculation of Value

In accordance with the foregoing, and as presented in Exhibit A, we determined the Fair Market Value of a 99.0% membership interest of APS, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

*FOUR HUNDRED FOURTEEN THOUSAND DOLLARS*

*$414,000*

Additionally, as presented in Exhibit A, we determined the Fair Market Value of a 1.0% membership interest of APS, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

*FOUR THOUSAND TWO HUNDRED DOLLARS*

*$4,200*

*    *    *    *    *    *    *    *

Our calculation of value is applicable only for the stated date and purpose and may not be appropriate for any other date or purpose. Reference should be made to the exhibits for assumptions and limiting conditions that apply to this valuation and report.

Regards,

*Stout Risius Ross, LLC*

**STOUT RISIUS ROSS, LLC**

**EXHIBIT B, Page 203 of 237**

# Exhibits

**Exhibit A** ................................................................................................................ Conclusion of Value

**Exhibit B** ................................................................................................................ Financial Statements

**Exhibit C** .......................................................................................... Capitalized Cash Flow Method

**Exhibit D** ............................................................................................ Merger and Acquisition Method

**Exhibit E** ..................................................................................... Assumptions and Limiting Conditions

**Exhibit F** ................................................................................................................ Certification

**Exhibit G** ......................................................................................... Statement of Qualifications

◀STOUT

ALPHA PROPERTY SERVICES, LLC | 7

CONFIDENTIAL

**EXHIBIT B, Page 204 of 237**

STOUT

# A. Conclusion of Value

## Conclusion of Value
*In U.S. Dollars*

Exhibit A.1

| | | Notes [a] | | |
|---|---|---|---|---|
| 1 | **Concluded Enterprise Value** | | **$** | **68,000** |
| 2 | Less: Interest-Bearing Debt | | | 0 |
| 3 | Add: Cash and Cash Equivalents | | | 65,901 |
| 4 | Add: Nonoperating Assets (Liabilities) | | | 286,710 |
| 5 | Less: Working Capital Deficit | | | (2,428) |
| 6 | **Total Value of Equity (Rounded)** | | **$** | **418,183** |
| 7 | **Pro Rata Value of Maeve's 99.0% Interest** | | **$** | **414,000** |
| 8 | **Pro Rata Value of Marty's 1.0% Interest** | | **$** | **4,200** |
| | **Implied Multiples** | | | |
| 9 | EV / Proj. EBITDA | | | 5.9x |
| 10 | EV / Proj. Revenue | | | 1.0x |

[a] See Exhibit C.1

ALPHA PROPERTY SERVICES, LLC | 8

CONFIDENTIAL

**EXHIBIT B, Page 205 of 237**

# B. Financial Statements

**◢ STOUT**

**Exhibit B.1**

## Reported Balance Sheets
*In U.S. Dollars*

| | | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ (36,784) | $ 95,783 | $ 91,267 | $ 51,526 | $ 65,901 |
| 2 | Due from Affiliate | 176,690 | 110,596 | 172,200 | 311,377 | 362,232 |
| 3 | Work in Process | 10,535 | 10,535 | 10,535 | 10,535 | 10,535 |
| 4 | **Total Current Assets** | **150,441** | **216,914** | **274,002** | **373,438** | **438,668** |
| 5 | Gross Fixed Assets | 0 | 0 | 0 | 0 | 0 |
| 6 | Less: Accumulated Depreciation | 0 | 0 | 0 | 0 | 0 |
| 7 | **Net Fixed Assets** | **0** | **0** | **0** | **0** | **0** |
| 8 | **Total Assets** | **$ 150,441** | **$ 216,914** | **$ 274,002** | **$ 373,438** | **$ 438,668** |
| 9 | Prepaid Rent | $ 29,833 | $ 53,653 | $ 52,038 | $ 62,442 | $ 75,522 |
| 10 | Escrowed Liability for 1454 Michigan Ave | 0 | 0 | 0 | 0 | 0 |
| 11 | **Total Current Liabilities** | **29,833** | **53,653** | **52,038** | **62,442** | **75,522** |
| 12 | Security Deposits | 13,863 | 14,013 | 14,033 | 14,133 | 14,133 |
| 13 | **Total Long-Term Liabilities** | **13,863** | **14,013** | **14,033** | **14,133** | **14,133** |
| 14 | **Total Liabilities** | **43,696** | **67,666** | **66,071** | **76,575** | **89,655** |
| 15 | Partners' Capital Accounts | 106,745 | 149,248 | 207,931 | 296,863 | 349,013 |
| 16 | **Total Members' Equity** | **106,745** | **149,248** | **207,931** | **296,863** | **349,013** |
| 17 | **Total Liabilities & Members' Equity** | **$ 150,441** | **$ 216,914** | **$ 274,002** | **$ 373,438** | **$ 438,668** |

Source: federal income tax returns.

**EXHIBIT B, Page 206 of 237**

# B. Financial Statements

▲ **STOUT**

**Exhibit B.2**

## Reported Income Statements
*In U.S. Dollars*

| | | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|---|
| 1 | **Total Net Sales** | $ 48,791 | $ 59,841 | $ 42,753 | $ 58,760 | $ 89,009 | $ 52,733 |
| 2 | *Growth Rate* | *n/a* | *22.6%* | *-28.6%* | *37.4%* | *51.5%* | *n/a* |
| 3 | Operating Expenses | 2,268 | 1,350 | 250 | 77 | 77 | 583 |
| 4 | Officer's Compensation | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | Depreciation | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | **Total Operating Expenses** | 2,268 | 1,350 | 250 | 77 | 77 | 583 |
| 7 | **EBIT** | 46,523 | 58,491 | 42,503 | 58,683 | 88,932 | 52,150 |
| 8 | Interest Income (Expense) | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | **Earnings Before Taxes** | 46,523 | 58,491 | 42,503 | 58,683 | 88,932 | 52,150 |
| 10 | Income Tax Benefit (Expense) | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | **Net Income** | $ 46,523 | $ 58,491 | $ 42,503 | $ 58,683 | $ 88,932 | $ 52,150 |
| 12 | **EBIT** | $ 46,523 | $ 58,491 | $ 42,503 | $ 58,683 | $ 88,932 | $ 52,150 |
| 13 | *EBIT Margin* | *95.4%* | *97.7%* | *99.4%* | *99.9%* | *99.9%* | *98.9%* |
| 14 | **EBITDA** | $ 46,523 | $ 58,491 | $ 42,503 | $ 58,683 | $ 88,932 | $ 52,150 |
| 15 | *EBITDA Margin* | *95.4%* | *97.7%* | *99.4%* | *99.9%* | *99.9%* | *98.9%* |

Source: federal income tax returns.

CONFIDENTIAL

ALPHA PROPERTY SERVICES, LLC | 10

# B.  Financial Statements

**STOUT**

Exhibit B.3

## Adjustments to Reported Income Statements
*In U.S. Dollars*

| | Notes | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|---|
| 1 **Reported EBIT** | | $ 46,523 | $ 58,491 | $ 42,503 | $ 58,683 | $ 88,932 | $ 52,150 |
| 2 Officers' Compensation - Market Level Adj. | [a] | (40,152) | (49,245) | (35,183) | (48,356) | (73,249) | (43,396) |
| 3 **Adjusted EBIT** | | **6,371** | **9,246** | **7,320** | **10,327** | **15,683** | **8,754** |
| 4 Adjusted EBIT Margin | | 13.1% | 15.5% | 17.1% | 17.6% | 17.6% | 16.6% |
| | | | | | | | |
| 5 **Reported Net Income** | | 46,523 | 58,491 | 42,503 | 58,683 | 88,932 | 52,150 |
| 6 Total Adjustments to EBIT | [b] | (40,152) | (49,245) | (35,183) | (48,356) | (73,249) | (43,396) |
| 7 Income Taxes Adjustment | | (1,816) | (2,636) | (2,087) | (2,944) | (4,471) | (2,495) |
| 8 **Adjusted Net Income** | | **4,555** | **6,610** | **5,233** | **7,384** | **11,213** | **6,259** |
| 9 Adjusted Net Income Margin | | 9.3% | 11.0% | 12.2% | 12.6% | 12.6% | 11.9% |
| | | | | | | | |
| 10 **Adjusted EBIT** | | $ 6,371 | $ 9,246 | $ 7,320 | $ 10,327 | $ 15,683 | $ 8,754 |
| 11 Adjusted EBIT Margin | | 13.1% | 15.5% | 17.1% | 17.6% | 17.6% | 16.6% |
| 12 **Adjusted EBITDA** | | $ 6,371 | $ 9,246 | $ 7,320 | $ 10,327 | $ 15,683 | $ 8,754 |
| 13 Adjusted EBITDA Margin | | 13.1% | 15.5% | 17.1% | 17.6% | 17.6% | 16.6% |

[a] Officers' compensation was adjusted to a market level that would be paid by a third party for a management team to oversee the day-to-day operations of the Company, as well as to compensate Marty for his personal contributions to the business.

[b] Income taxes were adjusted to reflect the prevailing federal and state income tax rates in effect as of the Valuation Date. Although the Company has elected to be taxed as a limited liability company ("LLC"), resulting in no taxes being paid at the corporate level, our approach is to tax-affect LLC income, thus incorporating distributions at a rate similar to a normalized corporate tax liability.

ALPHA PROPERTY SERVICES, LLC | 11

**STOUT**

# B. Financial Statements

## Adjusted Historical and Projected Income Statements

Exhibit B.4

*In U.S. Dollars*

| | | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | Projection Period |
|---|---|---|---|---|---|---|---|---|
| 1 | **Total Net Sales** | $ 48,791 | $ 59,841 | $ 42,753 | $ 58,760 | $ 89,009 | $ 52,733 | $ 66,834 |
| 2 | *Growth Rate* | *n/a* | 22.6% | -28.6% | 37.4% | 51.5% | -40.8% | 26.7% |
| 3 | Operating Expenses | 2,268 | 1,350 | 250 | 77 | 77 | 583 | 290 |
| 4 | Officer's Compensation | 40,152 | 49,245 | 35,183 | 48,356 | 73,249 | 43,396 | 55,000 |
| 5 | **Total Operating Expenses** | 42,420 | 50,595 | 35,433 | 48,433 | 73,326 | 43,979 | 55,290 |
| 6 | **Operating Income** | 6,371 | 9,246 | 7,320 | 10,327 | 15,683 | 8,754 | 11,544 |
| 7 | Other Income (Expense) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | **EBIT** | 6,371 | 9,246 | 7,320 | 10,327 | 15,683 | 8,754 | 11,544 |
| 9 | Interest Income (Expense) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | **Earnings Before Taxes** | 6,371 | 9,246 | 7,320 | 10,327 | 15,683 | 8,754 | 11,544 |
| 11 | Income Tax Benefit (Expense) | (1,816) | (2,636) | (2,087) | (2,944) | (4,471) | (2,495) | (3,291) |
| 12 | **Net Income** | $ 4,555 | $ 6,610 | $ 5,233 | $ 7,384 | $ 11,213 | $ 6,259 | $ 8,253 |
| 13 | **EBIT** | $ 6,371 | $ 9,246 | $ 7,320 | $ 10,327 | $ 15,683 | $ 8,754 | $ 11,544 |
| 14 | EBIT Margin | 13.1% | 15.5% | 17.1% | 17.6% | 17.6% | 16.6% | 17.3% |
| 15 | **EBITDA** | $ 6,371 | $ 9,246 | $ 7,320 | $ 10,327 | $ 15,683 | $ 8,754 | $ 11,544 |
| 16 | EBITDA Margin | 13.1% | 15.5% | 17.1% | 17.6% | 17.6% | 16.6% | 17.3% |

Source: projection period prepared by Stout based on a review of the Company's historical adjusted results and an analysis of the overall economy and the Company's industry.

CONFIDENTIAL

ALPHA PROPERTY SERVICES, LLC | 12



# C. Capitalized Cash Flow Method

**Capitalized Cash Flow Method**                                          **Exhibit C.1**

*In U.S. Dollars*

| | | Notes | |
|---|---|---|---|
| | **Sustainable Free Cash Flows** | [a] | $ |
| 1 | EBITDA | | 11,544 |
| 2 | Depreciation | | 0 |
| 3 | Income Taxes | | (3,291) |
| 4 | **Projected Sustainable Debt-Free Net Income** | | **8,253** |
| | | | |
| 5 | Depreciation | | 0 |
| 6 | Capital Expenditures | | 0 |
| 7 | Additional Working Capital | | (389) |
| 8 | **Projected Sustainable Free Cash Flows** | | **7,864** |
| | | | |
| | **Capitalization Factor** | | |
| 9 | Weighted Average Cost of Capital | | 15.5% |
| 10 | Less: Long-Term Growth Rate | | -3.0% |
| 11 | **Capitalization Rate** | | **12.5%** |
| | | | |
| 12 | **Capitalization Factor** | [b] | **8.5977** |
| | | | |
| | **Enterprise Value** | | |
| 13 | Projected Sustainable Free Cash Flows | | 7,864 |
| 14 | Capitalization Factor | | 8.5977 |
| 15 | **Enterprise Value** | | 67,616 |
| | | | |
| 16 | **Rounded** | | $ **68,000** |

[a] See Exhibit B.4.
[b] The capitalization factor is calculated utilizing the "mid-year convention," which assumes that the capitalized cash flows will be received throughout each year into perpetuity, instead of at the end of the year.

The capitalization factor is derived utilizing the following formula:

Capitalization Factor = [(1 + WACC)^0.5] / (CR)

where:
  WACC = Weighted Average Cost of Capital (i.e., line 9)
  CR = Capitalization Rate (i.e., line 11)

**EXHIBIT B, Page 210 of 237**

STOUT

# C. Capitalized Cash Flow Method

## Weighted Average Cost of Capital

Exhibit C.2

### Required Return on Equity

Modified Capital Asset Pricing Model

| | | Notes | | |
|---|---|---|---|---|
| 1 | Risk-Free Rate of Return | [a] | | 1.5% |
| 2 | Long-Term Market Equity Risk Premium | [b] | 6.2% | |
| 3 | Selected Equity Beta | [c] | 1.30 | 8.0% |
| 4 | Small Stock Risk Premium | [b] | | 9.5% |
| 5 | Company-Specific Risk Premium | | | 3.0% |
| 6 | **Concluded Required Return on Equity** | | | **21.9%** |

### Cost of Debt

Long-Term Cost of Debt

| | | | | |
|---|---|---|---|---|
| 7 | Risk-Free Rate of Return | [a] | | 1.5% |
| 8 | Add: Credit Spread | [d] | | 3.0% |
| 9 | Long-Term Cost of Debt | | | 4.5% |
| 10 | Less: Income Tax Factor | | 28.5% | -1.3% |
| 11 | **Concluded Cost of Debt** | | | **3.2%** |

### Weighted Average Cost of Capital

| | | | | |
|---|---|---|---|---|
| 12 | Equity Allocation of Capital Structure | [c] | 65.0% | 14.3% |
| 13 | Debt Allocation of Capital Structure | [c] | 35.0% | 1.1% |
| 14 | **Weighted Average Cost of Capital (Rounded)** | | | **15.5%** |

[a] 20-year U.S. Treasury bond yield as of the Valuation Date.
[b] Based on: *Valuation Handbook: U.S. Guide to Cost of Capital*, Duff & Phelps, LLC.
[c] Based on the results of relevant data for the Company's applicable GICS code. Refer to Exhibit C.3.
[d] Based on the historical spread between the prime rate and the 90-day Treasury Bill (approximately 300 basis points).

ALPHA PROPERTY SERVICES, LLC | 14

CONFIDENTIAL

# C.  Capitalized Cash Flow Method

**STOUT**

## Capital Structure and Beta Analysis

Exhibit C.3

| GICS Code [a] | 5-year Debt & Pfd. to EV | Current Debt & Pfd. to EV | Beta |
|---|---|---|---|
| 1  GICS Code 601020 - Median | 40.7% | 50.4% | 1.20 |
| 2  GICS Code 601020 - Composite | 39.0% | 35.1% | 1.33 |
| 3  **Selected** | | **35.0%** | **1.30** |

[a] Source: *Valuation Handbook: U.S. Industry Cost of Capital*, Duff & Phelps, LLC.

CONFIDENTIAL

**EXHIBIT B, Page 212 of 237**

**▲STOUT**

**Exhibit D.1**

# D. Merger and Acquisition Method

**Statistical Analysis of Company Fundamentals and Multiples**
*In U.S. Dollars*

|  | Adjusted Enterprise Value ("EV") | Analysis of Targets | | | | Analysis of Multiples | |
|---|---|---|---|---|---|---|---|
|  |  | LTM Net Revenue | LTM EBITDA | LTM EBITDA Margin | | EV / Revenue | EV / EBITDA |
| 1 High | $ 2,025,000 | $ 4,238,823 | $ 403,325 | 35.1% | | 1.56x | 4.2x |
| 2 Upper Quartile | 395,000 | 972,631 | n/a | n/a | | 0.93x | n/a |
| 3 Median | 245,500 | 360,046 | 95,900 | 22.3% | | 0.73x | 2.9x |
| 4 Lower Quartile | 138,000 | 206,662 | n/a | n/a | | 0.40x | n/a |
| 5 Low | 70,000 | 60,600 | 72,448 | 7.1% | | 0.11x | 2.0x |
| | | | | | | | |
| 6 Mean [a] | 356,117 | 693,091 | 166,893 | 21.7% | | 0.45x | 2.6x |
| 7 Coefficient of Variation [b] | 1.03 | 1.13 | 0.95 | 0.68 | | 0.56 | 0.39 |
| 8 Count | 40 | 40 | 4 | 4 | | 40 | 4 |

**Subject Company Fundamentals**

|  | Implied Enterprise Value | Projected Net Revenue | Projected EBITDA | Projected EBITDA Margin |
|---|---|---|---|---|
| 9 Alpha Property Services, LLC | $ 68,000 | $ 66,834 | $ 11,544 | 17.3% |

Source: DealStats™ Transaction Database
n/a = Not Available
nmf = Not Meaningful
[a] Mean represents arithmetic mean for analysis of targets and harmonic mean for analysis of multiples.

ALPHA PROPERTY SERVICES, LLC |16

**EXHIBIT B, Page 213 of 237**

# D. Merger and Acquisition Method

**Comparable Transactions**

Exhibit D.2

◆ STOUT

| | Sale Date | Target Business Description | Adjusted Enterprise Value ("EV") [a] | LTM Net Revenue | LTM EBITDA | LTM EBITDA Margin | EV / Revenue | EV / EBITDA |
|---|---|---|---|---|---|---|---|---|
| | | | | | Target Fundamentals | | Indicated Multiples | |
| 1 | 12/7/2020 | Provider of Residential Property Management Services for Retirement Community | $ 135,000 | $ 158,392 | n/a | n/a | 0.85x | n/a |
| 2 | 12/4/2020 | Residential Property Management Company | 395,000 | 1,398,659 | n/a | n/a | 0.28x | n/a |
| 3 | 11/18/2020 | Provider of Residential Property Management Services | 355,000 | 369,319 | n/a | n/a | 0.96x | n/a |
| 4 | 11/10/2020 | Provider of Residential Property Management Services for Retirement Community | 101,770 | 911,332 | n/a | n/a | 0.11x | n/a |
| 5 | 10/30/2020 | Property Management | 360,000 | 1,144,324 | n/a | n/a | 0.31x | n/a |
| 6 | 9/30/2020 | Property Management | 185,000 | 1,637,040 | n/a | n/a | 0.11x | n/a |
| 7 | 9/11/2020 | Provider of Residential Property Management Services for Retirement Community | 100,000 | 114,396 | n/a | n/a | 0.87x | n/a |
| 8 | 8/31/2020 | Property Management Company | 382,900 | 941,357 | n/a | n/a | 0.41x | n/a |
| 9 | 8/31/2020 | Provider of Residential Property Management Services for Retirement Community | 93,000 | 60,600 | n/a | n/a | 1.53x | n/a |
| 10 | 7/31/2020 | Provider of Residential Property Management Services | 216,000 | 322,985 | 109,561 | 33.9% | 0.67x | 1.97x |
| 11 | 7/16/2020 | Provider of Residential Property Management Services for Retirement Community | 175,000 | 231,233 | n/a | n/a | 0.76x | n/a |
| 12 | 7/8/2020 | Residential Property Management Services | 70,000 | 204,381 | n/a | n/a | 0.34x | n/a |
| 13 | 6/24/2020 | Residential Property Management Company | 295,000 | 416,193 | n/a | n/a | 0.71x | n/a |
| 14 | 6/15/2020 | Residential Property Management Services | 400,000 | 1,066,453 | n/a | n/a | 0.38x | n/a |
| 15 | 6/15/2020 | Property Management Company | 400,000 | 925,897 | n/a | n/a | 0.43x | n/a |
| 16 | 6/1/2020 | Residential Property Management Services | 365,000 | 498,752 | n/a | n/a | 0.73x | n/a |
| 17 | 5/31/2020 | Residential Property Management Company | 395,000 | 282,639 | n/a | n/a | 1.40x | n/a |
| 18 | 5/29/2020 | Property Management Company | 139,000 | 172,605 | n/a | n/a | 0.81x | n/a |
| 19 | 4/30/2020 | Residential Property Management Services | 160,000 | 210,820 | n/a | n/a | 0.76x | n/a |
| 20 | 4/17/2020 | Property Management for Commercial and Residential Customers | 2,025,000 | 1,743,782 | n/a | n/a | 1.16x | n/a |

Source: DealStats™ Transaction Database

Enterprise Value is presented on a "net of cash" basis.

**Terms Defined:**
n/a = Not Available
nmf = Not Meaningful
EBITDA = Earnings Before Interest, Taxes, Depreciation and Amortization

[a]  For stock-based transactions, the target's cash balance is removed.

ALPHA PROPERTY SERVICES, LLC | 17

CONFIDENTIAL

# D. Merger and Acquisition Method

**Comparable Transactions**

Exhibit D.2

◆ STOUT

| | Sale Date | Target Business Description | Adjusted Enterprise Value ("EV") [a] | Target Fundamentals | | | Indicated Multiples | |
|---|---|---|---|---|---|---|---|---|
| | | | | LTM Net Revenue | LTM EBITDA | LTM EBITDA Margin | EV / Revenue | EV / EBITDA |
| 21 | 3/24/2020 | Residential Property Management Services | 135,000 | 108,235 | n/a | n/a | 1.25x | n/a |
| 22 | 2/28/2020 | Residential Property Management Services | 150,000 | 207,422 | n/a | n/a | 0.72x | n/a |
| 23 | 1/31/2020 | Residential Property Management Services | 280,000 | 350,772 | n/a | n/a | 0.80x | n/a |
| 24 | 1/29/2020 | Residential Property Management Services | 345,000 | 1,156,499 | 82,238 | 7.1% | 0.30x | 4.20x |
| 25 | 1/25/2020 | Residential Property Management Services | 1,100,000 | 4,238,823 | n/a | n/a | 0.26x | n/a |
| 26 | 11/27/2019 | Provider of Property Management and Real Estate Brokerage Services | 800,000 | 1,149,880 | 403,325 | 35.1% | 0.70x | 1.98x |
| 27 | 11/1/2019 | Property Management Company | 70,000 | 70,000 | n/a | n/a | 1.00x | n/a |
| 28 | 10/22/2019 | Provider of Property Management Services | 925,000 | 594,033 | n/a | n/a | 1.56x | n/a |
| 29 | 9/30/2019 | Property Management Company | 542,500 | 350,136 | n/a | n/a | 1.55x | n/a |
| 30 | 9/13/2019 | Provider of Residential Property Management Services | 175,000 | 140,781 | n/a | n/a | 1.24x | n/a |
| 31 | 8/30/2019 | Real Estate Property Management | 99,500 | 232,058 | n/a | n/a | 0.43x | n/a |
| 32 | 6/28/2019 | Property Management Company | 450,000 | 491,115 | n/a | n/a | 0.92x | n/a |
| 33 | 5/28/2019 | Residential Property Management Services | 335,000 | 2,204,064 | n/a | n/a | 0.15x | n/a |
| 34 | 5/3/2019 | Residential Property Management Services | 200,000 | 165,000 | n/a | n/a | 1.21x | n/a |
| 35 | 5/1/2019 | Residential Property Management Services | 125,000 | 150,000 | n/a | n/a | 0.83x | n/a |
| 36 | 4/1/2019 | Residential Property Management Services | 275,000 | 674,505 | 72,448 | 10.7% | 0.41x | 3.80x |
| 37 | 3/15/2019 | Residential Property Management Services | 195,000 | 316,400 | n/a | n/a | 0.62x | n/a |
| 38 | 3/8/2019 | Residential Property Management Services | 190,000 | 237,895 | n/a | n/a | 0.80x | n/a |
| 39 | 1/18/2019 | Residential Property Management Services | 130,000 | 746,031 | n/a | n/a | 0.17x | n/a |
| 40 | 12/31/2018 | Residential Property Management Services | 975,000 | 1,328,841 | n/a | n/a | 0.73x | n/a |

Source: DealStats™ Transaction Database
Enterprise Value is presented on a "net of cash" basis.
**Terms Defined:**
  n/a = Not Available
  nmf = Not Meaningful
  EBITDA = Earnings Before Interest, Taxes, Depreciation and Amortization

[a]  For stock-based transactions, the target's cash balance is removed.

ALPHA PROPERTY SERVICES, LLC | 18

**EXHIBIT B, Page 215 of 237**

◆STOUT

# E.    Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or its representatives, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon.

- We conducted an interview with Marty on January 24, 2018. We also requested a more recent interview with management of APS. However, as of the date of this report, we had not been afforded the opportunity to conduct such an interview. We reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

- Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

- For the purpose of this engagement and report, we make no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our conclusion of value assumes the assets and liabilities presented in the Company's December 31, 2020 balance sheet were accurate and complete as of that date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- We do not provide assurance on the achievability of the results forecasted in this report. Differences between actual and expected results may be material and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- Our calculation of value is applicable to the Subject Interests for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report (which reflects a Summary Report as defined by the American Institute of Certified Public Accountants Statement on Standards for Valuation Services), and the opinions expressed herein are provided exclusively for the use of the addressee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent. Further, the rationale for how we arrived at the opinions and conclusions expressed herein may not be understood properly without additional information contained in our internal work papers.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" or a "solvency opinion" regarding any contemplated present or future transaction.

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and we have no obligation to update our report for such events and conditions.

- We have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The value that results from a valuation engagement is expressed as a conclusion of value.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

ALPHA PROPERTY SERVICES, LLC | 19

**EXHIBIT B, Page 216 of 237**

**◢STOUT**

# F.  Certification

We certify that, to the best of our knowledge and belief:

■ The statements of fact contained in this report, on which the analysis, opinions, and calculations expressed herein are based, are true and correct.

■ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

■ The data used in this report was obtained from sources believed to be reliable. All facts known to us that have bearing on the values presented in this report have been considered, and no facts of importance have been intentionally omitted.

■ We have no present or prospective interest in the business that is the subject of this report, and we have no personal interest with respect to the parties involved.

■ We have no bias with respect to the business that is the subject of this report or the parties involved with this assignment.

■ Our engagement in this assignment was not contingent on developing or reporting predetermined results.

■ Our compensation for completing this assignment is fee-based and is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

■ Our analyses, opinions, and conclusions are developed, and this report is prepared, with the intent of being in conformity with the American Institute of Certified Public Accountants Statement on Standards for Valuation Services.

■ Stout Risius Ross, LLC has performed no services, as an appraiser or in any other capacity, regarding the business that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

■ In addition to the undersigned, Adam B. Moeller and Karla N. Gross assisted in the research, analysis development, and report preparation for this engagement.

_Thomas J. Czupta, ASA, ABV_
Thomas J. Czupta, ASA, ABV
Director

_Brian R. Potter, CFA, CFE_
Brian R. Potter, CFA, CFE
Managing Director

**EXHIBIT B, Page 217 of 237**

# G.  Statement of Qualifications





**Chicago, IL USA**
**Office:** +1.312.752.3352
bpotter@stout.com

### Education

B.S., Finance
Miami University

### Designations

Chartered Financial Analyst (CFA)
Certified Fraud Examiner (CFE)

### Practice Areas

Valuation Disputes
Complex Business Litigation
High-Stakes Marital Dissolution
Shareholder Disputes
Transaction Disputes

Brian Potter is a Managing Director in the Valuation Advisory group and head of the firm's Chicago office. Mr. Potter has provided valuation, litigation advisory, and forensic accounting services for numerous purposes, including marital dissolutions, shareholder disputes, estate and gift taxation, purchase price allocation, Employee Stock Ownership Plans, brokerage fraud, bankruptcy, potential transactions and intellectual property valuations. Mr. Potter has extensive experience with intellectual property and brokerage fraud litigation, having provided advisory services in several patent infringement, misappropriation of trade secret and securities fraud matters. Additionally, Mr. Potter has been involved in the appraisal of real estate for various property types, including office, industrial and retail buildings, and vacant land. Mr. Potter has provided services within the context of litigation and has been trained to offer services within various alternative dispute resolution models.

Mr. Potter has presented continuing education seminars on business valuation, understanding tax returns, occupational fraud, and computer forensics and e-discovery. He has also published several articles on valuation and other related topics. Mr. Potter was a contributing author to the chapter entitled "Valuation in Shareholder and Partner Disputes" in Business Valuation, published by the Law Journal Press.

Prior to joining Stout, Mr. Potter was a Consulting Associate with CRA International in its Intellectual Property and Finance practices in Chicago. While at Miami, Mr. Potter earned CoSIDA First Team Academic All-America honors for his academic and athletic achievements while a member of the university's varsity football team.

### Professional Memberships

- The CFA Institute
- The CFA Society of Chicago
- Association of Certified Fraud Examiners (ACFE)
- AAML Foundation Forensic and Business Valuation Division

**⬥STOUT**

ALPHA PROPERTY SERVICES, LLC | 21

CONFIDENTIAL

**EXHIBIT B, Page 218 of 237**

# G.  Statement of Qualifications

**STOUT**



Chicago, IL USA
**Office:** +1.312.763.6629
**Mobile:** +1.312.833.2509
tczupta@stout.com

**Education**

B.S., Finance & Economics
DePaul University

**Designations**

Accredited Senior Appraiser (ASA)
Accredited in Business Valuation (ABV)

**Practice Areas**

High-Stakes Marital Dissolution
Valuation Disputes
Transaction Disputes
Trust & Estate

Thomas J. Czupta is a Director in the Valuation Advisory group. Mr. Czupta has extensive experience providing professional valuation advisory services in the fields of taxation, litigation, and corporate transactions.

Mr. Czupta has provided business valuation and financial advisory services for numerous purposes including estate and gift taxation, marital dissolutions, business transitions, shareholder disputes, and other tax, corporate, and litigation related matters. His experience spans a diverse client base, from regional middle-market businesses to billion dollar multinational companies, as well as private equity firms, law firms, and financial institutions.

Prior to joining Stout, Mr. Czupta was a Manager with Business Valuation Group, Inc. where his valuations were used in connection with ESOP reporting compliance, litigation support, and federal gift and estate taxation.

**Professional Memberships**

- American Institute of Certified Public Accountants
- Business Valuation Association of Chicago
- Chicago Estate Planning Council
- American Society of Appraisers

**EXHIBIT B, Page 219 of 237**

**STOUT**

# Appendix VI
## Sedgwick Properties Holding Corp. Report

CONFIDENTIAL



# Sedgwick Properties Holding Corp.

Valuation of a 100.0% Equity Interest as of December 31, 2020

Issued: December 13, 2021

CONFIDENTIAL



**STOUT**

# Contact Information

For more information, please contact one of the following members of the engagement team:

**Brian R. Potter, CFA, CFE**
Managing Director
+1.312.752.3352
bpotter@stout.com

**Christopher J. Carlton**
Analyst
+1.312.752.3324
ccarlton@stout.com

**Thomas J. Czupta, ASA, ABV**
Director
+1.312.763.6629
tczupta@stout.com

**Adam B. Moeller**
Associate
+1.312.237.4850
amoeller@stout.com



## STOUT'S SERVICES

**Investment Banking**
Advising buyers and sellers on mergers and acquisitions, private capital raising, and other corporate financial transactions.

**Valuation Advisory**
Providing valuations of business enterprises, complex securities, intellectual property, real estate, and personal property.

**Transaction Advisory**
Helping clients navigate the transaction process and provide transaction opinions and due diligence services.

**Disputes, Compliance, & Investigations**
Providing expert testimony and consulting, as well as investigative and compliance services for financial-related matters.

**EXHIBIT B, Page 222 of 237**

**STOUT**

# Executive Summary

December 13, 2021

Donald J. Angelini, Esq.
Carly E. Kenny, Esq.
Angelini Ori + Abate Law
155 North Michigan Avenue
Suite 400
Chicago, Illinois 60601

Dear Mr. Angelini and Ms. Kenny:

Stout Risius Ross, LLC ("Stout") has been engaged to determine the Fair Market Value of a 100.0% equity interest in Sedgwick Properties Holding Corp. ("SPHC" or the "Company"), on a marketable, controlling-interest basis (the "Subject Interest"), as of December 31, 2020 (the "Valuation Date"). We understand the results of our analysis will be used for marital-dissolution purposes.

## Company Synopsis

Founded in 2009, SPHC is a privately held corporation. The Company holds certain wholly owned subsidiaries that operate in the construction industry. Frank Martin Paris, Jr. ("Marty") holds a 100.0% equity interest in SPHC. SPHC is organized as an S corporation in Illinois.

Based on the information provided to date, SPHC is known to consolidate the results of the following wholly owned subsidiaries on its federal tax returns:

- Sedgwick Payroll Corporation;
- Sedgwick Design Corporation; and
- Sedgwick Properties Development Corporation.

## Definition of Value

For purposes of our valuation, the term "Fair Market Value" is defined as the price at which property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.[1]

The term "property" reflects the combined tangible and intangible assets of a company, as components of a going concern, and gives consideration to all known liabilities. The terms "willing buyer" and "willing seller" refer to hypothetical parties rather than any particular buyer or seller. It is important to note that the specific incentives or attributes of particular buyers and sellers may not be the same as the hypothetical buyer and seller from which Fair Market Value is determined.

## Premise of Value

When estimating the Fair Market Value of a controlling interest, we typically consider whether to analyze the subject business enterprise on a going-concern or liquidation basis. As economic theory holds that a controlling interest holder will seek to maximize the value of his or her interest, the determination of whether to use a going-concern or liquidation premise of value may depend on which basis provides a higher indication of value.

We conducted our analysis of the Company under a going-concern premise, meaning that the underlying assets of the Company are presumed, in the

---

[1] Treasury Regs. §20.2031-1(b) and §25.2512-1.

CONFIDENTIAL

SEDGWICK PROPERTIES HOLDING CORP. | 3

# Executive Summary

absence of a qualified appraisal of such assets, to attain their highest values as integral components of a business entity in continued operation and that liquidation of said assets would likely diminish the value of the whole to the members and creditors of the Company.

## Factors Considered

Our analysis considered the valuation guidelines referenced in Revenue Ruling 59-60, 1959-1 C.B. 237, which include consideration of the following factors:

- the nature of the business and the history of the Company from its inception;
- the economic outlook in general and the condition and outlook of the industry in which the Company operates;
- the book value of the stock and the financial condition of the Company;
- the earnings capacity of the Company;
- the dividend-paying capacity of the Company;
- whether goodwill or other intangible value exists within the Company;
- previous sales of the Company's stock and the size of the block of stock to be valued; and
- the market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Information Reviewed and Procedures Performed

We reviewed several sources of information during the course of the valuation analysis including, but not limited to, the following:[2]

- SPHC's federal income tax returns for the years ended December 31, 2011 through 2020;
- Sedgwick Payroll Corporation's federal income tax return for the year ended December 31, 2010;
- Sedgwick Properties Development Corporation's federal income tax return for the year ended December 31, 2010;
- SPHC's Illinois Secretary of State file detail report;
- Sedgwick Properties Development Corporation's Articles of Incorporation dated February 1, 1999;
- Sedgwick Properties Development Corporation's Pre-Incorporation Subscription Agreement dated January 21, 1999;
- Sedgwick Properties Development Corporation's "S corporation" election effective February 1, 1999;
- Sedgwick Design Corporation's by-laws;
- the general ledgers as of December 31, 2020 of Sedgwick Design Corporation and Sedgwick Payroll Corporation;
- various payroll records of Sedgwick Payroll Corporation prior to and including the year ended December 31, 2018;
- various written consent resolutions of Sedgwick Design Corporation; and

---

[2] This is not an exhaustive list of the documents reviewed in this matter.

**STOUT**

# Executive Summary

- SPHC's undated by-laws.

In addition to the information reviewed above, we also performed the following procedures:

- conducted an analysis of other facts and data resulting in our calculation of value.[3]

## Valuation Methodology

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our determination of value. A description of each approach is discussed below.

The *Income Approach* is a technique that estimates the value of a company based on the cash flows the company is expected to generate in the future. The Income Approach is generally performed in two steps: 1) estimate the expected annual future cash flows of the company; and 2) discount or capitalize these cash flows to present value at a rate of return that considers the relative risk of realizing the cash flows.

Under the *Market Approach*, which consists of the Guideline Public Company Method and the Merger and Acquisition ("M&A") Method, the value of a company is estimated by employing statistics derived from observed transactions of similar companies or prior transactions involving interests in the subject company. Ideally, these companies will operate in comparable markets and will have similar growth prospects and risks.

The *Asset Approach* estimates the equity of a business based on the market value of a company's assets minus the value of its liabilities.

The above valuation methods have long been recognized as acceptable in the appropriate circumstances. Accordingly, we applied the methods that, in our experience and judgment, provide the most supportable valuation based on the information available. For SPHC, we were unable to derive indications of value from the application of either the Income Approach or the Market Approach as the expected operating cash flows of the business do not support the economic value of the underlying operating assets of the Company. As such, we ultimately relied on the Adjusted Book Value ("ABV") Method, a form of the Asset Approach, in our determination of the value of the equity of SPHC.

---

[3] We conducted an interview with Marty on January 24, 2018. However, while we requested a more recent interview with management of the Company, we were not afforded with the opportunity to conduct such an interview prior to the issuance of this report. As such, we reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.



# Executive Summary

## Calculation of Value

In accordance with the foregoing, and as presented in Exhibit A, we determined the Fair Market Value of a 100.0% equity interest of SPHC, on a marketable, controlling-interest basis, as of December 31, 2020, to be:

### *DE MINIMIS*

\*     \*     \*     \*     \*     \*     \*     \*

Our calculation of value is applicable only for the stated date and purpose and may not be appropriate for any other date or purpose. Reference should be made to the exhibits for assumptions and limiting conditions that apply to this valuation and report.

Regards,

*Stout Risius Ross, LLC*

**STOUT RISIUS ROSS, LLC**

**STOUT**

# Exhibits

**Exhibit A** ................................................................................. Conclusion of Value

**Exhibit B** ................................................................................. Financial Statements

**Exhibit C** ................................................................................. Adjusted Book Value Method

**Exhibit D** ................................................................................. Assumptions and Limiting Conditions

**Exhibit E** ................................................................................. Certification

**Exhibit F** ................................................................................. Statement of Qualifications

**EXHIBIT B, Page 227 of 237**

**STOUT**

# A. Conclusion of Value

Exhibit A.1

## Conclusion of Value
*In U.S. Dollars*

|   |   | Notes |   |
|---|---|-------|---|
| 1 | **Total Value of Equity** | [a] | *de minimis* |
| 2 | **Pro rata value of Marty's 100.0% Interest** |   | *de minimis* |

[a] See Exhibit C.1.

**EXHIBIT B, Page 228 of 237**

# B. Financial Statements

◆ STOUT

Exhibit B.1

## Reported Balance Sheets
*In U.S. Dollars*

| | | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ 416,979 | $ 83,414 | $ 49,406 | $ 67,933 | $ 50,898 | $ 92,791 |
| 2 | Accounts Receivable | 25,828 | 28,584 | 28,821 | 38,296 | 38,296 | 38,296 |
| 3 | Due from Affiliate | 937,699 | 879,572 | 979,925 | 1,115,880 | 1,115,880 | 1,125,880 |
| 4 | Due from Title Company | 49,554 | 49,554 | 49,554 | 49,146 | 49,146 | 49,146 |
| 5 | Other Receivables | 112,837 | 64,988 | 67,546 | 31,237 | 43,536 | 44,898 |
| 6 | Prepaid Expenses | 1,024 | 1,024 | 1,024 | 1,024 | 1,024 | 1,024 |
| 7 | **Total Current Assets** | 1,543,921 | 1,107,136 | 1,176,276 | 1,303,516 | 1,298,780 | 1,352,035 |
| 8 | Buildings and Other Depreciable Assets | 100,012 | 100,012 | 100,012 | 100,012 | 100,012 | 100,012 |
| 9 | Less: Accumulated Depreciation | (100,012) | (100,012) | (100,012) | (100,012) | (100,012) | (100,012) |
| 10 | **Net Fixed Assets** | **0** | **0** | **0** | **0** | **0** | **0** |
| 11 | Loans to Shareholders | 1,403,319 | 1,403,319 | 1,504,533 | 1,632,409 | 1,809,409 | 1,881,909 |
| 12 | Other Assets | 4,107 | 3,945 | 3,945 | 3,945 | 3,945 | 3,945 |
| 13 | **Total Other Assets** | 1,407,426 | 1,407,264 | 1,508,478 | 1,636,354 | 1,813,354 | 1,885,854 |
| 14 | **Total Assets** | $ 2,951,347 | $ 2,514,400 | $ 2,684,754 | $ 2,939,870 | $ 3,112,134 | $ 3,237,889 |
| 15 | Due to Affiliates | 645,604 | 1,335,719 | 2,291,492 | 3,582,441 | 5,455,180 | 6,468,115 |
| 16 | Retirement Plan | 20,704 | 26,522 | 0 | 0 | 0 | 0 |
| 17 | **Total Current Liabilities** | 666,308 | 1,362,241 | 2,291,492 | 3,582,441 | 5,455,180 | 6,468,115 |
| 18 | Loans from Shareholders | 75,690 | 75,690 | 75,690 | 75,690 | 75,690 | 75,690 |
| 19 | **Total Long-Term Liabilities** | 75,690 | 75,690 | 75,690 | 75,690 | 75,690 | 75,690 |
| 20 | **Total Liabilities** | 741,998 | 1,437,931 | 2,367,182 | 3,658,131 | 5,530,870 | 6,543,805 |
| 21 | Capital Stock | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 22 | Retained Earnings | 2,206,349 | 1,073,469 | 314,572 | (721,261) | (2,421,736) | (3,308,916) |
| 23 | **Total Stockholders' Equity** | 2,209,349 | 1,076,469 | 317,572 | (718,261) | (2,418,736) | (3,305,916) |
| 24 | **Total Liabilities & Stockholders' Equity** | $ 2,951,347 | $ 2,514,400 | $ 2,684,754 | $ 2,939,870 | $ 3,112,134 | $ 3,237,889 |

Source: Federal income tax returns.

SEDGWICK PROPERTIES HOLDING CORP. | 9



# B. Financial Statements

**Exhibit B.2**

## Reported Income Statements
*In U.S. Dollars*

| | Notes | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|---|
| 1 Total Net Sales | | $ 2,957,469 | $ 2,427,177 | $ 2,437,986 | $ 1,252,504 | $ 0 | $ 1,424,291 |
| 2 *Growth Rate* | | *n/a* | *-17.9%* | *0.4%* | *-48.6%* | *nmf* | *n/a* |
| 3 Officer Compensation | | 144,424 | 156,005 | 95,000 | 0 | 0 | 90,000 |
| 4 Salaries and Benefits | | 1,820,926 | 2,471,399 | 2,117,966 | 1,729,801 | 0 | 1,578,322 |
| 5 Rent and Occupancy Expense | | 101,960 | 134,194 | 120,688 | 34,413 | 0 | 131,723 |
| 6 Other Operating Expenses | | 623,659 | 596,746 | 862,592 | 524,123 | 0 | 748,126 |
| 7 Depreciation | | 2,737 | 0 | 0 | 0 | 0 | 0 |
| 8 Total Operating Expenses | | 2,693,706 | 3,358,344 | 3,196,246 | 2,288,337 | 0 | 2,548,171 |
| 9 Operating Income | | 263,763 | (931,167) | (758,260) | (1,035,833) | 0 | (1,123,880) |
| 10 Other Income (Expense) | | 0 | 0 | 0 | 0 | 0 | 236,700 |
| 11 EBIT | | 263,763 | (931,167) | (758,260) | (1,035,833) | 0 | (887,180) |
| 12 Interest Income (Expense) | | (2,013) | (3,942) | (637) | 0 | 0 | 0 |
| 13 Earnings Before Taxes | | 261,750 | (935,109) | (758,897) | (1,035,833) | 0 | (887,180) |
| 14 Income Tax Expense | | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 Net Income (Loss) | | $ 261,750 | $ (935,109) | $ (758,897) | $ (1,035,833) | $ 0 | $ (887,180) |
| 16 EBIT | | $ 263,763 | $ (931,167) | $ (758,260) | $ (1,035,833) | $ 0 | $ (887,180) |
| 17 EBIT Margin | | 8.9% | -38.4% | -31.1% | -82.7% | n/a | -62.3% |
| 18 EBITDA | | $ 266,500 | $ (931,167) | $ (758,260) | $ (1,035,833) | $ 0 | $ (887,180) |
| 19 EBITDA Margin | | 9.0% | -38.4% | -31.1% | -82.7% | n/a | -62.3% |

Source: Federal income tax returns. Note that the provided income tax return for 2019 reported no income or expenses.

SEDGWICK PROPERTIES HOLDING CORP. | 10

CONFIDENTIAL



# C.  Adjusted Book Value Method

**STOUT**

**Exhibit C.1**

**SEDGWICK PROPERTIES HOLDING CORP. | 11**

## Adjusted Book Value Method
*In U.S. Dollars*

| | | Book Value as of 12/31/2020 | Fair Market Value as of 12/31/2020 | Explanation of Fair Market Value |
|---|---|---|---|---|
| 1 | Cash and Cash Equivalents | $ 92,791 | $ 92,791 | [a] |
| 2 | Accounts Receivable | 38,296 | 38,296 | [a] |
| 3 | Due from Affiliates | 1,125,880 | 976,907 | [b] |
| 4 | Due from Title Company | 49,146 | 49,146 | [a] |
| 5 | Other Receivables | 44,898 | 44,898 | [a] |
| 6 | Prepaid Expenses | 1,024 | 1,024 | [a] |
| 7 | **Total Current Assets** | **1,352,035** | **1,203,062** | |
| 8 | Buildings and Other Depreciable Assets | 100,012 | 100,012 | [a] |
| 9 | Less: Accumulated Depreciation | (100,012) | n/a | n/a |
| 10 | **Net Property and Equipment** | **0** | **100,012** | |
| 11 | Loans to Shareholders | 1,881,909 | 1,881,909 | [a] |
| 12 | Other Assets | 3,945 | 3,945 | [a] |
| 13 | **Total Other Assets** | **1,885,854** | **1,885,854** | |
| 14 | **Total Assets** | **$ 3,237,889** | **$ 3,188,928** | |
| 15 | Due to Affiliates | $ 6,468,115 | $ 3,188,928 | [c] [d] |
| 16 | **Total Current Liabilities** | **6,468,115** | **3,188,928** | |
| 17 | Loans from Shareholders | 75,690 | 0 | [c] |
| 18 | **Total Long-Term Liabilities** | **75,690** | **0** | |
| 19 | **Total Liabilities** | **6,543,805** | **3,188,928** | |
| 20 | **Total Stockholders' Equity** | **$ (3,305,916)** | **$ 0** | [e] |
| 21 | **Fair Market Value of Equity** | | *de minimis* | |

Refer to the last page of this exhibit for a description of the footnotes.



# C.  Adjusted Book Value Method

Exhibit C.1

## Explanation of Fair Market Value

[a] The value of this asset (or liability) is estimated to be equal to book value as represented in the Company's 2020 federal tax return.

[b] Due from affiliates has been reduced by $148,973 to reflect the collectible amount of the note payable from Alpha Carpentry, LLC.

[c] Since the fair market value of the Company's assets are insufficient to cover the Company's liabilities as of the Valuation Date, the value of this liability has been written down to the collectible amount.

[d] Since the Company's assets are insufficient to cover the Company's liabilities as of the Valuation Date, three notes payable to entities held by Marty have been adjusted to the collectible amount: $22,038 due to MK Manager Corp. has been adjusted to $0, $583,356 due to Alpha Construction Services, LLC has been adjusted to $0, and $2,978,409 due to Maeve, LLC has been adjusted to $304,616 which is a reduction of $2,673,793. Corresponding adjustments have been made to the notes receivable from Sedgwick Properties Holding Corp. as of the Valuation Date for MK Manager Corp., Alpha Construction Services, LLC and Maeve, LLC.

[e] The resulting value of stockholders' equity is the difference between the Fair Market Value of the assets and the Fair Market Value of the liabilities.

**EXHIBIT B, Page 232 of 237**

**STOUT**

# D. Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or its representatives, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon.

- We conducted an interview with Marty on January 24, 2018. We also requested a more recent interview with management of SPHC. However, as of the date of this report, we had not been afforded the opportunity to conduct such an interview. We reserve the right to amend our analysis and this report accordingly to the extent that we are provided with a current management interview.

- Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

- For the purpose of this engagement and report, we make no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our conclusion of value assumes the assets and liabilities presented in the Company's December 31, 2020 balance sheet were accurate and complete as of that date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- We do not provide assurance on the achievability of the results forecasted in this report. Differences between actual and expected results may be material and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- Our calculation of value is applicable to the Subject Interests for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report (which reflects a Summary Report as defined by the American Institute of Certified Public Accountants Statement on Standards for Valuation Services), and the opinions expressed herein are provided exclusively for the use of the addressee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent. Further, the rationale for how we arrived at the opinions and conclusions expressed herein may not be understood properly without additional information contained in our internal work papers.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" or a "solvency opinion" regarding any contemplated present or future transaction.

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and we have no obligation to update our report for such events and conditions.

- We have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The value that results from a valuation engagement is expressed as a conclusion of value.

- We have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The value that

**EXHIBIT B, Page 233 of 237**

**STOUT**

# D. Assumptions and Limiting Conditions

results from a valuation engagement is expressed as a conclusion of value.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

**EXHIBIT B, Page 234 of 237**

**STOUT**

# E.  Certification

We certify that, to the best of our knowledge and belief:

■ The statements of fact contained in this report, on which the analysis, opinions, and calculations expressed herein are based, are true and correct.

■ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

■ The data used in this report was obtained from sources believed to be reliable. All facts known to us that have bearing on the values presented in this report have been considered, and no facts of importance have been intentionally omitted.

■ We have no present or prospective interest in the business that is the subject of this report, and we have no personal interest with respect to the parties involved.

■ We have no bias with respect to the business that is the subject of this report or the parties involved with this assignment.

■ Our engagement in this assignment was not contingent on developing or reporting predetermined results.

Brian R. Potter, CFA, CFE
Managing Director

■ Our compensation for completing this assignment is fee-based and is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

■ Our analyses, opinions, and conclusions are developed, and this report is prepared, with the intent of being in conformity with the American Institute of Certified Public Accountants Statement on Standards for Valuation Services.

■ Stout Risius Ross, LLC has performed no services, as an appraiser or in any other capacity, regarding the business that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

■ In addition to the undersigned, Adam B. Moeller and Christopher J. Carlton assisted in the research, analysis development, and report preparation for this engagement.

Thomas J. Czupta, ASA, ABV
Director

SEDGWICK PROPERTIES HOLDING CORP. | 15

CONFIDENTIAL

**EXHIBIT B, Page 235 of 237**

# F.  Statement of Qualifications



Chicago, IL USA
**Office:** +1.312.752.3352
bpotter@stout.com

**Education**

B.S., Finance
Miami University

**Designations**

Chartered Financial Analyst (CFA)
Certified Fraud Examiner (CFE)

**Practice Areas**

Valuation Disputes
Complex Business Litigation
High-Stakes Marital Dissolution
Shareholder Disputes
Transaction Disputes

Brian Potter is a Managing Director in the Valuation Advisory group and head of the firm's Chicago office. Mr. Potter has provided valuation, litigation advisory, and forensic accounting services for numerous purposes, including marital dissolutions, shareholder disputes, estate and gift taxation, purchase price allocation, Employee Stock Ownership Plans, brokerage fraud, bankruptcy, potential transactions and intellectual property valuations. Mr. Potter has extensive experience with intellectual property and brokerage fraud litigation, having provided advisory services in several patent infringement, misappropriation of trade secret and securities fraud matters. Additionally, Mr. Potter has been involved in the appraisal of real estate for various property types, including office, industrial and retail buildings, and vacant land. Mr. Potter has provided services within the context of litigation and has been trained to offer services within various alternative dispute resolution models.

Mr. Potter has presented continuing education seminars on business valuation, understanding tax returns, occupational fraud, and computer forensics and e-discovery. He has also published several articles on valuation and other related topics. Mr. Potter was a contributing author to the chapter entitled "Valuation in Shareholder and Partner Disputes" in Business Valuation, published by the Law Journal Press.

Prior to joining Stout, Mr. Potter was a Consulting Associate with CRA International in its Intellectual Property and Finance practices in Chicago. While at Miami, Mr. Potter earned CoSIDA First Team Academic All-America honors for his academic and athletic achievements while a member of the university's varsity football team.

**Professional Memberships**

- The CFA Institute
- The CFA Society of Chicago
- Association of Certified Fraud Examiners (ACFE)
- AAML Foundation Forensic and Business Valuation Division

**EXHIBIT B, Page 236 of 237**



# F. Statement of Qualifications



Thomas J. Czupta is a Director in the Valuation Advisory group. Mr. Czupta has extensive experience providing professional valuation advisory services in the fields of taxation, litigation, and corporate transactions.

Mr. Czupta has provided business valuation and financial advisory services for numerous purposes including estate and gift taxation, marital dissolutions, business transitions, shareholder disputes, and other tax, corporate, and litigation related matters. His experience spans a diverse client base, from regional middle-market businesses to billion dollar multinational companies, as well as private equity firms, law firms, and financial institutions.

Prior to joining Stout, Mr. Czupta was a Manager with Business Valuation Group, Inc. where his valuations were used in connection with ESOP reporting compliance, litigation support, and federal gift and estate taxation.

**Professional Memberships**

- American Institute of Certified Public Accountants
- Business Valuation Association of Chicago
- Chicago Estate Planning Council
- American Society of Appraisers

Chicago, IL USA
**Office:** +1.312.763.6629
**Mobile:** +1.312.833.2509
tczupta@stout.com

**Education**

B.S., Finance & Economics
DePaul University

**Designations**

Accredited Senior Appraiser (ASA)
Accredited in Business Valuation (ABV)

**Practice Areas**

High-Stakes Marital Dissolution
Valuation Disputes
Transaction Disputes
Trust & Estate

**STOUT**

SEDGWICK PROPERTIES HOLDING CORP. | 17

CONFIDENTIAL

**EXHIBIT B, Page 237 of 237**

## SUMMARY OF MARTY'S PERSONAL FINANCIAL STATEMENTS

| Date | Total Income | Total Expenditures (inclduding income taxes) | Net Income |
|---|---|---|---|
| 1/1/2011 | $ 2,398,000.00 | $ 962,400.00 | $ 1,435,600.00 |
| 5/1/2012 | $ 753,000.00 | $ 242,400.00 | $ 510,600.00 |
| 5/1/2013 | $ 1,435,000.00 | $ 444,800.00 | $ 990,200.00 |
| 6/1/2014 | $ 1,377,000.00 | $ 515,800.00 | $ 861,200.00 |
| 4/1/2015 | $ 2,185,000.00 | $ 789,800.00 | $ 1,395,200.00 |
| 4/1/2016 | $ 1,740,000.00 | $ 753,000.00 | $ 987,000.00 |
| 5/1/2017 | $ 1,574,500.00 | $ 610,000.00 | $ 964,500.00 |
| AVERAGE: | $ 1,637,500.00 | $ 616,885.71 | $ 1,020,614.29 |

**EXHIBIT C, Page 1 of 62**

# January 1, 2011

**EXHIBIT C, Page 2 of 62**

## PERSONAL FINANCIAL STATEMENT AS OF ___01/01/11___
Date

### PERSONAL INFORMATION

| APPLICANT (NAME) | Marty Paris | CO-APPLICANT (NAME) | |
|---|---|---|---|
| Employer    Sedgwick Payroll Corp | | Employer | |
| Address of Employer | | Address of Employer | |
| 1525 West Homer Street, Suite 400, Chicago, IL 60642 | | | |
| Business Phone No. | No. of Years with Employer  12   Title/Position  President | Business Phone No. | No. of Years with Employer    Title/Position |
| ...ployer & position (if current employer less than 3 years) | | Name of previous employer & position (if with current employer less than 3 years) | |
| Home Address | | Home Address | |
| 711 Park Ave, River Forest, IL 60305 | | | |
| Home Phone No. | Social Security No.    Date of Birth | Home Phone No. | Social Security No.    Date of Birth |
| Name, Phone No. of your Accountant | | Name, Phone No. of your Accountant | |
| Warady and Davis, Norm Nagle, | | | |
| Name, Phone No. of your Attorney | | Name, Phone No. of your Attorney | |
| Much, Shelist, Glenn Taxman, 31... | | | |
| Name, Phone No. of your Investment Advisor/Broker | | Name, Phone No. of your Investment Advisor/Broker | |
| Renaissance Financial, Douglas G. Ciocca, | | | |
| Name, Phone No. of your Insurance Advisor | | Name, Phone No. of your Insurance Advisor | |
| David Agency, Fred Arkin, 630.592.5381 | | | |

Estimated Cash Income & Expenditures Statement For Year E___2011___ (Omit Cents)

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Salary (applicant) | $225,000 | Federal Income and Other Taxes | $838,000 |
| Salary (co-applicant) | | State Income and Other Taxes | $73,000 |
| Bonuses & Commissions (applicant) | | Rental Payments, Co-op. or Condo Maintenance | |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments - Residential | $36,000 |
| Rental Income, Net of Expenses | | Mortgage Payments - Investment | |
| Interest Income - Maeve, LLC - Series A | $45,000 | Property Taxes - Residential | $12,600 |
| Dividend Income- Maeve, LLC - Series A | $45,000 | Property Taxes - Investment | |
| Capital Gains | | Insurance | $2,800 |
| Partnership Income | | Investments (including tax shelters) | |
| 1454 S Michigan, LLC - Maeve, L... | $2,000,000 | Alimony/Child Support | |
| 2049 N Sheffield, LLC - Maeve, L... | $15,000 | Tuition | |
| 1933 N Sedgwick, LLC - Maeve, L... | $18,000 | Other Living Expense - Rent | |
| 3216 N Racine, LLC - Maeve, LLC | $27,000 | Medical Expenses | |
| PC Property Holdings, LLC - Mae... | $23,000 | Other Expense (List) | |
| | $0 | | |
| **TOTAL INCOME** → | **$2,398,000** | **TOTAL EXPENDITURES** ← | **$962,400** |

Any significant changes expected in the next 12 months? (If yes, attach information.)
_____ Yes        x    No

** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or co-applicant does not wish to have it considered as a basis for repaying this obligation.

**Marty Paris**
**Personal Financial Statement Data**
**Schedule A**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Marty Paris | 1% common stock | $ 134,751.63 |
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ 13,340,411.00 |
| Maeve, LLC - Series A, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 20,250.00 |
| Maeve, LLC - Series B, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,750.00 |
| Maeve, LLC - Series C, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,960.00 |
| Maeve, LLC - Series D, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 201.00 |
| Maeve, LLC - Series E, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series F, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series G, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 79,200.00 |
| Maeve, LLC - Series H, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,900.00 |
| Maeve, LLC - Series I, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 297.00 |
| Maeve, LLC - Series J, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,600.00 |
| Maeve, LLC - Series K, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,682.50 |
| Maeve, LLC - Series L, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 8,100.00 |

| Entity | Ownership | Description of Interest | Value of interest |
|---|---|---|---|
| Maeve, LLC - Series M, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 4,750.00 |
| Maeve, LLC - Series N, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 688.00 |
| Maeve, LLC - Series O, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 630.20 |
| Maeve, LLC - Series P, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,500.00 |
| Maeve, LLC - Series Q, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series R, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,500.00 |
| Maeve, LLC - Series S, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Conor DE II, Inc., a Delaware corporation | Frank Martin Paris, Jr. Revocable Trust | 33% common A voting stock | $ 46,997.63 |
| Conor Management, LLC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 142,417.06 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 1% common A voting stock | $ 140,992.89 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 95.002%   common B non-voting stock | $ 8,840,440.08 |
| 828 W. Grace, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 4,000.00 |
| 1615 Wabash, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ . |
| 6800 Stanley, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ . |
| 1454 S. Michigan, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 80,000.00 |

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| 1935 S. Wabash, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 10,000.00 |
| Sedgwick Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 300.00 |
| 2049 North Sheffield, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,750.00 |
| MCTIF, Inc. - A Nevada corporation | Marty Paris | 1% common stock | $ 487,300.00 |
| MCTIF, Inc. - A Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ 12,182,500.00 |
| **TOTAL** | | | **$ 35,562,168.98** |

**Balance Sheet as of:** 09/01/10

| ASSETS | AMOUNT ($) | LIABILITIES | AMOUNT ($) |
|---|---|---|---|
| Readily Marketable Securities | $0 | Notes Payable | $0 |
| Non-Readily Marketable Securities | $137,000 | Secured (Home) | $405,000 |
| Accounts and Notes Receivable | $0 | Unsecured | |
| Net Cash Surrender Value of Life Insurance | $0 | Notes Payable to Others (Schedule E) | $0 |
| | $0 | Secured | $0 |
| Residential Real Estate (Home) | $0 | Unsecured | $0 |
| Real Estate Investments (Schedule C) | $0 | Accounts Payable (including credit cards) | |
| Partnerships / LLC Interests (Schedule A) | $35,562,169 | Margin Accounts | $0 |
| IRA, Keogh, Profit-Sharing & Other Vested | $350,000 | Notes Due: Partnership (Schedule D) | $0 |
| Retirement Accounts | | Taxes Payable | $838,000 |
| Deferred Income | | Mortgage Debt (Schedule C) | |
| Number of years deferred: | | | $0 |
| Personal Property (including automobiles) | $175,000 | Life Insurance Loans (Schedule B) | $0 |
| Other Assets (List): | | Other Liabilities (List): | |
| | | Auto Loan | $10,000 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | **Total Liabilities** | **$1,253,000** |
| | | **Net Worth** | **$34,971,169** |
| **TOTAL ASSETS** | **$35,224,169** | **TOTAL LIABILITIES & NET WORTH** | **$36,224,169** |

Liquidity $ 4,850,000.00 *Cash and readily marketable securities

## CONTINGENT LIABILITIES

| | YES | NO | AMOUNT |
|---|---|---|---|
| | (mark with "X") | | |
| Are you a guarantor/co-maker/endorser for any debt of an individual, corporation, or partnership? | X | | see schedule |
| Do you have any outstanding letters of credit or surety bonds? | X | | $11,000 |
| Are there any suits or legal actions pending against you? | | X | |
| Are you contingently liable on any lease or contract? | | X | |
| Are any of your tax obligations past due? | | X | |

## Please Answer The Following Questions:

1. Income tax returns filed through (date): _____ 2009 _____
   Are any returns currently being audited or contested (Yes / No)? _____ No _____ If yes, what year(s)? _____

2. Have you or any firm in which you were a major owner ever declared bankruptcy? _____ No _____

3. Have you drawn a will? _____ Yes _____
   If yes, please furnish the name of the executor(s) and year will was drawn: _____ Kerry, 2006 _____

4. Number of dependents (excluding self) and relationship to applicants: _____ 6, wife, 4 sons and 1 daughter _____

5. Have you ever had a financial plan prepared for you? _____ Yes _____

6. Did you include two years federal and state tax returns? _____ No _____

7. Do (either of) you have a line of credit or unused credit facility at any other institution(s)? _____ Yes _____
   If yes, please indicate where, how much, and name of banker:
   $4,400,000 1454 S Michigan,Amalgamated Bank, Bob Corrigan, $46,000,000 1935 S Wabash, Amalgamated Bank

8. Do you anticipate any substantial inheritances? _____ No _____
   If yes, please explain:

9. Have you ever been convicted of a felony? _____ No _____

## Representation and Warranties

   The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue to accept a guarantee thereof. The undersigned agrees to notify you immediately and in writing of any change in name, address, or employment. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the guarantee of the undersigned to you is outstanding, the undersigned shall supply annually upon your request an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be property of the undersigned.

4/18/11
_____
Date

_____
Marty Paris

# May 1, 2012

EXHIBIT C, Page 8 of 62

# PERSONAL FINANCIAL STATEMENT AS OF ___05/01/12___
Date

## PERSONAL INFORMATION

| APPLICANT (NAME) | Marty Paris | CO-APPLICANT (NAME) | | | |
|---|---|---|---|---|---|
| Employer  Sedgwick Payroll Corp | | Employer | | | |
| Address of Employer | | Address of Employer | | | |
| 1525 West Homer Street, Suite 400, Chicago, IL 60642 | | | | | |
| Business Phone No. | No. of Years with Employer  13  Title/Position  President | Business Phone No. | No. of Years with Employer | Title/Position | |
| Name of previous employer & position (if with current employer less than 2 years) | | Name of previous employer & position (if with current employer less than 2 years) | | | |
| Home Address | | Home Address | | | |
| 711 Park Ave, River Forest, IL 60305 | | | | | |
| Home Phone No. | | Home Phone No. | Social Security No. | Date of Birth | |
| Name, Phone No. of your Accountant | | | | | |
| Loberg, Miki and Obrien LLP, Tim Obrier | | Name, Phone No. of your Accountant | | | |
| Name, Phone No. of your Attorney | | | | | |
| Stahl Cowen, Gary Stern, | | Name, Phone No. of your Attorney | | | |
| Name, Phone No. of your Investment Advisor/Broker | | | | | |
| Kavar Capital, Douglas G. Ciocca, | | Name, Phone No. of your Investment Advisor/Broker | | | |
| Name, Phone No. of your Insurance Advisor | | | | | |
| Willis Private Client Group, Mary Mullins, | | Name, Phone No. of your Insurance Advisor | | | |

Estimated Cash Income & Expenditures Statement For Year E___2012___ (Omit Cents)

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Salary (applicant) | $225,000 | Federal Income and Other Taxes | $145,000 |
| Salary (co-applicant) | | State Income and Other Taxes | $20,000 |
| Bonuses & Commissions (applicant) | | Rental Payments, Co-op, or Condo Maintenance | |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments - Residential | $60,000 |
| Rental Income, Net of Expenses | | Mortgage Payments - Investment | |
| Interest Income - Maeve, LLC – Series A | $20,000 | Property Taxes - Residential | $14,600 |
| Dividend Income- Maeve, LLC - Series A | $85,000 | Property Taxes - Investment | |
| Capital Gains | | Insurance | $2,800 |
| Partnership Income | | Investments (including tax shelters) | |
| Sedgwick Holdings Corp | $170,000 | | |
| 1454 S Michigan, LLC - Maeve, L | $150,000 | Alimony/Child Support | |
| 2049 N Sheffield, LLC - Maeve, L | $35,000 | Tuition | |
| 1933 N Sedgwick, LLC - Maeve, L | $18,000 | Other Living Expense - Rent | |
| 3216 N Racine, LLC - Maeve, LLC | $27,000 | Medical Expenses | |
| PC Property Holdings, LLC - Maev | $23,000 | Other Expense (List) | |
| | $0 | | |
| TOTAL INCOME → | $753,000 | TOTAL EXPENDITURES ← | $242,400 |

Any significant changes expected in the next 12 months? (If yes, attach information.)
_____ Yes    ___x___ No

** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or co-applicant does not wish to have it considered as a basis for repaying this obligation.

**EXHIBIT C, Page 9 of 62**

Marty Paris
**Personal Financial Statement Data**
Schedule A

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Marty Paris | 1% common stock | $ 46,947.45 |
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ 4,647,797.55 |
| Maeve, LLC - Series A, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 32,750.00 |
| Maeve, LLC - Series B, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,000.00 |
| Maeve, LLC - Series C, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,960.00 |
| Maeve, LLC - Series D, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 201.00 |
| Maeve, LLC - Series E, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series F, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series G, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 79,200.00 |
| Maeve, LLC - Series H, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,900.00 |
| Maeve, LLC - Series I, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,485.00 |
| Maeve, LLC - Series J, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,650.00 |
| Maeve, LLC - Series K, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,425.00 |
| Maeve, LLC - Series L, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,700.00 |

**EXHIBIT C, Page 10 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series M, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 4,750.00 |
| Maeve, LLC - Series N, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 688.00 |
| Maeve, LLC - Series O, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 630.20 |
| Maeve, LLC - Series P, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,500.00 |
| Maeve, LLC - Series Q, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series R, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,550.00 |
| Maeve, LLC - Series S, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series T, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,500.00 |
| Conor DE II, Inc., a Delaware corporation | Frank Martin Paris, Jr. Revocable Trust | 33% common A voting stock | $ 53,427.64 |
| Conor Management, LLC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 161,901.93 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 1% common A voting stock | $ 160,282.92 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 95.002%   common B non-voting stock | $ 11,420,398.16 |
| 828 W. Grace, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 4,000.00 |
| 1615 Wabash, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| 6800 Stanley, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |

**EXHIBIT C, Page 11 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| 1454 S. Michigan, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 80,000.00 |
| 1935 S. Wabash, LLC | Frank Martin Paris Jr. Revocable Trust | 1% class A membership interest | $ 10,000.00 |
| Sedgwick Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,500.00 |
| 2049 North Sheffield, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,500.00 |
| MCTIF, Inc. - A Nevada corporation | Marty Paris | 1% common stock | $ - |
| MCTIF, Inc. - A Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ - |
| **TOTAL** | | | $ 16,758,944.85 |

**Balance Sheet as of:** 05/01/12

| ASSETS | AMOUNT ($) | LIABILITIES | AMOUNT ($) |
|---|---|---|---|
| Readily Marketable Securities | $0 | Notes Payable | $0 |
| Non-Readily Marketable Securities | $0 | Secured (Home) | $975,000 |
| Accounts and Notes Receivable | $0 | Unsecured | |
| Net Cash Surrender Value of Life Insurance | $0 | Notes Payable to Others (Schedule E) | |
| Residential Real Estate (Home) | $0 | Secured | $850,000 |
| Real Estate Investments (Schedule C) | $0 | Unsecured | $0 |
| Partnerships / LLC Interests (Schedule A) | $16,759,945 | Accounts Payable (including credit cards) | |
| IRA, Keogh, Profit-Sharing & Other Vested | $500,000 | Margin Accounts | $0 |
| Retirement Accounts | | Notes Due, Partnership (Schedule D) | $0 |
| Deferred Income | $0 | Taxes Payable | $145,000 |
| Number of years deferred: | | Mortgage Debt (Schedule C) | |
| Personal Property (including automobiles) | $0 | Life Insurance Loans (Schedule B) | $0 |
| Other Assets (List): | | Other Liabilities (List): | $0 |
| | | Auto Loan | $0 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total Liabilities | $1,970,000 |
| | | Net Worth | $15,288,945 |
| **TOTAL ASSETS** | $17,258,945 | **TOTAL LIABILITIES & NET WORTH** | $17,258,945 |

*****Cash and readily marketable securities**          $          5,625,000.00

**EXHIBIT C, Page 12 of 62**

**CONTINGENT LIABILITIES**

| | YES | NO | AMOUNT |
|---|---|---|---|
| | (mark with 'X') | | |
| Are you a guarantor/co-maker/endorser for any debt of an individual, corporation, or partnership? | X | | see schedule |
| Do you have any outstanding letters of credit or surety bonds? | | X | |
| Are there any suits or legal actions pending against you? | X | | |
| Are you contingently liable on any lease or contract? | | X | |
| Are any of your tax obligations past due? | | X | |

**Please Answer The Following Questions:**

1. Income tax returns filed through (date):  2010
   Are any returns currently being audited or contested (Yes / No)?  No  If yes, what year(s)?

2. Have you ever declared personal bankruptcy?  No

3. Have you drawn a will?  Yes
   If yes, please furnish the name of the executor(s) and year will was drawn:  Kerry, 2006

4. Number of dependents (excluding self) and relationship to applicants:  7, wife, 4 sons and 2 daughter

5. Have you ever had a financial plan prepared for you?  Yes

6. Did you include two years federal and state tax returns?  Upon request

7. Do (either of) you have a line of credit or unused credit facility at any other institution(s)?  Yes
   If yes, please indicate where, how much, and name of banker:
   $4,100,000 1464 S Michigan, Ultra Longview Fund, $45,000,000 1935 S Wabash, Ultra Longview Fund

8. Do you anticipate any substantial inheritances?  No
   If yes, please explain:

9. Have you ever been convicted of a felony?  No

**Representation and Warranties**

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue to accept a guarantee thereof. The undersigned agrees to notify you immediately and in writing of any change in name, address, or employment. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the guarantee of the undersigned to you is outstanding, the undersigned shall supply annually upon your request an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be property of the undersigned.

5/17/12
**Date**

_Marty Paris_
**Marty Paris**

**EXHIBIT C, Page 13 of 62**

Marty Paris
Real Estate Schedule

| Address | Owner | % owned | Property type | Type of facility | Principal Loan Balance | Loan Maturity | Interest Rate | Market Value | Purchase Year | Personal Guaranty | Monthly Rent | Annual Debt Service | Rents | Operating Expense | NOI | DCR | Excess Cash Flow | Carry Reserve | Months of Carry |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 711 Park Ave River Forest IL, 60305 | Kerry Paris | 100% | Personal residence | home loan | $975,000 | 2042 | 4.38% | $2,400,000 | 2003 | Yes | $0 | $60,000 | | | | | | | 19 |
| 3216 N Racine Chicago, IL 60613 | 3216 N Racine, LLC | 50% | Apartment | 2 - 4 unit loan | $218,000 | 2026 | 4.50% | $1,350,000 | 1995 | Yes | $9,300 | $21,600 | $111,600 | $19,250 | $92,350 | 4.28 | $70,750 | 6.23 | 19 |
| 2049 N Sheffield Chicago, IL 60614 | 2049 N Sheffield, LLC | 100% | Apartment | 2 - 4 unit loan | $901,000 | 2042 | 4.00% | $1,650,000 | 2000 | Yes | $10,660 | $52,212 | $127,920 | $27,500 | $100,420 | 1.92 | $48,208 | 22.53 | 9 |
| 1933 N Sedgwick Chicago, IL 60614 | 1933 N Sedgwick, LLC | 50% | Apartment | 2 - 4 unit loan | $244,000 | 2019 | 3.88% | $1,200,000 | 1994 | No | $6,900 | $21,672 | $82,800 | $21,000 | $61,800 | 2.85 | $40,128 | 4.44 | 30 |
| 3114 N Southport Chicago, IL 60657 | 3114 N Southport LLC | 50% | Apartment | Construction loan | 0 | na | na | $1,360,000 | 2011 | na | $0 | $0 | | | | | | | na |
| 1927 N Sedgwick Chicago, IL 60614 | PC Property Holdings, LLC | 50% | Apartment | Commercial loan | $1,163,500 | 2040 | 5.90% | $2,500,000 | 1969 | No | $16,875 | $64,360 | $200,100 | $44,000 | $156,100 | 1.85 | $71,740 | 6.27 | 26 |
| 1454 S Michigan Chicago, IL 60605 | 1454 S Michigan, LLC | 69% | Mixed use building | Construction loan | $4,700,000 | 2010 | 6.38% | $20,500,000 | 2004 | Yes | $97,814 | $264,000 | $1,173,768 | $350,000 | $823,768 | 3.12 | $559,768 | 5.88 | 3 |
| 1935 S Wabash Chicago, IL 606 | 1935 S Wabash, LLC | 74% | Mixed use building | Construction loan | $46,000,000 | 2011 | | $46,000,000 | 2007 | Yes | $268,899 | na | $3,226,788 | $1,570,000 | $1,656,788 | na | $1,656,788 | 30.67 | na |
| 828 W Grace St Chicago, IL 60613 | 828 W Grace, LLC | 18% | Mixed use building | na | $0 | na | na | $1,000,000 | 2002 | na | $11,000 | na | $142,800 | $22,000 | $120,800 | na | $120,800 | 0.00 | na |
| 828 W Grace St Unit 402 Chicago, IL 60613 | Maeve LLC, Series N | 50% | Unit | na | $0 | na | na | $330,000 | 2007 | na | $2,100 | na | $25,200 | $7,600 | $17,600 | na | $17,600 | 0.00 | na |
| 1454 S Michigan, Unit 1605 Chicago, IL 606 | Maeve LLC, Series P | 50% | Unit | na | $0 | na | na | $340,000 | 2009 | na | $2,400 | na | $28,800 | $7,900 | $20,900 | na | $20,900 | 0.00 | na |

*Sale arranged to institutional partner and Market Value represents value related to the transaction.

**EXHIBIT C, Page 14 of 62**

May 1, 2013

## PERSONAL FINANCIAL STATEMENT AS OF _____05/01/13_____
Date

### PERSONAL INFORMATION

| APPLICANT (NAME)  Marty Paris | CO-APPLICANT (NAME) |
|---|---|
| Employer   Sedgwick Payroll Corp | Employer |
| Address of Employer | Address of Employer |
| 1525 West Homer Street, Suite 400, Chicago, IL 60642 | |

| Business Phone No. | No. of Years with Employer  14 | Title/Position  President | Business Phone No. | No. of Years with Employer | Title/Position |
|---|---|---|---|---|---|

| Name of previous employer & position (if with current employer less than 3 years) | Name of previous employer & position (if with current employer less than 3 years) |
|---|---|
| Home Address  711 Park Ave, River Forest, IL 60305 | Home Address |
| Home Phone No.     Social Security No. | Home Phone No. | Social Security No. | Date of Birth |

| Name, Phone No. of your Accountant  Loberg, Miki and Obrien LLP, Tim Obrien, | Name, Phone No. of your Accountant |
|---|---|
| Name, Phone No. of your Attorney  Stahl Cowen, Gary Stern, | Name, Phone No. of your Attorney |
| Name, Phone No. of your Investment Advisor/Broker  Kavar Capital, Douglas G. Ciocca | Name, Phone No. of your Investment Advisor/Broker |
| Name, Phone No. of your Insurance Advisor  Willis Private Client Group, Mary Mullins, | Name, Phone No. of your Insurance Advisor |

Estimated Cash Income & Expenditures Statement For Year E____ 2013 ____ (Omit Cents)

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Salary (applicant) | $225,000 | Federal Income and Other Taxes | $300,000 |
| Salary (co-applicant) | | State Income and Other Taxes | $50,000 |
| Bonuses & Commissions (applicant) | | Rental Payments, Co-op, or Condo Maintenance | |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments - Residential | $69,000 |
| Rental Income, Net of Expenses | | Mortgage Payments - Investment | |
| Interest Income - Maeve, LLC - Series A | $20,000 | Property Taxes - Residential | $18,000 |
| Dividend Income- Maeve, LLC - Series A | $97,000 | Property Taxes - Investment | |
| Capital Gains | | Insurance | $7,800 |
| Partnership Income | | Investments (including tax shelters) | |
| Sedgwick Holdings Corp | $140,000 | | |
| 1454 S Michigan, LLC - Maeve, L | $150,000 | Alimony/Child Support | |
| 2049 N Sheffield, LLC - Maeve, L | $35,000 | Tuition | |
| 1933 N Sedgwick, LLC - Maeve, L | $18,000 | Other Living Expense - Rent | |
| 3216 N Racine, LLC - Maeve, LLC | $27,000 | Medical Expenses | |
| PC Property Holdings, LLC - Maev | $23,000 | Other Expense (List) | |
| 645 Custer, LLC | $700,000 | | |
| TOTAL INCOME → | $1,435,000 | TOTAL EXPENDITURES ← | $444,800 |

Any significant changes expected in the next 12 months? (If yes, attach information.)
_____ Yes    __x__ No

** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or co-applicant does not wish to have it considered as a basis for repaying this obligation.

**EXHIBIT C, Page 16 of 62**

**Marty Paris**
**Personal Financial Statement Data**
**Schedule A**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Marty Paris | 1% common stock | $ 39,920.50 |
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ 3,952,129.50 |
| Maeve, LLC - Series A, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 41,000.00 |
| Maeve, LLC - Series B, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,000.00 |
| Maeve, LLC - Series C, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,960.00 |
| Maeve, LLC - Series D, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 201.00 |
| Maeve, LLC - Series E, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series F, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series G, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 79,200.00 |
| Maeve, LLC - Series H, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series I, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,485.00 |
| Maeve, LLC - Series J, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,000.00 |
| Maeve, LLC - Series K, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,425.00 |
| Maeve, LLC - Series L, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,250.00 |

**EXHIBIT C, Page 17 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series M, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,000.00 |
| Maeve, LLC - Series N, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 688.00 |
| Maeve, LLC - Series O, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 630.20 |
| Maeve, LLC - Series P, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,500.00 |
| Maeve, LLC - Series Q, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series R, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,550.00 |
| Maeve, LLC - Series S, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series T, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,250.00 |
| Maeve, LLC - Series U, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,650.00 |
| Maeve, LLC - Series V, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 12,000.00 |
| Maeve, LLC - Series W, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 8,712.00 |
| Maeve, LLC - Series X, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 14,850.00 |
| Maeve, LLC - Series Y, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 4,400.00 |
| Conor DE II, Inc., a Delaware corporation | Frank Martin Paris, Jr. Revocable Trust | 33% common A voting stock | $ 67,614.06 |
| Conor Management, LLC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 204,891.08 |

**EXHIBIT C, Page 18 of 62**

| Entity | Ownership | Description of Interest | | Value of Interest |
|---|---|---|---|---|
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 1% common A voting stock | $ | 202,842.17 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 93.639% common B non-voting stock | $ | 14,245,453.49 |
| 828 W. Grace, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ | 4,000.00 |
| 1615 Wabash, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | - |
| 6800 Stanley, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | - |
| 1454 S. Michigan, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ | 80,000.00 |
| 1935 S. Wabash, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ | - |
| Sedgwick Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 1,500.00 |
| 2049 North Sheffield, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 7,500.00 |
| Alpha Property Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 8,800.00 |
| 1611 N Hermitage LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 15,000.00 |
| TOTAL | | | $ | 19,038,702.00 |

**EXHIBIT C, Page 19 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|

Balance Sheet as of: _____05/03/13_____

| ASSETS | AMOUNT ($) | LIABILITIES | AMOUNT ($) |
|---|---|---|---|
| Readily Marketable Securities | $0 | Notes Payable | $0 |
| Non-Readily Marketable Securities | $0 | Secured (Home) | $1,350,000 |
| Accounts and Notes Receivable | $0 | Unsecured | |
| Net Cash Surrender Value of Life Insurance | $0 | Notes Payable to Others (Schedule E) | $0 |
| | $0 | Secured | $1,670,000 |
| Residential Real Estate (Home) | $0 | Unsecured | $0 |
| Real Estate Investments (Schedule C) | $0 | Accounts Payable (including credit cards) | |
| Partnerships / LLC Interests (Schedule A) | $19,038,702 | Margin Accounts | $0 |
| IRA, Keogh, Profit-Sharing & Other Vested | $500,000 | Notes Due: Partnership (Schedule D) | $0 |
| Retirement Accounts | | Taxes Payable | $350,000 |
| Deferred Income | $0 | Mortgage Debt (Schedule C) | |
| Number of years deferred: | | | |
| Personal Property (including automobiles) | $0 | Life Insurance Loans (Schedule B) | $0 |
| Other Assets (List): | | Other Liabilities (List): | $0 |
| | | Auto Loan | |
| | | | $0 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total Liabilities | $3,370,000 |
| | | Net Worth | $16,168,702 |
| TOTAL ASSETS | $19,538,702 | TOTAL LIABILITIES & NET WORTH | $19,538,702 |

*Cash and readily marketable securities                    $6,501,000

**EXHIBIT C, Page 20 of 62**

**CONTINGENT LIABILITIES**

|  | YES | NO | AMOUNT |
|---|---|---|---|
|  | (mark with "X") | | |
| Are you a guarantor/co-maker/endorser for any debt of an individual, corporation, or partnership? | X | | see schedule |
| Do you have any outstanding letters of credit or surety bonds? | | X | |
| Are there any suits or legal actions pending against you? | X | | |
| Are you contingently liable on any lease or contract? | | X | |
| Are any of your tax obligations past due? | | X | |

**Please Answer The Following Questions:**

1. Income tax returns filed through (date): _____ 2011 _____
   Are any returns currently being audited or contested (Yes / No)? _____ No _____  If yes, what year(s)? _____

2. Have you ever declared personal bankruptcy? _____ No _____

3. Have you drawn a will? _____ Yes _____
   If yes, please furnish the name of the executor(s) and year will was drawn: _____ Kerry, 2006 _____

4. Number of dependents (excluding self) and relationship to applicants: _____ 7, wife, 4 sons and 2 daughter _____

5. Have you ever had a financial plan prepared for you? _____ Yes _____

6. Did you include two years federal and state tax returns? _____ Upon request _____

7. Do (either of) you have a line of credit or unused credit facility at any other institution(s)? _____ No _____
   If yes, please indicate where, how much, and name of banker:
   _____ See Schedule of Real Estate _____

8. Do you anticipate any substantial inheritances? _____ No _____
   If yes, please explain:

9. Have you ever been convicted of a felony? _____ No _____

**Representation and Warranties**

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue to accept a guarantee thereof. The undersigned agrees to notify you immediately and in writing of any change in name, address, or employment. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the guarantee of the undersigned to you is outstanding, the undersigned shall supply annually upon your request an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be property of the undersigned.

_____ 5/10/13 _____
Date

_____ [signature] _____
Marty Paris

**EXHIBIT C, Page 21 of 62**

Marty Paris
Real Estate Schedule

| Address | Owner | % owned | Property type | Type of facility | Principal Loan Balance | Loan Maturity | Interest Rate | Market Value | Purchase Year | Personal Guaranty | Monthly Rent | Annual Debt Service | Rents | Operating Expense | NOI | DCR | Excess Cash Flow | Carry Reserve | Months of Carry |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 711 Park Ave, River Forest IL, 60305 | Kerry Paris | 100% | Personal residence | home loan | $1,300,000 | 2043 | 3.38% | $2,400,000 | 2003 | Yes | $0 | $66,000 | na | | | | | | | 19 |
| 3216 N Racine, Chicago IL 60613 | 3216 N Racine, LLC | 50% | Apartment | 2-4 unit loan | $206,000 | 2026 | 4.50% | $1,400,000 | 1995 | Yes | $9,500 | $21,600 | $114,000 | $19,250 | $94,750 | 4.39 | $73,150 | 6.89 | |
| 2049 N Sheffield, Chicago IL 60614 | 2049 N Sheffield, LLC | 100% | Apartment | 2-4 unit loan | $966,000 | 2022 | 4.80% | $1,650,000 | 2000 | Yes | $10,800 | $52,212 | $129,600 | $27,450 | $102,100 | 1.99 | $49,888 | 21.65 | |
| 1933 N Sedgwick, Chicago IL 60614 | 1933 N Sedgwick, LLC | 50% | Apartment | 2-4 unit loan | $230,000 | 2026 | 3.84% | $1,200,000 | 1994 | No | $6,500 | $21,672 | $82,850 | $21,000 | $61,850 | 2.85 | $40,128 | 4.18 | |
| 3114 N Southport, Chicago IL 60657 | 3114 N Southport LLC | 50% | Apartment | Construction loan | $742,000 | 2015 | 5% | $1,400,000 | 2011 | Yes | $0 | na | $0 | na | na | na | | | 30 |
| 1927 N Sedgwick, Chicago IL 60614 | PC Property Holdings, LLC | 50% | Apartment | Commercial loan | $1,150,000 | 2040 | 5.90% | $2,600,000 | 1999 | No | $16,800 | $84,360 | $200,100 | $44,000 | $156,100 | 1.85 | $71,740 | 6.22 | |
| 1454 S Michigan, Chicago IL, 606 | 1454 S Michigan, LLC | 69% | Mixed use building | Construction loan | $6,000,000 | 2017 | 5.25% | $20,590,000 | 2004 | Yes | $97,814 | $336,000 | $1,173,768 | $350,000 | $823,768 | 2.45 | $487,768 | 7.50 | |
| 1935 S Wabash, Chicago IL, 606 | 1935 S Wabash, LLC | 74% | Mixed use building | Construction loan | $46,000,000 | 2011 | na | $46,000,000 | 2007 | Yes | $258,899 | na | $3,226,788 | $1,570,000 | $1,656,788 | na | $1,656,788 | 30.67 | |
| 828 W Grace St, Chicago IL 60613 | 828 W Grace, LLC | 18% | Mixed use building | na | $0 | na | na | $1,000,000 | 2022 | na | $2,500 | na | $30,000 | $22,000 | $8,000 | na | $8,000 | 0.00 | |
| 828 W Grace St Unit 402, Chicago IL 60613 | Maeve LLC, Series N | 50% | Unit | na | $0 | na | na | $330,000 | 2007 | na | $2,100 | na | $25,200 | $7,500 | $17,600 | na | $17,600 | 0.00 | |
| 1454 S Michigan, Unit 1605, Chicago IL, 606 | Maeve LLC, Series P | 50% | Unit | na | $0 | na | na | $340,000 | 2009 | na | $2,400 | na | $29,800 | $7,900 | $20,000 | na | $20,000 | 0.00 | |
| 550 S Kedzie, Chicago, IL | 550 S Kedzie Investment | 40% | Commercial retail development | Construction loan | $11,600,000 | 2016 | 4.50% | $19,500,000 | 2013 | Yes | $0 | na | $0 | $0 | $0 | na | $0 | 0.00 | |
| Park Ave, River Forest, IL | Maeve LLC, Series Y | 99% | Vacant lot | na | $0 | na | na | $440,000 | 2012 | na | $0 | na | $0 | $0 | $0 | na | $0 | 0.00 | |

As arranged to Institutional partner and Market Value represents value related to the transaction.

# June 1, 2014

EXHIBIT C, Page 23 of 62

## PERSONAL FINANCIAL STATEMENT AS OF ___06/01/14___

Date

### PERSONAL INFORMATION

| APPLICANT (NAME)   Marty Paris | CO-APPLICANT (NAME) |
|---|---|
| Employer   Sedgwick Payroll Corp | Employer |
| Address of Employer | Address of Employer |
| 1525 West Homer Street, Suite 400, Chicago, IL 60642 | |
| Business Phone No. | Business Phone No. / No. of Years with Employer / Title/Position |
| Name of previous employer & position (if with current employer less than 3 years) | Name of previous employer & position (if with current employer less than 3 years) |
| Home Address | Home Address |
| 711 Park Ave, River Forest, IL 60305 | |
| Home Phone No. | Home Phone No. / Social Security No. / Date of Birth |
| Loberg, Miki and Obrien LLP, Tim Obrien | Name, Phone No. of your Accountant |
| Name, Phone No. of your Attorney | Name, Phone No. of your Attorney |
| Stern Law, Gary Stern, | |
| Name, Phone No. of your Investment Advisor/Broker | Name, Phone No. of your Investment Advisor/Broker |
| Kavar Capital, Douglas G. Ciocca, | |
| Name, Phone No. of your Insurance Advisor | Name, Phone No. of your Insurance Advisor |
| Willis Private Client Group, Mary M | |

Estimated Cash Income & Expenditures Statement For Year E| ___2014___   (Omit Cents)

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Salary (applicant) | $225,000 | Federal Income and Other Taxes | $330,000 |
| Salary (co-applicant) | | State Income and Other Taxes | $60,000 |
| Bonuses & Commissions (applicant) | | Rental Payments, Co-op, or Condo Maintenance | |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments - Residential | $69,000 |
| Rental Income, Net of Expenses | | Mortgage Payments - Investment | |
| Interest Income - Maeve, LLC - Series A | $20,000 | Property Taxes - Residential | $24,000 |
| Dividend Income- Maeve, LLC - Series A | $97,000 | Property Taxes - Investment | |
| Capital Gains | | Insurance | $7,800 |
| Partnership Income | | Investments (including tax shelters) | |
| Sedgwick Holdings Corp | $140,000 | | |
| 1454 S Michigan, LLC - Maeve, L| | $135,000 | Alimony/Child Support | |
| 2049 N Sheffield, LLC - Maeve, L| | $55,000 | Tuition | |
| 1933 N Sedgwick, LLC - Maeve, L| | $25,000 | Other Living Expense - Rent | $25,000 |
| 3216 N Racine, LLC - Maeve, LLC | $35,000 | Medical Expenses | |
| PC Property Holdings, LLC - Mae| | $45,000 | Other Expense (List) | |
| 1611 N Hermitage, LLC | $600,000 | | |
| **TOTAL INCOME** → | **$1,377,000** | **TOTAL EXPENDITURES** ← | **$515,800** |

Any significant changes expected in the next 12 months? (If yes, attach information.)

_____ Yes    __x__ No

** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or co-applicant does not wish to have it considered as a basis for repaying this obligation.

**EXHIBIT C, Page 24 of 62**

Marty Paris
Personal Financial Statement Data
Schedule A

| Entity | Ownership | Description of Interest | Value of Interest | |
|---|---|---|---|---|
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Marty Paris | 1% common stock | $ | 43,845.63 |
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ | 4,340,716.88 |
| Maeve, LLC - Series A, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 48,970.00 |
| Maeve, LLC - Series B, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 2,000.00 |
| Maeve, LLC - Series C, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 2,218.59 |
| Maeve, LLC - Series D, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 225.12 |
| Maeve, LLC - Series E, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | - |
| Maeve, LLC - Series F, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 495.00 |
| Maeve, LLC - Series G, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 83,160.00 |
| Maeve, LLC - Series H, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | - |
| Maeve, LLC - Series I, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 495.00 |
| Maeve, LLC - Series J, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 6,155.00 |
| Maeve, LLC - Series K, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 9,385.20 |
| Maeve, LLC - Series L, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 8,655.00 |

**EXHIBIT C, Page 25 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series M, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,683.75 |
| Maeve, LLC - Series N, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 860.00 |
| Maeve, LLC - Series O, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 630.20 |
| Maeve, LLC - Series P, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,500.00 |
| Maeve, LLC - Series Q, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series R, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,550.00 |
| Maeve, LLC - Series S, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series T, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,290.00 |
| Maeve, LLC - Series U, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,924.00 |
| Maeve, LLC - Series V, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 14,355.00 |
| Maeve, LLC - Series W, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 22,563.34 |
| Maeve, LLC - Series X, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,000.00 |
| Maeve, LLC - Series Y, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 14,800.50 |
| Conor DE II, Inc., a Delaware corporation | Frank Martin Paris, Jr. Revocable Trust | 33% common A voting stock | $ 87,955.60 |
| Conor Management, LLC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 266,532.12 |

**EXHIBIT C, Page 26 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 1% common A voting stock | $ 263,866.79 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 93.639% common B non-voting stock | $ 18,531,167.10 |
| 828 W. Grace, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 2,241.00 |
| 1857 W Dickens, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | n/a |
| Alpha Carpentry, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 500.00 |
| 1454 S. Michigan, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 84,000.00 |
| 1935 S. Wabash, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ - |
| Sedgwick Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 500.00 |
| 2049 North Sheffield, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,480.00 |
| Alpha Property Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,000.00 |
| Alpha Construction Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 22,791.25 |
| 1611 N Hermitage LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 23,990.00 |
| 1545 W North, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 14,950.00 |
| TOTAL | | | $ 23,930,752.08 |

**EXHIBIT C, Page 27 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|

*Cash and readily marketable securities                    $6,822,844

Balance Sheet as of: _____ 06/01/14 _____

| ASSETS | AMOUNT ($) | LIABILITIES | AMOUNT ($) |
|---|---|---|---|
| Readily Marketable Securities | $0 | Notes Payable | |
| Non-Readily Marketable Securities | $0 | Secured (Home) | $1,340,000 |
| Accounts and Notes Receivable | $0 | Unsecured | |
| Net Cash Surrender Value of Life Insurance | $0 | Notes Payable to Others (Schedule E) | $0 |
| | $0 | Secured | $2,550,000 |
| Residential Real Estate (Home) | $0 | Unsecured | $0 |
| Real Estate Investments (Schedule C) | $0 | Accounts Payable (including credit cards) | |
| Partnerships / LLC Interests (Schedule A) | $23,930,752 | Margin Accounts | $0 |
| IRA, Keogh, Profit-Sharing & Other Vested | $465,000 | Notes Due: Partnership (Schedule D) | $0 |
| Retirement Accounts | | Taxes Payable | $390,000 |
| Deferred Income | $0 | Mortgage Debt (Schedule C) | |
| Number of years deferred: | | | $0 |
| Personal Property (including automobiles) | $0 | Life Insurance Loans (Schedule B) | $0 |
| Other Assets (List): | | Other Liabilities (List): | |
| | | Auto Loan | $0 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total Liabilities | $4,280,000 |
| | | Net Worth | $20,115,752 |
| TOTAL ASSETS | $24,395,752 | TOTAL LIABILITIES & NET WORTH | $24,395,752 |

**EXHIBIT C, Page 28 of 62**

| CONTINGENT LIABILITIES | YES | NO | AMOUNT |
|---|---|---|---|
| | (mark with "X") | | |
| Are you a guarantor/co-maker/endorser for any debt of an individual, corporation, or partnership? | X | | see schedule |
| Do you have any outstanding letters of credit or surety bonds? | | X | |
| Are there any suits or legal actions pending against you? | | X | |
| Are you contingently liable on any lease or contract? | | X | |
| Are any of your tax obligations past due? | | X | |

**Please Answer The Following Questions:**

1. Income tax returns filed through (date):     2012
   Are any returns currently being audited or contested (Yes / No)?     No     If yes, what year(s)? _____

2. Have you ever declared personal bankruptcy?     No

3. Have you drawn a will?     Yes
   If yes, please furnish the name of the executor(s) and year will was drawn:     Kerry, 2006

4. Number of dependents (excluding self) and relationship to applicants:     8, wife, 5 sons and 2 daughter

5. Have you ever had a financial plan prepared for you?     Yes

6. Did you include two years federal and state tax returns?     Upon request

7. Do (either of) you have a line of credit or unused credit facility at any other institution(s)?     Yes
   If yes, please indicate where, how much, and name of banker:
        See Schedule of Real Estate

8. Do you anticipate any substantial inheritances?     No
   If yes, please explain:

9. Have you ever been convicted of a felony?     No

**Representation and Warranties**

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue to accept a guarantee thereof. The undersigned agrees to notify you immediately and in writing of any change in name, address, or employment. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the guarantee of the undersigned to you is outstanding, the undersigned shall supply annually upon your request an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be property of the undersigned.

7/28/14
Date

Marty Paris

April 1, 2015

**PERSONAL FINANCIAL STATEMENT AS OF** _04/01/15_
Date

| PERSONAL INFORMATION | |
|---|---|
| APPLICANT (NAME)            Marty Paris | CO-APPLICANT (NAME) |
| Employer       Sedgwick Payroll Corp. | Employer |
| Address of Employer | Address of Employer |
| 1525 West Homer Street, Suite 400, Chicago, IL 60642 | |
| Business Phone No.        Title of Years with Present Position | Business Phone No.        No. of Years with Employer        Title/Position |
| | Name of previous employer & position (if with current employer less than 3 years) |
| Home Address | Home Address |
| 711 Park Ave, River Forest, IL 60305 | |
| Home Phone No.        Social Security No.        Date of Birth | Home Phone No.        Social Security No.        Date of Birth |
| | Name, Phone No. of your Accountant |
| Loberg, Miki and Obrien LLP, Tim Obrien, | |
| Name, Phone No. of your Attorney | Name, Phone No. of your Attorney |
| Stern Law, Gary Stern, | |
| Name, Phone No. of your Investment Advisor/Broker | Name, Phone No. of your Investment Advisor/Broker |
| Kavar Capital, Douglas G. Ciocca, | |
| Name, Phone No. of your Insurance Advisor | Name, Phone No. of your Insurance Advisor |
| Willis Private Client Group, Mary N | |

Estimated Cash Income & Expenditures Statement For Year E_  2015    (Omit Cents)

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Salary (applicant) | $225,000 | Federal Income and Other Taxes | $600,000 |
| Salary (co-applicant) | | State Income and Other Taxes | $90,000 |
| Bonuses & Commissions (applicant) | | Rental Payments, Co-op, or Condo Maintenance | |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments - Residential | $69,000 |
| Rental Income, Net of Expenses | | Mortgage Payments - Investment | |
| Interest Income - Maeve, LLC - Series A | $10,000 | Property Taxes - Residential | $28,000 |
| Dividend Income - Maeve, LLC - Series A | $115,000 | Property Taxes - Investment | |
| Capital Gains | | Insurance | $7,800 |
| Partnership Income | | Investments (including tax shelters) | |
| Sedgwick Holdings Corp | $140,000 | | |
| 1454 S Michigan, LLC - Maeve, L | $135,000 | Alimony/Child Support | |
| 2049 N Sheffield, LLC - Maeve, L | $55,000 | Tuition | |
| 1933 N Sedgwick, LLC - Maeve, L | $25,000 | Other Living Expense - Rent | $25,000 |
| 3215 N Racine, LLC - Maeve, LLC | $35,000 | Medical Expenses | |
| PC Property Holdings, LLC - Mae | $45,000 | Other Expense (List) | |
| 5504 S Kedzie, LLC - Maeve, LLC | $200,000 | | |
| 1611 N Hermitage, LLC - Maeve, | $1,200,000 | | |
| TOTAL INCOME → | $2,185,000 | TOTAL EXPENDITURES → | $758,800 |

Any significant changes expected in the next 12 months? (If yes, attach information.)
_____ Yes    _x_ No

** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or co-applicant does not wish to have it considered as a basis for repaying this obligation.

**EXHIBIT C, Page 31 of 62**

Marty Paris
Personal Financial Statement Data
Schedule A

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Marty Paris | 1% common stock | $ 37,066.13 |
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ 3,669,744.38 |
| Maeve, LLC – Series A, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 36,146.57 |
| Maeve, LLC – Series B, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,000.00 |
| Maeve, LLC – Series C, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,218.60 |
| Maeve, LLC – Series D, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 225.12 |
| Maeve, LLC – Series E, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,850.00 |
| Maeve, LLC – Series F, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 495.00 |
| Maeve, LLC – Series G, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 104,049.79 |
| Maeve, LLC – Series H, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ . |
| Maeve, LLC – Series I, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 495.00 |
| Maeve, LLC – Series J, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,820.00 |
| Maeve, LLC – Series K, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 10,870.20 |
| Maeve, LLC – Series L, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,760.00 |

**EXHIBIT C, Page 32 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series M, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,798.60 |
| Maeve, LLC - Series N, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 860.00 |
| Maeve, LLC - Series O, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 137.00 |
| Maeve, LLC - Series P, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,800.00 |
| Maeve, LLC - Series Q, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 160.00 |
| Maeve, LLC - Series R, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,850.00 |
| Maeve, LLC - Series S, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series T, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,517.50 |
| Maeve, LLC - Series U, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 4,463.39 |
| Maeve, LLC - Series V, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 13,464.00 |
| Maeve, LLC - Series W, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,970.00 |
| Maeve, LLC - Series X, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,500.00 |
| Maeve, LLC - Series Y, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 23,750.10 |
| Maeve, LLC - Series Z, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 22,080.71 |
| Maeve, LLC - Series AA, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 16,008.00 |

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series BB, a Delaware limited liability company | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 9,565.56 |
| Maeve, LLC - Series CC, a Delaware limited liability company | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 1,815.00 |
| Maeve, LLC - Series DD, a Delaware limited liability company | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 10,749.66 |
| Maeve, LLC - Series EE, a Delaware limited liability company | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 14,995.00 |
| Maeve, LLC - Series FF, a Delaware limited liability company | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 1,000.00 |
| Maeve, LLC - Series GG, a Delaware limited liability company | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 1,000.00 |
| Conor DE II, Inc., a Delaware corporation | Frank Martin Pons, Jr. Revocable Trust | 33% common A voting stock | $ 102,303.96 |
| Conor Management, LLC, a Delaware limited liability company | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 310,010.23 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Pons, Jr. Revocable Trust | 1% common A voting stock | $ 206,910.13 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Pons, Jr. Revocable Trust 92.839% | common B non-voting stock | $ 21,323,865.03 |
| 828 W Grace, LLC | Frank Martin Pons, Jr. Revocable Trust | 1% class A membership interest | $ 2,241.00 |
| Alpha Carpentry, LLC | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 800.00 |
| 1454 S Michigan, LLC | Frank Martin Pons, Jr. Revocable Trust | 1% class A membership interest | $ 103,100.60 |
| Sedgwick Investments, LLC | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 800.00 |
| 2049 N Sheffield, LLC | Frank Martin Pons, Jr. Revocable Trust | 1% membership interest | $ 10,980.00 |

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| 55th and S Kedzie Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 13,600.00 |
| Alpha Property Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,000.00 |
| 1611 N Hermitage, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 29,890.00 |
| Alpha Construction Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 22,303.75 |
| 1545 W North, LLC | Frank Morin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 6,631.87 |
| | | | |
| | | | |
| **TOTAL** | | | **$ 26,250,814.01** |

*Cash and readily marketable securities                    $7,205,155

Balance Sheet as of:                    04/01/15

| ASSETS | AMOUNT ($) | LIABILITIES | AMOUNT ($) |
|---|---|---|---|
| Readily Marketable Securities | $0 | Notes Payable | $0 |
| Non-Readily Marketable Securities | $0 | Secured (Home) | $1,346,000 |
| Accounts and Notes Receivable | $0 | Unsecured | |
| Net Cash Surrender Value of Life Insurance | $0 | Notes Payable to Others (Schedule E) | $0 |
| | $0 | Secured | $2,750,000 |
| Residential Real Estate (Home) | $0 | Unsecured | $0 |
| Real Estate Investments (Schedule C) | $0 | Accounts Payable (including credit cards) | |
| Partnerships / LLC Interests (Schedule A) | $26,250,814 | Margin Accounts | $0 |
| IRA, Keogh, Profit-Sharing & Other Vested Retirement Accounts | $653,000 | Notes Due: Partnership (Schedule D) | $0 |
| | | Taxes Payable | $690,000 |
| Deferred Income | $0 | Mortgage Debt (Schedule C) | |
| Number of years deferred: | | | $0 |
| Personal Property (including automobiles) | $0 | Life Insurance Loans (Schedule B) | $0 |
| Other Assets (List): | | Other Liabilities (List): | |
| | | Auto Loan | $150,000 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total Liabilities | $4,786,000 |
| | | Net Worth | $22,096,814 |
| **TOTAL ASSETS** | **$26,893,814** | **TOTAL LIABILITIES & NET WORTH** | **$26,893,814** |

**EXHIBIT C, Page 35 of 62**

| CONTINGENT LIABILITIES | YES | NO | AMOUNT |
|---|---|---|---|
| | (mark with "X") | | |
| Are you a guarantor/co-maker/endorser for any debt of an individual, corporation, or partnership? | X | | see schedule |
| Do you have any outstanding letters of credit or surety bonds? | | X | |
| Are there any suits or legal actions pending against you? | | X | |
| Are you contingently liable on any lease or contract? | | X | |
| Are any of your tax obligations past due? | | X | |

**Please Answer The Following Questions:**

1. Income tax returns filed through (date): _____2013_____
   Are any returns currently being audited or contested (Yes / No)? _____No_____ If yes, what year(s)? 

2. Have you ever declared personal bankruptcy? _____No_____

3. Have you drawn a will? _____Yes_____
   If yes, please furnish the name of the executor(s) and year will was drawn: _____Kerry, 2008_____

4. Number of dependents (excluding self) and relationship to applicants: _____8, wife, 5 sons and 2 daughter_____

5. Have you ever had a financial plan prepared for you? _____Yes_____

6. Did you include two years federal and state tax returns? _____Upon request_____

7. Do (either of) you have a line of credit or unused credit facility at any other institution(s)? _____Yes_____
   If yes, please indicate where, how much, and name of banker:
   _____See Schedule of Real Estate_____

8. Do you anticipate any substantial inheritances? _____No_____
   If yes, please explain: 

9. Have you ever been convicted of a felony? _____No_____

**Representation and Warranties**

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue to accept a guarantee thereof. The undersigned agrees to notify you immediately and in writing of any change in name, address, or employment. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the guarantee of the undersigned to you is outstanding, the undersigned shall supply annually upon your request an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be property of the undersigned.

_____4/1/15_____
Date

_____
Marty Park

April 1, 2016

# PERSONAL FINANCIAL STATEMENT AS OF ___04/01/16___

Date

## PERSONAL INFORMATION

| APPLICANT (NAME)            Marty Paris | CO-APPLICANT (NAME) |
|---|---|
| Employer    Sedgwick Payroll Corp | Employer |
| Address of Employer | Address of Employer |
| 1525 West Homer Street, Suite 400, Chicago, IL 60642 | |
| | Business Phone No. / No. of Years with Employer / Title/Position |
| Name of previous employer & position (if with current employer less than 3 years) | Name of previous employer & position (if with current employer less than 3 years) |
| Home Address | Home Address |
| 711 Park Ave, River Forest, IL 60305 | |
| | Home Phone No. / Social Security No. / Date of Birth |
| Name, Phone No. of your Accountant | |
| Loberg, Miki and Obrien LLP, Tim Obrien | Name, Phone No. of your Accountant |
| Name, Phone No. of your Attorney | |
| Stern Law, Gary Stern | Name, Phone No. of your Attorney |
| Name, Phone No. of your Investment Advisor/Broker | |
| Kavar Capital, Douglas G. Ciocca, | Name, Phone No. of your Investment Advisor/Broker |
| Name, Phone No. of your Insurance Advisor | |
| Willis Private Client Group, Mary M | Name, Phone No. of your Insurance Advisor |

Estimated Cash Income & Expenditures Statement For Year E:___2016___ (Omit Cents)

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Salary (applicant) | $120,000 | Federal Income and Other Taxes | $500,000 |
| Salary (co-applicant) | | State Income and Other Taxes | $50,000 |
| Bonuses & Commissions (applicant) | | Rental Payments, Co-op, or Condo Maintenance | |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments - Residential | |
| Rental Income, Net of Expenses | | Mortgage Payments - Investment | $69,000 |
| Interest Income - Maeve, LLC - Series A | $10,000 | Property Taxes - Residential | |
| Dividend Income - Maeve, LLC - Series A | $115,000 | Property Taxes - Investment | $31,000 |
| Capital Gains | | Insurance | |
| Partnership Income | | Investments (including tax shelters) | $11,000 |
| Sedgwick Holdings Corp | $140,000 | Notes Payable - Interest | |
| 1454 S Michigan, LLC - Maeve, L | $135,000 | Alimony/Child Support | $60,000 |
| 2049 N Sheffield, LLC - Maeve, L | $60,000 | Tuition | |
| 1933 N Sedgwick, LLC - Maeve, | $25,000 | Other Living Expense - Rent | $32,000 |
| 3216 N Racine, LLC - Maeve, LLC | $40,000 | Medical Expenses | |
| PC Property Holdings, LLC - Mae | $45,000 | Other Expense (List) | |
| 5501 S Kedzie, LLC - Maeve, LLC | $350,000 | | |
| 1611 N Hermitage, LLC - Maeve, | $700,000 | | |
| TOTAL INCOME | $1,740,000 | TOTAL EXPENDITURES | $753,000 |

Any significant changes expected in the next 12 months? (If yes, attach information.)

_____ Yes    __x__ No

** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or co-applicant does not wish to have it considered as a basis for repaying this obligation.

**EXHIBIT C, Page 38 of 62**

Marty Paris
Personal Financial Statement Data
Schedule A

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Marty Paris | 1% common stock | $ 41,887.75 |
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ 4,146,887.25 |
| Maeve, LLC - Series A, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 40,510.00 |
| Maeve, LLC - Series B, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,000.00 |
| Maeve, LLC - Series C, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,049.30 |
| Maeve, LLC - Series D, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 225.12 |
| Maeve, LLC - Series E, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,918.50 |
| Maeve, LLC - Series F, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 495.00 |
| Maeve, LLC - Series G, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 100,975.84 |
| Maeve, LLC - Series H, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series I, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 495.00 |
| Maeve, LLC - Series J, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,045.00 |
| Maeve, LLC - Series K, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 11,859.20 |
| Maeve, LLC - Series L, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,200.00 |

**EXHIBIT C, Page 39 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series M, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,960.00 |
| Maeve, LLC - Series N, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 860.00 |
| Maeve, LLC - Series O, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6.85 |
| Maeve, LLC - Series P, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,800.00 |
| Maeve, LLC - Series Q, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series R, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,850.00 |
| Maeve, LLC - Series S, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series T, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,900.00 |
| Maeve, LLC - Series U, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,990.79 |
| Maeve, LLC - Series V, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 8,335.66 |
| Maeve, LLC - Series W, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,970.00 |
| Maeve, LLC - Series X, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,000.00 |
| Maeve, LLC - Series Y, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 12,500.73 |
| Maeve, LLC - Series Z, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 27,582.64 |
| Maeve, LLC - Series AA, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 4,120.00 |

**EXHIBIT C, Page 40 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series BB, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,027.21 |
| Maeve, LLC - Series CC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 15,281.27 |
| Maeve, LLC - Series DD, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 11,480.00 |
| Maeve, LLC - Series EE, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,010.15 |
| Maeve, LLC - Series FF, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 15,107.44 |
| Maeve, LLC - Series GG, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,884.92 |
| Conor DE II, Inc., a Delaware corporation | Frank Martin Paris, Jr. Revocable Trust | 33% common A voting stock | $ 104,417.31 |
| Conor Management, LLC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 316,416.09 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 1% common A voting stock | $ 313,251.93 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 90.639%   common B non-voting stock | $ 21,294,631.45 |
| 828 W Grace, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 2,070.00 |
| Alpha Carpentry, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 500.00 |
| 1454 S Michigan, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 101,995.80 |
| Sedgwick Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 500.00 |
| 2049 N Sheffield, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 12,080.00 |

**EXHIBIT C, Page 41 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| 55th and S Kedzie Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 8,419.86 |
| Alpha Property Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,000.00 |
| 1611 N Hermitage, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 12,527.00 |
| Alpha Construction Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 27,861.25 |
| | | | |
| | | | |
| | | | |
| TOTAL | | | $ 26,709,386.32 |

*Cash and readily marketable securities

$7,735,000

Balance Sheet as of: 04/01/16

| ASSETS | AMOUNT ($) | LIABILITIES | AMOUNT ($) |
|---|---|---|---|
| Readily Marketable Securities | | Notes Payable | |
| Non-Readily Marketable Securities | $0 | Secured (Home) | $0 |
| Accounts and Notes Receivable | $0 | Unsecured | $1,215,000 |
| Net Cash Surrender Value of Life Insurance | $0 | Notes Payable to Others (Schedule E) | |
| | $0 | Secured | $0 |
| Residential Real Estate (Home) | $0 | Unsecured | $2,850,000 |
| Real Estate Investments (Schedule C) | $0 | Accounts Payable (including credit cards) | $0 |
| Partnerships / LLC Interests (Schedule A) | $0 | Margin Accounts | |
| IRA, Keogh, Profit-Sharing & Other Vested | $26,709,386 | Notes Due: Partnership (Schedule D) | $0 |
| Retirement Accounts | $633,000 | Taxes Payable | $0 |
| Deferred Income | | Mortgage Debt (Schedule C) | $550,000 |
| Number of years deferred: | $0 | | |
| Personal Property (including automobiles) | | Life Insurance Loans (Schedule B) | $0 |
| Other Assets (List): | $0 | Other Liabilities (List): | $0 |
| | | Auto Loan | |
| | | | $110,000 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total Liabilities | $4,725,000 |
| | | Net Worth | $22,617,386 |
| TOTAL ASSETS | $27,342,386 | TOTAL LIABILITIES & NET WORTH | $27,342,386 |

**EXHIBIT C, Page 42 of 62**

**CONTINGENT LIABILITIES**

| | YES | NO | AMOUNT |
|---|---|---|---|
| | (mark with "X") | | |
| Are you a guarantor/co-maker/endorser for any debt of an individual, corporation, or partnership? | X | | see schedule |
| Do you have any outstanding letters of credit or surety bonds? | | X | |
| Are there any suits or legal actions pending against you? | | X | |
| Are you contingently liable on any lease or contract? | | X | |
| Are any of your tax obligations past due? | | X | |

**Please Answer The Following Questions:**

1. Income tax returns filed through (date):  _____2014_____
   Are any returns currently being audited or contested (Yes / No)?  ____No____  if yes, what year(s)? _____

2. Have you ever declared personal bankruptcy?  ____No____

3. Have you drawn a will?  ____Yes____
   if yes, please furnish the name of the executor(s) and year will was drawn:  ____Kerry, 2006____

4. Number of dependents (excluding self) and relationship to applicants:  ____8, wife, 5 sons and 2 daughter____

5. Have you ever had a financial plan prepared for you?  ____Yes____

6. Did you include two years federal and state tax returns?  ____Upon request____

7. Do (either of) you have a line of credit or unused credit facility at any other institution(s)?  ____Yes____
   If yes, please indicate where, how much, and name of banker:
   See Schedule of Real Estate

8. Do you anticipate any substantial inheritances?  ____No____
   If yes, please explain:

9. Have you ever been convicted of a felony?  ____No____

**Representation and Warranties**

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue to accept a guarantee thereof. The undersigned agrees to notify you immediately and in writing of any change in name, address, or employment. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the guarantee of the undersigned to you is outstanding, the undersigned shall supply annually upon your request an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be property of the undersigned.

____4/1/16____
Date

____Marty Paris____

# May 1, 2017

EXHIBIT C, Page 44 of 62

## PERSONAL FINANCIAL STATEMENT AS OF ___05/01/17___
Date

| PERSONAL INFORMATION | |
|---|---|
| **APPLICANT (NAME)**        Marty Paris | **CO-APPLICANT (NAME)** |
| Employer    Sedgwick Payroll Corp | Employer |
| Address of Employer | Address of Employer |
| 1525 West Homer Street, Suite 400, Chicago, IL 60642 | |

| Business Phone No. | No. of Years with Employer 18 | Title/Position President | Business Phone No. | No. of Years with Employer | Title/Position |
|---|---|---|---|---|---|

| Name of previous employer & position (if with current employer less than 3 years) | Name of previous employer & position (if with current employer less than 3 years) |
|---|---|

| Home Address | Home Address |
|---|---|
| 711 Park Ave, River Forest, IL 60305 | |

| Home Phone No. | Social Security No. | Date of Birth | Home Phone No. | Social Security No. | Date of Birth |
|---|---|---|---|---|---|

| Name, Phone No. of your Accountant | Name, Phone No. of your Accountant |
|---|---|
| George Spencer & Assoc, George Spencer | |
| Name, Phone No. of your Attorney | Name, Phone No. of your Attorney |
| Ruben & Goldberg, llc, Kristen Gorenberg, | |
| Name, Phone No. of your Investment Advisor/Broker | Name, Phone No. of your Investment Advisor/Broker |
| Kavar Capital, Douglas G. Ciocca, S | |
| Name, Phone No. of your Insurance Advisor | Name, Phone No. of your Insurance Advisor |
| Willis Private Client Group, Mary Mc | |

Estimated Cash Income & Expenditures Statement For Year E___  2017 ___  (Omit Cents)

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Salary (applicant) | $120,000 | Federal Income and Other Taxes | $350,000 |
| Salary (co-applicant) | | State Income and Other Taxes | $50,000 |
| Bonuses & Commissions (applicant) | | Rental Payments, Co-op, or Condo Maintenance | |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments - Residential | $69,000 |
| Rental Income, Net of Expenses | | Mortgage Payments - Investment | |
| Interest Income - Maeve, LLC - Series A | $12,000 | Property Taxes - Residential | $31,000 |
| Dividend Income- Maeve, LLC - Series A | $120,000 | Property Taxes - Investment | |
| Capital Gains | | Insurance | $11,000 |
| Partnership Income | | Investments (Including tax shelters) | |
| Sedgwick Holdings Corp | $140,000 | Notes Payable - Interest | $67,000 |
| 1454 S Michigan, LLC - Maeve, Ll | $195,000 | Alimony/Child Support | |
| 2049 N Sheffield, LLC - Maeve, Ll | $40,000 | Tuition | $32,000 |
| 1933 N Sedgwick, LLC - Maeve, L | $27,500 | Other Living Expense - Rent | |
| 3216 N Racine, LLC - Maeve, LLC | $45,000 | Medical Expenses | |
| PC Property Holdings, LLC - Maev | $50,000 | Other Expense (List) | |
| 5501 S Kedzie, LLC - Maeve, LLO | $750,000 | | |
| 1611 N Hermitage, LLC - Maeve, | $75,000 | | |
| **TOTAL INCOME** → | **$1,674,500** | **TOTAL EXPENDITURES** ◄ | **$610,000** |

Any significant changes expected in the next 12 months? (If yes, attach information.)
____x____ Yes     _____ No

** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or co-applicant does not wish to have it considered as a basis for repaying this obligation.

**EXHIBIT C, Page 45 of 62**

Marty Paris
Personal Financial Statement Data
Schedule A

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Marty Paris | 1% common stock | $ 36,271.88 |
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ 3,590,915.63 |
| Maeve, LLC - Series A, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 50,870.00 |
| Maeve, LLC - Series B, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,000.00 |
| Maeve, LLC - Series C, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,020.79 |
| Maeve, LLC - Series D, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 225.12 |
| Maeve, LLC - Series E, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,653.50 |
| Maeve, LLC - Series F, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 495.00 |
| Maeve, LLC - Series G, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 90,859.13 |
| Maeve, LLC - Series H, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series I, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 495.00 |
| Maeve, LLC - Series J, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,985.00 |
| Maeve, LLC - Series K, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 8,098.20 |
| Maeve, LLC - Series L, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,370.00 |

| Entity | Ownership | Description of Interest | Value of Interest | |
|---|---|---|---|---|
| Maeve, LLC - Series M, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 6,240.00 |
| Maeve, LLC - Series N, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 660.00 |
| Maeve, LLC - Series O, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | - |
| Maeve, LLC - Series P, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 2,000.00 |
| Maeve, LLC - Series Q, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 150.00 |
| Maeve, LLC - Series R, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 1,750.00 |
| Maeve, LLC - Series S, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 150.00 |
| Maeve, LLC - Series T, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 4,375.00 |
| Maeve, LLC - Series U, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 4,588.67 |
| Maeve, LLC - Series V, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 9,443.95 |
| Maeve, LLC - Series W, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 2,970.00 |
| Maeve, LLC - Series X, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 5,000.00 |
| Maeve, LLC - Series Y, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 7,797.32 |
| Maeve, LLC - Series Z, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 18,343.26 |
| Maeve, LLC - Series AA, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ | 2,924.80 |

**EXHIBIT C, Page 47 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series BB, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 10,166.05 |
| Maeve, LLC – Series CC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 19,390.75 |
| Maeve, LLC – Series DD, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 13,470.00 |
| Maeve, LLC - Series EE, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,565.97 |
| Maeve, LLC - Series FF, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 19,298.28 |
| Maeve, LLC - Series GG, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 8,656.26 |
| Maeve, LLC - Series HH, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 8,544.24 |
| Maeve, LLC - Series II, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series JJ, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,384.83 |
| Conor DE II, Inc., a Delaware corporation | Frank Martin Paris, Jr. Revocable Trust | 33% common A voting stock | $ 108,725.60 |
| Conor Management, LLC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 329,471.51 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 1% common A voting stock | $ 326,176.79 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 91.009%   common B non-voting stock | $ 19,592,115.71 |
| 828 W Grace, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 2,041.20 |
| Alpha Carpentry, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 500.00 |
| 1454 S Michigan, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 91,776.90 |

**EXHIBIT C, Page 48 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Sedgwick Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 500.00 |
| 2049 N Sheffield, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 8,180.00 |
| 55th and S Kedzie Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 9,539.34 |
| Alpha Property Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,000.00 |
| 1611 N Hermitage, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 7,876.08 |
| Alpha Construction Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 16,528.55 |
| TOTAL | | | $ 24,461,780.30 |

**\*Cash and readily marketable securities**

**Balance Sheet as of:**          05/01/17

| ASSETS | AMOUNT ($) | LIABILITIES | AMOUNT ($) |
|---|---|---|---|
| Readily Marketable Securities | $0 | Notes Payable | $0 |
| Non-Readily Marketable Securities | $0 | Secured (Home) | $1,184,000 |
| Accounts and Notes Receivable | $0 | Unsecured | |
| Net Cash Surrender Value of Life Insurance | $0 | Notes Payable to Others (Schedule E) | $0 |
| | $0 | Secured | $3,516,000 |
| Residential Real Estate (Home) | $0 | Unsecured | $0 |
| Real Estate Investments (Schedule C) | $0 | Accounts Payable (including credit cards) | |
| Partnerships / LLC Interests (Schedule A) | $24,461,780 | Margin Accounts | $0 |
| IRA, Keogh, Profit-Sharing & Other Vested | $633,000 | Notes Due: Partnership (Schedule D) | $0 |
| Retirement Accounts | | Taxes Payable | $400,000 |
| Deferred Income | $0 | Mortgage Debt (Schedule C) | |
| Number of years deferred: | | | $0 |
| Personal Property (Including automobiles) | $0 | Life Insurance Loans (Schedule B) | $0 |
| Other Assets (List): | | Other Liabilities (List): | |
| | | Auto Loan | $68,000 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total Liabilities | $5,168,000 |
| | | Net Worth | $19,926,780 |
| TOTAL ASSETS | $25,094,780 | TOTAL LIABILITIES & NET WORTH | $25,094,780 |

| CONTINGENT LIABILITIES | YES | NO | AMOUNT |
|---|---|---|---|
| | (mark with "X") | | |
| Are you a guarantor/co-maker/endorser for any debt of an individual, corporation, or partnership? | X | | see schedule |
| Do you have any outstanding letters of credit or surety bonds? | | X | |
| Are there any suits or legal actions pending against you? | X | | na |
| Are you contingently liable on any lease or contract? | | X | |
| Are any of your tax obligations past due? | | X | |

**Please Answer The Following Questions:**

1. Income tax returns filed through (date): _____ 2015 _____
   Are any returns currently being audited or contested (Yes / No)? _____ No _____ If yes, what year(s)? _____

2. Have you ever declared personal bankruptcy? _____ No _____

3. Have you drawn a will? _____ Yes _____
   If yes, please furnish the name of the executor(s) and year will was drawn: _____ Kerry, 2006 _____

4. Number of dependents (excluding self) and relationship to applicants: _____ 8, wife, 5 sons and 2 daughter _____

5. Have you ever had a financial plan prepared for you? _____ Yes _____

6. Did you include two years federal and state tax returns? _____ Upon request _____

7. Do (either of) you have a line of credit or unused financing facility at any other institution(s)? _____ Yes _____
   If yes, please indicate where, how much, and name of banker:
   See Schedule of Real Estate

8. Do you anticipate any substantial inheritances? _____ No _____
   If yes, please explain:

9. Have you ever been convicted of a felony? _____ No _____

**Representation and Warranties**

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue to accept a guarantee thereof. The undersigned agrees to notify you immediately and in writing of any change in name, address, or employment. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the guarantee of the undersigned to you is outstanding, the undersigned shall supply annually upon your request an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be property of the undersigned.

_____ 7/14/17 _____
Date

_____ Marty Parls _____

**EXHIBIT C, Page 50 of 62**

## PERSONAL FINANCIAL STATEMENT AS OF ___05/01/18___
Date

| PERSONAL INFORMATION | | | | | |
|---|---|---|---|---|---|
| **APPLICANT (NAME)** Marty Paris | | | **CO-APPLICANT (NAME)** | | |
| Employer    Sedgwick Payroll Corp | | | Employer | | |
| Address of Employer | | | Address of Employer | | |
| 1525 West Homer Street, Suite 400, Chicago, IL 60642 | | | | | |
| Business Phone No. | No. of Years with Employer 19 | Title/Position President | Business Phone No. | No. of Years with Employer | Title/Position |
| Name of previous employer & position (if with current employer less than 3 years) | | | Name of previous employer & position (if with current employer less than 3 years) | | |
| Home Address | | | Home Address | | |
| 711 Park Ave, River Forest, IL 60305 | | | | | |
| | | | Home Phone No. | Social Security No. | Date of Birth |
| Name, Phone No. of your Accountant | | | Name, Phone No. of your Accountant | | |
| George Spencer & Assoc, George Spencer | | | | | |
| Name, Phone No. of your Attorney | | | Name, Phone No. of your Attorney | | |
| Ruben & Goldberg, llc, Kristen Gorenberg | | | | | |
| Name, Phone No. of your Investment Advisor/Broker | | | Name, Phone No. of your Investment Advisor/Broker | | |
| Kavar Capital, Douglas G. Ciocca, | | | | | |
| Name, Phone No. of your Insurance Advisor | | | , Phone No. of your Insurance Advisor | | |
| Willis Private Client Group, Andria Zimmerman, | | | | | |

Estimated Cash Income & Expenditures Statement For Year E___  2018   (Omit Cents)

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Draw (applicant) | $240,000 | Federal Income and Other Taxes | $220,000 |
| Salary (co-applicant) | | State Income and Other Taxes | $40,000 |
| Bonuses & Commissions (applicant) | | Rental Payments, Co-op, or Condo Maintenance | |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments - Residential | $69,000 |
| Rental Income, Net of Expenses | | Mortgage Payments - Investment | |
| Interest Income - Maeve, LLC - Series A | $12,000 | Property Taxes - Residential | $31,000 |
| Dividend Income- Maeve, LLC - Series A | $150,000 | Property Taxes - Investment | |
| Capital Gains | | Insurance | $7,500 |
| Partnership Income | | Investments (including tax shelters) | |
| Sedgwick Holdings Corp | $0 | Notes Payable - interest | $118,150 |
| 1454 S Michigan, LLC - Maeve, L | $195,000 | Alimony/Child Support | |
| 2049 N Sheffield, LLC - Maeve, L | $50,000 | Tuition | $9,500 |
| 1933 N Sedgwick, LLC - Maeve, L | $27,500 | Other Living Expense - Rent | |
| 3216 N Racine, LLC - Maeve, LLC | $45,000 | Medical Expenses | |
| PC Property Holdings, LLC - Maev | $65,000 | Other Expense (List) | |
| 5501 S Kedzie, LLC - Maeve, LLC | $150,000 | | |
| 1545 W North , LLC - Maeve Seri | $330,000 | | |
| 1611 N Hermitage, LLC - Maeve, | $75,000 | | |
| **TOTAL INCOME** → | **$1,339,500** | **TOTAL EXPENDITURES** ◄ | **$495,150** |

Any significant changes expected in the next 12 months? (If yes, attach information.)

_____x_____ Yes      _____ No

** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or

**EXHIBIT C, Page 51 of 62**

**Marty Paris**
**Personal Financial Statement Data**
**Schedule A**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Marty Paris | 1% common stock | $ 40,671.13 |
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ 4,026,441.38 |
| Maeve, LLC - Series A, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 54,180.98 |
| Maeve, LLC - Series B, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,000.00 |
| Maeve, LLC - Series C, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,960.20 |
| Maeve, LLC - Series D, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 225.12 |
| Maeve, LLC - Series E, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 2,783.00 |
| Maeve, LLC - Series F, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 495.00 |
| Maeve, LLC - Series G, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 90,221.40 |
| Maeve, LLC - Series H, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series I, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 495.00 |
| Maeve, LLC - Series J, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,242.58 |
| Maeve, LLC - Series K, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,971.31 |
| Maeve, LLC - Series L, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,880.00 |

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series M, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    6,427.87 |
| Maeve, LLC - Series N, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    860.00 |
| Maeve, LLC - Series O, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    - |
| Maeve, LLC - Series P, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    2,000.00 |
| Maeve, LLC - Series Q, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    150.00 |
| Maeve, LLC - Series R, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    1,750.00 |
| Maeve, LLC - Series S, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    150.00 |
| Maeve, LLC - Series T, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    4,520.00 |
| Maeve, LLC - Series U, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    277.67 |
| Maeve, LLC - Series V, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    1,905.75 |
| Maeve, LLC - Series W, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    2,970.00 |
| Maeve, LLC - Series X, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    5,000.00 |
| Maeve, LLC - Series Y, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    8,288.44 |
| Maeve, LLC - Series Z, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    16,723.58 |
| Maeve, LLC - Series AA, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $    3,049.60 |

**EXHIBIT C, Page 53 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series BB, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 5,214.75 |
| Maeve, LLC - Series CC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 19,390.75 |
| Maeve, LLC - Series DD, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 14,025.50 |
| Maeve, LLC - Series EE, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,565.97 |
| Maeve, LLC - Series FF, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 19,298.28 |
| Maeve, LLC - Series GG, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 8,656.26 |
| Maeve, LLC - Series HH, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 30,044.24 |
| Maeve, LLC - Series II, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series JJ, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,726.75 |
| Conor DE II, Inc., a Delaware corporation | Frank Martin Paris, Jr. Revocable Trust | 33% common A voting stock | $ 110,112.76 |
| Conor Management, LLC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 333,675.03 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 1% common A voting stock | $ 330,338.28 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 89.009%   common B non-voting stock | $ 19,406,032.68 |
| 828 W Grace, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 1,980.00 |
| Alpha Carpentry, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 500.00 |
| 1454 S Michigan, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 91,132.73 |

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| | | | |
| Sedgwick Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 500.00 |
| | | | |
| 2049 N Sheffield, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 4,011.42 |
| | | | |
| 55th and S Kedzie Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 1,925.00 |
| | | | |
| Alpha Property Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,000.00 |
| | | | |
| 1611 N Hermitage, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 8,372.16 |
| | | | |
| Alpha Construction Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 16,892.50 |
| **TOTAL** | | | **$ 24,716,035.04** |

**\*Cash and readily marketable securities**

Balance Sheet as of: _____05/01/18_____

| ASSETS | AMOUNT ($) | | LIABILITIES | AMOUNT ($) |
|---|---|---|---|---|
| Cash | $10,000 | | Notes Payable | $0 |
| Readily Marketable Securities | $0 | | Secured (Home) | $1,353,000 |
| Non-Readily Marketable Securities | $0 | | Unsecured | |
| Accounts and Notes Receivable | $0 | | Notes Payable to Others (Schedule E) | $0 |
| Net Cash Surrender Value of Life Insurance | $0 | | Secured | $4,000,000 |
| | $0 | | Unsecured | $0 |
| Residential Real Estate (Home) | $1,500,000 | | Accounts Payable (including credit cards) | |
| Real Estate Investments (Schedule C) | $0 | | Margin Accounts | $0 |
| Partnerships / LLC Interests (Schedule A) | $24,716,035 | | Notes Due: Partnership (Schedule D) | $0 |
| IRA, Keogh, Profit-Sharing & Other Vested | $823,000 | | Taxes Payable | $260,000 |
| Retirement Accounts | | | Mortgage Debt (Schedule C) | |
| Deferred Income | $0 | | | $0 |
| Number of years deferred: | | | Life Insurance Loans (Schedule B) | $0 |
| Personal Property (including automobiles) | $0 | | Other Liabilities (List): | |
| Other Assets (List): | | | Auto Loan | $35,000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | Total Liabilities | $5,648,000 |
| | | | Net Worth | $21,391,035 |
| **TOTAL ASSETS** | **$27,039,035** | | **TOTAL LIABILITIES & NET WORTH** | **$27,039,035** |

**EXHIBIT C, Page 55 of 62**

| CONTINGENT LIABILITIES | YES | NO | AMOUNT |
|---|---|---|---|
| | (mark with "X") | | |
| Are you a guarantor/co-maker/endorser for any debt of an individual, corporation, or partnership? | X | | see schedule |
| Do you have any outstanding letters of credit or surety bonds? | | X | |
| Are there any suits or legal actions pending against you? | X | | na |
| Are you contingently liable on any lease or contract? | | X | |
| Are any of your tax obligations past due? | X | | see notes |

**Please Answer The Following Questions:**

1. Income tax returns filed through (date):  ____2016____
   Are any returns currently being audited or contested (Yes / No)?  ____No____   If yes, what year(s)?  _____

2. Have you ever declared personal bankruptcy?  ____No____

3. Have you drawn a will?  ____Yes____
   If yes, please furnish the name of the executor(s) and year will was drawn:  ____Kerry, 2006____

4. Number of dependents (excluding self) and relationship to applicants:  ____8, wife, 5 sons and 2 daughter____

5. Have you ever had a financial plan prepared for you?  ____Yes____

6. Did you include two years federal and state tax returns?  ____Upon request____

7. Do (either of) you have a line of credit or unused credit facility at any other institution(s)?  ____Yes____
   If yes, please indicate where, how much, and name of banker:  _____
        See Schedule of Real Estate

8. Do you anticipate any substantial inheritances?  ____No____
   If yes, please explain:  _____

9. Have you ever been convicted of a felony?  ____No____

**Representation and Warranties**

   The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue to accept a guarantee thereof. The undersigned agrees to notify you immediately and in writing of any change in name, address, or employment. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the guarantee of the undersigned to you is outstanding, the undersigned shall supply annually upon your request an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be property of the undersigned.

____7/12/18____                    _____
Date                                                Marty Paris

## PERSONAL FINANCIAL STATEMENT AS OF  05/01/19

Date

| PERSONAL INFORMATION | | | | | |
|---|---|---|---|---|---|
| **APPLICANT (NAME)** | | Marty Paris | **CO-APPLICANT (NAME)** | | |
| Employer | Sedgwick Payroll Corp | | Employer | | |
| Address of Employer | | | Address of Employer | | |
| 1525 West Homer Street, Suite 400, Chicago, IL 60642 | | | | | |
| Business Phone No. | No. of Years with Employer: 20 | Title/Position: President | Business Phone No. | No. of Years with Employer | Title/Position |
| Name of previous employer & position (if with current employer less than 3 years) | | | Name of previous employer & position (if with current employer less than 3 years) | | |
| Home Address | | | Home Address | | |
| 711 Park Ave, River Forest, IL 60305 | | | | | |
| Home Phone No. | Social Security No. | Date of Birth | Home Phone No. | Social Security No. | Date of Birth |
| Name, Phone No. of your Accountant | | | Name, Phone No. of your Accountant | | |
| George Spencer & Assoc, George Spencer, | | | | | |
| Name, Phone No. of your Attorney | | | Name, Phone No. of your Attorney | | |
| Ruben & Goldberg, llc, Kristen Gorenberg, | | | | | |
| Name, Phone No. of your Investment Advisor/Broker | | | Name, Phone No. of your Investment Advisor/Broker | | |
| Kavar Capital, Douglas G. Ciocca, | | | | | |
| Name, Phone No. of your Insurance Advisor | | | Name, Phone No. of your Insurance Advisor | | |
| Willis Private Client Group, Andria Zimmerman, | | | | | |

Estimated Cash Income & Expenditures Statement For Year   2019

| ANNUAL INCOME | AMOUNT ($) | ANNUAL EXPENDITURES | AMOUNT ($) |
|---|---|---|---|
| Draw (applicant) | $240,000 | Federal Income and Other Taxes | $250,000 |
| Salary (co-applicant) | | State Income and Other Taxes | $35,000 |
| Bonuses & Commissions (applicant) | | Rental Payments, Co-op, or Condo Maintenance | |
| Bonuses & Commissions (co-applicant) | | Mortgage Payments - Residential | $69,000 |
| Rental Income, Net of Expenses | | Mortgage Payments - Investment | |
| Interest Income - Maeve, LLC - Series A | $12,000 | Property Taxes - Residential | $31,000 |
| Dividend Income- Maeve, LLC - Series A | $150,000 | Property Taxes - Investment | |
| Capital Gains | | Insurance | $7,986 |
| Partnership Income | | Investments (including tax shelters) | |
| | | Notes Payable - Interest | $181,800 |
| 1454 S Michigan, LLC - Maeve, LL | $100,000 | Alimony/Child Support | |
| 3114 N Southport, LLC - Maeve, L | $20,000 | Tuition | $5,400 |
| 1933 N Sedgwick, LLC - Maeve, L | $27,500 | Other Living Expense - Rent | |
| 3216 N Racine, LLC - Maeve, LLC | $45,000 | Medical Expenses | |
| PC Property Holdings, LLC - Maev | $65,000 | Other Expense (List) | |
| 5501 S Kedzie, LLC - Maeve, LLC | $70,000 | | |
| 1857 W Dickens, LLC - Maeve, LL | $15,000 | | |
| 1325 N Wells, LLC - Maeve, LLC | $500,000 | | |
| **TOTAL INCOME** | $1,244,500 | **TOTAL EXPENDITURES** | $580,186 |

Any significant changes expected in the next 12 months? (If yes, attach information.)

___x___ Yes   _____ No

** Income from alimony, child support, or separate maintenance income need not be revealed if the applicant or co-applicant does not wish to have it considered as a basis for repaying this obligation.

**EXHIBIT C, Page 57 of 62**

Marty Paris
Personal Financial Statement Data
Schedule A

| Entity | Ownership | Description of Interest | Value of interest |
|---|---|---|---|
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Marty Paris | 1% common stock | $ 28,134.38 |
| Sedgwick Properties Holdings, Corp., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 99% common stock | $ 2,785,303.13 |
| Maeve, LLC - Series A, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 59,260.02 |
| Maeve, LLC - Series B, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,000.00 |
| Maeve, LLC - Series C, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,939.53 |
| Maeve, LLC - Series D, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 225.12 |
| Maeve, LLC - Series E, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,525.00 |
| Maeve, LLC - Series F, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 495.00 |
| Maeve, LLC - Series G, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 73,897.76 |
| Maeve, LLC - Series H, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series I, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 99.00 |
| Maeve, LLC - Series J, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,678.91 |
| Maeve, LLC - Series K, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 910.80 |
| Maeve, LLC - Series L, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 8,940.00 |

**EXHIBIT C, Page 58 of 62**

| Entity | Ownership | Description of interest | Value of interest |
|---|---|---|---|
| Maeve, LLC - Series M, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 6,248.18 |
| Maeve, LLC - Series N, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 860.00 |
| Maeve, LLC - Series O, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series P, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,925.00 |
| Maeve, LLC - Series Q, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series R, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,650.00 |
| Maeve, LLC - Series S, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 150.00 |
| Maeve, LLC - Series T, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 3,350.00 |
| Maeve, LLC - Series U, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7.22 |
| Maeve, LLC - Series V, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 898.43 |
| Maeve, LLC - Series W, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 990.00 |
| Maeve, LLC - Series X, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 4,500.00 |
| Maeve, LLC - Series Y, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 113.10 |
| Maeve, LLC - Series Z, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 14,439.40 |
| Maeve, LLC - Series AA, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 134.40 |

**EXHIBIT C, Page 59 of 62**

| Entity | Ownership | Description of Interest | Value of Interest |
|---|---|---|---|
| Maeve, LLC - Series BB, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 19.31 |
| Maeve, LLC - Series CC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 27,021.34 |
| Maeve, LLC - Series DD, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 14,025.50 |
| Maeve, LLC - Series EE, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 7,610.75 |
| Maeve, LLC - Series FF, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 21,480.46 |
| Maeve, LLC - Series GG, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 33,608.60 |
| Maeve, LLC - Series HH, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 36,794.24 |
| Maeve, LLC - Series II, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ - |
| Maeve, LLC - Series JJ, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 9,292.50 |
| Conor DE II, Inc., a Delaware corporation | Frank Martin Paris, Jr. Revocable Trust | 33% common A voting stock | $ 110,106.58 |
| Conor Management, LLC, a Delaware limited liability company | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 333,656.32 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 1% common A voting stock | $ 330,319.75 |
| Martin NV II, Inc., a Nevada corporation | Frank Martin Paris, Jr. Revocable Trust | 89.009% common B non-voting stock | $ 19,404,944.50 |
| 828 W Grace, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 1,959.12 |
| Alpha Carpentry, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 500.00 |
| 1454 S Michigan, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 74,644.20 |

**EXHIBIT C, Page 60 of 62**

| Entity | Ownership | Description of interest | Value of interest |
|--------|-----------|------------------------|-------------------|
| Sedgwick Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 100.00 |
| 2049 N Sheffield, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 920.00 |
| 55th and S Kedzie Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 907.50 |
| Alpha Property Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 1,000.00 |
| 1611 N Hermitage, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% class A membership interest | $ 114.24 |
| Alpha Construction Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% membership interest | $ 14,576.25 |
| TOTAL | | | $ 23,427,616.86 |

*Cash and readily marketable securities

Balance Sheet as of:                05/01/19

| ASSETS | AMOUNT ($) | LIABILITIES | AMOUNT ($) |
|--------|-----------|-------------|-----------|
| Cash | $10,000 | Notes Payable | $0 |
| Readily Marketable Securities | $0 | Secured (Home) | $1,373,000 |
| Non-Readily Marketable Securities | $0 | Unsecured | |
| Accounts and Notes Receivable | $0 | Notes Payable to Others (Schedule E) | $0 |
| Net Cash Surrender Value of Life Insurance | $0 | Secured | $4,650,000 |
| | $0 | Unsecured | $0 |
| Residential Real Estate (Home) | $1,400,000 | Accounts Payable (including credit cards) | |
| Real Estate Investments (Schedule C) | $0 | Margin Accounts | $0 |
| Partnerships / LLC Interests (Schedule A) | $23,427,617 | Notes Due: Partnership (Schedule D) | $0 |
| IRA, Keogh, Profit-Sharing & Other Vested | $567,000 | Taxes Payable | $635,000 |
| Retirement Accounts | | Mortgage Debt (Schedule C) | |
| Deferred Income | $0 | | $0 |
| Number of years deferred: | | Life Insurance Loans (Schedule B) | $0 |
| Personal Property (including automobiles) | $0 | Other Liabilities (List): | |
| Other Assets (List): | | Auto Loan | $10,000 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total Liabilities | $6,668,000 |
| | | Net Worth | $18,746,617 |
| TOTAL ASSETS | $25,414,617 | TOTAL LIABILITIES & NET WORTH | $25,414,617 |

**EXHIBIT C, Page 61 of 62**

| CONTINGENT LIABILITIES | YES | NO | AMOUNT |
|---|---|---|---|
| | (mark with "X") | | |
| Are you a guarantor/co-maker/endorser for any debt of an individual, corporation, or partnership? | X | | see schedule |
| Do you have any outstanding letters of credit or surety bonds? | | X | |
| Are there any suits or legal actions pending against you? | X | | na |
| Are you contingently liable on any lease or contract? | | X | |
| Are any of your tax obligations past due? | X | | see notes |

**Please Answer The Following Questions:**

1. Income tax returns filed through (date):    2017
   Are any returns currently being audited or contested (Yes / No)?    No    If yes, what year(s)? _____

2. Have you ever declared personal bankruptcy?    No

3. Have you drawn a will?    Yes
   If yes, please furnish the name of the executor(s) and year will was drawn:    Beth, 2008

4. Number of dependents (excluding self) and relationship to applicants:    7, 5 sons and 2 daughter

5. Have you ever had a financial plan prepared for you?    Yes

6. Did you include two years federal and state tax returns?    Upon request

7. Do (either of) you have a line of credit or unused credit facility at any other institution(s)?    Yes
   If yes, please indicate where, how much, and name of banker:
        See Schedule of Real Estate

8. Do you anticipate any substantial inheritances?    No
   If yes, please explain: _____

9. Have you ever been convicted of a felony?    No

**Representation and Warranties**

   The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue to accept a guarantee thereof. The undersigned agrees to notify you immediately and in writing of any change in name, address, or employment. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the credit-worthiness of the undersigned. The undersigned authorize any person or consumer reporting agency to give you any information it may have on the guarantee of the undersigned to you is outstanding, the undersigned shall supply annually upon your request an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be property of the undersigned.

6/19/19
Date

Marty Paris

**EXHIBIT C, Page 62 of 62**

EXHIBIT D



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

| DATE: | January 19, 2022 | | | |
|---|---|---|---|---|
| Bank: | Beverly Bank & Trust Company, N.A. | | Officer: | Terry Rosenberger |
| ☒New  ☐Existing, customer since | | | Prepared By: | Martin Cisneros |
| | | | Current Risk Rating: | N/A |
| Referral Source(s): Darragh Griffin | | | Proposed Risk Rating: | 5 - Management Attention Risk |

### GENERAL INFORMATION:

| | | | |
|---|---|---|---|
| Borrower Name: | **Lake Lathrop Partners LLC** | Transaction Amount: | $20,000,000 |
| Related Entities: | N/A | Wintrust Global Approval ACE: | $20,000,000 |
| Headquarters Address: | 1525 West Homer Street | Beverly Bank & Trust Company, N.A. Approval ACE: | $20,000,000 |
| City, State, Zip: | Chicago, IL | Participation/Syndication: | Yes |
| State of Incorporation | DE | Beverly Bank & Trust Company, N.A. Avg. Deposits: | $2,000,000* |
| Legal Structure: | LLC | Transaction ROA/ROE: | 1.26%/12.59% |
| Loan to Wintrust Affiliate: | No | Relationship ROA/ROE: | 1.26%/12.59% |
| Reg "O": | No | ACBS/FIS: | ACBS |
| Reg "W": | No | | |

*Estimated

### ACTION REQUESTED:

| | Amount: | Loan Type: | Purpose: |
|---|---|---|---|
| 1 | $20,000,000 | NRLOC | The purpose of this request is to provide a $20MM NRLOC to Lake Lathrop Partners LLC to fund the development of a 59,542SF, mixed-use condo building located at 7601 Lake Street, River Forest, IL ("the Subject"). The total loan facility represents a 70% LTC/79% LTV based upon an "As-Complete, As-Stabilized" value for the retail component and "As Complete" bulk value for the residential component. The Facility will have a 50% repayment guaranty from Martin NV II, Inc. and a 10% repayment guaranty from Marty Paris personally. |

### CRE METRICS (For underwriting purposes only):

| | |
|---|---|
| DSCR (WICC Underwriting): | N/A |
| Debt Yield Ratio: | N/A |
| Max LTC/LTV: | 70%/79%* |

*LTV decreases to 73% based upon the "As-Stabilized" value of the retail units plus the "Gross Retail Sell-Out" of the residential units.

**CREDIT POLICY EXCEPTIONS:**

| POLICY EXCEPTIONS | | | |
|---|---|---|---|
| Type of Loan | Policy Exception(s) | Mitigating Factor(s) | If "Other" Exception/Mitigating Factor, please provide description below: |
| Commercial CRE/C&I | 25 – LTV Ratio/Advance Rate High **Bulk Value LTV > 75%** | L – Net Worth High M – Liquid Assets Avail K – Qualified Cosigner/Guarantor A – Competition | |

### GUARANTOR(S): (000's)

| Name | Type | FICO | Date | Liquid Assets | Total Assets | Total Debt | Net Worth |
|---|---|---|---|---|---|---|---|
| Frank Martin Paris, Jr. | Limited | +661 | 6/19/19 | $ 9,525 | $ 34,940 | $ 6,668 | $ 28,272 |
| **TOTAL** | | | | **$ 9,525** | **$ 34,940** | **$ 6,668** | **$ 28,272** |

- The Subject facility will also have a corporate guaranty from Martin NV II, Inc.
- Mr. Paris' low credit score is primarily due to a $3M collection account that will be settled with the resolution of Mr. Paris' divorce proceedings. There are no other accounts that are currently past due.

**EXHIBIT D, Page 1 of 37**



**WINTRUST**
COMMERCIAL REAL ESTATE

**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

| FACILITY #1 | PROPOSED |
|---|---|
| BORROWER: | Lake Lathrop Partners LLC (c/o Sedgwick Development) |
| AMOUNT: | $20,000,000 |
| SUB-FACILITY: | N/A |
| LOAN TYPE: | NRLOC |
| REQUEST TYPE: | NEW |
| MATURITY: | 30 MFDOC |
| EXTENSION OPTION: | N/A |
| ↳ EXTENSION OPTION CANCELABILITY: | N/A |
| ↳ ULTIMATE MATURITY DATE: | 30 MFDOC |
| REPAYMENT: | I/O |
| SOURCES OF REPAYMENT: | Primary: Sale of Units<br>Secondary: Guarantor Support<br>Tertiary: Sale or Refinance of the Collateral<br>Interest Reserve: Yes ($931,240) |
| AMORTIZATION: | N/A |
| INTEREST RATE: | Fed Funds + 275bps, Floating |
| RATE INDEX FLOOR: | US Fed Funds Floor of 0.00% |
| LOAN FEES & COSTS: | 100bps ($200,000) + Third Party Costs |
| PRE-PAYMENT PENALTY: | None |
| PRIMARY COLLATERAL: (For this Obligation) | FREM, assignment of rents and leases, and purchase contracts on the property located at 7601 Lake Street, River Forest, IL. |
| SECONDARY COLLATERAL: | N/A |
| ADVANCE RATE: | The $20,000,000 total loan amount represents:<br>  i.   70% of the full cost development budget of $28.6MM.<br>  ii.  79% of "As-Complete and Stabilized" for retail + "As-Complete" bulk valuation for residential of $25.3MM.<br>  iii. 73% of "As-Complete and Stabilized" for retail + "As-Complete" gross retail sell-out for residential of $27.6MM. |
| RE TAX ESCROW: | RE Taxes to be funded from a tax reserve established in the construction budget ($144,988). |
| APPRAISALS: | An appraisal conducted by the Praedium Valuation Group dated 11/17/21 valued the property as the following:<br>  -   $6MM for the retail portion of the property on an "As-Complete, As-Stabilized" basis.<br>  -   $19.3MM for the residential portion of the property on an "As-Complete" bulk basis.<br>  -   $21.6MM for the residential portion of the property on an "As-Complete" gross- retail sell-out basis. |
| ENVIRONMENTAL: | A Satisfactory Phase 1 is a condition of closing. |
| GUARANTOR: | Martin NV II, Inc. |
| ↳ TYPE: | Joint & Several |
| ↳ AMOUNT: | Unlimited Completion Guaranty & Limited 50% Repayment Guaranty |
| GUARANTOR: | Frank Martin Paris Jr. |
| ↳ TYPE: | Joint & Several |
| ↳ AMOUNT: | Unlimited Completion Guaranty & Limited 10% Repayment Guaranty |
| SUBORDINATIONS: | N/A |
| CROSSED: | N/A |
| BORROWER'S EQUITY: | Total equity is $8.6MM (30%) including $1.9MM of TIF funds already received and used for environmental clean-up. $6.7MM (23%) of cash will be contributed prior to any advances on the Facility. |
| COVENANTS: | • Minimum residential sales price will be established at 95% of the sales prices as depicted in **Appendix F**.<br>• Minimum residential release price no less than 92% of the sales prices as depicted in Appendix F and 100% repayment of net proceeds.<br>• Minimum earnest money deposit of 10% cash or cash equivalents on all sales contracts (held at BevBT).<br>• Required vertical construction start date (1 MFDOC).<br>• Required construction completion date (18 MFDOC).<br>• $3,000,000 minimum unencumbered liquidity covenant for "Guarantor Entities". (Guarantor Entities defined as Marty Paris and Martin NV II, Inc.)<br>• Benchmarks required for distribution of any expense related to the Sponsor or related company, including developer fee, will be established upon completion of third party budget review and outlined for approval in a pre-close memo approved by Concurrence Officer. |

DocuSign Envelope ID: E63BE995-AED4-4797-8905-F88BAE219467



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

| | |
|---|---|
| *CONDITIONS PRECEDENT:* | • Receipt and satisfactory review of Phase 1 environmental.<br>• Receipt and satisfactory review of NFR letter.<br>• Satisfactory TLJ search for Borrower and Guarantors.<br>• Earnest money deposits for new and existing contracts to be held in a BevBT account.<br>• Satisfactory third-party budget review.<br>• A minimum of 14 finalized pre-sales with a minimum aggregate sale price of $13.6MM **(Satisfied)**.<br>• Receipt and satisfactory review of 14 purchase contracts.<br>• Developer will be required to maintain project-related depository accounts at the Bank.<br>• Receipt of a current ALTA conforming plat of survey, with legal description.<br>• Receipt of a certified "Sworn Contractors Statement" detailing all applicable developments (soft) costs and itemized construction (hard) costs for the subject development project.<br>• Appropriate insurance coverage for the project is required, including flood insurance if applicable.<br>• All draws to be handled by Wintrust's construction administration group.<br>• Satisfactory review of all legal documentation related to the equity component of the transaction.<br>• The Bank will limit the initial advances under the facility for true 3rd party incurred costs to date on the project. The Bank will also limit the distribution of GC/Developer Fees until established performance benchmarks have been achieved. These limitations will be agreed to in advance of closing the facility by both parties and outlined and approved in a pre-close memo.<br>• Verification of Guarantor liquidity no less than $3MM. |
| *DOCUMENTATION:* | External – Justin Newman (Thompson Coburn LLP) |

**REPORTING DATA:**

| | | | | | |
|---|---|---|---|---|---|
| Collateral Code: | CA | Call Report Code: | A1A2 | NAICS Code: | 531110 |
| Flood Zone: | No | Total Revenues (In-Place): | N/A | DSC Actual: | N/A |
| Exceeds Supervisory LTV: | No | Total Revenues Date: | N/A | DSC Date: | N/A |
| CDL Reportable: | No | UDF 12 (New and Renewal ONLY): | S Residential-For Sale | UDF 2(New and Renewal ONLY): | S Residential-For Sale |
| HVCRE: | No | B) Appraisal received, results final | ☒Construction: new construction; renovation; reposition/re-use; unstabilized property; and land loan with proceeds for site work<br>☐ Non-Construction: stabilized property; loan with proceeds for minor repairs, cosmetic improvements, or modest TILC. Property should not have speculative leasing risk or change in use. | | |

**SYNDICATION DISCUSSION: None**

| |
|---|
| **EXECUTIVE SUMMARY:** |

**TRANSACTION SUMMARY:**

- **The Subject transaction was presented at pre-flight committee on 12/15/21 where it received a green-light. No changes have been made to the terms and conditions. A restriction on recapture costs and non-third party costs will be established prior to closing as noted in the terms above. A policy exception for an advance rate > 75% of bulk value was identified during pre-flight discussion, which has been reported on page 1.**

- The Subject request is to finance the development of a mixed-use condo property located at 7601 Lake Street, River Forest, IL for Marty Paris (president/founder) and Sedgwick Properties Development Corp. ("Sedgwick"), a Chicago based real estate developer with a 20-year track record. The NRLOC will have a term of 30 months, interest only, and will be priced at Federal Funds + 275bps, floating.

- The project will include 22 luxury residences consisting of various sized 2-Bedroom, 3-Bedroom, and 4-Bedrom units. The average unit size is 2,069SF with an average projected sales price of $979M. The ground floor will have approximately 14,022 SF of storefront retail on a complimentary intersection between residential and commercial areas in River Forest, as well as just a few blocks from entertainment venues, retail, shopping, and dining. The project will include a total of 88 parking spaces. Residential units will serve the demand of an under supplied market for new construction luxury residential homes. There are 8 units of storefront retail, the Borrower is anticipating selling the retail portion of the property in whole.

- Sedgwick closed on the 36,700 SF site located at the southwest corner of Lake Street and Lathrop Avenue in 2017. At that time, Sedgwick received TIF proceeds of $1.9MM for environmental clean-up, which have been completed. The Borrower has already received an NFR letter.

- The total loan commitment represents a 70% advance against the proposed acquisition and development budget of $28.6MM. An appraisal conducted by Praedium Valuation Group dated 11/17/21 concluded an "As-Complete" bulk value of $19,270M for the residential units (Gross Sell-Out value of $21,580M) and an "As-Complete, As-Stabilized" value of $6,000M for the retail units, resulting in an LTV of 79%. Based on the "gross retail sell-out" value of the residential units, LTV decreases to 73%. The appraisal has been reviewed and accepted by WRES.

**EXHIBIT D, Page 3 of 37**



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

- Total upfront equity of $8.6MM includes $1.9MM of TIF proceeds that have already been received and used for environmental clean-up. In addition, the structure will require a minimum of 14 residential pre-sales (aggregating $13.6MM in gross sales) prior to closing on the proposed $20MM facility. To finalize a pre-sale the buyer must be third party and put down 10% cash deposit, with no sales contingencies.

- The Borrower has already fulfilled the pre-sale requirement with 16 units under contract (73%). Pre-sales were particularly strong in the past year, with 11 pre-sales in 2021. Assuming the 16 pre-sales close netting $891M each after closing costs (8% selling costs), the proposed $20MM loan will be paid down to $5.7MM with 6 units or 12,145 SF of residential units remaining as well as 14,022SF of retail. If the retail is not sold, the Borrower needs to sell all residential units to nearly repay the loan in full. **In a downside scenario, the Bank could lend $3MM (50% of the "As Complete/As Stabilized" $6MM retail value), which would yield a WICC DSC of 1.84x. This would leave a $2.7MM loan balance which would allow the Borrower to complete a "fire sale" for the remaining residential units at $496M, or $245/SF in order to reach the $2.98MM in gross sale proceeds to pay off the remaining balance of $2.7MM. This represents a 50% discount from the remaining units projected sales price. Please see page 13 for the detail on the downside scenario.**

- The Facility will have a full completion guaranty and a 50% repayment guaranty from Martin NV II, LLC as well as a 10% repayment guaranty from Marty Paris. Mr. Paris reports liquidity of $9.5MM, assets of $34.9MM and a net worth of $28.3MM. Please note Mr. Paris is in the midst of a dissolution of marriage case and has been advised by his attorney's to not create any additional financial records until the case is resolved. The attorney believes the case will be concluded in Q1 2022. The RM has verbally discussed the Borrower's balance sheet and is comfortable that the values reflected on the 2019 PFS remain accurate. The Bank expects the divorce settlement will not result in a material change to Mr. Paris' liquidity and net worth reported herein.

- Sedgwick's construction arm, Alpha Construction Services, will be serving as the GC for the Subject Project. The Bank will limit distribution of GC and Developer Fees until established performance benchmarks have been achieved. These benchmarks will be agreed to by both parties prior to the closing of the facility. Upon completion of the budget review, a pre-close memo, approved by concurrence, will outline related party costs and what benchmarks must be achieved for the distribution of any expenses that would be paid out to the sponsor and related companies.

**SOURCES & USES:**

| PROJECT CAPITALIZATION / BUDGET SUMMARY / SOURCES & USES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Land SF: | 36,700 | Building SF: 59,542 |
| **SOURCES** | | | | **USES** | | | | |
| DESCRIPTION | $ | $ PSF | % | DESCRIPTION | TOTAL $ | $ FUNDED VIA EQUITY | $ FUNDED VIA DEBT | $ PSF | % of TOTAL |
| Debt Structure | $20,000,000 | $336 | 70% | **Land and Acquisition Costs** | **$4,350,000** | **$4,350,000** | **$0** | **$118.53** | **15%** |
| Equity Structure | $6,662,621 | $112 | 23% | | | | | | |
| TIF Proceeds | $1,940,000 | $33 | 7% | Construction Costs | $13,709,631 | $4,255,580 | $9,454,051 | $230 | 48% |
| | | | | Tenant Improvements (Retail) | $420,660 | $0 | $420,660 | $7 | 1% |
| **TOTAL SOURCES** | **$28,602,621** | **$480** | **100%** | Leasing Commissions (Retail) | $245,385 | $0 | $245,385 | $4 | 1% |
| | | | | FF&E Costs | $0 | $0 | $0 | $0 | 0% |
| | | | | Other Hard Costs | $817,292 | $0 | $817,292 | $14 | 3% |
| | | | | Hard Cost Contingency | $768,740 | $0 | $768,740 | $13 | 3% |
| | | | | **Total Hard Costs** | **$15,961,708** | **$4,255,580** | **$11,706,128** | **$268** | **56%** |
| | | | | | | | | | |
| | | | | General Contractor Fees | $888,340 | $0 | $888,340 | $15 | 3% |
| | | | | Development Management Fee | $841,489 | $0 | $841,489 | $14 | 3% |
| | | | | Real Estate Taxes | $144,988 | $0 | $144,988 | $2 | 1% |
| | | | | Other Soft Costs | $5,196,737 | $0 | $5,196,737 | $87 | 18% |
| | | | | Soft Cost Contingency | $288,119 | $0 | $288,119 | $5 | 1% |
| | | | | Interest Reserve | $931,240 | $0 | $931,240 | $16 | 3% |
| | | | | Operating Reserve | $0 | $0 | $0 | $0 | 0% |
| | | | | **Total Soft Costs** | **$8,290,913** | **$0** | **$8,290,913** | **$139** | **29%** |
| | | | | | | | | | |
| | | | | **TOTAL USES** | **$28,602,621** | **$8,605,580** | **$19,997,041** | **$480** | **100%** |

The proposed loan of $20MM represents 70% LTC based on the total development budget of $28.6MM with the Borrower having to contribute equity of $8.6MM in upfront equity, inclusive of $1.9MM of TIF proceeds, prior to any loan funding. The $4.35MM in land and acquisition costs includes environmental costs associated with the $1.9MM of TIF proceeds. The Borrower has estimated a hard cost budget of $16MM in order to construct the mixed-use building. The Developer Fee will be paid out based on performance benchmarks agreed to by both the Borrower and the Bank prior to closing. Contingency represents 5% of hard costs. **A third-party construction budget review will be required prior to loan closing.**

**EQUITY DISCUSSION:**
- The Borrower will need to provide $6.7MM of additional equity, net of the $1.9MM received and contributed via TIF proceeds. A portion of the equity source will be from Principal Insurance, who has been an equity partner with the Sponsor for several other projects.
- The 16 pre-sold contracts required an aggregate $1.6MM deposit in order to be finalized. These deposits will be held in a BevBT account.



**CREDIT APPROVAL PRESENTATION
for Lake Lathrop Partners LLC (Sedgwick Development)**

**RISK(S)/MITIGANTS:**
Construction Risk & For Sale Housing Risk:

- Sedgwick Development has significant experience in multi-family and condo development projects and is a premier residential developer in Chicago and its core neighborhoods. Additionally, the budget includes hard cost contingency of 5%, real estate tax and interest reserves, and a soft cost contingency.
- The Subject is located in River Forest, a prime location with high demand of luxury condos.
- The general contractor will be in-house via Alpha Construction Services.
- Martin NV II, Inc. and Marty Paris will maintain a 100% completion guaranty as well as a limited guaranty on the facility. Mr. Paris reports liquidity of $9.5MM, assets of $34.9MM and a net worth of $28.3MM.
- The Sponsor has received 16 hard contracts to date (73% of residential). Assuming the 16 units close, the Bank's net exposure will decrease to $5.7MM.

**BORROWER/GUARANTOR BACKGROUND:**
**Company Overview:**



- Founded in 1996 by Marty Paris, Sedgwick Development has grown to be one of the leading development companies in Chicagoland. Focusing on both the residential and commercial arenas, they have built a portfolio by creating value in coveted districts and distinctive communities.  As a fully integrated real estate firm, Sedgwick houses its own development, design and construction departments. This unified approach allows the Company to execute each project with agility and efficiency. Engaging all teams during the development process not only streamlines communication, but also allows them to oversee the details of each phase.  Sedgwick's construction arm, Alpha Construction Services, will be serving as the GC for the Subject Project as they have for all of the other Sedgwick projects listed below.
- All of Sedgwick's current construction projects are neighborhood multi-family developments on schedule to be completed by Q1 2022: Please see below for a list of Sedgwick's current/recently completed projects.
  - **146 W. Erie St "The Bentham"** – 31 luxury condominium and ground floor retail in River North, construction is scheduled to be completed in Q1 2022. To date, 40% of units are sold. The Borrower had, like other developers, construction delays during the pandemic due to staffing or supply chain issues. These have all been resolved at this stage. Republic Bank is the lender on this facility providing $32MM in construction proceeds.*
  - **301 W. North Ave.** – 69 luxury rental apartments and ground floor retail in Old Town; construction is complete and the property is 97% leased. Per the Guarantor REO schedule, the First Midwest loan commitment is $22.3MM and as-stabilized value is $35MM ($507k/unit) resulting in a 64% LTV.*
  - **1302-1325 N Wells** - 60 luxury rental apartments and ground floor retail in Old Town; construction is complete and the property is 100% leased. Per the Guarantor REO schedule, the Chase loan commitment is $12.65MM and as-stabilized value is $30MM ($500k/unit) resulting in a 42% LTV.*

*See note on **page 18** as it relates to these assets.

**PREVIOUS PROJECTS SOLD:**
  - **1545 W. North Avenue (SOLD IN MAY 2018)** –30 luxury rental apartments and ground floor retail in Wicker Park; construction is complete and the property is 100% leased.






Bentham – Under Construction
Chicago, IL

301 W. North Avenue,
Chicago, IL

1325 N. Wells Street,
Chicago, IL

1545 W. North Ave,
Chicago, IL

- **Due diligence results:**
  - EDFAC: No.
  - Internet Search: No issues found.
  - Tax Lien, Judgement and Pending Suits: A satisfactory TLJ search on Borrower and Guarantors is a condition of closing.

**RELATIONSHIP STRATEGY:**

- The Bank has been looking to do business with the Borrower for over five years beginning with the Bentham development. The Bank believes the subject property contains the most value as compared to the other properties in the Borrower's portfolio. The Bank will continue to look at



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

multifamily deals on a go forward basis and introduce the Borrower to the private client group after Mr. Paris' divorce proceedings are finalized. The overall relationship will be between $20MM to $40MM at any one time.

**CROSS SELL OPPORTUNITIES**

| Product/Service | Wintrust Provider | Comments |
|---|---|---|
| Treasury Management | Yes | |
| Personal Wealth Services | Yes | |
| CDEC (1031x Business) | Yes | |
| Derivatives | Yes | |
| Wintrust @ Work | No | |

**ORGANIZATION INFORMATION:**

| Organization Type: | LLC | Accountant: | TBD |
|---|---|---|---|
| State of Organization: | IL | Legal Counsel: | Thompson Coburn LLP |
| Year Organized: | 2016 | Insurance Agent: | TBD |
| Status: | Active | | |

**OWNERSHIP/MANAGEMENT/REPUTATION:**
- Sedgwick Development is 100% owned by Marty Paris.
- Martin NV II, Inc. is 90% owned by Marty Paris via Marty Paris' Revocable Living Trust. The remaining 10% is owned by Marty Paris' Children's living trust.

**VENDOR INFORMATION:**

| Leasing Broker: | Jameson Sotheby's International Realty |
|---|---|
| Property Manager: | Jameson Sotheby's International Realty |
| General Contractor: | Alpha Construction |

**TRACKING REQUIREMENTS:**

| Tracking Requirements | Entity | Current Required | Proposed Required | Grace Period | Frequency | Last Received | Next Test Date | Compliant? |
|---|---|---|---|---|---|---|---|---|
| Corporate Tax Returns | Lake Lathrop Partners LLC | No | Yes | 315 Days | Annually | N/A | 12/31/2022 | Yes |
| Executed Purchase Contracts | Lake Lathrop Partners LLC | No | Yes | | AS-SIGNED | | | Yes |
| Personal Financial Statement | Marty Paris | No | Yes | 120 Days | Annually | N/A | 12/31/2022 | Yes |
| Personal Tax Return | Marty Paris | No | Yes | 315 Days | Annually | N/A | 12/31/2022 | Yes |
| Liquidity Statement | Marty Paris | No | Yes | 30 Days | Semi-Annually | N/A | 6/30/2022 | Yes |
| Business Tax Return | Martin NV II, Inc. | No | Yes | 315 Days | Annually | N/A | 12/31/2022 | Yes |
| Liquidity Statement | Martin NV II, Inc. | No | Yes | 30 Days | Semi-Annually | N/A | 6/30/2022 | Yes |
| Annual Review | Lake Lathrop Partners LLC | No | Yes | | Annually | N/A | 1 YFDOA | Yes |

**COVENANTS:**

| | FINANCIAL COVENANTS | Entity | Testing Frequency | Grace Period | Required Level | Proposed Level | Compliant? | Next Test Date |
|---|---|---|---|---|---|---|---|---|
| 1 | Minimum Residential Unit Sales Price (Defined below) | Lake and Lathrop Partners LLC | Annually | N/A | See Below | See Below | Yes | Ongoing |
| 2 | Minimum Residential Unit Release Price (Defined below) | Lake and Lathrop Partners LLC | Annually | N/A | 92% | 92% | Yes | Ongoing |
| 3 | Minimum Earnest Money Deposit (Defined below) | Lake and Lathrop Partners LLC | Annually | N/A | 10% | 10% | Yes | Ongoing |
| 4 | Required Vertical Construction Start Date (Defined below) | Lake and Lathrop Partners LLC | One-Time | N/A | N/A | N/A | Yes | 1 MFDOC |
| 5 | Required Construction Completion (Defined below) | Lake and Lathrop Partners LLC | One-Time | N/A | N/A | N/A | Yes | 18 MFDOC |
| 6 | Guarantor Minimum Unencumbered Liquidity (Defined below) | Marty Paris & Corporate Guarantor | Semi-Annually | 30 Days | $3MM | $3MM | Yes | 6/30/2022 |

**Covenant Definitions:**

1. Each unit shall sell for no less than the minimum sales price, which will be established as 95% of sales price as depicted in **Appendix F**.
2. Proceeds from respective unit closings will be subject to commission expenses capped at 8% with 100% of net proceeds from all unit sales used to pay-down the Construction Loan. See Appendix F.
3. Each Sale shall be evidenced by a third party executed purchase and sale agreement with the prospective purchaser and accompanied by a cash or cash equivalent earnest money deposit of no less than 10% of the contracted sales price (held at the Bank).
4. Vertical Construction shall begin no later than once month from date of closing.
5. Construction shall be completed no later than eighteen months from date of closing.
6. The Guarantor shall maintain unencumbered "minimum liquid assets" of $3,000,000. The covenant shall be tested semi-annually on June 30th and December 31st of each year of the loan. Minimum Liquid Assets shall be in the form of cash and/or marketable securities held in the name of Martin Paris Jr. (personally) and/or Corporate Guarantor. And verified by submission of account statements dated no earlier than June 30th and December 31st. For purposes of calculating minimum liquid assets (i) any loan balances outstanding under any unsecured lines of credit held in the name of the guarantor shall be deducted and (ii) any accounts pledged as collateral to secure a loan or guaranty shall be deducted.

*As previously noted, performance benchmarks will be established for distribution of any expense related to the Sponsor or related company, including developer fee, upon completion of third party budget review, and outlined for approval in a pre-close memo.*



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

**CREDIT SERVICES:**

| | | |
|---|---|---|
| 1. | Are there new, modified, or waived covenants or tracking requirements associated with this loan approval? | Yes |
| 2. | Are there any differences between the approved covenants and/or tracking requirements and the requirements currently in Moody's? | No |
| 3. | Was an Annual Review or ACH Annual Review performed in conjunction with this approval? | No |
| **If any of the above are "Yes", a Credit Services Covenant Update Check is required.** | | |

| Covenant Update Check Required? | Yes |
|---|---|

## PROPERTY DESCRIPTION:

**DESCRIPTION:**



- The Subject is a proposed 59,542sf mixed-use condo property. The building will consist of 22 luxury condo units and 14,022sf of retail storefront.
- The residential unit mix will consist of the following: two 2BD/2BA, two 3BD/2BA, one 3BD/3.5BA, fifteen 3BD/3BA, and two 4BD/4.5BA.
- Each unit will include:
  - Direct elevator access to each home.
  - Expansive, private outdoor living spaces with composite decking and electric, water, and gas connections.
  - 10' ceilings in living areas.
  - Expansive windows and living rooms.
  - Wide plank wood flooring throughout kitchen and living room.
  - Great Room designed for entertaining.
  - Luxurious carpeting included in all bedrooms.
  - Pre-wired for motorized window treatments in living room and master bedroom.
  - 8' high flush solid core doors with architectural hardware.
  - High-performance Whirlpool washer and dryer.
  - A Contemporary Kitchen with Wood-Mode traditional custom handcrafted cabinetry, natural stone countertops with under-mount kitchen sink and top-of-the-line appliances including a 36" Professional Series Pro Harmony stainless steel gas oven, 30" MicroDrawer stainless steel built-in microwave, integrated dishwater, and a 27" Tornado concealed exhaust fan.
  - The bathrooms feature Wood-Mode traditional bathroom vanity, natural stone countertops with under-mount porcelain double bowl sink, Italian decorative porcelain tile, radiant heated floors, walk-in shower with frameless oversized glass doors, an oversize standalone soaking tub, and a built-in master closet system.

**BANK INSPECTION:**

- On December 13th, 2021, real estate managing director Darragh Griffin inspected the subject property. The lot has been scraped and pre-construction activity has started.

**EXHIBIT D, Page 7 of 37**



**CREDIT APPROVAL PRESENTATION
for Lake Lathrop Partners LLC (Sedgwick Development)**

**LOCATION:**

- The Subject Development will be located in River Forest. River Forest is a suburban village adjacent to Chicago in Cook County. River Forest is bounded by the Des Plaines River to the west, Illinois Route 43 to the east, Illinois Route 64 to the north, and Madison Street to the south. River Forest is accessible from Chicago by service on the Green Line and Blue Line at five CTA stations in Oak Park. River Forest also has a station for Metra's Union Pacific/West in Oak Park. Bus transit service is available via the CTA and Pace buses. The Eisenhower Expressway is the primary expressway between Chicago and River Forest. The highway also provides connections to O'Hare International Airport.

 

**ZONING:**

- Subject is zoned C-3 Central Commercial District.

**ENVIRONMENTAL:**

- A Phase I is currently under review by WRES. Satisfactory review of the Phase I is a condition of closing

**R/E TAXES:**

| Date | Property | R/E Taxes Paid Thru | Annual Amount (2020) | Comments |
|------|----------|---------------------|----------------------|----------|
| 1/11/22 | 7601 Lake Street, River Forest, IL | 2020 (1st & 2nd Installments) | $31,686.69 | Includes parcel #15-12-117-002-0000; 15-12-117-003-0000; 15-12-117-017-0000; 15-12-117-018-0000; 15-12-117-019-0000 |



# CREDIT APPROVAL PRESENTATION
## for Lake Lathrop Partners LLC (Sedgwick Development)

---

**PROPERTY DESCRIPTION – CONT'D:**

**MARKET ANALYSIS: RIVER FOREST**

**HOUSING TRENDS:**

- The subject property is located in the Village of River Forest. The housing stock consists of a mix of single-family attached and detached housing units, with few 2-4 unit rental properties.

- Median sale prices for detached properties, which make up the majority of the market area, have increased in the most recent 12-month period, after decreasing the prior 12-month period. Median sale prices for attached properties have decreased in the most recent 12-month period after increasing the year prior. Median prices are up from two years ago in both instances. Too few 2-4 unit properties have recently been sold in the market area to accurately assess trends. The median sale price for detached properties is above the median for the Chicago Metro Area as a whole, which was reported to be $268,000 as of year-end 2020. Overall, this area's for-sale residential market is considered to be stable to increasing.

**COMMERCIAL:**

- According to Costar, average market rents for commercial retail properties within a 2 mile radius of the subject property have generally increased over the last five years. There was a slight dip in 2020, likely due in part to the Covid 19 pandemic but rates have since improved. Rates were reportedly $19.34 psf in the 1st quarter of 2016 and are currently at a five-year high of $20.35 psf in the 4th quarter of 2021, year to date. Vacant rates have fluctuated with rates as high as 15% in the 3rd quarter of 2020, after the onset of the Covid 19 pandemic. The high vacancy in 2029 / 2020 was due to the Sears department store going vacant. It has since been demolished for mixed-use redevelopment. The average vacancy rate has since declined and is currently at a five-year low of 3.3% in the 4th quarter of 2021, year to date.



**MULTI-FAMILY:**

- According to Costar, multi-family properties within a 2-mile radius of the subject property have shown increasing rents and fluctuating vacancies within a relatively tight margin over the last five years. Rents were at a five-year low in the 3rd quarter of 2016 at $1,255 per month. Rents are currently $1,368 in the 4th quarter of 2021 year to date, close to the five-year high of $1,383 in the 2nd quarter of 2021. Occupancy rates have fluctuated and were at a five-year low of 90.6% in the 3rd quarter of 2017. Occupancy is currently 95.5% in the 4th quarter of 2021, year to date indicating relatively low vacancy rates in the area.

**MARKET AREA SUMMARY:**

- Overall, the subject's River Forest area is an area with high household incomes and home values. The local median home sale price is well above the median for the metro area, however the average sale price for attached single family homes has declined over the last year. The local multifamily and commercial markets have relatively low vacancy and rents that have been stable to increasing. The area has good access to public transportation, I-290 and solid demographics.

Source: Subject Appraisal dated 11/17/21.



WINTRUST
COMMERCIAL REAL ESTATE

**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

**MARKET ANALYSIS (Continued)**

- Due to a restricted supply of condominium and multi-family developments in the Near West suburbs and River Forest neighborhood, the luxury residential condo demand is significant and that low supply and pent-up demand is driving sales. New construction condo buildings lacking the same high-end, top of the line finishes and features as the subject property, have experienced rapid absorption and presales in a matter of months. Newer inventory of high-end residential units in the surrounding areas (Oak Park, Elmhurst) command price points of over $440 per square foot. Due to undersupplied inventory in this area, new high-end product does not stay on the market very long.

- District House in Oak Park, which is a couple of miles from the subject, was built in 2018. The building consists of 28-units with the building being sold out upon completion of construction. The average sales price for the Oak Park property was $440/SF.

- Another example showcasing the high demand is a new luxury condo development project in Elmhurst. The building consists of 20 units and was completed in Q1 2021. The average sales price per square foot for the building is $470.

- The current sales price per square foot for the subject property is $464/SF. The price per square foot is very competitive to both the Oak Park and Elmhurst properties. Not only is the price per square foot competitive, but River Forest is perceived as a much more desirable place to live. The desirable location ranges among many targeted buyers, which include empty nesters to families. The Village of River Forest can provide the convenience of living in a quiet neighborhood, while allowing access to a vibrant downtown just steps away and having access to some of the most top-rated schools of the state.

- The Subject property separates itself from the other new developments by providing expansive outdoor living spaces that were specifically designed to integrate with the interior space. These outdoor living rooms allow for a seamless transition between the interior living room and the exterior living room. The exterior living room is designed to act as a suburban backyard that rivals single family homes in the area. The average square footage of the outdoor living room is 500+ square feet. Oak Park District House provides no outdoor living space, while the average square footage for 195 N. Addison in Elmhurst is 265 square feet of outdoor balcony space. The Subject's outdoor living space has been a great selling point to buyers.

- The Subject also separates itself from other new development in the area by providing the buyers direct elevator access to each unit. Each unit has access to their own private elevator lobby that is connected to the indoor parking garage. The private elevator brings residences up to their respective condo and opens its doors inside the condo for the buyers to exit. This amenity is in high demand.

| Summary of Sales Comparison | | |
|---|---|---|
| **Address** | **# of Units** | **Avg. $/Unit** | **Avg. $/SF** |
| 195 N. Addison Ave, Elmhurst, IL | 20 | $994,573 | $470 |
| 147 N. Euclid Ave, Oak Park, IL | 28 | $764,273 | $440 |
| **7601 Lake Street, River Forest (Subject)** | **22** | **$961,018** | **$464** |



**EXHIBIT D, Page 10 of 37**



**WINTRUST**
COMMERCIAL REAL ESTATE

**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

**SALE/LEASE-UP STATUS:**

Residential Pre-Sales To-Date:

| UNIT | Unit Type | SF | BORROWER PROJECTED | PRICE/SF | APPRAISED VALUE (RETAIL) | PRICE/SF |
|---|---|---|---|---|---|---|
| 202 | 2BD/2BA | 1,512 | $734,900 | $486 | $734,900 | $486 |
| 203 | 3BD/2BA | 1,512 | $689,900 | $456 | $689,900 | $456 |
| 205 | 3BD/3BA | 1,672 | $844,900 | $505 | $844,900 | $505 |
| 206 | 3BD/3BA | 1,905 | $934,900 | $491 | $934,900 | $491 |
| 301 | 3BD/3BA | 2,240 | $850,000 | $379 | $850,000 | $379 |
| 302 | 2BD/2BA | 1,512 | $734,900 | $486 | $734,900 | $486 |
| 303 | 3BD/2BA | 1,512 | $629,900 | $417 | $629,900 | $417 |
| 304 | 3BD/3BA | 1,644 | $765,000 | $465 | $765,000 | $465 |
| 305 | 3BD/3BA | 1,701 | $834,900 | $491 | $834,900 | $491 |
| 308 | 3BD/3.5BA | 2,498 | $1,179,900 | $472 | $1,179,900 | $472 |
| 401 | 3BD/3BA | 2,293 | $1,234,900 | $539 | $1,234,900 | $539 |
| 402 | 4BD/4.5BA | 3,426 | $1,410,900 | $412 | $1,410,900 | $412 |
| 403 | 4BD/4.5BA | 3,479 | $1,474,900 | $424 | $1,474,900 | $424 |
| 404 | 3BD/3BA | 1,920 | $972,741 | $507 | $972,741 | $507 |
| 405 | 3BD/3BA | 1,998 | $1,012,259 | $507 | $1,012,259 | $507 |
| 406 | 3BD/3BA | 2,551 | $1,249,900 | $490 | $1,249,900 | $490 |
| **Total Under Contract** | | **33,375** | **$15,554,800** | **$466** | **$15,554,800** | **$466** |
| *Avg. Under Contract* | | *2,086* | *$972,175* | *$466* | *$972,175* | *$466* |
| 201 | 3BD/3BA | 2,240 | $1,127,988 | $504 | $960,000 | $429 |
| 204 | 3BD/3BA | 1,673 | $827,988 | $495 | $960,000 | $574 |
| 207 | 3BD/3BA | 1,914 | $977,988 | $511 | $960,000 | $502 |
| 208 | 3BD/3BA | 2,498 | $1,277,988 | $512 | $960,000 | $384 |
| 306 | 3BD/3BA | 1,875 | $870,988 | $465 | $960,000 | $512 |
| 307 | 3BD/3BA | 1,945 | $895,988 | $461 | $960,000 | $494 |
| **Total Remaining Condo Units** | | **12,145** | **$5,978,925** | **$492** | **$5,760,000** | **$474** |
| *Avg. Remaining* | | *2,024* | *$996,488* | *$492* | *$960,000* | *$474* |
| TOTAL | | 45,520 | $21,533,725 | $473 | $21,314,800 | $468 |
| *Avg. Total* | | *2,069* | *$978,806* | *$473* | *$968,855* | *$468* |
| **Retail Unit** | | **14,022** | **$9,348,000** | **$667** | **$6,000,000** | **$428** |
| Parking Revenue | | | $315,000 | | $270,000 | |
| Upgrades | | | $440,000 | | $440,000 | |
| **TOTAL Gross Sales** | | **59,542** | **$31,636,725** | **$531** | **$28,024,800** | **$471** |

- There are currently 16-residential units under contract.
- The appraiser valued the remaining 6 condo units at $5.76MM, or $960M per unit on a retail sell-out basis. This results in a total appraised value of $21,315M for the residential units, which was used to calculate the repayment analysis on the next two pages. The appraiser valued the remaining 6 condo units on an average basis, but acknowledged the units vary significantly in size and outdoor space and some units will sell for more or less.
- Four of the contracts were signed in 2019, one was signed in November of 2020 and the remaining 11 units were signed in 2021. It should be noted that two units (#404, #405) are under contract to the same buyer and were negotiated as one contract with one sale price for both units.
- Total gross sales of $28.3MM in comparison to total costs of $28.6MM does not take into consideration the TIF proceeds of $1.9MM already funded into the project thereby reducing the Borrower's required equity contribution. Additionally, the Borrower believes the retail value is $9.3MM compared to the $6MM appraised value, and there is additional profit for the developer included in the soft costs.

**RETAIL LEASE-UP:**

| | | Retail | | | |
|---|---|---|---|---|---|
| Unit | SF | Prospect | Status | Proposed Rent/SF (NNN) | |
| 1 | 2,500 | Elevare MD | Lease | $32.00 | |
| 2 | 1,050 | N/A | Available | | |
| 3 | 1,010 | N/A | Available | | |
| 4 | 2,270 | Midwest Orthopedics (Rush) | LOI | $29.50 | |
| 5 | 2,710 | Midwest Orthopedics (Rush) / Thrive Vet / Family Medical Office | LOI | $29.50/$29.25/$28.00 | |
| 6 | 962 | N/A | Available | | |
| 7 | 1,120 | One Off Group / 79th St. BBQ | LOI | $40.00 / $26.00 | |
| 8 | 2,400 | One Off Group / 79th St. BBQ | LOI | $40.00 / $26.00 | |
| | Total: 14,022 | | | | |

| Retail Summary | |
|---|---|
| Total Units | 8 |
| Signed Leases | 1 |
| LOIs | 4 |
| Remaining Units | 3 |

*The Borrower anticipates to sell the retail portion of the subject property in whole.



# CREDIT APPROVAL PRESENTATION
## for Lake Lathrop Partners LLC (Sedgwick Development)

**REPAYMENT ANALYSIS (RESIDENTIAL ONLY):**

### SEGEWICK DEVELOPMENT - PROFORMA
Does not include 14,022SF of retail SF.

| | | | | |
|---|---|---|---|---|
| Senior Loan Repayment | 100% | Construction Loan (Max Dist) | $20,000,000 | Parking Gross Value | $270,000 |
| Closing Costs | 8% | Bulk Coll Value of Condos | $19,270,000 | Buyer Upgrades | $440,000 |
| | | Retail Coll Value of Condos | $21,314,800 | | |
| | | Bulk Coll Value w/ Retail | $25,270,000 | | |
| | | Retail Coll Value w/ Retail | $27,314,800 | | |
| | | Avg. Coll Value/Unit - Bulk (Condos) | $875,909 | | |
| | | Avg. Coll Value/Unit - Retail (Condos) | $968,855 | | |

| Type | # of Units | Avg. SF | Avg. Selling $/SF | Avg. Purchase Price | Gross Retail |
|---|---|---|---|---|---|
| 2BD/2BA | 2 | 1,512 | $486.04 | $734,900 | $1,469,800 |
| 3BD/2BA | 2 | 1,512 | $436.44 | $659,900 | $1,319,800 |
| 3BD/3BA | 15 | 1,906 | $513.43 | $978,562 | $14,678,425 |
| 3BD/3.5BA | 1 | 2,498 | $472.34 | $1,179,900 | $1,179,900 |
| 4BD/4.5BA | 2 | 3,453 | $417.93 | $1,442,900 | $2,885,800 |
| **Total/Avg. Units** | 22 | 2,069 | $468.25 | $978,806 | $21,533,725 |
| **Appraised Value of Residential** | | | | $968,855 | $21,314,800 |
| Residential Parking | 9 | | | $30,000 | $270,000 |
| Buyer Upgrades | | | | $440,000 | $440,000 |
| GRAND TOTAL | | | | | $22,024,800 |

### Repayment Analysis

| % Closed | # of Closings | Construction-Note Repayment | Construction-Note Exposure | Collateral Value of Remaining Units (Bulk) | Collateral Value of Remaining Units (Retail Sell-Out) | LTV Bulk (W/ Retail Units) | LTV Gross (W/ Retail Units) | Exposure per Unit | Exposure per SF |
|---|---|---|---|---|---|---|---|---|---|
| 0% | 0 | $0 | $20,000,000 | $19,270,000 | $21,314,800 | 79% | 73% | $909,091 | $439.37 |
| 5% | 1 | $891,346 | $19,108,654 | $18,394,091 | $20,345,945 | 78% | 73% | $909,936 | $439.78 |
| 9% | 2 | $1,782,692 | $18,217,308 | $17,518,182 | $19,377,091 | 77% | 72% | $910,865 | $440.22 |
| 14% | 3 | $2,674,039 | $17,325,961 | $16,642,273 | $18,408,236 | 77% | 71% | $911,893 | $440.72 |
| 18% | 4 | $3,565,385 | $16,434,615 | $15,766,364 | $17,439,382 | 76% | 70% | $913,034 | $441.27 |
| 23% | 5 | $4,456,731 | $15,543,269 | $14,890,455 | $16,470,527 | 74% | 69% | $914,310 | $441.89 |
| 27% | 6 | $5,348,077 | $14,651,923 | $14,014,545 | $15,501,673 | 73% | 68% | $915,745 | $442.58 |
| 32% | 7 | $6,239,423 | $13,760,577 | $13,138,636 | $14,532,818 | 72% | 67% | $917,372 | $443.37 |
| 36% | 8 | $7,130,769 | $12,869,231 | $12,262,727 | $13,563,964 | 70% | 66% | $919,231 | $444.27 |
| 41% | 9 | $8,022,116 | $11,977,884 | $11,386,818 | $12,595,109 | 69% | 64% | $921,376 | $445.30 |
| 45% | 10 | $8,913,462 | $11,086,538 | $10,510,909 | $11,626,255 | 67% | 63% | $923,878 | $446.51 |
| 50% | 11 | $9,804,808 | $10,195,192 | $9,635,000 | $10,657,400 | 65% | 61% | $926,836 | $447.94 |
| 55% | 12 | $10,696,154 | $9,303,846 | $8,759,091 | $9,688,545 | 63% | 59% | $930,385 | $449.66 |
| 59% | 13 | $11,587,500 | $8,412,500 | $7,883,182 | $8,719,691 | 61% | 57% | $934,722 | $451.76 |
| 64% | 14 | $12,478,847 | $7,521,153 | $7,007,273 | $7,750,836 | 58% | 55% | $940,144 | $454.38 |
| 68% | 15 | $13,370,193 | $6,629,807 | $6,131,364 | $6,781,982 | 55% | 52% | $947,115 | $457.74 |
| 73% | 16 | $14,261,539 | $5,738,461 | $5,255,455 | $5,813,127 | 51% | 49% | $956,410 | $462.24 |
| 77% | 17 | $15,152,885 | $4,847,115 | $4,379,545 | $4,844,273 | 47% | 45% | $969,423 | $468.53 |
| 82% | 18 | $16,044,231 | $3,955,769 | $3,503,636 | $3,875,418 | 42% | 40% | $988,942 | $477.96 |
| 86% | 19 | $16,935,577 | $3,064,423 | $2,627,727 | $2,906,564 | 36% | 34% | $1,021,474 | $493.68 |
| 91% | 20 | $17,826,924 | $2,173,076 | $1,751,818 | $1,937,709 | 28% | 27% | $1,086,538 | $525.13 |
| 95% | 21 | $18,718,270 | $1,281,730 | $875,909 | $968,855 | 19% | 18% | $1,281,730 | $619.47 |
| 100% | 22 | $19,609,616 | $390,384 | $0 | $0 | 7% | 7% | $17,745 | $8.58 |

- Excluding any retail unit proceeds, a note balance of approximately $390M will remain after 100% of residential units are sold.
- Bulk value for the condos, and "as stabilized" retail value were provided via the Subject appraisal conducted by the Praedium Valuation Group dated 11/17/21.
- The $891M valuation used as the construction note repayment for each sold unit is 92% of the average appraised unit value of $968,855.

**EXHIBIT D, Page 12 of 37**



# CREDIT APPROVAL PRESENTATION
## for Lake Lathrop Partners LLC (Sedgwick Development)

**REPAYMENT ANALYSIS (W/ RETAIL UNITS SALE):**

**SEGEWICK DEVELOPMENT - PROFORMA**
Does not include 14,022SF of retail SF.

| | | | | | |
|---|---|---|---|---|---|
| Senior Loan Repayment | 100% | Construction Loan (Max Dist) | $20,000,000 | Parking Gross Value | $270,000 |
| Closing Costs | 8% | Bulk Coll Value of Condos | $19,270,000 | Buyer Upgrades | $440,000 |
| | | Retail Coll Value of Condos | $21,314,800 | | |
| | | Bulk Coll Value w/ Retail | $25,270,000 | | |
| | | Retail Coll Value w/ Retail | $27,314,800 | | |
| | | Avg. Coll Value/Unit - Bulk (Condos) | $875,909 | | |
| | | Avg. Coll Value/Unit - Retail (Condos) | $968,855 | | |

| Type | # of Units | Avg. SF | Avg. Selling $/SF | Avg. Purchase Price | Gross Retail |
|---|---|---|---|---|---|
| 2BD/2BA | 2 | 1,512 | $486.04 | $734,900 | $1,469,800 |
| 3BD/2BA | 2 | 1,512 | $436.44 | $659,900 | $1,319,800 |
| 3BD/3BA | 15 | 1,906 | $513.43 | $978,562 | $14,678,425 |
| 3BD/3.5BA | 1 | 2,498 | $472.34 | $1,179,900 | $1,179,900 |
| 4BD/4.5BA | 2 | 3,453 | $417.93 | $1,442,900 | $2,885,800 |
| **Total/Avg. Units** | **22** | **2,069** | **$468.25** | **$978,806** | **$21,533,725** |
| Appraised Value of Residential | | | | $968,855 | $21,314,800 |
| Residential Parking | 9 | | | $30,000 | $270,000 |
| Buyer Upgrades | | | | | $440,000 |
| Retail | 1 | 14,022 | $427.90 | $6,000,000 | $6,000,000 |
| GRAND TOTAL | | | $470.67 | | $28,024,800 |

**Repayment Analysis**

| % Closed | # of Closings | Construction-Note Repayment | Construction-Note Exposure | Collateral Value of Remaining Units (Bulk) | Collateral Value of Remaining Units (Retail Sell-Out) | LTV Bulk | LTV Gross | Exposure per Unit | Exposure per SF |
|---|---|---|---|---|---|---|---|---|---|
| 0% | 0 | $0 | $20,000,000 | $25,270,000 | $27,314,800 | 79% | 73% | $869,565 | $335.90 |
| Retail | Retail | $6,000,000 | $14,000,000 | $19,270,000 | $21,314,800 | 73% | 66% | $636,364 | $307.56 |
| 5% | 1 | $6,891,346 | $13,108,654 | $18,394,091 | $20,345,945 | 71% | 64% | $624,222 | $301.69 |
| 9% | 2 | $7,782,692 | $12,217,308 | $17,518,182 | $19,377,091 | 70% | 63% | $610,865 | $295.23 |
| 14% | 3 | $8,674,039 | $11,325,961 | $16,642,273 | $18,408,236 | 68% | 62% | $596,103 | $288.10 |
| 18% | 4 | $9,565,385 | $10,434,615 | $15,766,364 | $17,439,382 | 66% | 60% | $579,701 | $280.17 |
| 23% | 5 | $10,456,731 | $9,543,269 | $14,890,455 | $16,470,527 | 64% | 58% | $561,369 | $271.31 |
| 27% | 6 | $11,348,077 | $8,651,923 | $14,014,545 | $15,501,673 | 62% | 56% | $540,745 | $261.34 |
| 32% | 7 | $12,239,423 | $7,760,577 | $13,138,636 | $14,532,818 | 59% | 53% | $517,372 | $250.05 |
| 36% | 8 | $13,130,769 | $6,869,231 | $12,262,727 | $13,563,964 | 56% | 51% | $490,659 | $237.14 |
| 41% | 9 | $14,022,116 | $5,977,884 | $11,386,818 | $12,595,109 | 52% | 47% | $459,837 | $222.24 |
| 45% | 10 | $14,913,462 | $5,086,538 | $10,510,909 | $11,626,255 | 48% | 44% | $423,878 | $204.86 |
| 50% | 11 | $15,804,808 | $4,195,192 | $9,635,000 | $10,657,400 | 44% | 39% | $381,381 | $184.32 |
| 55% | 12 | $16,696,154 | $3,303,846 | $8,759,091 | $9,688,545 | 38% | 34% | $330,385 | $159.68 |
| 59% | 13 | $17,587,500 | $2,412,500 | $7,883,182 | $8,719,691 | 31% | 28% | $104,891 | $129.55 |
| 64% | 14 | $18,478,847 | $1,521,153 | $7,007,273 | $7,750,836 | 22% | 20% | $66,137 | $91.90 |
| 68% | 15 | $19,370,193 | $629,807 | $6,131,364 | $6,781,982 | 10% | 9% | $27,383 | $43.48 |
| 73% | 16 | $20,261,539 | $0 | $5,255,455 | $5,813,127 | 0% | 0% | $0 | $0.00 |
| 77% | 17 | $21,152,885 | $0 | $4,379,545 | $4,844,273 | 0% | 0% | $0 | $0.00 |
| 82% | 18 | $22,044,231 | $0 | $3,503,636 | $3,875,418 | 0% | 0% | $0 | $0.00 |
| 86% | 19 | $22,935,577 | $0 | $2,627,727 | $2,906,564 | 0% | 0% | $0 | $0.00 |
| 91% | 20 | $23,826,924 | $0 | $1,751,818 | $1,937,709 | 0% | 0% | $0 | $0.00 |
| 95% | 21 | $24,718,270 | $0 | $875,909 | $968,855 | 0% | 0% | $0 | $0.00 |
| 100% | 22 | $25,609,616 | $0 | $0 | $0 | 0% | 0% | $0 | $0.00 |

- Including retail units proceeds, the subject facility will be paid off after the 16th residential unit sale.
- Bulk value for the condos, and "as stabilized" retail value were provided via the Subject appraisal conducted by the Praedium Valuation Group dated 11/17/21.

**EXHIBIT D, Page 13 of 37**



# CREDIT APPROVAL PRESENTATION
## for Lake Lathrop Partners LLC (Sedgwick Development)

**Repayment Summary**

As previously mentioned, no advances will be made on the proposed facility without fourteen (14) pre-sold units with an aggregate gross sales price of no less than $13.6MM.  The chart on the two previous pages shows the loan repayment schedule, one is based on residential sales only while the other includes the sale of the retails units in whole. The net proceeds were calculated using the average residential sales price per unit of $968,855 discounted by 8% for closing costs and transfer of title as well as a sales price of $6,000,000 for retail. The loan terms call for 100% of net proceeds to be used to pay down the Subject Facility. As such, the note balance of $20,000,000 can be assumed to be paid-off in full after the 16th residential unit is sold with the sale of retail in whole. Therefore, the Borrower will make 100% of their profit off of the last six unit sales.

**Downside Scenario Assuming Pre-Sales Do Close – Rental and Fire Sale**

Assuming the 16 pre-sales close netting $891M each after closing costs (8% selling costs), the proposed $20MM loan will be paid down to $5.7MM with 6 units or 12,145 SF of residential units remaining as well as 14,022SF of retail. In a downside scenario, the Bank could lend $3MM (50% of the "As Complete/As Stabilized" $6MM retail value), which would yield a WICC DSC of 1.84x. This would leave a $2.7MM loan balance which would allow the Borrower to complete a "fire sale" for the remaining residential units at $496M, or $245/SF in order to reach the $2.98MM in gross sale proceeds to pay off the remaining units projected sales price. This represents a 50% discount from the remaining units projected sales price.

| Retail Cash Flow - 7601 Lake Street, River Forest, IL | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | WICC | | | APPRAISAL ANALYSIS | | | DOWNSIDE ANALYSIS | | |
| **TOTAL RENTABLE SF:** | **14,022** | | PRO FORMA | | | PRO FORMA | | | | | |
| **REVENUE:** | | | | $/SF | % | | $/SF | % | | $/SF | % |
| Gross Potential Income | | $ | 462,726 | $ 33.00 | 78.8% | $ 462,726 | $ 33.00 | 78.8% | $ 462,726 | $ 33.00 | 78.8% |
| Recoverable Expenses (CAM/Tax/Ins.) | | $ | 124,344 | $ 8.87 | 21.2% | $ 124,344 | $ 8.87 | 21.2% | $ 124,344 | $ 8.87 | 21.2% |
| Other Income | | $ | - | $ - | 0.0% | $ - | $ - | 0.0% | $ - | $ - | 0.0% |
| Less:  Vacancy & Collection Loss | | $ | (58,707) | $ (4.19) | -10.0% | $ (35,224) | $ (2.51) | -6.0% | $ (239,861) | $ (17.11) | -40.9% |
| **EFFECTIVE GROSS INCOME** | | $ | **528,363** | $ **37.68** | **90.0%** | $ **551,846** | $ **39.36** | **94.0%** | $ **347,209** | $ **24.76** | **59.1%** |
| | | | | | | | | | | | |
| **RECOVERABLE EXPENSES:** | | | | | | | | | | | |
| Real Estate Taxes | | $ | 70,110 | $ 5.00 | 13.3% | $ 70,110 | $ 5.00 | 12.7% | $ 70,110 | $ 5.00 | 20.2% |
| Property Insurance | | $ | 5,609 | $ 0.40 | 1.1% | $ 5,609 | $ 0.40 | 1.0% | $ 5,609 | $ 0.40 | 1.6% |
| Utilities | | $ | 2,103 | $ 0.15 | 0.4% | $ 2,103 | $ 0.15 | 0.4% | $ 2,103 | $ 0.15 | 0.6% |
| Maintenance and Repairs | | $ | 21,033 | $ 1.50 | 4.0% | $ 21,033 | $ 1.50 | 3.8% | $ 21,033 | $ 1.50 | 6.1% |
| Payroll & Related | | $ | - | $ - | 0.0% | $ - | $ - | 0.0% | $ - | $ - | 0.0% |
| Administrative & General | | $ | 2,000 | $ 0.14 | 0.4% | $ 2,000 | $ 0.14 | 0.4% | $ 2,000 | $ 0.14 | 0.6% |
| **NON-RECOVERABLE EXPENSES:** | | | | | | | | | | | |
| Management Fees | | $ | 26,418 | $ 1.88 | 5.0% | $ 27,592 | $ 1.97 | 5.0% | $ 26,418 | $ 1.88 | 7.6% |
| Structural Reserve | | $ | 4,207 | $ 0.30 | 0.8% | $ 3,506 | $ 0.25 | 0.6% | $ 4,207 | $ 0.30 | 1.2% |
| **TOTAL EXPENSES** | | | **131,480** | $ **9.38** | **24.9%** | $ **131,953** | $ **9.41** | **23.9%** | $ **131,480** | $ **9.38** | **37.9%** |
| | | | | | | | | | | | |
| **NET OPERATING INCOME** | | $ | **396,883** | $ **28.30** | **65.1%** | $ **419,893** | $ **29.95** | **70.1%** | $ **215,729** | $ **15.39** | **21.3%** |

| WICC DEBT SERVICE | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loan Amount: | $3,000,000 | Debt Service: | $215,729 | Debt Service: | $215,729 | Debt Service: | $215,729 |
| Rate: | 5.25% | Residual: | $181,154 | Residual: | $204,164 | Residual: | $0 |
| Amortization: | 25 | **DSCR:** | **1.84** | **DSCR:** | **1.95** | **DSCR:** | **1.00** |

| | | | |
|---|---|---|---|
| **Debt Yield** | **6.9%** | **7.3%** | |

Alternatively, if the Borrower were to complete a "fire sale" the retail portion of the property at $3MM ($215/SF or half of Sedgwick's appraised value), the remaining 6 residential units would only need to be sold at $496k/unit or $245/SF in order to reach $3MM in gross sale proceeds which would payoff our remaining loan balance of $2.7MM after 8% closing costs.



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

## COLLATERAL VALUATION:

**REAL ESTATE ANALYSIS:**

| Real Estate Collateral Valuation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Address | Basis of Value | Prepared By | Date of Valuation | Value | Advance Rate | Less Prior Liens | Net Collateral Value |
| 7601 Lake Street, River Forest, IL, 60305 | "As-Complete and Stabilized" (Commercial Units) | Praedium Valuation Group | 11/17/21 | $6,000,000 | 75% | $0 | $4,500,000 |
| | "As-Complete and Stabilized" Bulk Value (Residential Units) | Praedium Valuation Group | 11/17/21 | $19,270,000 | 75% | $0 | $14,452,500 |
| TOTAL | | | | $25,270,000 | | $0 | $18,952,500 |

| | | | |
|---|---|---|---|
| | | Proposed Debt: | $20,000,000 |
| | | Excess/(Deficit) | ($1,047,500) |

| SF | Value PSF | Loan PSF |
|---|---|---|
| 59,461 | $424.98 | $336.35 |

| | |
|---|---|
| Collateral Coverage | 0.95x |
| LTV: | 79% |
| LTV (including CEE): | N/A |

- The Appraiser also valued the residential units at $21,580M on a "Gross Retail Sell-Out" basis, increasing the aggregate value for the subject property to $27,580M, reducing the LTV to 73%.

**SALES COMPARABLES:**

**2 Bedroom Comparables:**

| Building Location | Year Built | Sales Price | Date Sold | Approx. Size (SF) | Price/SF | Adjusted Price/SF |
|---|---|---|---|---|---|---|
| 110 S. Marion St, Unit 501, Oak Park, IL | 2007 | $540,000 | 10/12/21 | 1,574 | $343 | $433 |
| 140 N. Euclid Ave, Apt 307, Oak Park, IL | 2000 | $560,000 | 8/6/21 | 1,564 | $358 | $437 |
| 1024 Washington Blcf # 1S, Oak Park, IL | 2021 | $595,000 | Active | 1,614 | $369 | $431 |
| AVERAGE | | $565,000 | | 1,584 | $357 | $434 |

| Building Location | Year Built | Sales Price | Date Sold | Approx. Size (SF) | Price/SF | Adjusted Price/SF |
|---|---|---|---|---|---|---|
| SUBJECT PROPERTY (2BD/2BA) | 2022 | $695,000 | N/A | 1,512 | $460 | $460 |

Source: Subject Appraisal dated 11/17/21.

- The Subject appraisal made adjustments to account for differences in location, common elements/rec facilities, condition, age, parking, and amenities. The sales comparables range from $430/SF to $437/SF with an average of $434/SF on an adjusted basis. The appraiser estimated the sales price of the subject units at $460/SF, above the adjusted range of comparables. Per the appraiser, this is reasonable based on the under contract prices for the Subject's 2BD/2BA units.

**3 & 4 Bedroom Comparables:**

| Building Location | Year Built | Sales Price | Date Sold | Approx. Size (SF) | Price/SF | Adjusted Price/SF |
|---|---|---|---|---|---|---|
| 1024 Washington Blvd #5N, Oak Park, IL | 2021 | $700,000 | 9/3/21 | 2,100 | $333 | $378 |
| 147 N. Euclid Ave, Unit 507, Oak Park, IL | 2017 | $675,000 | 8/31/21 | 1,700 | $397 | $411 |
| 1133 Chicago Ave, Unit 4W, Oak Park, IL | 2017 | $630,000 | 6/23/21 | 1,855 | $340 | $414 |
| 195 N. Addison Ave, Unit 402, Elmhurst, IL | 2021 | $1,000,000 | 7/14/21 | 2,162 | $463 | $500 |
| 195 N. Addison Ave, Unit 503, Elmhurst, IL | 2021 | $1,100,000 | 7/7/21 | 2,201 | $500 | $541 |
| 195 N. Addison Ave, Unit 603, Elmhurst, IL | 2021 | $1,170,000 | 5/26/21 | 2,162 | $541 | $556 |
| AVERAGE | | $879,167 | | 2,030 | $429 | $467 |

| Building Location | Year Built | Sales Price | Date Sold | Approx. Size (SF) | Price/SF | Adjusted Price/SF |
|---|---|---|---|---|---|---|
| SUBJECT PROPERTY (3BD/3BA) | 2022 | $962,208 | N/A | 2,005 | $480 | $480 |
| SUBJECT PROPERTY (3BD/3.5BA) | 2022 | $1,150,000 | N/A | 2,498 | $460 | $460 |
| SUBJECT PROPERTY (3BD/2BA) | 2022 | $670,000 | N/A | 1,512 | $443 | $443 |
| SUBJECT PROPERTY (4BD/4.5BA) | 2022 | $1,415,525 | N/A | 3,453 | $410 | $410 |

Source: Subject Appraisal dated 11/17/21.

- The Subject appraisal made adjustments to account for differences in location, common elements/rec facilities, condition, age, parking, and amenities. The sales comparables range from $378/SF to $556/SF with an average of $467/SF on an adjusted basis. The appraiser estimated the sales price of the subject units at $480/SF (3BD/3BA), $460/SF (3BD/3.5BA), and $443/SF (3BD/2BA).

- The appraiser was not able to identify any recent sales of similar, new, or recently constructed 4BD/4.5BA units in the area or surrounding market area, therefore, the appraiser used the 3BD comparables listed above as a comparison. The 4BD/4.5BA units were superior in bed/bath count to all of the comparables included above, however, it is significantly inferior in size on a $/SF basis due to the inverse relationship between size and unit price. The 4BD/4.5BA units are superior in outdoor space to the comps, however the outdoor area is smaller than the average for the 3BD/3BA subject units and therefore a lesser downward adjustment was applied. The Subject's 4BD/4.5Ba units are penthouse units and command a premium to lower level units (all else equal). The appraiser estimated a price/SF of $410/SF for the 4BD/4.5BA units.



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

## GUARANTOR ANALYSIS:

**PERSONAL GUARANTOR ANALYSIS:**

| PERSONAL FINANCIAL STATEMENT | | | | | |
|---|---|---|---|---|---|
| **Marty Paris** | | | | | **($000's)** |
| **Assets Held:** | Personally | | | | |
| **Assets** | | [1] | **6/19/2019** | **Liabilities** | **6/19/2019** |
| Cash | | [2] | 9,525 | RE - Mortgage Residence | 1,373 |
| Marketable Securities | | | - | HELOC-Residence | - |
| Partnerships/LLC Interests | | [3] | 23,428 | RE - Mortgage Investment | - |
| RE - Residence | | | 1,400 | Notes Payable to Others | 4,650 |
| RE - Investment Value | | | - | Notes Payable (Car Loans) | 10 |
| Cash Value of Life Insurance | | | - | Taxes Payable | 635 |
| Retirement Assets | | | 587 | **Total Liabilities** | $ 6,668 |
| Other Personal Property | | | - | **Net Worth** | 28,272 |
| Other Assets | | | - | **Adjusted Net Worth** | $ 4,257 |
| **Total Assets** | | | $ 34,940 | **Contingent Liabilities:** [4] | $ 44,415,300 |

*Marty Paris' legal name is Frank Martin Paris Jr.

[1] The Bank has obtained a letter from Hurst, Robin & Kay, LLC, the attorneys for Mr. Paris. The letter indicates it is the attorney's recommendation for Mr. Paris to not create any further personal financial records until the dissolution of marriage case is resolved. The attorney believes the case will be concluded in Q1 2022. The RM has verbally discussed the Borrower's balance sheet and is comfortable the values reflected on the 2019 PFS remain accurate.

[2] The $9.5MM in total liquidity is held in various entities as detailed below. The Maeve Series LLCs are all operating entities so liquidity moves between the entities in the normal course of business. Since they are all ultimately owned and controlled by Martin NV II, INC the Sponsor uses that entity to capture the benefit of the total liquidity and net worth. Maeve is a series LLC set up to provide the benefit of liability protection between the series but still allowing for the controlling interest holder to have access to all the liquidity in the event it is needed.

| Entity | Liquidity (Cash & Marketable Securities) | Held At |
|---|---|---|
| Maeve, LLC - Series A | $5,023,823 | Jefferies |
| Maeve, LLC - Series A | $902,179 | Private Bank |
| Maeve, LLC - Series DD | $1,336,636 | Jefferies |
| Misc. Entities | $1,587,000 | Charles Scwab |
| Sedgwick related entities | $10,000 | Republic Bank, Private Bank, etc. |
| Misc. Property operating accounts | $665,000 | Various |
| Total: | $9,524,638 | |

[3] Please note that the partnerships/LLC interests below are based on Mr. Paris' share only. Mr. Paris had Martin NV II, INC (the "Guarantor Entity") setup to act in lieu of his personal guaranty. Ultimately the Guarantor Entity owns the majority of Mr. Paris' assets and liquidity including the operating and single purpose real estate development entities. **On Mr. Paris' PFS he values his 1% Common A Voting Stock in the Guarantor Entity at $330,319.75 and his 89.009% Common B Non-Voting Stock in the Guarantor Entity at $19,404,944.50**

[4] Mr. Paris' contingent liabilities as of 6/19/19 are detailed below.

| Contingent Liabilities | | | | |
|---|---|---|---|---|
| **Property Address** | **Guarantor** | **Recourse Level** | **Recourse Amount (Maximum)** | **Recourse Notes** |
| 3216 N Racine | F. Martin Paris, Jr. | 100% | $ 166,000 | |
| 2049 N Sheffield | F. Martin Paris, Jr. | 100% | $ 813,000 | |
| 3114 N Southport | F. Martin Paris, Jr. | 100% | $ 850,000 | |
| 5501 S Kedzie | F. Martin Paris, Jr. | 100% | $ 11,600,000 | |
| 1545 W North | F. Martin Paris, Jr. Martin NV II, INC Maeve LLC-Series DD | 100%/50% | $ 8,000,000 | $8M/$4M after 1.0:1.0 DSCR |
| 1325 N Wells | Martin NV II, INC | Partial | $ 2,400,000 | $2.4M/$1.2M after 1.2:1.0 DSCR |
| 301 W North | F. Martin Paris, Jr. | 100%/50%/25% | $ 19,900,000 | $19.9M/50% after 1.2:1.0 DSCR/ 25% after 1.4:1.0 DSCR |
| 1857 W Dickens | F. Martin Paris, Jr. | 100% | $ 686,300 | |
| | | **TOTAL** | $ 44,415,300 | |

Please refer to **page 19** for a detailed breakdown of Mr. Paris Jr.'s partnerships and LLC interests.

**EXHIBIT D, Page 16 of 37**



**CREDIT APPROVAL PRESENTATION**

**for Lake Lathrop Partners LLC (Sedgwick Development)**

**APPENDICES:**

Appendix A: Wintrust Exposure/Deposit Summary
Appendix B: Guarantor Global RE Holdings
Appendix C: Breakdown of Mr. Paris' Partnerships/LLC Interests
Appendix D: Risk Evaluation Rating
Appendix E: Profitability Model
Appendix F: Minimum Sale Price and Release Price
Appendix G: Construction
Appendix H: Required Approval

**EXHIBIT D, Page 17 of 37**



## CREDIT APPROVAL PRESENTATION
## for Lake Lathrop Partners LLC (Sedgwick Development)

### APPENDIX A: WINTRUST EXPOSURE/DEPOSIT SUMMARY

**WINTRUST APPROVAL ACE SUMMARY:**

| GLOBAL EXPOSURE/STRUCTURE SUMMARY: | | | | | | | | | GUARANTY | | | CROSSED | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BORROWER | RISK RATING | FACILITY TYPE | CURRENT COMMITMENT | PROPOSED COMMITMENT | CURRENT OUTSTANDING | PRICING | DATE OPENED | MATURITY | Name | Type | Amount | Type | With What Facilities | NEXT ANNUAL REVIEW DUE |
| 1. Lake Lathrop Partners LLC | 5 | NRLOC | $          - | $   20,000,000 | $          - | Fed Funds + 275bps, Floating | TBD | 30 MFDOC | Marty Paris; Martin NV II, Inc. | Limited | 1) 10% 2) 50% | N/A | N/A | 1 YFDOA |
| SWAP Exposure: | $          - | | $          - | $          - | | | | | | | | | | |
| Global WTFC ACE: | $          - | | $   20,000,000 | $          - | | | | | | | | | | |
| Less Participation (Northbrook): | $          - | | $   10,000,000 | $          - | | | | | | | | | | |
| Beverly ACE: | $          - | | $   10,000,000 | $          - | | | | | | | | | | |
| ACH Exposure: | $          - | | $          - | $          - | | | | | | | | | | |

**PARTICIPATION/SYNDICATION STRATEGY:**

| INTERNAL PARTICIPATIONS: | *FACILITY #1* | | | | |
|---|---|---|---|---|---|
| CHARTER | CURRENT COMMITMENT | PROPOSED COMMITMENT | SWAP EXPOSURE: | CURRENT BANK ACE: | PROPOSED BANK ACE: |
| 1. Northbrook Bank and Trust | - | 10,000,000 | - | - | 10,000,000 |

**DEPOSIT SUMMARY:**

| DEPOSIT RELATIONSHIP (Estimate) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Account Holder | Account Number | Type | TTM Avg Balance | Current Balance | OD Last 12 Mos | Interest Rate | |
| Lake Lathrop Partners LLC | TBD | DDA | $   2,000,000 | $   2,000,000 | 0 | | |
| Total Non-Interest Bearing | | | $   2,000,000 | $   2,000,000 | | | |

| Total Deposit Relationship with Beverly Bank | $   2,000,000 | $   2,000,000 |
|---|---|---|

| Total Deposit Relationship with Beverly Bank | 1 |
|---|---|

**WEALTH MANAGEMENT SUMMARY: None**



### CREDIT APPROVAL PRESENTATION
### for Lake Lathrop Partners LLC (Sedgwick Development)

**APPENDIX B: GUARANTORS GLOBAL RE HOLDINGS As of 5/1/19 (Income and Expenses as of 12/31/18)**

| Property Street Address City, State, Zip Code | Property Type (1) | Year Acquired | Percentage Owned (%) | 100% Estimated Market Value | 100% Current Loan Balance (Approx.) | LTV (%) | Personal Guaranty? | 100% Est. Annual Collected Rental Income | 100% Annual Operating Expenses | Net Operating Income (NOI) | 100% Annual Debt Service | 100% Net Cash Flow | Personal Equity Interest | Personal Net Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3216 N. Racine, Chicago, IL | SFH | 1995 | 50% | $1,350,000 | $120,219 | 9% | Yes | $123,540 | $30,500 | $93,040 | $21,600 | $71,440 | $614,891 | $35,720 |
| 2049 N. Sheffield, Chicago, IL | SFH | 2000 | 100% | $1,750,000 | $1,713,000 | 98% | Yes | $169,752 | $33,000 | $136,752 | $52,212 | $84,540 | $37,000 | $84,540 |
| 1933 N. Sedgwick, Chicago, IL | SFH | 1994 | 50% | $1,250,000 | $144,900 | 12% | No | $101,220 | $26,000 | $75,220 | $21,672 | $53,548 | $552,550 | $26,774 |
| 3114 N. Southport, Chicago, IL | MF | 2011 | 50% | $1,500,000 | $840,000 | 56% | Yes | $178,800 | $30,000 | $148,800 | $42,000 | $106,800 | $330,000 | $53,400 |
| 1927 N. Clybourn, Chicago, IL | MF | 1999 | 50% | $2,500,000 | $1,029,000 | 41% | No | $239,700 | $55,000 | $184,700 | $84,360 | $100,340 | $735,500 | $50,170 |
| 1454 S. Michigan, Chicago, IL | MU | 2004 | 69% | $14,000,000 | $3,676,000 | 26% | No | $1,161,636 | $511,000 | $650,636 | $248,000 | $402,636 | $7,123,560 | $277,819 |
| 1611 N. Hermitage, Chicago, IL | MU | 2013 | 50% | $0 | $0 | 0% | No | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 828 W. Grace St, Chicago, IL | MU | 2002 | 18% | $1,000,000 | $0 | 0% | N/A | $17,052 | $26,000 | -$8,948 | $0 | -$8,948 | $180,000 | -$1,611 |
| 828 W. Grace St Unit 402, Chicago, IL | SFH | 2007 | 50% | $385,000 | $0 | 0% | N/A | $27,600 | $7,600 | $20,000 | $0 | $20,000 | $192,500 | $10,000 |
| 1454 S. Michigan Unit 160, Chicago, IL | SFH | 2009 | 50% | $330,000 | $0 | 0% | N/A | $28,800 | $7,900 | $20,900 | $0 | $20,900 | $165,000 | $10,450 |
| 5501 S. Kedzie, Chicago, IL | RET | 2013 | 40% | $0 | $0 | 0% | Yes | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 703 Park Ave, River Forest, IL | LND | 2012 | 100% | $450,000 | $0 | 0% | Yes | $0 | $0 | $0 | $0 | $0 | $450,000 | $0 |
| 1545 W. North, Chicago, IL | MU | 2013 | 15% | $0 | $0 | 0% | No | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 1325 N. Wells, Chicago, IL | MU | 2014 | 5% | $30,000,000 | $12,650,000 | 42% | Yes | | | Under Construction | | | $867,500 | $0 |
| 301 W. North, Chicago, IL | MU | 2014 | 10% | $35,000,000 | $22,300,000 | 64% | Yes | | | Under Construction | | | $1,270,000 | $0 |
| 1857 W. Dickens, Chicago, IL | MF | 2014 | 50% | $1,900,000 | $1,627,000 | 86% | Yes | | | Under Construction | | | $136,500 | $0 |
| 146 W. Erie, Chicago, IL | LND | 2016 | 15% | $17,500,000 | $6,315,000 | 36% | No | | | Under Construction | | | $1,677,750 | $0 |
| Lake and Lathrop, River Forest, IL (Subject Property) | LND | 2017 | 75% | $1,200,000 | $0 | 0% | | | | Under Construction | | | $900,000 | $0 |
| TOTAL: | | | | $110,115,000 | $50,415,119 | 46% | | $2,048,100 | $727,000 | $1,321,100 | $469,844 | $851,256 | $15,232,751 | $547,262 |

Please note the properties that are highlighted have been sold.

**5501 S. Kedzie** – Construction is complete and the property is stabilized; the anchor tenant is LA Fitness.

**1325 N. Wells** – Construction is complete and property is 100% leased. The asset is now 100% owned by Sedgwick Principals.

**301 W. North** – Construction is complete and the property is 97% leased. The asset is now 100% owned by Sedgwick Principals.

**146 W. Erie Street** – Construction is expected to be completed in Q2 of 2022. The construction delays have been mitigated.

**Lake and Lathrop (Subject Property)** – It should be noted the $1.2MM valuation is as of 2019 and did not include the work done on the property.

**EXHIBIT D, Page 19 of 37**



**CREDIT APPROVAL PRESENTATION**

**for Lake Lathrop Partners LLC (Sedgwick Development)**

### APPENDIX C: BREAKDOWN OF MR. PARIS' PARTNERSHIPS/LLC INTERESTS

| Partnerships/LLC Interests | | | |
|---|---|---|---|
| **Entity** | **Ownership** | **Interest** | **Value** |
| Sedgwick Properties Holdings, Corp. | Marty Paris | 1% Common Stock | $28,134 |
| Sedgwick Properties Holdings, Corp. | Frank Martin Paris, Jr. Revocable Trust | 99% Common Stock | $2,785,303 |
| Maeve, LLC - Series A | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $59,260 |
| Maeve, LLC - Series B | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $1,000 |
| Maeve, LLC - Series C | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $1,940 |
| Maeve, LLC - Series D | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $225 |
| Maeve, LLC - Series E | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $1,525 |
| Maeve, LLC - Series F | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $495 |
| Maeve, LLC - Series G | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $73,898 |
| Maeve, LLC - Series H | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $0 |
| Maeve, LLC - Series I | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $99 |
| Maeve, LLC - Series J | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $6,679 |
| Maeve, LLC - Series K | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $911 |
| Maeve, LLC - Series L | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $8,940 |
| Maeve, LLC - Series M | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $6,248 |
| Maeve, LLC - Series N | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $860 |
| Maeve, LLC - Series O | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $0 |
| Maeve, LLC - Series P | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $1,925 |
| Maeve, LLC - Series Q | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $150 |
| Maeve, LLC - Series R | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $1,650 |
| Maeve, LLC - Series S | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $150 |
| Maeve, LLC - Series T | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $3,350 |
| Maeve, LLC - Series U | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $7 |
| Maeve, LLC - Series V | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $898 |
| Maeve, LLC - Series W | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $990 |
| Maeve, LLC - Series X | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $4,500 |
| Maeve, LLC - Series Y | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $113 |
| Maeve, LLC - Series Z | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $14,430 |
| Maeve, LLC - Series AA | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $134 |
| Maeve, LLC - Series BB | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $19 |
| Maeve, LLC - Series CC | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $27,021 |
| Maeve, LLC - Series DD | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $14,026 |
| Maeve, LLC - Series EE | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $7,611 |
| Maeve, LLC - Series FF | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $21,480 |
| Maeve, LLC - Series GG | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $33,809 |
| Maeve, LLC - Series HH | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $36,794 |
| Maeve, LLC - Series II | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $0 |
| Maeve, LLC - Series JJ | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $9,293 |
| Conor DE II, Inc. | Frank Martin Paris, Jr. Revocable Trust | 33% Common A Voting Stock | $110,107 |
| Conor Management, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $333,656 |
| Martin NV II, Inc. | Frank Martin Paris, Jr. Revocable Trust | 1% Common A Voting Stock | $330,320 |
| Martin NV II, Inc. | Frank Martin Paris, Jr. Revocable Trust | 89.009% Common B Non-Voting Stock | $19,404,945 |
| 828 W. Grace, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Class A Membership Interest | $1,959 |
| Alpha Carpentry, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $500 |
| 1454 S. Michigan, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Class A Membership Interest | $74,644 |
| Sedgwick Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $100 |
| 2049 N. Sheffield, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $920 |
| 55th and S. Kedzie Investments, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Class A Membership Interest | $908 |
| Alpha Property Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $1,000 |
| 1611 N. Hermitage, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Class A Membership Interest | $114 |
| Alpha Construction Services, LLC | Frank Martin Paris, Jr. Revocable Trust | 1% Membership Interest | $14,576 |
| | | **Total:** | $23,427,617 |

**EXHIBIT D, Page 20 of 37**



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

### APPENDIX D: RISK EVALUATION RATING

**BORROWER:** Lake Lathrop Partners LLC (Sedgwick Development)
Wintrust Financial Corporation
**CREDIT RATING SYSTEM - UNSTABILIZED REAL ESTATE**

| Risk Evaluation Rating | | Asset Quality, Liquidity, and Additional Leverage Capacity | Interest Coverage Cash Flow/Total Debt Coverage | Debt Service Coverage vs. Peer Group (RMA, market comps etc.) | Monitoring Requirements | Loss Potential | Loan Types | Other Factors | + or - |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Minimal Risk | Superior asset quality, excellent liquidity, minimal leverage | Substantial excess debt coverage | Debt service coverage substantially in excess of comparable companies/properties | Virtually no Need | None or extremely low. | | | |
| 2 | Modest Risk | Very good asset quality and liquidity, strong leverage capacity | Very comfortable interest and debt coverage | Debt service coverage well in excess of comparable companies/properties | Low monitoring requirements | Demonstrably low potential | | | |
| 3 | Average Risk | Most satisfactory asset quality and liquidity, good leverage capacity | Satisfactory interest and debt coverage, prone to some fluctuation | Debt service coverage in excess of comparable companies/properties | Reasonable level of monitoring to ensure continuing credit quality | Potentially low but no longer irrefutable | Residential mortgages and home equity loans within Policy limits | | |
| 4 | Above Average Risk | Acceptable asset quality, little excess liquidity, modest leverage capacity | Generally acceptable coverage, some concern about future coverage | Debt service coverage similar to comparable companies/properties. Typically Debt Service Coverage would be 1.2x or greater | Close supervision required | Variable, but some potential for deterioration | Moderately leveraged, but well collateralized commercial and personal loans | Guarantor Liquidity, Net Worth, Character | |
| 5 | Management Attention Risk | Generally acceptable asset quality, somewhat strained liquidity, minimal leverage capacity | Somewhat erratic, weak coverage. Concern about future coverage if trends continue. | Current and/ or projected debt service coverage marginally below comparable companies/properties | Management supervision required. | Moderate if corrective action not taken | | Global Cashflow | |
| 6 | Special Mention | Assets in this category are currently protected, potentially weak, but not to the point of a substandard classification. | Assets in this category carry risks which have increase beyond that at which the loan originally would have been granted. | Current and projected debt service coverage substantially below comparable companies/properties | Close Management supervision required | Moderate if corrective action not taken | | Regular Reporting including monitored ABL transactions | |
| 7 | Substandard (Accrual) | Must have well defined weaknesses that jeopardize the liquidation of the debt. | Inadequately protected by the current net worth and paying capacity of the obligor or collateral pledged. | The Borrower no longer demonstrates an ability to keep the loan current under its contractual terms | Close Management supervision required | Distinct possibility that the Bank may sustain some loss, but no discernable impairment. | | | |
| 8 | Substandard (Non-Accrual) | Must have well defined weaknesses that jeopardize the liquidation of the debt. | The Bank considers the Borrower as unable to pay its obligation without forced liquidation of collateral. | The Borrower no longer demonstrates an ability to keep the loan current under its contractual terms | Close Management supervision required | Well documented probability of loss, including potential impairment | | | |
| 9 | Doubtful | These assets have all the weaknesses in those classified as "substandard" with the added characteristic that the weaknesses make collection or liquidation in full, on the basis of current existing facts, conditions, and values, highly improbable. | | The Borrower no longer demonstrates an ability to keep the loan current under its contractual terms | Close Management supervision required | Extremely high. | | | |
| 10 | Loss | Loans included in this category are considered uncollectible and of such little value that there continuance as bankable assets is not warranted. This classification does not mean that the asset has absolutely no recovery or salvage value, but rather it is not practical or desirable to defer writing off this basically worthless asset even though partial recovery may be effected in the future. | | | | | | | |

**Attestation:** I have reviewed the credit criteria in this CAP necessary to make the Risk Rating assessment including the applicable items and commentary below and affirm the Risk Rating for each category above is accurate.

| Items Reviewed (each where applicable) | LTV/Advance Rate, Proforma DSCR, Contingency, Quality of GC, Sponsor/Guarantor Liquidity | Actual Proforma Debt Service Coverage, Tenant Quality, Feasibility Study | WICC Debt Service, Rental Projections Relative to Market, Amenity Comparison to Market | Debt Service Covenant, Construction/Lease Up Hurdles, Reserve Adequacy, Sponsor/Guarantor Liquidity | LTV/Advance Rate, Guarantor Analysis, Project Feasibility, Conversion Potential | N/A | | Reporting Requirements, Guarantor Analysis |
|---|---|---|---|---|---|---|---|---|
| **Initials** | DS | DS | DS | DS | DS | DS | | DS |

| Category RR | 5 | 5 | N/A | 5 | 5 | Total | |
|---|---|---|---|---|---|---|---|
| Category % (total =1.0) | 0.25 | 0.25 | N/A | 0.25 | 0.25 | 1.00 | 0.25 |

| Calc. Grade | 5 | | | | | |
|---|---|---|---|---|---|---|
| Assigned Grade | 5.00 | Date: | 1/11/2022 | | Prepared By: M. Cisneros | |

**RECOMMENDED RISK RATING OF "5" BASED ON THE FOLLOWING:**

- **Asset Quality:** The Subject will be a 59,542Sf mixed-use condo building that will consist of 22 luxury condos and 14,022sf of storefront retail.
- **LTV/Advance Rate:** 70% LTC/ 79% LTV based upon 2021 appraised value.
- **Budget Adequacy:** A third party budget review is a condition of closing. The Sponsor has a proven track records and experience in construction of condo development projects. Comment on GC being in-house Alpha Construction.
- **Debt Service Coverage/Interest Reserve Adequacy:** Based upon Bank assumptions as outlined in the interest reserve chart on **page 24**, an estimated $800M is recommended for the interest reserve. A $931M interest reserve will be in place for the duration of the term.
- **Sponsor/Management:** Sedgwick Development has over 25-years of experience in developing both residential and commercial properties.
- **Guarantor:** Martin NV II, INC. will provide an unlimited completion guaranty and a 50% repayment guaranty. Additionally, Marty Paris will provide a 10% repayment guaranty personally.
- **Monitoring:** The subject will be monitored via several on-going covenants containing minimum sales prices (95% of sales prices as depicted in **Appendix F**), minimum release price (92%), minimum earnest money deposit (10%). Construction will be monitored by WRES.

| Upgrade Benchmarks (RR5 or Worse) | Downgrade Benchmarks (RR5 or Worse) |
|---|---|
| • Certificate of occupancy; and<br>• Amortized In-Place DSC > 1.20x based upon retail NOI. | • Material cost overruns not covered by the Guarantor; and/or<br>• Borrower is not in compliance with required start and completion dates; and/or<br>• Cancellation of 50% or more of pre-sale contracts. |

**EXHIBIT D, Page 21 of 37**



# CREDIT APPROVAL PRESENTATION
# for Lake Lathrop Partners LLC (Sedgwick Development)

### APPENDIX E: PROFITABILITY MODEL(S)

**Transaction/Relationship:**

*Customer: Sedgwick Development*

**Assets**

| Note Type | Note Short Name | ACL Segment | Leverage Desc | Property Land | Asset Collateral | Term(In Months) | Fix/Var | Floor Rate | Rate/Spread (%) | Cmmt Amt | Avg Balance | Risk Rating | Sub Total Income |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 688 - Commercial-Real Estate-Construction | $20MM NRLOC | CRE Construction | N/A | | CA - Commercial Real Estate - Construction - Commercial | 30 | VAR-FED-FUNDS | 2.75 % | 2.75 % | $20,000,000.00 | $20,000,000.00 | 5 | $564,000.00 |
| | | | | | Totals | | | | | $20,000,000.00 | $20,000,000.00 | | $564,000.00 |

**Accounts**

| Account Type | Avg Balance | Rate | Sub Total Cost |
|---|---|---|---|
| Non-Interest Bearing Account Type | $2,000,000.00 | 0.00 % | $0.00 |
| Totals | $2,000,000.00 | | $0.00 |

**Fees**

| | | **Expenses** | |
|---|---|---|---|
| Total SWAP Fee : | $0.00 | Credit Losses (CECL): | $236,000.00 |
| New Treasury Management Fees: | $0.00 | FDIC Insurance: | $14,000.00 |
| Existing Treasury Management Fees: | $0.00 | Loan Origination Cost and Overhead: | $49,433.20 |
| Wealth Management: | $0.00 | Additional Service Cost: | $0.00 |
| DDA Bonus Income: | $10,000.00 | | |
| Other Fee Income: | $0.00 | | |
| Unused Commitment Fee: | $0.00 | | |
| Origination Fee: | $200,000.00 | | |

**Funding**

| | | **Totals** | | **Profitability Analysis** | |
|---|---|---|---|---|---|
| Capital Allocation : | $2,000,000.00 | Net Interest : | $552,800.00 | | |
| Cost of Capital : | $0.00 | Earning Asset Credit : | $0.00 | | |
| Net Funding Required : | $16,000,000.00 | Credit Losses : | $236,000.00 | | |
| Cost of Funds : | $11,200.00 | Fees : | $90,000.00 | | |
| Total Funding Cost : | $11,200.00 | Expenses : | $63,433.20 | | |
| Excess Liquidity : | $0.00 | Pre -Tax income : | $343,366.80 | | |
| Net Interest : | $552,800.00 | Taxes : | $91,575.93 | | |
| Net Interest (%) : | 2.76 % | Net Income : | $251,790.87 | | |

| | | |
|---|---|---|
| | After-Tax ROA: | 1.26 % |
| | After-Tax ROE: | 12.59 % |
| **Managements Internal Targets:** | | |
| | After-Tax ROA: | > 1.25 % |
| | After-Tax ROE: | > 12.50 % |
| **Pre-Tax Income Shortfall to Targets:** | | |
| | ROA Shortfall: | NA |
| | ROE Shortfall: | NA |

**Comments** (If relationship does not meet targets, please provide an explanation) :

DocuSign Envelope ID: E63BE995-AED4-4797-80D5-F88BAE219467



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

APPENDIX F: Minimum Residential Sale Price and Release Price

| Unit | SF | Borrower Projected | Minimum Sale Price | Minimum Release Price |
|------|------|--------------------|--------------------|-----------------------|
| 201 | 2,240 | $1,127,988 | $1,071,588 | $985,861 |
| 202 | 1,512 | $734,900 | $698,155 | $642,303 |
| 203 | 1,512 | $689,900 | $655,405 | $602,973 |
| 204 | 1,673 | $827,988 | $786,588 | $723,661 |
| 205 | 1,672 | $844,900 | $802,655 | $738,443 |
| 206 | 1,905 | $934,900 | $888,155 | $817,103 |
| 207 | 1,914 | $977,988 | $929,088 | $854,761 |
| 208 | 2,498 | $1,277,988 | $1,214,088 | $1,116,961 |
| 301 | 2,240 | $850,000 | $807,500 | $742,900 |
| 302 | 1,512 | $734,900 | $698,155 | $642,303 |
| 303 | 1,512 | $629,900 | $598,405 | $550,533 |
| 304 | 1,644 | $765,000 | $726,750 | $668,610 |
| 305 | 1,701 | $834,900 | $793,155 | $729,703 |
| 306 | 1,875 | $870,988 | $827,438 | $761,243 |
| 307 | 1,945 | $895,988 | $851,188 | $783,093 |
| 308 | 2,498 | $1,179,900 | $1,120,905 | $1,031,233 |
| 401 | 2,293 | $1,234,900 | $1,173,155 | $1,079,303 |
| 402 | 3,426 | $1,410,900 | $1,340,355 | $1,233,127 |
| 403 | 3,479 | $1,474,900 | $1,401,155 | $1,289,063 |
| 404 | 1,920 | $972,741 | $924,104 | $850,176 |
| 405 | 1,998 | $1,012,259 | $961,646 | $884,714 |
| 406 | 2,551 | $1,249,900 | $1,187,405 | $1,092,413 |
| Total: | | $21,533,725 | $20,457,039 | $18,820,476 |

Pre-sale units are highlighted.

Notes:
- The appraiser valued the pre-sold units on a retail sell out basis based upon the finalized sales price.
- The remaining 6 condo units are all three bedroom/three bath units, but vary in size and outdoor space. The appraisal valued the units for $5.76MM or $960M per unit on an average basis, but acknowledged the units will sell for more or less.

**EXHIBIT D, Page 23 of 37**



DocuSign Envelope ID: E63BF995-AED4-4797-8905-E88BAF219467

# CREDIT APPROVAL PRESENTATION
## for Lake Lathrop Partners LLC (Sedgwick Development)

### APPENDIX G: CONSTRUCTION LOAN

**HVCRE TESTING (FOR ACQUISITION, DEVELOPMENT, & CONSTRUCTION OF REAL PROPERTY):**

| | | |
|---|---|---|
| 1. | The project's loan-to-value is less than or equal to the Bank's maximum supervisory loan-to-value limit for asset class. (Refer to applicable regulatory limit for the asset class) | Yes |
| **If 1st test is "Yes," continue below. If 1st test is "No," STOP; Loan is a HVCRE.** | | |
| 2. | The Borrower has contributed capital or paid development expenses of at least 15% of the project's "as-completed" value. Borrower's capital must be in the form of the following: i) Cash; ii) Unencumbered readily marketable assets; iii) Cash or securities used to purchase land. | Yes |
| **If 1st test AND 2nd test are "Yes," continue below. If 1st test OR 2nd test is "No," STOP; Loan is HVCRE.** | | |
| 3. | The Borrower's capital must be: i) contributed prior to an advance of funds under the credit facility AND ii) contractually required to remain in the project throughout the life of the project. | Yes |
| **If all tests are "Yes," Loan is not HVCRE.** | | |

| | |
|---|---|
| **HVCRE?** | No |

| CONSTRUCTION PROJECT SUMMARY | |
|---|---|
| **ASSET TYPE** | Mixed-Use |
| *If Other:* | |
| **PROJECT TYPE** | Residential (including mixed-use) - For-Sale |
| *If Other:* | |
| **NATURE OF PROJECT** | Ground-Up Construction |
| *If Other:* | |
| **PHASED DEVELOPMENT** | No |
| *Briefly Describe:* | |
| **L/C REQUIREMENTS** | No |
| *If Yes, Briefly Describe:* | |
| **PROJECT TEAM/VENDORS** | |
| **Developer** | Alpha Construction |
| **General Contractor** | Alpha Construction |
| **Architectural/Design Firm** | TBD |
| **Leasing/Listing Broker** | Jameson Sotheby's International Realty |
| **CONSTRUCTION MONITORING** | |
| **Contract Type** | Guaranteed Maximum Price |
| *If Other:* | |
| **Construction Monitoring** | WRES - $1MM or greater in project costs (excluding land) |
| *If Third-Party:* | |
| *If WRES or Third-Party, have they been engaged:* | Yes |
| **Feasibility Study** | No |
| *If Yes, Company:* | |
| **Pre-Closing Cost Review** | Yes - $3MM or greater in project costs (excluding land) |
| *If Yes, Company:* | Oppidan USA |
| **Third-Party Inspections** | Yes |
| *If Yes, Company:* | TBD |
| **Construction Escrow** | Yes |
| *If Yes, Title Company:* | TBD |
| *Describe Process:* | |
| **Retention** | No |
| *Describe:* | |
| **INSURANCE** | |
| **General Liability, Carrier & Limit** | TBD |
| **Builders Risk, Carrier & Limit** | TBD |
| **Workmans Comp, Carrier & Limit** | TBD |
| **Other, Type & Carrier & Limit** | TBD |



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

### INTEREST RESERVE CALCULATION - SELL-OUT

| Projected Loan Closing Date | Jan-22 | Assumptions: $4MM draw in month 1 and 11 equal draws for months 2-12. |
| Projected Loan Funding Date | Feb-22 | |
| Assumed Interest Rate | 2.87% | |

| Period* | Funding | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days in Month | | 28 | 31 | 30 | 31 | 30 | 30 | 31 | 30 | 31 | 30 | 31 | 31 |
| | | | | | | | | | | | | | |
| Total # of Units | | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 |
| # of Units Under Contract | | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| # of Units Closed Per Month | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Avg/Unit | | | | | | | | | | | | |
| Gross Sales Proceeds | $968,855 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Less: Closing Costs (8%) | (77,508) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Sales Proceeds | $891,347 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | | |
| Draw Amount | | $4,000,000 | $1,454,545 | $1,454,545 | $1,454,545 | $1,454,545 | $1,454,545 | $1,454,545 | $1,454,545 | $1,454,545 | $1,454,545 | $1,454,545 | $1,454,545 |
| Outstanding Balance | $0 | $4,000,000 | $5,454,545 | $6,909,091 | $8,363,636 | $9,818,182 | $11,272,727 | $12,727,273 | $14,181,818 | $15,636,364 | $17,090,909 | $18,545,455 | $20,000,000 |
| Monthly Interest Payments | | $8,804 | $13,292 | $16,294 | $20,382 | $23,155 | $26,585 | $31,016 | $33,445 | $38,105 | $40,306 | $45,194 | $48,739 |
| | | | | | | | | | | | | | |
| Running Interest Payments | | $8,804 | $22,097 | $38,391 | $58,773 | $81,927 | $108,512 | $139,528 | $172,973 | $211,078 | $251,384 | $296,578 | $345,317 |

| Period | | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Jan-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days in Month | | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 31 |
| | | | | | | | | | | | | | |
| Total # of Units | | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 |
| # of Units Under Contract | | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| # of Units Closed Per Month | | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 0 |
| | | | | | | | | | | | | | |
| Gross Sales Proceeds | | $0 | $0 | $0 | $0 | $3,875,420 | $0 | $3,875,420 | $0 | $3,875,420 | $0 | $3,875,420 | $0 |
| Less: Closing Costs (8%) | | $0 | $0 | $0 | $0 | ($310,034) | $0 | ($310,034) | $0 | ($310,034) | $0 | ($310,034) | $0 |
| Net Sales Proceeds | | $0 | $0 | $0 | $0 | $3,565,386 | $0 | $3,565,386 | $0 | $3,565,386 | $0 | $3,565,386 | $0 |
| | | | | | | | | | | | | | |
| Draw Amount | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Outstanding Balance | | $20,000,000 | $20,000,000 | $20,000,000 | $20,000,000 | $16,434,614 | $16,434,614 | $12,869,227 | $12,869,227 | $9,303,841 | $9,303,841 | $5,738,454 | $5,738,454 |
| Monthly Interest Payments | | $44,022 | $48,739 | $47,167 | $48,739 | $38,758 | $40,050 | $31,362 | $30,350 | $22,673 | $21,942 | $13,984 | $13,984 |
| | | | | | | | | | | | | | |
| Running Interest Payments | | $389,339 | $438,078 | $485,245 | $533,984 | $572,742 | $612,792 | $644,154 | $674,504 | $697,177 | $719,118 | $733,103 | $747,087 |

| Period | | Feb-24 | Mar-24 | Apr-24 | May-24 | Jun-24 | Jul-24 |
|---|---|---|---|---|---|---|---|
| Days in Month | | 29 | 31 | 30 | 31 | 30 | 31 |
| | | | | | | | |
| Total # of Units | | 22 | 22 | 22 | 22 | 22 | 22 |
| # of Units Under Contract | | 16 | 16 | 16 | 16 | 16 | 16 |
| # of Units Closed Per Month | | 1 | 1 | 1 | 1 | 1 | 1 |
| | | | | | | | |
| Gross Sales Proceeds | | $968,855 | $968,855 | $968,855 | $968,855 | $968,855 | $968,855 |
| Less: Closing Costs (8%) | | ($77,508) | ($77,508) | ($77,508) | ($77,508) | ($77,508) | ($77,508) |
| Net Sales Proceeds | | $891,347 | $891,347 | $891,347 | $891,347 | $891,347 | $891,347 |
| | | | | | | | |
| Draw Amount | | $0 | $0 | $0 | $0 | $0 | $0 |
| Outstanding Balance | | $4,847,108 | $3,955,761 | $3,064,415 | $2,173,068 | $1,281,721 | $390,375 |
| Monthly Interest Payments | | $11,050 | $9,640 | $7,227 | $5,296 | $3,023 | $951 |
| | | | | | | | |
| Running Interest Payments | | $758,137 | $767,777 | $775,004 | $780,300 | $783,322 | $784,274 |

| TOTAL PROJECTED INTEREST PMTS | $784,274 |
| RECOMMENDED INTEREST RESERVE | $800,000 |

DocuSign Envelope ID: E63BE995-AED4-4797-8095-F88BA5219467



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**



DocuSign Envelope ID: E63BE995-AED4-4797-8095-F88DA5219467

**CREDIT APPROVAL PRESENTATION
for Lake Lathrop Partners LLC (Sedgwick Development)**



**UPPER-LEVEL PARKING PLAN**

**EXHIBIT D, Page 27 of 37**



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**



**2ND FLOOR PLAN**

DocuSign Envelope ID: E63BE995-AED4-4797-8095-F88BA5219467



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**



3RD FLOOR PLAN

**EXHIBIT D, Page 29 of 37**

DocuSign Envelope ID: E63BE995-AED4-4797-8095-F88BA5219467



**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**



4TH FLOOR PLAN -MARKETING



DocuSign Envelope ID: E63BE995-AED4-4797-8905-F88BAF219467

**CREDIT APPROVAL PRESENTATION**
**for Lake Lathrop Partners LLC (Sedgwick Development)**

Detailed Development Budget

| Description | Development Budget Line Item | % of Total | /SF* | /Residential Unit |
|---|---|---|---|---|
| **Property Acquisition** | **$4,350,000** | **14.4%** | **$73.16** | **$197,727** |
| **Hard Costs** | | | | |
| General Requirements | $272,385 | 0.9% | $4.58 | $12,381 |
| Site Construction | $555,118 | 1.8% | $9.34 | $25,233 |
| Concrete | $1,202,846 | 4.0% | $20.23 | $54,675 |
| Masonry | $1,578,392 | 5.2% | $26.54 | $71,745 |
| Metals | $1,315,370 | 4.4% | $22.12 | $59,790 |
| Wood and Plastic | $734,030 | 2.4% | $12.34 | $33,365 |
| Thermal & Moisture Protection | $640,378 | 2.1% | $10.77 | $29,108 |
| Door and Windows | $751,116 | 2.5% | $12.63 | $34,142 |
| Finishes | $2,563,555 | 8.5% | $43.11 | $116,525 |
| Specialties | $13,662 | 0.0% | $0.23 | $621 |
| Equipment | $131,543 | 0.4% | $2.21 | $5,979 |
| Conveying Systems | $302,691 | 1.0% | $5.09 | $13,759 |
| Mechanical | $1,933,453 | 6.4% | $32.52 | $87,884 |
| Electrical | $1,451,092 | 4.8% | $24.40 | $65,959 |
| General Conditions | $687,820 | 2.3% | $11.57 | $31,265 |
| General Liability Insurance | $129,472 | 0.4% | $2.18 | $5,885 |
| General Contractor Fee | $888,340 | 2.9% | $14.94 | $40,379 |
| GC Contingency | $768,740 | 2.5% | $12.93 | $34,943 |
| Buyer Upgrades | $264,000 | 0.9% | $4.44 | $12,000 |
| **TOTAL HARD COSTS** | **$16,184,003** | **53.7%** | **$272.18** | **$735,637** |
| **SOFT COSTS** | | | | |
| Loan Fees and Costs | $489,270 | 1.6% | $8.23 | $22,240 |
| Pre-Development Administration | $718,063 | 2.4% | $12.08 | $32,639 |
| Pre-Development Cost | $454,517 | 1.5% | $7.64 | $20,660 |
| Design | $826,574 | 2.7% | $13.90 | $37,572 |
| Consultants/Survey | $274,000 | 0.9% | $4.61 | $12,455 |
| Attorney Costs | $316,599 | 1.0% | $5.32 | $14,391 |
| Attorney Fees / Unit Closings | $22,700 | 0.1% | $0.38 | $1,032 |
| Permit & Fees | $476,324 | 1.6% | $8.01 | $21,651 |
| Insurance | $50,000 | 0.2% | $0.84 | $2,273 |
| Land Title & Transfer Tax | $22,230 | 0.1% | $0.37 | $1,010 |
| Title & Unit Closing Costs | $172,235 | 0.6% | $2.90 | $7,829 |
| Marketing | $108,162 | 0.4% | $1.82 | $4,916 |
| Administration Fee** | $1,000,063 | 3.3% | $16.82 | $45,457 |
| Real Estate Taxes | $144,988 | 0.5% | $2.44 | $6,590 |
| Testing and Inspections | $65,000 | 0.2% | $1.09 | $2,955 |
| FF&E Fee | $75,000 | 0.2% | $1.26 | $3,409 |
| HOA Expense (Developer) | $126,000 | 0.4% | $2.12 | $5,727 |
| Soft Cost Contingency | $288,260 | 1.0% | $4.85 | $13,103 |
| Tenant Improvements | $420,660 | 1.4% | $7.07 | $19,121 |
| Residential Sales Commissions | $1,092,291 | 3.6% | $18.37 | $49,650 |
| Retail Sales Commissions | $467,400 | 1.5% | $7.86 | $21,245 |
| Retail Lease Commissions | $245,385 | 0.8% | $4.13 | $11,154 |
| Developer Fee | $841,489 | 2.8% | $14.15 | $38,250 |
| Bridge Interest | $116,099 | 0.4% | $1.95 | $5,277 |
| Interest Reserve | $815,141 | 2.7% | $13.71 | $37,052 |
| **TOTAL SOFT COSTS** | **$9,628,450** | **31.9%** | **$161.93** | **$437,657** |
| **TOTAL DEVELOPMENT BUDGET** | **$30,162,453** | **100.0%** | **$507.26** | **$1,371,021** |
| **TOTAL DEVELOPMENT BUDGET (Less Sales Commissions)** | **$28,602,762** | **94.8%** | **$481.03** | **$1,300,126** |
| | | | | |
| **Proposed Loan** | **$20,000,000** | **69.9%** | **$336.35** | **$909,091** |

*Based on the gross square footage of 59,461.

**Administrative fee of $1,000,063 represents salary cost for a construction consultant.

**EXHIBIT D, Page 31 of 37**



**CREDIT APPROVAL PRESENTATION
for Lake Lathrop Partners LLC (Sedgwick Development)**

APPENDIX H: REQUIRED APPROVALS

| Business Sponsors | Name | Signature | Date |
|---|---|---|---|
| Relationship Manager: | Terry Rosenberger | *Terry Rosenberger* | 1/19/2022 |
| Managing Director: | Darragh Griffin | *Darragh Griffin* | 1/19/2022 |
| Chief Credit Officer: | Dennis McClelland | *D. McClelland* | 1/19/2022 |
| CEO: | William Cordes | *William B Cordes* | 1/19/2022 |
| Concurrence Officer: | Brooke Cullen | *Brooke Cullen* | 1/19/2022 |
| | | ICC/ILA APPROVAL: | N/A |
| | | WICC APPROVAL: | 1/19/22 |

**EXHIBIT D, Page 32 of 37**

**DocuSign**

| Certificate Of Completion |
|---|

Envelope Id: E63BE995AED44797800FF88BAF219467      Status: Completed
Subject: Please DocuSign: Sedgwick Development CAP.pdf
Source Envelope:
Document Pages: 32    Signatures: 5    Envelope Originator:
Certificate Pages: 5    Initials: 7    Marty Cisneros
AutoNav: Enabled    9700 W. Higgins Road
EnvelopeId Stamping: Enabled    Rosemont , IL  60018
Time Zone: (UTC-06:00) Central Time (US & Canada)    mcisneros@wintrust.com
   IP Address: 161.199.76.17

| Record Tracking |
|---|

Status: Original    Holder: Marty Cisneros    Location: DocuSign
     1/19/2022 7:57:18 AM      mcisneros@wintrust.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Terry Rosenberger<br>trosenberger@wintrust.com<br>Security Level: Email, Account Authentication (None) | **DocuSigned by:**<br>Terry Rosenberger<br>E80B545DE02C42D...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 161.199.76.20 | Sent: 1/19/2022 8:13:18 AM<br>Viewed: 1/19/2022 11:32:09 AM<br>Signed: 1/19/2022 11:34:41 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 1/19/2022 11:32:09 AM<br>    ID: f19e20a3-bb54-4d7f-8af4-4da4763bb4df | | |
| Darragh Griffin<br>dgriffin@wintrust.com<br>Security Level: Email, Account Authentication (None) | **DocuSigned by:**<br>Darragh Griffin<br>336DC4AD1167423...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 107.77.207.112<br>Signed using mobile | Sent: 1/19/2022 11:34:44 AM<br>Viewed: 1/19/2022 11:35:14 AM<br>Signed: 1/19/2022 11:35:34 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 1/19/2022 11:35:14 AM<br>    ID: db249f60-0564-4f5e-9c0c-44dee6d809c1 | | |
| Dennis McClelland<br>dmcclelland@wintrust.com<br>CCO<br>Beverly Bank & Trust Company<br>Security Level: Email, Account Authentication (None) | **DocuSigned by:**<br>B598D9BEF2BF48A...<br><br>Signature Adoption: Uploaded Signature Image<br>Using IP Address: 161.199.76.17 | Sent: 1/19/2022 11:35:36 AM<br>Viewed: 1/19/2022 12:41:58 PM<br>Signed: 1/19/2022 12:42:31 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 4/1/2020 8:43:30 AM<br>    ID: 54e92541-bf4e-47ad-b86c-d2859bc02034 | | |
| Bill Cordes<br>wcordes@thebeverlybank.com<br>Chairman/CEO<br>Beverly Bank<br>Security Level: Email, Account Authentication (None) | **DocuSigned by:**<br>William B C Jr<br>E3DD9C3C01524DC...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 161.199.76.17 | Sent: 1/19/2022 12:42:33 PM<br>Viewed: 1/19/2022 12:46:46 PM<br>Signed: 1/19/2022 12:46:56 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 3/31/2020 10:14:17 AM<br>    ID: 80a8a16e-841c-4c3a-b38c-6483c9098486 | | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Brooke Cullen<br>brooke.cullen@wintrust.com<br>SVP, Concurrence Officer<br>Wintrust Bank<br>Security Level: Email, Account Authentication (None) | *Brooke Cullen*<br>DocuSigned by:<br>8302EF4341D0462...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 161.199.76.17 | Sent: 1/19/2022 12:46:58 PM<br>Viewed: 1/19/2022 12:50:16 PM<br>Signed: 1/19/2022 12:50:22 PM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 4/29/2020 2:46:32 PM<br>  ID: cdbe68a2-9b65-43b0-becc-f89f92fe7272 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Kari Reid<br>kreid@wintrust.com<br>VP, Credit Administration<br>Beverly Bank<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 1/19/2022 12:50:24 PM<br>Viewed: 1/19/2022 12:53:31 PM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 11/23/2020 8:28:56 AM<br>  ID: 746275f2-abed-4466-b63f-cb68aadcde06 | | |
| Bev Admin<br>MMBEVADMIN@thebeverlybank.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 1/19/2022 12:50:25 PM<br>Viewed: 1/19/2022 12:56:46 PM |
| **Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 1/19/2022 8:13:18 AM |
| Certified Delivered | Security Checked | 1/19/2022 12:50:16 PM |
| Signing Complete | Security Checked | 1/19/2022 12:50:22 PM |
| Completed | Security Checked | 1/19/2022 12:50:25 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure | | |
|---|---|---|

Electronic Record and Signature Disclosure created on: 3/31/2020 10:00:58 AM
Parties agreed to: Terry Rosenberger, Darragh Griffin, Dennis McClelland, Bill Coates, Brooke Cullen, Kari Reid

Case 23-16481    Doc 20-1    Filed 12/11/23    Entered 12/11/23 16:10:53    Desc Exhibit
A - C    Page 435 of 470

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Wintrust Financial Corporation and affiliates such as: Banks: Barrington Bank & Trust, N.A.; Beverly Bank & Trust Company, N.A.; Crystal Lake Bank & Trust, N.A.; Hinsdale Bank & Trust Company, N.A.; Lake Forest Bank & Trust Company, N.A.; Libertyville Bank & Trust Company, N.A.; Northbrook Bank & Trust Company, N.A.; Old Plank Bank & Trail Community Bank N.A.; Schaumburg Bank & Trust Company, N.A.; State Bank of The Lakes, N.A.; St. Charles Bank & Trust Company, N.A.; Town Bank, N.A.; Village Bank & Trust, N.A; Wheaton Bank & Trust Company, N.A.; Wintrust Bank, N.A. Specialized Services: FIRST Insurance Funding, a division of Lake Forest Bank & Trust Company, N.A.; FIRST Insurance Funding of Canada Inc.; Tricom; Wintrust Asset Finance, a subsidiary of Beverly Bank & Trust Company, N.A.; Wintrust Life Finance, a division of Lake Forest Bank & Trust Company, N.A.;Wintrust Treasury Management Services Wealth Management: Wintrust Wealth Management, consisting of Great Lakes Advisors, LLC, The Chicago Trust Company, N.A., and Wintrust Investments, LLC. Mortgage: Wintrust Mortgage, a division of Barrington Bank & Trust Company, N.A may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $7.35 statement fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wintrust Financial Corporation and affiliates.**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To withdrawn, you may contact us at e-sign@wintrust.com

**To advise Wintrust Financial Corporation and affiliates.]] of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at e-sign@wintrust.com and in the body of such request you must state: your previous email address, your new email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Wintrust Financial Corporation and affiliates.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to e-sign@wintrust.com and in the body

of such request you must state your email address, full name, mailing address, and telephone
number.

**To withdraw your consent with Wintrust Financial Corporation and affiliates.**

To inform us that you no longer wish to receive future notices and disclosures in electronic
format you may:

i. decline to sign a document from within your signing session, and on the subsequent page,
select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to e-sign@wintrust.com and in the body of such request you must state your
email, full name, mailing address, and telephone number.

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The
current system requirements are found here: https://support.docusign.com/guides/signer-guide-
signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to
other electronic notices and disclosures that we will provide to you, please confirm that you have
read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for
your future reference and access; or (ii) that you are able to email this ERSD to an email address
where you will be able to print on paper or save it for your future reference and access. Further,
if you consent to receiving notices and disclosures exclusively in electronic format as described
herein, then select the check-box next to 'I agree to use electronic records and signatures' before
clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm
that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send
  this Electronic Record and Disclosure to a location where you can print it, for future
  reference and access; and
- Until or unless you notify Wintrust Financial Corporation and affiliates. as described
  above, you consent to receive exclusively through electronic means all notices,
  disclosures, authorizations, acknowledgements, and other documents that are required to
  be provided or made available to you by Wintrust Financial Corporation and affiliates.
  during the course of your relationship with Wintrust Financial Corporation and affiliates.

**EXHIBIT D, Page 37 of 37**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION

IN RE THE MARRIAGE OF:          )
                                )
KERRY PARIS,                    )
                                )          No. 16 D 004685
    Petitioner/Counter-Respondent          )
                                )          Hon. Abbey Fishman Romanek
and                             )
                                )          Calendar 94
FRANK MARTIN PARIS, JR.,        )
                                )
    Respondent/Counter-Petitioner.          )

### ORDER OF ADJUDICATION OF INDIRECT CIVIL CONTEMPT
### AND ORDER OF COMMITMENT

    This matter coming to be heard on Petitioner's Corrected Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Fund Children's Activities Trust Account per the October 17, 2023 Order)

    Petitioner Kerry Paris, her counsel Thomas C. Cronin, and counsel for Angelini, Ori + Abate, Donald Angelini, appearing in person, the Contemnor Frank Martin Paris, Jr. failing to appear as ordered and his counsel, Glen Udell, appearing via Zoom, the Court being fully advised, **IT IS HEREBY ORDERED:**

    1.    The Court has jurisdiction of the parties and the subject matter.

    2.    On December 2, 2022, the Court issued its Opinion Memorandum and Allocation Judgment of Parental Responsibilities and Parenting Plan (the "Allocation Judgment").

    3.    Pages 35-36 of the Allocation Judgment required Contemnor to "fund a children's activities trust account" with $15,000.00. (Exhibit A at pp. 35-36).

    4.    The Allocation Judgment provides that the "account shall be held by the children's attorney and shall be used to pay for children's activities as set forth herein including, but not limited to, all fees for participation, uniforms, and equipment."

    5.    It further provides that once the account falls below $5,000, MARTY shall replenish it "within seven (7) days of written notification thereof."

    6.    In its Order dated July 24, 2023 *nunc pro tunc* to July 6, 2023, the Court clarified:

That part of the Allocation Judgment that provides that when the activity account "falls below Five Thousand dollars ($5,000) MARTY shall replenish the account

to the Five Thousand dollars ($5,000.00) balance within seven (7) days of written notification thereof" is changed to provide that when the activity account "falls below Five Thousand dollars ($5,000) MARTY shall replenish the account to the Fifteen Thousand dollars ($15,000.00) balance within seven (7) days of written notification thereof."

7.   On September 27, 2023, the Petitioner and Child Representative filed their Joint Motion to Enforce the Judgment (Reimbursement of Children's Activities Trust Account) (the "Joint Motion").

8.   On September 29, 2023, the Court entered an Order granting Contemnor until October 13, 2023, to file any response to the Joint Motion and set it for hearing on October 17, 2023.

9.   Contemnor did not file any response to the Joint Motion.

10.   On October 17, 2023, Contemnor did not appear for the hearing either in person or via Zoom despite being ordered to personally appear.  Contemnor's counsel appeared via Zoom but did not offer any excuse or justification for Contemnor's absence.

11.   On October 17, 2023, the Court granted the Joint Motion and entered an Order stating, in relevant part: "[Contemnor] shall replenish the Children's Activities Trust Account back up to $15,000 within 7 days (October 24, 2023)."

12.   To date, Contemnor has not not replenished the Children's Activities Trust Account.

13.   Accordingly, Petitioner filed Petitioner's Corrected Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Fund Children's Activities Trust Account per the October 17, 2023 Order) (the "Petition").

14.   On October 30, 2023, the Court issued its Order and Rule to Show Cause, which ordered Contemnor to file a response to the Petition no later than November 13, 2023 and to appear in person to respond to the Rule on November 15, 2023 at 11:15 a.m.

15.   Contemnor did not file a response to the Petition, as ordered.

16.   Contemnor did not appear in Court today, as ordered.

17.   Contemnor's counsel appeared in Court via Zoom, but did not offer any excuse or justification for Contemnor's absence.

18.   The Court proceeded to the previously scheduled contempt hearing.

**EXHIBIT E, Page 2 of 4**

19. As Contemnor failed to appear as ordered by the Court, he did not present any evidence to meet his burden and show cause why he should not be held in indirect civil contempt of court.

20. Moreover, Contemnor's counsel, who appeared via Zoom, did not present any evidence to meet Contemnor's burden and show cause why Contemnor should not be held in indirect civil contempt of court and did not otherwise object to the Court adjudicating Contemnor to be in indirect civil contempt of court.

21. As stated in open court, Contemnor has been granted multiple evidentiary hearings (including today) to present evidence justifying his non-compliance with the Court's orders. Contemnor has repeatedly chosen not to present evidence or skip the evidentiary hearings entirely.

**Findings**

22. The Judgment for Dissolution of Marriage expressly found that: contemnor placed the value of his own business interests at $23,428,000 (page 58); the mean value of contemnor's non-marital estate is $20,374,000 (page 58); contemnor controls issuance of dividends and interest in the various entities in which he holds financial interests vis-à-vis Sedgwick, Maeve, Martin NV II., Inc. (Page 69); contemnor controls his own salary (page 69); and contemnor does have sufficient income and/or resources to make provision for the financial support and maintenance of KERRY and the Paris Children (page 70).

23. The Contemnor has not given any legally sufficient reasons for failure to comply with the Allocation Judgment or the Court's Order of October 17, 2023, even though he had, and still has, the means to comply with said Order.

24. The Contemnor's failure to comply with the Allocation Judgment and the Court's October 17, 2023 Order is willful and contumacious. Further, the conduct of the Contemnor has defeated and impaired the rights and interests of the Petitioner and the minor children and has further impeded and obstructed the Court in its administration of justice.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Contemnor Frank Martin Paris, Jr.:

Is hereby found and declared to be in indirect civil contempt of Court for willful failure to obey the Allocation Judgment and the Court's Order of October 17, 2023, as stated herein;

Is ordered committed to the Cook County Jail, there to remain until he shall have purged himself of contempt by (i) posting the sum of **One Million Six Hundred Twenty Two Thousand Eight Hundred Fifty Dollars and 35 Cents ($1,622,850.35)** with the Clerk of the Circuit Court, which represents the purge amount from today's contempt finding ($15,000.00), in addition to the purge amounts from the Court's Orders dated September 29, 2023 and October 17, 2023 ($1,257,945.68 and $349,904.67, respectively) and (ii) tendering copies of his life insurance policies, which shall include a $2.5 million policy with Kerry Paris as the primary beneficiary.

Page 3 of 4

Petitioner's counsel shall update the existing Body Attachment Order with the new purge amount.

The Clerk of the Court is directed to prepare two certified copies of this Order and submit the same to the Sheriff of Cook County.

**ENTERED:**

12-07-2023 Nunc Pro Tunc
**SO ENTERED**: November 15, 2023        **BY**:**/S/Judge Abbey Fishman Romanek  #2119**
                                          Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287

**EXHIBIT E, Page 4 of 4**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION**

IN RE THE MARRIAGE OF: )
)
KERRY PARIS, )
) No. 16 D 004685
    Petitioner/Counter-Respondent )
) Hon. Abbey Fishman Romanek
and )
) Calendar 94
FRANK MARTIN PARIS, JR., )
)
    Respondent/Counter-Petitioner. )

**ORDER AND RULE TO SHOW CAUSE**

This matter coming to be heard on (i) presentment on Petitioner's Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Pay September, October, November Maintenance and Child Support), (ii) contempt hearing on Petitioner's Corrected Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Fund Children's Activities Trust Account per the October 17, 2023 Order), (iii) ruling on Petitioner's Petition to Increase and Modify the Terms of 503(g) Trust; (iv) ruling on Petitioner's Motion to Dismiss Amended Petition to Modify the Orders or Spousal Maintenance, Support and Payment of Bill and Other Expenses and (iv) hearing on Petitioner's Motion to Disgorge Legal Fees That Have Been Paid to the Law Firm of Brown, Udell, Pomerantz & Delrhaim, Ltd.

Petitioner Kerry Paris, her counsel Thomas C. Cronin, and counsel for Angelini, Ori + Abate, Donald Angelini, appearing in person, the Respondent failing to appear as ordered and his counsel, Glen Udell, appearing via Zoom, the Court being fully advised, **IT IS HEREBY ORDERED:**

1.    Having reviewed Petitioner's Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Pay September, October, November Maintenance and Child Support), the Court finds that a prima facie case of indirect civil contempt has been shown by the verified petition.

    a.    A rule is hereby issued against Frank Martin Paris, Jr. to show cause why he should not be held in indirect civil contempt of Court for his failure to Pay September, October and November Maintenance and Child Support as required by the Judgment.

    b.    Respondent shall file a response to the Petition no later than December 7, 2023.

    c.    Petitioner shall file a reply to Respondent's response brief no later than December 14, 2023.

    d. Respondent Frank Martin Paris, Jr. is ordered to appear **in person** at the Richard J. Daley Center, 50 W. Washington St., Chicago, Illinois 60602, Courtroom 3008 on **December 21, 2022 at 2:00 p.m.** to respond to the Rule, said Rule being returnable on that date and the Court conducting a contempt hearing at that time and place.

## NOTICE

**FAILURE TO APPEAR AS ORDERED BY THE COURT MAY RESULT IN A FINDING OF CONTEMPT AND/OR COURT ORDER FOR A BODY ATTACHMENT WHICH WILL RESULT IN YOUR ARREST BY THE SHERIFF.**

2.    Petitioner's Corrected Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Fund Children's Activities Trust Account per the October 17, 2023 Order) is hereby **granted**.

    a. The Court issued its Order and Rule to Show Cause on October 30, 2023 and directed Respondent to file a written response to the Petition and appear in person to respond to the Rule at today's hearing.

    b. Respondent did not file any written response and did not appear at today's hearing either in person or via Zoom (as his counsel chose to appear).

    c. As Respondent failed to appear at the contempt hearing and failed to present any evidence justifying why he should not be held in contempt of court, he is adjudicated to be in indirect civil contempt of court as set forth in the separate Order of Adjudication of Indirect Civil Contempt and Order of Commitment.

3.    Petitioner's previously filed Petition to Increase and Modify the Terms of the 503(g) Trust is hereby **granted**.

    a. The Court finds that Respondent's continued non-compliance with the support obligations placed upon him by the Judgment and Allocation Judgment necessitates an increase in the amount of the 503(g) Trust established by the Judgment in order to protect and promote the interests of the Paris children.

    b. Respondent is ordered to pay One Million One Hundred Eight Five Thousand Seven Hundred Twenty-Two Dollars ($1,185,722) to Howard Rosenberg, not individually but as trustee of the 503(g) trust no later than December 7, 2023.

    c. The $1,185,722 was calculated based on the following: Only $17,488.46 remains in the 503(g) Trust today. Kerry has been paid child support and maintenance for November, but the mortgage on 711 Park Ave ($10,931.11) has not been paid yet. Per page 77 of the Judgment, 711 Park will be listed for sale in May 2028. $1,185,722 represents the child support, maintenance and mortgage payments due between now and May 2028, LESS the $100,000 that is the subject of the existing contempt purge order and body attachment order.

      d.   Once Respondent has fully funded the 503(g) Trust, Kerry's maintenance and child support payments (including the mortgage on 711 Park Ave.) shall be made directly from the 503(g) Trust without the need of any further Court order.

    4.    Petitioner's Motion to Dismiss Amended Petition to Modify the Orders or Spousal Maintenance, Support and Payment of Bill and Other Expenses is **granted**.

      a.   As stated in open court, Respondent's Amended Petition fails to allege sufficient facts to support a substantial change in circumstances and fails to allege sufficient facts justifying a modification.

    5.    Petitioner's Motion to Disgorge Legal Fees That Have Been Paid to the Law Firm of Brown, Udell, Pomerantz & Delrhaim, Ltd. is entered and continued upon the agreement of the parties.  The court will conduct an in person evidentiary hearing on the petition on December 21, 2023 at 2:00 p.m..

    6.    All other matters are entered and continued to the Court's in person hearing set for **December 21, 2023 at 2:00 p.m.**

**ENTERED:**

12-07-2023 Nunc Pro Tunc

**SO ENTERED**:  November 15, 2023      **BY**:  **/S/Judge Abbey Fishman Romanek  #2119**
                                               Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287

**EXHIBIT F, Page 3 of 3**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION**

IN RE THE MARRIAGE OF: )
)
KERRY PARIS, )
) No. 16 D 004685
Petitioner/Counter-Respondent )
) Hon. Abbey Fishman Romanek
and )
) Calendar 94
FRANK MARTIN PARIS, JR., )
)
Respondent/Counter-Petitioner. )

## ORDER

This matter coming to be heard on (i) the status of Respondent's purge from the Order of Adjudication of Indirect Civil Contempt entered on September 29, 2023, (ii) hearing on Petitioner's Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Pay STOUT Per the June 29, 2023 Order), (iii) hearing on Petitioner's and Child Representative's Joint Motion to Enforce the Judgment (Reimbursement of Children's Activities Trust Account); (iv) presentment of Respondent's Emergency Motion to Stay and Vacate Judgments for Attorneys' Fees, To Advance Unresolved Motions and For an Evidentiary Hearing on Final Fees and Ability to Pay; and (v) presentment of Petitioner's Motion to Disgorge Legal Fees That Have Been Paid to the Law Firm of Brown, Udell, Pomerantz & Delrhaim, Ltd.; and (vi) status on all other matters, Petitioner Kerry Paris, her counsel Thomas C. Cronin, counsel for Angelini, Ori + Abate, counsel for Lake Toback, counsel for Hurst Robin & Kay, and counsel for Law Offices of Jonathan Merel, P.C. appearing in person, the Child Representative and Contemnor/Respondent's counsel appearing via Zoom, the Court being fully advised, **IT IS HEREBY ORDERED:**

1.  The Court being advised that Respondent has not purged the adjudication of contempt entered on September 29, 2023, and Respondent failing to appear in person as ordered by the Court, a body attachment shall issue by separate order.

2.  Petitioner's and Child Representative's Joint Motion to Enforce the Judgment (Reimbursement of Children's Activities Trust Account) is **granted**. Respondent shall replenish the Children's Activities Trust Account back up to $15,000 within 7 days (October 24, 2023).

3.  Petitioner's Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Pay STOUT Per the June 29, 2023 Order) is hereby **granted**. A rule to show cause is issued *instanter*. As Respondent failed to appear at the contempt hearing to present evidence justifying why he should not be held in contempt of court, he is adjudicated to be in indirect civil contempt of court as set forth in the separate Order of Adjudication of Indirect Civil Contempt and Order of Commitment.

4.      Respondent's Emergency Motion to Stay and Vacate Judgments for Attorneys' Fees, To Advance Unresolved Motions and For an Evidentiary Hearing on Final Fees and Ability to Pay is **denied** for the reasons stated in Court, including:

    a.  The motion does not set forth a sudden and unforeseen emergency;

    b.  The motion is not verified by Respondent;

    c.  The Court denied the motion to reconsider the fees awarded to Angelini, Ori + Abate on July 6, 2023 when it entered judgment and ordered that Respondent remained obligated to comply with the May 18, 2023 fee order; and

    d.  The fees awarded to Respondent's former counsel were awarded under 750 ILCS 5/508(c) and not 750 ILCS 5/503(j), and the orders requiring payment of such fees were never the subject of a motion for reconsideration or appeal.

5.      Brown, Udell, Pomerantz & Delrahim, Ltd. shall have 21 days (November 7, 2023) to respond to Petitioner's Motion to Disgorge Legal Fees That Have Been Paid to the Law Firm of Brown, Udell, Pomerantz & Delrhaim, Ltd. Petitioner shall have 3 days to file any reply in support of the motion (November 10, 2023). The motion is set for an in person hearing on **November 15, 2023 at 11:15 p.m.** Counsel for parties not involved in the motion can appear via Zoom.

6.      All other matters are entered and continued until **October 30, 2023 at 9:30 a.m.** **via Zoom**.

7.      The Court's Zoom Meeting ID is 925 1023 5145. The password is 767670.

**ENTERED:**

> **ENTERED**
> Judge Abbey Romanek-2119
> **OCT 17 2023**
> IRIS Y. MARTINEZ
> CLERK OF THE CIRCUIT COURT
> OF COOK COUNTY, IL

**SO ENTERED:** October 17, 2023

BY:/S/**Judge Abbey Fishman Romanek #2119**
Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287

**EXHIBIT G, Page 2 of 2**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION**

IN RE THE MARRIAGE OF:     )
    )
KERRY PARIS,     )
    )      No. 16 D 004685
    Petitioner/Counter-Respondent     )
    )      Hon. Abbey Fishman Romanek
and     )
    )      Calendar 94
FRANK MARTIN PARIS, JR.,     )
    )
    Respondent/Counter-Petitioner.     )

**ORDER OF ADJUDICATION OF INDIRECT CIVIL CONTEMPT
AND ORDER OF COMMITMENT**

This matter coming to be heard on:

A. Status of Respondent's purge from the Order of Adjudication of Indirect Civil Contempt entered on September 29, 2023 (including failure to pay: (i) $100,000 to 503(g) Trust and turn over $2.5 million life insurance policy; (ii) $935,300 to Angelini, Ori & Abate Law ("AOA"); (iii) $150,548.68 to Hurst, Robin & Kay ("HRK"); and (iv) $72,097 to Lake Toback DiDomenico ("LTD"); and

B. Petitioner's Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Pay STOUT $349,904.67 Per the June 29, 2023 Order),

Petitioner Kerry Paris, her counsel Thomas C. Cronin, counsel for Angelini, Ori + Abate, counsel for Lake Toback, counsel for Hurst Robin & Kay, and counsel for Law Offices of Jonathan Merel, P.C. appearing in person, the Child Representative and Contemnor/Respondent's counsel appearing via Zoom, the Court being fully advised,

**IT IS HEREBY ORDERED:**

1. The Court has jurisdiction of the parties and the subject matter.

2. On September 29, 2023, this Court adjudicated Contemnor Frank Martin Paris, Jr. to be in Indirect Civil Contempt of Court and ordered him to purge his contempt through the payment of funds no later than October 16, 2023.

3. On September 29, 2023, the Court ordered Contemnor to appear in person for today's hearing.

Page 1 of 4

4.      Contemnor failed to appear in person or via Zoom for today's hearing and his counsel offered no justification or excuse for his non-compliance with the Court's order.

5.      Contemnor has not purged the adjudication of indirect civil contempt entered against him on September 29, 2023.

6.      Further, on June 29, 2023, the Court entered an Order granting Petitioner's Motion for Expert Witness Fees (the "STOUT Fee Order").

7.      The STOUT Fee Order states, in relevant part:

FRANK MARTIN PARIS, JR. is hereby ordered to pay STOUT Expert Witness fees in the amount of $349,904.67 by August 15, 2023.

8.      The STOUT Fee Order also states:

This court further finds that based upon the finding of the trial court and the awards made by the trial court, that FRANK MARTIN PARIS, JR. does have the ability to pay the fees incurred by STOUT and further finds that much of those fees were incurred as a result of the cations of FRANK MARTIN PARIS, JR. in the defense and prosecution of his case whether he was represented by counsel or represented himself.

9.      Contemnor did not pay any of the $349,904.67 to STOUT by August 15, 2023.

10.     On September 27, 2023, Petitioner filed her Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Pay STOUT Per the June 29, 2023 Order).

11.     On September 29, 2023, the Court ordered Contemnor to respond to Petitioner's Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Pay STOUT Per the June 29, 2023 Order) within 14 days (until October 13, 2023) and set the Petition for an in person hearing on October 17, 2023 at 11:00 a.m.

12.     On the same date, the Court ordered: "If a Rule to Show Cause is issued, it shall issue *instanter* and the Court may proceed to a contempt hearing at that time."

13.     Contemnor did not file any response to the Petition as required by the Court's Order.

14.     Further, Contemnor did not appear either in person or via Zoom at today's hearing as required by the Court's Order.

15.     The Court finds that a prima facie case of indirect civil contempt has been shown by the verified petition.

**EXHIBIT H, Page 2 of 4**

16. A rule was issued *instanter* against Contemnor Frank Martin Paris, Jr. to show cause why he should not be held in contempt of Court for his failure to pay Stout the $349,904.67 by August 15, 2023.

17. As ordered by the Court on September 29, 2023, the Court immediately proceeded to a contempt hearing.

18. As Contemnor failed to appear as ordered by the Court, he did not present any evidence to meet his burden and show cause why he should not be held in indirect civil contempt of court.

19. Moreover, Contemnor's counsel, who appeared via Zoom, did not present any evidence to meet Contemnor's burden and show cause why Contemnor should not be held in indirect civil contempt of court and did not otherwise object to the Court adjudicating Contemnor to be in indirect civil contempt of court.

**Findings**

20. The Judgment for Dissolution of Marriage expressly found that: contemnor placed the value of his own business interests at $23,428,000 (page 58); the mean value of contemnor's non-marital estate is $20,374,000 (page 58); contemnor controls issuance of dividends and interest in the various entities in which he holds financial interests vis-à-vis Sedgwick, Maeve, Martin NV II., Inc. (Page 69); contemnor controls his own salary (page 69); and contemnor does have sufficient income and/or resources to make provision for the financial support and maintenance of KERRY and the Paris Children (page 70).

21. The Contemnor has not given any legally sufficient reasons for failure to comply with the Court's Order of June 29, 2023, even though he had, and still has, the means to comply with said Order.

22. The Contemnor's failure to comply with the June 29, 2023 Order is willful and contumacious. Further, the conduct of the contemnor has defeated and impaired the rights and interests of the petitioner and has further impeded and obstructed the Court in its administration of justice.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Contemnor Frank Martin Paris, Jr.:

Is hereby found and declared to be in indirect civil contempt of Court for willful failure to obey the Court's Order of June 29, 2023, as stated herein;

Is ordered committed to the Cook County Jail, there to remain until he shall have purged himself of contempt by (i) posting the sum of **One Million Six Hundred Seven Thousand Eight Hundred Fifty Dollars and 35 Cents ($1,607,850.35)** with the Clerk of the Circuit Court, which represents the purge amount from today's contempt finding ($349,904.67) in addition to the purge amounts from the Court's Orders dated September 29, 2023 ($1,257,945.68) and (ii)

tendering copies of his life insurance policies, which shall include a $2.5 million policy with Kerry Paris as the primary beneficiary.

The Clerk of the Court is directed to prepare two certified copies of this Order and submit the same to the Sheriff of Cook County.

**ENTERED:**

**SO ENTERED:** October 17, 2023          **BY:/S/Judge Abbey Fishman Romanek #2119**
                                                Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287

```
E N T E R E D
Judge Abbey Romanek-2119
OCT 17 2023
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
```

Page 4 of 4

**EXHIBIT H, Page 4 of 4**

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | |
| | ) | |
| KERRY PARIS, | ) | |
| | ) | No. 16 D 004685 |
| Petitioner/Counter-Respondent | ) | |
| | ) | Hon. Abbey Fishman Romanek |
| and | ) | |
| | ) | Calendar 94 |
| FRANK MARTIN PARIS, JR., | ) | |
| | ) | |
| Respondent/Counter-Petitioner. | ) | |

### BODY ATTACHMENT ORDER

This matter coming to be heard on the status of Respondent's purge from the Order of Adjudication of Indirect Civil Contempt entered on September 29, 2023, and Petitioner's Petition for Adjudication of Indirect Civil Contempt and For Other Relief (Failure to Pay STOUT Per the June 29, 2023 Order), Petitioner Kerry Paris, her counsel Thomas C. Cronin, counsel for Angelini, Ori + Abate, counsel for Lake Toback, counsel for Hurst Robin & Kay and counsel for Law Offices of Jonathan Merel, P.C. appearing in person, the Child Representative and Respondent's counsel appearing via Zoom, the Court being fully advised, **IT IS HEREBY ORDERED:**

     1.    Per the Court's September 29, 2023, Respondent/Obligor FRANK MARTIN PARIS, JR was ordered to appear in person in Room 3008 of the Daley Center at 11:00 a.m. today.

     2.    Without cause or explanation, Respondent/Obligor did not appear in person or via Zoom.

     3.    The Court having found and declared FRANK MARTIN PARIS, JR (Respondent/Obligor) to be in indirect civil contempt of Court for his willful failure to obey the Court's Judgment and Orders of May 5, 2023, May 17, 2023, May 18, 2023, June 29, 2023, July 6, 2023, and July 17, 2023.

     4.    This is Respondent's/Obligor's Body Attachment ordered by this court.

     5.    Respondent/Obligor shall post cash bond in the amount of One Million Six Hundred Seven Thousand Eight Hundred Fifty Dollars and 35 Cents ($1,607,850.35).

     6.    The Clerk of the Court is directed to prepare two certified copies of this Order for submittal to the Sheriff of Cook County.

**WHEREFORE, THE COURT ORDERS:**

1.  The Sheriff of Cook County, the Sheriff of any County in Illinois, or any duly deputized law enforcement agent to seize the Respondent/Obligor and bring him to Courtroom 3008 of the Richard J. Daley Center, 50 West Washington, Chicago, Illinois 60602 and to enter this Order into the LEADS System:

    **Name:** Frank Martin Paris, Jr. (AKA "Marty")   **Date of Birth:** November 23, 1968

    **Male**   **Height:** 5'9"   **Weight:** 160 pounds   **Race:** Caucasion

    **Last known home address:** 1100 Keystone Ave., River Forest, IL 60305
    **Alternate home address:** 822 Forest Ave., River Forest, IL 60305
    **Last known work address:** 1525 W. Homer Street, Suite 401, Chicago, IL 60642

2.  If Respondent/Obligor is taken into custody, the Sheriff/law enforcement agent may release the Respondent/Obligor after he shall deposit **One Million Six Hundred Seven Thousand Eight Hundred Fifty Dollars and 35 Cents ($1,607,850.35)** in escrow with the Sheriff or the Court pursuant to 750 ILCS 5/713(a).

3.  If the Respondent/Obligor is released pursuant to paragraph 2, the Sheriff shall then advise the Respondent/Obligor that further hearing on the Petition is continued to 21 to 30 days from the date of release and the Respondent/Obligor is required to appear at _____ a.m. on _____, 2023 at the Richard J. Daley Center, 50 W. Washington, Chicago, Illinois 60602, Room 3008.

    FAILURE OF RESPONDENT TO APPEAR AFTER POSTING ESCROW SHALL RESULT IN ANOTHER BODY ATTACHMENT.

4.  The conditions set forth on the next page apply to this order.

    **ENTERED:**

**SO ENTERED:** October 17, 2023      **BY: /S/Judge Abbey Fishman Romanek #2119**
                                      Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287
tcc@cronincoltd.com

ENTERED
Judge Abbey Romanek-2119
OCT 17 2023
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

**EXHIBIT I, Page 2 of 3**

**TO BE COMPLETED BY THE SHERIFF/LAW ENFORCEMENT AGENCY:**

I informed the Respondent/Obligor that his court date is at _____ a.m. on_____, 2023 at the time and location set forth in paragraph 3 of the Body Attachment Order, and informed him attendance is mandatory. A copy of this order was given to Respondent/Obligor.

**DATE:** _____  **SHERIFF:** _____

**RESPONDENT/OBLIGOR:** _____

## CONDITIONS OF THE BODY ATATCHMENT ORDER

1. A copy of this order is given by the Sheriff to the Respondent/Obligor.

2. THE CONTINUANCE DATE GIVEN BY THE SHERIFF/LAW ENFORCEMENT AGENCY TO THE RESPONDENT/OBLIGOR SHALL NOT BE LESS THAN 21 DAYS NOR MORE THAN 30 DAYS FROM THE DATE OF RELEASE, AND IF SUCH DATE FALLS ON A COURT HOLIDAY, THE HEARING WILL BE HELD ON THE NEXT REGULAR DAY THE COURT IS IN SESSION.

3. The Order is directed to any Sheriff of any County in Illinois.

4. The Clerk shall inform the legal counsel of the Petitioner/Obligee whose name appears on this order of the court date at which the Respondent/Obligor is required to appear.

5. If the Respondent/Obligor fails to appear on the next court date, the escrow deposited either with the Sheriff or the Clerk, pursuant to local rule, shall be sent immediately from the Clerk of the Circuit Court Bond Department to the Office of the Clerk of the Circuit Court, Child Support Division, Richard J. Daley Center, 50 West Washington Street, Room LL01, Chicago, Illinois 60602, to be applied toward child support arrearages unless otherwise ordered by the Court issuing this order.

6. The escrow is not subject to fees.

**EXHIBIT I, Page 3 of 3**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION**

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | |
| | ) | |
| KERRY PARIS, | ) | |
| | ) | No. 16 D 004685 |
| Petitioner/Counter-Respondent | ) | |
| | ) | Hon. Abbey Fishman Romanek |
| and | ) | |
| | ) | Calendar 94 |
| FRANK MARTIN PARIS, JR., | ) | |
| | ) | |
| Respondent/Counter-Petitioner. | ) | |

**ORDER OF ADJUDICATION OF INDIRECT CIVIL CONTEMPT**

This matter coming to be heard this date pursuant to rules to show cause directed to Respondent Frank Martin Paris, Jr (hereinafter "contemnor") to show cause, if any he has, why he should not be found in indirect civil contempt and sanctioned forthwith, for failure to comply with the Court's Judgment for Dissolution of Marriage and the Court's Orders of May 5, 2023, May 17, 2023, May 18, 2023, June 29, 2023, July 6, 2023, and July 17, 2023 directing contemnor (i) to pay Petitioner Kerry Paris child support of $7,500 per month and maintenance of $5,500 per month, and pay the monthly mortgage and real estate taxes on 703 and 711 Park Ave., River Forest; (ii) to reimburse the 503(g) Trust $3,553.57 within thirty (30) days of May 5, 2023; (iii) to tender a copy of his life insurance policies, which include a $2.5 million policy with Kerry Paris as the primary beneficiary, to Kerry's counsel and the Child Representative, no later than June 5, 2023; (iv) to pay Angelini, Ori & Abate Law ("AOA") $935,300 by July 6, 2023; (v) to pay Hurst, Robin & Kay ("HRK") fees in the amount of $150,548.68 by August 1, 2023; and (vi) to pay Lake Toback DiDomenico ("LTD") fees in the amount of $72,097.00 by August 1, 2023.

And the petitioner appearing with counsel via Zoom, the contemnor appearing via Zoom, and counsel for AOA, HRK and LTD each appearing via Zoom;

And the Court having heard from contemnor, having considered the findings of fact contained in the Judgment for Dissolution of Marriage and the Court's orders dated May 17, 2023, May 18, 2023, June 29, 2023 and July 6, 2023, together with all pleadings, exhibits, and arguments of counsel, and being fully advised in the premises, hereby finds:

1.      The Court has jurisdiction of the parties and the subject matter;

**Kerry's Petition**

2.      On December 2, 2022, this Court entered the Judgment for Dissolution of Marriage which directs contemnor (i) to pay Kerry Paris $7,500 in child support and $5,500 in maintenance on the 1st of each month and further directs contemnor to pay the mortgage and real estate taxes

on 703 Park Ave. and 711 Park Ave. as part of his child support obligations (Judgment at pp. 97-8), (ii) to fund a 503(g) Trust to secure Marty's maintenance and child support obligations (Judgment at p. 99); and (iii) to secure and maintain life insurance on his life in the amount of $2.5 million, and to provide a copy of the same to the Child Representative and counsel for Kerry Paris (Judgment at p., 100);

3. On May 5, 2023, as a result of Marty's failure to comply with his child support obligations, the Court ordered $3,553.57 to be paid from the 503(g) Trust to Kerry Paris and further ordered that Marty reimburse the 503(g) Trust $3,553.57 within 30 days;

4. On May 5, 2023, as a result of Marty's failure to comply with his obligation to secure and maintain the life insurance policy required by the Judgment, the Court ordered that Marty tender copies of his life insurance policies, which shall include a $2.5 million policy with Kerry Paris as the primary beneficiary, to Kerry's counsel and the Child Representative no later than June 5, 2023;

5. As of today's date, Marty has not reimbursed the 503(g) Trust the $3,553.57 as required by the Court's May 5, 2023 Order;

6. As of today's date, Marty has not tendered the life insurance policies required by the Judgment and the Court's May 5, 2023 Order;

7. Further, Marty did not make the child support, maintenance or mortgage payments required of him by the Judgment for the months of June, July, August and September 2023;

8. On August 11, 2023, Petitioner filed Petitioner's Petition for Adjudication of Indirect Civil Contempt and for Other Relief;

9. On August 15, 2023, the Court entered an Order providing that contemnor had until September 12, 2023 to file any response to the Petition, setting the matter for hearing/ruling on September 29, 2023 and expressly stating that: "Should the Court issue the Rule, it shall be issued *instanter* and the Court will proceed to a contempt hearing at that time";

10. Notwithstanding the Court's Order of August 15, 2023, contemnor did not file any response contesting the Petition;

11. On September 29, 2023, the Court issued its Order on Rule to Show Cause *instanter* as to why contemnor should not be held in indirect civil contempt of court for his willful failure to obey the Judgment and the Court's Order dated May 5, 2023;

**<u>AOA's Petition</u>**

12. On May 17, 2023 and May 18, 2023, the Court entered Orders granting Kerry's Petition for Contribution to Attorneys' Fees and Costs and ordering contemnor to pay $935,000 to AOA by paying the sum of $100,000 per month for a period of 9 months beginning June 1, 2023 with a final payment of $35,000 on March 1, 2024; provided, however, that a missed payment

**EXHIBIT J, Page 2 of 5**

without discussion, consultation or plan for payment would result in the entire balance being due and owing;

13.     Further, the Court expressly found that contemnor "does have the ability to pay" the fees to AOA;

14.     Marty did not make any payments to AOA on June 1, 2023.  Accordingly, on July 6, 2024, the Court entered an Order finding the entire sum due and owing;

15.     As of today's date, contemnor has not paid AOA any of the fees ordered;

16.     On August 15, 2023, the Court issued its Order on Rule to Show Cause as to why contemnor should not be held in indirect civil contempt of court for his willful failure to obey the Court's Orders dated May 17, 2023, May 18, 2023 and July 6, 2023;

17.     On August 15, 2023, the Court entered an Order providing that contemnor had until September 12, 2023 to file any response to the Petition for Rule to Show Cause and Finding of Indirect Civil Contempt of Court, and Other Relief (Failure to Pay Angelini Ori + Abate Law);

18.     Notwithstanding the Court's Order of August 15, 2023, contemnor did not file any response contesting AOA's Petition;

**HRK's Petition**

19.     On June 29, 2023, this Court entered an Order granting HRK's Petition for Attorneys' Fees in the amount of $150,548.68 and ordering contemnor to pay HRK such amount in full by August 1, 2023;

20.     The Court's Order expressly found that contemnor "does have the ability to pay" HRK's fees;

21.     As of today's date, contemnor has not paid HRK any of the fees ordered;

22.     On August 15, 2023, the Court issued its Order on Rule to Show Cause as to why contemnor should not be held in indirect civil contempt of court for his willful failure to obey the Court's Order dated June 29, 2023;

23.     On August 15, 2023, the Court entered an Order providing that contemnor had 28 days to respond to the Petition for Rule to Show Cause and Finding of Indirect Civil Contempt of Court and for Other Relief filed by HRK;

24.     Notwithstanding the Court's Order of August 15, 2023, contemnor did not file any response contesting HRK's Petition;

**LTD's Petition**

25.     By Orders dated June 29, 2023 and July 17, 2023, this Court granted LTD's Petition for Attorneys' Fees in the amount of $72,097.00 and ordered contemnor to pay LTD such amount by August 1, 2023;

26.     The Court's Order expressly found that contemnor "does have the ability to pay" LTD's fees;

27.     As of today's date, contemnor has not paid LTD any of the fees ordered;

28.     On August 18, 2023, LTD filed its Petition for Rule to Show Cause and Adjudication of Indirect Civil Contempt;

29.     On August 22, 2023, the Court issued its Order on Rule to Show Cause as to why contemnor should not be held in indirect civil contempt of court for his willful failure to obey the Court's Orders dated June 29, 2023 and July 17, 2023;

30.     Contemnor has not filed any response contesting LTD's Petition;

**Findings Relevant to All Petitions**

31.     The Judgment for Dissolution of Marriage expressly found that: contemnor placed the value of his own business interests at $23,428,000 (page 58); the mean value of contemnor's non-marital estate is $20,374,000 (page 58); contemnor controls issuance of dividends and interest in the various entities in which he holds financial interests vis-à-vis Sedgwick, Maeve, Martin NV II., Inc. (Page 69); contemnor controls his own salary (page 69); and contemnor does have sufficient income and/or resources to make provision for the financial support and maintenance of KERRY and the Paris Children (page 70);

32.     The contemnor has not given any legally sufficient reasons for failure to comply with said Judgment and the Court's Orders of May 5, 2023, May 17, 2023, May 18, 2023, June 29, 2023, July 6, 2023, and July 17, 2023, even though he had, and still has, the means to comply with said Judgment and orders;

33.     The contemnor's failure to comply with said Judgment and orders is willful and contumacious.  Further, the conduct of the contemnor has defeated and impaired the rights and interests of the petitioners and has further impeded and obstructed the Court in its administration of justice; and

        **IT IS THEREFORE ORDERED AND ADJUDGED** that the contemnor Frank Martin Paris, Jr.:

Is hereby found and declared to be in indirect civil contempt of Court for willful failure to obey the Court's Judgment and the Court's Orders of May 5, 2023, May 17, 2023, May 18, 2023, June 29, 2023, July 6, 2023, and July 17, 2023, as stated herein;

**EXHIBIT J, Page 4 of 5**

Is ordered to take the following actions no later than October 16, 2023, in order to purge his indirect civil contempt:

a. Pay the sum of One Hundred Thousand Dollars ($100,000.00) to the 503(g) Trust;

b. Tender copies of his life insurance policies, which shall include a $2.5 million policy with Kerry Paris as the primary beneficiary, to Kerry's counsel and the Child Representative;

c. Pay Angelini, Ori & Abate Law the sum of $935,300 plus statutory interest of 9% ($230.62 per day) running from July 6, 2023 through the date of payment;

d. Pay Hurst, Robin & Kay the sum of $150,548.68 plus statutory interest of 9% ($37.12 per day) running from August 1, 2023 through the date of payment;

e. Pay Lake Toback DiDomenico the sum of $72,097.00 plus statutory interest of 9% ($17.78 per day) running from August 1, 2023 through the date of payment.

This matter is set for status on contemnor's purge on October 17, 2023, at 11:00 a.m. in Courtroom 3008 of the Richard J, Daley Center, 50 W. Washington Street, Chicago, Illinois 60602. **Frank Martin Paris, Jr. and Kerry R. Paris are ordered to appear in person in Courtroom 3008 for the October 17, 2023, status hearing.**

Failure of contemnor to purge his contempt by that date will subject him to the possibility of coercive sanctions, including the issuance of a body attachment and commitment to the Cook County Jail.

**ENTERED:  10-20-2023 nunc pro tunc 09-29-2023**

**SO ENTERED**: September 29, 2023          **BY**:/S/**Judge Abbey Fishman Romanek  #2119**
                                             Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287

**EXHIBIT J, Page 5 of 5**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION

IN RE THE MARRIAGE OF:    )
    )
KERRY PARIS,    )
    )    No. 16 D 004685
    Petitioner/Counter-Respondent    )
    )    Hon. Abbey Fishman Romanek
and    )
    )    Calendar 94
FRANK MARTIN PARIS, JR.,    )
    )
    Respondent/Counter-Petitioner.    )

### ORDER

This matter coming to be heard on (i) Petitioner's Petition for Adjudication of Indirect Civil Contempt and for Other Relief (Failure to Pay June, July, August Maintenance and Child Support, Failure to Reimburse 503(g) Trust, Failure to Provide Life Insurance), (ii) Petition for Rule to Show Cause and Finding of Indirect Civil Contempt of Court, and Other Relief (Failure to Pay Angelini Ori + Abate Law) and (iii) Petition for Rule to Show Cause For Indirect Civil Contempt and Other Relief (Failure to Pay Hurst, Robin & Kay, LLC), (iv) Petition for Rule to Show Cause and Adjudication of Indirect Civil Contempt (Failure to Pay Lake Toback DiDomenico), (v) Petitioner's and Child Representative's Joint Motion to Enforce the Judgment (Failure to Replenish the Children's Activities Trust Account), (vi) Petitioner's Petition for Adjudication of Indirect Civil Contempt and for Other Relief (Failure to Pay STOUT), and (vii) Motion of Frank Martin to Continue All Pending Matters, the parties, Petitioner's counsel, the Child Representative, and counsel for AOA, HRK, LTD and the Law Offices of Jonathan Merel each appearing via Zoom, the Court being fully advised, **IT IS HEREBY ORDERED:**

    1.    With respect to Petitioner's Petition for Adjudication of Indirect Civil Contempt and for Other Relief (Failure to Pay June, July, August Maintenance and Child Support, Failure to Reimburse 503(g) Trust, Failure to Provide Life Insurance):

    a.    the Court finds that a prima facie case of indirect civil contempt has been shown by the verified petition; and

    b.    a rule hereby issues *instanter* against Frank Martin Paris, Jr. to show cause why he should not be held in contempt of Court for his failure (i) to pay Kerry Paris $7,500 in child support and $5,500 in maintenance on the 1st of each month (for June, July, August and September 2023) and failure to pay the mortgage for 711 Park Ave (for June, July, August and September 2023) as required by pages 97-98 of the Judgment; (ii) to reimburse the 503(g) Trust $3,553.57 as required by the Court's Order dated May 5, 2023; and (iii) tender copies of his life insurance policies, which shall include a $2.5 million policy with Kerry Paris as the primary

**EXHIBIT K, Page 1 of 2**

beneficiary, to Kerry's counsel and the Child Representative as required by page 100 of the Judgment and by the Court's Order dated May 5, 2023.

2.      As set forth in the separate Order of Adjudication of Indirect Civil Contempt, the Court adjudicates Frank Martin Paris, Jr. to be in indirect civil contempt of court for his willful failure to comply with the Judgment and the Court's Orders of May 5, 2023, May 17, 2023, May 18, 2023, June 29, 2023, July 6, 2023, and July 17, 2023.

3.      Marty is given 14 days (until October 13, 2023) to file any response to the Petitioner's and Child Representative's Joint Motion to Enforce the Judgment (Failure to Replenish the Children's Activities Trust Account). This motion is set for hearing and/or ruling on October 17, 2023, at 11:00 a.m.

4.      Marty is given 14 days (until October 13, 2023) to file any response to the Petitioner's Petition for Adjudication of Indirect Civil Contempt and for Other Relief (Failure to Pay STOUT). This motion is set for hearing and/or ruling on October 17, 2023, at 11:00 a.m. If a Rule to Show Cause is issued, it shall issue *instanter* and the Court may proceed to a contempt hearing at that time.

5.      All other matters are entered and continued until **October 17, 2023 at 11:00 a.m. in person.**

        **ENTERED: 10-20-2023 nunc pro tunc 09-29-2023**


**SO ENTERED:** September 29, 2023      **BY: /S/Judge Abbey Fishman Romanek #2119**
                                        Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287

ENTERED
Judge Abbey Romanek-2119
OCT 20 2023
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

**EXHIBIT K, Page 2 of 2**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION

IN RE THE MARRIAGE OF: )
)
KERRY PARIS, )
)
    Petitioner/Counter-Respondent )
)
and )
)
FRANK MARTIN PARIS, JR., )
)
    Respondent/Counter-Petitioner. )

No. 16 D 004685

Hon. Abbey Fishman Romanek

Calendar 94

**ENTERED**
Judge Abbey Romanek-2119

**JAN 1 0 2023**

IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

**ORDER OF ADJUDICATION OF INDIRECT CIVIL CONTEMPT AND ORDER OF COMMITMENT**

4210ᴿ
4674
4569
4437

    This matter coming to be heard this date pursuant to a rule to show cause directed to Respondent Frank Martin Paris, Jr (hereinafter "contemnor") to show cause, if any he has, why he should not be found in indirect civil contempt and sanctioned forthwith, for failure to comply with the Court's Judgment for Dissolution of Marriage and the Court's Orders of December 20, 2022, November 18, 2022, June 4, 2020 and December 12, 2017, directing contemnor (i) to pay Petitioner Kerry Paris child support of $7,500 on January 1, 2023, maintenance of $5,500 on January 1, 2023, and support of $8,000 (for November and December 2022); and (ii) to pay the mortgage and real estate taxes on 703 Park Ave. and 711 Park Ave., River Forest, Illinois;

    And the petitioner appearing with counsel via Zoom, and the contemnor likewise appearing via Zoom;

    And the Court having heard from contemnor, having considered the findings of fact contained in the Judgment for Dissolution of Marriage and the Court's November 18, 2022 Order together with all pleadings, exhibits, and arguments of counsel, and being fully advised in the premises, hereby finds:

    1.    The Court has jurisdiction of the parties and the subject matter;

    2.    On December 2, 2022, this Court entered the Judgment for Dissolution of Marriage which directs contemnor to pay Kerry Paris $7,500 in child support and $5,500 in maintenance on January 1, 2023 and further directs contemnor to pay the mortgage and real estate taxes on 703 Park Ave. and 711 Park Ave. as part of his child support obligations (Judgment at pp. 97-8);

    3.    On December 20, 2022, this Court entered an Order directing contemnor to pay $8,000 to Kerry Paris by 5:00 p.m. on December 20, 2022. This same amount was ordered to be

paid to Kerry Paris in the Court's Orders of November 18, 2022, June 4, 2020 and December 12, 2017;

4. On November 18, 2022, this Court entered an Order directing contemnor to make current and pay all amounts due (including principal, interest, taxes and insurance and any late or other associated expenses) on the mortgage secured by the marital residence, by December 19, 2022, and to provide proof of the same to Kerry Paris and the Court. These same expenses were ordered to be paid by contemnor in the Court's Order of December 12, 2017;

5. As of January 6, 2023, the contemnor has failed: to pay Kerry Paris the $7,5000 in child support and $5,500 in maintenance due on January 1, 2023; failed to pay Kerry Paris the $8,000 in support due on December 20, 2022 (and previously ordered paid in November and December 2022); to make current and pay the mortgage and real estate taxes due JP Morgan on 711 Park Ave., River Forest; and to make current and pay the real estate taxes due on 703 Park Ave.

6. The Judgment for Dissolution of Marriage expressly found that: Marty does have sufficient income and/or resources to make provision for the financial support and maintenance of KERRY and the Paris Children (page 70); Marty controls his own salary (page 69); and Marty controls issuance of dividends and interest in the various entities in which he holds financial interests vis-à-vis Sedgwick, Maeve, Martin NV II., Inc. (Page 69).

7. The contemnor has not given any legally sufficient reasons for failure to comply with said Judgment and orders, even though he had, and still has, the means to comply with said Judgment and orders, and that contemnor's failure to comply with said Judgment and orders is willful and contumacious;

8. The conduct of the contemnor has defeated and impaired the rights and interests of the petitioner and has further impeded and obstructed the Court in its administration of justice; and

**IT IS THEREFORE ORDERED AND ADJUDGED** that the contemnor:

Is hereby found and declared to be in indirect civil contempt of Court for willful failure to obey the Court's Judgment and orders as stated herein;

Is ordered committed to the Cook County Jail, there to remain until he shall have purged himself of contempt by posting the sum of Five Hundred Thousand Dollars and No Cents ($500,000.00) with the Clerk of the Circuit Court.

The Clerk of the Court is directed to prepare two certified copies of this Order and submit the same to the Sheriff of Cook County.

**EXHIBIT L, Page 2 of 3**

**ENTERED:  01-10-2023 nunc pro tunc 01-06-2023**

**SO ENTERED:**                          BY:  /S/Judge Abbey Fishman Romanek  #2119
                                             Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287

Page 3 of 3

**EXHIBIT L, Page 3 of 3**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION

IN RE THE MARRIAGE OF:                     )
                                           )
KERRY PARIS,                               )
                                           )        No. 16 D 004685
     Petitioner/Counter-Respondent       )
                                           )        Hon. Abbey Fishman Romanek
and                                        )
                                           )        Calendar 94
FRANK MARTIN PARIS, JR.,                   )
                                           )
     Respondent/Counter-Petitioner.      )

**ENTERED**
Judge Abbey Romanek -2119
**JAN 1 0 2023**
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

### BODY ATTACHMENT ORDER

This matter coming to be heard on the Emergency Petition for Adjudication of Indirect Civil Contempt and for Other Relief, Petitioner KERRY PARIS appearing through counsel and Respondent FRANK MARTIN PARIS, JR. appearing *pro se* via Zoom, the Court being fully advised, **IT IS HEREBY ORDERED:**

    1.    The Court having found and declared FRANK MARTIN PARIS, JR (Respondent/Obligor) to be in indirect civil contempt of Court for his willful failure to obey the Court's Judgment and support orders requiring the payment of child support and maintenance to KERRY PARIS and the payment of the mortgage and real estate taxes at 703 Park Ave. and 711 Park Ave., River Forest, Illinois.

    2.    This is Respondent's/Obligor's Body Attachment ordered by this court.  4288

    3.    Respondent/Obligor shall post bond in the amount of Five Hundred Thousand Dollars and No Cents ($500,000.00).

    4.    The Clerk of the Court is directed to prepare two certified copies of this Order for submittal to the Sheriff of Cook County.

---

**WHEREFORE, THE COURT ORDERS:**

1.    The Sheriff of Cook County, the Sheriff of any County in Illinois, or any duly deputized law enforcement agent to seize the Respondent/Obligor and bring him to Courtroom 3008 of the Richard J. Daley Center, 50 West Washington, Chicago, Illinois 60602 and to enter this Order into the LEADS System:  9400

    **Name:** Frank Martin Paris, Jr. (AKA "Marty")    **Date of Birth:** November 23, 1968

**EXHIBIT M, Page 1 of 3**

**Male**         **Height:** 5'9"         **Weight:** 160 pounds         **Race:** Caucasion

**Last known home address:** 1100 Keystone Ave., River Forest, IL 60305
**Last known work address:** 1525 W. Homer Street, Suite 401, Chicago, IL 60642

2.  If Respondent/Obligor is taken into custody, the Sheriff/law enforcement agent may release the Respondent/Obligor after he shall deposit **Five Hundred Thousand Dollars and No Cents ($500,000.00)** in escrow with the Sheriff or the Court pursuant to 750 ILCS 5/713(a).

3.  If the Respondent/Obligor is released pursuant to paragraph 2, the Sheriff shall then advise the Respondent/Obligor that further hearing on the Petition is continued to 21 to 30 days from the date of release and the Respondent/Obligor is required to appear at _____ a.m. on _____, 2023 at the Richard J. Daley Center, 50 W. Washington, Chicago, Illinois 60602, Room 3008.

    FAILURE OF RESPONDENT TO APPEAR AFTER POSTING ESCROW SHALL RESULT IN ANOTHER BODY ATTACHMENT.

4.  The conditions set forth on the next page apply to this order.

**ENTERED:  01-10-2023 nunc pro tunc 01-06-2023**

**SO ENTERED:**         **BY  /S/Judge Abbey Fishman Romanek  #2119**
                                    Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287
tcc@cronincoltd.com

Page 2 of 3

**EXHIBIT M, Page 2 of 3**

**TO BE COMPLETED BY THE SHERIFF/LAW ENFORCEMENT AGENCY:**

I informed the Respondent/Obligor that his court date is at _____ a.m. on_____, 2023 at the time and location set forth in paragraph 3 of the Body Attachment Order, and informed him attendance is mandatory. A copy of this order was given to Respondent/Obligor.


**DATE:** _____     **SHERIFF**: _____


                                **RESPONDENT/OBLIGOR:** _____


**CONDITIONS OF THE BODY ATATCHMENT ORDER**

1.      A copy of this order is given by the Sheriff to the Respondent/Obligor.

2.      THE CONTINUANCE DATE GIVEN BY THE SHERIFF/LAW ENFORCEMENT AGENCY TO THE RESPONDENT/OBLIGOR SHALL NOT BE LESS THAN 21 DAYS NOR MORE THAN 30 DAYS FROM THE DATE OF RELEASE, AND IF SUCH DATE FALLS ON A COURT HOLIDAY, THE HEARING WILL BE HELD ON THE NEXT REGULAR DAY THE COURT IS IN SESSION.

3.      The Order is directed to any Sheriff of any County in Illinois.

4.      The Clerk shall inform the legal counsel of the Petitioner/Obligee whose name appears on this order of the court date at which the Respondent/Obligor is required to appear.

5.      If the Respondent/Obligor fails to appear on the next court date, the escrow deposited either with the Sheriff or the Clerk, pursuant to local rule, shall be sent immediately from the Clerk of the Circuit Court Bond Department to the Office of the Clerk of the Circuit Court, Child Support Division, Richard J. Daley Center, 50 West Washington Street, Room LL01, Chicago, Illinois 60602, to be applied toward child support arrearages unless otherwise ordered by the Court issuing this order.

6.      The escrow is not subject to fees.

**EXHIBIT M, Page 3 of 3**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION

IN RE THE MARRIAGE OF:           )
                                 )
KERRY PARIS,                     )
                                 )        No. 16 D 004685
        Petitioner/Counter-Respondent )
                                 )        Hon. Abbey Fishman Romanek
and                              )
                                 )        Calendar 94
FRANK MARTIN PARIS, JR.,         )
                                 )
        Respondent/Counter-Petitioner. )

**ENTERED**
Judge Abbey Romanek-2119
**JAN 1 0 2023**
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

**ORDER**

This matter coming to be heard on the Emergency Petition for Adjudication of Indirect Civil Contempt and for Other Relief, Petitioner KERRY PARIS appearing through counsel and Respondent MARTY PARIS appearing *pro se* via Zoom, the Court being fully advised, **IT IS HEREBY ORDERED:**

1.    The Court finds that the Emergency Petition for Adjudication of Indirect Civil Contempt and for Other Relief states an emergency.

2.    A rule to show cause is issued *instanter* against Respondent MARTY PARIS to show cause why he should not be held in indirect civil contempt for:

    a.  failing to pay Petitioner KERRY PARIS $7,500 in child support and $5,500 in maintenance on January 1, 2023, as required by pages 97 to 98 of the Judgment;

    b.  failing to pay the mortgage and real estate taxes on 711 Park, as required by pages 97 to 98 of the Judgment and the Court's November 18, 2022 and December 12, 2017 Orders;

    c.  failing to pay the real estate taxes on 703 Park, as required by pages 97 to 98 of the Judgment and the Court's November 18, 2022 and December 12, 2017 Orders; and

    d.  failing to pay KERRY PARIS $8,000 in support for November and December 2022, as required by the Court's December 20, 2022, November 18, 2022, June 4, 2020 and December 12, 2017 Orders;

3.    At the hearing, MARTY PARIS did not dispute that that he has not paid any of the amounts due and owing under the Judgment and the Court's various support orders. Rather,

4262 R
4251 P
4608 P
4217
4569

Page 1 of 2

**EXHIBIT N, Page 1 of 2**

Mr. Paris stated that having seven (7) children does not "entitle" Mrs. Paris to be paid funds from him.

4.      The Court holds MARTY PARIS in indirect civil contempt of Court for the reasons set forth in the accompanying Order of Adjudication of Indirect Civil Contempt and Order of Commitment.

5.      Petitioner's counsel is directed to prepare a Body Attachment Order setting cash bond in the amount of $500,000.

6.      Petitioner is granted leave to file liens against any real or personal property owned by MARTY PARIS in order to secure and enforce his obligations.

7.      Petitioner is granted leave to file a petition for attorneys' fees and costs related hereto under 750 ILCS 5/508(b)

8.      This matter entered and continued to January 25, 2023 at 10:00 a.m.

**ENTERED:  01-10-2023 nunc pro tunc 01-06-2023**

**BY  /S/Judge Abbey Fishman Romanek  #2119**
Abbey Fishman Romanek

*Prepared By:*
Cronin & Co., Ltd.
Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, Illinois 60602
Tel. 312.500.2100
Firm No. 37287

Page 2 of 2

**EXHIBIT N, Page 2 of 2**

4210 - Held In Contempt Of Court - Allowed
4437 - Law Enforcement Agency to Comply - Allowed
4676 - Party to Purge - Allowed
4309 - Bond Set At - Allowed
9203 - Stay Of Execution
4436 - Clerk's Office to Comply - Allowed

EXHIBIT O

(Rev. 9/22/11) CCDR N032 A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION**

*Judge Timothy P. Murphy*

*NOV 23 2022*

*Circuit Court - 1892*

IN RE: THE MARRIAGE/CIVIL UNION OF

KERRY PARIS

**PETITIONER**

AND

FRANK MARTIN PARIS, JR

**RESPONDENT**

NO: 16 D 4685

CALENDAR: _____

## ORDER OF ADJUDICATION OF INDIRECT CIVIL CONTEMPT AND / OR ORDER OF COMMITMENT

This cause being heard this date pursuant to a rule to show cause directed to

_____Frank Martin Paris, Jr_____ (hereinafter "contemnor") to show cause, if any s/he has,
(name)

why s/he should not be found in indirect civil contempt and sanctioned forthwith, for failure to comply with the Court's

order entered on _November 18, 2022_, directing contemnor to ~~$~~ pay: i) $1,034.24 to the
Village of River Forest for water & refuse service; ii) $314.28 to Nicor Gas; iii) $859.21
to Comcast; and iv) $3850 to Kerry paris for october 2022 support by 11/22/22.

And the ~~Petitioner~~/Respondent appearing:  not appearing having been ~~given notice by~~
☑ in person and ☑ with counsel, and the contemnor ~~likewise appearing~~ ☐ in person and ☐ with counsel;
2mail on 11/22/22 and 11/23/22, text message by counsel, voicemail by counsel, phone call to contemnor
And the Court, having heard the testimony of the parties and witnesses, together with all pleadings, exhibits, and
arguments of counsel, and being fully advised in the premises, hereby finds that:
The Court having heard petitioner's testimony regarding nonpayment of the utilities
1. The Court has jurisdiction of the parties and subject matter; bills

2. On the _18th_ day of _November_, _2022_ this Court entered an order directing the
contemnor to pay: i) $1,034.24 to the village of River Forest; ii) $314.28 to
Nicor Gas; iii) $859.21 to Comcast; and iv) $3850 to Kerry Paris, by
11/22/22 at 5:00 p.m.

3. As of the _23rd_ day of _November_, _2022_, contemnor has failed to: pay
i) $1,034.24 to the Village of River Forest; ii) $314.28 to Nicor Gas;
iii) $859.21 to Comcast; and iv) $3850 to Kerry Paris, by 11/22/22
at 5:00 pm.

* place of business by counsel, text message by petitioner, and via Talking
Parents

Page 1 of 2

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**EXHIBIT O, Page 1 of 2**

(Rev. 9/22/11) CCDR N032 B

4. The contemnor has not given any legally sufficient reasons for failure to comply with said order, even though s/he had, and still has, the means to comply with said order, and that contemnor's failure to comply with said order is willful and contumacious;

5. The conduct of the contemnor has defeated and impaired the rights and interests of the Petitioner/Respondent and has further impeded and obstructed the Court in its administration of justice; and

**IT IS THEREFORE ORDERED AND ADJUDGED** that the contemnor:

4210 ☑ Is hereby found and declared to be in indirect civil contempt of Court for willful failure to obey the Court's order as herein stated;

4437 ☑ Is ordered committed to the Cook County Jail, there to remain until s/he shall have purged him/herself of contempt by:

paying: i) $1031.24 to the Village of River Forest; ii) $34.28 to Nicor Gas; iii) $859.21 to Comcast; and iv) $3850 to Kerry Paris.

9203  ☐ Commitment is stayed until _____, _____ s/he purges the contempt by
4676

posting $ _____ with the Clerk of the Circuit Court.

4436 ☑ The Clerk of the Court is directed to prepare a certified copy of this Order and submit same to the Sheriff of Cook County.

☑ The Sheriff shall enter this order into the LEADS system.

The return date for contemnor is December 21, 2022 at 10:15 a.m. before Judge Romanek, Calendar #94. Daley Center. 50 W. Washington. Room 3008

Atty. No.: 59586
Name: Carly Kenny
Atty. for: Petitioner
Address: 155 N Michigan Ave #400
City/State/Zip: Chicago, IL 60601
Telephone: (312) 621-0000

Entered: _____, _____

_____
Judge                                    Judge's No.

11/23/22

Page 2 of 2

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**EXHIBIT O, Page 2 of 2**